1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5         v.                              Case No. 19-20052-JAR

6    FENG TAO, a/k/a "Franklin
     Tao,"                                Kansas City, Kansas
7                                         Date:  15 October, 2021
          Defendant.
8    ........................

9                 TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE JULIE A. ROBINSON
10            UNITED STATES CHIEF DISTRICT COURT JUDGE

11
                     A P P E A R A N C E S
12

13   For the Plaintiff:

14   Mr. Adam Berry               Mr. Christopher Oakley
     U.S. DEPARTMENT OF JUSTICE   U.S. ATTORNEY'S OFFICE
15   950 Pennsylvania Avenue, NW  500 State Avenue
     Washington, D.C. 20530       Suite 360
                                  Kansas City, Kansas 66101
16

17   For the Defendant:

18   Mr. Michael F. Dearington
     Mr. Peter R. Zeidenberg
19   ARENT FOX, LLP
     1717 K Street NW
20   Washington, D.C. 20006

21

22

23

24   _____
             Proceedings recorded by machine shorthand,
25      transcript produced by computer-aided transcription.

1

                              I N D E X

2

     Government's Witnesses:                                    Page

3

     GLENN TIFFERT
4       Direct Examination by Mr. Barry                      28
        Cross-Examination by Mr. Dearington                  77

5

6

                            E X H I B I T S

7

        Government's
8       Exhibits                    Offered              Received

9          1 - 7                      45                    45

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  We are back on the record in The United

3    States versus Tao.  And Dr. Tao is here, and all counsel are

4    present from yesterday.

5          All right.  So I think where we're at this point is

6    Document 154, which is motion *in limine* No. 4, to exclude

7    expert testimony, Defendant's motion.

8          All right.  So let's proceed with that.

9          MR. DEARINGTON:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MR. DEARINGTON:  So, Your Honor, motion *in limine*

12   No. 4 covers a number of proposed experts.  Motion *in limine*

13   No. 2, much of which was argued yesterday, also includes --

14   seeks to exclude the expert testimony of Mr. Tiffert, who I

15   believe is here today.

16         So would Your Honor like for us to start with that one

17   since Mr. Tiffert is present?

18         THE COURT:  Yes.  That makes sense.

19         MR. DEARINGTON:  Great.  We'd like to respectfully

20   request that Mr. Tiffert not be present during this argument as

21   we'll be raising a number of issues that we plan to examine him

22   about, and we'd rather not have him hear those points in

23   advance.

24         THE COURT:  All right.  There should be an open -- are

25   those witness rooms unlocked, Bonnie?

```
1              COURTROOM DEPUTY:  They should be unlocked, but I will
2    check.
3              MR. DEARINGTON:  Thank you, Your Honor.
4              Your Honor, the defense moves to exclude Mr. Tiffert
5    as an expert --
6              MR. BARRY:  Sorry.  Would you mind waiting until my
7    co-counsel --
8              MR. DEARINGTON:  I apologize.
9              Ready to proceed, Your Honor?
10             THE COURT:  Yes.
11             MR. DEARINGTON:  Thank you.
12             We move to exclude Mr. Tiffert as an expert under
13   Rules 401, 403, 702, and *Daubert*, and also contend that the
14   Rule 16 disclosure for Mr. Tiffert is inadequate.
15             Yesterday, the Court heard argument on a lot of the
16   Rule 401 and Rule 403 challenges that we've asserted as to
17   Mr. Tiffert.  And I -- because the Court has indicated that it
18   is inclined to rule, according to our understanding, that
19   Mr. Tiffert may be able to testify about the Changjiang
20   Scholars Program and the expectations of Fuzhou University
21   under that program but not the CCP's involvement in talent
22   plans, talent plans at large, PRC political system, the PRC
23   government's national development goals, competition with the
24   U.S., censorship, or intellectual property theft, we will limit
25   our argument to just the Changjiang Scholars Program and Fuzhou
```

1   University's expectations under that program for today's

2   argument.  But we maintain our arguments in our papers as to

3   the 401 and 403 grounds of those other issues.

4          There is one footnote to that that I would like to say

5   as an aside, which I believe yesterday the government and

6   possibly the Court discussed the picture that purports to be

7   Dr. Tao.  And the Court may have left open a window for some

8   testimony from Mr. Tiffert about the Communist Party if, in

9   fact, the person in the picture was a member and an official of

10  the Communist Party.

11         But I think that's actually based on an inaccuracy,

12  which is that the picture would show Dr. Tao -- purports to

13  show Dr. Tao and a member -- an official at Fuzhou University,

14  so we contend that that is not an exception to what the Court's

15  inclination is to exclude evidence of the Communist Party and

16  its involvement in talent plans.

17         THE COURT:  I think what the government said yesterday

18  was that the other individual was the party secretary -- and

19  the government can clarify this -- was party secretary, but it

20  sounded to me like had some sort of appointment or some

21  relationship with Fuzhou University too.  So it was perhaps

22  both, so I did want to hear more about that today.

23         MR. DEARINGTON:  Sure, Your Honor.

24         And I'll -- I'm happy to return to that, or I can

25  argue about it right now, but I think for present purposes, if

1   the government is able to establish that this particular

2   official in the picture is operating in his capacity -- is

3   identified and authenticated to be a person who is within the

4   Communist Party of China, we would still object on relevance

5   and prejudice grounds because we don't -- first of all, that

6   picture and the caption of it -- at least the caption is

7   hearsay.

8          And the government hasn't been able to satisfy an

9   exception to the rule against hearsay and its hint that the

10  public records exception is belied by its effective admission

11  that it doesn't have a certification, that this is actually an

12  authentic public record of China, such that the caption would

13  be taken as true.  In particular, that's exacerbated by the

14  fact that it appears to be a social media website that we're

15  talking about, not even a Fuzhou or PRC government website.

16         So the caption, all of the information that might

17  allow this picture to have some relevance is all inadmissible,

18  so we don't think that the picture is even an issue at trial or

19  something that can be admitted.

20         Certainly, if the government would like to try to

21  authenticate the picture and just admit it as a standalone

22  picture, we will consider whether we have an objection on that

23  ground.  I could think of some potential hearsay arguments,

24  even though pictures generally are not hearsay.  But they can

25  be used in different ways, so we would reserve our rights

1    there.

2           But we don't think that's actually going to be an

3    issue at trial since this is inadmissible in the first place,

4    so we'd rather not have a ruling that opens the door to the

5    government bringing in testimony that the Court has already

6    seemed inclined to find prejudicial about the Communist Party

7    based entirely on this picture that's likely not coming in

8    anyway.

9           So, Your Honor, as I mentioned at the outset, we're

10   going to focus our argument today, in light of the Court's

11   inclinations expressed yesterday, on the Changjiang Scholar

12   Program and Fuzhou University's expectations under that

13   program.

14          And our contention is that Mr. Tiffert is not an

15   expert on those particular topics and his testimony and

16   opinions to be proposed by the government are not reliable and

17   cannot reliably be applied to the facts.  The government has

18   therefore failed its burden to satisfy Rule 702 and *Daubert*.

19          Beginning with Mr. Tiffert's qualifications.  He is

20   identified repeatedly as a Chinese legal historian, not an

21   expert of the Changjiang Scholar Program or even academia *writ*

22   *large* in China.  His Ph.D. is in history and his dissertation

23   focused on the Chinese judiciary from 1906 to 1958.  His

24   studies apparently had nothing to do with the Changjiang

25   Scholar Program or even talent plans, which is an overbroad

1    topic in its own right.

2           Since then, he worked at the Hoover Institution, but

3    his Hoover website indicates that he has expertise in Asia,

4    China, communism, contemporary history, cybersecurity, and law.

5    This is a very broad expression of expertise, and yet it does

6    not even fit within it under that umbrella the Changjiang

7    Scholar Program or Chinese academia or Fuzhou University.

8           He has published no books or academic articles, that

9    we're aware of, about the Changjiang Scholar Program or any

10   talent plans, at least not that focused on them.

11          And the government's response to our argument in its

12   opposition brief confirms that point.  The government attached

13   three exhibits of writings that it has attributed or associated

14   with Mr. Tiffert.  And a canvass of those three writings

15   demonstrates why Mr. Tiffert is not a Changjiang expert.

16          Exhibit C is a 276-page report called *China's*

17   *Influence & American Interests*.  That title alone betrays any

18   focus on the Changjiang Scholar Program.  But when you open the

19   book, you can see that it was apparently edited or written by

20   Larry Diamond and Orville Schell, not Mr. Tiffert.

21          Two paragraphs, 142 pages into the book, and one

22   paragraph, 147 pages into the book, reference a different

23   talent program, the Thousand Talents Program, not the

24   Changjiang Scholar Program.  The Thousand Talents Program is

25   not at issue here, of course.  There is no mention of the

1    Changjiang Scholar Program in the book that we're aware of.

2         In addition, the references buried among hundreds of

3    pages of writing on other topics written by other -- apparently

4    written, or at least edited, by other individuals, merely

5    footnotes to the Thousand Talents Program website.  Of course,

6    anyone can click on the Thousand Talents Program website and

7    parrot whatever it says in a book.  That, an expert does not

8    make.

9         On page 263, it states that Mr. Diamond and

10   Mr. Schell's report is an outgrowth of discussions with 23

11   individuals, one of whom, apparently, was Mr. Tiffert.  But it

12   does not state that Mr. Tiffert even contributed to the report,

13   let alone that he contributed the sparse sentences about the

14   Thousand Talents Program, which is not the Changjiang Scholar

15   Program.

16        So Exhibit C provides nothing and, if anything,

17   confirms our point.  If this is some of the best evidence that

18   the government can marshal to show Dr. -- or Mr. Tiffert's

19   expertise in the Changjiang program, it has failed.

20        Exhibit B is a ten-page online pamphlet offered by

21   Mr. Tiffert entitled *Compromising the Knowledge Economy:*

22   *Authoritarian Challenges to Independent Intellectual Inquiry*.

23   And it focused on a number of authoritarian regimes around the

24   world in those ten pages.

25        It states that, quote, his research has centered on

1    Chinese legal history and judicial system in China.  It does

2    not state he is a Changjiang Scholar or talent program, for

3    that matter, expert.

4         Now, if you open the ten-page pamphlet, there are

5    references to news reports too, across, I think, three

6    sentences that states that academics at two institutions were

7    either fired or, in one instance, criminally charged for not

8    disclosing alleged Thousand Talents Program involvement.

9         There is no reference to the Changjiang Scholars

10   Program, and the footnote in that pamphlet are to news

11   articles, including *The New York Times*.

12        This is not anything that an ordinary person could not

13   look up on the Internet and parrot.  These are just news

14   reports being discussed in a pamphlet related to a different

15   issue and the Changjiang Scholars Program, again, is not

16   referenced in the pamphlet.  The pamphlet is also not focused

17   on talent programs, even though there is an allusion to one --

18   these news reports.

19        Third, Exhibit A is a report coedited by Mr. Tiffert

20   called *Global Engagement: Rethinking Risk in the Research*

21   *Enterprise*.  It consists of a study of the PRC's, quote, Seven

22   Sons of National Defense, as they are called in the report,

23   which, apparently, are seven universities in China with

24   associations with the PRC military.  Fuzhou University is not

25   one of those seven universities focused on in this report.

1       Mentions of the Changjiang Scholars Program appear on

2   three pages across the entire report, and the only reason that

3   they are mentioned is to parrot information from the

4   university's websites touting how many Changjiang scholars and

5   other talent program scholars they received.

6       Again, a layperson can look at a university's website

7   and find out whom they have reported they have hired as a

8   Changjiang or other talent program recipient, but the thrust of

9   the report is not talent programs, let alone the Changjiang

10  Scholars Program.

11      Finally, the government says that Mr. Tiffert

12  testified before Congress in 2017.  And that testimony, he was

13  identified properly as an expert in modern legal history, not

14  talent programs, and he didn't testify about talent programs or

15  mention the Changjiang Scholars Program.

16      So if these pieces of writing and testimony are the

17  best evidence that Mr. Tiffert is a Changjiang Scholars Program

18  or Fuzhou University expert, the government simply has not met

19  its burden to show that he is qualified.  It may very well be

20  Mr. Tiffert is a top expert in Chinese legal history, but he is

21  not the right expert for this case.

22      The government could have sought out someone in the

23  Changjiang Scholars Program or someone with experience in

24  academia who's worked at the Ministry of Education in China.

25  There are innumerable avenues that the government could have

1    sought to find some with expertise, but it instead chose

2    Mr. Tiffert, who has no expertise about -- relating to the

3    Changjiang Scholars Program.

4          In fact, as the government's 302s reveal much of what

5    Mr. Tiffert says either is not based on anything he has cited

6    outside of the evidence provided to him by the government or

7    largely based on things he found on the Internet.  And that

8    will be part of our examination of Mr. Tiffert, should the

9    government -- should the Court hold a *Daubert* hearing.

10         But to be clear, we don't think a *Daubert* hearing is

11   necessary because we think that as an initial matter, the Court

12   should find that the government hasn't met its burden under

13   Rule 702 and *Daubert*.  But if the Court is not prepared yet to

14   render that ruling, we think a *Daubert* hearing is necessary.

15         Now, turning to Mr. Tiffert's proposed opinions, these

16   opinions are undisclosed.  They are also not connected to his

17   experience or qualifications; and, therefore, the government

18   has not satisfied its burden under Rule 702 and *Daubert* to show

19   that his opinions are reliably applied to the facts and helpful

20   to the finders of fact under Rule 702 and *Daubert*.

21         The Supreme Court has made clear in *Kumho Tire* that

22   reliability requires a valid connection to the pertinent

23   inquiry as a precondition to admissibility.  It is explained

24   that when assessing expert testimony, the question before the

25   trial court is specific, not general -- and that's from the

1    *Nacchio* case -- and thus, quote, a district court might well

2    respect, quote -- his credentials, the Court had an obligation

3    to assess the methodology that the expert employed at hand.

4            The Tenth Circuit has elaborated than an expert

5    witness's testimony can rely solely on experience, quote --

6    quote/end quote, but when this is the case, quote, the witness

7    must explain how that experience leads to the conclusion

8    reached, why the experience is a sufficient basis for the

9    opinion, and how that experience is reliably applied to the

10   facts, end quote.  The Court is not able to, quote, take the

11   expert's word for it, end quote, or accept, quote, *ipse dixit*,

12   end quote, the Tenth Circuit has held.

13           The government has failed to meet this burden because

14   it has not disclosed a summary of Mr. Tiffert's opinions, as

15   required by Rule 16, let alone shown that those opinions, as

16   required, are connected to his experience and reliably applied

17   to the facts of this case.

18           The government does try to fill this void by pointing

19   to a handful of 302 interview summaries.  But even if the

20   government is representing these are the sole opinions confined

21   to these 302s, that it intends for Mr. Tiffert to introduce,

22   those 302s also lack the necessary gap between the opinions and

23   Mr. Tiffert's experience.  And that is required as part of the

24   government's burden.

25           It's worth noting in addition that, as I mentioned

1    earlier, the 302s reveal that much of Mr. Tiffert's opinion or

2    observations are based on the Internet on purported regulations

3    for the Changjiang program that he found on the Internet.  But

4    he does not state that he drafted the regulations, implemented

5    the regulations, enforced the regulations, spoke to those who

6    do enforce the regulations, interprets the regulations for a

7    living, or anything of that nature.

8            In sum, the government has come nowhere close to

9    satisfying its burden of demonstrating that Mr. Tiffert is

10   qualified to give opinions about the Changjiang Scholars

11   Program or Fuzhou University's expectations of a professor

12   under that program, let alone reliably apply his opinions to

13   the facts of this case.

14           And the Court should therefore exclude him as an

15   expert.  At a minimum, if the Court is not prepared to exclude

16   Mr. Tiffert on the basis of our motion and the government's

17   inadequate response despite its burden, we request a *Daubert*

18   hearing so we can probe these issues with Mr. Tiffert.

19           The government argues that the Court should not hold a

20   *Daubert* hearing because the defendant can cross-examine

21   Mr. Tiffert, but that argument would invite error.

22           The Tenth Circuit has held that, quote, the district

23   court has discretion in the manner in which it conducts its

24   *Daubert* analysis, including when it conducts its hearing, but,

25   quote, there is no discretion regarding the actual performance

1    of the gatekeeper function.

2         We specifically hold that a district court, when faced

3    with a party's objection, must adequately demonstrate by

4    specific findings on the record that it has performed its duty

5    as gatekeeper.

6         So the government's invitation for the Court to

7    abrogate that duty would invite error and is erroneous.  The

8    Court has no basis as of now to permit Mr. Tiffert's testimony,

9    and if the government does not want a *Daubert* hearing to try to

10   demonstrate his qualifications and reliability, then the Court

11   should rule on the papers that the government has not met its

12   initial burden under Rule 702 and *Daubert* and should exclude

13   him as an expert.

14        THE COURT:  Thank you.

15        MR. DEARINGTON:  Thank you, Your Honor.

16        MR. BARRY:  Good morning, Your Honor.

17        THE COURT:  Good morning.

18        MR. BARRY:  I thought for a minute that we would be

19   able to agree that we didn't need a *Daubert* hearing today, but

20   it sounds like, based on his last statements -- we're obviously

21   prepared to go forward if that's what the Court would like.

22        I'd like to break this down into three buckets.

23   Obviously, our arguments are articulated in our papers.  I

24   don't want to waste unnecessary time repeating things that the

25   Court has already read.

1          But the first thing is our interpretation of what the

2    Court said yesterday on the relevance, was it's a line-drawing

3    exercise; the Court is going to take it under advisement and

4    provide a written order that's going to give us guidance.

5          So we're obviously the prepared, if the Court would

6    like, to provide a preview of Dr. Tiffert's testimony with some

7    of that preliminary guidance, but I don't want to kind of

8    bicker with opposing counsel about what exactly those lines --

9    which lines were drawn yesterday because, obviously, we'll get

10   more guidance once we get the order from the Court.

11         So in terms of relevance, we gave some examples

12   yesterday.  We're happy to provide more in context with

13   Dr. Tiffert at the stand if that's what the Court would like.

14         In terms of qualifications, Dr. Tiffert is a renowned

15   legal historian who works at the Hoover Institution.  His

16   qualifications are not only based on his educational

17   background, which includes a Ph.D. in modern Chinese history

18   from Cal Berkeley and a master's in East Asian studies from

19   Harvard University; it's also based on his knowledge, skill,

20   experience, and training.

21         Those are the factors that we looked at under 702.  So

22   let's go through each of those.  I already talked about formal

23   qualifications.

24         In terms of experience, he co-leads the Hoover

25   Institution's China Global Sharp Power Project.  That project

1    focuses on PRC government activities around the world,

2    including the United States, that, as our footnote described in

3    our brief, focused on government activities that are not soft

4    power.  So they're not the kind of traditional diplomatic

5    measures that we're used to, and they're not hard power, which

6    would be military activities.  They're somewhere in between.

7         Talent plans are one of those examples.  We're not

8    proposing Dr. Tiffert as a Changjiang distinguished professor

9    expert.  Frankly I don't know that anyone in academia or in the

10   think tank industry can make much of a living if their

11   expertise were so narrow.

12        We're simply proposing him as someone who's qualified

13   under 702 and *Daubert* to provide the expert testimony that

14   we've previewed for the Court in our papers and that, again,

15   we're happy to do in an evidentiary hearing if the Court finds

16   that's necessary to fulfill its gatekeeping function.

17        Dr. Tiffert is also a member of the executive

18   committee of Academic Security and Counter Exploitation

19   Program.  That's a national organization created by members of

20   the government and academic institutions, private and public,

21   that's focused on ensuring research security within the

22   American research enterprise against all sorts of improper

23   foreign influence, not only talent plans from the PRC

24   government but also other activities from other types of

25   governments and organizations.

1        Furthermore, Dr. Tiffert has published a number of

2   articles on this topic.  We included the three attachments not

3   for the purpose of demonstrating that Dr. Tiffert has published

4   on the specific issues for which we're planning to elicit

5   expert testimony -- that's not the standard -- but simply to

6   provide the Court with an understanding of the type of

7   publications that he's written, the level of research, the

8   level of footnoting, and the tone.

9        And in particular, that's to distinguish some of the

10  problems that came up in the Yu order, which defense counsel

11  focused a lot in their brief but did not focus on in today's

12  hearing, and some of the issues that that Court found with

13  Dr. Robert Spaulding, who was a previously identified expert in

14  this case and that case.

15       Furthermore, Dr. Tiffert has done a number of

16  briefings -- whether to members of Congress, other university

17  leaders, other members of government, civil society

18  organizations -- to satisfy *Daubert* and to allow the Court to

19  satisfy its gatekeeping feature.  We didn't find the need to

20  list every single engagement that he has done.

21       We provided the defense counsel with a detailed

22  summary, pursuant to Rule 16, of his proposed testimony.  We

23  also provided them with his CV and a number of FBI summaries of

24  interviews that we took of Dr. Tiffert, which, at least in my

25  experience, goes above and beyond what is typically provided in

1    criminal cases.  And part of the reason why we did that is to

2    give them a detailed understanding of the bases on which

3    Dr. Tiffert would offer expert testimony.

4         Now, the standard -- this is going a little bit into

5    reliability, which is sort of the next thing I want to focus

6    on.  The standard for reliability in the context of a social

7    scientist like Dr. Tiffert is different than the framework that

8    we apply when we're talking about scientific experts.

9         The Supreme Court has said clearly that in the context

10   of a social scientist, it's okay for the proposed expert's

11   testimony to be based on their experience and the application

12   of their experience to the facts.

13        That's what we plan to do here.  That's what's

14   demonstrated in the 302s that we provided to the defense.  It's

15   what's explained in our response to their motion *in limine*.

16   And, again, we don't think a *Daubert* hearing is warranted, but

17   obviously we've flown Dr. Tiffert here from California to be

18   prepared in case the Court finds that is necessary or would

19   like to do that to satisfy its gatekeeping function.

20        The last thing I'll note is that the gatekeeping

21   function is largely left to the discretion of the Court.  The

22   Court is aware of this.  The Court obviously has a requirement

23   to exercise that function and to make specific factual

24   findings, but the manner in which the Court exercises that

25   function is up to the Court.  So if the Court wants to decide

1   it on the papers, that's entirely appropriate.  If the Court

2   would like to hold an evidentiary hearing to further understand

3   the context in which the testimony is likely to occur, the

4   Court is also welcome to do that.

5          But the point of *Daubert* is to allow the Court to

6   basically act as a gatekeeper and prevent the introduction of

7   evidence under the imprimatur of an expert that is really not

8   based on any specialized set of knowledge or specialized

9   understanding of the particular facts.

10          The thing to keep in mind, though, is at the end of

11   the day when you're doing relevance analysis related to the

12   proffered testimony for Dr. Tiffert, it's will his elicited

13   testimony assist the trier of fact in determining whether the

14   defendant has committed the offenses for which he has been

15   charged.

16          We talked yesterday about a few examples.  Again,

17   we're happy to go through a few more examples if the Court

18   would like that, but *Daubert* and 702 favor admissibility.  And

19   it's a pretty low -- it is our burden to demonstrate that the

20   proposed expert testimony satisfies 702 and *Daubert*.

21          But a lot of Mr. Dearington's arguments about whether

22   or not certain exhibits can be authenticated that Dr. Tiffert

23   may opine on or whether or not we're going to have issues with

24   his ability to explain where he got a particular document are,

25   A, we argued about a lot of that yesterday, and based on the

1    Court's rulings and statements, I think most -- in our view is

2    that most of those objections are -- defense is free to make

3    them, but those are more appropriate for trial.  Those don't

4    really have any bearing on whether or not we've satisfied our

5    burden under 702 and *Daubert*.

6          I'm now planning to touch on 403, the unfair prejudice

7    argument.  We went over a lot of that yesterday, unless the

8    Court would like to explore that further.  But in closing, the

9    government's view is that we have satisfied our obligations to

10   propose Dr. Tiffert as an expert.

11         We've given the defense more than enough basis under

12   the Rule 16 letter that we sent them, which is attached as an

13   exhibit to their motion, as well as the 302s as well as the

14   response to their motion, which gives them even further

15   evidence and -- you know, we went -- we got into this a little

16   bit yesterday.

17         So from a disclosure standpoint, I don't think there's

18   an issue.  And from a reliability, relevance, qualifications

19   perspective, we think that the Court can make those rulings on

20   the merits.  But, again, we're ready and prepared to call

21   Dr. Tiffert if the Court would like to do so.

22         Thank you.

23         THE COURT:  All right.  Thank you.

24         MR. DEARINGTON:  Your Honor, may I respond to just a

25   couple points?

