UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 19-20052-JAR

FENG TAO, a/k/a "Franklin Tao,"

Kansas City, Kansas
Date: 3 March, 2022

Defendant.

..........................

TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
BEFORE THE HONORABLE JULIE A. ROBINSON
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S

For the Plaintiff:

Mr. Adam Barry
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Mr. Christopher Oakley
U.S. ATTORNEY'S OFFICE
500 State Avenue
Suite 360
Kansas City, Kansas 66101

For the Defendant:

Mr. Michael F. Dearington
Mr. Peter R. Zeidenberg
ARENT FOX, LLP
1717 K Street NW
Washington, D.C. 20006

Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE COURT: We're here in United States versus Feng Tao, 19-20052. Your appearances, please.

MR. OAKLEY: May it please the Court, the United States appears by Chris Oakley, Assistance United States Attorney, and Adam Barry, a trial attorney with the Department of Justice.

MR. ZEIDENBERG: Good morning, Your Honor. Peter Zeidenberg and Michael Dearington on behalf of Dr. Tao, who is present.

THE COURT: All right. Thank you. All right. So we have several matters to talk about this morning. There are two matters I'm going to rule on, and then I'm going to do what I call the final pretrial conference or final *limine* conference with you all ahead of the trial which is starting on March 21st.

So let me start with the matters, the disputed matters or issues that are still pending. You all have heavily briefed the issue concerning the government's notice of intent to offer certifications. You've also heavily briefed the defendant's motion to compel. I don't want oral argument on either. I think I do have some discreet questions of either the government or the defendant or both on either one of these. So I'll ask those questions, but otherwise I'm prepared to rule.

And then we'll move into a discussion about trial

procedure and take up some other housekeeping matters so we'll be ready to go on the 21st of this month.

So let's start with the government's notice of intent to offer evidence pursuant to rule -- Federal Rule of Evidence 902 and certain subsections, and I have not been provided with the certifications. I take it that those have been shared with the defendant already; is that correct, Mr. Oakley?

MR. OAKLEY: Yes, that is, Your Honor.

THE COURT: Okay. Have you all resolved any of this? My sense is that perhaps it hadn't been fully shared at the time you all were briefing this, but I don't know.

Mr. Oakley.

MR. OAKLEY: Your Honor, on last Friday we sent a proposed stipulation to the defense that covers the business records, the other records such as the text records, and those sort of things. We received a response and a question from Mr. Dearington last night, so I -- we're working through those.

I don't know what the defense's position or if they're able to say whether or not, assuming we can answer their question, that they're willing to stipulate to the business records or that they agree that we complied with Rule 902, but we did send a proposed stipulation Friday.

THE COURT: All right. And these are, the government says, business records of what entities?

MR. OAKLEY: They are bank records, Your Honor. They

are records of Homeland Security, the text records which would qualify both as a business record and as a public record. They are records -- title records obtained from Kansas Secured Title, but the bulk of them are bank records, Your Honor.

THE COURT: All right. One thing I guess I sort of surmised from the defendant's objection is your use of the word "self-authenticating." 902 allows for the admission, at least the foundation -- the authentication foundation of certain types of records based on the certification of somebody, whether it be a custodian, in lieu of them coming in and saying essentially the same thing that they say in the certification. That doesn't mean the record is necessarily admissible obviously.

And the use of self-authentication, using that term is a little bit fraught because although the certifications may say, you know, yes, these are the records of this account under this account number, that doesn't obviously on its face necessarily mean that those are the account records of somebody that's relevant to this case.

So I think maybe the use of self-authenticating may be a concern in the sense that the government still has to show that these are bank records of Dr. Tao or that these are e-mail records of Dr. Tao, you know, beyond just a certification. Now, there may be ways to do that obviously. The government has some evidence what they are or they wouldn't have asked for

those particular records.

Are you tracking with me, Mr. Oakley, on that?

I mean, I think what the 902 certifications do is they mean that the custodian of records doesn't have to come in and say these are our business records for this account, you know, these records -- this e-mail account -- I mean, these are e-mails that went from this to this. It avoids those people marching in.

But obviously it doesn't mean the records are admissible. The government has to, you know, perhaps go further in terms of getting them admitted.

Do you agree?

MR. OAKLEY: Yes, yes, the government agrees, Your Honor.

THE COURT: Okay. I mean, the relevance -- you know, if you were to put my bank records in, it would not be relevant in other words.

So I think we're on the same page as that.

With respect to them being business records, so the certifications I assume lay out the steps that one must show under Rule 803, I believe, to show that somebody -- something is a business record?

MR. OAKLEY: Yes, Your Honor.

THE COURT: Okay.

MR. OAKLEY: And I'll say the defense has not informed

us that they disagree that the certifications are not sufficient under the rule, and certainly it's the government's position that they are.

THE COURT: Okay. Mr. Zeidenberg or Mr. Dearington, you've reviewed them. Do you take a position that any of them are insufficient?

Mr. Dearington, unmute, please.

MR. DEARINGTON: Your Honor, sorry about that. We received the certifications on Friday, and with our filings due Monday and some other government requests to us, we haven't been able to fully decide that they're -- we're going to sign this particular certification. Substantially it seems to be okay, but we had a follow-up question that we submitted to the government last night.

And we hope to be able to certify to as much as possible with respect to the certification that the government submitted to us, even if it requires a little bit of back and forth to make sure that it properly satisfies the evidentiary rule and is acceptable to our client. But we're certainly not going to try to hold anything up with respect to proper certification on this.

THE COURT: Okay.

MR. OAKLEY: Your Honor, just to be clear, we sent a proposed stipulation. The defense has had the custodian certifications for sometime.

THE COURT: Okay. Well, we're on a fast track on this because obviously to the extent the defense takes the position that something is inadequate or can't be done this way, the government is going to need to get these people subpoenaed and brought in from who knows where.

So today is the 3rd. I would say by the 7th the defense needs to give the government notice if they have a problem with anything or not going to sign the stipulation or if there's a part of the stipulation that you want to exclude from the stipulation, et cetera.

(Court reporter interruption for clarification due to audio technical failure.)

THE COURT: So March 7th will be the deadline to let the government know whether there's anything in the stipulation you can't stipulate to and specifically any particular entity that you think the certification notice or stipulation or both are inadequate so the government has at least two weeks to get those folks subpoenaed.

MR. DEARINGTON: Understood, Your Honor.

THE COURT: Okay. And obviously I really strongly encourage you all to get this done. This is a very common practice, as you know, and it will make a huge difference probably in terms of how much time the case takes at trial.

All right. So let's move on to -- well, my ruling really is with respect to the e-mails as well. Is that part of

the stipulation, the Gmail account, the proposed stipulation?

