UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 19-20052-01-JAR

FENG TAO, a/k/a "Franklin Tao,"

Kansas City, Kansas
Date: March 22, 2022

Defendant.

Day 1 (Pages 1-33)

. . . . . . . . . . . . . . . . . . . . . . . . . .

# TRANSCRIPT EXCERPT OF JURY TRIAL
# (OPENING STATEMENTS)

BEFORE THE HONORABLE JULIE A. ROBINSON
SENIOR UNITED STATES DISTRICT COURT JUDGE

## A P P E A R A N C E S

For the Plaintiff:

Mr. D. Christopher Oakley
United States Attorney's Office
500 State Avenue
Room 360
Kansas City, Kansas 66101

Mr. Adam Barry
Department of Justice-Nsd
950 Pennsylvania Avenue, NW
Washington, DC 20530

For the Defendant:

Mr. Peter R. Zeidenberg
Mr. Michael F. Dearington
Arent Fox, LLP
1717 K Street NW
Washington DC, 20008

---

Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.

(Excerpt of opening statements).

THE COURT: With that, I will turn to the government. Are you ready to proceed with your opening statement?

MR. BARRY: Yes, Your Honor.

THE COURT: Okay.

MR. BARRY: Good morning. It's February 27th, 2018 and the defendant, Franklin Tao, has a problem so he dials up his friend, another scientist at Georgia Tech, to ask for advice, but what that scientist doesn't know is that the defendant is about to secretly record that phone call.

In that secretly recorded call, you'll hear the defendant describe his problem. You see, he's a full-time professor at the University of Kansas in Chemical and Petroleum Engineering, but he's just been offered a very attractive job at a research university in China and he doesn't know what to do. Should he give up the KU job, should he take the China job, or should he try to do both? So the Georgia Tech professor gives him some advice. He says, if you're upfront with KU, you tell them the truth, you shouldn't have any problems. Maybe they'll even let you work out a situation where you can do both.

But the evidence in this case will show that that is not what the defendant did. He ignored his friend's advice, but he still came up with a solution and that solution was to lie. What the evidence in this case will show is that for over

a year, from 2018 to 2019, the defendant lied, cheated, and concealed his second job at a research university in China from KU and from the federal government that had been giving him hundreds of thousands of dollars to fund his research.

Now, this case isn't just about that second job in China. It's about the lies, it's about the fraud, it's about the concealment, and it's about the deceit that the defendant used for over a year to conceal that second job so that he could get paid his full-time salary at KU and so that he could continue to benefit from the hundreds of thousands of dollars in federal taxpayer money to fund his research.

Now, this is my opportunity to give you an overview of what the government will present to you to prove its case. So I just want to give you a sort of 30,000-foot preview of what the evidence is going to show.

The first thing it's going to show is that since 2014 the defendant has been a full-time professor at KU in chemistry and chemical and petroleum engineering. The evidence will show that his expertise is catalysis, which basically just means using substances to speed up a chemical reaction or to change the conditions under which a chemical reaction occurs. An example is that you drove here today, your car probably had a catalytic converter. That uses catalysis to reduce the amount of harmful pollutants that go into the atmosphere.

The evidence will also show that as part of his

full-time position he earned over $100,000 a year from KU and that KU expected him to have what's called a 40/40/20 split. That means 40 percent of his time should be spent on research, 40 percent of his time should be spent teaching, and 20 percent of his time should be spent on service to KU.

The evidence will also show that while at KU the defendant received hundreds of thousands of dollars in federal grant money from the National Science Foundation and from the U.S. Department of Energy. The evidence will show that that evidence *[sic]* was used to build him an expensive laboratory, to purchase expensive equipment, to hire a staff of researchers to perform that research.

The evidence will also show that from 2015 *[sic]* to 2019 the defendant had a second job at a research university in China.

The evidence will show that in the summer of 2017, the defendant applied for a highly competitive position in China called a Changjiang Distinguished Professor Program, also sometimes called the Yangtze River Distinguished Professor Program. You'll hear testimony that that program is sponsored by the Chinese government and that people who participate in that program receive numerous reputational and financial benefits. You will hear that the purpose of that program is to recruit scientists from around the world, just like the defendant, who are successful mid-level career researchers who

have the know-how of how to build a laboratory, how to conduct science, how to publish articles, how to build a research team.

