1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
2

3   UNITED STATES OF AMERICA,

4       Plaintiff,                    Case No. 19-20052

5       v.
                                      Kansas City, Kansas
6   FENG TAO, a/k/a "Franklin         Date:  31 March, 2022
    Tao,"
7                                     Day 9

8       Defendant.
    .........................
9                TRANSCRIPT OF EXCERPT OF JURY TRIAL
                   (TESTIMONY OF DR. MEILIN LIU)
10
            BEFORE THE HONORABLE JULIE A. ROBINSON
11       SENIOR UNITED STATES DISTRICT COURT JUDGE

12
                    A P P E A R A N C E S
13

14   For the Plaintiff:

15   Mr. Adam Berry               Mr. Christopher Oakley
     U.S. DEPARTMENT OF JUSTICE   U.S. ATTORNEY'S OFFICE
16   950 Pennsylvania Avenue, NW  500 State Avenue
     Washington, D.C. 20530       Suite 360
17                                Kansas City, Kansas 66101

18   For the Defendant:

19   Mr. Peter R. Zeidenberg
     Mr. Michael F. Dearington
20   ARENT FOX, LLP
     1717 K Street NW
21   Washington, D.C. 20006

22

23

24

25   _____
                Proceedings recorded by machine shorthand,
         transcript produced by computer-aided transcription.

1                              I N D E X

2

    Government's Witnesses:                                  Page
3
    DR. MEILIN LIU
4     Direct Examination by Mr. Barry                          3
      Cross-Examination by Mr. Zeidenberg                     10
5     Redirect Examination by Mr. Barry                       26

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Transcript excerpt consisting of the testimony of

2     Dr. Meilin Liu).

3                         DR. MEILIN LIU,

4     called as a witness on behalf of the government, having first

5     been duly sworn, testified as follows:

6               THE COURT:  Dr. Liu, if you're comfortable removing

7     your mask during your testimony.

8               THE WITNESS:  Okay.  I can take this off.

9               THE COURT:  I'm sorry?

10              THE WITNESS:  Yeah, I can take the mask off.

11              THE COURT:  Okay.  Thank you.

12                        DIRECT EXAMINATION

13    BY MR. BARRY:

14    Q.   Good morning, Dr. Liu.

15    A.   Good morning.

16    Q.   Would you please state and spell your name for the record?

17    A.   My name is Meilin Liu.  Spelled M-e-i-l-i-n, L-i-u.

18    Q.   Where do you work, Dr. Liu?

19    A.   I work at Georgia Institute of Technology.

20    Q.   What do you do there?

21    A.   Currently I'm a professor in the School of Material Science

22    and Engineering.

23    Q.   Do you have a particular specialty?

24    A.   It's in materials science engineering area and mostly

25    materials for energy storage and conversion.

1    Q.   Things like batteries?

2    A.   Yes, batteries and fuel cells.

3    Q.   How long have you worked at Georgia Tech?

4    A.   I joined the faculty at Georgia Institute of Technology in

5    1992 so I've been there for 30 years, about 30 years.

6    Q.   And when you joined the Georgia Institute of Technology,

7    what was your position?

8    A.   It was an assistant professor.

9    Q.   At some point did you get promoted to a different position?

10   A.   Yes.  Was promoted every four years from assistant to

11   associate and then to the full professor and all the way to a

12   regents professor.  So currently I hold regents professor and

13   Hightower Endowed Chair so that represent the highest academic

14   ranking in the university system.

15   Q.   And do you teach classes?

16   A.   Yes.  Over the past three decades I have taught more than

17   ten undergraduate and graduate courses in the core area of

18   material science and engineering.

19   Q.   Do you perform any research?

20   A.   Yes.  I mostly focus on fundamental research of materials

21   for energy storage and conversion such as batteries and fuel

22   cells.

23   Q.   Do you have a team to help you with research?

24   A.   Yes, I have a large research team.  Over the past 30 years

25   I have -- typically my group size varies from more than 10 to

1    over 20 including post-doctoral research associate, visiting

2    scientists, Ph.D. students, master's students, et cetera.

3    Q.    Are you the head of that group and then you have kind of a

4    team who works with you?