1        THE COURT:  Go ahead.

2        MR. DEARINGTON:  Just a few points that I thought were

3   revealing in the government's argument there.

4        First, the government claims that Mr. Tiffert is an

5   expert on China's sharp power, but as the Court acknowledged

6   yesterday, China is not on trial here.  And the government has

7   admitted that in its brief.  This is not a FARRA case.  This is

8   not an intellectual property theft case.  This is not an

9   economic espionage case.

10        Mr. Tiffert maybe is very qualified in other topics

11   that have nothing to do with this case, and he may very well be

12   a good expert in an economic espionage case or a FARRA case but

13   not in a case here, which relates to whether Dr. Tao took a

14   full-time job in China and failed to disclose it as required in

15   certain forms submitted to KU and to agencies -- federal

16   agencies.

17        There was a very telling admission here by the

18   government.  The government stated that Mr. Tiffert, quote, is

19   not a Changjiang Scholars Program expert.  I am paraphrasing,

20   though that may be precise.  That's all the Court needs to know

21   to exclude him as an expert.

22        Within the confines of the Court's expected order from

23   yesterday relating to the obvious prejudice of putting China on

24   trial here and the Communist Party and China's development

25   goals, the Court is inclined, as it stated yesterday, to limit

1    the evidence relating to China -- I'm paraphrasing, but to the

2    Changjiang Scholars Program and Fuzhou University's

3    expectations of a participant in that program.  The government

4    expressly just admitted that Mr. Tiffert is not an expert in

5    those areas.

6         The government stated that it went, quote, above and

7    beyond with its disclosures, but the government never even

8    offered proposed opinions.  An expert disclosure, the bare

9    minimum has to have a summary of the expert opinions, and these

10   were entirely absent.  So to say that the government went above

11   and beyond when it didn't even meet the basic requirements of

12   Rule 16 is simply erroneous.

13        The other thing that the government said that I think

14   is particularly telling is, quote -- in reference to *Daubert*,

15   quote, it's pretty low.  If that's the government's argument

16   here, I think that is sufficient for the Court to realize that

17   not even the government is convinced that Mr. Tiffert is

18   qualified as an expert to give reliable testimony tied to the

19   facts of this case about the Changjiang Scholars Program.

20        So the government's unwillingness to even ask for a

21   *Daubert* hearing and to rest on its papers enables the Court to,

22   if it chooses, exclude Mr. Tiffert without a *Daubert* hearing.

23   Of course, if the Court is not inclined to do that at this

24   moment, we would request the *Daubert* hearing.

25        Unless the Court has any questions, that's all we

1     have.  Thank you.

2               THE COURT:  I do not.

3               So I would like to proceed with the *Daubert* hearing.

4     Yesterday I talked about line drawing in terms of -- you know,

5     as you said, I've taken it under advisement and will issue a

6     written order that will give you, hopefully, a good idea of

7     where the parameters are in terms of evidence about -- let's

8     just say China.  And I think you all understand my concerns

9     about introducing evidence about espionage and theft of

10    intellectual property because that's not what these charges are

11    about.

12              And so with Dr. Tiffert, his expertise -- he has,

13    sounds like, pretty extensive expertise in current things in

14    China, modern Chinese history, as well as in talent programs.

15    I did not want to leave you all with the impression that the

16    only person that would qualify to testify in what I think will

17    be a pretty targeted way about the expectations with respect to

18    this talent program is somebody who's carved out a niche in

19    just this talent program.

20              If this witness has experience and can testify and aid

21    the jury about how -- if he has the experience to understand

22    how talent programs work and what the expectations are,

23    et cetera, et cetera, that does not mean he doesn't have the

24    requisite expertise to testify about this specific talent

25    program, unless it's different than the others in some

1  appreciable way that he wouldn't understand this program as

2  compared to other programs.

3           So although I've talked about, you know, cabining the

4  evidence, that does not mean that he can only qualify to

5  testify as an expert if his expertise is limited to this

6  particular talent program.

7           I would like to hear more from him about that because,

8  as you've all said, when we're talking about the standard of

9  reliability, it's experience that can then be applied to the

10 specific facts of this case.

11          And that's what we're really talking about here, is I

12 want the testimony to be relevant to this case, and I'm

13 concerned about hearing broad-scale evidence about talent

14 programs and the risk they may present to national security in

15 the United States or whatever, those sorts of things.

16          But at the same time, I'd like to hear from him so I

17 can decide whether he does have experience that would assist

18 the jury in understanding what the expectations are with

19 respect to applying for a talent program and getting an award

20 of such a scholarship and what the expectations are once

21 someone receives an award of a professorship in a talent

22 program and in this specific talent program based on the way

23 the talent program works and his expertise in general about how

24 all of these programs work.

25          So I want to hear from him more on that so that I can

1    be convinced that his broader experience is something that can

2    be applied to the situation in this case with this particular

3    talent program in a way that convinces me that his testimony is

4    reliable as well as relevant.

5          I did hear some examples, either yesterday or in the

6    paper, about other things that he could speak to.  Obviously,

7    the photograph is one of them.  I'm not ruling that the

8    photograph is going to be admissible or the caption or anything

9    else, but that was given to me as one example of someone -- of

10   something that his expertise could potentially be applied to,

11   and that is the significance attached to Dr. Tao meeting that

12   particular person, given his standing at Fuzhou University

13   and/or in the party.

14         That was one example, but another example that was in

15   the papers was the significance of seals on certain documents

16   and what that means with respect to activities of the Chinese

17   government or Chinese higher educational institutions.  So

18   that's another example.

19         And then I will be listening, I think, during the

20   *Daubert* hearing to what expertise he would have to offer, if

21   any, as applied to this case concerning expectations to obtain

22   an appointment to one of these programs and then to perform

23   what the expectations are for someone that is appointed.

24         So I think it would be helpful for me to hear from

25   Dr. Tiffert.

1          Among the topics -- and I do think this has been an

2     adequate disclosure under Rule 16, pretty specific, in my view,

3     in terms of all of the topics, so specific that I told you

4     yesterday I was concerned about some of them going outside the

5     lines that I had kind of loosely drawn in my head so far.

6          But among those are -- you know, something that I

7     think does have to do with expectations.  So one of those

8     topics:  Professor recipients are expected to build ecosystems

9     underneath them to satisfy these goals.  You know, that, I

10    think if this witness is qualified and has experience in this,

11    would be something relevant, given the charges in this case and

12    given the government's theory that there was a contract entered

13    into, although there's no signed, written contract that will

14    come into evidence.  But there was a contract, and one of the

15    expectations or requirements of that contract was to do this

16    very thing, build ecosystems.

17         So, again, I think that's one specific example of

18    something that this witness may offer experience and expertise

19    in as applied to this case if the jury -- you know, it would

20    help the jury understand.

21         So, again, those are just some examples that I've

22    drawn so far from what you've presented me, but I do think it

23    would be helpful to me to hear more from Dr. Tiffert to decide

24    whether indeed he meets the requirements of 702 and *Daubert*.

25         So why don't we proceed.

1        MR. BARRY:  While Mr. Oakley is getting Dr. Tiffert,

2   for the purposes of the testimony, do you want me to cover his

3   qualifications as well?

4        THE COURT:  I think you should, to some extent.  I

5   don't want to spend hours doing it.  I think the CV speaks for

6   itself, but there may be things in there that bear further

7   explanation.

8        MR. BARRY:  Okay.  I'll try to go through it quickly,

9   Your Honor.

10        THE COURT:  Okay.

11        MR. BARRY:  The government calls Dr. Glenn Tiffert.

12                    GLENN TIFFERT,

13   called as a witness on behalf of the government, having first

14   been duly sworn, testified as follows:

15        THE COURT:  You can remove your mask while you're

16   testifying.

17        THE WITNESS:  Thank you.  Thank you, Your Honor.

18                  DIRECT EXAMINATION

19   BY MR. BARRY:

20   Q.   Good morning, Dr. Tiffert.

21   A.   Good morning, Adam.

22   Q.   Dr. Tiffert, where do you work?

23   A.   I work at the Hoover Institution on War, Revolution, and

24   Peace at Stanford University.

25   Q.   And what's your position there?

1    A.    I'm a research fellow.

2    Q.    And how long have you had that position?

3    A.    I've had that position for two years, and I was a visiting

4    fellow at Hoover for two years prior to that.

5    Q.    What did you do before you were at Hoover?

6    A.    I worked at the University of Michigan.  I had a faculty

7    appointment in the department of history and the department of

8    Asian languages and cultures and I did a post-doc there.

9    Q.    And as a research fellow at the -- well, let me take a step

10   back.

11         What is the Hoover Institution?

12   A.    The Hoover Institution is a think tank that largely -- its

13   identity is based on doing research of the highest academic

14   rigor.  We are at Stanford University, after all.  It's taking

15   that rigorous academic research and translating it into

16   actionable policy recommendations.  So you take the best of the

17   academic world and then you make it useful.

18   Q.    And are you responsible for the China Global Sharp Power

19   Project at Hoover?

20   A.    Yes, I co-lead that project, and I've built the program.

21   Q.    Can you summarize what that project is focused on?

22   A.    Sure.  That program focuses on China's assertion of its

23   growing power around the world, in particular the concept of

24   sharp power, which, in contrast to hard power, which we think

25   of largely, say, in military terms and soft power, which is

1    often described, for example, as Hollywood movies, American pop

2    music influencing -- you know, raising America's profile in the

3    world, there's this larger zone of gray activity between those

4    two poles called sharp power.

5        And it's the way, largely, that authoritarian regimes in

6    particular use nontraditional means to perforate, penetrate

7    free societies and open, democratic societies.  A recent

8    example might be the Russian participation in disinformation in

9    the 2016 presidential election.

10       That's a classic example of sharp power.

11   Q.   Thank you.

12       And in your role as co-leader of the Sharp Power Project at

13   Hoover, can you describe a few of your activities?

14   A.   Sure.  So mainly research; publications; program building;

15   advising government; advising universities, particularly with

16   regard to academic policies and research security; and engaging

17   with the public.

18   Q.   Okay.  What is the Academic Security and Counter

19   Exploitation Program?

20   A.   So its acronym is ASCE, and ASCE is a group of largely

21   research security officers from major universities, many of

22   which do classified work but not exclusively, who meet on a

23   regular basis.  It's a voluntary association of these

24   universities to discuss problems and best practices in the

25   research securities sphere.  The goal is we generate documents

1   that can be useful to universities.

2   Q.   And do you serve on the executive committee of that

3   organization?

4   A.   Yes.  I'm a China subject matter expert on that

5   organization.

6   Q.   How are you selected to serve on that executive committee?

7   A.   I was identified because I've consulted with various

8   universities and government in my work in academic security.  I

9   was -- the director of that organization reached out to me

10  personally and invited me to join.  And on the basis of my

11  publications as well.

12  Q.   Okay.  Can you read Chinese?

13  A.   Yes.

14  Q.   Can you read simplified and traditional Chinese?

15  A.   Yes.

16  Q.   Would you mind just explaining the difference between those

17  two systems?

18  A.   Sure.  Traditional Chinese is the historic writing system

19  that was used in China.  It was simplified in the 20th century

20  and standardized under the government of the People's Republic

21  of China, largely to increase literacy.  And so there are fewer

22  numbers of strokes in many of the characters in the simplified

23  system.  Same language written slightly differently.

24        MR. BARRY:  So unless the Court has further questions,

25  I'm going to move on from qualifications.

1          THE COURT:  That's fine.

2    BY MR. BARRY:

3    Q.   Dr. Tiffert, are you familiar with the phrase "talent

4    recruitment program"?

5    A.   Yes.

6    Q.   What does that mean?

7    A.   A talent recruitment program is a program that many nations

8    have, in fact, that's largely geared towards building centers

9    of excellences and stimulating the development of proficiencies

10   and competencies in particular fields.  And so countries adopt

11   these policies, universities adopt these policies, to bring the

12   best and brights and then nurture them, cultivate their talent.

13   Q.   When we use the phrase "talent recruitment programs," are

14   we typically talking about government-directed programs?

15   A.   Generally, yes, but they're implemented at the university

16   level.

17   Q.   What are some examples of countries that used talent

18   recruitment programs?

19   A.   China, Russia, Canada, India.  A wide range of countries.

20   Q.   Okay.  So I'm going to now move to substance, and I'm going

21   to focus on three buckets.

22        So the first is:  I'm going to just ask you about how

23   talent recruitment programs fit into the PRC government's

24   approach to technological advancement at a very high level.

25   And the meat of what we're going to talk about is the

1    Changjiang Scholars Program and the expectations that people

2    who participate in that program would be expected to satisfy.

3    And then, third, I'm going to ask you about the structure of

4    academic institutions in the People's Republic of China.

5         And do you understand that -- it sounds like everybody

6    here, if I say "PRC," I'm referring to the People's Republic of

7    China?

8    A.   Yes.

9    Q.   Okay.  So briefly would you please summarize how the PRC's

10   political system is structured?

11   A.   So the PRC's political system is a system that can best be

12   described as helical, in that there is a party pillar and a

13   state pillar that interweave at every level of government.  The

14   party's role in that system is to maintain -- is a coordinating

15   body across all levels of government and to ensure that all

16   levels of government are serving the same aligned purposes.

17   Q.   And when you say the "party structure," you're referring to

18   the Chinese Communist Party?

19   A.   Yes, I am.

20   Q.   And that's the ruling party of the PRC government?

21   A.   Correct.  It's the party that has held exclusive power

22   since 1949.

23   Q.   And that's because the PRC is a unitary political system?

24   A.   Correct.

25   Q.   Okay.  So generally speaking on matters of industrial

1    policy within the PRC, how does the national government

2    communicate decisions to the provincial or lower-level

3    institutions?

4    A.    Right.  So as I described with this helical structure,

5    generally it's party-level bodies that decide policy-level

6    documents.  And those are then implemented and passed down

7    through a party-and-state chain from the higher levels to the

8    lower levels.

9        And because it's a unitary state, it's not a federal state.

10    Decisions taken at Beijing at the central level are transmitted

11    directly down to each succeeding lower level.

12    Q.    So it sounds like you're saying, unlike a federalist system

13    like the United States has where there's state structure and

14    federal structures, the PRC government is really a -- not a

15    federal system but a national system, and then there are

16    subordinate levels going down to the local level, leading at

17    the provincial level, in which decisions are made.

18    A.    Correct.  And lower levels do not have the option to opt

19    out.

20    Q.    Okay.  And how are -- generally speaking, how are folks at

21    those lower provincial levels incentivized or encouraged to

22    follow the mandates that are promulgated by the national level?

23    A.    The national level has various tools at its disposal.

24    Sometimes it's as simple as opening funding streams to pursue

25    particular purposes.

1       But there's also a darker side, in that they have a

2   disciplinary apparatus, a secret police, which enforces

3   ideological discipline and also engages in inspections and

4   audits of lower level units to make sure they're faithfully

5   implementing policy.

6       And they do this at the university level as well.

7   Q.   And is another way in which the national level communicates

8   its objective or goals to the lower levels through public

9   statements or publications?

10  A.   Absolutely.  Those public statements are a signaling method

11  by which the party demonstrates its priorities.  And so lower

12  levels can read those documents.  They can read announcements

13  promulgated in major newspapers that the party controls, to

14  understand where the party's priorities lie.  And then there's

15  also a range of internal documents that are passed down the

16  chain as well.

17  Q.   And for those public pronouncements, are those things that

18  are accessible on the Internet?

19  A.   Yes, they are.  And, in fact, that's often the way one gets

20  them.

21  Q.   What's the Made in China 2025 plan?

22  A.   So the Made in China 2025 plan is, in fact, one of those

23  signaling mechanisms adopted at the general level by the

24  highest level of the PRC government, which identifies several

25  strategic sectors in which China aims to achieve dominance that

1    it doesn't currently have, strategic sectors like renewable

2    energy and other areas as well.

3        And so that document adopted at the national level then

4    establishes the priorities for everyone down the chain, and

5    then they mobilized to implement those priorities.

6    Q.   Okay.  Are your opinions regarding the -- that you've just

7    expressed regarding the PRC's government's structure widely

8    accepted within the community of people who study the PRC?

9    A.   They're uncontroversial.

10   Q.   And are there opinions regarding the PRC government's

11   mechanisms for communicating its industrial objectives

12   controversial among people who study China?

13   A.   Not at all.

14   Q.   Okay.  Would it be fair to say that these policies that

15   we've briefly described would be widely known to scientists

16   with ties to the PRC?

17   A.   Yes, I believe so.

18   Q.   Why?

19   A.   Certainly scientists who are products of the PRC

20   educational system would absolutely understand that this is the

21   way that the system works.  And those who engaged with China

22   regularly, I think, would often know how these work.

23   Q.   Okay.  What is the Changjiang Scholars Program?

24   A.   Changjiang Scholars Program is one of these talent

25   recruitment programs, in fact, one of the most prestigious of

1   these programs.

2   Q.   Why is it so prestigious?

3   A.   So it was established in 1998.  There are various levels of

4   it.  As is often true of talent recruitment programs, there's

5   several flavors.  One is meant to engage mid-career scholars

6   who are promising in their fields.  Another one is the

7   distinguished professor level, is meant to take people who have

8   established very strong reputations in their fields who are

9   program builders, in a sense.  And I think that's the one at

10  issue in this case.

11      And then there's a chair-level professor program as well,

12  which recognizes people who are at the apex of their careers,

13  and the idea is to tap the potential of these people and to

14  orient it towards, really, national purposes.

15  Q.   And when you say "national purposes," does that include at

16  a high level the types of industrial policies that we discussed

17  earlier?

18  A.   Indeed, yes.

19  Q.   Okay.  So I want to focus, as you said, on the Changjiang

20  Distinguished Professor Program, which is the program at issue

21  in this case.  Can you tell us a little bit more about what

22  types of candidates is the Changjiang Distinguished Scholars

23  Program targeting or attempting to recruit?

24  A.   Right.  So a very wide range, actually.  But the priority

25  is on people that meet China's defined strategic interests.  So

1    if China has determined that it wants to -- if it has

2    prioritized a particular field of study or a particular

3    industry, a funding stream is made available to support that.

4         And, again, as I suggested earlier, every lower level of

5    the state is mobilized to actually fulfill and try to achieve

6    that goal.

7         And so the Distinguished Professors Program tends to be

8    candidates in the sciences because China's goals have tended to

9    be in that area.  And the goal is to bring the best and

10   brightest in those fields and to give them an opportunity to

11   contribute to China's achievement of those strategic

12   objectives.

13   Q.   And is the Changjiang Distinguished Scholars Program well

14   known -- well, is it opinion that the Changjiang Distinguished

15   Scholars Program would be well known among scientists with ties

16   to China?

17   A.   Yes.  In fact, it's -- being as prestigious as it is, it's

18   widely known.  And particularly those that are the Chinese

19   academic community, it would be regarded as a feather in their

20   academic resume caps.

21   Q.   Okay.  It at, like, the Nobel Prize level, or --

22   A.   No.  No.  It's below that, but it's regarded -- it selects

23   people who are extremely strong in their fields.

24   Q.   Okay.  And how are Changjiang Distinguished Professors

25   selected?

1    A.   So there are various methods, actually, but ordinarily,

2    it's -- the initial selection involves negotiation with the

3    particular university that's interested in building a center of

4    excellence around a particular faculty member that they want to

5    recruit, again in fulfillment of these national power goals.

6        And so the university and the prospective candidate come to

7    an understanding of the possibilities of perhaps that candidate

8    establishing a place at that university.  They put together an

9    application packet, and the university then submits that packet

10   to Beijing, the Ministry of Education, for consideration.

11   Q.   Okay.  So let's break that into a few buckets.  So let's go

12   step by step.

13       So it sounds like you're saying that the first step is that

14   someone who's interested needs to apply.

15   A.   Correct.

16   Q.   And I think you said that one of the ways in which someone

17   can apply is through a sponsoring institution, which would be a

18   university in the PRC.

19   A.   Correct.

20   Q.   And are -- there's alternative ways people can apply,

21   though?

22   A.   That's right.  You can self-recommend.  You can be

23   recommended by a sponsoring institution.  There are various

24   pathways.

25   Q.   Okay.  So that's step one.

1        So what happens specific to the Changjiang Distinguished
2    Scholar Program after someone applies to the program with the
3    support of a sponsoring institution, such as a university, in
4    the PRC?
5    A.   So -- right.  The individual in question puts together a
6    very substantive portfolio of the research, the awards they've
7    won, the plaudits they've achieved, their entire academic
8    background.  The university does a check on those and then
9    submits the packet to the Ministry of Education.
10       The Ministry of Education then reviews it, submits the
11   portfolio to a peer review panel of experts drawn from, you
12   know, that field within China to evaluate it.
13       And then if the candidate is recommended, then the
14   fellowship is offered to the individual.  They are then invited
15   to reach a contractual agreement with the university that
16   specifies the terms of their engagement under the fellowship.
17       And then when that is concluded, that is forwarded to the
18   Ministry of Education, and the Ministry of Education finalizes
19   the appointment to the fellowship and issues a certificate.
20   Q.   What is the Ministry of Education?
21   A.   The Ministry of Education is a central-level body in the
22   PRC, the state -- PRC state, that governs all education from
23   higher education to primary education.  And, again, because
24   it's a unitary state, it has subsidiary bodies at provincial
25   and local levels that all report up to it.

1    Q.   And so would it be fair to say that for the Changjiang

2    Distinguished Scholar Program, the Ministry of Education is

3    involved, but so are provincial or local-level academic

4    institutions?

5    A.   Indeed.  Again, the central level, the national Ministry of

6    Education, sets the broad policy objectives and makes the

7    funding stream available.  Then it works with local and

8    provincial-level governments and universities as well.

9         And, in fact, in a sense, the Changjiang Scholars Program

10   fellowship stipend that the candidate receives is in some sense

11   seed money which provincial-level governments, local

12   governments and universities, can add to, to sweeten the deal.

13   Q.   Okay.  So I want to go back to something you said earlier

14   when we were talking about the way in which the national PRC

15   government communicates its policy objectives or particular

16   programs that it wants to support to local and provincial

17   levels.

18        So specific to the Changjiang Distinguished Professor

19   Program, do you know how the Ministry of Education communicates

20   how local or provincial provincial-level institutions should be

21   administering that program?

22   A.   So there are governing regulations on the program.  There

23   was a set issued in 2011, for example.

24   Q.   Okay.  And how do you know that?

25   A.   Through experience and research.

1  Q.   So once someone becomes a Changjiang Distinguished

2  Professor, what are the expectations of what they should be

3  doing?

4  A.   So it depends upon the one -- distinguished professor,

5  right?

6      The expectation, really, is that they will be doing their

7  research at the highest level but, in particular, program

8  building.  That level of the Changjiang fellowship is oriented

9  towards people who've demonstrated that they can lead research

10 groups.  And the goal, then, is to give them the resources to

11 build a research group and create an ecosystem under them so

12 China can build a center of excellence in that identified

13 field.

14 Q.   Okay.

15 A.   At that university.

16 Q.   And how -- for the Changjiang Distinguished Professor

17 Program, how, if at all, is the party apparatus involved in

18 administering that program at a provincial or local level?

19 A.   Right.  So as I said, the party apparatus interweaves at

20 the provincial and local level with every level of government,

21 including universities, which are, in fact, all public.  So

22 these are public institutions.  There are nearly zero -- I

23 think there's only one private university in the PRC, and it's

24 actually very small.  So these are all state institutions.

25     The party secretary is the most powerful person in the

1    Chinese university campus, even more powerful than the

2    university president.  Individual colleges and departments have

3    their own party secretaries, which, again, are all linked up

4    through the party chain.

5        And their role there is to make sure that, again,

6    everyone's aligned to serve the same priorities and, to some

7    extent, also to enforce ideological discipline, which is

8    becoming more and more important in the academic environment.

9    Q.   Are all citizens of the PRC members of the Chinese

10   Communist Party?

11   A.   No.  I think only about nine percent.  It's a prestigious

12   appointment.

13        MR. BARRY:  All right.  So I'm going to show

14   Dr. Tiffert a few exhibits.  I want to make a few notes first,

15   just so we're all on the same page in terms of ground rules.

16        So the first thing is:  All of the documents are going

17   to be in Chinese.  However there are translations that are

18   separated by these -- I don't know if this is orange or peach

19   slip sheet.