MR. OAKLEY: Yes, Your Honor. We included both the Gmail and also the KU e-mails. I think at the October hearing Mr. Zeidenberg indicated the defense would stipulate to the e-mails, so we did include that as part of our proposed stipulation.

THE COURT: Okay. Again, March 7th hopefully all will know whether everybody is on the same page on everything.

All right. Let's move on to Dr. Tao's motion to compel the government's production of the *Brady* material, which is Document 227. This has been extensively briefed. I just have a few discreet questions. Really they are questions I direct to the government.

So we have these two federal agencies, NSF and DOE, and I think, is it Dr. Feldman that the government is going to call from NSF; is that correct?

MR. OAKLEY: NSF is Dr. Keiser, Your Honor.

THE COURT: Dr. Keiser. And what is the position of Dr. Keiser at NSF?

MR. OAKLEY: Adam, I'm sorry, I don't know her title. Adam, what is her title?

MR. BARRY: She is the chief of research security strategy and policy.

THE COURT: Okay. Now, my understanding is that at the time of the revisions to the policy in 2020 at NSF it was

somebody named Jean Feldman that was ultimately responsible for those policies; is that correct?

MR. BARRY: Your Honor, Ms. Feldman is in a different office as Dr. Keiser. Jean Feldman is the head of the policy office. So Dr. Keiser, her role is more limited to research security and then she also works on international collaboration issues.

THE COURT: Okay.

MR. BARRY: So we don't plan to call Ms. Feldman or any of the other individuals who the defense has talked about in their motion to compel from NSF. We just plan to call Dr. Keiser.

THE COURT: Okay. I understand. So Dr. Feldman is the person at NSF that at the germane time period was responsible ultimately for the revision of the policy on disclosures.

And then on the DOE side there was an acting director, Schwartz, acting director of the office of basic energy sciences, material sciences, and engineering division. That was Andrew Schwartz I think in 2020, correct me if I'm wrong. And then Chris Fall at that time was at the director of the DOE's office of science; is that correct? And I'm focusing at the time of the revisions in 2020.

MR. BARRY: So I don't know what each of those individual's position was at the exact time of the revisions

because we haven't planned to call them as witnesses, so I haven't actually talked to Dr. Fall or Andrew Schwartz, who doesn't have anything to do with our case.

But the way I -- in terms of where people fall within the structure is that -- my understanding just from reading the defendant's motion is that Dr. Fall at some past time -- he's no longer a Department of Energy employee -- was the head of the office of science. Within the office of science there are different subcompartments based on different scientific disciplines.

So Andrew Schwartz, who is the individual related to the Gang Chen case that the defense focuses on, my understanding from again just reading their motion is that he was -- he was a part of an office that had to do with nanotechnology and a different discipline.

Our office that had to do with grant that's the Department of Energy grant that is at issue here is the office of catalysis, and we plan to call two of the program managers who are sort of the people who actually administer the research proposals and grants on a day-to-day basis. And that's -- it's a little confusing, but that's Dr. Viviane Schwartz as opposed to Andrew Schwartz and Dr. Raul Miranda, and those are the individuals who are also -- we've discussed in the Rule 15 motion.

THE COURT: Okay. And I wasn't focusing so much on

the names of the people the government was going to call. Okay. So there were policy -- policies were revised with respect to Department of Energy and NSF in calendar year 2020. The grant years at issue here of course preceded that.

The defendant has asked -- has moved to compel and has asked really for the government to be ordered to do this broad search across Department of Energy and NSF employees, I suppose, with respect to this issue of before the revisions were made, what was the thinking in terms of how clear these disclosure requirements were or whether it mattered that somebody was in a foreign talent program, whether that was material, et cetera, et cetera.

Okay. Now that I have received the government's response -- I mean, frankly, when I read the defendant's motion, it was misleading because I didn't realize that you all had been engaged in this ongoing discussion for some time about issues -- these issues and related issues. Receiving the government's response and seeing the correspondence between you all and that you've been engaged in this, it's been on the radar for all of you for some time. The new thing that's happened, I suppose, is what surfaced in the prosecution of Dr. Chen, I believe it was, with these two individuals. And I mean, I'm just, you know, relying on what you all referenced that was reported in the press.

But that these two individuals made statements that in

my view are exculpatory; they're helpful to the defense in the sense that at least some people might have thought that the requirements were not clear or that, you know, maybe that they weren't even material.

Now, I recognize that this is not the same case as Dr. Chen's case. This is not a case simply about they are to disclose participation in the talent program. There's other alleged failures to disclose. There's other alleged false statements in part pertaining to where Dr. Tao was, where he was working, whether he was actually, you know, working for the salary that he was being paid at KU or whether he was in China working, et cetera. So, I mean, those are not just the failure to disclose participation in a talent program; I understand there's that factual distinction.

So here's my ruling. I'm going to start by just sort of explaining how I get to where I get. First, I largely agree with the government that the defendant's motion asks for relief that is far beyond what defendant is entitled to in terms of directing the government to engage in some wide-scale search across employees in these departments with respect to their internal deliberations or their thoughts or their statements or whatever leading up to the revisions in 2020.

I find that these employees, outside of the OIG offices at those two agencies, are not part of the prosecution team. We could characterize them as victims because I guess

these two programs are essentially the victim programs, if you will, that are alleged in this indictment. They're fact witnesses. Certain employees are fact witnesses. The government is sponsoring the testimony or bringing in the testimony of some of these people because they have presumably knowledge about the program and what happened, but they're not part of the prosecution team.

In fact, the Department of Energy employees generally and NSF employees generally, they don't have investigative powers. Those reside within their OIGs. That's why there are OIG offices in these executive branch agencies. So it's clear to me that throughout the course of the government's investigation they've worked closely with the OIG. The OIG has obtained records for them at the government's request, et cetera, but that does not mean the entire agency is part of the prosecution team. So that's one reason why I'm denying any request to do some sort of -- require the government to do some sort of large-scale, widespread search across the employees.

Having said that, Dr. Feldman or Jean Feldman at the time of the revisions apparently reportedly acknowledged that universities and researchers, at least some, had not previously understood NSF's disclosure requirements and that there seemed to be a disconnect between the requirements and what was understood by grant applicants. I view a statement like that as exculpatory, helpful to the defense.

And then these other two individuals that are on record with respect to the Chen prosecution made similar statements that may be exculpatory on the basis of the element of materiality. So I -- and of course this is in the public domain. The defendant has already discovered that. To the extent this is *Brady*, the defendant already has that.

I'm going to grant only partial relief on this motion to compel, and it's limited to those high-level officials -- and we may have already named them, Schwartz and Fall on the DOE side and Feldman on the NSF side, the high-level policy officials. It's limited to -- I'm directing the government to determine whether they made any other statements of record prior to the revisions and during the relevant time period that Dr. Tao was applying for these grants, those calendar years.