You'll also hear evidence that Changjiang Distinguished Professors receive a salary of at least $85,000 a year; that the Chinese government gives them millions of dollars in research support; that they give them lab space so they can build a laboratory; that they give them a budget to hire a research team.

And you'll hear evidence that in -- around May of 2018, the defendant accepted a job at a university in southern China called Fuzhou University, because the other thing you'll hear is that to be a Changjiang Distinguished Professor - even though it's a Chinese government sponsored program - you need a sponsoring Chinese university. So the evidence in this case will show that around May of 2018, the defendant accepted a position at Fuzhou University in southern China as a Changjiang Distinguished Professor.

Now, you'll see a lot of evidence of different varieties in this case. You'll see e-mails in English and Chinese; you'll hear translations. You'll read translations. You'll listen to the dozens of recorded phone calls that the defendant secretly recorded. You'll see documents. And what that sort of plethora of evidence will show is the sequence in which the defendant applied for the position at Fuzhou University. You'll see him travel to China to defend his

application in front of the Chinese government. You'll see him exchange draft contracts with people who work at Fuzhou University and you'll see a certificate found in his house that announces that he's been appointed as a Changjiang Distinguished Professor at Fuzhou University.

You'll hear testimony from an opinion leader on what are called Chinese talent programs who will testify to the significance of this certificate, who will testify to the significance of a Chinese government seal.

Now, you won't see a signed contract, but what you will see are a variety of draft contracts exchanged back and forth, and then you'll also see evidence showing the defendant fulfilling the key terms of that contract. You'll see him sending recruiting e-mails to scientists from around the world trying to get them to join his research team at Fuzhou. You'll see him funneling post-doctoral students who reach out to him at KU asking if he has a position there and him telling them, are you interested in a lab at Fuzhou University?

You'll hear him in the recorded phone calls that he secretly made trying to recruit other students of his, including his former students from KU, to try to get them to go to Fuzhou. You'll see mentor/mentee cards, some of which are signed by the defendant, of him agreeing to mentor students at Fuzhou University. You'll see e-mails of him negotiating the prices of equipment to put in his laboratory at Fuzhou. You'll

see e-mails of him ordering that equipment and you'll see research proposals that he submitted to the Chinese government for the Chinese government to fund research that he was going to do at Fuzhou. You'll also see his extensive travel, which I will talk about shortly, to China.

And you don't have to take my -- you'll -- furthermore, you will see the defendant's own words. You'll see him sending e-mails saying, I got a joint appointment at Fuzhou University-China other than the current one. Or Franklin Tao from Fuzhou and Kansas. This is Franklin from Fuzhou and University of Kansas. You'll see his own words.

So how was he able to do both? How was he able to work a full-time job at KU and a job at Fuzhou in China? He was able to do it through lies, through deceit, through cheating, and through concealment.

The evidence will show that starting around May of 2018, the defendant made -- took multiple steps of fraud to conceal his second job at Fuzhou. The evidence will show that he first intentionally failed to disclose that job or any of his affiliation with Fuzhou or any of the activities that he was doing there to KU.

The evidence will show that KU has an Office of Research to manage the hundreds of millions of dollars in federal research dollars that it gets every year, and the evidence will show that the defendant was very familiar with

that office because he had done federal research a number of times in the past. The evidence will show that among the 80 members of that office, they had to frequently contact -- had frequent contact with the defendant.

And as part of that process, there are certain forms and disclosures that KU requires professors like the defendant to make. The evidence will show that one of those policies requires that scientists or professors like the defendant disclose all potential or actual conflicts of interest.

The evidence will show that they require scientists like the defendant to -- whenever they submit a research proposal, to do it through the Office of -- the Office of Research at KU. They're not allowed to just submit the proposals on their own.

The evidence will also show that anytime a professor, who was full-time at KU like the defendant, wanted to accept outside employment or engage in outside activities that were related to their primary job responsibilities, they were supposed to seek pre-approval from this office and what the evidence will show is that the defendant did none of these things. Instead, the evidence will show that on numerous occasions over the years he submitted certifications to KU stating that he didn't have anything to disclose.

But it's not just the failure to disclose certain information to KU. The evidence will also show that the

defendant engaged in an elaborate scheme to lie to KU, not only about where he was but about what he was doing. The evidence will show that in the 2018 time period, the defendant was mostly able to work remotely for Fuzhou University, meaning he could be in the United States and other places while he was doing that.