5    A.    Yes.

6    Q.    I want to shift a little bit.  Are you familiar with

7    Dr. Franklin Tao?

8    A.    Yes.  To the best of my recollection, I think I met him

9    first in one of the Basic Energy Science program or review

10    program under the Office of Science of Department of Energy.

11    So that's where we first met.

12    Q.    Do you remember approximately when that was?

13    A.    Let's see.  I think probably about 2012 or 2013, so during

14    that meeting I was one of the principal investigator in that

15    program, that DOE program, and he, Dr. Tao, was also a

16    principal investigator, but he was relatively young in that

17    group and so that is an indication he's really excellent in his

18    research.

19        So when I have some need for an expert in the area of

20    catalysis and then I basically approach him and ask him to work

21    with me to prepare DOE proposal.  So that proposal was

22    successful and that leaded to a research project, and so in the

23    period from 2014 to 2018 together we work on a joint research

24    program -- project.

25    Q.    And at a high level for the jury, can you just explain kind

1    of the relationship between your focus on energy storage and

2    material science and how catalysis is related to that in

3    certain circumstances?

4    A.    Okay.    So my area of expertise is develop new materials for

5    energy storage and conversion.    And for that particular

6    research project is on fuel cells.    We try to use fuel cell as

7    a device to directly convert chemical fuel into electricity.

8    For that chemical conversion processes we needed some knowledge

9    in catalysis.    That is outside my expertise.

10        So that's why I approached Dr. Tao and he's a leading

11    expert in that area.    So he has contributed to the design of

12    catalyst that will help to convert or breakdown the energy

13    barrier to chemical reactions that will make fuel cell more

14    efficient.    So I design the entire fuel cell system.    His

15    expertise most -- develop a unique catalyst that will reduce

16    the energy barrier for conversion, therefore will increase the

17    energy efficiency, make the fuel cell more efficient.

18    Q.    Just big picture, when we talk about kind of fuel cells,

19    what are some of the other aspirational or current applications

20    of this kind of fuel cell technology globally?

21    A.    Yes.    So fuel cells represent a new clean energy

22    technology.    Most electricity we're using today is from burning

23    fossil fuel.

24        MR. ZEIDENBERG:    Your Honor, I'm going to object to

25    the line of questioning.    Can we approach?

1           THE COURT:  Yes.

2      (The following proceedings were had at the bench).

3           MR. ZEIDENBERG:  Your Honor, I'm objecting on the

4  grounds of relevance, 403.  He is -- I believe the government

5  is trying to try and imply that this is some fuel cell

6  technology which has some great or significant material,

7  practical, or commercial implications and Dr. Tao was working

8  on this and somehow this is going to be benefitting the

9  government of China or we're going to be deprived of this in

10  some way.

11           That is not an allegation in this case.  This case is

12  about whether he notified Kansas or NSF or DOE of a second job

13  that he may have had or research he did, but the nature of that

14  research and whether it's got commercial implications and it

15  could be harmful or competitive, that's not an issue in this

16  case.

17           MR. BARRY:  This was the last question on this topic.

18  I'm merely laying a foundation so the jury understands who

19  Dr. Liu is, what his research is, how he first interacted with

20  Dr. Tao, and how that research overlapped.  That lays the

21  foundation for the phone call I'm about to introduce in terms

22  of why someone like Dr. Tao would call someone like Dr. Liu

23  based on the differences in their career trajectory and their

24  past experience working together.  So I'm not -- I mean, once

25  Dr. Liu finishes, I'm moving on to a different topic.

1          THE COURT:  I -- maybe the fact that they had a

2    relationship and worked on a project together lays the

3    foundation for a conversation or phone call, but I'll sustain

4    as to relevance.  When I heard this, I thought Dr. Tao only

5    engaged in fundamental science.  This is starting to sound like

6    applied science, and I'm a little worried for the reasons that

7    Mr. Zeidenberg articulated so this is going too far.  I'll

8    sustain to the objection to this line of questioning.

9          (Thereupon, the proceedings continued in open court.)

10   BY MR. BARRY:

11   Q.   So I'm going to shift topics again.  Was there a moment in

12   time when Dr. Tao called you to ask about a job he was

13   considering in China?

14   A.   Yes.  I do recall there was a phone conversation about that

15   topic.