20        I will note that the translations are a little bit of

21   a hodgepodge, and I'll try to note the specifics as we're

22   working through these.  Some of the translations are going to

23   be FBI-linguist-certified verbatim translations.  Others will

24   be summary translations.  Others will be translations of

25   particular pages that we're going to focus on.

1          So, for example, there's going to be a PowerPoint deck

2    in here of about -- I don't know.  It's 40 pages of very

3    science-heavy information.  We did not translate all 40 pages.

4          And then there's going to be one document that is

5    machine translated, meaning it was an automated translation.

6          These are being offered strictly for the purposes of

7    the *Daubert* hearing, to satisfy the Court's gatekeeping role.

8    Obviously, at trial we would use different types of

9    translations for all of these, and it would be a little bit

10   clearer, but I just want to flag this because this is something

11   we're going to have to maybe come up with a plan for when we're

12   in trial.

13         THE COURT:  Okay.  But -- we're going to talk about

14   that for the record, but I take it this witness is fluent in

15   Mandarin.

16         THE WITNESS:  Yeah.

17         THE COURT:  And so he can read these with

18   understanding, despite whatever methodology used to

19   translate --

20         MR. BARRY:  Correct.

21         THE COURT:  -- is that fair?

22         MR. BARRY:  Yeah.  Mandarin, Dr. Tiffert?

23         THE WITNESS:  Yes.

24         MR. BARRY:  Okay.  So, yes.

25         Obviously, if defense counsel or someone wants to ask

1    him something that's not in a translation -- he might need a

2    minute, but he'd be prepared to just give a translation on the

3    stand.

4                Okay.  So I'm -- may I approach the witness, Your

5    Honor?

6                THE COURT:  Yes.

7                MR. BARRY:  So I'd like to start with what's been

8    marked Government Exhibit 1 for the *Daubert* hearing.  Everybody

9    should have this.

10   BY MR. BARRY:

11   Q.   And, Dr. Tiffert, when I refer to exhibit numbers, it's

12   going to be these little yellow stickers in the bottom

13   right-hand corner of the documents.  I'll try to refer to Bates

14   numbers as well as we go along, but if you, at any point, are

15   not following where I am, just ask me to clarify.

16        So looking at the Chinese version, since you speak Chinese,

17   would you please --

18               MR. BARRY:  Well, actually, would you like me to move

19   to admit these for the purposes of this hearing, Your Honor?

20               THE COURT:  Yes.  These are Exhibits 1 through 7?

21               MR. BARRY:  Correct.

22               THE COURT:  Any objection?

23               MR. DEARINGTON:  No objection, Your Honor.

24               THE COURT:  For purposes of today's hearing, Exhibits

25    1 through 7 admitted.

1          MR. BARRY:  And I will note -- we'll note this as I'm

2    going through.  I may have -- there may be one number that's

3    missing.  So I'll -- as I'm going through, we'll talk about

4    each exhibit number.

5    BY MR. BARRY:

6    Q.  All right.  So we're focusing on Exhibit 1.  And we're

7    focusing on the first page, which is ending in Bates

8    number 8427.

9          So, Dr. Tiffert, I'd like you to first just look at that

10   front page.

11   A.  Uh-huh.

12   Q.  And there's obviously an English translation attached, so

13   feel free to reference either.

14         But would you please summarize what that first page says.

15   A.  Absolutely.  The main title of the top of the page says

16   Changjiang Distinguished Professor candidate recommendation

17   packet or portfolio.

18   Q.  And then for the first that line, what does that say?

19   A.  The first line says -- is the name of the recommending

20   school.

21   Q.  And what does it say next to that?

22   A.  Fuzhou University.

23   Q.  And then for the third line, what does the sort of field

24   prompt say on the left hand of the column?

25   A.  Columns.  Right.

1       The field name is name of post.

2    Q.   And what's the name -- what do those two characters next to

3    that say in Chinese?

4    A.   The four characters next to it say physical chemistry.

5    Q.   Oh, I think we're on the wrong one.

6    A.   Oh, I'm sorry.

7    Q.   Third line.  Third line.

8    A.   Oh, third line.  I apologize.

9        The third line says name of candidate, and then the two

10   characters next to it say Tao Feng.  Surname first in the

11   Chinese convention.

12   Q.   And then two lines down from that -- so we're on the fifth

13   line.  It says in English, University of Kansas.

14   A.   Correct.

15   Q.   What is to the left of that in Chinese?

16   A.   It says current place of employment of the candidate.

17   Q.   And then you'll see there's sort of a seal -- or not a

18   seal, but like a --

19   A.   A watermark?

20   Q.   Watermark.  Correct.  Thank you.

21       In Chinese across the page, what does that watermark say?

22   A.   That watermark says Ministry of Education product of --

23   product of the Ministry of Education of the People's Republic

24   of China.

25   Q.   Okay.  So based on your training and experience, does this

1    look like an application for the Changjiang Distinguished

2    Scholar Program?

3    A.   It does.

4    Q.   So I'd like to turn your attention to section 4 of the

5    application.

6         And the English translation is tentative work plan?

7    A.   Yes.

8    Q.   So -- and I'm going to refer to the English version, so if

9    you go to page 3 of the translation.

10   A.   Okay.

11   Q.   Okay.  So the first thing I'd like you to do is just

12   identify in the original Chinese version of the application and

13   direct us to where section 4 is.

14   A.   Okay.  Section 4.

15            THE COURT:  I'm not sure I understand what page you're

16   on.

17            MR. BARRY:  Oh.  So I'm referring to -- in the

18   translated version --

19            THE COURT:  Which starts --

20            MR. BARRY:  It starts after the peach page.

21            THE COURT:  Okay.  Got you.

22            MR. BARRY:  And the bottom page number is 3, and then

23   it has the marking.  And at the top, it says Roman numeral 4,

24   tentative work plan.

25            THE COURT:  Okay.

1          MR. BARRY:  Okay.

2    BY MR. BARRY:

3    Q.   So that's what I'm going to focus on.

4         But first, Dr. Tiffert, since we're kind of going back and

5    forth between the various languages, I'd like you to just find

6    that section in the Chinese version so that you can have both

7    next to you as I'm asking you questions.

8    A.   I already have them.

9    Q.   Okay.  Great.

10        And what page -- just for the record, what Bates number in

11   the Chinese version is where section 4 of the tentative work

12   plan starts?

13   A.   It ends in 446.

14   Q.   Okay.  Okay.  So looking at the English translation, you'll

15   see that the first -- I don't know if this is a paragraph or

16   two paragraphs, but it's titled "Thoughts on Work."

17   A.   Uh-huh.

18   Q.   And generally speaking, what is that section describing?

19   A.   So that section, really, is describing the applicant's

20   research plan and the sort of -- the motivating idea behind it.

21   Q.   Okay.  And I'd like to focus on -- there's three

22   Romanettes.

23   A.   Uh-huh.

24   Q.   The translation identifies them as Romanettes.  I think in

25   the Chinese version there, they obviously use different

1   characters, and they're identified by the parentheses.  Let's

2   look at Romanette No. 1.

3       And, again, I'm not going to have you just read what the

4   document says, but can you summarize what Romanette No. 1 says

5   in terms of what the applicant is proposing?

6   A.  Are you referring to the paragraph in English begins with

7   "conduct energy conversion"?

8   Q.  Yes.

9   A.  Right.  So the applicant is proposing -- and I'll look at

10  the Chinese as well -- but essentially to help make

11  breakthroughs in catalytic research that could be applied to

12  energy conversion, environmental protection, and -- yeah.  And

13  so those are the goals.

14  Q.  Okay.  And consistent -- is it consistent -- based on your

15  training and experience, is explaining why research that would

16  be funded by the Ministry of Education through this program

17  consistent with your understanding what the Changjiang

18  Distinguished Professor Program is designed to do?

19  A.  Absolutely.  I mean, the candidate is in this -- on this

20  page and the thoughts on work articulating how their research

21  and their proposal and their background fits into strategic

22  needs that China has and, in particular, priorities that the

23  government has at a higher level established.

24      So he's saying that I am your guy to do this type of work.

25  Q.  Okay.  And on that point, I'd like to go to the next

1    section.  It's on the same page, so this is on page 3 of the

2    translation.  The translation says "research focus and

3    disciplinary research value."

4    A.    Uh-huh.

5    Q.    And, similarly, in the original Chinese, there's a Roman 2

6    or Arabic 2 number at the beginning.

7    A.    Right.

8    Q.    So if you need to take a minute, but I'd like you to just

9    summarize that paragraph in terms of what the applicant is

10   explaining as their research focus and the disciplinary value

11   of their research or proposed research, rather.

12   A.    Right.  So in recent years, the development of green energy

13   technologies has been a priority for the PRC.  And the

14   candidate is saying that -- is saying exactly that, the

15   shortcomings of energy, the worsening of the environment,

16   particularly caused by China's rapid economic growth, are

17   problems for China and that solving these problems -- that is,

18   increasing energy efficiency and the green use of energy,

19   search for new energies -- are high priorities and will meet

20   the country's strategic requirements going forward.

21        So he's positioning his own research in the context of that

22   frame.

23   Q.    And based on your training and experience and knowledge of

24   the Changjiang Distinguished Professor Program, would

25   explaining how an applicant's proposed research or work plan

1    would fulfill the PRC's government's industrial policies

2    increase their chances of receiving an award?

3    A.    I would imagine so.  I have no insight into the minds of

4    those who are determining that, but to make your research -- to

5    make the case for why your research is important is clearly

6    advantageous.

7    Q.    Okay.  And then I'd like to turn now -- and, again, I

8    apologize because I'm going to be focusing on the English

9    version, so it may take you a minute to catch up.  But I'm

10   going to turn to page 7 of the English translation, and I'm

11   going to focus on Arabic No. 3, anticipated outcomes.

12        So please also -- the first thing I'd like you to do is

13   just identify where that section or subheading begins in the

14   Chinese version.

15   A.    Right.  Give me just a moment to do that.

16        Okay.  That is on the Bates stamp page ending in 448.

17   Q.    Okay.  Thank you.

18        So focusing on anticipated outcomes, again, I'd like you to

19   provide some context for -- the English version, at least lists

20   five anticipated outcomes.

21   A.    Uh-huh.

22   Q.    Conduct foundational applied research, occupy domestic and

23   international markets and market ties, build an innovation team

24   for insight to new research and technology, et cetera.

25        So I want to talk about the first three.

1    So why -- based on your training and experience and

2    understanding of the Changjiang Distinguished Professor

3    Program, why would it be important to explain why the

4    applicant's anticipated outcomes include building an innovation

5    team for a particular type of technology and research?

6    A.    Right.  So this tier of the Changjiang fellow program, as I

7    said earlier, is not just geared towards pure research.  It's

8    geared towards bringing somebody who's already demonstrated

9    their capacity to do that and has also demonstrated their

10   capacity to run programs or build programs to bring that skill

11   set, that complete package, to China.

12       So you're going to be a great researcher, but, in

13   particular, you're also going to build a team, an ecosystem

14   under you, so that the institution that you go to can build a

15   cluster of excellence around you.

16   Q.    Okay.  And the only other thing I want to focus on right

17   here is that next bullet point.  I guess it's the prior point,

18   which is -- the English translation is occupy domestic and

19   international market and market ties.

20   A.    Yes.

21   Q.    So why would -- again, why would that be, from a -- based

22   on your training and experience and understanding of the

23   Changjiang Distinguished Scholars Program or Distinguished

24   Professors Program, why would it be matter to the Ministry of

25   Education for somebody to explain how they might be able to

1    help with the marketization of a particular type of technology

2    in the PRC?

3    A.    So this connects to the fact that the Changjiang Scholars

4    Program also servings a national project to build China's

5    capacity and strategic industries, and so the candidate is

6    saying that he not only has the skill set as a chemist and the

7    ability to run a research program, but also to bring knowledge

8    that can help China conquer new markets as well.

9    Q.    Okay.  So next I want to -- I just want to go to the

10   last -- I think it's the very next page, where there appears to

11   be a signature.

12        And I know you're not, obviously, a signature expert by any

13   means, but can you read out what that signature says?

14   A.    Would that be on translated page 9?

15   Q.    Yes.

16   A.    Franklin Tao, it appears to be.

17   Q.    So the last thing I want to ask about is there's these --

18   in the translation, at least, there are four pages at the back

19   titled with Roman numeral 7, research conditions, "the

20   institution is prepared to offer the candidate," and Roman

21   numeral 8, "the institution's recommendations."

22   A.    Right.

23   Q.    Would you first please identify the Bates numbers in the

24   original version for those four pages.

25   A.    So Roman numeral 7 begins in the Chinese on Bates number

1    ending in 451, and Roman numeral 8 is on Bates number 452.

2    Q.    Okay.  So Roman numeral 7, which is on page 10 of the

3    English translation, that's again titled, "Research conditions

4    the research institution is prepared to offer the candidate."

5          THE COURT:  I'm sorry.  I'm not following.  You said

6    on the English translation, page 10.

7          MR. BARRY:  Correct.

8          I'm sorry, Your Honor, I know it's difficult to go

9    back and forth.

10          THE COURT:  I'm not -- I'm seeing -- okay.  I'm sorry.

11    Roman numeral 7 is at the top.

12          MR. BARRY:  Correct, correct.

13    BY MR. BARRY:

14    Q.    Okay.  So what is this?

15    A.    Right.  So --

16    Q.    And you can just focus on the English version, I think,

17    unless the Court wants us to go back and forth.  I think, for

18    the purposes of this, we don't need to focus on the Chinese.

19    A.    Right.  So if I recall correctly -- I'd have to look at the

20    top page of the Chinese version, but sections, I believe,

21    1 through 5 of this application are filled by the applicant.

22    And beginning in section 6 onwards, that's filled by the

23    institution, Fuzhou University.

24          And so Roman numerals 7 and 8 are filled out by the

25    university and they're specifying the terms that they're

 1   offering the candidate and the package they're putting

 2   together.

 3   Q.   And based on your understanding of how the Changjiang

 4   Distinguished Professor Program works, does it appear that

 5   whoever submitted this application submitted it with Fuzhou

 6   University as the sponsor?

 7   A.   Indeed, yes.

 8   Q.   Okay.

 9   A.   And that is what the title page says.

10   Q.   Okay.  All right.  You can put that away.

11        So I want to go to Exhibit -- what's been marked as

12   government Exhibit 2 for the purposes of *Daubert* hearing.

13        And, again, this is -- we included the original Chinese.

14   We're only going to be focusing on a few pages of this, so

15   the -- this one is a little different.  The peach pages

16   separate the cover e-mail from the attachment to the e-mail,

17   and then the last document is a translation of a few pages.

18        So let's just start -- since you're able to read Chinese,

19   let's just start at the front.  So -- and this is the cover

20   e-mail with the sticker on the front.

21   A.   Uh-huh.

22   Q.   And this -- obviously, you don't know who he has -- well,

23   you know who the defendant is, but what does it say in Chinese

24   at that -- in the body of the e-mail?

25   A.   So the body of the e-mail says, you know, Teacher Tao,

1    Professor Tao, hello.  Attached is Teacher Wong's revisions to

2    your Changjiang PPT.  And it says -- then it asks him to review

3    it and then says thank you.

4    Q.   Okay.  And then you see that there's a file name under

5    attachments?

6    A.   Yes.

7    Q.   So if you go to the next document, which is behind the

8    first peach page, it's a document that's in Chinese that looks

9    like a PowerPoint presentation.

10        Do you see that?

11   A.   Yes.

12   Q.   Okay.  So I want to focus on the front page.

13        So what is this -- can you summarize what this front page

14   says?

15   A.   So the front page the major title at the top says 2017 year

16   cohort Changjiang Scholars Fellowship Program, Distinguished

17   Professor candidate presentation meeting.

18   Q.   And does it list who is -- who the presentation is -- who

19   the applicant for the application is?

20   A.   It says Q and A meeting, really, is what it says.

21   Q.   Okay.

22   A.   Yeah.

23   Q.   And who's listed as the applicant?

24   A.   The applicant is listed as Tao Feng.

25   Q.   And who is listed as the sponsoring institution?

1  A.   The -- so it's listed as the applicant institution, and

2  that's Fuzhou University.

3  Q.   And then is there a particular department -- academic

4  department of Fuzhou University that's listed?

5  A.   Yeah.  The applicant or reporting department is the

6  physical chemistry, or the discipline is physical chemistry.

7           MR. DEARINGTON:  Your Honor, we'd object --

8           THE REPORTER:  I'm sorry.  Can you remove your mask so

9  we can hear you better?

10          MR. DEARINGTON:  Your Honor, I think we're objecting

11 here because -- did you guys provide us with the English

12 translation of this?

13          MR. BARRY:  Only the front page.  I'm not going to

14 go --

15          MR. DEARINGTON:  Your Honor, we can't possibly -- he's

16 not a certified translator.  They haven't even given us a

17 translation today to look at.  It's not fair for us to be able

18 to cross-examine about a document just taking his word at and

19 trying to scribble it down as quickly as we can and come back

20 to it.

21          THE COURT:  Okay.  So you're -- the first page of this

22 attachment has been translated but not the rest of it?

23          MR. BARRY:  Correct.  And that's all I'm going to ask

24 him about.  I'm not asking him about the rest of the document.

25          THE COURT:  I mean, the defense does have the

1    translation of this first page, the cover page?

2              MR. BARRY:  Correct.

3              THE COURT:  All right.  Well, the objection is

4    sustained to the extent it has to do with the other pages that

5    they haven't provided a translation.

6              MR. BARRY:  Fair enough.  Okay.

7    BY MR. BARRY:

8    Q.  So, Dr. Tiffert, earlier we talked about the process by

9    which somebody applies to become a Changjiang Distinguished

10   Professor, and you said the first step is the application,

11   right, which we looked at.

12        And you said the second step is once that application is

13   submitted to the Ministry of Education, there is either a

14   defense or a presentation by the applicant to the Ministry of

15   Education and the panel of experts, right?

16   A.  Right.

17   Q.  Okay.  So based on your training, experience, and

18   understanding of the Changjiang Distinguished Professor

19   Program, does this document appear to be a document related to

20   such a presentation?

21   A.  Yes, it does.

22             MR. DEARINGTON:  Objection, Your Honor.  We just went

23   over the ground rules that the witness wasn't going to testify

24   about the document attached.

25             THE COURT:  I assume your answers were just confined

1    to the cover page of it, not to the rest of the document?

2            THE WITNESS:  Correct.

3            THE COURT:  All right.  Overruled.

4    BY MR. BARRY:

5    Q.  Okay.  You can put that away.

6        What I'd next like to focus on is what's been marked as

7    Government Exhibit 3 for the purposes of the *Daubert* hearing.

8    And, again, I apologize that -- you know, dealing with the

9    translations of this is going to be tricky, so I'll just

10   up-front walk through kind of what we're looking at here.

11       The first document is simply an e-mail.  There's an

12   attachment.  If you take the peach page and go back, the

13   attachment -- this Chinese document is the attachment.  And

14   then if you take the next peach -- if you turn the peach page

15   again, there is a translation of the attachment.

16       I will point out that the version of the translation, if

17   you look at it, the cover e-mail was translated too, which,

18   again, there's no substance in the cover e-mail.  It simply is

19   the name of the attachment and the to and from.

20       The translation has a forward that's different than the

21   original that I'm showing you.  So, basically, the -- this

22   version of the e-mail -- the version that's marked with a stamp

23   is from Franklin Tao Gmail account to another Franklin Tao

24   Gmail account.

25       If you look at the translation, you'll see that header but

1    then you'll see a separate header where that second Gmail

2    account forwarded to a third Gmail account.  That -- I'm not

3    going to get into that.  It's not relevant.  I just want to

4    flag it for the Court.

5           MR. DEARINGTON:  Your Honor, I'm not sure if we're

6    objecting, but is this translation of this exact document

7    attached to the e-mail?  Because if it's not, we're objecting

8    on the basis that the translation isn't of the document.

9           If it is, then perhaps I misunderstood.

10          THE COURT:  In my understanding, you're saying that

11   the Chinese e-mail that's the first page of this exhibit shows

12   Franklin Tao Gmail account sending this to another Franklin Tao

13   Gmail account.  The one that's been translated shows that but

14   also has a separate header that shows that, in turn, it was

15   sent still to another, but the attachment -- it's the same

16   e-mail; it's just more of the string, in terms of --

17          MR. BARRY:  Correct.

18          THE COURT:  -- the first page, but the attachment was

19   the same; is that correct?

20          MR. BARRY:  Correct.

21          MR. DEARINGTON:  We'll withdraw the objection on that

22   ground.

23          MR. BARRY:  Yeah, I'm not -- I'm just focusing -- I'm

24   not focusing on the transmission or anything.

25          THE COURT:  Right.

1          MR. BARRY:  I'm just simply -- for the purposes of

2     *Daubert*, I'm going to ask some questions about the attachment.

3          THE COURT:  Okay.  Go ahead.

4     BY MR. BARRY:

5     Q.   Okay.  So we're looking at what's been marked as Government

6     Exhibit 3 for the purposes of *Daubert* hearing.  There is a --

7     the subject line of the e-mail, you can see at the top of the

8     document, is "contract," and then you'll see there's Chinese

9     language.  It looks like a contract that's not signed.  And

10    then there's the accompanying English translation.

11         So, Dr. Tiffert, the first thing I want to focus your

12    attention to is just the first page of the draft contract.

13    A.   Uh-huh.

14    Q.   And would you mind just telling us what the title is.

15    A.   Sure.  It says Changjiang Distinguished Professor

16    appointment contract.

17    Q.   Okay.  And then I want to focus on -- there's in -- in the

18    English translation, there's different articles that it walks

19    through.  And there's article II, which the English translation

20    version is Party B's objectives for the position and job

21    duties.

22         And Party B is listed as Tao Feng, right?

23    A.   Uh-huh.

24    Q.   Okay.  And Party A is listed as Fuzhou University?

25    A.   Yes.

1    Q.    Okay.  So consistent with your testimony earlier about your

2    understanding of how the Changjiang Distinguished Professor

3    Program is administered, why would there be an employment

4    contract with the section describing the objectives for the

5    proposed position?

6    A.    Right.  It's not purely my own experience.  This procedure

7    is specified in the 2011 governing regulations on the

8    Changjiang Scholars Program, that after the Ministry of

9    Education has selected and approved a candidate as being

10   recipient of the fellowship, it then falls to the sponsoring

11   university to work out the details of their appointment, the

12   terms of the contract.

13       And when that is finalized, it's forwarded to the Ministry

14   of Education and the Ministry of Education reviews it.  And at

15   that point, it formalizes the recipient's award of the

16   fellowship, and they issue the certificate.

17       And that's all laid out step by step in the governing

18   regulations.

19   Q.    Okay.  So since you mentioned them -- you can put that

20   exhibit away.

21       So I'm going to -- I apologize for going out of order, but

22   I'm going to focus on what's been marked as Government

23   Exhibit 7 for the *Daubert* hearing.  It's at the back of the

24   pack.

25       And this is the machine translation that I mentioned at the

1    beginning.  So, again, there's going to be a Chinese version

2    and then a peach slip sheet and then a machine English

3    translation.

4    A.    Okay.

5    Q.    Are you with me, Dr. Tiffert?

6    A.    I am.

7    Q.    So looking at the Chinese language version, do you

8    recognize this document?

9    A.    I do.

10   Q.    What is it?

11   A.    These are the governing regulations in effect from 2011 to

12   2018 for the Changjiang Scholars Program.

13   Q.    How do you know that?

14   A.    So the title says Ministry of Education issues the

15   Changjiang Scholars Program plan implementing regulations

16   notice.  It's a notification that they've issued it.  Dated

17   2011 -- let's see.  Dated February 15, 2011.

18        That's the header, and then beneath is the text of the

19   regulations.

20   Q.    Okay.  And do you see at the bottom of the first page

21   there's a URL?

22   A.    Yes, I do.

23   Q.    And do you see how it says www.moe.gov.cn and then forward

24   slash, it has a specific web page?  But do you see that

25   first-level domain?

1    A.    Yes.

2    Q.    Okay.  And is it -- based on your training and experience

3    and just research, do you believe that www.moe.gov.cn is a

4    Chinese government domain?

5    A.    I can personally attest to it, yes.  That is the official

6    Ministry of Education website.

7    Q.    And have you, in fact, visited this specific URL?

8    A.    Yes, I have.

9    Q.    Okay.  So you viewed this -- or, assuming that this web

10   page represents what you viewed at some point, you viewed the

11   content located at that particular URL before?