And I'm limiting it to have a very small universe of people. I don't know the names necessarily because maybe they were there. Maybe they weren't there. Mr. Barry has sort of said he's not real sure; they haven't put these people on their witness list obviously. But whoever was in charge of the decision to revise the policy, somebody similarly situated or perhaps one in the same as Mr. Andrew Schwartz and Chris Fall and Jean Feldman, those are the people that the government must just determine whether they made any other such statements that could be deemed exculpatory because they perhaps call into question the issue of materiality or the lack of clarity with

respect to what the disclosure requirements were. So very limited.

Beyond that, I deny the motion to compel for the reasons that I have stated. As you know, *Brady vs. Maryland* requires that the prosecution has an obligation to disclose exculpatory evidence, whether it's substantive or for impeachment purposes, when it is material to the defense and it's in the possession of the prosecution team.

So the limited relief I'm granting on this motion to compel in my view is in the possession of the prosecution team because it's I think readily available to the OIG. The OIG can request that. But I'm not ruling as a matter of law that everything that's within the possession of the Department of Energy and NSF is within the prosecution's possession because it's not; they're not part of the prosecution team.

*Brady* does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant. Due process only requires the disclosure of material exculpatory evidence, which, if suppressed, would deprive the defendant of a fair trial.

The fact that these, in my view, high-level officials have made some statements that could be helpful to this defendant on these disclosure requirements I think is material and exculpatory, and so that's why I'm allowing just this limited relief.

*Brady* is not an evidentiary rule. It does not grant broad discovery powers to the defendant. There is no general constitutional right to discovery in a criminal case. There's statutory rules that require certain discovery, but no general right to discovery.

So I'm denying largely the defendant's request to compel the government to engage in some large scale search/investigation which the government calls a fishing expedition into the records of Department of Energy and NSF employees.

So -- and, again, because I'm limiting it to probably a search of statements made by two, three, maybe even four people -- and when I say statements, I'm talking about, you know, statements made in the public domain or statements made in some written memorandum or something, some statement of record that somebody may have made that said, you know, for example, these applicants were not required to disclose participation in certain things or work in certain areas or that, you know, it wasn't really -- it didn't really matter to the agency because they wouldn't have -- they would not have rejected a grant application had they known that, statements along those lines consistent with, you know, what the two people that had made those statements with respect to the Dr. Chen case had made, statements that are similar to that.

All right. So that's my ruling on that.

MR. OAKLEY: Your Honor?

THE COURT: Yes.

MR. OAKLEY: I'm sorry, I just have a question. Obviously we'll need to get this information to the agencies, and I'll ask Ms. Murray for a copy of the Court's oral transcript, but does the Court intend to write on this?

THE COURT: No.

MR. OAKLEY: Okay.

THE COURT: Let me just -- let me see if I can frame it a little bit more clear. So I'm directing -- I'm granting the motion to compel in a limited sense to the following: For the government to produce statements of any other high-level Department of Energy officials' statements on the record or in writing or orally similar to those made by Schwartz and Fall and any other high-level NSF officials who've made statements on the record, in writing, or in person similar to those made by NSF's Feldman.

So that cabins in the type of statements, similar to what either Feldman, Fall, or Schwartz had made.

MR. ZEIDENBERG: Your Honor, may I?

THE COURT: Yes.

MR. ZEIDENBERG: Understanding the Court's ruling, I'd ask if you would consider to -- when you say statements on the record, you know, we've done, as you can imagine, searches to the extent it's possible to get things that are publicly

available. And I understand and -- the Court's ruling fully and I'm not contesting that, but I would like to know if we could expand that simply just to include e-mails, written -- the same exact ruling but also to include internal discussions because, I mean, we have what I think -- statements, you know, that were made publicly on webcasts and on press releases and what have you.

What we're looking for are internal discussions. So if those same individuals could also be asked or required to search their e-mails for this same type of discussions where they say the same type of information as Schwartz and Fall did, Andrew Schwartz, that this information was not material or not required, that way we would certainly be -- you know, I think that would give us some universe of documents that aren't, as I said, publicly available now.

THE COURT: All right. So when I said statements of record, I didn't necessarily mean public record. I am not requiring the government to produce all of the internal deliberations of these people. I'm limiting this to statements made either internally or externally that are in line with what Schwartz, Fall, or Feldman said because frankly internal deliberations and debating back and forth and all of that, I don't look at that as being exculpatory under the fairly tight definition of what qualifies as exculpatory under *Brady*.

It's more the definitive statements that this didn't

matter to us; it wasn't material to whether we approved the grant application or not; or, you know, the requirement to disclose X, Y, and Z was not clear to anybody or wasn't clear to these applicants and we understand that, I mean, something along those lines.

That does not mean the government is going -- I'm not requiring the government to do a search and find all of the internal deliberations and the back and forth and debating among people in the department and any comments that may have been made back and forth in that record. I'm just looking for definitive statements of these people that are the policy-makers and the decision-makers that may have led to the revisions in 2020, I don't know.

Not that I'm not necessarily ruling that the revisions of 2020 are admissible, but again, we are aware that there are these certain people that have made statements that go to the issue perhaps of materiality, and I'm just saying if there are more statements like that from those particular people, then I think the defendant is entitled to know that.

That would include e-mails, but I just want to be clear that I'm talking about definitive statements. I'm not talking about debating back and forth and stray comments, et cetera, et cetera.

Mr. Oakley, do you need any more clarity from me on that. Mr. Oakley? I'm not seeing you on the screen. Did we

lose --

MR. BARRY: We may have lost Mr. Oakley it looks like.

THE COURT: Oh, my gosh.

MR. BARRY: I do --

THE COURT: Wait. Oh, Mr. Barry. Okay.

MR. BARRY: Yes, Your Honor. Hopefully I'll -- Mr. Oakley will be able to join back in a minute. So I just want to logistically make sure I understand the distinction that you're drawing between what you're calling definitive statements and deliberations because obviously if we're going to go to NSF and DOE's OIG and ask them to locate -- identify particular individuals and then have those individuals search their e-mails, I just want to know if there's any other guidance that we can provide to them to make sure that we comply with your ruling because I could see it -- just based on past experience of searching e-mails or looking for *Jencks* material or those sort of things, it's obviously very burdensome to, especially if it's a large volume of e-mails, to identify and then review what type of material is discoverable under the applicable rules.

And so if you can provide any other guidance for how to -- I kind of understand I think the distinction between definitive and deliberative when we're talking about public statements that Mr. Zeidenberg mentioned or formal documents like memoranda or notices, but when we're talking about

internal e-mail, if you can provide any other guidance, we would greatly appreciate it, and I think it would frankly make this more efficient just considering how close we are to trial.

THE COURT: Okay. And as you can imagine, I'm limited by not understanding how these offices are organized and how they communicate, exactly how decisions are made, but I would expect that most e-mails back and forth would probably be more deliberative than definitive.