But in December of 2018, the defendant effectively moved to China to work full-time at Fuzhou University. And what the evidence will show is that from December of 2018, for nine months, until August of 2019, with the exception of a handful of two-week trips back to the United States, the defendant was effectively working at Fuzhou University in China.

The evidence will show that to maintain this double life, this duality, the defendant concocted an elaborate lie. The first step to that lie is that he asked his chair at KU to allow him to do what's called a course buyout. And what this is, is it's a policy that KU has that allows professors to essentially buy out their teaching responsibilities for a particular semester. So it's that 40 percent of the 40/40/20 split.

And what the evidence will show is that the defendant told his chair, I'd like to do a course buyout and I'd like to do that buyout because I want to do some research in Germany. In particular, there is a research institution in Germany that

I have a collaboration with and so I'd like to take the time off so I can focus on that and so I can focus on my federally-funded research. That's the first part of the web of lies.

The second part is, the evidence will show, that the defendant had to figure out a way to try to pay for that buyout because if the defendant is not teaching that class, somebody else at KU has to teach that class. And so what the defendant did is he told KU, hey, I might have this contract from a university in China called Fuzhou and they want me to do some tests for them and they might give KU some money to do those tests. But what the evidence will show is that during that entire period, the defendant never disclosed his relationship with Fuzhou. He never said, I have a job there; I'm building a laboratory; I'm recruiting students to work there.

Instead, based on those lies, the evidence will show that his chair allowed him to have a buyout for the spring 2019 course, but he imposed three conditions: First, he said you need to transfer the money that's going to pay for the buyout to KU so that we can pay for somebody to teach the course; second, you need to satisfy your -- continue to satisfy your other duties to the university; and, third, you need to stay on campus.

Now, what the evidence will show is that the defendant didn't do any of those things. Instead, what the evidence will

show is that there was no collaboration with Germany. The scientist who he was supposed to be collaborating with will testify that although he had talked to the defendant about a collaboration, the defendant never followed up, and that scientist will testify that when he sees the defendant in this courtroom, it will be the first time he's seen him in six years.

The evidence will also show that the defendant's travel records don't show any stamps to Germany or the European Union during this time period. The evidence will show they show a lot of stamps to China.

And the evidence will also show that during this time period when the defendant missed and failed to satisfy his obligations at KU, like failing to go to a faculty retreat or failing to be able to meet with his professor to do his faculty review, that the defendant actively lied. The defendant told his chair, as you'll see in e-mails, I'm in Germany; I'm at the Fritz-Haber Institute doing research, but the evidence will show that those were lies.

The evidence will also show that that cover that he used to say Fuzhou is going to pay for my buyout, that never came to fruition. The evidence will show that Fuzhou never transferred any money to KU. Instead, the defendant went to China, worked at Fuzhou, and when he came back and KU asked, hey, how are you going to pay us for that course buyout, he

says, oh, the thing with Fuzhou never worked out, and he instead used his National Science Foundation dollars to pay for that buyout.

This isn't just about fraud on KU though, this is about fraud on the federal government. And in particular in this case, you'll hear testimony about the special relationship between the federal government - primarily here the National Science Foundation, the Department of Energy - and research universities across America like KU. You'll hear evidence that there's a special relationship between the way that the federal government funds the research, the way that universities and colleges in the United States sponsor that research or provide the environment in which the research can take place, and the way that the individual scientists, also called principal investigators or PIs, participate in that system.

You'll hear evidence that every year the U.S. Government pumps billions of dollars of research money into this system, and they do it because they're funding something called fundamental or basic research. This is different than applied research. You'll hear evidence that fundamental research is the type of investment that takes 20 to 30 years before you see any kind of return. It's the type of investment that in our country the federal government primarily, if not exclusively, funds. And you'll hear testimony that many of the things that we take for granted in our daily lives, like an

Internet search, at some point -- at some point in the distant past were funded by the federal government. You'll also hear testimony that this system is a tripartite relationship. It's premised on trust and it's premised on the integrity of the system.