16   Q.   What do you remember about that call?

17   A.   So it was more than four years ago.  I do not remember a

18   lot of the specific details.  To the best of my recollection, I

19   think the major point is that he told me he was offered a

20   position in China and my main response was that it sounds a

21   good opportunity.  You may start with the summer, work there

22   three months, and see how everything is going.  If things going

23   well, perhaps you can consider complete transfer to there.  But

24   if things doesn't go well, you may come back, keep your

25   original position.  So that's the major point I can remember.

19-20052    USA v. Feng Tao    03.31.22    Excerpt

1    Q.   Do you remember if in that call the defendant -- or Dr. Tao

2    said anything about the university he was going -- he was

3    thinking about working at?

4    A.   I think it was -- well, I really don't.  Maybe it's Fuzhou

5    University.

6    Q.   Do you remember him saying anything about the particular

7    position, like whether it was an associate professor position,

8    an assistant professor position, or something else?

9    A.   Seems to be a title of professor so it's like a endowed

10    chair professor.

11    Q.   Did he tell you that it was called the Changjiang

12    Distinguished Professor position?

13    A.   Yes.  Something like that.

14    Q.   And are you -- based on your decades of experience in the

15    research community, are you familiar with the title Changjiang

16    Distinguished Professor?

17    A.   To the best of my knowledge, I think it's similar to a

18    chaired professor in the U.S. so that basically means there

19    would be some sustainable research funding to support research

20    activity.

21    Q.   Okay.  I'd like to pull up what's already been introduced

22    into evidence as Government's Exhibit 512A.  And I'm going to

23    give transcripts to the jury.  And I'd first like to play the

24    first couple seconds and pause and go back to the beginning

25    because I'd like to ask Dr. Liu about something.

1       Is that you in this phone call?

2  A.   It sounds my voice.

3  Q.   Is Dr. Tao the other voice on the phone?

4  A.   Yes.

5  Q.   Is this the phone call we were talking about just a moment

6  ago?

7  A.   It sounds like, yeah.

8  Q.   At the time that you had this phone call with Dr. Tao, did

9  you know that he was recording it?

10 A.   No.  I have -- no.

11 Q.   Okay.  If we can go back to the beginning and just -- this

12 is going to be a longer call, so it's going to be about

13 20 minutes, so if we can just play the full call, please.

14      Dr. Liu, you said that you remembered the call being

15 sometime in 2018?

16 A.   Yes.

17 Q.   And you said that you didn't know at the time that the

18 defendant was recording that call?

19 A.   No.

20      MR. BARRY:  I'd just like the record to reflect that

21 the file name for that call is February 27, 2018.  No further

22 questions.

23      MR. ZEIDENBERG:  Good morning, ladies and gentlemen.

24                    CROSS-EXAMINATION

25 BY MR. ZEIDENBERG:

19-20052    USA v. Feng Tao    03.31.22    Excerpt

1    Q.    Good morning, Dr. Liu.

2    A.    Good morning.

3    Q.    Is it fair to say that you said you met Dr. Tao about ten

4    years ago?

5    A.    Yes.

6    Q.    And at the time that you met him, is it fair to say you

7    knew him by reputation?

8    A.    Yes.

9    Q.    And fair to say that he had an outstanding reputation?

10    A.    Yes.

11    Q.    What was your impression of his accomplishments given his

12    relative young age when you met him ten years ago?  He would

13    have been about 40.

14    A.    My impression is that he is an excellent scientist because

15    I met him in the DOE Basic Energy Science program.

16    Q.    If you can pull that microphone up just a little bit to

17    make sure everyone can hear you.

18    A.    You may already know, the research program managed by the

19    Basic Energy Science under Office of Science of Department of

20    Energy, that is one of the very best and most prestigious

21    research program of our nation and perhaps in the world.  Only

22    the topnotch scientists, the very well established scientists

23    has the opportunity to participate that program.