12   A.    I have.

13   Q.    Okay.  So I want to direct your attention to a few -- well,

14   big picture.

15        So why is the PRC government's Ministry of Education --

16   well, let me rephrase that.

17        What is the purpose of the PRC government's Ministry of

18   Education in publicly promulgating regulations or guidance for

19   the Changjiang Scholars Program?

20   A.    So this is a notification that the implementing regulations

21   had been issued by the Ministry of Education.  It's a public

22   set of implementation rules.  And, again, it is so that every

23   other organ of the PRC state and party apparatus that touches

24   on the Changjiang Scholars Program has access to it and then

25   can act in conformity with these regulations.

1   Q.   Okay.  So I want to direct your attention to -- and I'm not

2   quite sure where this falls in the original, but you can look

3   at the machine translation and then double-check it with the

4   original.

5       So in the machine translation on the first page in the

6   middle of the page, it says, quote, in order to implement the

7   national medium- and long-term education reform and development

8   plan 2010 to 2020 and national medium- and long-term talent

9   development plan 2010 to 2020, vigorously attract and cultivate

10  a number of leading talents in disciplines with international

11  influence, et cetera.

12      So those two descriptions of the national and medium

13  long-term education reform and development plan, are those

14  plans consistent with what you talked about earlier in terms of

15  national industrial planning and policy that the PRC government

16  publishes and issues to the subordinate organizations?

17  A.   Absolutely.  To put it into a context, the PRC maintains a

18  state planning apparatus that it inherited from Soviet-style

19  state planning.  And so with regard to industrial policy,

20  educational planning, and a whole host of sectors, they issue

21  strategic long-term plans that are intended to mobilize

22  resources towards the fulfillment of the objectives identified

23  in those plans.

24      And these are two examples of those plans.

25  Q.   Okay.  So let's go to article III, which is on the second

1  page of the English translation.

2      It says the Yangtze River Scholar Program --

3          THE REPORTER:  I'm sorry.  Would you repeat that?

4          MR. BARRY:  Sure.  Sorry.

5  BY MR. BARRY:

6  Q.  So I'd like to direct your attention to article III, which

7  is on page 2 of the English translation, and it discusses the

8  Yangtze River Scholar Award Program.

9  A.  Uh-huh.

10 Q.  Is the -- is the Yangtze River Scholar Program another word

11 for the Changjiang Scholars Program?

12 A.  It is.

13 Q.  And it says -- the translation says, the Yangtze River

14 Scholar Program supports higher education institutions to

15 appoint special professors and share professors of Yangtze

16 River Scholars.

17     Is that consistent with your understanding of how the

18 Ministry of Education administers the Changjiang Distinguished

19 Scholar Program?

20 A.  Yes, it is.

21 Q.  Okay.  And then the next article seems to describe an

22 appointment of experts to evaluate applicants.  Again, is that

23 consistent with your understanding of how the Changjiang

24 Distinguished Scholar Program is administered?

25 A.  It is.

1  Q.  And then article VI -- and I know this is an older

2  regulation, but article VI seems to say that there were 150

3  special professors.

4      And can we use the word "special professor" and

5  "distinguished professor" interchangeably here?

6  A.  Yes, we can.

7  Q.  Okay.  It says, 150 special professors shall be appointed

8  each year, and 50 chair professors shall be appointed.

9      So based on your experiences -- your interpretation of

10  article VI that, at least as of this point in time, there would

11  only be 150 distinguished -- Changjiang Distinguished

12  Professors appointed?

13  A.  Annually.

14  Q.  Annually.

15  A.  Yes.

16  Q.  Okay.  And is that a relatively small -- do you know if

17  that's a pretty small or select group of people relative to the

18  number of applicants?

19  A.  Relative to the size of Chinese academia, it's an extremely

20  small and select group.

21  Q.  So I want to next go to article VIII, which is on page 3 of

22  the translation.  And it says, the Changjiang Scholars award is

23  financed by the central government.

24      Based on your training, experience, and understanding of

25  the Changjiang Distinguished Scholars Program, is that

1    consistent -- is that statement consistent with your

2    understanding of how the program is administered?

3    A.    It is.

4    Q.    Okay.  And then I'd like to go to page 5 of the

5    translation, which is chapter 4.  The subtitle is "Appointment

6    Procedures."  Okay?  And I'd like you to just quickly review --

7    or take however much time you need, but articles XIII through

8    XVI, which, at least based on the translation, appear to

9    describe the appointment procedure.

10        I'd like you to do two things:  One is I'd like you to

11   review those and determine if that's consistent with your

12   description of the appointment procedure as elicited earlier;

13   and then, number two, I'd like you to just -- since you have

14   the articles sort of to assist in structure, to just go step by

15   step and describe how the appointment procedure works.

16   A.    Right.  These are the regulations and specifically articles

17   that I was alluding to several moments ago when I described the

18   process by which an applicant comes to the attention of a

19   university, how they put a packet together, submit it to the

20   Ministry of Education, how it undergoes a peer review.  When

21   the candidate meets their -- Ministry of Education's

22   requirements, they refer back to the sponsoring institution to

23   work out the duties of the contract that is then sent to the

24   Ministry of Education for approval.  And at that point, the

25   award is formalized.

1       And so that's spelled out methodically, step by step, in

2   articles XIII through XIX, and I can walk through them if you'd

3   like.

4   Q.   So I'd like to just -- since we've covered, I think, the

5   first couple articles, I want to talk about -- again, based

6   on what you're -- this exhibit that you're looking at but also

7   your training, experience, and understanding of the Changjiang

8   Distinguished Professor Program, what happens -- or what

9   typically happens after an applicant is awarded the position or

10  the Changjiang Distinguished Professor award?

11  A.   By the Ministry of Education, at the point where it's

12  referred to the higher education institution?

13  Q.   Yes.

14  A.   Right.   Okay.

15      So the Ministry of Education at that point has done a

16  formal review of the file.   It publishes a list of names of the

17  people who've been identified as potential recipients of the

18  fellowship.   That's like -- it opens up a public comment

19  period, in a way.   And then those candidates are sent back to

20  the sponsoring institution, and they negotiate the terms of

21  that candidate's service at that institution.

22      And so it's, you know -- and it varies because different

23  fields, different applicants, will have different needs.

24  Different needs for research budgets, different needs for

25  equipment apparatuses.   Some of them may be setting up labs;

1    others might not be.

2        So all of those details that are specific to the individual

3    candidate are hammered out in negotiations between them and the

4    sponsoring institution.  It's all formalized in a contract,

5    highly specific, that indicates what the applicant -- the

6    candidate will do to meet all the things that are being asked

7    of them to do.

8        When they come to that agreement, it specifies their

9    salary, their living arrangements, the number of students that

10   they're expected to train, the number of publications or

11   fellowships they're expected to apply, alternate funding

12   sources they're expected to pursue.  All of that is laid out

13   and stipulated in the contract.

14       When they've come to an agreement on those terms and signed

15   it, that contract is sent to the Ministry of Education for

16   approval which, again, reviews it to make sure that it's

17   satisfied that the terms are specific enough and meet the

18   government's needs.

19       And at that point, the formal certificate of the award that

20   the candidate is, in fact, a -- Changjiang Scholars approved,

21   and a list is again issued of people who made it to that stage.

22   Q.   Okay.  So I want to focus a minute on article XIX.

23       So based on your training, experience, understanding of the

24   Changjiang Distinguished Professor Program review of this

25   regulation, if the Ministry of Education issues a certificate

1  appointing someone as a Changjiang Distinguished Professor,

2  would that issuance occur before or after a contract was signed

3  between the applicant and the university?

4  A.    Pursuant to article XIX, it would have to be issued after

5  the contract had been signed.   And, in fact, article XIX

6  specifically says a signed contract.

7  Q.    Okay.

8          THE COURT:   We need to take a break here shortly.   Are

9  you about to finish, or would this be a good time to take a

10  break?

11          MR. BARRY:   I probably have ten minutes left.

12          THE COURT:   Well, I want them to take a break.

13          MR. BARRY:   Okay.

14          THE COURT:   All right.   Let's take a break until

15  11:00.

16      (Recess.)

17  BY MR. BARRY:

18  Q.    Welcome back, Dr. Tiffert.

19      Let's move to Government Exhibit 5 for purposes of the

20  *Daubert* hearing.   And I apologize.   It looks like -- at least

21  the photocopy I have is very dark.   But there's a black page,

22  and then there's a clear page and then a translation.   You can

23  just look at the second page ending Bates number 1091.

24  A.    Yes.

25  Q.    So what is this, or what does this appear to be to you?

1    A.    This appears to be the formal certificate announcing that

2    the candidate was selected and has received the Changjiang

3    Scholars Program.  This is the formalization of it.

4    Q.    Okay.

5    A.    -- issued by the Ministry of Education.

6    Q.    And based on your training, experience, and understanding

7    of the Changjiang Distinguished Professor Program, is this the

8    certificate that was mentioned in article XIX of the

9    regulations that we looked at?

10   A.    Yes, it is.

11   Q.    Okay.  And is this the certificate that, at least pursuant

12   to those regulations, would not be issued unless there was a

13   formal agreement between the applicant and the sponsoring

14   university?

15   A.    Correct.  There would have to be a signed contract.

16   Q.    Okay.  So in your opinion, again, based on your training,

17   experience, research, public speaking, would someone be issued

18   this certificate if they were not, in fact, a Changjiang

19   Distinguished Professor?

20   A.    These certificates -- certificates of this nature are not

21   issued lightly.  It would be almost inconceivable that it would

22   have been issued before a signed contract if the regulations

23   require a signed contract.

24   Q.    And in your opinion, why do you think that the probability

25   of that is, to use your word, inconceivable?

1    A.    Simply because observance of such regulations is taken very

2    seriously.

3    Q.    And is that based on the -- just sort of the nature of how

4    decisions are made within the PRC and how the system is

5    structured?

6    A.    Indeed.  And based on my own personal experience with

7    Chinese Universities and the Ministry of Education.

8    Q.    Okay.  So you'll see on the certificate that there's a

9    stamp.

10        Does that have any special significance in the PRC?

11    A.    Yes, it does.  A stamp, it's a traditional mechanism by

12    which documents are essentially signed, in a way, or

13    authenticated by an organization.  Holding the seal or stamp --

14    and this stamp says "PRC Ministry of Education" on it --

15    indicates that this document has been formally approved by the

16    relevant authorities in the Ministry of Education.  And it's

17    what gives its authenticity and significance.

18    Q.    Okay.

19    A.    And the seal is kept by a licensed -- or by a designated

20    person within that institution, and it's closely held.  So it's

21    only used at the very end of a process by which, you know, the

22    document that's to be -- to have the seal affixed has gone

23    through all the proper channels and approvals.

24    Q.    And is -- does -- is your understanding that government

25    seals like the seal that appears to be based on this document

1    are also closely held at other government or public

2    institutions in the PRC, such as universities?

3    A.    Absolutely.

4    Q.    Okay.  All right.  You may put that away.

5        So the last thing I want to ask you about is what's been

6    marked as Government Exhibit 6 for purposes of the *Daubert*

7    hearing.  This is the web page with the photograph.

8    A.    Uh-huh.

9    Q.    And this is -- it's pretty short, but there's an English

10   translation in the back, and then there's a -- the Chinese

11   version on front.

12       So since it's short, I'll just ask you, can you please

13   summarize, at least, just what the text of this web page says.

14   A.    Right.  So this is a news story about the party secretary

15   of Fuzhou University visiting the school of chemistry to meet

16   with the Changjiang Distinguished Professor Tao Feng.

17   Q.    And who is the -- what's the significance of the title

18   "party secretary of Fuzhou University"?

19   A.    So the party secretary is the most powerful person in the

20   party apparatus at that university.  And as I suggested

21   earlier, in the sort of helical structure of the PRC, you have

22   a kind of administrative pillar of the university, and then you

23   have the party.  And it interweaves and wraps around at every

24   level.

25       The party secretary is the senior party member at the

1    university, and functionally his powers exceed that of the

2    university president.  So this is the top party official

3    visiting to welcome Tao Feng.

4        It's -- as the article describes, there's evident pride

5    that Fuzhou University has this Changjiang Distinguished

6    Professor.

7    Q.   Okay.  So, in short, is it significant or big deal, to be

8    more colloquial, to have the party secretary of Fuzhou

9    University meeting with someone who, at least according to the

10   article, is the defendant?

11   A.   Indeed it is.  It is the head honcho at the university

12   coming to welcome you and congratulate you.

13       And, in fact, the first couple of sentences of this article

14   indicate that the rather than have Professor Tao come to him,

15   he went to Professor Tao, which suggests that -- when you have

16   the big head honcho of the university's party apparatus come to

17   visit to welcome and congratulate you, that is a big deal, as

18   you say.

19   Q.   Okay.  So last question.

20       Based on your training, experience, and understanding of

21   how the Changjiang Distinguished Professor Program operates,

22   how likely do you think it would be for the party secretary of

23   Fuzhou University to meet with a Changjiang applicant who was

24   still considering whether to make a commitment to the

25   university?

1  A.  So the party secretary is an important person and a very

2  busy person.  The fact -- and the entire text of this article

3  indicates that he's welcoming somebody who has been appointed,

4  and so it's, I think, highly unlikely that that would be the

5  case before the appointment had been formalized.

6  Q.  Okay.

7          MR. BARRY:  All right.  Thank you, Dr. Tiffert.

8          No more questions from the government at this time.

9                      CROSS-EXAMINATION

10  BY MR. DEARINGTON:

11  Q.  Good morning, Dr. Tiffert.  And do you prefer Dr. or

12  Mr. Tiffert?

13  A.  Dr. Tiffert is fine.  Thank you.

14  Q.  Dr. Tiffert.  Great.

15      So you obtained your Ph.D. at Berkeley, correct?

16  A.  Correct.

17  Q.  And what was your dissertation in?

18  A.  My dissertation was in history.  My degree was in history.

19  Q.  Generally, or was that a specific type of history?

20  A.  So the department issuing my degree was the history

21  department, but my specialization is in 20th century China.

22  Q.  20th century China.  And was there a particular period of

23  20th century China in which you focused?

24  A.  So my particular dissertation looked at the period from

25  1906 to 1979.

1    Q.    Okay.  And your dissertation, I believe, was focused on 19-

2    roughly around 1908 or so to somewhere in the middle of the

3    century; is that correct?

4    A.    Well, most of the dissertation focused on the 1940s through

5    the 1960s, but there was an opening section that looked at

6    earlier decades and a concluding section that looked at later

7    decades.

8    Q.    And fair to say this all predated the advent of the talent

9    programs that we've been discussing today by several decades?

10   A.    Correct.

11   Q.    And your dissertation made no reference to the Changjiang

12   Scholars Program, correct?

13   A.    Correct.

14   Q.    And no reference to the talent programs?

15   A.    Correct.

16   Q.    And did you take any coursework on talent programs?

17   A.    I'm not aware that anywhere ever offered any in the history

18   department.

19   Q.    Is it not an area that many people would study as an export

20   or in academia?

21   A.    There are not academic courses on talent programs.  Talent

22   programs may be covered in certain academic courses, but I'm

23   not aware of any that specialize on the matter.

24   Q.    So you would say the talent programs is not a typical

25   specialization in academia?

1    A.    Talent programs are a relatively new phenomenon.

2    Q.    Are there currently any classes on talent programs at

3    Stanford or Berkeley or anywhere else that you're aware of?

4    A.    Not that deal exclusively on talent programs, but they are

5    covered in coursework.

6    Q.    So few, if anyone, specializes in talent programs, fair?

7    A.    That's not true, actually.  Many people specialize in

8    talent programs, particularly in the think tank sectors and

9    among analysts.

10   Q.    And so you, for example, are at a think tank, and I -- in

11   looking at your website, it describes you as an expert on Asia,

12   China, communism, contemporary history, cybersecurity, and law,

13   correct?

14   A.    Correct.

15   Q.    Those are your specializations, correct?

16   A.    Right.

17   Q.    I did not see talent programs in that list.

18   A.    So Hoover has a menu of boxes that you can tick off of the

19   areas that you specialize in, so it's not -- talent programs is

20   not identified as one of those areas at Hoover, but it is in my

21   background.  So it's simply not on that menu.

22   Q.    Have you sought to add talent programs as a box there?

23   A.    I haven't.

24   Q.    Okay.  Those are pretty broad subject matters -- Asia,

25   China, communism -- so would you say that you're an expert in

1    all of those areas?

2    A.   China is communist, and it is in Asia, and so it ticks all

3    of those boxes.

4    Q.   And you're a cybersecurity expert?

5    A.   I have done work on cybersecurity.

6    Q.   And you're a law expert?

7    A.   My dissertation was on legal history, and I'm a specialist

8    on the Chinese legal system.

9    Q.   And would you say you're an expert in Chinese academia?

10   A.   I have done a lot of work on Chinese higher education.

11   Q.   But are you an expert in Chinese academia?

12   A.   Yes.

13   Q.   Have you written any books focused on the Changjiang

14   Scholars Program?

15   A.   No.

16   Q.   Have you written any books focused on talent programs?

17   A.   Not exclusively.

18   Q.   Have you written books that focus in large part on talent

19   programs?

20   A.   I've written books that have touched on talent problems.

21   It was --

22   Q.   And -- good ahead.  I'm sorry.

23   A.   There was a global engagement report that I authored, for

24   example.

25   Q.   We'll come back to that one.

1        Any other works that you would say touch or in

2    substantial -- let's say substantially discussed talent

3    programs.

4    A.   Not in the public record.

5    Q.   Do you have books that are not in the public record that

6    substantially discuss talent programs?

7    A.   I have done presentations on talent programs that are not

8    in the public record.

9    Q.   Okay.  And you said that in your view, the global

10   engagement publications focuses -- or substantially discusses

11   talent programs?  Is that what you testified?

12   A.   It substantially discusses talent -- talent recruitment

13   efforts, yes.  Not talent programs, such as Changjiang or

14   10,000 or Thousand Talents.

15   Q.   So it does not substantially discuss talent programs like

16   the Changjiang or others.

17   A.   It does not deal with the Changjiang Scholars Program,

18   correct.

19   Q.   Okay.  And have you written any papers about the Changjiang

20   Scholar Program?

21   A.   Not in the public record.  Actually, not in the private

22   record either.  I've only given oral presentations based on my

23   research.

24   Q.   Okay.  Let's just stick to -- when I say "papers," let's

25   answer the question, please, as to papers.  I'm not asking

1    about presentations right now.  I may come back to that.

2        Have you written any papers focused on talent plans in

3    China?

4    A.  No.

5    Q.  So I guess that's -- it's fair to say you haven't

6    focused -- you haven't written, I believe you testified, papers

7    that focus on the Changjiang Scholars Program.  Did I hear that

8    correctly?

9    A.  I have not written papers that focus on the Changjiang

10   Scholars Program.

11   Q.  Okay.  And it's -- are you aware that the government

12   attached exhibits displaying your work to one of its briefs

13   recently, to tout your expertise?

14   A.  Generally, but not specifically.

15   Q.  So you're not aware of which of your writings or other

16   writings were attached to the government's recent brief about

17   you?

18   A.  I believe I've reviewed the response that it filed pursuant

19   to this Daubert hearing, but the top of my working memory, I

20   could not quote exactly which publications or references they

21   cited.

22   Q.  Well, I'll try to refresh your recollection here.

23       One of them is called *China's Influence & American*

24   *Interests* --

25   A.  Correct.

1    Q.    -- *Promoting Constructive Vigilance.*

2          And you wrote that report?

3    A.    I collaborated in the authorship of it.

4    Q.    Okay.

5    A.    It was put together by a working group, so there are no

6    signed chapters, but the working group all -- it's a jointly

7    authored document.

8    Q.    Got it.  It says here it's edited by Larry Diamond and

9    Orville Schell, not Dr. Tiffert.  Is that --

10   A.    Correct.

11   Q.    But you're testifying that you contributed to this report?

12   A.    Indeed.  And I'm listed as a contributor in the report.

13   Q.    Which chapter focuses substantially on talent plans?

14   A.    There are no specific chapters that focus on talent

15   programs.

16   Q.    Okay.  Is there any section that focuses on talent plans?

17         MR. BARRY:  Objection, Your Honor.  I'd ask -- and I

18   have a copy I'm happy to provide.  This is a 200-plus-page

19   document, so if he's going to ask specific questions about it,

20   I'd ask that he provide the witness with a copy of it.

21         THE COURT:  All right.  That's fair.

22         MR. DEARINGTON:  Yeah, I'm happy to provide a copy.

23         MR. BARRY:  I can give him a copy.

24         MR. DEARINGTON:  If you have an extra, that would be

25   great.

1      MR. BARRY:  Do you want me to give him all three?

2      MR. DEARINGTON:  Yes, please.

3      May I approach, Your Honor?

4      THE COURT:  Yes.

5   BY MR. DEARINGTON:

6   Q.   So I'm providing to the witness *China's Influence &*

7   *American Interests*, which is Exhibit C to the government's

8   opposition to the defense's motion *in limine* No. 2.

9      Dr. Tiffert, would you like a moment to review, or are you

10  familiar enough with the text to proceed?

11  A.   I'm familiar with the document, but I've not looked at it

12  in a couple of years since it was first published and presented

13  on.  I recall a chapter, chapter 8 in particular, Technology

14  and Research, that -- in which discussions on talent programs

15  occurred.

16  Q.   Okay.  Could you point me specifically -- and take your

17  time here -- to the discussion you mentioned about talent

18  programs.

19  A.   All right.

20  Q.   If you'd like some guidance, I think I found it.

21  A.   Yes.  On page 142.

22  Q.   Okay.  So page 142 out of 276, that's the page we're

23  looking at?

24  A.   Correct.

25  Q.   So on page 142, two full paragraphs in, there's a statement

1    that China's most systematic channel for identifying

2    foreign-based nontraditional collectors is its recruitment

3    program of global experts, commonly known as the Thousand

4    Talents Program or the -- sorry, Thousand Talents Plan or

5    Thousand Talents Program.  The TTP is a massive and sustained

6    talent recruitment campaign designed to recruit leading experts

7    from overseas to assist in the country's modernization drive.

8        Did you write that?

9    A.   I did not write that particular paragraph, no.

10   Q.   So the next paragraph also discusses the TTP.

11       Did you write that paragraph?

12   A.   No.  But I approved it.

13   Q.   You reviewed it?

14   A.   I reviewed it, yes.

15   Q.   Did you provide comments?

16   A.   On this chapter, yes.

17   Q.   To these two paragraphs?

18   A.   I do not recall, to be honest.

19   Q.   You don't recall providing any comments or input to these

20   two paragraphs about the TTP?

21   A.   That would have been about four years ago.

22   Q.   Okay.  And are there any other sections in this 276-page

23   text that focus on talent plans?

24   A.   Not that I recall.

25   Q.   Well, I will, in fairness, point you to page 147.

1    A.    Okay.

2    Q.    Page 147 states, one of the most glaring factors that

3    facilitates IP theft is the fact that recipients of Chinese

4    funding programs, such as the Thousand Talents Program

5    described above, routinely do not declare their work in China.

6         Do you agree with that?

7    A.    I think it's been empirically demonstrated that many

8    scholars who participate in Thousand Talents programs do not

9    declare.

10   Q.    So you would say that you -- your opinion is that if you're

11   in a Thousand Talents Program in China, you are subject to

12   routinely not declaring your work, as required?

13           MR. BARRY:  Objection, beyond the scope.  This is a

14   Daubert hearing and not an opportunity to impeach the witness.

15           THE COURT:  Okay.  I do think it's beyond the scope.

16   This witness is not offering an opinion on that.  I wouldn't

17   allow him to offer an opinion on that.

18           MR. DEARINGTON:  And, Your Honor, I'll move on.  I'm

19   just -- the reason I'm asking is because this is one of the

20   exhibits that reference talent plans that was provided by the

21   government as Mr. Tiffert's credentials.  Just wanted to see if

22   this was actually representative of him or if this is something

23   we should altogether disregard as it relates to his

24   credentials, and it sounds like the latter.

25           But I'll move on, in any event.

1    BY MR. DEARINGTON:

2    Q.   The next sentence says, at a minimum -- just for

3    completeness -- recipients should be required to register as

4    foreign agents under the Foreign Agents Registration Act.

5         So you didn't write either of these sentences?

6    A.   I did not write those particular sentences.

7    Q.   So you didn't write any of the sentences in these 276 pages

8    that relate to talent plans or discuss talent plans?