I would expect that if something is going to be -- a definitive statement is going to be made, it's going to either be made on a public record or it's going to be made in a memorandum that's just disseminated to all the key people that need to know that within the department as opposed to, you know, debating back and forth in e-mails and what do you think about this or what do you think about that, that's not what I'm talking about.

So I don't know if perhaps the burden could be lessened by, for example, doing a search of a certain category of e-mails, say like the e-mails between Ms. Feldman and certain key people within a certain key time period when one would expect definitive statements might have been made.

I would think the closer in time to when the policies were changed one might expect to see definitive statements if there were any as opposed to the beginning of the process. So I don't know if that helps.

But I am not at all directing the government to, you know, go through every e-mail, and I mean, I just think that is burdensome, and it's really beyond the scope of what I would consider to be relevant to finding a definitive statement made by a decision-maker.

MR. BARRY: Okay. That helps. Thank you, Your Honor.

THE COURT: Okay.

MR. OAKLEY: Your Honor?

THE COURT: Yes, Mr. Oakley.

MR. OAKLEY: I'm sorry. It's Chris. I don't know what happened. I'm sure everybody noticed, but I dropped off. I've now rejoined by audio only.

THE COURT: Okay. Mr. Barry picked up the conversation and I think he can advise you. I was just trying to give him more clarity on what I anticipate the government should do in terms of searching for this material.

MR. OAKLEY: Thank you, Your Honor.

THE COURT: Okay. And then in terms of a time frame to disclose any further findings, with a March 21st trial date -- again, I don't know how extensive this search will take. Mr. Barry, I don't know if you've even thought about it, but I guess my thought was maybe by March 11th, that Friday, that's ten days before trial.

MR. BARRY: I -- as you anticipated, I do not know without talking to OIG, and my guess is that the OIG folks are

then going to have to talk to the tech folks about identifying e-mail inboxes, whether the e-mails are archived, you know, all the kind of logistics. We can certainly try to meet that deadline, but I just right now I can't tell you either away whether that's realistic without having first talked to DOE and NSF.

THE COURT: Okay.

MR. ZEIDENBERG: Your Honor, we appreciate that. And, you know, as long as good faith efforts are made, if we can get this in advance of the trial, I mean, this is not information that's going to require us to likely reconfigure our whole trial strategy. So we can use it, and it will be of assistance to the defense if we get it the 14th or the 15th, as long as we get it in advance of the trial. And if we could get it on a rolling basis, that would be fine too.

THE COURT: Okay. That's reasonable.

All right. Okay. So I think we have fully discussed those two issues. Let me just very briefly -- there are some other pending matters and some of which I'm going to write on, so I just wanted to give you a heads-up on that, and then we'll turn more into the logistics of the trial.

So there's the pending motions to depose certain government witnesses. I'm going to be issuing an order very soon on that. My understanding is that most of these witnesses are now available, but I'm going to be issuing an order on

that.

The CIPA matter, I'm going to be issuing an order on that in very short measure. I'll issue it on the, you know, so-called public docket so I won't go in any great detail. I'm going to talk to the court security officer about perhaps providing him with another order that expands upon my analysis, but I will be issuing an order on that shortly.

The MLAT request, I'm going to be taking that up. But I -- I am interested in what the status is with respect to, have you heard anything else from the PRC about the request?

MR. BARRY: This is Mr. Barry again. I think -- I will answer that in one minute, but just to let you all know, I think Mr. Oakley has lost connection again, so he may or may not be on.

But in terms of the MLAT request, we have -- we don't really have a substantive update. We've continued to go back and forth with the PRC government. They have essentially continued to ask us the same question which we told the Court about last time, which is whether or not this prosecution and investigation is part of the China Initiative and whether it is politically motivated.

We've continued to provide, you know, an explanation of the basis of the case, and more importantly, we have continued to emphasize that for this particular request it is at defendant's -- we're asking on behalf of the defendant and

that these are witnesses that the defense believes have exculpatory testimony and it's not a government request; you know, these are defense witnesses.

But, again, we have not essentially since we submitted the initial request in September gotten any kind of substantive response. It's rather been this sort of back and forth up to this point.

THE COURT: Okay. All right. So let's talk about the trial itself. There was -- there has been an estimated trial time of two weeks. I think the government more recently said three weeks, which frankly is a concern. This trial is actually sandwiched between two other trials. I wanted to try this case in April. Dr. Tao objected to that. I bumped a trial in March, which means it is sandwiched between two other trials. We're going to need to keep this trial at two weeks. So I want to talk to you about that.

Let me start by asking the defense best estimate on how long they think their evidence will take, should they present evidence.

MR. ZEIDENBERG: One to two days.

THE COURT: Okay.

MR. ZEIDENBERG: I'm sorry, Your Honor. I mean, realistically, if we are able to line everyone up and everybody is there when we start, I would think we could get through our witnesses in a day, day and a half I would think realistically.

THE COURT: Okay. So Mr. Oakley or Mr. Barry, you know, I -- obviously it's the trial judge's responsibility to make sure the case is tried efficiently, make sure everybody's rights are preserved, but also that we are efficient and mindful of the jurors' time. They're volunteers. The rest of us aren't, but they are.

And so this 902 certification process and stipulation is very important. I hope you all get that nailed down because that's going to save time.

There have been a number of pretrial rulings made in this case, everything from a motion to dismiss, to *Franks* hearing, motion to suppress, to -- I've ruled, you know, in writing on *limine* motions. I understand that for purposes of appeal everybody has issues they want preserved for the record. I don't want to spend time at trial on those same objections. I do want them fully preserved for the record.

So typically what we do, particularly in a trial that doesn't have a lot of that activity, is you raise your objection for the first time and then it's a continuing objection, and then it's preserved for the record that way.

I think in light of all of the pretrial rulings in this case, it may be helpful to appellate court and to you all if you each file a notice of rulings that you want preserved for the record and considered a continuing objection and you do that before trial. And that would be everything from the

*limine* rulings to, you know, the dismissal -- motion to dismiss, the motion to suppress, et cetera, evidentiary matters that -- if you can anticipate any.

And I don't want to litigate what the content of each one of your notices are. This is just simply we make a record of it now, and then there's no question that there's a continuing objection so that at trial you won't have to just repeatedly raise those objections because that can cost a lot of time, as you all know.

Does that sound like something that makes sense to you, Mr. Zeidenberg?

MR. ZEIDENBERG: Your Honor, if I could get a clarification for what you mean by continuing objection. Do you mean that we would simply say "objection as noted previously, Your Honor," and sit down and not ask for argument, not ask for sidebar or anything like that, it's been briefed? Or do you say that we don't object at all and, you know, because we've objected before the -- you know, before the trial?