You'll also hear about the specific program the defendant participated in. For example, this is the Department of Energy program that funded his research. It's called Basic Energy Sciences. And you'll see its mission statement is: The mission of Basic Energy Sciences program is to support fundamental research; to understand, predict, and ultimately control matter and energy at the electronic, atomic, and molecular levels in order to provide foundations for new energy technologies and to support DOE missions in energy, environment, and national security. That's the mission of these organizations that are funding the defendant's research.

You'll hear that as part of that mission and as part of that purpose of ensuring the integrity of the system, these agencies have a number of policies in place. They require scientists or principal investigators like the defendant to disclose certain information. You'll hear testimony that that information is crucial for them to make funding decisions.

One of the types of information that they require is called current and pending support and what that means is that basically any scientist or principal investigator who's

applying to receive federal grant dollars has to disclose all current research support that they're getting and all pending support, meaning applications that they submitted but they haven't heard back from yet.

You'll hear testimony that the reason why the National Science Foundation and the Department of Energy require this information, why it's crucial to their decision-making, why it's incredibly important to the integrity of the system, is because they don't want to fund duplicative research. They don't want to use federal taxpayer dollars to pay for something that somebody else is already paying for. They also want to fund research that the scientist actually has the time to do.

You'll also hear that the National Science Foundation and the Department of Energy in different ways require principal investigators like the defendant to disclose all outside affiliations, and they do this because -- and this is an example from the Department of Energy -- because part of the process when they review these proposals - and they get tons of them, they're incredibly competitive to get - is that they have an independent panel of third-party experts who basically volunteer, who are other scientists in the space, and who review the merits of the scientific proposal.

And one of the things that the Department of Energy requires is that we need to know all of your outside affiliations because we need to screen for any conflicts of

interest for that panel because, again, this is about funding science for science's sake, and the merits of the science should be what determines whether or not funding occurs.

And so one of the ways -- even if there isn't an actual conflict of interest, one of the ways that they ensure the integrity of that system is that they ensure that the panel of independent experts who are reviewing that proposal -- that they don't have any conflicts; that they don't work for the same institution; that they're not brother-in-laws of the person who is submitting the proposal.

You'll hear testimony from an executive at the National Science Foundation who will say that this kind of information is crucial; it is critical to their funding decisions. You'll hear testimony from the two Department of Energy program managers who reviewed the defendant's applications and grant proposals in this case who will say that this information was incredibly important to their decision-making, that they required it and that if they had failed to receive it, it would have -- it could affect their funding decision.

You'll also hear testimony that since the defendant was charged in August of 2019, some of these funding requirements have been clarified. You'll hear testimony from the National Science Foundation executive who was involved in one of those clarifications who will say, yes, there were

clarifications. There were even clarifications to this current and pending section.

You will also hear her testify, however, that in terms of disclosing all current and pending research support, "all" has always meant all. She will testify that since the 1970s the National Science Foundation has required principal investigators to disclose all current and pending research support, irrespective of whether it comes from the federal government, a state government, or a foreign government.

You will hear similar testimony from the Department of Energy witnesses who will say that aside from looking at the text of the instructions of current and pending, "all" meant all.

You'll also hear -- you'll also see evidence that even if other scientists who aren't on trial here today may have had misgivings or questions about what they were supposed to tell the Department of Energy and the National Science Foundation during the relevant time period, the evidence in this case will show that the defendant knew what he was supposed to disclose and that he chose to conceal that information from the federal government and from KU.

You'll hear testimony from KU as well as the federal funders that the defendant is an experienced researcher; he's been doing this for years. You'll hear evidence that in lots of other circumstances that did not involve his job at Fuzhou

in China, he asked questions, he asked for clarifications. He engaged with that staff of 80 people at KU to make sure he was doing it right. But when it came to his job at Fuzhou, when it came to his Changjiang Distinguished Professor position, no questions.

You'll also see the multiple steps of concealment that he took. You'll see e-mails where he tells people, don't use my Fuzhou e-mail account. You'll hear recorded phone calls where he says, don't mention this Changjiang Distinguished Professor thing. You'll hear a witness testify and you'll hear the recorded call where the defendant expressly tells that witness, if anybody mentions this Changjiang Distinguished Professor thing, I'd like you to pretend like you don't know what they're talking about.

You'll hear testimony from a forensic examiner from the FBI who will tell you that when the defendant's KU computer was searched, they found that it was partitioned, meaning that the hard drive had been broken into a bunch of sub-compartments, and in two of those sub-compartments you'll see lots of documents relating to Fuzhou and his work there.