24         Now, for myself, I already work in the U.S. for over

25    30 years.  I entered that program in much larger age in

1  comparison to Dr. Tao.  So he was one of the very young

2  investigator in that group, in that club.  So the fact that he

3  can enter that program when he was very young, that itself is a

4  strong indication he's one of the best and brightest in his

5  field of study.  And that's the very reason I approached him

6  when I needed somebody with expertise in that area.  And also

7  he already published very high profile technical papers like in

8  The Journal of Science, the science is managed by the American

9  Association of Advancement of Science.  So that's the most

10  prestigious journal in the world in the scientific field.

11      So the reason I approached him, asked him to work with me

12  is because his reputation is already very well established even

13  though he's much younger than I am.

14      So yes, to answer your question, yes, my impression is that

15  he was excellent.  He's bright, very insightful, and very

16  innovative, and in my judgment I think he can contribute a

17  great deal to the U.S. competitiveness in science and the

18  technology development and that's the very reason I approached

19  him and asked him to work with me.

20  Q.  And did you in fact work with him?

21  A.  Could you please repeat the question?

22  Q.  You approached him to talk to him about working with him

23  and did you in fact work with him?

24  A.  Yes.  So I approached him, asked him to work with me to

25  prepare a DOE proposal.  So we worked together, prepared the

1   proposal, and that proposal was successful, successfully went

2   through the review process.  So in the end we were award that

3   DOE project, that was $1 million research project.  So we

4   worked together for about four years from 2014 to 2018.

5   Q.  And what were your impressions of his work when you were

6   working with him?

7   A.  He's very responsive every time when I -- since I'm the

8   principal investigator, he is the co-principal investigator, so

9   often I have to directly report to Department of Energy program

10  manager.  When they call me or send me e-mail, I have to

11  respond.

12      But often when the questions related to catalysis, I have

13  to rely on him, so I will send him e-mail or call him so he

14  always responds very fast and with -- so his response always

15  professional, very thoughtful, and very insightful and very

16  helpful to the project.

17      So we have -- the project was very successful.  We

18  published one very influential paper in the journal Nature

19  Energy.  Nature Energy is the topnotch journal in the world in

20  this area.  We also filed a patent application.  So the project

21  went very well, very successful, and he's always very

22  responsive and I have only good things to talk about, yes.

23  Q.  And what did you observe in your interactions with Dr. Tao

24  about his work ethic?

25  A.  Excellent as much as -- very professional.  When it's come

1    to the technical aspect, he's at the top of his field.  So

2    during the -- for instance, during the review process of our

3    manuscript, the editors/reviewers have a lot of questions and

4    when it comes to catalysis, I have to rely on him to respond.

5    So he responds, always very professional and excellent.

6    Q.   Now, is it fair to say for research professors like you and

7    Dr. Tao that it's common to collaborate with universities

8    overseas?

9    A.   Yes.  Since we're working in the Basic Energy Science, that

10   means everything we do will be published.  So for myself over

11   the past three decades everything come out of my research been

12   published in the open literature, including research projects

13   supported by private companies around the world.  Yes, so

14   inevitably we have a lot of collaborations with the scientists

15   around the world, for myself it's almost around the world

16   everywhere.

17   Q.   Has it at least historically been a sign of accomplishment

18   if a researcher has ties to overseas and multiple foreign

19   institutions?

20   A.   Yes.  So often there is a lot of international conferences,

21   international meetings, and so we have to participate in those

22   to get engaged with international collaboration.

23        Also, I would like to mention it is only in recent few

24   years the political atmosphere has changed.  A few years ago I

25   think everywhere from university always promote international

1    collaboration including everybody, yeah.  But I know the
2    situation has changed since a few years ago.  Right now we're
3    not promote collaboration for instance with China.  I realize
4    that.  But before a few years ago there was no -- so basically
5    everybody is promote -- is encouraged to have collaboration,
6    international collaboration.
7    Q.   So I want to ask you about your call in -- on February 27,
8    2018, when Dr. Tao called you, the call we just listened to.
9    Fair to say that Dr. Tao was calling you for advice or at least
10   as a sounding board?
11   A.   Yes, sort of.
12   Q.   What was your impression?  I mean, you look like you're
13   hesitating with my characterization for advice or sounding
14   board.  How would you characterize it?
15   A.   Can you rephrase the question?
16   Q.   What was your impression of why Dr. Tao was calling you in
17   February 2018 to talk to you about this decision he had to
18   make?
19   A.   So from that phone conversation, it seems that he was
20   struggling to make a decision if he should take position in
21   China or stay with his position in the U.S.  But my advice is
22   that for the university position all the academic contract for
23   a full time faculty, you only have nine months covered by the
24   university and the other three months you have to make special
25   arrangement in order to get covered with your salary.