9    A.   I was not the lead author on this chapter.  I was part of

10   the group that reviewed it.

11   Q.   So the answer is:  Correct --

12   A.   Correct.

13   Q.   -- I didn't write any of these?

14        Okay.  And turning to page 247.  Let me know once you're

15   there.

16   A.   247.

17   Q.   Footnotes 5 and 6 to chapter 8.

18   A.   Yes.

19   Q.   And these are footnotes that -- and feel free to turn back

20   to confirm -- that support or purport to support the statements

21   about talent plans in this report, correct?

22   A.   Correct.

23   Q.   And the source of the information is 1000plan.org; correct?

24   A.   Correct.

25   Q.   So the report took information from the Internet, Thousand

1    Talent Plan website, and reported it.  That's a proper

2    understanding of this report that you reviewed and commented

3    on?

4    A.    That is what the footnote seems to say.

5    Q.    Got it.

6          So fair to say anyone who has an Internet connection could

7    have looked at 1000plan.org and parroted the language there,

8    correct?

9          MR. BARRY:  Objection, beyond the scope.  This doesn't

10   have to do with *Daubert*.

11         MR. DEARINGTON:  Your Honor, this has everything to do

12   with *Daubert*.  He's expected to provide expert testimony.  If a

13   lay witness could look at the Internet and provide the very

14   same types of testimony or provide the very same types of

15   reports that qualify him as an expert, that cuts against it.

16         THE COURT:  I will tell you that is an issue in this

17   case.  And listening to his testimony on direct, I think there

18   were some things that fall within the ambit of expert testimony

19   and some that were more factual.  That doesn't preclude him

20   from testifying to both.

21         I do want to know what those differences are, so I'll

22   be prepared to instruct the jury so they can compartmentalize

23   the testimony that way.

24         So I think he is going to testify to fact evidence.  I

25   think that's a given.

1      MR. DEARINGTON:  Your Honor, we'll take that under

2  advisement.  I'm not sure that right now is the time to object

3  to it -- just in general to that, but we would of course

4  reserve our rights there.

5      THE COURT:  Well, you know, a *Daubert* hearing is to

6  discuss, first of all, you know, whether he's qualified; and,

7  second of all, what the scope of his expert testimony might be.

8      There's nothing that could preclude him from

9  testifying as a fact witness, if he has the ability to do that,

10  if something is within his knowledge or expertise.

11      That's not what this hearing is about.  It's about the

12  expert testimony that he might offer.

13      MR. DEARINGTON:  Right, Your Honor.  And that's

14  exactly where I was going, is he's being proposed as an expert

15  here, so separately if the government would like to proffer him

16  as a fact witness and if they can provide foundation and the

17  evidence is otherwise admissible, then it may come in.

18      But I won't touch on --

19      THE COURT:  Okay.

20      MR. DEARINGTON:  I think it is important to

21  distinguish between facts and opinion, in some respects,

22  because we need to know which are opinions so we can ask what's

23  the basis for those opinions.

24      THE COURT:  And that's one of the primary reasons I

25  wanted to have this *Daubert* hearing so that I could hear this

1    fleshed out and so I would have -- first of all, so I could do

2    the line drawing I've talked about; but, second of all, so I

3    could have some idea of what I think is expert versus lay

4    testimony that we can anticipate from this witness.

5            MR. DEARINGTON:  Understood, Your Honor.

6            THE COURT:  So proceed.

7    BY MR. DEARINGTON:

8    Q.   Dr. Tiffert, I'm providing you with Exhibit B to the

9    government's opposition.  You can hold on that one for now.

10   A.   Right.

11   Q.   Are you familiar with this document?

12   A.   Yes.  I wrote this document.

13   Q.   And what would you say the focus of this document is?

14   A.   So the focus of this document was in the context of what I

15   earlier described as sharp power to describe the exposure

16   largely of American and global universities, especially in the

17   humanities and social sciences, to authoritarian influence and

18   interference in their activities.

19   Q.   How many countries do you discuss or refer to in this

20   ten-page pamphlet?

21   A.   I refer to Hungary, Russia, China, Saudi Arabia -- I can't

22   recall if I refer to more than that, but a handful.

23   Q.   But do you ever refer to the Changjiang Scholar Program in

24   this pamphlet?

25   A.   Not explicitly.

19-20052-JAR    USA v. Feng Tao    10.15.21

1    Q.   But you do refer to the Thousand Talent Program in one

2    instance; is that correct?

3    A.   Could you draw me attention to that instance?

4    Q.   Sure.  That is on page 5, in the middle paragraph.

5    A.   Right.

6    Q.   The second half of the middle paragraph.

7    A.   Yes.

8    Q.   And fair to say this reports out that certain individuals

9    were terminated from their U.S. university and that one

10   individual was criminally charged at a U.S. -- who works for a

11   U.S. university for failing -- allegedly failing to disclose

12   certain ties to China, correct?

13   A.   That sentence refers to a particular case, yes.

14   Q.   Right.  And all of this discussion of the talent plan came

15   from -- you cite *The New York Times* and a Tampa Bay online

16   newspaper correct?

17   A.   Indeed.

18   Q.   Sorry.  Just going back to Exhibit C for a moment.  If you

19   could just turn to page 263, please.  Actually, let's start

20   with page 261.

21   A.   Okay.

22   Q.   It says, this report grew out of a series of discussions

23   over the past year and a half at the Hoover Institution,

24   Sunnylands, and Georgia Washington University in which the

25   following scholars participated?

1    And if you go to page 263, I think you're the 21st person

2   listed in that; is that correct?

3   A.   It's alphabetical.

4   Q.   Right.  So there -- I'm just trying to direct you to where

5   you are in the list of 23, if we're being complete here.

6        So fair to say 23 people discussed these issues, and then

7   Mr. Diamond and his colleague put together this report?

8   A.   No.  Fair to say that 23 people were the core members of

9   this working group, and clusters of them authored individual

10   chapters, which Messrs. Diamond and Schell edited into the

11   final report.

12   Q.   And did you author chapter 8, which discussed the talent

13   plans?

14   A.   I was part of the group that was part of chapter 8.  I was

15   not the lead author on it.

16   Q.   You were not the author.  Got it.

17        There was a third exhibit that the government proffered,

18   and it's attached -- in its opposition, which I will provide to

19   you.  This is Exhibit A.

20        MR. DEARINGTON:  I'm providing the witness with an

21   exhibit called Global Engagement: Rethinking Risk in the

22   Research Enterprise.

23        THE WITNESS:  Yes.

24   BY MR. DEARINGTON:

25   Q.   Now, this was a study of the Seven Sons universities and

1    their affiliation with the Chinese military.  Is that fair?  It

2    may not be precise, but that's correct?

3    A.    This report is a study of American universities'

4    engagements with the Seven Sons of National Defense, which are

5    universities tied to China's military.

6    Q.    And was Fuzhou University one of those?

7    A.    Fuzhou University was not among those.

8    Q.    So this report is not about, in any respect, Fuzhou

9    University?

10   A.    Correct.

11   Q.    And is this report focused on talent programs?

12   A.    No.

13   Q.    Is the Changjiang Scholar Program referenced in this

14   report?

15   A.    I do not believe so.

16   Q.    Well, again, in fairness, to avoid any corrections of the

17   record later, I will point you to the three places where

18   Changjiang is referenced.

19   A.    Thank you.

20   Q.    The first is page 36.  There's one sentence, and it refers

21   to HIT, which is Harbin?

22   A.    Right.

23   Q.    And it states that certain recruits, according to the

24   website, to Harbin were part of the Changjiang Scholar Program,

25   correct?

1    A.  Yes, I see that.

2    Q.  Did you write that?

3    A.  Yes, I did.  You've jogged my memory.  Thank you.

4    Q.  Sure.

5        And the other instance are page 50, where you make the same

6    type of observation about MIIT.

7    A.  Yes.

8    Q.  And finally, on page 70, you make the same observation, or

9    substantially similar, about SKLEST, and you cite to the

10   websites for this information, correct?

11   A.  Correct.

12   Q.  And there's no other discussion, that you're aware of, of

13   the Changjiang Scholar Program?

14   A.  I don't believe so.  It was not the focus of this report.

15   Q.  Did you present these three writings to the government in

16   connection with this case?

17   A.  Not in connection with this case.  I have made

18   presentations of this report to the government.

19   Q.  Would you -- would you think it's fair that this is some of

20   the best evidence of your credentials to testify about the

21   Changjiang Scholars Program?

22   A.  This, I believe, is evidence of my familiarity with China's

23   efforts to engage in tech transfer.

24   Q.  Are you aware that this case is not an intellectual

25   property theft case?

1    A.    Yes.

2    Q.    Now you testified to Congress in 2017; is that correct?

3    A.    Correct.

4    Q.    And you were identified as a, quote, expert in modern

5    Chinese legal history, not talent programs, right?

6    A.    The subject of that hearing was not about talent programs.

7    Q.    You weren't called to testify about talent programs?

8    A.    Not at that hearing.

9    Q.    Were you called to testify about the Changjiang Scholars

10   Program at any congressional hearing?

11   A.    No.

12   Q.    Were you called to testify about talent programs in

13   particular at any congressional hearing?

14   A.    No.

15   Q.    So when you said not at that hearing, you meant at no

16   hearings you've been called to testify about the talent

17   programs.

18   A.    We were speaking only of that hearing.

19   Q.    Got it.

20         Let's turn to the Changjiang Scholarship Program just

21   generally.

22   A.    Uh-huh.

23   Q.    How many Changjiang Scholars are awarded each year?

24   A.    There are 150, approximately, awarded under the regulations

25   at the Distinguished Professor level; approximately 300 at the

1  youth level; and then a smaller group of, if I recall, about 50

2  at the chair level.

3  Q.  So that's 500 scholars per year?

4  A.  Right.

5  Q.  And how many -- sorry.  Let me go back.

6      So the -- how long has the program been in effect?

7  A.  Since 1998.

8  Q.  Wow.  So that means there must be -- I don't know -- am I

9  doing the math right here?  If you have 23 years at 500 per

10  year, is that 10,000, roughly?

11  A.  I don't have access to a calculator.

12  Q.  I don't either, but it's a lot, fair?

13      How many of them have you spoken to?

14  A.  More than five, under a dozen.

15  Q.  Okay.  What were their names?

16          MR. BARRY:  Objection.  This gets into private issues

17  in terms of individuals he's spoken to who may be implicated as

18  Changjiang scholars.

19          THE COURT:  I'll sustain.  It's not relevant anyway.

20          MR. DEARINGTON:  Your Honor, may I argue that?

21          THE COURT:  It's not relevant.  Why do I care what

22  their names are?

23          MR. DEARINGTON:  So he's basing his expertise -- in

24  part, I imagine -- on his familiarity with the Changjiang

25  Scholar Program.  It sounds like you need to talk to some

1    Changjiang scholars to know what the program is about.  How are

2    we able to verify or understand the depth of these

3    conversations or who these people were, to confirm that they

4    were Changjiang scholars?

5        We're not talking about an informant here.  We're

6    talking about an expert, and it's not illegal to be a

7    Changjiang Scholar --

8        THE COURT:  I don't know who these folks are.  I don't

9    know if they're under investigation.  The government says it's

10   subject to some sort of protective order.  I don't think that I

11   need to know their identification.

12       On direct examination, I didn't hear anything about

13   him talking to scholars, et cetera.  This is sort of expanding

14   the questioning about what his level of experience might have

15   been.  You can certainly inquire about whether he's basing any

16   of this on those conversations.

17       But I don't think I need to know who these folks are.

18       MR. DEARINGTON:  Understood, Your Honor.

19       MR. BARRY:  And just to clarify, the objection is not

20   based on a protective order.  I don't even know the identities

21   of these people, so I don't know if there are issues.  I think

22   it's beyond the scope.

23       You know, if the defense has an issue afterwards,

24   we're happy to engage in that, but I don't think it's

25   appropriate right now at a public hearing.

1    MR. DEARINGTON:  I'll move on, Your Honor --

2    THE COURT:  Okay.

3    MR. DEARINGTON:  -- to the question you just

4    suggested.

5    BY MR. DEARINGTON:

6    Q.  Are you basing any of your testimony or your opinions on

7    your conversations with Changjiang scholars?

8    A.  They have provided background information that has been

9    useful for me to reach the judgments that I have about the

10   Changjiang Scholars Program.

11   MR. DEARINGTON:  So, Your Honor, I don't want to be

12   out of line, but I'd like to ask about those conversations.  We

13   don't need to get into names at this point, but he is basing

14   his testimony on those conversations.

15   THE COURT:  Go ahead.

16   BY MR. DEARINGTON:

17   Q.  What was the nature of those conversations?

18   A.  I had specific questions, for example, about the process of

19   application.

20   Q.  And how many conversations would you say, in total --

21   separate conversations you've had with Changjiang scholars?

22   A.  Perhaps a dozen.

23   Q.  So a dozen conversations, roughly, with roughly five

24   scholars.

25   And when did those conversations occur?

1    MR. BARRY:  Objection.  This is beyond the scope.

2    This is not for the purposes of defense developing

3    investigative -- I mean, I don't know, discovery evidence for

4    cross-examination.  If he wants to get into the bases, I did

5    not talk, as the Court said, about conversations he had that

6    form the basis.

7         So I don't -- I don't see how this has to do with

8    *Daubert*.  He's asking for details.

9         THE COURT:  I will allow you to ask when the

10   conversations occurred, but I don't know that I need to hear

11   anything more about it.  I think the witness has sufficiently

12   answered that he learned things about the program from talking

13   to people that were involved as scholars.

14        But you can ask him what time frame we're talking

15   about.

16   BY MR. DEARINGTON:

17   Q.  Did you speak to any Changjiang scholars who applied to the

18   program between 2017 and 2018?

19   A.  No.  I spoke to --

20   Q.  Just a simple no is okay.  Thank you.  I'll ask follow-ups

21   if I need more information on that particular point, but I'm

22   just trying to keep this moving along.

23        Did you speak to any Changjiang scholars who accepted

24   employment in 2018?

25   A.  No.

1    Q.    Thank you.

2          Have you spoken -- are you basing your testimony on your

3    discussions with any Ministry of Education officials in China?

4    A.    No.

5    Q.    Have you spoken to any Ministry of Education officials in

6    China?

7    A.    Yes.

8    Q.    Have you spoken about the Changjiang Scholars Program?

9    A.    No.

10   Q.    Putting aside the evidence provided to you in this case by

11   the government, how many of the 10,000 or so Changjiang

12   scholars that have come about in the last couple of decades,

13   how many of their contracts -- final contracts have you

14   reviewed?

15   A.    None.

16   Q.    None?

17   A.    Correct.

18   Q.    So you had never seen a final contract before ever?

19   A.    Those are not public documents.

20   Q.    Do you recall meeting with the FBI on June 2, 2021?

21          MR. BARRY:  Objection.  I think this is beyond the

22   scope.  I mean, you're asking about interviews by the FBI?

23          MR. DEARINGTON:  It's beyond the scope that there was

24   a meeting with the FBI?  I haven't even gotten to the question

25   yet.

1        THE COURT:  What does this have to do with *Daubert*

2    issues?

3        MR. DEARINGTON:  So Mr. Tiffert provided an opinion to

4    the FBI that seems to have been what he iterated, and according

5    to the 302, it says --

6        THE COURT:  Do you want to ask him about an opinion he

7    gave to the FBI?

8        MR. DEARINGTON:  Correct.

9        THE COURT:  All right.  Proceed.

10   BY MR. DEARINGTON:

11   Q.   Do you recall on June 2, 2021, giving the opinion to the

12   FBI that the unsigned -- do you recall looking at an unsigned

13   contract template purporting to be between Dr. Tao and Fuzhou

14   University?

15   A.   I do.

16   Q.   And do you recall stating to the FBI that this verbiage in

17   the contract, unsigned contract template, applied to most

18   participants of the Changjiang Scholars Program?

19   A.   I don't recall that conversation specifically, so it's

20   difficult for me to say.

21   Q.   Do you agree today that the verbiage in Dr. Tao's unsigned

22   contract template applied to most participants of the

23   Changjiang Scholars Program?

24   A.   Yes.

25   Q.   And yet you've never seen a contract before?

1  A.   Yes.  Because I'm familiar with the regulations and with

2  the scholarship on the contracts.

3  Q.   So your opinion is that the unsigned contract template is

4  consistent with the regulations?  That's what you meant, then?

5  A.   And the scholarship and research on this -- on the

6  Changjiang Scholars Program.

7  Q.   Okay.  Have you ever seen another talent program final

8  contract?

9  A.   I don't recall.

10  Q.   So it's possible that you've actually never seen a talent

11  program contract that has been entered into in China?

12  A.   Correct.

13  Q.   Have you ever been to Fuzhou University?

14  A.   No.

15  Q.   You've never studied the university as an academic.  You

16  studied some of the Seven Sons, but you didn't study Fuzhou,

17  correct?

18  A.   I've never studied Fuzhou University, no.

19  Q.   When were you retained as an expert in this case?

20  A.   I'd have to consult my reports.  I want to say April 2021,

21  but I'm not certain.

22  Q.   Got it.

23       And have you served as an expert in any other cases?

24  A.   I have.

25  Q.   And which cases were those?

1    A.   The Guan Lei case in Los Angeles.

2    Q.   Guan Lei case in Los Angeles.

3         Is that the only case?

4    A.   Excuse me.

5    Q.   Is that the only case you've served as an expert in?

6    A.   Yes.

7    Q.   Did that involve talent programs?

8    A.   No.

9    Q.   So what was your area of expertise stated in that case?

10   A.   This was a case that related to -- my expertise related to

11   my knowledge of Chinese military universities.

12   Q.   You have a very wide breadth of knowledge about China.

13   Chinese military is also your expertise, in addition to

14   cybersecurity, the law, Asia, China, and talent programs?

15   A.   Chinese military universities --

16             MR. BARRY:  Objection, argumentative.

17             THE COURT:  I'm sorry?

18             MR. BARRY:  Objection, argumentative.

19             MR. DEARINGTON:  I can move on, Your Honor.

20             THE COURT:  All right.

21   BY MR. DEARINGTON:

22   Q.   And in that case, were you asked to render an opinion?

23   A.   I was asked to review evidence and to interpret it.

24   Q.   What was your initial opinion in that case, if you can

25   summarize it?

1          MR. BARRY:  Objection, beyond the scope.  He already

2     said the testimony -- or his opinion in that case did not have

3     to do with talent plans.  I don't see how it's related to --

4          MR. DEARINGTON:  Your Honor --

5          THE COURT:  Well, he also said he didn't have an

6     opinion.  He said he reviewed evidence and interpreted it.

7          So I don't know that --

8          MR. DEARINGTON:  I think -- we've been produced

9     opinions in that case by the government, so --

10          THE COURT:  Did they have anything to do with what his

11     testimony --

12          MR. DEARINGTON:  Well, Your Honor, where I'm going

13     with this is that Daubert allows a party to explore error

14     rates.  And so if he's had one case where he was an expert and

15     he rendered one opinion and then changed his mind, I would like

16     to know that because I think it informs his ability to serve as

17     an expert related to universities in China.

18          THE COURT:  All right.  Go ahead.

19     BY MR. DEARINGTON:

20     Q.   Did you render an opinion in that case initially that the

21     defendant was likely in the Chinese military?

22     A.   When the facts as the government understood them were

23     presented to me, I suggested that there was a strong

24     possibility.  Then when I reviewed the evidence in greater

25     detail and was asked to look into it further, I changed my

1    opinion based on the empirical data.

2    Q.   So you rendered an opinion with incomplete information and

3    evidence?

4    A.   I was not aware I was rendering an opinion, a formal

5    opinion.  I was simply asked a question, given the nature of

6    that university, whether it seemed possible that the defendant

7    was who the government thought he was.

8    Q.   Would you say you made a mistake?

9    A.   No.

10   Q.   So you stand by your initial opinion that the defendant was

11   likely, based on what you knew then, associated with the -- in

12   the Chinese military?

13   A.   Absolutely not.  It was -- I do not stand by that original

14   opinion because I revised it on the basis of research.  I did

15   not render it as a formal opinion, as a conclusory opinion.

16   Q.   So what -- okay.  So you testified at that trial,

17   presumably, as well?

18   A.   There was no trial.  The case was dismissed.

19   Q.   Okay.  And so just to clarify, you conducted additional

20   research later in the case and provided a different opinion?

21   A.   I was retained as an expert witness to review the

22   government's evidence, to conduct additional research into the

23   factual background of that university.  And on the basis of

24   that, my thinking changed, and I reported my findings to the

25   government.

1  Q.  But you were retained based on your experience, were you

2  not?

3  A.  I can't speak to the grounds that the government had for

4  retaining me.

5  Q.  So you provided an opinion about the defendant in that

6  case's association with the -- or in involvement with the

7  Chinese military, based on your experience, correct?

8  A.  Again, define opinion, please.

9  Q.  You opined that it was likely that the defendant was

10  involved with the Chinese military in that case, correct?

11  A.  Initially, yes.

12  Q.  Correct.  I'm talking about initially.

13  A.  Initially.

14  Q.  And that was based on your experience?

15  A.  That was based on my experience and my understanding and

16  research into that particular institution.

17       I then developed the evidence further and did deeper

18  research and discovered that the particular program that that

19  defendant was enrolled in was unusual for that university, and

20  thus my -- I revised my opinion based on my findings.

21           THE COURT:  Is that why the case was dismissed?

22           THE WITNESS:  I reported my findings to the FBI.  I

23  can't speak to why the case was dismissed, but it was

24  dismissed, and I recommended that it be dismissed.

25  BY MR. DEARINGTON:

1    Q.   So no one brought this --

2         THE COURT:  This suggests that he's not a hired gun

3    for the government.

4         MR. DEARINGTON:  Well, Your Honor, I haven't finished

5    crossing him, in fairness.

6         THE COURT:  I'm just telling you.  I don't think you

7    need to go any further with this line of questioning, but go

8    ahead.

9    BY MR. DEARINGTON:

10   Q.   So it sounds like you said no one brought to your attention

11   this new information.  You personally investigated the

12   defendant?

13   A.   No.  I personally investigated the university and the

14   program that the defendant had been enrolled in.

15   Q.   Okay.  And no one had ever suggested to you that this

16   person wasn't in the Chinese military?

17   A.   Excuse me?  That was or wasn't?

18   Q.   That wasn't suggested prior to your figuring it out this

19   person wasn't in the Chinese military?

20   A.   It was a question in the case whether they were or weren't.

21   Q.   What I'm getting at is:  Were you the first person to raise

22   a red flag about your initial opinion?

23        MR. BARRY:  Objection, beyond the scope.

24        THE WITNESS:  I can't know that.

25        MR. BARRY:  Wait a minute.

19-20052-JAR   USA v. Feng Tao   10.15.21

1          MR. DEARINGTON:  To you.

2          MR. BARRY:  Beyond -- objection, beyond the scope.

3    We're not talking about --

4          THE COURT:  I'll sustain it.  I don't think I need to

5    hear anything more about this.

6          MR. DEARINGTON:  Your Honor, he just took a white

7    knight position that he flagged for the government an issue and

8    told them to dismiss the case.

9          THE COURT:  Here's what I heard:  He didn't have a

10   complete picture.  He rendered an initial opinion.  He went and

11   did more research.  He changed his opinion and recommended to

12   the government they ought to dismiss the charges, and the

13   charges were dismissed.  I don't think that's helpful to you.

14   I would move on.

15         MR. DEARINGTON:  Okay.  Understood, Your Honor.

16   BY MR. DEARINGTON:

17   Q.  In this case, do you -- were you provided with evidence

18   relating to Dr. Tao?

19   A.  I was provided with a packet of evidence, and that was the

20   entire universe of evidence that I looked at.

21   Q.  And did any of that evidence suggest to you that Dr. Tao

22   may not have taken a full-time position at Fuzhou University?

23   A.  The evidence tended to indicate that he did take a

24   full-time position at Fuzhou University.

25   Q.  Every single document the government provided to you

1    indicated to you that Dr. Tao took a full-time position at

2    Fuzhou University?

3    A.   The preponderance of the evidence, to be sure.

4    Q.   Was there any piece of evidence that caused you to perhaps

5    doubt or conduct further research as to whether Dr. Tao may

6    have taken a full-time job at Fuzhou University?

7    A.   There were documents that were ambiguous, depending on the

8    dating.  There were times where he presented himself as being

9    exclusively at Fuzhou University.