I mean, my preference would be to simply, you know, in an undramatic way, just note -- Your Honor, note our objection for -- you know, as noted previously and then, you know, it moves on; it won't slow things up, and it's noted at that time that there's no waiver of anything.

And also I think sometimes can hopefully alert the

Court if we're going into an area that, you know, where we're veering somewhere that counsel is anticipating and the Court might not appreciate.

THE COURT: And what you've described is the way it's typically done. At least that's the way I typically want it done that, you know, there may be a pretrial ruling or may have been a ruling during trial but, you know, it's adverse to a particular party and they want to continue to raise that as it relates to ongoing testimony, and so they'll say, you know, continuing objection -- objection and -- just say "subject to continuing objection." All right. And that's it.

I'm just concerned because there's been so much of this activity that -- and by the way, there's no argument on it; it's just "subject to continuing objection." I've already made the record on the basis for my ruling, et cetera.

I'm just concerned in this case that because there's been so much of that pretrial activity and ruling that, you know, 50 percent of the questions you could jump up and say "I want a continuing objection." That's repetitive and redundant and doesn't need to happen.

I think we might be able to short circuit some of this by there being a record of every subject matter that each party wants the record to reflect is subject to a continuing objection.

Now, there may be times -- I think you've alluded to

this, Mr. Zeidenberg -- that you still may want to alert me during trial that this subject matter or something is subject to continuing objection, but all I'm trying to do is short circuit that and not have constant objections on the basis of things that -- rulings that were adverse to you.

And I think it might be helpful, particularly if this case goes up on appeal, to have each party lay out what it is they think should be subject to a continuing objection during the trial.

Does that make sense?

Uh-oh. I think Mr. Zeidenberg is frozen. Are you there?

And, Mr. Dearington, you're there.

MR. DEARINGTON: Yeah.

THE COURT: Does that make sense to you, Mr. Oakley?

MR. OAKLEY: Yes, Your Honor, it does.

THE COURT: Okay. That brings up another matter, though. Again, I want to keep this trial on track, and I know particularly in cases like this can get really bogged down with objections. I just want to tell you what my practice is.

So, again, I've never tried this notice thing before. I wish I had in the past, and that's my thinking this time. But also my practice is I want to avoid bench conferences to the greatest extent possible. I mean, if something major happens and -- a legal issue, hopefully we can take it up at

lunchtime or early day, end of the trial day, et cetera, and not interrupt the flow of evidence and not, frankly, antagonize the jury. I've seen juries over the last 20 years; they get pretty mad at all of us when we do that.

So I don't like to take evidentiary objections at the bench, and if there is an evidentiary objection, I'm just going to rule. If I think I need to hear argument, I'll tell you, reluctantly tell you to come up to the bench, but only if I think I need to hear argument. If you're making a hearsay objection, I'm going to rule probably unless there's something really strange or something I don't understand.

And I don't like to hear argument from the floor either in the hearing of the jury. So what I really expect you all to do is stand up and say "object on the basis of hearsay." If you want to quote the rule number, you can do that. You know, just shorthand me what your objection is and then I'm going to rule.

And, again, if I think I'm not equipped to rule, I'll let you know and we'll do a bench conference, but hopefully that won't happen very often.

Any questions about that?

MR. ZEIDENBERG: None, Your Honor. That's always been my practice as well, just be a one-word or two-word objection, and if there's some particular reason why I feel I need to be heard, I'll request it, and obviously it will be up to the

Court. But I would -- hopefully it will be apparent what the basis is.

THE COURT: Okay.

All right. So what I'd like to do is talk a little bit about trial procedure, how I'll handle certain things, and then I know I've covered a lot of ground and there may be additional questions, but let's go through that.

So we're still in the season unfortunately of COVID, although things seem to be significantly improving around here. We've been trying cases in Kansas, jury trials we reopened for that April of last year and we haven't stopped.

And having said that, we're going to try this case on our sixth floor -- we have two large ceremonial courtrooms. We're going to use one of them for *voir dire*. It's set up for *voir dire* with social distancing of all the chairs, et cetera, and then we're going to use the other one for trial.

And the way it's set up, the jury can socially distance. There's Plexiglass panels. The way I intend to approach this is telling these jurors if they're comfortable not wearing a mask, they don't have to wear a mask. If they're comfortable only wearing a mask, they can wear a mask. I'm going to leave it up to the individual jurors because we do have other measures in place, including the Plexiglass and social distancing.

The jury deliberation room will be a very large

conference room where every juror will have their own little table, and those tables are spaced. So we've been successful trying cases during this era this way, so I'm not concerned about that.

As far as jury selection, typically we get a jury seated by lunchtime or at least early afternoon in a criminal case. I use the struck method, which means if we're going to seat a jury of 12 plus two alternates, that means that I will call 32 people and we'll do *voir dire* of all 32 at once, and then the peremptories, 10 and 6, and then 1 and 1 for alternates, means we're then left -- everybody has to exercise all of their peremptories -- means we're then left with 12 jurors and two alternates that stay with us.

The only caveat to that is, if we're not able to get this case in within two weeks, we're going to have a pretty significant break for me to try the next case, and I'm concerned that if that happens, we may need more than two alternates.

Let me stop for a minute and ask the government what they anticipate in terms of trial time, especially now that you've heard me talk about minimizing bench conferences and how we're going to handle continuing objections, et cetera.

MR. OAKLEY: Your Honor, I think back in October we thought it was going to be closer to three. If we can get stipulations that it sounds like we will be able to get, my

estimate would be two and a half.

As I hear the Court, I understand that we -- we will be as efficient as possible, and our goal will be to fit within that two weeks, but obviously having the burden, we need to present all the evidence to establish that. We will try and be as efficient as possible, try our absolute best to get it within the two weeks, but I don't think we can promise for sure that we will meet that goal.

THE COURT: All right. Well, I typically run trial days 9:00 to 5:00. We may go a little later than 5:00, particularly if we're trying to finish a particular witness or something like that because, I mean, in other words, I may push everybody hard because we really do need to get this case in so we're not bleeding into the next trial, and it in turn will bleed into the next trial. It's the kind of cycle that we're in right now unfortunately.

There's a lot of backlog because of COVID in terms of trials, and these are trials like yours that are going to go because people have been waiting for a while and are ready, and they're not willing to have their case moved again, which I understand.

So okay. And we'll measure that as we go obviously, but hopefully we'll get this case to the jury. My goal will be Friday, April 1st. We'll see how that goes. The next trial I have is scheduled to start April 5th, and that's the following

Tuesday.

So anyway, that's -- I'm sorry.

MR. ZEIDENBERG: Your Honor, may I ask a question about the struck method because I always -- I forget. It always goes enough time between trials. Is that going to be striking from the box or striking from the panel? Is that the difference between the struck method and whatever the other method is? Can you strike from either?