You'll also hear another recorded phone call between the defendant and someone at Fuzhou where they talk about the need to not put anything in writing. You'll hear the defendant agree when that person says, don't put anything in writing, that would be, quote, "evidence."

As a result of the defendant's multi-year fraud, his lies, his deceit, he's been charged with six counts of wire fraud and two counts of making materially false statements in a federal matter.

Now, Judge Robinson will instruct you on the law at a later time, but just to give you an overview of what -- wire fraud makes it a crime to use telecommunication wires - so using the Internet, sending an e-mail - across state lines to further a scheme to defraud. It's also a crime to make a materially false statement to a federal agency.

You'll see a lot of evidence in this case. There's going to be a lot of exhibits. It's going to be a couple weeks, you've already heard that, there's going to be a lot of witnesses. But in the end, the story is simple. KU trusted the defendant; the National Science Foundation trusted the defendant; the U.S. Department of Energy trusted the defendant, and the defendant broke that trust. He betrayed them and he did it because he wanted to reap the benefits of that second job at Fuzhou University while continuing to receive a full-time salary from KU and hundreds of thousands of dollars in federal taxpayer-funded research dollars.

At the end of trial we'll come back to you and after you've heard all the evidence and gotten your instructions on the law from Judge Robinson, we'll ask you to return the only verdict that the evidence and the law will support, which is a

verdict finding the defendant guilty on all counts. Thank you.

MR. ZEIDENBERG: Thank you, Your Honor.

Good morning, ladies and gentlemen. Moonlighting. That's the government's case. The government has alleged that Doctor Tao was moonlighting, that he had a second job and he didn't tell his employer about it. For that, they have charged him with eight felonies.

The government is prosecuting Doctor Tao, a father, a husband and, until he was arrested, the most productive member of the Chemistry Department at the University of Kansas, for suspicion of moonlighting. And if you think there's something wrong with this picture, you're not alone.

If you listened to the government's opening and wondered, why aren't I hearing about some money being lost? Well, join the crowd. Think about it. He's being charged with eight felonies alleging that he defrauded the government and KU and yet no one lost a penny. Doctor Tao did not defraud KU or NSF or DOE of a dime. He did all of the research that was expected of him, all of it. All of the research he was expected to do, he did. They got exactly what they paid for.

Now, before I tell you what happened here, ladies and gentlemen, and what the evidence will show, I want to tell you what the case is not about. It isn't about theft. There's no allegation that Doctor Tao stole anything from anyone. It isn't about transferring technology. There's no allegation

that Doctor Tao transferred technology or intellectual property to anyone in China or anywhere else. It's not about diverting grant funds for personal use. He didn't take grant money and go take a vacation or buy fancy watches, he used it to pay for research.

What it is about is an allegation that Doctor Tao had a second job in China and didn't tell the University of Kansas about it. Now, if that second job had been in Belgium or France or Canada or Ireland or Houston, Texas, none of us would be here today. It would be an H.R. matter with the University of Kansas. But because that other country involved China, the government has turned it into a federal case.

But as absurd as that sounds, trying to make a criminal out of someone who's alleged to have worked a second job, in this case it isn't even true. Doctor Tao did not accept the position at Fuzhou University and he was never paid. In addition to it not being true, ladies and gentlemen, the amazing thing here that you will learn during this trial is that none of this even mattered. At the time of these events neither the DOE nor the NSF had any requirements that researchers like Doctor Tao report unpaid positions at foreign universities. There was no requirement that they report participation in a foreign talent program. You will hear from the government witnesses that none of these things would've made the slightest difference to whether or not Doctor Tao's

grants would've been funded. It didn't matter.

Now, I want you to pay close attention not just on direct examination when the government is asking their witness the questions but listen on cross examination to the answers that you hear. And you're going to learn the following, ladies and gentlemen: That all the research money that was provided to Kansas to fund Doctor Tao's research was properly spent on research; that there is no allegation of theft of intellectual property; that he never signed an employment agreement with Fuzhou University; and he was never paid.

You will learn that it's not only not illegal to be a member of a foreign talent program, it's not unethical, it's not improper. There are no rules against it from KU, from NSF, from DOE. None of them prohibit it. And, in fact, in this time period, 2017 and 2018, there was no requirement that it even be disclosed.