1    So that is an opportunity.  That's where you can explore

2  other things.  And in fact it's very common in the university.

3  For instance, one of my colleagues in my department, I remember

4  he eventually transferred to United Kingdom, one of the

5  universities in the United Kingdom.  But the way it started is

6  he worked there in the summer, those three months, for a couple

7  times and then he feel comfortable, eventually he transferred

8  completely to a university in the United Kingdom.

9      My suggestion basically was that you have the freedom to

10  explore so you can work there three months and if things going

11  well, you can transfer, but if things does not going well, you

12  can come back.  So there's nothing to lose.  So basically that

13  was my suggestion.

14  Q.   So if I got that right, your suggestion was try it out, see

15  if it fits, see if you're comfortable?

16  A.   Right.

17  Q.   And they do what they say they're going to do, and if it

18  works out, then you can go and if it doesn't work out, then you

19  stay at KU?

20  A.   Right.  So that's what I know because a lot of professors

21  in universities doing that for typical transfers.

22  Q.   And when there was a reference in the call with Dr. Tao

23  saying he thought it would be problematic if this were looked

24  into, do you remember that?  He said if it could be looked

25  into, it could be problematic?

1    A.   Problematic in which respect?

2    Q.   Well, that's what I was going to ask you.  Was it your

3    understanding when he was talking about the issue about what to

4    reveal to KU and when, that his focus -- your understanding of

5    the conversation was that he was worried about KU rules and

6    regulations as opposed to federal wire fraud statutes?  I mean,

7    what was his concern as you understood them?

8             MR. BARRY:  Objection, speculation.

9             THE COURT:  Overruled.  You can answer if you know.

10            THE WITNESS:  I'm sorry.  Can you rephrase the

11   question?  I don't fully understand that language.

12   BY MR. ZEIDENBERG:

13   Q.   Yeah.  Was it your understanding from the conversation that

14   Dr. Tao's hesitancy and concerns pertained to what you would

15   basically call H.R. questions of KU, what the KU rules and

16   regulations were as opposed to some criminal statute?  Do you

17   understand my question?

18   A.   I really don't fully understand.  I'm sorry.  I have no

19   knowledge of law and don't fully understand your question.

20   Q.   Let me show you what I'm talking about.

21            MR. ZEIDENBERG:  If we could turn on the ELMO.

22   BY MR. ZEIDENBERG:

23   Q.   And I'm referring to page 4, ladies and gentlemen, at the

24   top of the page.  And Dr. Tao says, if I don't say anything, it

25   would definitely be problematic if this thing were looked into.

1    And you said, yeah, it would be problematic for you.  You

2    wouldn't have to deal with it if it were looked into.  I think

3    you meant you would have to deal with it if it were looked

4    into, yeah.  Do you see that?

5    A.   I see.

6    Q.   And so my question is, was this a reference to he would

7    have to deal with, you know, his KU department chair or he'd

8    have to deal with his KU dean of chemistry and sort of figure

9    out how to handle a problem like this?

10   A.   Okay.  So I sort of get your question.  Let me see.  So

11   typically for the three months it should be arranged with the

12   university.  I guess his concern maybe is that the

13   university -- his home university may not allow him to work

14   elsewhere.  For that I really cannot comment.

15       I must admit the fact that I have no knowledge of

16   University of Kansas policy about the situation.  I do not

17   believe I'm in the position or I'm not qualified to tell him

18   what to do or what he should not do or what's right or what's

19   wrong.  So I really cannot comment on that.

20       So it depends on the university.  I really can't --

21   Q.   It was in the context of what the university rules are or

22   are not.  Is that the context of your -- the way you understood

23   the questions?

24   A.   Right.  So when you negotiate with the university, it's

25   just based on -- to the best my knowledge.  I don't know.

1   Again, I have no knowledge of law, I don't know.  But I would

2   think it depends on the university.  If the university says,

3   no, we don't allow you to do that, perhaps the university has

4   the power to do so.  But I just have no idea what to advise.