10   Q.   I'd like to turn to some of the government's exhibits.

11        Do you still have copies of those, Dr. Tiffert?

12   A.   I think so.  They're a bit disordered, but I'll try --

13   Q.   Sure.  I will try to organize mine with you in tandem.

14        So let's start with what's marked as Government Exhibit 1.

15   A.   All right.

16   Q.   You testified that this appeared to you to be a Changjiang

17   Scholar application.  And is it your testimony that this looked

18   like an application that would have been submitted by Fuzhou

19   University?

20   A.   That is what the document attests.

21   Q.   Okay.  And if you turn to page 9 -- are you there?

22   A.   Are we looking at the Chinese?  The English?

23   Q.   You can look at whichever version, and if you disagree with

24   my characterization based on the English translation, please

25   let me know.

1    A.    Can you give me the Bates stamp number?

2    Q.    Sure.

3          THE COURT:    I don't think it's Bates stamped.    It's

4    towards the back of the -- so it would say page 21 of 25 and

5    then 9 -- I don't think there's a Bates stamp on them.

6    BY MR. DEARINGTON:

7    Q.    Yes, the signature page.

8    A.    Oh, okay.    Got it.

9    Q.    Alleged signature page.

10         So the first paragraph states, after accepting employment

11   and entering on duty -- let me back up.

12         How many of these Changjiang scholar final applications

13   have you reviewed?

14   A.    This is the only one.

15   Q.    This is the only one ever?

16   A.    I'm not a member of the selection committee.

17   Q.    Have you spoken to anyone on the selection committee?

18   A.    I don't believe the person that I have in mind, no, has

19   ever served on a selection committee.

20   Q.    So you --

21   A.    But, actually, I could not confirm that.

22   Q.    You're not aware of -- you cannot confirm you've spoken to

23   anyone on the selection committee, correct?

24   A.    Right.

25   Q.    Whoever served on the selection committee in the last

1    25 years or so?

2    A.   I do not know.

3    Q.   Okay.  So this is the first alleged Changjiang application

4    you've seen?

5    A.   Correct.

6    Q.   And on page 9, it says, after accepting employment and

7    entering on duty, do you commit to make the distinguished

8    professor position for which you are being hired your full-time

9    position and do you pledge to work full-time every year in this

10   position?  And the box says yes, correct?

11   A.   Correct.

12   Q.   So if someone were to have submitted this -- let me back

13   up.

14       If someone -- if a university submits this application, it

15   was your testimony that that does not mean the person has

16   entered into a contract and agreed to work full-time at the

17   university, correct?  This is an application for the Changjiang

18   program, and that would come later?

19   A.   Right.  The submission of this application is prior to the

20   negotiation of the full contract and the signing of that

21   contract.

22   Q.   Got it.

23       And is it consistent, in your opinion, with being a full --

24   with being a Changjiang scholar who has accepted full-time

25   employment, as required by this application, if that very same

1   person was teaching classes in Lawrence, Kansas?

2        MR. BARRY:  Objection, beyond the scope.  The purpose

3   of a *Daubert* hearing is relevance, reliability, and

4   qualifications.  We offered his testimony to give the Court

5   context in order to make determinations about relevant expert

6   testimony.

7        Mr. Dearington, in my view at least, is beginning to

8   cross-examine him, which he'll be entitled to do later, but,

9   again, objection to scope.

10       THE COURT:  This is not an opinion this witness is

11  called by the government to offer.

12       MR. DEARINGTON:  Your Honor, in the -- I believe it's

13  the 302, if not today --

14       THE COURT:  All right, but -- wait.  Forget what's in

15  the 302.  That's just an interview.

16       MR. DEARINGTON:  That's the expert disclosure, though.

17       THE COURT:  All right.  Whatever.  I've already told

18  you there's a lot of topics that I'm not going to allow, and

19  this is one of them.

20       MR. DEARINGTON:  Understood.

21       THE COURT:  He's not going to give an opinion on the

22  defendant's intent.  That's what this question goes to, is

23  intent.  And your motion *in limine* to exclude him talked about

24  this very issue of intent, so stop asking him about things that

25  you know are not admissible.

1          I'm not going to let any expert testify about intent.

2          MR. DEARINGTON:  About what this document is, though?

3          THE COURT:  I don't care what's in the disclosures.

4     I'm going to give you an opinion that tells you what he can and

5     cannot testify to.  And it's a given -- that question, I don't

6     care whether it's in the 302 or not.  If it has something to do

7     with intent -- and I think it does -- it's not proper for an

8     expert to testify to it.

9          So we don't need to talk to him about that.

10         MR. DEARINGTON:  Your Honor, understood.

11         And just for the sake of clarity, if the government is

12    representing that Dr. Tiffert is not going to render an opinion

13    that Dr. Tao is likely to have accepted full-time employment by

14    comparing the intent through this document to the evidence of

15    what Dr. Tao allegedly was doing in China, then I can move on

16    from here.

17         I'm not sure that is their position.

18         THE COURT:  Is the government -- does the government

19    seek to elicit that kind of opinion from this witness?

20         MR. BARRY:  Dr. Tiffert is not going to testify about

21    intent.  It's not -- as you said, it's not appropriate for him

22    to testify about the defendant --

23         MR. DEARINGTON:  That's not what I -- respectfully,

24    that's not what I was suggesting.

25         THE COURT:  Well, I think your question was:  Is it

19-20052-JAR    USA v. Feng Tao    10.15.21

1    consistent for somebody to say they're going to work full-time

2    and then also think they're going to work full-time at KU?

3            MR. DEARINGTON:  So the government --

4            MR. BARRY:  That's -- just, for example, that

5    statement, we're not going to elicit testimony on that.

6            THE COURT:  Okay.  Let's move on.

7            MR. DEARINGTON:  Okay.  So the -- a slightly separate

8    point, though, Your Honor, just so I'm clear, is:  The

9    government has signaled that it intends to point to the

10   unsigned contract, this application, and not use it for the

11   truth of the matter asserted, but their argument seems to be

12   that if Dr. Tiffert can state -- can look at evidence of what

13   Dr. Tao was allegedly doing in China and compare it to the

14   regulations in these documents, his opinion will be suggestive

15   and probative and possibly conclusive to -- according to him,

16   that Dr. Tao did, in fact, take a full-time job.

17           And I'm cutting --

18           THE COURT:  No one is going to ask this witness for an

19   ultimate opinion about intent.

20           MR. DEARINGTON:  Right.

21           THE COURT:  The government can ask him, I think, about

22   how the program works, what the expectations were.  The

23   government probably is going to try to put evidence on that he

24   was fulfilling those expectations with other evidence.

25           But we're here to determine what's proper expert

1    testimony.  They're saying they're not going to ask him that.

2    I'm not going to allow them to ask them that.

3              So please move on.

4              MR. DEARINGTON:  Understood, Your Honor.

5              THE COURT:  Okay.

6              MR. DEARINGTON:  And I may come back to expectations,

7    since that was within the scope of what Your Honor just stated,

8    but I will move on from this question.  And if Your Honor

9    thinks I'm crossing the line accidentally, I'm sure you will

10   pause me.

11   BY MR. DEARINGTON:

12   Q.   So, Dr. Tiffert, you testified about an announcement you

13   saw on the Internet that suggested that Dr. Tao was a

14   Changjiang scholar; is that correct?

15             MR. BARRY:  Objection, misstates his testimony.

16             THE COURT:  I think you're referring to that

17   Exhibit No. 6 or something?

18             MR. DEARINGTON:  No, I -- well, I'm not sure.

19             Maybe I'll pose it as an open-ended question.

20             THE COURT:  Because what I recall him testifying was

21   just the general steps of what happens and that there's an

22   announcement, I believe, of the applicants.  And then later,

23   once they're chosen and a certificate is issued, there's

24   another public announcement or statement, but I don't think his

25   testimony on that was specific to this defendant.

1          So I'll sustain as to the form of the question because

2     I don't think that's what he testified to specifically.

3          He in general terms talked about the program, the

4     steps from application to approval, you know, who participated

5     in each step.  And he was talking about the Changjiang Scholars

6     Program, but he -- other than that one exhibit, the photo and

7     the article, I don't recall that there was any testimony

8     specifically about the defendant and some sort of public

9     pronouncement.

10          MR. DEARINGTON:  I -- do you mind if -- Your Honor, if

11     I clarify that because --

12          THE COURT:  Go ahead.

13     BY MR. DEARINGTON:

14     Q.   So did you testify earlier about an announcement of

15     Changjiang Scholars on the Internet?

16     A.   I made no representations specific to Professor Tao.

17     Instead, I described the process by which these things unfold.

18          MR. DEARINGTON:  Okay.  I can move on, in that case,

19     Your Honor.

20     BY MR. DEARINGTON:

21     Q.   I would like to ask about Exhibit 6, that Your Honor just

22     referenced, which has the picture on it.  You testified as to

23     the significance of that picture.

24          Did you know who was in that picture when you first

25     reviewed it?  Were you -- let me reframe that.

1      Were you able to identify the individual that you say --

2  said was a party secretary in that picture?

3  A.  Well, I didn't need to, insofar as the person is identified

4  in the title of the article and the body of the text as the

5  party secretary.

6  Q.  And do you trust that text?

7  A.  And then I looked up the party secretary's photo.  There's

8  a biography of him available with that -- with his face.  And

9  that is the party secretary.

10  Q.  The question was:  Do you trust what you found on this web

11  page in Exhibit 6, what you saw on this web page in Exhibit 6?

12  A.  I have no reason to distrust it, so I do.

13  Q.  So do you have a reason to trust it, or do you only not

14  have a reason to distrust it?

15  A.  This individual data point in the context of the larger

16  body of evidence indicates that it is a trustworthy source.

17  Q.  Okay.  And I don't want to draw on your alleged -- or on

18  your represented cybersecurity expertise here, so I want to --

19  but I do want to ask:  This URL at the top is not a government

20  URL, correct?

21  A.  As far as I know, it is not.  It's an aggregator of news

22  about Chinese academia.

23  Q.  How do you know that?

24  A.  Having visited it and explored it.

25  Q.  That's what it looks like to you.  Is that what you're

```
 1   saying?

 2   A.   Indeed.

 3   Q.   Okay.  Let's turn to the exhibit consisting of the machine

 4   translation of the 2000- -- what purports to be the 2011

 5   regulations of the Changjiang Scholars Program.

 6        Are you aware of how this was translated?

 7        I know you've represented it somewhere you were an expert

 8   in machine learning or translation or something.  I just want

 9   to see if this was you who translated this.

10   A.   No.

11             MR. BARRY:  Objection, misstates his prior testimony.

12             THE COURT:  He said he was fluent in Mandarin --

13             MR. DEARINGTON:  But this is from --

14             THE COURT:  -- he didn't say he was an expert in

15   translation.

16             MR. DEARINGTON:  I read him -- I was just making sure

17   that he didn't do this.

18             THE COURT:  Okay.

19             THE WITNESS:  This was -- I did not pursue this

20   machine translation.

21   BY MR. DEARINGTON:

22   Q.   Okay.  But you have no reason to doubt this translation,

23   from your review of it?

24   A.   It seems consistent with the Chinese text.

25   Q.   Okay.  I'd like to start --
```

19-20052-JAR   USA v. Feng Tao   10.15.21

1           THE COURT:  What's the exhibit number again?

2           MR. BARRY:  7.

3           MR. DEARINGTON:  It's 7.

4    BY MR. DEARINGTON:

5    Q.  Start on page 4.  Article XI, basic conditions of special

6    professor.

7        Could you read paragraph 1, please, for the record.

8    A.  On January 1st of the year of application, the age of

9    candidates in natural science and engineering technology shall

10   not exceed 45 years old, and the age of candidates in

11   humanities and social science shall not exceed 55 years old.

12   Q.  So if a candidate -- if I were to tell you that Dr. Tao had

13   passed the age -- his 45th birthday at the time of July 2017

14   when he submitted the application, would that change your

15   opinion that that application could have led to a full-time

16   position?

17   A.  Are you saying that he was 45 years old at the time he

18   submitted the application?

19   Q.  I'm stating that -- if I were to tell you he had already

20   turned 45, such that he was in excess of his 45th -- of

21   45 years old.

22           MR. BARRY:  Objection --

23           THE WITNESS:  I will look at the Chinese.

24           MR. BARRY:  Wait a minute, Dr. Tiffert.

25           THE COURT:  Wait a minute.

1          MR. BARRY:  Objection, scope.  Probably an appropriate

2     question for cross-examination, getting into the substance of

3     the opinion.  Doesn't have to do with reliability, relevance,

4     or qualifications, which is the purpose of *Daubert* and the

5     purpose of the evidentiary hearing today.

6          MR. DEARINGTON:  Your Honor, this witness's proposed

7     expert testimony was that is an authentic Changjiang Scholar

8     application and that it is consistent with someone who could

9     have obtained full-time employment as a Changjiang Scholar.

10         THE COURT:  I'll allow this question.  Overruled.

11         THE WITNESS:  So I'm looking at the Chinese in

12    addition to the English, and both say exceed 45 years, so that

13    suggests to me 46 years.

14    BY MR. DEARINGTON:

15    Q.   So if you've been on the planet for 45 years and you exceed

16    those 45 years, you're ineligible under this article?

17    A.   My reading of it in plain English suggests that if you turn

18    46, you are ineligible.  You are eligible up until that time.

19    Q.   But you've never spoken to anyone who has interpreted these

20    in China who is responsible for drafting or interpreting these

21    regulations?

22    A.   I have not.

23    Q.   Got it.

24         And turning to paragraph 5 of article XI, could you please

25    recite that condition.

1   A.   Work time in the employed university during the appointment

2   period.   They should work full-time in the university within

3   one year after signing the appointment contract.

4        THE COURT:   Right.   I'm going to stop because I

5   overruled the government's last objection, but I do think this

6   is the path that you're on, is impeaching him rather than

7   focusing on the proper things that I need to decide at this

8   stage.

9        I mean, at trial, I could -- I anticipate that you

10  would go into these questions, but I think you've crossed the

11  line.   I mean, I don't think this -- I think you're beyond what

12  I need to decide to determine whether or not he's qualified to

13  testify as an expert and whether his expertise would offer help

14  to the trier.

15       MR. DEARINGTON:   Understood, Your Honor.

16       I have one more question about these regulations.   Two

17  more.   Sorry.

18  BY MR. DEARINGTON:

19  Q.   On page 7, article XXIX states that appointed professor

20  shall not hold leading positions in higher education

21  institutions or be transferred from their appointed positions

22  during the appointed period.   Would it change your opinion

23  testimony if you learned from the facts at trial that Dr. Tao

24  had a position at KU after he allegedly signed an employment

25  contract?

1   A.    No.  I believe that's the issue at trial.

2   Q.    So you're saying that these regulations, which I believe

3   you said, quote, observance of regulations are taken very

4   seriously.  Do you stand by that testimony?

5   A.    Yes.

6          MR. BARRY:  Objection, beyond the scope.  This is

7   impeachment.

8          THE COURT:  I'll sustain.

9   BY MR. DEARINGTON:

10  Q.    When did you first review these regulations?

11  A.    2021.  Some point in the middle of 2021.

12  Q.    Right around the time -- I guess after you said you were

13  retained for this case, correct?

14  A.    Correct.

15  Q.    How did you find these regulations?

16  A.    I went to the Ministry of Education's website.

17  Q.    And you followed the Ministry of Education website to find

18  this regulation?

19  A.    Indeed.

20  Q.    Now, you've rendered certain opinions, you've proposed

21  certain opinions, and you covered a lot of ground with the

22  government so I want to go through a couple of their bullet

23  points to see if they're at all part of the basis for your

24  opinion.

25         You've discussed the secret police in China.

19-20052-JAR    USA v. Feng Tao    10.15.21

1      Is that part of the basis of your opinions about this case?

2  A.   No.

3  Q.   You discussed the unitary structure of the Communist Party

4  of China.

5      Does that form part of the basis of your opinions in this

6  case?

7  A.   Yes.

8  Q.   So is it your opinion -- let me ask it this way.

9      Does it make Dr. Tao more or less likely to have accepted

10  full-time employment at Fuzhou University if there's a unitary

11  system versus a nonunitary system in China?

12          MR. BARRY:  Objection, beyond the scope.  Again,

13  Dr. Tiffert is offering expert -- we're proposing that he offer

14  expert testimony to provide context based on his experience and

15  his interpretation of some of the evidence that the government

16  intends to present.

17          MR. DEARINGTON:  Your Honor, I'm confused.  The

18  government went through each of these topics on its direct

19  testimony to build up the credentials and the reliability of

20  Mr. Tiffert's testimony, and then the moment I ask about them,

21  it's outside the scope of his credentials.

22          THE COURT:  You know what, I think we're just sort

23  of --

24          MR. DEARINGTON:  I can move on.

25          THE COURT:   -- ignoring the elephant in the room,

1    which is this:  The government did ask this witness a number of

2    topics, frankly, I'm not going to allow them to talk to him

3    about at trial.  And I haven't told you clearly which ones I

4    will and I which ones I won't, although I haven't changed my

5    mind since yesterday about the general parameters.

6         I'm going to have to draw a line because the

7    scholarship program, party officials, and government, Ministry

8    of Education, et cetera, it's -- they're directing it,

9    administering it, leading it, whatever you want to call it.  I

10   mean, that kind of evidence is unavoidable because they're in

11   these documents, et cetera.  So I'm going to have to give you

12   all some direction about that, but --

13        So, for example, I would not allow this witness to

14   testify that, in my opinion, there's a unitary government and

15   that means that Dr. Tao blah, blah, blah.  I mean, I don't

16   think that's the way the evidence would come in anyway.

17        But I understand your concerns because those are

18   topics.  If you feel like you need to confer with the

19   government right now to see which ones they're still pursuing

20   in light of my sort of preliminary rulings telling them some of

21   those things they can't pursue, that's fine.  It may save time.

22   Maybe I should have had you all to do that before now, to be

23   fair to you.

24        Do you all want time to go through those topics and

25   the government -- I mean, are you still pursuing all of those

1    topics that are in your disclosure?

2        MR. BARRY:  No.  The government is not pursuing all of

3    those topics.  The disclosure was A, in part B, overly

4    cautious; and, B, as I said this morning, based on the

5    preliminary guidance that the Court gave us yesterday, we tried

6    to narrow the scope.

7        So the direct examination that I did of Dr. Tiffert

8    this morning, that's not going to be the complete universe, but

9    those three buckets that we went through, generally speaking,

10   are going to be the scope -- subject to the Court's further

11   guidance of the government's testimony.

12       THE COURT:  Yeah.  And I think, at least with respect

13   to some of the questions you asked him in those three buckets,

14   it went beyond what I will allow.

15       So, I mean, you know, cybersecurity, he did make some

16   mention of that.  The national party controls state levels of

17   government through public statements, through discipline and

18   terror, my verbiage, through opening funding streams.

19       I mean, I'm going to allow the government to present

20   evidence that the way this program worked was X.  There was

21   this partnership, or whatever you want to call it, between the

22   government and Fuzhou University.  The government was

23   responsible for this, Fuzhou University responsible for that.

24   It's kind of laid out in the regulations.

25       And, I mean, because there's going to have to be some

1   context for why there's any government -- any reference to

2   governmental entities on this or any reference to Fuzhou

3   University.  So, I mean, I think that's contextual, but I don't

4   think it needs to go much further than that.

5        The Made in China 2025 plan is an example of a

6   signaling plan.  I don't think that's something I would allow

7   to come into evidence, although I will tell you, in these

8   documents, application and otherwise, there is reference to

9   doing research to further the interests of China, just like

10  somebody that does research for our federal government is in

11  part -- you know, there's a reason why our federal government

12  funds academic research to the university level.

13       So anyway, I'm going to draw these lines.  I'm glad to

14  know the government understands that I'm not going to allow

15  them to go as far as they have on these topics.

16       Would you like to take a recess at this point, maybe

17  to have more clarity?  Because I don't want to spend the whole

18  afternoon --

19       MR. DEARINGTON:  Yes, Your Honor.  So --

20       THE COURT:  -- asking this witness about things that

21  aren't going to be admissible anyway.

22       MR. DEARINGTON:  Yeah.  And I appreciate Your Honor's

23  streamlining in that sense.  We were quite alarmed by the

24  government's direct because we thought, based on yesterday's

25  preliminary rulings or inclinations, that was off the table.

1  So that's why I was going to tick through them all but --

2      THE COURT:  Had you objected because you were alarmed,

3  I would have made that speech then.  I mean, I sat here and

4  took notes.  It's given me background about his qualifications

5  and the scope of his understanding and expertise, but it did

6  not mean all of that is going to be admissible.

7      MR. DEARINGTON:  Understood, Your Honor.  And we

8  discussed whether to object.  I -- we would not have objected,

9  I should say.  We didn't want to disrupt the government's

10 direct, and we wanted to keep things moving.  But I appreciate

11 that.

12     I think we could just take a very short recess just to

13 collect and see if there's anything else that we'd like to ask.

14     THE COURT:  Are you nearing the end, or do we need to

15 take a lunch break?

16     MR. DEARINGTON:  Yes, Your Honor, we're nearing the

17 end.

18     THE COURT:  Okay.  Why don't we take a 20-minute

19 recess, then.

20     (Recess.)

21     THE COURT:  All right.  Did you get some clarity?

22     MR. DEARINGTON:  Yes, Your Honor.  We just have a

23 couple more questions, and then we would request short argument

24 on the basis of the evidence during the *Daubert* hearing.

25     THE COURT:  Proceed.

1        MR. DEARINGTON:  Thank you, Your Honor.

2   BY MR. DEARINGTON:

3   Q.   Dr. Tiffert, you saw what you thought to be certificate --

4   a Changjiang Scholar certificate associated with Dr. Tao,

5   correct?

6   A.   One of the exhibits?  Yes.

7   Q.   Other than that certificate, have you ever seen a

8   Changjiang Scholar final certificate?

9   A.   I have not.

10  Q.   Never before.  Okay.

11       You testified -- did you testify earlier -- you testified

12  earlier about the process for applying and being awarded a

13  Changjiang scholarship, correct?

14  A.   Correct.

15  Q.   And was it your testimony that the Changjiang certificate

16  means that the particular applicant has entered into an

17  employment contract under the Changjiang program?

18  A.   That the document submitted as Exhibit 5 --

19  Q.   Correct.

20  A.   -- satisfies that requirement?  It is the certificate, yes.

21  I testified to that.

22  Q.   And how do you know that?

23  A.   Because this document bears the seal of the --

24  Q.   Excuse me.  Sorry.

25       How do you know that the certificate indicates that an

1  employment contract has been signed?

2  A.  The text of the certificate indicates that Dr. Tao has been

3  appointed a distinguished Changjiang fellow at Fuzhou

4  University with a term of five years, and this is the document

5  to which article XIX refers.

6  Q.  Okay.  So I want to unpack that.

7      The first part, you said, was that this certificate states

8  that he was appointed a Changjiang Scholar.  But, to be clear,

9  you testified earlier that that doesn't mean he entered into a

10 contract to actually work at Fuzhou because that comes later,

11 correct?

12 A.  The first line of the document in Chinese says that this

13 approves -- this is the approval coming from the ministry of

14 justice that Dr. Tao is a Changjiang scholar.

15 Q.  Ministry of Education?

16 A.  Or Ministry of Education.  Thank you.  I'm sorry, yes.

17     So this is the final formalization of the Ministry of

18 Education's approval of his appointment at Fuzhou University --

19 Q.  And you're basing that --

20 A.  -- for a term of five years.

21 Q.  Sorry.  You're basing that just off your reading of this

22 document?

23 A.  That is what it says.

24 Q.  And a layperson could read this document, right?

25 A.  If they read Chinese.

1    Q.   If they read Chinese or had a translation.  Okay.

2    A.   Right.

3    Q.   And then you based the second part -- you took this

4    document and you read it, and then you went to article XIX of

5    the regulations.  And you -- and that one says that -- suggests

6    to you that there would be a contract signed prior to a

7    certificate being issued; is that correct?

8    A.   That is the logic.

9    Q.   So you read this certificate, or translation of it, and you

10   read this regulation in Exhibit 7, or a translation of it.  And

11   you read the two, and you said they match up, correct?

12   A.   Correct.  And then I confirmed that in my conversations

13   with --

14   Q.   Isn't it --

15   A.   -- previous Changjiang scholars.

16   Q.   I'm sorry.  You've spoken to Changjiang scholars about this

17   case?