THE COURT: No. So the struck method I guess it's called -- the old style one was you would put 12 people in the box, deal with those for cause, peremptories, and then like a steady stream of backfill, get the 12 seated and you start working on the panel and start bringing in, you know, for the two or three or however many alternates.

But the struck method what you do is you put -- if we're going to do 12 plus two alternates, you put 32 in the box. Defendant gets ten peremptories, government gets six. So that's 16 of the 32 that get struck. And then another two gets struck by the defendant having one peremptory for alternates and the government having one peremptory for alternates. So that's how you end up with the -- you go from 32 to 14.

Now, as for-causes come up, the 32 are backfilled from other people in the courtroom, but ultimately once we get through the whole for-cause process and we've got 32 people to work with to, you know, start striking on peremptories -- and

this method requires everybody to use all of their peremptories.

But, you know, you're dealing with a known universe. Those other people in the courtroom will not have been *voir dire*d. They're sitting there listening, and unless they end up coming to the box of 32, you're not questioning them.

MR. ZEIDENBERG: Are the -- is the method you're suggesting, Your Honor, that we submit our strikes at the same time or do we do it alternatively?

THE COURT: Alternatively. So we'll do *voir dire* and get the 32, go through the for-causes on an individual basis as we're questioning, and we end up finally with the 32. If I decide to do more than two alternates, it will be -- like, if I decide to do four alternates, then I think it would be 36 we'd end up with.

Anyway, so all right. So then when we're finally left with the people in the box and we're at the end of *voir dire*, there's a sheet that I will hand to you and it's got numbers, you know, by peremptory strikes for you and the government. So -- and I can't remember, Bonnie, is the first line the defendant's peremptory or the government's? I think the first line is the defendant.

We excuse the jury. You write your peremptory. You pass the sheet to the government. They write theirs. It goes back and forth, so you're able to see who's striking who until

you get down the whole list and then you give it to me.

MR. ZEIDENBERG: We won't be able to see who -- like their -- they won't be -- when we're striking them, they got a -- we know where they're sitting, right, so we can look back and see who's who?

THE COURT: Okay. So when the morning you come in, you're going to be given a blank chart, so as people come into those number juror seats, you can write their name, you can write your notes, et cetera, et cetera. Then when we get the final 32, Bonnie is going to give you their names. On a break or whatever, she's going to give you their names in that box.

Now, when it's time to start exercising peremptories, I always ask you all what do you want to do. Do you want the jury to stay in the box while you do that so you can see their faces or do you want to excuse them? I leave that up to the parties.

MR. ZEIDENBERG: Okay.

THE COURT: If either one of you want to leave them in the box, I'm going to leave them in the box so that you can remember what they look like.

MR. ZEIDENBERG: Yeah.

THE COURT: Sometimes people are fine though with, you know, excusing them, so I just leave that up to you.

MR. ZEIDENBERG: All right.

MR. OAKLEY: Your Honor, would it be possible to

either get the map of the seating arrangements or to visit the courtroom in advance so that I can prepare my own map so I can give myself a little bit more space to make notes?

THE COURT: Sure. Bonnie, we're going to be using the large ceremonial courtroom -- or is it the court of appeals courtroom actually, right, Bonnie, that's the trial courtroom?

COURTROOM DEPUTY: Yes, 655.

THE COURT: Six what?

COURTROOM DEPUTY: 655, it's the -- where we have the celebrations and naturalizations.

THE COURT: Okay. So, yeah, we're going to be using that. Sure, just contact Bonnie and you all can come take a look at it. You can test out your electronic equipment, all of that ahead of time.

And the nice thing about that courtroom is it's big so, you know, hopefully it will accommodate the public, the press. If we needed to have -- if there's too many people, then we'll figure that out, and we'll figure out some kind of overflow situation.

Okay. So the way I conduct *voir dire* is I do the initial questioning, which is the majority of the questioning, but I call it the basic biographical questions. You know, who they are, where they work, where they've ever worked, what about their family members; what are their life experiences with work, with jury service, with grand jury service, with

criminal and civil litigation, the criminal justice system, law enforcement, et cetera.

And then I leave it to the parties to do whatever else they want to do, whether that's follow-up questions or more case-specific questions.

So, for example, when you're -- you know, the proposed *voir dire* questions, you don't need to propose the typical biographical questions; I'm going to ask those anyway.

I typically give each side 30 minutes to do *voir dire*, and typically people think that's enough because I've spent quite a bit of time already on a lot of things, and I know when I was a trial lawyer at least initially I thought I didn't like that method because I wanted to do the *voir dire* myself, but what I found over the years is I gleaned a lot of information watching the judge ask questions. I was able to watch the jurors much more closely than if I were questioning them myself. So hopefully you find that to be the case too.

But having said that, 30 minutes per side to do any follow-up or additional questioning is fine.

We'll do challenges for cause usually as they go at the bench. We will do those at the bench.

And, again, the government will have six peremptories plus one for the alternates, and it will have --

MR. ZEIDENBERG: Your Honor, I'm sorry. I have a question about *voir dire*. It's not been my practice or at

least where I've practiced to ever have the lawyers do it; the Court has always done it. Are you suggesting that the *voir dire* by the attorneys is for individual jurors or for the panel? And is it done after the Court asks its questions, that we ask -- I'm not -- I'm a little unclear about how that process works because we're submitting to the Court additional *voir dire* questions that we think are appropriate, and so these are the questions we want asked.

If the Court is saying those aren't appropriate, then obviously, you know, I don't think -- I wouldn't want to ask -- try to ask them on my own. So I'm not sure --

THE COURT: Okay. As far as the proposed *voir dire* questions, to the extent there are objections, I'll rule on those before we start so you'll know. Sometimes I will incorporate in my questioning ones that you proposed because I think they're particularly good and maybe something I should ask. In fact, sometimes parties would rather have me ask certain sensitive questions than they do, and if they tell me that, I will.

But I will do all of my part of the *voir dire* before you, so the government and then you will ask *voir dire* questions. And then I do -- I ask the panel -- you know, most of the questioning I do is to the whole panel, but then at the end of my questioning I do talk to each juror individually.

And actually what we have them do is stand up and, you

know, say where they lived, generally the community, what their job is, what their household adults' jobs are, what their favorite activities are, what their organizations are, what they like to watch on TV, what they like to read, you know, that sort of thing.

What else? Yeah, just sort of that. And you get a sense of who they are just because they're talking. They've got the list of questions and they just sort of contemporaneously speak from that.

When you're doing your own *voir dire*, you can certainly call on people individually if you want to. It's up to you.

Okay. And I -- well, I'll let you know whether we're going to stick with 12 plus two alternates. That's generally enough for a two-week trial. But if I think we're going to run into problems and have to take a break, I may actually seat four alternates. We can talk about that before we start.

Now, generally I allow 20 minutes opening statements per side, but I'm open to having longer opening statements if you think that's what you want.