And finally, you're going to learn that there was no training provided whatsoever to researchers like Doctor Tao on all these regulations and all these policies that you're going to see the government talk about. No training. The government -- KU and the NSF and DOE simply referred their researchers to websites and said, look at these policies, here's a booklet, some of them 180 pages long, figure it out. And in all those websites and in all those booklets, not once does it say, and by the way, if you get something wrong, you

can expect the FBI to be bursting through your door with arrest warrants and search warrants and you'll be indicted for wire fraud. They never say that.

This entire prosecution was a rush to judgment. The government indicted this case without asking the most basic and fundamental questions that they should have been asking first. Was the information about the allegations of what Doctor Tao was doing in China -- did that need to be disclosed? They never asked. It's incredible, but it's true.

The government indicted this case before asking a single relevant witness at the National Science Foundation or the Department of Energy whether participation in a foreign talent program needed to be disclosed. If they had asked that question before indicting the case, none of us would be here today. If they had simply asked if an affiliation with a foreign university needed to be disclosed before they indicted the case, none of us would be here today. If they had picked up the phone or sent an e-mail to Fuzhou University and said, hey, do you guys have a Doctor Tao on your faculty, we wouldn't be here. None of you would be here.

The basic fundamental questions that you would have expected investigators to ask before indicting, they failed to ask. They indicted first and investigated later. Of course, by that point they had already committed themselves and they did not want to admit that they had made a colossal mistake.

The investigation of Doctor Tao should be everyone's worst nightmare. They went through every shred of paperwork in this man's life. Every e-mail, every text message, every submission of paper, electronic or otherwise, to any employer he's had here in the United States or to the federal government was put under a microscope.

They surveilled him and his wife while they went to Costco, and went to get pizza, and took their kids to school. They had drones up over his house. They didn't just search his bank account, they searched his wife's bank account. And they didn't just search their bank accounts, they searched their children's bank accounts, their middle school-aged children's. And not just them but the church members who happened to lend them money to pay for their legal fees, their bank accounts were searched. They looked for anything they could find to try and turn that into a federal crime.

And after all that digging and all that investigating, what did they find? A conflict of interest form sent to the H.R. department at KU in 2018 that they say didn't have the right box checked, and they said, you should've updated your paperwork to the NSF and the DOE. And for those alleged paperwork failures, they charged him with eight felonies.

Why did this happen? What explains this rush to judgment and this attempt to turn paperwork, paperwork failures, into eight felonies when there's no one who lost any

money and the research was done? The answer to the question of "why?" is that the FBI and the DOJ were tricked and manipulated by a former graduate student of Doctor Tao's, a woman by the name of Huimin Liu, who was attempting to extort Doctor Tao for $300,000. She was angry with Doctor Tao because she didn't feel she got sufficient credit on an article that she had written. Doctor Tao refused to change her credit, she said she wanted $300,000 from him and if he didn't pay her she was going to report him to the FBI as being a spy involved in economic espionage, she said, because that topic is very popular these days.

And that is exactly what she did. She made up aliases, she made up this allegation that Doctor Tao was a spy, and she sent these allegations in to the FBI and to the University of Kansas.

Well, you can imagine what happened next. Cue the drones, cue the surveillance teams. Doctor Tao's life was put under a microscope. Her plan worked perfectly. She said she was going to reap revenge on him if he didn't pay her and she did. She manipulated the FBI into destroying Doctor Tao's life and they fell for it hook, line, and sinker.

Who is Doctor Tao? Doctor Tao is a 50-year-old husband. He's the father of twins who are now in high school. They were in middle school at the time of these events.

After getting his undergraduate degree in China, he

came to the United States over 20 years ago to get his Ph.D. at Princeton University. After getting his Ph.D. at Princeton, he went to the University of California in Berkeley in 2006. He stayed there until 2010 where he went to Notre Dame as a professor. And at Notre Dame, from 2014, his specialty, as the government has said, was something called catalysis. You don't have to know anything about the science involved, it's not going to be on the test. You're relieved to know.