5   Q.   And do you recall him in that conversation talking about

6   the research funding that he would get or that was being

7   offered but that it was significantly less than what he had at

8   KU?  Do you recall seeing that?

9   A.   Can you repeat again?

10  Q.   Yes.  Do you recall in the conversation we just looked at

11  that Dr. Tao was expressing concerns that the -- his current

12  lab was worth $5 million in terms of equipment and the one that

13  was being offered to -- when I say 5 million -- yes, 5 million

14  USD, and the one that was being offered to him in China was

15  going to be considerably less, only about 3 million.  Do you

16  remember that?

17  A.   I really don't remember that detail.

18  Q.   Let me show it to you.  This is on page 5.  This is page 5

19  starting at 7:35.  Okay.  Through 7:32.  Dr. Tao says they've

20  promised to give me 20 million -- and that would be about 3

21  million Yuan; that is correct?

22  A.   Yes.

23  Q.   You said oh.

24       And Dr. Tao said, 20 million Yuan, that's 3 million.

25       Yes, something like that.

1       Dr. Tao said, if it's $3 million, that's better than here,

2   but my current laboratory definitely -- my current laboratory

3   has assets I think of about $5 million.  So it's not quite as

4   much as here, if I were to move.  And then he said I could ask

5   for more, they would give it to me.  And then he said they

6   would give it to me, but it's hard to say whether they would --

7   they'll actually give it to me or not.  Do you see that?

8   A.   Yes.  Yes.

9   Q.   Is it fair to say, Dr. Liu, that for a researcher like

10  yourself or Dr. Tao, that it's very important to have the

11  requisite funding that you need for your research, a lab?

12  A.   Yes.  To be good, yes.

13  Q.   And why is that so important?

14  A.   Well, for -- in order to support a research activity, we do

15  need the funding.  Without funding we would not be able to hire

16  post-docs, graduate students, and then you have to rely on

17  yourself and what you can do is very limited.  So that's why we

18  have to write proposals, we have to approach private companies,

19  just about anywhere we can get funding to support our research

20  activity.

21  Q.   And during the call that we just heard, there was --

22  Dr. Tao was talking about Fuzhou University, and did you

23  understand from the context of the call that Fuzhou was not --

24  or do you know whether it was actually considered a top ranked

25  university in China?

1   A.   No, definitely not.

2   Q.   Definitely not?

3   A.   No.

4   Q.   Why do you say that?

5   A.   Well, to the best of my knowledge, Fuzhou University, if we

6   do the ranking -- let me see where it would be.  The reputation

7   of that university I think is beyond at least -- let me say how

8   many.  Just make a guess.  Most likely beyond close to 100

9   university in China, below.

10  Q.   Okay.

11  A.   Somewhere there.  I don't think first rate, even maybe not

12  second rate of university.

13  Q.   Definitely not a top tier school?

14  A.   Definitely not a top tier.

15  Q.   And for a researcher who's young and ambitious and

16  talented, why is it important to go to a top ranked university

17  if you can?

18  A.   Well, you have all the resources.  A better university, you

19  have a better reputation that attracts bright students and so

20  you have -- also have more resources.  You have -- typically

21  it's easier to attract research funding from various funding

22  sources, so you have better student, better facility, better

23  colleagues, so everything -- the entire ecosystem would be

24  better and you have a better platform to accomplish what are

25  your objectives.

1      MR. ZEIDENBERG:  Court's indulgence.

2  BY MR. ZEIDENBERG:

3  Q.  Now, at one point you said to Dr. Tao that he could work

4  both sides and see how it goes, and then if it goes well, you

5  gradually transfer over.  If it doesn't go well, you gradually

6  back out.  Do you remember saying that?

7  A.  Yes.

8  Q.  Can you explain what you were referring to with that

9  strategy.

10  A.  Yeah.  As I mentioned earlier, so that is a common strategy

11  for many university professors if they're considering a

12  transfer.  I mentioned earlier one of my colleagues, he moved

13  to a university in United Kingdom.  So he started with first

14  working there three months each year for a couple times.  Then

15  when he feel comfortable, he complete transfer over.  So that's

16  pretty common in the university, so that's why I make that

17  suggestion.