18   A.   Not about this case but about the process.

19   Q.   Did you show them this certificate?

20   A.   No.

21   Q.   Okay.  So you've confirmed that maybe in other cases,

22   according to your opinion, a certificate, from reading it,

23   would match article XIX.

24        And I'm confused.  You can you can -- a layperson can read

25   article XIX, can read a translation, and decide for themselves

1    if these are consistent, right?  So why did you need to ask a

2    Changjiang Scholar to do the same thing?

3    A.   Just to confirm if that's the way it, in fact, works in

4    practice.

5    Q.   And that Changjiang Scholar didn't apply at the same time

6    in 2017 or 2018, correct?

7    A.   Correct.

8    Q.   Okay.

9           MR. DEARINGTON:  One moment, Your Honor.

10          Your Honor, we have no further questions for this

11   witness.

12          THE COURT:  All right.

13          MR. DEARINGTON:  Thank you, Dr. Tiffert.

14          THE COURT:  Do you have any further questions,

15   Mr. Barry?

16          MR. BARRY:  Nothing further from the government.

17          THE COURT:  All right.  Dr. Tiffert, you can step

18   down.

19          MR. DEARINGTON:  And, Your Honor, if we may just have

20   a short argument following the *Daubert*, based on the evidence.

21          THE COURT:  All right.  Mr. Barry.

22          MR. BARRY:  Can we release Dr. Tiffert, so he can go?

23          THE COURT:  Yes.

24          MR. BARRY:  Okay.  Thank you.

25          THE COURT:  Do you want to go first?

1    MR. DEARINGTON:  Well, it's the government's burden,

2    so...

3        THE COURT:  Mr. Barry, do you want to make an oral

4    argument?

5        MR. BARRY:  At this point, the government doesn't see

6    the need for us to make further argument.  We'd reserve the

7    right to respond to anything that Mr. Dearington raises that we

8    think deserves a response.

9        THE COURT:  All right.  Go ahead, Mr. Dearington.

10        MR. DEARINGTON:  So, Your Honor, Dr. Tiffert testified

11    about a number of items that this Court has already stated it

12    is inclined to rule are unfairly prejudicial and not at issue

13    in this case.  He may very well be a top expert in his field at

14    Chinese legal history.

15        We haven't questioned him about his cybersecurity

16    credentials or any of the other, but he has a lot of areas of

17    purported expertise that are unrelated to this case, and the

18    Court has already said it will likely draw a line at.

19        The issues that the Court has not drawn a line at are

20    the Changjiang Scholar Program and the expectations of the

21    Fuzhou University.  And I'll add at the end the pictures that

22    the Court had mentioned that purports to show Dr. Tao with a

23    Fuzhou official.

24        So what we're left with is the Changjiang Scholar

25    Program that Dr. Tao has never written a book, a paper about.

1    He's never -- he's spoken to a handful of individuals out of

2    the 10,000 or so that exists, about their experiences.  And

3    they never even were Changjiang Scholars appointed around the

4    time that Dr. Tao was appointed, despite, as Dr. Tiffert said,

5    changing regulations and implementations.

6          He's not an expert of the Changjiang Scholars Program.

7    He's never even seen a Changjiang Scholar contract before,

8    which is, as we've said yesterday, one of the centerpieces of

9    the government's case, even though it's hearsay.  He's never

10   seen a Changjiang application, and he's never even seen a

11   certificate, so what does he bring to this case?

12         Well, what he brings to this case he's reviewed a

13   bunch of hearsay that the government knows can't come in as

14   hearsay, and he's claiming that he can review those

15   translations because he speaks Chinese and understand them.

16   And then he's comparing the 2011 regulations, which have

17   already been translated, and he's comparing those to the

18   Changjiang application, which he's never seen before.  And he's

19   comparing that to the certification that he's never seen

20   before.

21         So if he's taking three documents, if you really boil

22   down his testimony that may be relevant here -- that the Court

23   has said may be relevant here.  He's taking three documents

24   that he's never seen before, this case:  The regulations he

25   looked at after he was retained, the certification he's never

1    seen before except the one presented to him in this case, and

2    the Changjiang unsigned contract template he's never seen

3    before except in this case.

4           And all he's doing is looking at the translation or

5    translating himself and saying, yeah, this regulation seems to

6    match up with this document, and if you take this document, you

7    look at this regulation, they look like there's some meaning to

8    that, even though he's not an expert in these regulations.

9           That's not helpful to the jury.  What he's doing is

10   he's trying to take the jury's role here and usurp it and put

11   on an expert hat, which courts have noted is very dangerous

12   when you have an expert because if you go into prejudicial

13   territory or unhelpful territory, jurors take them very

14   seriously, more seriously than fact witnesses often.

15          You have what's essentially lay testimony masquerading

16   as expert testimony in an area that he's not an expert.  A

17   witness can look at these regulations if the government can

18   authenticate them and present them.  And a witness can look at

19   this contract, this alleged unsigned contract template, if the

20   government can get it in, notwithstanding our hearsay and other

21   objections.

22          And they can look at this certificate and they can

23   decide for themselves does this regulation encompass or have --

24   give some meaning to this certificate or to this application.

25   They don't need Dr. Tiffert to tell them what his view on that

1    is.  They're the jury.

2           This isn't a case where he's testifying based on some

3    specialized knowledge.  He didn't have an awareness of any of

4    the things germane to his testimony until he joined this case

5    and looked it up on the Internet or was given it by the

6    government.

7           Agent Lampe or any number of FBI agents could have

8    done exactly what Dr. Tiffert did, looked at the regulation on

9    the Internet, translated it, looked at the documents that

10   they've collected and seized, and decided what their view of

11   whether these match up is.  There's no need for an expert for

12   that.

13          And I would like to point to one example of how this

14   could be prejudicial.  When I crossed Dr. Tiffert about the

15   meaning of the regulation and what it meant to be past 45 years

16   old such that you're ineligible to be a Changjiang scholar, he

17   just interpreted it based on his own view.  He has no expertise

18   with these regulations.  He found them on the Internet after he

19   joined the case.

20          And so if he's up there giving interpretations of a

21   document he's spoken to nobody who is aware of them about, no

22   one who drafted them, no one who enforces them, the jury is

23   going to be at the risk of believing him despite that he's

24   basing that on nothing but his own lay opinion of what this

25   regulation means.

1          And so that is just a mere example of why it's so

2    dangerous to have an expert get up on the stand who's been

3    certified by the Court as an expert and tell the jury what to

4    think about lay information.

5          So for that reason, Your Honor, we contend that the

6    government has not met its burden under *Daubert* or Rule 702,

7    and the Court should exclude Dr. Tiffert as an expert in this

8    case.

9               THE COURT:  All right.  Thank you.

10              MR. DEARINGTON:  Thank you, Your Honor.

11              THE COURT:  Anything from the government?

12              MR. BARRY:  I'll keep it short.

13              Rule 702 should be applied consistently with a liberal

14   thrust of the federal rules and its general approach to

15   relaxing traditional barriers to expert testimony.  That's the

16   core of *Daubert*.  That's the core of 702.

17              Dr. Tiffert is eminently qualified to provide the

18   expert testimony that we've proposed.  We would welcome further

19   guidance from the Court in terms of dealing with some of these

20   line-drawing exercises.

21              But at a minimum, based on his extensive experience,

22   understanding of the Chinese language, understanding of the

23   particular threats to the American research enterprise that

24   certain PRC activities pose, and his understanding of the PRC

25   political system, his testimony is not simply looking at two

1    documents and saying as a layperson, I read X and then I

2    read Y.  He has years of experience that help contextualize and

3    interpret that.

4            So the government concludes that it's satisfied its

5    burden.  This is clearly relevant.  If there are some areas

6    that, obviously, the Court may conclude are either unfairly

7    prejudicial or just not relevant relative to the risk of

8    prejudice, we would welcome guidance on that.

9            But we don't think that -- we think we've satisfied

10    our burden at a minimum to show that he's qualified, that the

11    opinions that he would be offering would be reliable, and that

12    at a minimum there are certain lay opinions focused on the

13    Changjiang Distinguished Professor Program itself and the

14    context in which it operates that would be helpful to a jury in

15    understanding the evidence.

16            THE COURT:  All right.  Thank you.

17            All right.  The last thing I want to take up today is

18    the government's motion to continue the trial date.  I don't

19    want argument on this, but I do want some questions answered.

20            First, what's the status of the witnesses the

21    government talked about when we last spoke about this a couple

22    weeks ago?

23            MR. BARRY:  So for the three witnesses we've

24    discussed, I don't know -- time has kind of blurred.  I think

25    that's last week.

1    So the KU witness, his health status is, let's just

2   say, precarious, so we won't know right now whether we would

3   seek Rule 15 deposition of him.  He is very unlikely to be

4   available at trial, so the determinant is going to be, you

5   know, if -- consistent with whatever continuance we would

6   receive, we would check in with him probably in a few weeks and

7   see if his health status would make him available for any kind

8   of testimony.  And if that were the case, we would seek a

9   Rule 15 deposition.

10    Again, I -- well, so the status of the other two

11   witnesses, so we've reached out to both of them again.  These

12   are the two DOE witnesses.  We discussed their particularized

13   health issues that were filed under seal, and we will be

14   seeking Rule 15 depositions of the two of them.

15    We asked for alternatives to be identified, and we

16   were told that there are no alternatives, and that's consistent

17   also with -- from a trial strategy and the types of testimony

18   and evidence that we would seek to introduce for those

19   witnesses, we do not believe they can be replaced.

20    I'm happy to -- actually, if I may, I'd just like to

21   repeat some of the reasons for why that testimony is essential,

22   which may assist the Court in at least one of its bases to

23   grant a continuance.

24    So the KU witness is -- as I said, was the defendant's

25   supervisor at KU, also the department chair.  One of the counts

1   in the indictment has to do with specific representations that

2   the defendant made to that professor related to what's called a

3   buyout or a -- basically a policy that the university has that

4   allows a professor to buy out with funds their teaching

5   responsibility.

6           That professor approved that buyout based on certain

7   misrepresentations that were made to him and with specific

8   conditions, which included the defendant remaining on campus to

9   fulfill other responsibilities.  So we deem that at a minimum

10  for that count, that that witness is essential.

11          That witness also will be able to testify related to

12  Defendant's knowledge of that buyout policy and can explain why

13  he believed Defendant was aware of that policy.

14          Furthermore, that witness, because he was the

15  defendant's direct supervisor, will be -- or -- I mean, it's in

16  academia, but sort of department head -- will be able to attest

17  to Defendant's performance based on some of the statements that

18  the defense has made, including a video that they presented to

19  us or that they pointed us to as part of discovery that shows

20  Defendant at an awards ceremony.

21          We anticipate that they're going to make arguments

22  about Defendant's performance, and so, obviously, his

23  department chair is a crucial witness for being able to opine

24  on his performance across all the areas of his responsibility.

25          And, lastly, there are multiple e-mail communications

1  between this witness and the defendant, which we would be

2  seeking to introduce and authenticate through that witness, and

3  that would help us avoid a number of hearsay issues.

4          As to the DOE witnesses, there are two of them.  These

5  are both program managers in DOE's office of science who

6  communicated regularly with the defendant about his DOE grants

7  which form some of the fraud counts and false statements -- or

8  some of the fraud counts alleged in the operative indictment.

9          One of them was Defendant's program manager at a

10  particular point in time, sort of the earlier point in time.

11  That person was then promoted to be the supervisor of the

12  second program manager, who was the main point of contact

13  between Defendant and the DOE office of science for a later

14  point in time.

15          Similarly to the KU witness, these witnesses will be

16  able to testify about and introduce relevant communications on

17  which they are on those communications with Defendant and

18  elicit testimony having to do with Defendant's knowledge of

19  certain reporting requirements and the materiality of

20  Defendant's omissions or misstatements to the DOE.

21          So, obviously, when we spoke last week, that was one

22  of the bases for a motion to continue that would extend the

23  time under the Speedy Trial Act.

24          We also moved for a continuance for the ends of

25  justice, and I -- you know, I'm not going to reargue that whole

1   motion.  I've explained the basis for that last week, but we

2   would view that as a separate basis, separate to the essential

3   witness provision.

4        And, you know, the core of that is the *Franks* motion,

5   that it was late filed, which the Court agreed with yesterday.

6   We all have spent a significant amount of time litigating,

7   spending nine hours in court yesterday, in my view, all for

8   naught.  The Court rejected it not only on timeliness for lack

9   of good cause but also on the merits despite holding a

10  four-and-a-half hour *Franks* hearing of the agent.

11       That independently would be a basis for an ends of

12  justice continuance.  And then the last piece I'll add on that

13  sort of ends of justice component is, obviously, Mr. Hawk, who

14  unfortunately is not here with us today, mentioned, I think,

15  two hearings ago about his current unavailability to attend

16  trial that -- this year.

17       Again, we don't know.  His situation is dynamic, but

18  obviously to the extent we can increase the odds of a

19  continuity of counsel with Mr. Hawk, that is a separate factor

20  that the Court can consider under the Speedy Trial Act when

21  determining whether an ends of justice continuance is

22  warranted.

23       I'm happy to answer any other questions the Court may

24  have.

25       THE COURT:  One other thing I want to hear about you

19-20052-JAR    USA v. Feng Tao    10.15.21                    142

1    mentioned a little earlier today, and that is it appears

2    there's a number of documents that have been translated in a

3    variety of ways and sometimes only partially translated.

4            So tell me about that, and have the parties stipulated

5    to translations?

6            MR. BARRY:  So we have not stipulated to translations.

7    I think the government would hope to be able to stipulate to

8    translations.  Frankly, based on how litigious things have

9    been, I'm not especially optimistic.  But I would hope, if

10   we're not able -- that would be our preference, would be to

11   stipulate.

12           If we're not able to stipulate, then the government

13   would be prepared to have certified FBI linguists introduce the

14   relevant translations.

15           THE COURT:  Have the defense retained translators?  Is

16   there a dispute about translations?  Is that why -- well, first

17   of all, do you think you're going to be in a position to

18   stipulate to the translations obtained by the government thus

19   far?

20           MR. ZEIDENBERG:  Well, Your Honor, we're still getting

21   documents from the government.  We've gotten hundreds of

22   thousands of documents.  When we find out -- now that we have

23   an exhibit list and we'll know what the documents are and we

24   can focus on those and assuming if we find that they're

25   accurate, then we won't have a problem with it.

1          But we couldn't begin to undertake doing an analysis

2    of whether these are all accurate until we knew what it is

3    we're reviewing because there's simply hundreds of thousands of

4    documents to review.

5          THE COURT:  But you've discovered them in a translated

6    form throughout, right?

7          MR. ZEIDENBERG:  We have, but --

8          THE COURT:  It's just that you had a big universe and

9    now with an exhibit list, you have a smaller universe, but you

10   didn't discover documents that were only in Mandarin.  I mean,

11   didn't you produce them with translations at some point?

12         MR. BARRY:  We've been producing documents that we've

13   identified as potentially being relevant, the translations on a

14   rolling basis.  There are a lot of documents, and it's very

15   time intensive, so some of the documents are translated by some

16   entities of the government.

17         All of the documents that we will plan to introduce at

18   trial we will have certified and translated by the FBI.  But

19   the collection that the defense has is a combination of

20   documents certified -- or documents translated by FBI

21   linguists, including the linguist we plan to call, and then

22   other translations that we provided on a rolling basis to

23   assist all of us who are not Chinese speakers.

24         But we're not planning to introduce that second

25   category for those other people, so we're having the FBI look

19-20052-JAR    USA v. Feng Tao    10.15.21

1   at those again.

2        THE COURT:  All right.  So -- but at this point, you

3   have identified the documents that are marked as exhibits for

4   trial, and you have those translated; it's just a question of

5   whether the translations are acceptable to the defendant?

6        MR. BARRY:  We have the majority of them translated.

7   I don't know that every document on the exhibit list is

8   currently translated in a certified way that we would plan to

9   introduce into evidence, but definitely the majority of them

10  are.  That's a continuing process for us because of how time

11  intensive it is.

12       THE COURT:  And so what's your best guess on when you

13  can have all of those fully translated?  At least with respect

14  to the ones you're marking as exhibits, that are on your

15  exhibit list.

16       MR. BARRY:  I would have to talk to the linguist.  I

17  mean, obviously we were operating in circumstances in which we

18  were going to be ready to have those by next week, so I don't

19  think it's going to be that long.

20       But, again, part of what we were planning to do was we

21  were not -- an example is we were not planning to translate a

22  45-page document verbatim if we were only going to talk about

23  one page of the document.  Because that would take 45 -- like,

24  the amount of time it would take to translate the entire

25  document for something we're only planning to introduce a page

1    of it.

2          THE COURT:  All right.  And so it sounds like,

3    Mr. Zeidenberg, you have not started the process of reviewing

4    the translations you've received to date.

5          MR. ZEIDENBERG:  Correct.

6          THE COURT:  And is that going to be fairly time

7    consuming?

8          MR. ZEIDENBERG:  Well, you know, we have to go through

9    their exhibit list.  Obviously, our client speaks Chinese.  So,

10   you know, I don't know, when I'm going through their exhibit

11   list, how much of this will be an issue or not.  I just can't

12   say.  I mean, a lot of the documents we've seen before.  Others

13   I don't know if we've seen them or not.

14         THE COURT:  Have I given you a deadline to file your

15   exhibit lists?

16         MR. BARRY:  Yes.  The exhibit lists have already been

17   filed and exchanged.

18         THE COURT:  And when was that?

19         MR. BARRY:  I think October 1st.

20         THE COURT:  Okay.

21         MR. ZEIDENBERG:  Your Honor, we're not seeking

22   additional time for this reason.  We're not asking for time

23   because we haven't managed to accomplish that.  We will get it

24   done, whatever needs to be done.

25         THE COURT:  Well, what needs to be done is a

1    stipulation.

2          MR. ZEIDENBERG:  Well, I can't stipulate -- they still

3    haven't finished translating.

4          THE COURT:  I understand.  But all I'm telling you is,

5    this case won't be trial ready without a stipulation to the

6    translations.

7          MR. ZEIDENBERG:  We're not going to --

8          THE COURT:  I'm not suggesting you stipulate before

9    you have a chance to review them.

10         MR. ZEIDENBERG:  Right.

11         THE COURT:  I'm just telling you that's what needs to

12   happen.  I have had cases where there was no stipulation, and

13   literally we got into a battle of linguist experts.  And that

14   was -- I don't know -- a two- or three-day hearing, which we're

15   not going to accomplish before October 25th.

16         So I'm just trying to get a sense of where we're at.

17   We're not ready for trial on October 25th.  That's pretty

18   obvious.

19         MR. ZEIDENBERG:  Well, all I can say about that, Your

20   Honor, is the defense -- that is on the government for not

21   having their documents translated.  Not on the defense.  Okay?

22   We can only look at documents that they've translated and

23   stipulate to that.

24         THE COURT:  I understand.

25         MR. ZEIDENBERG:  So to the extent that --

1        THE COURT:  But I also have to take into consideration

2    the fact that the government has spent most of this month on a

3    late-filed *Franks* motion, as has the government.  And as had

4    the defendant and has the Court, so...

5        MR. ZEIDENBERG:  Well, respectfully, I don't believe

6    the linguists were participating in the *Franks* hearing and that

7    the people at the FBI who are doing the translations -- I don't

8    understand why the litigation over the *Franks* hearing would be

9    interfering with their ability to, you know, march through

10   these documents.

11       THE COURT:  Have you marched through any documents

12   that have been translated for you to date that are on the

13   exhibit list?

14       MR. ZEIDENBERG:  Your Honor, I don't speak Chinese, so

15   I'm saying that my role -- I'm one of two lawyers.  The FBI

16   linguists are not in the courtroom.

17       THE COURT:  I understand.  But all I'm saying is, you

18   haven't done -- you do have some translated documents, and you

19   haven't started going through those yet.

20       MR. ZEIDENBERG:  Your Honor, we have not identified

21   documents about which we have issues.  Okay?  So we anticipate

22   that we won't have -- you know, we're not anticipating

23   problems.  We -- You know, I'm not saying this is -- we're

24   never going to, you know, have an agreement.  We don't want to

25   delay the trial.  We don't want to drag the trial out.

19-20052-JAR    USA v. Feng Tao    10.15.21

1          I'm not foretelling this is going to be a major
2   problem.  All we've got to do is when we get the documents,
3   we'll look at them.  And if there's a problem, we'll let the
4   government know, and hopefully we can work it out.  I don't
5   anticipate it being an issue.
6          THE COURT:  Well, the reason I ask is because you
7   already have some translated documents, and you haven't done
8   that process yet.
9          MR. ZEIDENBERG:  That's right.
10         THE COURT:  If the government had not accomplished
11  that, the only stipulations are the ones you already have.
12         MR. ZEIDENBERG:  Well, we haven't done -- we're not
13  going to do it piecemeal.  So what we were going to do is if we
14  have issues with documents, we would let the government know.
15         We haven't identified any so far.  So far, we're good.
16         THE COURT:  So far, you can stipulate to the
17  translated documents you have?
18         MR. ZEIDENBERG:  I don't anticipate it being a
19  problem, Your Honor.
20         THE COURT:  But can you stipulate?
21         MR. ZEIDENBERG:  I'm not here to represent right now,
22  going through the exhibit list, which I haven't looked at
23  carefully, but I don't -- I'm saying to the Court I don't
24  expect that to be a problem.
25         THE COURT:  Okay.  I mean, the reason I ask is because

what is today?  Today is October 15th.  So when between now and the 25th are you going to be in a position to stipulate, and when is the government going to be -- they say they can get everything translated and to you, but they're doing it on a rolling basis.

And, frankly, counsel are going to have to confer with the linguist.  They're not going to leave it just up to the linguist.  They're going to want to look at their work product before they turn it over to you, just like you're going to spend some time as counsel before you let them know whether the translations are okay.

So how is that going to be accomplished in ten days to everyone's satisfaction?

MR. ZEIDENBERG:  Well, I -- respectfully, Your Honor, I think the question's going in the wrong direction because you can't, I don't think, fairly ask us how long is it going to take to translate documents that we haven't yet received or review documents we haven't received.

THE COURT:  I'm asking both of you because you have received some, and the government has some that they have not. I'm not asking you about the ones you haven't received, but you received some and you haven't started that process.  And the government is not through with their process, and that's not on you.  You're right.

But we've been spending this month on some other

1   important issues, and I just want to know realistically how

2   anyone can stand here and tell me this case is trial ready on

3   October 25th, even we didn't have all these other issues about

4   witnesses and depositions that the defendant wants to take of

5   four witnesses in China that's still a pending matter.

6         I mean, there's a lot of moving parts here.

7         MR. BARRY:  And I -- respectfully, this is an example

8   why the government has been prejudiced by the late-file *Franks*

9   motion and why an ends of justice continuance is necessary.

10        The reality is, based on where we sit right now, the

11  case is not ready to go to trial in ten days.  And a large

12  reason for that is because of the litigation that we've all

13  been dealing with for the last six weeks.

14        THE COURT:  All right.  I'm taking this under

15  advisement.  I'll tell you right now we're not going to start

16  trial on October 25th.

17        MR. ZEIDENBERG:  Your Honor, I will say --

18        THE COURT:  We have severe witness issues here.  I

19  assume you're going to file motions for Rule 15 depositions.

20  They may object.  We're going to have to litigate that.

21        Ten days is a pretty short period of time, and the

22  fact that there are three witnesses that the government argues

23  are essential that have severe health issues is not something I

24  take lightly.  And maybe you won't object to that, but if you

25  do, then we're -- I'm going to have to have a hearing on that.

1          I don't know how we're going to get all this

2    accomplished in ten days.  I'm just being realistic here.

3          MR. ZEIDENBERG:  Okay.  I -- just for the record, Your

4    Honor, we -- I talked about this a little bit at the hearing,

5    but the representations -- as far as the witness issue, the

6    representations that were made to these witnesses that the

7    government says, they're by e-mail.  They weren't

8    conversations.  They're e-mail conversations.  They're e-mail

9    exchanges.  They are admissible without those witnesses.  They

10   don't need those witnesses.  So it's what they said and what

11   Dr. Tao said.

12         The Court knows what this case is about.  The

13   submissions -- the false statements are based on conflict of

14   interest forms that were submitted and a grant application that

15   was submitted.  And the truth or the falsity of those

16   statements are going to be proved by all this other evidence

17   about what was happening or not happening in China.