Mr. Oakley, what's your position on that?

MR. OAKLEY: Your Honor, I think Mr. Barry is going to do opening for the government, so I'll defer to him if that's okay.

MR. BARRY: 20 minutes will be fine, Your Honor.

THE COURT: All right. Does that work for you, Mr. Dearington?

MR. ZEIDENBERG: No, Your Honor. Actually I appreciate the question. I have -- I've written my opening. I think -- it's not going to be redundant, but I think it's going to be probably 30 or 35 minutes, something like that. It's not going to be -- there's a lot of ground to cover. I promise I won't be repeating myself.

THE COURT: Okay. Well, given that, why don't we allow each side 40 minutes. It doesn't mean you have to use it, but I'll allow each side 40 minutes of opening.

MR. ZEIDENBERG: Thank you.

THE COURT: We'll defer talking about closing because sometimes your initial views change after the evidence has come in, I recognize. So we'll talk about that later as we get into the trial itself.

Let's see. Just some kind of basic trial rules in my courtroom anyway, I don't like people to call witnesses by their first name. I think we should be respectful and call them by their titles or, you know, their last name.

You all already know this because you're experienced, but, you know, shouldn't be hanging out at the witness box unless you're showing the witness a document, you're sharing it or something like that. Same thing with the jury box, don't allow you get too close to them.

And as far as the presentation of evidence, we have an electronic evidence presentation system in the courtroom which allows you to hook your notebook computers in and display things on big screens. We also have a system that allows you to place paper and it's projected up as well, and you can check that out ahead of time.

I want to remind you all of the national -- it is a national privacy and redaction policy that applies to witnesses and exhibits alike. So the following has to be redacted or not testified to for purposes of protecting people's privacy and identity. Certain types of numbers: Social security numbers, tax ID numbers, and financial account numbers should be redacted except for the last four digits so that those aren't part of the public record.

Also, no reference to names of minor children, not their first names anyway. No reference to dates of birth. And then also no reference to street addresses of witnesses, victims, parties, jurors, or anyone really. We keep those out of the public record.

Does either party want to exclude witnesses under Federal Rule of Evidence 615, the witness sequestration rule?

Mr. Oakley?

MR. OAKLEY: Yes, Your Honor.

THE COURT: Okay. So that rule is invoked at the request of either party or both, which means that witnesses

that are going to testify will not be allowed to be in the courtroom to listen to other witness's testimony. I expect the parties to self-police with respect to their own witnesses, and also that means telling those witnesses they're not to share the content of their testimony with any other witnesses during the trial.

All right. And I understand you may have questions, but I'm going to keep going through the end of the trial, and then we'll come back to any questions you may have.

MR. ZEIDENBERG: I'm sorry, Your Honor. I may have spoken too quickly on the juror -- I mean, on the witness sequestration because Mr. Tao's wife -- I haven't spoken with her, but I know she'll want to be present. She is going to be a witness. So I don't know if an exception can be made or I can withdraw my request on that or maybe I can just ponder it a little bit after I talk to her and Dr. Tao because I hadn't considered that.

THE COURT: Okay. So the exceptions to -- generally the exceptions to the sequestration rule are the case agent and obviously Dr. Tao. Witnesses are not entitled to be there for the whole trial as well as expert witnesses.

MR. ZEIDENBERG: Right.

THE COURT: Does the government object to Mrs. Tao being present during the trial?

MR. OAKLEY: Your Honor, could we internally discuss

that and then we'll let Mr. Zeidenberg and Mr. Dearington know if we do object?

THE COURT: Okay. Sure. Okay. Okay. So moving through the trial, next phase, I instruct before closing arguments, so we will be having a jury instruction conference near the end of the trial, and the way I typically do that is I have the law clerk that's assigned to the case have an informal conference with you all first just to see if any of the objections or concerns can be worked out, and then we'll have a formal instruction conference with me where I will actually rule on any remaining objections to the instructions.

I will say the charges in this case are ones that we have standard instructions for. The Tenth Circuit does not have pattern instructions. I guess you could call them model instructions because they've never adopted them formally, but they do have model instructions for criminal cases.

But having said that, I mean, I've been using the same instructions for mail fraud, wire fraud, false statement cases for 20-plus years. The elements haven't changed for the most part, and so I don't know that I really need that from you. I also have stock criminal jury instructions that, you know, cover everything from burden of proof to deliberations and et cetera.

So I suggest that you get those stock instructions. I think they're posted on our website under my name, but Bonnie

can provide them to you as well. And then we will have an instruction conference down the line, informal and formal, to cover that.

I instruct before closing arguments, which means that you all can use the instructions in your closing arguments. You can publish them, highlight them, read from them, whatever you want to do. That's usually really helpful to the jury to have you be able to talk about the evidence in the context of the instructions.

What else? Oh, well, trial days generally are going to run, like I said, from 9:00 to 5:00, although this case I might push it more. We might have slightly longer days. We don't take more than an hour for lunch, and we take about a 15-minute break in the afternoon and one in the morning as well. But otherwise we try to stay on track as much as we can to get this case moving.

One other thing I wanted to talk about and then we'll open it up for questions, and I want to do the *Lafler-Frye* inquiry. I want to inquire if Dr. Tao has received any and all plea offers from the government.

MR. OAKLEY: Yes, Your Honor.

THE COURT: Okay. And he's had a full opportunity to discuss them with his lawyers?

MR. ZEIDENBERG: Well, we haven't gotten a plea offer. I guess back in February of last year we may have, I don't

remember, but we haven't gotten anything since then.

THE COURT: Okay. But to the extent you did then or before, you had a full opportunity to discuss those with Dr. Tao and to address with him the risks of rejecting the agreement and proceeding to trial, the risks and benefits?

MR. ZEIDENBERG: Yes, we talked to him, yes.

THE COURT: Okay. All right. Okay. So for now, that's all I had. So let me start with you, Mr. Oakley. Do you have any questions or you, Mr. Barry?

MR. OAKLEY: No, Your Honor. I had a few minutes to think about the defendant's spouse. I think if she is going to be a witness, I think she needs to abide by the sequestration rule. I know of no exceptions for spouses.

THE COURT: Okay. Anything more from the government?

MR. BARRY: Your Honor, I have one question, and this was about something very early that I do think may have an impact on trial length. On the pending Rule 15 motion for the government, I know you said you're going to issue a written order on that.

Can you give us any indication about whether we will be permitted to call either Dr. Weatherley or Dr. Chen either via two-way video for Dr. Weatherley or for either of them via deposition because that may affect the witness order and may also -- for example, if Dr. Weatherley is not able to testify via deposition and he's not able to come and testify live, we

may need to put on two or three other witnesses to try to make up for that if we can.

THE COURT: Hold on just a minute.

MR. BARRY: Okay.