But I will tell you this, as the government said correctly, this is fundamental research. Fundamental, as opposed to applied, does not seek to answer a specific question or solve a specific problem. It's considered knowledge for knowledge sake. All of the results of fundamental research are published. They're made available for anyone to read. In fact, the research that Doctor Tao was doing required the results to be published and that's how his success was to be measured. If you didn't get it published, well, then it was wasted money. And none of this is classified, none of this is secret, none of this is confidential. It's just the opposite. It's meant to be widely dispersed, and the more widely dispersed the better.

After four years at Notre Dame, Doctor Tao came to KU. And while at KU, from 2014 to 2019, he was by far the most productive member of the chemistry department at KU. He was just one of 26 professors, but he alone accounted for

25 percent of the published -- publications from that department. His colleagues were publishing three or four papers per year. He was publishing a dozen, a multiple of four more than his colleagues.

His output and productivity were so outstanding that he was formally recognized by the Chancellor of the University of Kansas at a ceremony in April of 2019. That's right. One year after Doctor Tao allegedly began working full-time in China, he was being recognized by the University of Kansas by being one of the four most outstanding and productive members of the faculty.

Now, that award came with a $10,000 prize. After taxes, Doctor Tao cleared $7,000. He took that seven -- $7,000 and half of it he donated back to the Chemistry Department at KU to further the research of his group. The other thousand dollars he donated to his church. Now, that is the man, the Doctor Tao the government is claiming is a fraudster.

Now, what is it exactly the government is claiming that he did that was illegal? The government's case comes down to this: They claim that he accepted a full-time job at Fuzhou University and he failed to disclose that to KU or on his grant applications. The government is wrong. You will hear that Doctor Tao applied to be considered a Changjiang Scholar in China. Not only was this not improper, as I said earlier there's no rules that prohibited it and back in 2017 or 2018,

it didn't even have to be disclosed.

In 2017, the end of the year, he was named a Changjiang Scholar. What that means was at that point he had to negotiate an employment contract with Fuzhou University, but Doctor Tao had serious misgivings and he never came to an agreement with Fuzhou. He was in an awkward situation because Fuzhou had sponsored him for this award, they wanted him to come and to teach full-time. He gave that offer serious consideration. In fact, you will hear that he brought his family with him - his wife, his children - to Fuzhou in early 2018 to take a look at Fuzhou, the city, the campus, and see what life would be like for them.

Well, they didn't like it. His children were born in New Jersey. They never lived in China. They are not fluent in Chinese, they don't write Chinese, and they were in middle school. You can imagine the idea for them moving at that point in their lives. His wife, Hong, was studying to be a doctor here and put down deep roots in Kansas and here in the U.S. She didn't want to move back to China. And Doctor Tao had serious misgivings whether Fuzhou would really do what they said that they would do in terms of whether they would actually provide him the resources they had promised.

But rather than turn them down cold, Doctor Tao made exorbitant demands from them on how much research money he needed. They were demands that Fuzhou was never able to meet.

And you're going to see this back and forth negotiation; you're going to see Doctor Tao asking for "X" amount and Fuzhou offering half of "X". They were light years apart in what they were going to offer. He wasn't asking for the money for himself, he was asking for research, to build a research lab. And they couldn't come to an agreement and it was never signed, and you're going to see that. There's no question about that.

Now, one reason for Doctor Tao's hesitancy was that he was skeptical that Fuzhou would do what it said. He wanted to see if they would really deliver on what they promised. Would they really put up the money to fund a world-class lab? Would they really be able to recruit for him or with him top students to Fuzhou, which was not a top university in China? Would they get him the grant money he would need? He wanted to find out.

So you're going to see that Doctor Tao agreed to help Fuzhou set up a research lab and to recruit students. You're going to see e-mails and hear calls of Doctor Tao trying to assist Fuzhou with that process of setting up a research lab and trying to recruit students. You will see those e-mails of him trying to recruit students to Fuzhou to staff it.

The government points to these facts and the fact that Doctor Tao had a Fuzhou e-mail address and says, that's proof, he was employed there. He signed the contract. They're wrong. In fact, Doctor Tao was trying to help Fuzhou set up a lab; he was trying to recruit students to that lab. And if he had been

successful in setting up that lab and if he had been successful in recruiting students to that lab and if he could not get a better job at one of the more than one dozen U.S. universities he was also applying to at that very same time and if he could persuade his family to change their minds, to uproot themselves and go with him back to China, and if all those things had come to pass, he might well have accepted that position. But they didn't and he didn't.