18  Q.  And when you were having this conversation with Dr. Tao, I

19  take it you're aware that he had federal grants with different,

20  you know, National Science Foundation, Department of Energy

21  grants ongoing?

22  A.  I know part, not everything.

23  Q.  I'm not asking you if you know the specific grant and what

24  it was for, but you know that generally he's funded by federal

25  grants?

1   A.   Yes, yes.

2   Q.   Like all researchers like yourself.

3   A.   Yep.

4   Q.   And when you were having this conversation with him and you

5   were, you know, suggesting, you know, you work there three

6   months, come back, see how it goes, did it ever cross your mind

7   what the implication that that decision could have on his U.S.

8   federal grants?

9   A.   At the time, no.  I wouldn't worry that because that is a

10  very common practice in the university, but as of today I would

11  say, yes, there would be implications because some of the

12  current programs.

13  Q.   So today you would be worried about it?

14  A.   Yes.

15  Q.   But back then it didn't cross your mind?

16  A.   At that point, no, because that was a very common practice

17  at university.  I would never worry.  But actually, as I

18  mentioned earlier, at that time we are all encouraged to have

19  more collaborations.  That would be considered a positive

20  aspect.  But today the situation is different I do realize.

21  Q.   And in fact, did you know that Dr. Tao published articles

22  and listed his affiliation with Fuzhou University and with KU

23  in multiple articles?

24  A.   I did not aware of that.

25  Q.   And you were talking to him during the call, at one point

1  towards the end of the call you and he started talking about

2  three different instances of Chinese-American professors being

3  prosecuted in the United States by the Department of Justice.

4  Do you remember that?

5  A.   Yes.

6  Q.   And you were talking about Professor Xi from Temple

7  University who was arrested and his case got dismissed and a

8  NOAA, N-O-A-A, scientist from down in Florida --

9         MR. BARRY:   Objection, relevance.   He's testifying

10  about the results of other criminal cases.

11         THE COURT:   I'll sustain.

12         MR. ZEIDENBERG:   I'm sorry?

13         THE COURT:   I sustained.

14  BY MR. ZEIDENBERG:

15  Q.   You were talking about these three individuals, right,

16  three different cases?

17  A.   Yeah, he mentioned three cases.

18  Q.   And were you discussing that because you thought -- well,

19  why don't you tell the ladies and gentlemen why it was this was

20  on your mind and whether it was because you thought Dr. Tao was

21  violating the law or whether it was just because you had

22  concerns about the scrutiny you were feeling under at that

23  time.

24  A.   Can you rephrase your question?   I'm not sure what concern

25  you mean there.

1    Q.  Well, when you were talking -- at one point -- let me

2    change your -- the question a little bit.

3        At one point you said you and he discussed the fact you

4    were both likely being monitored by the government.  Do you

5    remember that?

6                MR. BARRY:  Objection, misstates the testimony.

7                THE COURT:  You can clarify on redirect.

8                MR. BARRY:  Okay.

9                THE COURT:  You can answer that question, if you can.

10                THE WITNESS:  So where he says our conversation may be

11    monitored, I said, yeah, it's possible.  But I'm not sure

12    what's your question there.

13                MR. ZEIDENBERG:  One moment, Your Honor.

14                THE COURT:  Yes.

15    BY MR. ZEIDENBERG:

16    Q.  Turning to page 12, this was after you talked about the

17    third case.  Dr. Tao says, I suspect we will all be monitored

18    and you said, that's possible, we'd all be monitored.  Yeah,

19    like people with our status.  And you said, that's possible

20    especially if you go back, right.  And you said if you go back

21    you might be monitored.  Do you see that?

22    A.  Yes.

23    Q.  What do you mean by that?

24    A.  Well, just the -- as it is implying from the word there,

25    basically because there's a few professor of Chinese origin

1   already being prosecuted.  And based on from the information

2   from the news, they have a lot of monitoring of those

3   activities over years, so that's why I said it is possible

4   because the U.S.-China relationship is deteriorating and if you

5   have too much interaction with China and it is possible get

6   monitored.