18         And those witnesses from the Department of Energy, the

19   program managers, there are -- they are not essential to this

20   case.  Okay?  They didn't witness a crime.  They didn't talk to

21   Dr. Tao where he made an admission.  There's nothing essential

22   about them.

23         It's a paper case.  It's a fraud case.  And it's based

24   on documents, and it's going to be proved on documents, not

25   because someone saw him do something or I heard him say

 1   something or anything like that.  None of the -- there is not a

 2   living, breathing person that is essential to this case.  It's

 3   based on the documents.

 4            THE COURT:  Well, I heard otherwise from Mr. Barry.  I

 5   heard that these witnesses were going to offer testimony, not

 6   just introduce documents.  And the exhibits themselves, their

 7   admissibility has been heavily litigated in these *limine*

 8   motions.

 9            And they've got to be able to offer the documents

10   through a witness unless we're going to just admit all of them

11   by stipulation right now, and then I still need to find out if

12   they say there's some essential testimony in addition to that.

13            MR. ZEIDENBERG:  Your Honor, the evidence --

14            THE COURT:  Are you prepared to stipulate to the

15   admission of all of these documents?

16            MR. ZEIDENBERG:  Not all of them.  But certainly the

17   KU e-mails of Dr. Tao, we've never suggested they're not going

18   to be able to admit them unless Dr. Tao stipulates to their

19   accuracy.

20            The FBI is going to get up and say, we obtained these

21   via a search warrant -- or a grand jury subpoena to KU, and

22   here's the e-mails of Dr. Tao, from Dr. Tao to Dr. Tao.

23   They're admissible.  Okay?

24            THE COURT:  Here's what I want -- I'm going to give

25   you a to-do list here.  We're not going to have the trial on

```
 1   October 25 because I've heard conflicting views about whether
 2   these witnesses are essential or not.
 3          The government has told me in their argument that they
 4   need their testimony as well as them to introduce documents,
 5   and the documents they're talking about are not just KU
 6   e-mails, I don't think.
 7          But if those documents are just KU e-mails and you can
 8   stipulate, you all work on getting a stipulation and getting
 9   those documents -- you know, you can stipulate to the admission
10   of those documents.
11          That's one thing you can do on your to-do list.
12          MR. ZEIDENBERG:  We'll stipulate.
13          THE COURT:  Second, the government needs to file a
14   motion for Rule 15 deposition, and you need to respond so we
15   can be teed up so that I can fully understand whether these
16   witnesses are essential.
17          My sense is they are, if the government needs
18   testimony in addition to using them to admit documents that you
19   are now going to stipulate to.  So we need to figure that out.
20          The third thing is, the government needs to complete
21   these translations, and they need to do so forthwith.  And then
22   you need to get to work and determine whether you have a
23   problem with any of those translations.
24          And, for example, the government is telling me they're
25   not -- if they've got a 45-page document, they may only be
```

19-20052-JAR    USA v. Feng Tao    10.15.21

1   translating several pages that they think are germane.  Maybe

2   you're okay with that, but you need to figure out whether

3   you're okay with that.

4          So there's a lot of work to be done that's very

5   important to both the government and the defense.  I'm going to

6   grant the motion for continuance.  But I'm going to need to

7   figure out when we're going to do a case that's going to take

8   two weeks, supposedly, although, I will tell you, based on this

9   last two days, I doubt it's only going to take two weeks, but

10   because I -- well, anyway.

11          I'm going to grant the continuance.  There's no way

12   this case is ready for trial on October 25th.  No way.

13          MR. ZEIDENBERG:  And I --

14          THE COURT:  And I'm not -- I'm not faulting the

15   defense in any way, Mr. Zeidenberg.  You are right; you have to

16   get their translations before you can look at them.  But you

17   have had some, and you haven't looked at them.

18          MR. ZEIDENBERG:  Well, that's --

19          THE COURT:  And the government hasn't completed what

20   they were supposed to do.  And the government has witness

21   problems, and you have witness problems because you've got a

22   pending Rule 15 motion that I haven't granted or denied.  I

23   basically said it's contingent on whether this process is

24   followed, and we'll see what happens.

25          And so your client needs, I think, time to figure out

1    whether he can get those four essential -- what you've told me

2    is essential witnesses to his defense.  So I think we're

3    playing games here to suggest that this case should start on

4    October 25.

5            MR. ZEIDENBERG:  Okay.  I just -- I feel I need to

6    respond to what the Court just said.

7            We will stipulate, as necessary, to translations.

8    That's -- I don't want the Court to feel that because the

9    defense hasn't fully reviewed every document, that that's a

10   reason for holdup.  We are not asking for a holdup for that.

11           And as far as --

12           THE COURT:  Okay.  I'm going to have the last word

13   here.

14           MR. ZEIDENBERG:  It --

15           THE COURT:  I am not trying to force you to stipulate

16   to translations.  I want to give you time to do that.  And

17   maybe you can stipulate, and maybe you cannot.  I don't want

18   there to be any suggestion on the record that I'm trying to

19   push you.

20           All I'm saying is that you should have the right to do

21   that.  And you have -- you don't even have all of the documents

22   translated yet.  I get that.  That's on the government, and I'm

23   telling the government to get that done forthwith.

24           All I'm suggesting and all I'm saying is, this case is

25   not trial ready on October 25th.  The government would be

1    prejudiced if I called this case for trial on October 25th, and
2    so would the defendant.

3            And I'm not going to do it, so I'm going to grant a
4    continuance.  I'm going to issue an order.  I'm going to make
5    excludable time findings.  I've kind of given you a to-do list
6    of what I want you all to do.  We're going to have another
7    status conference after I issue my continuance order.

8            And, frankly, we've got problems in terms of
9    scheduling because of COVID, because of backup of criminal
10   cases.  I am booked, but I'm going to find time because this is
11   an important case, as is every other case I have, all 300 and
12   something of them.  I'm going to find time to do this trial.
13   This is an important trial that's going to get done.

14           But it's not like I can just snap my fingers and have
15   time appear on my calendar because the cases I've got set for
16   trial right now have been set for trial for a long time, and
17   those counsel are telling me they're not pleading those cases
18   out, just like I think you're saying that in this case.

19           So I've got a lot of things to consider here, but the
20   bottom line is:  There's no way this case can start trial on
21   October 25th.  There's just no way.

22           MR. ZEIDENBERG:  Your Honor, on the two points --
23           THE COURT:  I really.  I really --
24           MR. ZEIDENBERG:  I'm asking --
25           THE COURT:  I said what I'm going to say.  You know

 1    what, Mr. Zeidenberg, when I rule, I rule.  I don't want any

 2    further comment --

 3             MR. ZEIDENBERG:  And I --

 4             THE COURT:  -- I get to have the last word.

 5             MR. ZEIDENBERG:  Okay.  May I inquire about another

 6    issue, Your Honor, about government discovery?

 7             We are still getting government discovery.  Last week,

 8    we got government discovery.  These are form documents -- these

 9    are from devices that the government has had in their

10    possession for over two years.

11             Then they go through them, and they provide the

12    documents that they think are responsive -- because we just got

13    images.  Okay?  We got the forensic images of those documents.

14    We are still getting discovery, so it's extremely difficult to

15    prepare for a trial when discovery, which was supposed to have

16    been completed 18 months ago, is still coming in.

17             And I'd ask the Court to set a cut-off by which -- and

18    I think it should already have existed -- where no new

19    discovery, anything that you had in your possession -- I mean,

20    obviously, if something walks in the door, if a witness

21    materializes, the government is going to take advantage of

22    that, but we're talking about material that they've had for

23    over two years and then we're getting and having to review.

24             THE COURT:  I don't understand that.  You've had it in

25    image form, so what you're talking about is they've printed it

1    off and put a Bates number on it?

2           MR. ZEIDENBERG:  No, Your Honor.  It's not

3    forensically -- it's a forensic image.  It can't be searched.

4    Okay?  You need -- according to the court discovery order,

5    these have to be provided -- electronic discovery has to be in

6    a searchable format.

7           We are not getting it -- now we're getting it, over

8    two years late -- 18 month late.  And so they're saying, oh, we

9    got some more for you.  We've got some more for you.  There's

10   no cutoff.

11          I mean, they have an obligation to review these

12   documents and produce these documents in a searchable format

13   back when the discovery order was issued, consistent with that.

14          So, you know, we're in a position where it's just -- I

15   mean, it's a morass.  It never stops.

16          THE COURT:  When's the last time you got a discovery

17   production?

18          MR. ZEIDENBERG:  The last discovery production was, I

19   believe, a week ago.

20          THE COURT:  And what was it?

21          MR. ZEIDENBERG:  It was a --

22          MR. BARRY:  I can tell the Court what it was.

23          MR. DEARINGTON:  Your Honor --

24          THE COURT:  What was it, Mr. Barry?

25          MR. BARRY:  So two things:  One is we have been

1    producing rolling discovery that comes in as it is created.

2         For example, if we interview a witness last week and

3    we write a 302 and we think it's discoverable, we give it to

4    the defense.

5         I think what Mr. Zeidenberg is referring to --

6         THE COURT:  And this is a witness that was already

7    disclosed --

8         MR. BARRY:  Yes.

9         THE COURT:  -- or this is a new witness?

10        MR. BARRY:  I think there's one -- I don't know if

11   it's been produced yet, but there's one witness who was

12   identified on the witness list.  So identified October 1st.

13        But I think what Mr. Zeidenberg is referencing is -- I

14   think it was last week.  When we were preparing for the case,

15   the FBI forensic lab created a report from the image devices

16   that were provided to the defense in duplicate copy a year or

17   two ago.

18        And what that report showed was simply that on those

19   devices, there was web history that showed the defendant from

20   his KU computer logging into the Fuzhou e-mail account and

21   logging into the National Natural Science Foundation account.

22        We did not know that that document existed.  It didn't

23   exist, actually, until the date it was created.

24        The only reason we learned about it is that as we were

25   preparing the FBI agent, they said, oh, FBI forensic ran this

1    thing on the data that we turned to the defense two years ago.

2    Here is the report.  We got the report.  We gave it to the

3    defense on the same day.

4            THE COURT:  So this is -- that's new evidence?

5            MR. BARRY:  It's -- I would say the report itself is

6    new.  The underlying data that the report analyzed, which is on

7    the image devices that are searchable, as explained in the

8    reply to the motion to strike -- I mean, we can get into the

9    discovery weeds, but these images that were produced to them,

10   you can review them using free software.

11           We offered -- this predates us.  But when Mr. Mattivi

12   and the defense counsel discussed how to produce the electronic

13   drives, which are all from the defense's -- Defendant's house

14   and laboratory, we gave them a couple options.

15           We said, there are free tools you can use to search

16   this stuff.  We're happy to make space available in the

17   forensic lab where they can load it up on the computer, and you

18   can look at it at your leisure there.

19           And these are searchable.  They're not searchable in

20   the way they wanted them to be searchable, but this has been

21   discussed extensively in the motion to strike briefing, this

22   image device issue.

23           THE COURT:  All right.  First of all, of course, there

24   was a discovery deadline.

25           Second of all, you have litigated this notion of, you

1   know, you got it in one format and it wasn't a searchable

2   format.  And I've heard all of that and the disputed views on

3   both sides.

4            Third, this latest thing that the FBI has done a

5   forensic -- a further forensic examination and seen that there

6   were website searches from, I guess, Dr. Tao's computer and

7   produced a report, that's new to the defense.  There's no

8   question about that.

9            The difficulty lies there in the government, in every

10  case, prepares for trial.  They interview their witnesses.

11  That produces -- if the FBI investigates the case, more 302s.

12  If they didn't produce the 302s, then the defendant is going to

13  complain because they don't have a summary of what they --

14  their latest interview has gotten.  That's not new.  That's

15  trial preparation.

16           This new forensic report from the FBI, I'm not sure

17  why that wasn't done before now.  But I can understand what --

18  it is new evidence to the defendant and causes them some

19  concern.

20           Is there going to be any more of that activity?

21  Because you've got these people designated as experts that are

22  doing forensic -- I mean, I'm concerned if they're going to

23  continue more forensic examination and produce more reports

24  closer to trial the defendant hasn't had a chance to really

25  work with.

1         MR. BARRY:  So I don't know what I don't know.  I

2    mean, sitting here today, we obviously disclosed our exhibit

3    list on October 1st, and at that point in time, we were

4    preparing to go to trial based on the exhibits identified on

5    that list.

6         This report that was prepared, as you said, in the

7    context of preparing for trial, was new.  None of the

8    prosecutors knew that it even existed.  It was just given to us

9    by the FBI.

10        I don't foresee something else popping up, you know.

11   But to date, we have disclosed everything that's discoverable.

12        THE COURT:  All right.  So here's what I think I'm

13   going to put in the order because I, frankly, anticipate that

14   this is going to be a somewhat lengthy continuance because of

15   the need to do all of these things to get ready for trial.

16        But I think in fairness to the defendant, I mean,

17   there has -- there's trial prep and then there's trial prep.  I

18   don't think that, you know, the government should now have, you

19   know, several months of additional time to do additional

20   investigation, you know, under the title of trial prep and more

21   forensic examination, et cetera, et cetera.

22        Now, having said that, it is important for the

23   government to pretry, prepare identified witnesses.  That's

24   fine.  And produce -- if you do that multiple times, then you

25   produce multiple 302s.  But I am concerned about further

1    forensic examinations in this lapse between October 25th and

2    when I set it for trial.

3           So I'm going to order the government -- I'm going to

4    say the government can't produce any additional evidence,

5    should they decide to do -- the FBI decide to do more forensic

6    examination or more investigation because I don't think that's

7    fair.  If there's any question about the scope of what I'm

8    saying, the government can file a motion and we can litigate

9    that, but anyway -- okay.

10          So I'm going to issue an order and hopefully give you

11   all as much direction as I can on this as well.

12          MR. BARRY:  And just to be clear, in the order

13   relating to the continuance, you'll make the appropriate Speedy

14   Trial findings?

15          THE COURT:  I will.

16          MR. BARRY:  So we don't need to --

17          THE COURT:  I will.  You know, you're moving under

18   ends of justice, but you're also moving under essential

19   witnesses.

20          But I think you should file a motion for Rule 15

21   depositions.  If that's what you're going to do, you need to do

22   that and tee it up.  I don't know if the defendant will object

23   or not, but if they do, I'm going to want to read that and

24   then, you know -- I don't know.  I guess we'll have to have

25   another hearing.

1          MR. ZEIDENBERG:  As for our Rule 15 deposition and

2     those witnesses, Your Honor, just for the record, while we

3     wanted those witnesses, we've -- and I've spoken to Dr. Tao

4     about this -- that to the extent that the Court is extending

5     this for -- to assist the defense in the ability to get those

6     witnesses, we would forego that, with the understanding that if

7     we had a trial date sooner, it would make it almost -- you

8     know, very unlikely they would be produced.

9          As for the government's response, they indicated

10    yesterday -- to your question about what's going on with this,

11    they said that the Chinese government inquired about whether

12    this was part of the China Initiative and there's racial

13    profiling.

14          We have not -- I don't know how they're responding to

15    that.  That's -- I'm uncomfortable suggesting that this is a

16    defense request.  The government has taken that over.  They

17    haven't shared with us what they shared with the Chinese

18    government.  We don't know how -- we didn't know till they told

19    the Court yesterday about the question they got from China, the

20    Chinese government.

21          So we're not really a party to that.  We just get told

22    what we get told, and we don't know what the communications are

23    like.

24          THE COURT:  That's because you didn't take the

25    initiative to do this for your own witnesses.  I told the

1    government to do it.  They, apparently, were doing it to try to

2    get witnesses or something out of China on their own, but then

3    I told them to do it for you because you didn't do it.

4            So if you want to do it on your own, you can initiate

5    that process yourself.

6            MR. ZEIDENBERG:  Well --

7            THE COURT:  Which is what you should have done a year

8    and a half ago.

9            MR. ZEIDENBERG:  We believe we did when we filed the

10   motion and -- which the Court is holding in abeyance.  But we

11   don't believe this process is necessary, as we explained and

12   won't reiterate.

13           THE COURT:  Okay.  Well, I'm going to go ahead and

14   rule on the pending Rule 15 depositions.  And I think I will --

15   yeah.  I don't know if it will say denied without prejudice or

16   granted subject to conditions, but that process does need to be

17   followed.

18           I have received absolutely no authority at all that

19   tells me that I can enter an order that violates that process

20   and in effect orders the government to participate in a

21   deposition that would be illegal to China -- a citizen of the

22   People's Republic of China, based on Chinese law.  I'm not

23   doing that, not that it would be recognized by the People's

24   Republic of China, anyway, my order.

25           But I'm not going to enter an order that I know to be

1    illegal.  I've not received any evidence or anything persuasive

2    to the contrary that I would have authority to do that.  And

3    those people in mainland China would not be violating Chinese

4    law to be participating in a deposition in this case.  I'm not

5    going to order that.

6           And I'm not going to order representatives of the

7    United States Government to be a part of that process.  That's

8    why -- I mean, these are negotiated, and that's why there is a

9    process that the executive branch of this government and the

10   People's Republic of China have agreed to.  And that's the

11   process that needs to be followed.

12          All you've done is follow the motion for Rule 15

13   deposition and skipped that step and are trying to urge me to

14   file an order that I view to be illegal.  The process needs to

15   be followed.  We'll enter an order, you know, to that effect.

16          I'm not granting a continuance on that basis, but

17   it -- frankly, it's something that I think justifies, along

18   with all other reasons, a continuance.  Because I do think

19   Dr. Tao -- if he has four witnesses in China he'd like to use

20   in his defense, I'd like to have him have that opportunity.

21          I am not going to continue it for, you know, an

22   extremely long time to see if that happens because that process

23   should have been initiated a long time ago.  But I guess a

24   bonus from getting a continuance is, perhaps, maybe that will

25   happen, especially now that the People's Republic of China

1   seems to be engaging in conversation with the government.

2         I do think the government, though, needs to

3   communicate clearly with the People's Republic of China that

4   with respect to those four witnesses, that is for a defendant

5   in a criminal case; those witnesses are not government

6   witnesses.  And that is presumably favorable to Dr. Tao, who I

7   believe is a Chinese national.  So that needs to be made clear

8   to them.  Maybe they won't be as reluctant if they understand

9   it's to help him and not the United States government.

10        So anyway, that's where we're at on that.  I will

11  issue an order on everything I've taken under advisement,

12  including the motion for continuance.  And then I urge you all

13  just to continue on these steps so we can get this case in

14  trial posture and get it ready.

15        MR. OAKLEY:  Your Honor, I'm sorry.  There's two

16  hanging threads as it relates to the motion *in limine*.

17        The defendants filed motion *in limine* No. 4, which

18  relates to the other witnesses, the linguist -- I'm sorry.  The

19  financial analyst, et cetera.  And then also the defense has

20  objected to our Rule 902 notice related to business records.

21        I don't think we've addressed those yet.

22        THE COURT:  I think you're right.  With respect to

23  those other experts, I was just going to rule on the basis of

24  the paper.

25        With respect to the 902 certifications, that's a

1    little bit more difficult because it's contextual again.

2            Did you want to present argument on that?  I do -- my

3    recollection in going through that is, you know, it's almost

4    exhibit-by-exhibit analysis I need to do.

5            MR. OAKLEY:  The only thing that I would say, Your

6    Honor, that the -- obviously, the defense objected before we

7    filed our exhibit list.  So I don't know if, after seeing our

8    exhibit list, it changes the defense's objection.

9            One of the things they objected to was the fact that

10   we had not obtained a records custodian certificate and,

11   therefore, weren't able to provide it.  And we recognize that

12   if we don't have such a certificate, we can't -- absent a

13   stipulation, we would have to physically bring in a records

14   custodian.  So we recognize that.

15           They also objected -- some of the Bank of the America

16   records that we provided we did not identify in our notice by

17   Bates number, which I don't think is required by the rule.  We

18   did that to try and aid the defense in knowing what we're

19   talking about.

20           We certainly continue to be willing to engage with the

21   defense to make sure that they know what records we're

22   referring to.  We can identify them by dates that they were

23   disclosed or that sort of thing.

24           So I don't know that I have much more argument other

25   than what's in our response, but I just want to note that that

1    has not been addressed yet.

2         THE COURT:  Anything more from the defendant on that?

3         MR. DEARINGTON:  Your Honor, given the Court's

4    statements and the government's representations, it may be most

5    reasonable and expedient at this time if we just meet and

6    confer on an exhibit-by-exhibit basis to see if we can reach

7    consensus about whether there's a certification that applies to

8    the document or absent a certification, if there's sufficient

9    indicia that the defense is comfortable stipulating.

10        THE COURT:  Okay.  And if you're not able to reach an

11   agreement on all of those, I think -- what I would suggest is

12   we're going to have another sort of cleanup final pretrial

13   conference maybe a month before the trial date, and we can take

14   up any of those kind of issues then.

15        But I would urge you that you all need to work on

16   these translations and identify if there are any issues as soon

17   as possible, so if there are, I can have a hearing on those as

18   quickly as possible.

19        MR. DEARINGTON:  Your Honor, do you mind if we just

20   have one moment to discuss whether -- well, I guess I should

21   start with a question.

22        Did you want to hear argument on the other experts, or

23   do you plan to rule on the papers without argument?

24        THE COURT:  I was going to rule on the paper.

25        MR. DEARINGTON:  Understood.  Thank you, Your Honor.

19-20052-JAR    USA v. Feng Tao    10.15.21

1          THE COURT:  Okay.  I feel like we all need to regroup

2     because there's so many things, and I don't want to -- I'd

3     already forgotten those two that you pointed out.

4          Is there anything else you can think of?

5          MR. OAKLEY:  Not -- not that I can think of, Your

6     Honor.  We were anticipating pointing out something that I

7     think you already pointed out, that our earlier estimate of two

8     weeks seems to be overly optimistic at this point.

9          THE COURT:  What's your revised estimate?

10         MR. OAKLEY:  I think we would say three weeks at this

11    point, but hopefully if we can consult with the defense about

12    stipulations and that sort of thing, that could help us refine

13    that estimate.

14         THE COURT:  When you say three weeks, are you just

15    talking about the government's case?  Are you building in

16    time --

17         MR. OAKLEY:  At this point, based on what we know

18    right now, I think -- we would estimate three weeks for the

19    government's case in chief.

20         THE COURT:  All right.  And how much time would you

21    say we should build in beyond that, Mr. Zeidenberg?

22         MR. ZEIDENBERG:  I mean, I don't think it would be a

23    lengthy case, Your Honor.  It's hard to say whether Dr. Tao

24    will testify, but I would think no more than a couple days.

25         THE COURT:  Okay.  All right.

1          MR. ZEIDENBERG:  That's if we put on a case, so...

2          THE COURT:  Right.  I'm not binding you one way or the

3     other.  I just kind of want a loose idea so I can clear out

4     that block of time.

5          MR. DEARINGTON:  Your Honor, I don't want to get ahead

6     of you, but I wasn't sure if you still wanted to conduct the

7     *limine* conference at this time.

8          THE COURT:  No.  Let's do that much closer in time to

9     the trial date.

10          MR. DEARINGTON:  Understood.  Thank you.

11          THE COURT:  Okay.  Because, again, I mean, there's

12    more work to be done, I think, before we're really ready to

13    have the final conference before trial.

14          But we've -- so have I already given you deadlines of

15    proposed jury instructions, proposed *voir dire*, all of that?

16          MR. DEARINGTON:  Your Honor, you provided initial

17    deadlines, and then the government, with our agreement, reached

18    out to the Court to see if we could suspend them, given the

19    continuance.

20          THE COURT:  Oh, that's right.

21          MR. DEARINGTON:  So we don't currently have deadlines.

22          THE COURT:  Okay.  I'm going to need to give you those

23    deadlines too.  Okay.  All right.

24          Okay.  Thank you all.  We'll be issuing written

25    orders, and we'll be recess.  Safe travels.

19-20052-JAR   USA v. Feng Tao   10.15.21

1          (The proceedings were adjourned.)

2                    C E R T I F I C A T E

3     I, Danielle R. Murray, a Certified Court Reporter and the

4  regularly appointed, qualified, and acting official reporter of

5  the United States District Court for the District of Kansas, do

6  hereby certify that the foregoing is a true and correct

7  transcript from the stenographically reported proceedings in

8  the above-entitled matter.

9     SIGNED 22nd of October, 2021

10

11                    /s/Danielle R. Murray
                       DANIELLE R. MURRAY, RMR, CRR
12                    United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25