THE COURT: All right. I'm going to rule on this early next week, so you're going to have plenty of notice.

MR. BARRY: Okay. Thank you, Your Honor.

THE COURT: Dr. Weatherley and Dr. Chen are the two that the government argues are still unavailable; is that correct?

MR. BARRY: Yes, Your Honor.

THE COURT: Okay. I'll rule on this early next week, so that will give you plenty of time hopefully.

MR. BARRY: Thank you, Your Honor.

THE COURT: Okay. Anything else from you, Mr. Barry or Mr. Oakley?

MR. OAKLEY: No, Your Honor.

THE COURT: How about you, Mr. Zeidenberg or Mr. Dearington?

MR. ZEIDENBERG: Not on the trial mechanics, Your Honor.

THE COURT: Okay. On anything else?

MR. ZEIDENBERG: Yes, Your Honor. We have one -- I think one issue. We are -- we've requested from the government the return of Dr. Tao's wife's cell phone. When they did the

search at Dr. Tao's house back in 2019, they took his wife's cell phone. They've had it for two and a half years.

We believe there's exculpatory text messages that we would like to obtain that are on that message on a messaging app.

The government has imaged the phone. They have the contents of the phone. We've asked for the phone back so we could search the phone. Their response was that the phone is evidence in the case and we've given you, you know, the electronic data from the phone. The problem is the data is not in a format that is searchable and findable because we've tried and she has tried.

And so the phone is not listed as an exhibit on the government's exhibit list nor are the contents of the phone listed as an exhibit, any of the contents listed as exhibits at trial.

So, you know, the government has said, well, you can come to the FBI and inspect it. Well, that's not really practical and it's also very expensive to have a vendor come to the FBI and try to copy the phone in the FBI -- I don't even know if they'll allow us to copy the phone again.

What we're told this app, the messaging app she used, she needs to access it. So rather than necessitate or try to require us to send a vendor and Mrs. Tao to the FBI office to try and search and then copy, we don't understand why they

can't have the phone returned to her since they've got the contents of it.

And I should say, Your Honor, I have a lot of cases in which subjects' and defendants' homes and offices are searched, and most cases -- and in fact just about all of them -- the devices are returned to the defendant or the target after they've been imaged, and a lot of times it's done on the scene of the search. You know, they go in, they image the phone, they do this as a courtesy so they're not deprived of the phones; they image the phone at the scene and give it back to the person because it's the contents of the phone that's the evidence, not the device. It's just like a filing cabinet. So the filing cabinet isn't the evidence; it's the contents, which they have.

So this would enable us and Dr. Tao's wife to sit down and spend the time with us to go through her text messages that we think may bear -- may -- she has text messages with individuals that we think are relevant and admissible evidence.

THE COURT: Mr. Oakley or Mr. Barry?

MR. OAKLEY: Your Honor, first of all, we have told the defense since very early on, I think Mr. Mattivi told the defense they're free to come to the FBI and look at any physical item that's been seized.

On this particular phone my understanding from my review of the evidence is there was a micro SD card that was

plugged into the phone that was collected along with the phone. We intend to introduce that card and contents into evidence. The way that the FBI packaged it is those two -- since the card came from the phone, those two things are packaged together, so the phone would be part of the package.

Today is the first -- we did receive a request from the defense to have the phone returned, and we said no for that reason and because they have received the Cellebrite report that has the contents on the phone.

Today, to my knowledge, is the first time that we've heard specifically what it is that they're looking for. I think if the Court will give us an opportunity to talk to the defense, if they're willing to stipulate to certain facts related to the SD card such as that it came from the phone, that the phone belonged to the defendant's wife, we might be able to resolve this.

As I said, alternatively we've given them the opportunity to come to the FBI to examine it, to do what they need to, and to bring whomever they need to get that done.

THE COURT: I would prefer if you could resolve it. But I do have some questions. So the government intends to offer the phone and the SD card into evidence, and then what will be displayed? I mean --

MR. OAKLEY: There's a screenshot -- so the SD card as I understand it from my conversation with the computer folks,

the SD card was in the phone, and from the SD card when you take a picture or screenshot from the phone, it's stored -- if it's an Android-type phone, it's stored on the SD card as opposed to internal memory of the card itself.

So we would intend to introduce both the card and a screenshot and I believe a couple items -- other items that came from that particular card.

THE COURT: Okay. But then what -- I mean, you're introducing this because you want the contents -- some contents of the phone in evidence, correct?

MR. OAKLEY: Correct.

THE COURT: Text messages or something? So how are those -- why do you need the phone and the SD card in order to admit, say, text messages that were on the phone?

MR. OAKLEY: For the chain of custody so that we would have an agent who would say I collected this phone and I submitted it to the RCFL lab and we have somebody from the RCFL lab say this particular phone had a micro SD. As part of our examination we removed it, and this exhibit is a printed copy of a screenshot or something similar that came from this micro SD card that was in this phone.

MR. ZEIDENBERG: We'll stipulate to chain of custody, Your Honor.

THE COURT: Okay. You all work this out. I think you can work this out. If the defendant will stipulate to chain of

custody and there's not going to be an objection to admissibility of the contents of this phone, then I think Mrs. Tao should be able to get her phone back, particularly if she can't really read the contents without coming over to the FBI at this point. So try to work that out. It sounds like you can. Okay.

MR. ZEIDENBERG: Thank you.

THE COURT: All righty. What else, Mr. Zeidenberg or Dearington?

MR. ZEIDENBERG: Can I have one moment, Your Honor?

THE COURT: Sure.

MR. ZEIDENBERG: Nothing else, Your Honor. Thank you.

THE COURT: Okay. And anything else from you, Mr. Oakley?

MR. OAKLEY: No, Your Honor.

THE COURT: All right. Well, I appreciate it. We had a productive hearing today. I appreciate that.

And we will look forward to seeing you on March 21st. We will start selecting the jury at 9:00 a.m. The panel will be in the building and get an orientation film, et cetera, et cetera, and should be ready to go at 9:00.

What I probably will want to do is have you all available in the courtroom at 8:30 should there be any last-minute things that we need to talk about before we bring the jury in at 9:00. So plan on being in the courtroom at

8:30. All right?

MR. OAKLEY: Yes, Your Honor.

MR. ZEIDENBERG: Very well.

THE COURT: Thank you. We'll be in recess until 10:30.

(The proceedings were adjourned to March 21, 2022, at 8:30 a.m.)

C E R T I F I C A T E

I, Danielle R. Murray, a Certified Court Reporter and the regularly appointed, qualified, and acting official reporter of the United States District Court for the District of Kansas, do hereby certify that the foregoing is a true and correct transcript from the stenographically reported proceedings in the above-entitled matter.

SIGNED 4th of March, 2022

/s/Danielle R. Murray
DANIELLE R. MURRAY, RMR, CRR
United States Court Reporter