And here's how you will know that the government's case is full of holes. The government has alleged in their indictment that Doctor Tao accepted a full-time position at Fuzhou University in May of 2018. Okay? That's the end of the school year, 2018. And there's a summer break where he's not working. It's a nine-month appointment. September 2018, where is Doctor Tao? He's in Lawrence, Kansas teaching a full load with office hours.

Now, you would think that the government would say, well, he's -- we think he accepted a full-time position but he's teaching full-time in Kansas, obviously these two things can't both be correct so maybe we should think this through again. Unfortunately, you would be wrong if you thought that that gave them any pause, but that's why we have jurors decide. Jurors with common sense decide whether these theories make any sense.

You're going to learn that during the exact same time

that the government claims Doctor Tao was working full-time at Fuzhou University, he was applying to Princeton, Brown, Stanford, Illinois, Florida, Michigan, Wisconsin, and a half a dozen other schools here in the United States. He was looking for a job here at the very same time they say he accepted a job.

Not only that, ladies and gentlemen, in September he worked in China as I -- in Kansas, as I said, from September 2018. And fall of 2019, he was scheduled to teach full-time here in Kansas. The only reason he didn't is he got arrested in August of 2019.

So what he did do in the interim, in the spring semester of 2019 when he had a semester with no teaching requirements, he traveled to China and collaborated with Fuzhou University. He helped set up a lab and tried to recruit students to come there. He collaborated on papers. He wanted to keep his options open. But he never accepted the job, he never got paid, he never taught classes there, and he never quit his job at KU. All things that this purported contract that he had with Fuzhou University required him to do, he did none of them.

But here's another problem with this case and it's a big one. You will hear that during the 2017 and 2018 time frame when these events were occurring, neither the NSF nor the DOE even required that the affiliations that you will be

hearing about needed to be disclosed. Foreign grants and unpaid appointments at foreign universities did not at that time need to be disclosed. It was only in 2020, long after Doctor Tao was arrested, that those rules were changed.

Ladies and gentlemen, this is not a breach of contract case. Even if you were to find that Doctor Tao violated some clause of some provision of some grant proposal, that does not make him guilty of wire fraud. In order to convict Doctor Tao of wire fraud, you must find beyond a reasonable doubt that he knowingly and intentionally lied in order to obtain money or property from the NSF or DOE or KU. That's very different from simply failing to properly follow every provision in a contract.

One other thing to keep in mind. None of this grant money went to Doctor Tao. All of the grant money we've been talking about went to KU; they disbursed the money. And Doctor Tao's salary was not tied to whether or not he got grants. It was a salary, not contingent. So what the government wants you to believe, ladies and gentlemen, is that Doctor Tao committed wire fraud, that he defrauded NSF and DOE of money so that money could go to KU. Think about it. The money wasn't going to him. Their theory is that he committed fraud on NSF and DOE to benefit KU. I mean, you've got to just scratch your head. Like, does that make any sense?

Finally, and I'm almost done, there's two things that

you really have to keep at the forefront of your mind throughout this trial, and the first is that all of the conduct that Doctor Tao was alleged to have been involved in in China was lawful. Okay? It's legal to be a member of a foreign talent program. It is legal to work at a Chinese university. It's legal to work on grants in China. All legal. The government's entire case is that Doctor Tao failed to report about legal, lawful activities in China. That's it. That's how they come up with eight felonies even though no one lost a dime.

And the second thing that you can't lose sight of is that this is a criminal trial. Doctor Tao is on trial for wire fraud. This is not an H.R. disciplinary hearing convened to determine if Doctor Tao violated the H.R. policy of KU. Doctor Tao is not on trial because he might've violated some H.R. or KU policy. He's not on trial for violating a conflict of interest policy. He's on trial for criminal fraud. That is a distinction that the government seems to have forgotten, but you must keep it in mind.

All the research Doctor Tao was supposed to do, he did. All of the money was spent properly. No one was defrauded of a dime. And at the end of the case when you come and consider all that evidence, we'll be asking you to return a verdict consistent with that evidence, and that is not guilty.

Thank you.

(Excerpt of opening statements concluded).

* * *

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

April 7, 2022.

/s/ Kelli Stewart
KELLI STEWART, CSR, RPR, CRR, RMR
United States Court Reporter