7              MR. ZEIDENBERG:  I have no further questions, Your

8   Honor.

9                        REDIRECT EXAMINATION

10  BY MR. BARRY:

11  Q.   Hi, Dr. Liu.  So I first want to go back to something

12  Mr. Zeidenberg said in the beginning when he was -- do you

13  remember when he was asking you about your use of the term

14  "problematic."  Do you remember that?

15  A.   Yeah.

16  Q.   I just want to show you a section of the -- this is the

17  translation, and so this is a part of it where Dr. Tao says --

18  do you remember when he says, do you mean a lot of people

19  actually declare this to the American school?  They tell them?

20  And you say right, right.  But this, this depends on the stance

21  of your American school over here.  If the school is fairly

22  open-minded, it shouldn't be a big problem.

23       Do you remember hearing that?

24  A.   Yes.

25  Q.   And then you see how the very next question or statement

 1  from the defendant is talking about those other three criminal

 2  cases that Mr. Zeidenberg mentioned?  First he says because you

 3  -- recently there was a Chinese person in the U.S. Oceanic

 4  Administration in Florida, didn't the FBI -- and then the next

 5  page later on in the conversation, he says also Michigan State,

 6  you might know this Chinese person.  He's in Hong Kong.  I

 7  think he got arrested when he came back.

 8      So at least in that context, the conversation transitioned

 9  from whether something was problematic to talking about

10  criminal prosecutions?

11  A.   What's your question?

12  Q.   I'm asking about the sequence of the call.

13  A.   Yes.  The sequence of the call is correct.

14  Q.   Okay.  You were talking about your lab and your funding for

15  post-docs.  Remember that?

16  A.   Yes.

17  Q.   You need to have funding in order to recruit post-doctoral

18  students to your team?

19  A.   Yes.

20  Q.   So if someone was recruiting post-doctoral students, would

21  you assume that they had funding to pay those students?

22  A.   Yes.

23  Q.   Mr. Zeidenberg was asking you about the conversation about

24  government monitoring and potentially surveillance.  In this

25  call Dr. Tao was the one recording you, not the FBI, right?

19-20052   USA v. Feng Tao   03.31.22   Excerpt

1   A.   I don't -- I have no knowledge of either.  I have no

2   knowledge he was recording.  I have no knowledge of that.

3   Q.   You don't know whether Dr. Tao recorded you here?

4   A.   No, no.

5   Q.   So let's just say -- I'll represent to you this was a

6   recorded call found on Dr. Tao's KU computer among hundreds of

7   other calls.  I think there was 632.  And in each call the one

8   commonality is the defendant's voice is in each call.  So based

9   on that factual predicate I've given you --

10       MR. ZEIDENBERG:  Objection.

11  BY MR. BARRY:

12  Q.   -- would you believe in this instance Dr. Tao was recording

13  you, not the government?

14       MR. ZEIDENBERG:  Objection.

15       THE COURT:  All right.  There's an objection?

16       MR. ZEIDENBERG:  He's telling him what he thinks

17  happened and then saying if that happened, would you agree that

18  that happened.

19       THE COURT:  All right.  Overruled.  You can answer it,

20  if you know.

21       THE WITNESS:  Well, as I mentioned, I have no

22  knowledge of who is recording.  But if from the record you tell

23  me that's Dr. Tao record that, I have no reason not to believe

24  that, but I don't know the fact.  I have no idea of who record

25  that.  I was very surprised the call was -- the phone

1    discussion was recorded.

2           MR. BARRY:  Thank you.

3           THE COURT:  Any further questions?

4           MR. ZEIDENBERG:  No further questions.

5           THE COURT:  All right.  May this witness be excused,

6    Dr. Liu?

7           MR. BARRY:  Yes, Your Honor.

8                (Transcript excerpt concluded).

9

10              C E R T I F I C A T E

11      I, Danielle R. Murray, a Certified Court Reporter and the

12   regularly appointed, qualified, and acting official reporter of

13   the United States District Court for the District of Kansas, do

14   hereby certify that the foregoing is a true and correct

15   transcript from the stenographically reported proceedings in

16   the above-entitled matter.

17      SIGNED 20th of May, 2022

18

19                    /s/Danielle R. Murray
                      DANIELLE R. MURRAY, RMR, CRR
20                    United States Court Reporter

21

22

23

24

25