```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4        Plaintiff,
                                          Case No. 19-20052-JAR
 5        v.

 6   FENG TAO, a/k/a "Franklin        Kansas City, Kansas
     Tao,"                            Date:  23 March, 2022
 7
          Defendant.                  Day 3
 8                                    Pages 222 - 457
     ........................

 9
                      TRANSCRIPT OF JURY TRIAL
10            BEFORE THE HONORABLE JULIE A. ROBINSON
            SENIOR UNITED STATES DISTRICT COURT JUDGE
11

12                    A P P E A R A N C E S

13   For the Plaintiff:

14   Mr. Adam Barry                  Mr. Christopher Oakley
     U.S. DEPARTMENT OF JUSTICE      U.S. ATTORNEY'S OFFICE
15   950 Pennsylvania Avenue, NW     500 State Avenue
     Washington, D.C. 20530          Suite 360
16                                   Kansas City, Kansas 66101

17   For the Defendant:

18   Mr. Michael F. Dearington
     Mr. Peter R. Zeidenberg
19   ARENT FOX, LLP
     1717 K Street NW
20   Washington, D.C. 20006

21

22

23

24   _____
               Proceedings recorded by machine shorthand,
25        transcript produced by computer-aided transcription.
```

1                          I N D E X

2
    Government's Witnesses:                              Page
3
    ALICIA REED
4     Continued Direct Examination by Mr. Oakley         227
      Cross-Examination by Mr. Dearington               285
5   DR. LAURENCE WEATHERLEY
      Direct Examination by Mr. Oakley                  311
6     Cross-Examination by Mr. Dearington               394
      Redirect Examination by Mr. Oakley                428
7     Recross-Examination by Mr. Dearington             434
    ALICIA REED
8     Continued Cross-Examination by Mr. Dearington     437

9


10                         E X H I B I T S

11
    Government's
12  Exhibits                 Offered        Received

13           6                 339             339
            16                 234             234
14          20                 240             240
            26                 317             318
15          27                 320             320
            28                 323             323
16          29                 329             329
            33                 307             307
17          44                 442             442
            55                 438             438
18          58                 283             283
            59                 244             244
19          60                 249             249
            65                 274             274
20          69                 253             253
            70                 258             258
21          71                 258             258
            72                 259             259
22          73                 259             259
            74                 260             260
23          75                 261             261
            76                 262             262
24          77                 262             262
            78                 265             265
25          79                 268             268
            81                 270             270

```
 1      (Continued)
        Government's
 2      Exhibits                    Offered           Received

 3          82                        271                271
           117                        353                353
 4         118                        355                355
           145                        342                342
 5         146                        343                343
           147                        346                346
 6         150                        351                351
           164                        358                358
 7         165                        363                363
           166                        366                366
 8         167                        369                369
           211                        431                432
 9         221                        386                386
          221A                        387                387
10         225                        371                371
           233                        378                378
11         247                        380                380
           248                        383                383
12         249                        390                390
           291                        391                391
13        291A                        393                393
           292                        229                229
14        292A                        229                229
           321                        374                374

15
        Defendant's
16      Exhibits                    Offered           Received

17        1017                        409                409
          1452                        446                --
18        1454                        290                290
          1455                        401                401

19

20

21

22

23

24

25
```

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3                    225

1                     P R O C E E D I N G S

2        (The following proceedings occurred outside the presence of

3    the jury.)

4            THE COURT:  So I understand you have a matter to take

5    up before we get started?

6            MR. OAKLEY:  Yes, Your Honor.  It relates to

7    Dr. Weatherley and we've communicated with the defense.  We

8    anticipate calling Dr. Weatherley today.  We've asked him to be

9    here at 1:00.  So if we're in the middle of a long witness,

10   we'd ask for permission to present Dr. Weatherley out of order

11   so that we can get him on and off the stand as quickly as

12   possible given his physical condition.

13           THE COURT:  He's the one that had some serious health

14   issues?

15           MR. OAKLEY:  Yes, Your Honor.

16           THE COURT:  Do you anticipate getting him on and off

17   in a matter of -- how long?  Hour?  Several hours?

18           MR. OAKLEY:  It won't be several hours, Your Honor.

19   I'm not good at guessing.  I would think an hour or so.

20           THE COURT:  Any objection?

21           MR. ZIEDENBERG:  No, Your Honor.

22           THE COURT:  Okay.  So you asked him to be here at

23   1:00.  We'll kind of watch the clock.  We might want to break a

24   little bit before noon for lunch and go like that.  We're a

25   little bit delayed.  Apparently there was a gate issue with the

1    parking lot where the jurors park, so they're not all here.

2    They couldn't get in their parking lot, so we're trying to

3    wrangle them up, but hopefully they'll be here pretty soon.

4            And I've also been told there is a juror, and he

5    brought this up during *voir dire*, but he needs to leave by 5:00

6    every day because he has a child to pick up.  So we'll need to

7    make sure we stay on that target.  After today we will start at

8    9:00 every morning.

9            We could have -- I had a post-op appointment, my first

10   post-op appointment with my doctor at 8:40 and I thought there

11   was no way.  And I was in the building at 9:00 and, wouldn't

12   you know, today it would have worked.  But oh well.

13           Mr. Oakley, how much longer do you think you'll be on

14   direct with this witness?

15           MR. OAKLEY:  Probably an hour or so.

16           THE COURT:  We're ready.

17      (The jury entered the courtroom, after which the following

18   proceedings were had.)

19           THE COURT:  Good morning.  You can be seated.  We're

20   sorry about the troubles you had this morning.  You couldn't

21   get in the parking garage -- or the lot and you couldn't get in

22   the front door.  There's something amiss with the way the

23   badges are programmed.  So I've contacted our number one person

24   in operations.

25           Bonnie, I don't know if you have talked to anybody?

1      COURTROOM DEPUTY:  I'm going to start chatting with

2  them.

3      THE COURT:  All right.  Mr. Oakley, you can bring your

4  witness back up and you are still under oath to tell the truth.

5                    ALICIA REED,

6  called as a witness on behalf of the government, having been

7  previously sworn, testified as follows:

8              CONTINUED DIRECT EXAMINATION

9  BY MR. OAKLEY:

10 Q.  Good morning, Ms. Reed.

11 A.  Good morning.

12 Q.  So yesterday we discussed a number of ways in which KU

13 attempts to deal with potential conflicts of interest.  Do you

14 remember that testimony?

15 A.  Yes.

16 Q.  You mentioned that there's an office or a department that

17 deals with those types of issues?

18 A.  Correct.  There's a unit in the Office of Research called

19 research integrity that deals with those issues.

20 Q.  And, again, you oversee the Office of Research?

21 A.  I oversee research administration for the Office of

22 Research so I do not directly oversee research integrity, but

23 we work closely together.

24 Q.  I want to hand you what's been marked as Government's

25 Exhibits 292 and 292A.  And let me direct your attention first

1   to 292.  Do you recognize that?

2   A.   This looks like an e-mail from Dr. Tao to the conflict of

3   interest e-mail at KU, which is a single point of contact to

4   reach our conflict of interest office, and then it's a response

5   from the compliance officer, Bob Szrot to Dr. Tao.

6   Q.   Do you recognize Bob Szrot, that name?

7   A.   Yes.  He's the point of contact for conflict of interest

8   questions.  We work closely with him in preaward and award

9   management.  If we would have a question about conflict of

10  interest or any time we need a review done, he is our point of

11  contact.

12          MR. OAKLEY:  Your Honor, I would offer Government

13  Exhibit 292 and 292A.

14          THE COURT:  What is 292A?

15          MR. OAKLEY:  It's --

16  BY MR. OAKLEY:

17  Q.   You said that 292A is an attachment to the e-mail?  I may

18  not have asked you that, I apologize.  What is 292?

19  A.   It is the attachment noted in the e-mail which is titled

20  COI Clarifying Questions.  So it's a KU research sort of

21  questionnaire where you can more clearly explain any conflict

22  of interest that you might have.

23  Q.   And directing your attention to 292, does it appear that

24  Mr. Szrot included that as an attachment in his e-mail back to

25  Dr. Tao?

19-20052-JAR   USA v. Feng Tao   03.23.22   Day 3

1   A.   It does appear that way.

2         MR. OAKLEY:   Your Honor, now I'd offer Government

3   Exhibit 292 and 292A.

4         THE COURT:   Any objection?

5         MR. DEARINGTON:   No objection, Your Honor.

6         THE COURT:   292 and 292A admitted.

7         MR. OAKLEY:   Would you please pull up 292.

8   BY MR. OAKLEY:

9   Q.   And so this is an e-mail exchange with the subject conflict

10  of interest; is that correct?

11  A.   Yes.

12  Q.   And when an e-mail is printed, is it your understanding

13  that the first e-mail and time is typically printed at the

14  bottom?

15  A.   Yes.

16  Q.   I want to direct your attention to the original message

17  that's on that screen.

18  A.   Yes.

19  Q.   And can you tell me what the sent date is for that e-mail?

20  A.   March 3, 2017, at 3:12 p.m.

21  Q.   Can you tell us who that e-mail was from that was sent on

22  March 3rd of 2017?

23  A.   That is from Dr. Tao.

24  Q.   And who was that e-mail sent to?

25  A.   That was sent to the conflict of interest e-mail which is

1  coi@ku.edu.  That e-mail box is managed by Bob Szrot, but it's

2  a simple way to make sure if people have questions, they have

3  an easy way of reaching the conflict of interest office.

4  Q.  You recognize that e-mail address?

5  A.  Yes, that e-mail address is a common one that's on a lot of

6  our websites, as well as how we reach out to Bob if we wanted

7  to make sure that it's in that e-mail box.

8  Q.  And so that e-mail address, the coi@ku.edu, is that

9  something that's used within the Office of Research or would

10  other people outside the Office of Research have the ability

11  and would be aware of that e-mail address?

12  A.  They should be aware of that e-mail address.  It is again

13  listed in things like the annual conflict of interest e-mail

14  that they receive, that's listed as a contact.  It's listed on

15  our website as a way to get in contact with the office if you

16  have questions.

17  Q.  And so if an employee of the University of Kansas had a

18  question related to anything conflict of interest related, is

19  that a source of help?

20  A.  That's exactly right and that's why we have that e-mail box

21  entitled such.  Since it is COI, it's an easy way to remember

22  that is your contact for conflict of interest issues and

23  questions.

24  Q.  And so in addition to the e-mail being sent from Franklin

25  Feng Tao to the KU conflict of interest, it looks like there

1  was a CC.  Could you read the CC e-mail address?

2  A.   Sure.  It's HPENGTAO02@gmail.com.

3  Q.   Do you know who that e-mail address belongs to?

4  A.   I do not.

5  Q.   What was the subject of the e-mail that Dr. Tao sent on

6  March 3rd of 2017?

7  A.   The subject reads conflict interest.

8  Q.   And could you read the content of that e-mail that Dr. Tao

9  sent?

10  A.   The e-mail reads, "Dear Colleague, here I am writing to ask

11  what paperwork I need to do for clearance of conflict interest

12  if my wife would launch a consulting ltd. co.  Look forward to

13  your reply."  And then says, "All the best, Franklin (Feng)

14  Tao."

15  Q.   So that e-mail from Dr. Tao to the KU conflict of interest

16  form was sent March 3, 2017.  Above that e-mail was there a

17  reply?

18  A.   Yes.  Bob Szrot replied from the COI e-mail box to Dr. Tao

19  on March 3, 2017 and the time stamp is 1712 which would be 5:12

20  with 26 seconds.

21  Q.   Mr. Szrot responded to Dr. Tao's question about conflict of

22  interest on that -- the same date Dr. Tao sent the original

23  e-mail?

24  A.   Correct.

25  Q.   And could you please read what Mr. Szrot sent to the

1    defendant?

2    A.    Sure.  It says, "Hello, Dr. Tao.  Thank you for the e-mail.

3    To better help you, I would appreciate it if you would answer

4    the questions in the attached clarifying questions document

5    regarding your wife's company and how it would relate to KU

6    and/or your role at KU.  Best regards, Bob Szrot."

7    Q.    And so he referenced an attachment and you identified the

8    attachment as Government's Exhibit 292A.  Could we please bring

9    292A up.

10        And this is the attachment that Mr. Szrot sent to the

11    defendant in March of 2017?

12    A.    Correct.

13    Q.    And what was the attachment?  Can you generally explain for

14    the jury what was sent to the defendant?

15    A.    Sure.  This is a template that is used by our COI office to

16    answer questions and gain additional information about

17    potential disclosures to learn how they do impact the

18    individual that works at KU, and so it's a way of clarifying so

19    decisions can be made if it truly is a conflict and how to

20    mitigate that.

21    Q.    And so it's a document that has questions related to

22    potential matters that could be conflicts of interest?

23    A.    Correct.

24    Q.    And that e-mail was sent to the defendant Franklin Feng

25    Tao.  Do you know Dr. Tao?

1  A.  I do not personally know Dr. Tao.

2  Q.  Have you ever dealt with Dr. Tao?  Do you know if your

3  office has ever dealt with Dr. Tao?

4  A.  Yes.  In my role in research administration and my staff

5  have helped Dr. Tao with proposals, contract negotiations, and

6  award management.

7  Q.  And do you know whether or not Dr. Tao was employed at KU?

8  A.  Yes, he was employed at KU.

9  Q.  And how was he employed?

10  A.  He was employed as a professor at KU.

11  Q.  When you say that you don't know Dr. Tao, have you ever

12  personally met Dr. Tao?

13  A.  I do not believe so, no.

14  Q.  You said that your office has dealt with Dr. Tao.  In what

15  capacity?

16  A.  So my office, as I mentioned yesterday, really is charged

17  with assisting in proposal preparation, contract negotiations,

18  and award management.  And so since Dr. Tao was an active

19  researcher at KU, my office assisted him with those tasks as

20  well as assisting with his transfer when he first started at KU

21  in making sure that he had the lab and his awards had

22  transferred appropriately.

23  Q.  When you say -- you said that the defendant transferred to

24  KU.  Was that from Notre Dame?

25  A.  Yes.

1   Q.   At the time the defendant transferred, did he have a CAREER

2   grant?

3   A.   He did from National Science Foundation.

4   Q.   And did National Science Foundation ultimately approve

5   transfer of that grant to KU?

6   A.   Yes.

7   Q.   I want to hand you a DVD that's been marked as Government's

8   Exhibit 16.  Do you recognize that?

9   A.   Yes.  This is a listing of Dr. Tao's proposals and awards

10  that I compiled out of our financial system.

11  Q.   That's a DVD that contains a file that has that

12  information?

13  A.   Yes.

14  Q.   Is that --

15  A.   That is correct.

16          MR. OAKLEY:  Your Honor, I offer Government's

17  Exhibit 16.

18          THE COURT:  Any objection?

19          MR. DEARINGTON:  No objection, Your Honor.

20          THE COURT:  Exhibit 16 admitted.

21  BY MR. OAKLEY:

22  Q.   And so this is a spreadsheet and you said that you

23  prepared.  What information did you use to prepare this

24  spreadsheet?

25  A.   So what I did is I took the information from our

1  institutional records which are stored in a preaward system

2  called Streamlyne as well as financial system called Financials

3  in the Cloud and that is for any records from 2017 to present,

4  and then there were People Soft records which is our prior

5  system as well.  What we did is we used the institutional

6  records that we keep and I pulled those files from those

7  records.

8  Q.   Let me talk to you about this spreadsheet.  At the bottom

9  it looks like there's two tabs.  One marked Proposals-Tao and

10  the other one marked Awards-Tao.  In this particular

11  spreadsheet we're looking at the tab that's indicated as

12  Proposals-Tao.  Is that accurate?

13  A.   That is correct.

14  Q.   So explain for -- if we could go across the columns.  Would

15  you explain for the jury the information that's contained in

16  this spreadsheet?

17  A.   Sure.  So column A file name, documentation notes.  This

18  was my notes regarding all of the materials that we pulled.  So

19  at the Office of Research we're required to retain all

20  documentation that's submitted as well as issued from the

21  sponsor and our working documents.  So this was an internal

22  note regarding those files.

23       Column B is PI, the principal investigator of the proposal.

24  And that -- do you want me to read just the column names and

25  tell -- give the context of that?

1  Q.   Yes, ma'am.

2  A.   So then column C, individual role.  So in a situation like

3  we talked about yesterday, if someone was not listed as the PI,

4  their role would be listed here, whether it was Co-I or key

5  personnel.

6      Institutional proposal People Soft number is column D.  So

7  that is the record number that's assigned by the Streamlyne

8  system or the People Soft system, depending on when it was

9  generated.

10      Type is the proposal type, so that could be new.  You can

11  see a resubmission in this file, that could also say things

12  like supplement depending on if it was a brand new scope of

13  work that's being proposed, if it's a resubmission of that,

14  meaning that it had been submitted once and we would submit it

15  again if it had not been funded.

16      Column F is activity.  So every single proposal we code, if

17  it's research or development or if it's things like training or

18  public service.  And so this is a coding that we use to

19  classify the activity that's being proposed.

20      Status, which is column G, means if it was funded or not

21  funded.  Also if it was withdrawn, meaning that it was

22  submitted, but then we withdrew it prior to a funding decision

23  being made.

24      Column I is title.  So this is the actual title of the

25  proposal that was submitted.

1      Column J is sponsor.  And as we talked about yesterday

2   that's the agency to whom we submitted the proposal.

3      L is requested start date so that would be the proposed

4   start date of the proposed work.

5      Requested end date would be the proposed termination of the

6   proposed work, which is column M.

7      And column P is the total proposed budget.

8   Q.   And this first tab, it says proposals, so what's the

9   difference between proposal -- the Proposal-Tao tab and the

10  Awards-Tao tab?

11  A.   So the proposals tab shows any proposal that was processed

12  through our office.  And as we talked about yesterday, in some

13  cases things do not get funded.  So if they are funded, then

14  they become an award and so the awards tab shows only the

15  records that became an award.  Everything else -- we have a

16  much larger volume of proposals than we do of awards because

17  awards are only those that have been successfully funded.

18  Q.   Could we scroll through the beginning at line six and

19  scroll through the different rows, please.

20     And so those are all the proposals that were submitted

21  through your office.  Are those all the proposals Dr. Tao was

22  the principal investigator, the PI?

23  A.   That is correct.

24  Q.   And those include nonfunded, nonawarded applications and

25  also awarded applications?

1    A.    That is correct.

2    Q.    And what we're seeing now are only ones where he was the

3    principal investigator?

4    A.    That is correct.

5    Q.    Could we please scroll to the top again.

6          And there's a -- on column C -- I'm sorry, column B where

7    it says PI, Ms. Reed, is that a filter so this information is

8    filtered?

9    A.    That is correct.

10   Q.    Could we please click on the filter button.

11         And so can you explain what's filtered in this particular?

12   A.    This is a -- so this tab would show proposals in which

13   Dr. Tao was PI or had any other role.  And so right now it's

14   filtered to only show those which Dr. Tao was the PI.  If you

15   click -- if you clear filter from PI, then it will show all of

16   the proposals at KU on which Dr. Tao was named.

17   Q.    And so the first series, what we ran through, he was the

18   PI?

19   A.    Correct.

20   Q.    Now what we're looking at would be -- would include not

21   only where he was the PI, but also those proposals where he was

22   listed as a co-PI?

23   A.    A Co-PI or key personnel.  So if you look in column B now,

24   you can see the name Bala Subramaniam.  So that -- in line two

25   that shows that Dr. Tao was named as a key personnel if you

1    look in column C, but he wasn't the PI.  But he was still named

2    so it was included in this list.

3    Q.   Could we please scroll through that list.

4         Could we next go to the awards tab, please.

5         And you said that these are the awards that were

6    actually -- excuse me, the grant applications that were

7    actually awarded?

8    A.   Yes.  So these are the awards.  And this shows only

9    those -- right now you can see it's filtered again so these

10   show the awards in which Dr. Tao was the PI.

11   Q.   Could we scroll through those, please.

12        And then if we could go back to the top.  And so the column

13   B, the filter again, right now that's the ones where he was

14   the -- these are grants awarded where he's the PI?

15   A.   Correct.

16   Q.   And so if we click the clear filter, it would show any

17   awarded grants where he was the PI or the co-PI?

18   A.   Where he was -- right, where he was a named investigator on

19   the proposal or award.

20   Q.   Will you scroll down, please.

21        So all of these awards -- all of these applications,

22   whether they were awarded or not, would have been run through

23   your office?

24   A.   Correct.

25   Q.   And would have gone through the process that we discussed a

1    little bit yesterday?

2    A.    Correct.

3    Q.    So would it be a fair statement that Dr. Tao was a frequent

4    flyer with your office?

5    A.    Yes, he was highly productive in research so he often

6    worked with our team for submission of proposals and then would

7    have worked with our team for the administration of these

8    awards.

9    Q.    I want to hand you another DVD that's been marked as

10    Government's Exhibit 20.  Do you recognize that?

11    A.    Yes.  This is a DVD that's entitled "Tao Salary 2015 to

12    2019."

13    Q.    And do you know what's contained on that DVD?

14    A.    Yes.  This is information from our H.R. pay system which

15    integrates with our financial system to show the sources of

16    payment for Dr. Tao.

17              MR. OAKLEY:  Your Honor, I offer Government's

18    Exhibit 20.

19              THE COURT:  Any objection?

20              MR. DEARINGTON:  No objection, Your Honor.

21              THE COURT:  Exhibit 20 admitted.

22    BY MR. OAKLEY:

23    Q.    And so could you just summarize what we're seeing in this

24    spreadsheet?

25    A.    Sure.  So this is a spreadsheet that I compiled that shows

1    -- the first tab called "Award Reference," is a very similar

2    tab to the tab that was entitled "Award-Tao" from the prior

3    document.  And again it's just a reference so that you can see

4    the folder where items are stored, the information about the

5    project and award, that's columns E and F.  And so those

6    numbers are really important as we look at the financial system

7    and the payroll data because those are the numbers that are

8    used as reference throughout those documents.  And so this was

9    a tab just to ease use of this complex spreadsheet and then

10   there's additional tabs on this spreadsheet.

11       The next tab over entitled "5-1-18 To Present Expenses" is

12   an extract from the financial system of all the expenses on

13   awards under Dr. Tao's PI role.  So all the awards that we saw

14   that have Dr. Tao as the PI, the expenses are listed there.

15       There is the third tab over entitled "5-1-18 To Present

16   Pivot" is a pivot table to show those expenses for ease of

17   interpretation.

18       The next tab over, "5-1-18 To Present Payroll" is an

19   extract from the payroll system that shows the payroll on those

20   awards.

21       The next tab over is "Pivot By Pay Period."  And that is a

22   pivot table that shows by pay period the sources of Dr. Tao's

23   funding.

24       The next tab over, "Pivot By Project" is a pivot table that

25   shows by the project number, which again is column E on this

1    first tab, the sources of funding.

2        Can we scroll over some?

3        That might be the last -- oh.  Payroll All Details Report.

4    So this is an extract from the payroll system that shows all

5    the payroll details, which is then pivoted into the Pivot By

6    Pay Period and Pivot By Project.

7    Q.   I'm not going to have you go through this in its entirety,

8    but I do want to focus if we could go back to the very first

9    tab.

10       And so if you could just summarize on all these tabs the

11   information that's contained in there.

12   A.   Right.  So this -- these are -- this is a summary of

13   Dr. Tao's awards and then the expenses and payroll from those

14   awards to summarize activity.

15   Q.   I want to show you, if we could get back to the -- I want

16   to direct your attention to No. 7 on there, and column F it

17   says awards and it's 8747.

18   A.   Yes.

19   Q.   Is this an award -- federal grant by the U.S. Department of

20   Energy?

21   A.   That is correct.  The KU award number 8747 is a U.S.

22   Department of Energy award to Dr. Tao.

23   Q.   When I'm looking at these grants, I see a lot of numbers.

24   Does KU assign a number?

25   A.   That is correct.  So we assign the project number which is

1    column E and the award number which is column F.  Those are

2    numbers that we use in our financial system and our payroll

3    system to ensure that we're keeping the funds that were given

4    to us by the agency separated from all other funds.  We're

5    required to do that, but there is also an agency number

6    assigned usually.  I think we need to scroll over on this tab

7    to see that though.

8         Column M on this is sponsor award number.  And so for the

9    line seven that you asked about, the sponsor award number which

10   is assigned by the agency is DE-SC0014561.

11   Q.   So to try and simplify it a bit, if we refer to that by the

12   8747, you said that's a number that KU assigned to it?

13   A.   That is correct.

14   Q.   That would be assigned to that DOE grant?

15   A.   That's exactly right.  When we received the notice of

16   award, we would set it up in our financial system, the

17   financial system would assign it a number, in this case 8747.

18   Q.   Could we go back to the front, please.

19        I want to direct your attention to the row below that,

20   which is column eight, and is that information -- the award

21   number is 8056?

22   A.   Correct.

23   Q.   So can we refer to that as award 8056?

24   A.   Yes.

25   Q.   Is that an award that was provided to KU from the National

1   Science Foundation?

2   A.   Correct.  This is the National Science Foundation award for

3   Dr. Tao's CAREER proposal and award.

4   Q.   You said that when Dr. Tao transferred from Notre Dame to

5   KU, that NSF allowed a grant to be transferred from Notre Dame

6   to KU?

7   A.   Correct.

8   Q.   And is that this grant?

9   A.   I believe so.  I would need to see the notice of award to

10  confirm that, but that is my understanding.

11  Q.   Okay.  I next want to hand you another DVD that's marked as

12  Government's Exhibit 59.  And do you recognize that DVD?

13  A.   I do.  This is KU expenses spreadsheet for Tao's awards.

14  Q.   And another spreadsheet contained on that DVD?

15  A.   That is correct.  This is another extract of expenses

16  specifically covering -- if I recall what I pulled onto this,

17  it's specifically the supplies and equipment.

18          MR. OAKLEY:  Your Honor, I offer Government's

19  Exhibit 59.

20          THE COURT:  Any objection?

21          MR. DEARINGTON:  No objection, Your Honor.

22          THE COURT:  59 admitted.

23  BY MR. OAKLEY:

24  Q.   So can you -- this spreadsheet again has tabs at the

25  bottom, but can you summarize what's contained in this first

1    tab?

2    A.    Yes.  So this is a summary table that I created to show --

3    so what this entire spreadsheet is is a really large extract of

4    all the lines of expenses on all of the awards both from FITC,

5    our Financials in the Cloud, our current financial system and

6    People Soft, PS.  So these contain row after row after row of

7    expenditure data for the awards.  And so this is a summary by

8    project.

9        So under each award -- we talked about award in the last

10   question.  Each award then has at least one project, if not

11   more, under it to separate out potentially years, if we have to

12   report by separate years, or activities, if we have to report

13   by separate activities.  So we sometimes will, when we're

14   looking at expenses, look at a project level instead of an

15   award level.

16       And so what you see here is each of the projects on which

17   Dr. Tao was an active investigator and then the title of that

18   project and shared with the award there.  And then the summary

19   of expense transactions that were posted to each of those

20   projects for supplies and expenses -- for supplies and then

21   equipment.

22   Q.    When you say expenses, what are you referring to?  Is this

23   money that is being spent as part of the grant or is this money

24   that's coming to KU as part of the grant?

25   A.    So the way that most federal awards work is that when we

1    receive a notice of award, that's authorizing us to expend

2    dollars.  We expend those dollars and then we submit back to

3    the agency a list of the expenses that we've incurred and they

4    reimburse us.

5        So what you're seeing here are the expenses in our system

6    that were charged to those specific projects that we set up due

7    to the notices of award, sort of like the promise that we would

8    get paid because they had awarded for that work.

9    Q.  Could we bring up the second tab, please.  And so if you

10   could scroll down and just scroll through this.

11       There's a long list of rows in this -- don't worry, I'm not

12   going to have you go through all of them, but what are these

13   rows generally speaking?

14   A.  Every single one of those rows is a transaction that was

15   posted to an award or the project.  And so you can see the

16   project as column A and, like I said, because we separate out

17   projects on complex awards, most of our transactions we will

18   look at at a project level so we can separate it out for

19   reporting.

20       This is an extract out of our financial system.  We're

21   required by the federal government to keep this level of data

22   for every single award.  And so we keep it separate by those

23   project numbers.  And then our financial system -- every single

24   time something is purchased, it posts in the system and this is

25   a record of that.

1   Q.   So generally speaking, when a researcher or KU receives a

2   federal grant for a particular project, what type of things can

3   KU spend that money on?

4   A.   So it would depend on the type of award, what we had put in

5   the budget.  Usually each agency will have terms of

6   allowability, so usually things that are allowable on a

7   standard research award would be salaries and fringes to

8   support the personnel, potentially travel, potentially purchase

9   of equipment, supplies that were necessary to complete the

10  scope of work.

11       If it has anything to do with student training, there would

12  be support costs which would be to support the training on that

13  award.  And then there could be other things like sub-awards.

14  If we are working with another institution to do a portion of

15  the work, we could have that, but that would all be outlined in

16  the budget that's included in our notice of award.  And the

17  expectation in the notice of award is that if we are not going

18  to abide by that budget, that we would alert the agents.

19       So one of the roles of my office and the -- our post-award,

20  our award management team is really to ensure as costs are

21  being posted, that they're allowable on that project.

22  Q.   And so this spreadsheet shows a summary of all the money

23  that KU spent that it received as part of the award?

24  A.   That it would be reimbursed, correct.

25  Q.   And so for instance, just looking at this page, column --

1    excuse me, row 283 is listed as chemicals?

2    A.    Correct.

3    Q.    So that would have been something that KU would have bought

4    that would have been reimbursed by the federal government

5    pursuant to a particular grant?

6    A.    Correct.  And from the look of the transaction reference,

7    this was probably from a vendor that we use often, so there

8    would have been a staff member who keyed in the purchase and

9    that would have immediately posted once the supplies had been

10    received.

11    Q.    Next I want to hand you what's been marked as Government's

12    Exhibit 60.  Do you recognize that?

13    A.    I do.  This is a DVD that is entitled "KU NSF and DOE Draw

14    Spreadsheet."  And then it has award number from the sponsor

15    CHE-1462121&DE-SC0014561.

16    Q.    Does that DVD contain another spreadsheet?

17    A.    That is a spreadsheet that shows from both National Science

18    Foundation and the Department of Energy the draw spreadsheet.

19    And so when I was talking about the reimbursement process, the

20    way that we get reimbursed is we expend the money.  Our

21    financial system tracks that on the project level.  And then on

22    a monthly basis we have our billing team go into the financial

23    system, they extract out and invoice that states at a project

24    level how much funding has been expended on each award.  And

25    they access either the National Science Foundation or the

1  Department of Energy systems in this case and they certify that

2  the work was completed.  They enter that information and then

3  we receive that funding through an electronic transfer from the

4  federal government to reimburse us for those expenses.

5           MR. OAKLEY:  Your Honor, I would offer Government's

6  Exhibit 60.

7           THE COURT:  Any objection?

8           MR. DEARINGTON:  No objection, Your Honor.

9           THE COURT:  Exhibit 60 admitted.

10  BY MR. OAKLEY:

11  Q.  And you said that these are draws related to NSF awards and

12  DOE awards?

13  A.  That is correct.

14  Q.  And so this spreadsheet shows instances where, in this

15  first tab, that the National Science Foundation provided money

16  pursuant to a grant to KU after KU had spent the money in the

17  spreadsheet that we just looked at?

18  A.  Correct.

19  Q.  And the second tab would be the same information related to

20  the Department of Energy?

21  A.  Correct.

22  Q.  And at the top the columns on each have specific

23  information related to what?

24  A.  So again, in our financial system everything is aligned

25  with the award number, so that is column E here called Contract

1    Number, and so you can see here that's 8747, which is the same

2    award number that we had discussed on the prior spreadsheet.

3    You can see the project number I referenced again.  So each one

4    of these columns corresponds with a chart field.  So you can

5    see the account number of the customer, you can see the site,

6    the contract number, again that's the award number, the project

7    number.

8        Fund means -- so everything at KU is done on fund

9    accounting.  This fund specifically means these are federal

10   monies so we would know just by looking at this without any

11   other information that this was subject to federal regulation.

12       The cost center is the administrative unit that is assigned

13   to that award.  The account is the financial account into which

14   the revenue that is generated here would be deposited.  The

15   transaction is the specific transactional number that's

16   assigned to what I referenced as an invoice before.  So when we

17   go in, we actually generate and the system will say you pulled

18   this invoice out and it assigns it a transaction number.  So if

19   we had questions about this draw later on, we could go back and

20   look exactly what expenses made up this amount.

21       The transaction date is the date this actually occurred in

22   the financial system.  The amount due is the summary of

23   expenses that make up that transaction.  There's no adjustments

24   here, but if there was an adjustment, if we determined

25   something wasn't allowable or something had posted erroneously,

 1    we would adjust that and that would be seen here so we could

 2    track any changes to the system that way.

 3        The receipt number, when we actually receive the funds in,

 4    then we assign a receipt number so we can identify that we've

 5    received that revenue.  The receipt date is the date that we

 6    received that money and the amount received is the actual total

 7    received, and the amount remaining if there was a difference

 8    between the amount that we tried to draw and the amount that

 9    the agency gave us, there would be an amount remaining.  But if

10    -- in this case you can see there's not.  They reimbursed us

11    the full amount that we claimed.

12    Q.   So if someone wanted to know the amount of money that DOE

13    paid KU related to that grant, the 8747 grant number, this has

14    the withdrawals?

15    A.   That is correct.

16    Q.   Can we look at the NSF tab, please?  Is this similar

17    information related to NSF?

18    A.   That is correct.

19    Q.   And earlier we talked about the -- an NSF grant with 8056.

20    And is that information included in this spreadsheet?

21    A.   That is correct.  That is correct.  You can see that in

22    column E.

23    Q.   And the -- it looks like perhaps the columns may not be in

24    the same order, but directing your attention to column Q it

25    says "Amount Received"?

1    A.    Correct.

2    Q.    And does that show it was actually paid to KU from NSF?

3    A.    That is correct.

4    Q.    Do you know what a PI checklist is?

5    A.    Yes.  The PI checklist is the questionnaire that we ask

6    principal investigators to complete when they initiate doing a

7    proposal with our office to gather basic information about

8    their plans and potential compliance issues so that we can

9    proactively gather information or assist them in meeting their

10   proposal deadline.

11   Q.    And is this required of just the principal PI or is the

12   co-PI who is on the award required to provide the PI checklist?

13   A.    Only the PI.  As we discussed earlier, the PI is

14   responsible for everything that occurs on their proposal and

15   award.  So the PI is responsible for completing this

16   accurately.  If there's questions that they need to collaborate

17   with their co-PI or key personnel, that's their responsibility

18   to do so prior to answering.

19   Q.    I want to hand you what's been marked as Government's

20   Exhibit 69.  Do you recognize that?

21   A.    I do.  This is a copy of a PI checklist.

22   Q.    And does this particular PI checklist relate to the

23   defendant Franklin Feng Tao?

24   A.    It does.

25        MR. OAKLEY:  Your Honor, I offer Government's

1    Exhibit 69.

2         THE COURT:  Any objection?

3         MR. DEARINGTON:  No objection, Your Honor.

4         THE COURT:  69 admitted.

5    BY MR. OAKLEY:

6    Q.   And so directing your attention to the top half of this

7    document, you said this is a PI checklist?

8    A.   Correct.

9    Q.   And so the name, is that the name of the principal

10   investigator that the checklist would apply to?

11   A.   Correct.

12   Q.   Then there's some information, position, position title,

13   project administrative unit, funding agency, and then the

14   proposal title?

15   A.   Correct.

16   Q.   Does that all relate to the particular grant at issue?

17   A.   That's right.  A PI checklist is required for every single

18   proposal, and that information at the top would correlate with

19   the PI and the proposal solicitation or opportunity to which

20   they are applying.

21   Q.   And we had talked a little bit yesterday about preaward and

22   award, and the preaward is the application process?

23   A.   Correct.

24   Q.   And then award is after.  If it's one of the -- I think you

25   said your hit rate was about 20 percent, so if it's one of the

254

1    20 percent awards to get funding, then it goes to award status?

2    A.   Correct.

3    Q.   At what stage is the PI checklist obtained from the

4    principal investigator?

5    A.   The PI checklist is one of the first documents that we

6    gather when we are starting a proposal.  So it's early in the

7    application process.  And it has a series of questions that

8    help us to ensure that the application can be submitted in a

9    timely manner because we can then check if there's any other

10   offices that we need to work with to ensure we're being

11   compliant with the regulations.

12   Q.   Is this a document that gets submitted to the federal

13   funding agencies or is this an internal document that your

14   office used to help make sure that you're compliant?

15   A.   This is an internal document that we keep with the file.

16   Q.   So there's certain questions you said on this document?

17   A.   Correct.

18   Q.   And so for instance question number two is, will the

19   proposed project involve human subjects?  Answer no.  That

20   particular question is something that your office needs to

21   know?

22   A.   That's exactly right.  So most of these are compliance

23   issues.  And the reason that we need to know these is based on

24   federal regulation, we have to have certain protocols in place.

25   We would -- in the case of -- especially of animals or humans

1    or some of these early on about recumbent DNA, restrictions on

2    research -- and so -- sorry.

3        A lot of these are things that we would actually have to

4    indicate on the application, and so this document helps us not

5    only be proactive in ensuring if there are human subjects that

6    we would be working with the human subjects committee to make

7    sure that the work was approved or the animal subjects

8    committee was approving that work.  It also helps us make sure

9    that we're answering the electronic application questions

10   correctly.

11   Q.   This particular document it says completed, answered 2015

12   1/5.  Was this completed on January 5th of 2015?

13   A.   Yes.

14   Q.   And is this -- is the PI checklist an electronic document

15   or is it a paper document?

16   A.   It's an electronic document.

17   Q.   And so this is filled out electronically and this is a

18   printout that contains the particular answers that were

19   provided?

20   A.   That is correct.

21   Q.   Now, this -- let me direct your attention to -- if we can

22   scroll to section 7C.  And there's a question under 7C, travel

23   outside the U.S.  And then there's some dot dot dots and then

24   DEF, answer no.

25   A.   Correct.

1   Q.   What -- is there a question on this document related to

2   travel outside the United States?

3   A.   Yes.  So the 7C question is regarding travel outside of the

4   United States.  And then it goes into the sub-questions about

5   collaborations with non-U.S. institutions, shipment or

6   hand-carrying outside the U.S. and transfer.  These all relate

7   to questions around export control.

8        And so as an institution of higher education we have to

9   make sure that we're following export control regulations and

10  that we would not be doing anything that would require us to

11  get any sort of licenses or anything prior to the performance

12  of work.

13  Q.   And the -- where it said Answer: No, that's the answer that

14  was provided by the particular PI on that form?

15  A.   Correct.

16  Q.   Let me direct your attention to number ten.  It says, "As a

17  principal investigator I will take the necessary steps to

18  ensure that all investigators" and then there's dot dot dot

19  "policies on conflict of interest"?

20  A.   Correct.

21  Q.   That's a question on the PI checklist?

22  A.   Yes.  This is an assurance that is certified by submission

23  of this form, and this specifically is noting as the principal

24  investigator they are acknowledging their responsibility to

25  make sure that they and anybody who is a named investigator

1  follows the policies on conflict of interest for the

2  university.

3  Q.   And this is separate and apart from the annual reporting

4  form or the ad hoc form.  Do I understand that correctly?

5  A.   That is correct.  This is a standalone document.  This

6  again is our opportunity to remind investigators of their

7  obligations as PIs at KU that they are required to follow those

8  policies.

9  Q.   And so just -- this is just a reminder?

10 A.   Right.

11 Q.   To the PI.

12 A.   This is a reminder.  There is -- the information here would

13 allow them to -- if they didn't understand those obligations or

14 had questions, would allow them at that time to ask those

15 questions prior to submitting the proposal.

16 Q.   Next I want to hand you what's been marked as Government's

17 Exhibit 70.  Do you recognize that document?

18 A.   Yes.  This is an additional PI checklist form.

19 Q.   And which PI does that relate to?

20 A.   This is for Dr. Tao.

21 Q.   And when was that completed?

22 A.   This was completed October 8th of 2015.

23        MR. OAKLEY:  Your Honor, I offer Government's

24 Exhibit 70.

25        THE COURT:  Any objection?

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3          258

```
1              MR. DEARINGTON:  No, Your Honor.
2              THE COURT:  Exhibit 70 admitted.
3    BY MR. OAKLEY:
4    Q.   And, again, this is just the same checklist that contains
5    essentially the same information that we discussed earlier,
6    correct?
7    A.   That's exactly right.
8    Q.   So if we look at number ten, it would be the reminder about
9    the obligation to abide by conflict of interest?
10   A.   That is correct.
11   Q.   Next I want to hand you what's been marked as Government's
12   Exhibit 71.  Do you recognize that document?
13   A.   Yes.  This is another PI checklist.
14   Q.   And which PI does that relate to?
15   A.   For Dr. Tao.
16   Q.   What's the date of that PI checklist?
17   A.   This is dated 09/28 of 2016.  So September 28th of 2016.
18             MR. OAKLEY:  Your Honor, I offer Government's
19   Exhibit 71.
20             THE COURT:  Any objection?  Any objection to
21   Exhibit 71?
22             MR. DEARINGTON:  Sorry, Your Honor.  No objection.
23             THE COURT:  71 admitted.
24   BY MR. OAKLEY:
25   Q.   Scrolling to number ten.
```

1    A.   It's the same assurance about the PI taking responsibility

2    in ensuring that all investigators will follow policies on

3    conflict of interest.

4    Q.   I'm going to hand you what's been marked as Government's

5    Exhibit 72.  Do you recognize that?

6    A.   Yes.  This is another PI checklist for Dr. Tao dated

7    October 17th of 2016.

8              MR. OAKLEY:  Your Honor, I offer Government's

9    Exhibit 72.

10             THE COURT:  Any objection?

11             MR. DEARINGTON:  No, Your Honor.

12             THE COURT:  72 admitted.

13   BY MR. OAKLEY:

14   Q.   Could we look at section ten, please.  Again, there's the

15   reminder about the conflict of interest?

16   A.   That's exactly right.

17   Q.   I'll hand you what's been marked as Government's

18   Exhibit 73.  Do you recognize that?

19   A.   Yes.  This is a PI checklist for Dr. Tao dated October 27,

20   2016.

21             MR. OAKLEY:  Your Honor, I offer Government's

22   Exhibit 73.

23             THE COURT:  Any objection?

24             MR. DEARINGTON:  No objection, Your Honor.

25             THE COURT:  73 admitted.

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3          260

1   BY MR. OAKLEY:

2   Q.   Can we look at number ten.

3   A.   It is the same question and assurance.

4   Q.   Now I notice on these it says -- on this one, for instance,

5   it's "principal investigator, I will take the necessary steps

6   to ensure that all investigators," and there's dot dot dot,

7   "policies on conflicts of interest."  As the PI is filling it

8   out, is this what they see or is the question -- or the

9   reminder longer than this?

10  A.   It's longer than this.  The dots indicate that it has been

11  truncated for the printing of this.  It is a full statement

12  that says that they will take necessary steps to ensure that

13  all investigators are aware of and follow the policies.

14  Q.   I'm going to hand you what's been marked as Government's

15  Exhibit 74.  Do you recognize that document?

16  A.   Yes.  This is a PI checklist for Dr. Tao dated November 7th

17  of 2016.

18        MR. OAKLEY:  Your Honor, I offer Government's

19  Exhibit 74.

20        THE COURT:  Any objection?

21        MR. DEARINGTON:  No objection, Your Honor.

22        THE COURT:  74 admitted.

23  BY MR. OAKLEY:

24  Q.   Can we please pull up section ten.  Again, the reminder?

25  A.   That's exactly right.  The assurance from the PI.

1    Q.   Next I'll hand you what's been marked as Government's

2    Exhibit 75.  Do you recognize that?

3    A.   Yes.  This is a PI checklist for Dr. Tao dated January 12th

4    of 2017.

5            MR. OAKLEY:  Your Honor, I offer Government's

6    Exhibit 75.

7            THE COURT:  Any objection?

8            MR. DEARINGTON:  No, Your Honor.

9            THE COURT:  75 admitted.

10   BY MR. OAKLEY:

11   Q.   Then can we see ten.  Now earlier I said reminder.  You

12   said assurance.  What do you mean by assurance?

13   A.   So there are certain steps along the way that when someone

14   submits something at the university, they are certifying they

15   have read and understood what they are submitting.  It's almost

16   like signing a contract without actually signing your name.  By

17   submitting this, they're saying I have read that and I

18   understand this and I will follow these policies.  That's one

19   of the control mechanisms we have to understand and make sure

20   that PIs understand that we're all being compliant with the

21   regulations that we have to follow.

22   Q.   And, again, that's in addition to the annual certifications

23   and the requirement to certify on an ad hoc basis?

24   A.   That's exactly right.  So that reporting and the ad hoc

25   reporting that goes along with it is the actual way that we get

1    this information.  This is a reminder that they are subject to

2    the -- and are required to do that and as a way to ensure that

3    they understand that.

4    Q.  I'm going to next hand you what's been marked as

5    Government's Exhibit 76.  Do you recognize that document?

6    A.  I do.  This is a PI checklist for Dr. Tao dated October 20,

7    2017.

8          MR. OAKLEY:  Your Honor, I would offer government's

9    Exhibit 76.

10          THE COURT:  Any objection?

11          MR. DEARINGTON:  No, Your Honor.

12          THE COURT:  76 admitted.

13    BY MR. OAKLEY:

14    Q.  And, again, the same language in paragraph ten is included?

15    A.  That's exactly right.

16    Q.  Next I'll hand you what's been marked as Government's

17    Exhibit 77.  Do you recognize that document?

18    A.  Yes.  This is a PI checklist for Dr. Tao dated October 30th

19    of 2017.

20          MR. OAKLEY:  Your Honor, I offer Government's

21    Exhibit 77.

22          THE COURT:  Any objection?

23          MR. DEARINGTON:  No, Your Honor.

24          THE COURT:  Exhibit 77 admitted.

25    BY MR. OAKLEY:

1    Q.  And, again, section ten is listed; is that correct?

2    A.  That is correct.

3              MR. DEARINGTON:  Your Honor?

4              THE COURT:  Yes.

5              MR. DEARINGTON:  We're happy to stipulate, if the

6    government is interested, that all of the many checklists that

7    the government is seeking to introduce here to the extent

8    they're the same, are the same, and we're not going to object

9    to their admission if that will move things along.

10             THE COURT:  Okay.  I think that was -- from my list

11   that was the end of a particular sequence, but are there other

12   checklists somewhere in your sequence that you're wanting to

13   introduce?

14             MR. OAKLEY:  These are similar and I'll certainly -- I

15   appreciate defense counsel.  And to the extent that I can speed

16   it up with that, I will do so.  But we are through the

17   particular checklists.

18             THE COURT:  Okay.  Thank you.

19             MR. DEARINGTON:  Thank you.

20   BY MR. OAKLEY:

21   Q.  Are you familiar with something called the Streamlyne

22   system?

23   A.  Yes.  Streamlyne is the preaward system of record that we

24   use to prepare proposals as well as submit National Institutes

25   of Health proposals.

1    Q.   Is that -- is that something that is specific that KU uses

2    or is that something that federal grants use?

3    A.   So Streamlyne is a vendor that provides us a way to collect

4    all of our preaward information in one place.  So it is

5    considered our system of record and we maintain it as a system

6    of record.  It is in most cases separate from our submission

7    through grants.gov or research.gov or FastLane which are all

8    electronic submission systems that agencies require us to use

9    to submit the actual proposal.

10       But the Streamlyne system is our way of recording the PI

11   checklist and a lot of background information that we need to

12   maintain in addition to the actual proposal documents that we

13   submit to the agency.

14   Q.   Okay.  When did KU begin utilizing and, maybe more

15   specifically, the Center for Research begin utilizing the

16   Streamlyne system?

17   A.   We started using Streamlyne in 2017.

18   Q.   Is there a PI approval process to the Streamlyne system?

19   A.   Yes.  Streamlyne has an electronic routing process, so the

20   process steps are our proposal preparation staff works with the

21   PI.  When the PI has indicated that everything is ready for

22   review and approval, then it gets routed in the system.  It

23   gets routed to the PI first for their acknowledgment.  And then

24   it routes to their supervisors, including chairs, deans, and,

25   if they're affiliated with a research center, to the director

1    of their research center for their approval as well to ensure

2    everyone is on the same page about the content of the proposal

3    and everyone is aware of what was proposed.

4    Q.   I'm going to hand you what's been marked as Government's

5    Exhibit 78.  Do you recognize that document?

6    A.   Yes.  This is the wording that the PI must approve prior to

7    the document routing to their supervisor.  So this is the PI

8    approval of the proposal, meaning that the PI has reviewed and

9    approved the information that was included in that record as

10   accurate.

11   Q.   You said that KU went to the Streamlyne system when?

12   A.   In 2017.

13   Q.   Would any grant that was submitted through the Center for

14   Research after 2017 have utilized this PI approval system in

15   Streamlyne?

16   A.   It should have, yes.

17           MR. OAKLEY:  Your Honor, I offer Government's

18   Exhibit 78.

19           THE COURT:  Any objection?

20           MR. DEARINGTON:  No objection, Your Honor.

21           THE COURT:  78 admitted.

22   BY MR. OAKLEY:

23   Q.   I want to direct your attention to the -- well, just

24   overall you said this is the information that's provided to the

25   principal investigator in the Streamlyne system?

1    A.   Right.  So the way that it works is that when our -- when

2    we're ready to route it, our staff in the Office of Research

3    will electronically route it.  The PI receives an e-mail with a

4    link.  That link leads them to the proposal record.  The

5    expectation is that the PI would access the proposal record,

6    review it to ensure that all the materials in there reflect

7    what they have worked with the staff on, and then they would

8    sign this assurance that they understand the obligations as PI

9    and that they will -- should we receive an award, follow all

10   KU, state, and federal agency -- any sort of regulations that

11   are incumbent upon that award.

12   Q.   I want to direct your attention to that first paragraph,

13   the bottom that begins with "I will ensure."  Do you see the

14   portion I'm talking about?

15   A.   I do.

16   Q.   Could you please read that section?

17   A.   Yes.  "I will ensure all activities on the project will

18   adhere to university policies and procedures regarding

19   information access, technology, and privacy.  The information

20   submitted with this application is true, complete, and accurate

21   to the best of my knowledge and that any false, fictitious or

22   fraudulent statements or claims may subject me to criminal,

23   civil, or administrative penalties."

24   Q.   Thank you.  I want to direct your attention to the bottom

25   section and the part that begins, "have read and fully comply."

1    Do you see what I'm referring to?

2    A.    I do, yes.

3    Q.    Can you read that section, please?

4    A.    "Have read and fully comply with the Kansas Board of

5    Regents, University of Kansas, and funding agency policies on

6    conflict of interest, have made all financial and other

7    disclosures required by the policies in connection with the

8    research project described and prior to the expenditure of any

9    award funds shall have reached an agreement with the university

10   which provides for conditions or restrictions necessary to

11   manage, reduce, or eliminate conflicts of interest according to

12   the governing policies."

13   Q.    Thank you.  Did this Streamlyne system replace the PI

14   checklist that we talked about earlier or is in addition to the

15   PI checklist?

16   A.    So the format changed slightly.  So in Streamlyne there was

17   still a PI checklist that PIs are required to complete at the

18   beginning of the process.  But they are also required to

19   complete this assurance at the end of the proposal process for

20   the routing of the proposal.

21   Q.    And did the PI checklist that's included in Streamlyne, is

22   it similar to what we looked at?

23   A.    It is similar.  Some of the questions had been replaced by

24   this assurance so that we weren't duplicating efforts, but the

25   content is otherwise unchanged.

1    Q.  I want to hand you what's been marked as Government's

2    Exhibits -- well, Exhibit 79.  Do you recognize that?

3    A.  Yes.  This is a screenshot of the route log which is a

4    function in Streamlyne that allows for administrative users

5    like the Office of Research to see where a proposal is in the

6    routing process for approval.

7             MR. OAKLEY:  Your Honor, I offer Government's

8    Exhibit 81.

9             THE COURT:  It's 79, you mean?

10            MR. OAKLEY:  I'm sorry, 79.

11            THE COURT:  Any objection?

12            MR. DEARINGTON:  No objection.

13            THE COURT:  79 admitted.

14   BY MR. OAKLEY:

15   Q.  And this is a screenshot -- is this a screenshot of the --

16   A.  Yes.

17   Q.  -- Streamlyne system?

18   A.  That's exactly right.  So this is a function in Streamlyne

19   that allows us to at any time check where a proposal is, if it

20   hasn't been fully approved, or check time stamping and date

21   stamping if something was approved.

22        So what you're seeing here is at the top of the screen it's

23   information about the proposal record itself, so you can see

24   the title, that it was a proposal; you can see the individual

25   in the Office of Research who initiated; and you can see what's

1    called route status.

2        Since this one is marked final, it means it went through

3    the entire approval process and received final approval, so

4    it's a complete record that's been approved.  You can see the

5    date stamping of when it started, in this case the 11th of

6    January 2018, and the last approval on the 12th of February of

7    2018.

8    Q.   So is this just an example of what you would see if you

9    accessed the Streamlyne system?

10   A.   That's exactly right.  This is a way for us to monitor and

11   ensure that proposals are being routed and approved.

12   Q.   And the completed section, the approved section, does that

13   show if PIs have filled -- have done the necessary steps

14   including the Streamlyne certification?

15   A.   That's correct.  So in the Actions Taken section, you can

16   see the action and who completed that and then the time and

17   date stamp.  And so in this record you can see the first three,

18   so Matthew Sunner and Bradley Bernet are individuals in the

19   Office of Research, and so this is them -- sorry, didn't mean

20   to draw on the screen -- this is Matthew and Brad getting the

21   proposal ready and you can see Dr. Tao approved it on the 29th

22   of January.  Bala Subramaniam, who would be the director of the

23   center, approved it on the 30th of January.  Dr. Weatherley,

24   who was the chair of Dr. Tao's department, on the 11th of

25   February.

1    Q.   So this is just a sample showing -- and this one you said

2    was approved so that's an example of -- you can see the steps

3    on an approved grant?

4    A.   That's exactly right.

5    Q.   I next want to hand you what's been marked as Government's

6    Exhibit 81.  Is that another copy of a Streamlyne screenshot?

7    A.   Yes.

8           MR. OAKLEY:  Your Honor, I offer Government's

9    Exhibit 81.

10          THE COURT:  Any objection?

11          MR. DEARINGTON:  No objections.

12          THE COURT:  81 admitted.

13   BY MR. OAKLEY:

14   Q.   And so looking at the bottom, the Pending Action Request

15   that says In Action List Approve.  What can you tell from this

16   information?

17   A.   So this means that this was routed to Dr. Tao on the 28th

18   of June of 2018, and it is sitting in his to do -- or the

19   Streamlyne words for this are action list.  So if he were to

20   log in to Streamlyne, on the first page he would see this

21   proposal record sitting there for his approval.  So it has not

22   been approved.

23   Q.   And so once KU went to the Streamlyne system, would the

24   Center for Research have submitted any grant applications to a

25   federal grant without all the steps being required having been

1   completed?

2   A.   So in the transition between our old paper approval process

3   -- so prior to Streamlyne, we did not require the routing that

4   we have required now in the electronic system.  So in

5   transition periods we did not wait for the entire electronic

6   routing to be done.  The PI in communication with our preaward

7   office would approve something to be submitted so we did not

8   miss a deadline so we could always meet our deadline, but then

9   we would expect that this piece be completed after that fact.

10  We would not hold up submission and endanger the proposal not

11  being submitted to the agency at all, but the expectation was

12  the PI would then complete these steps and that their

13  supervisors and center directors and things would complete

14  these steps after the fact.

15  Q.   I next want to hand you what's been marked as Government's

16  Exhibit 82.  Do you recognize that?

17  A.   Yes.  This is a similar but different format PI

18  questionnaire.  It replaced the older PI questionnaire and you

19  can see that -- at the top of this one, it has some information

20  about the actual Streamlyne record.

21          MR. OAKLEY:  Your Honor, I offer Government's

22  Exhibit 82.

23          THE COURT:  Any objection?

24          MR. DEARINGTON:  No objection.

25          THE COURT:  82 admitted.

1    BY MR. OAKLEY:

2    Q.   And so earlier you mentioned that the Streamlyne system

3    also had the PI checklist.  Is this an example of that PI

4    checklist that is part of the Streamlyne system?

5    A.   That is accurate, yes.

6    Q.   And this particular one relates to principal investigator

7    Franklin Tao?

8    A.   Correct.

9    Q.   The proposal on this is 908?

10   A.   Yes.

11   Q.   Again the earlier ones had questions and I think we talked

12   about the one with human subjects.  This has the same question

13   and in this particular answer it was no.  Again, this is an

14   electronic system that the PI uses to answer this and this is a

15   printed version of that?

16   A.   That's exactly right.

17   Q.   Can we please scroll through.

18        So for instance the one at the top, "Do you anticipate that

19   your project personnel will do any of the following:"  Travel

20   outside of the U.S. being one of the questions, collaborate

21   with individuals or institutions outside the U.S., ship or

22   hand-carry tangible items, et cetera.  In this particular form

23   it was answered no?

24   A.   Correct.

25   Q.   Can you continue scrolling down, please.  Thank you.

1     So you said that once you went to the Streamlyne system,

2 some of the questions were put into the certification at the

3 end?

4 A.   Correct.  So on the prior version of the checklist, we

5 would ask questions about conflict of interest, the PHS

6 compliance, which is health services, so NIH questions, open

7 access, and lobbying.  Because we actually cover that in the

8 assurance, we no longer require that assurance on the PI

9 checklist portion because it's all part of the same system.

10 Q.   I want to hand you what's been marked as Government's

11 Exhibit 65.  What is Government's Exhibit 65?

12 A.   This is a copy of the -- of a notice of award from

13 Department of Energy entitled award number DE-SC0014561.  The

14 first sheet is a internally-generated document called a budget

15 summary that we create in our office, and it summarizes the

16 award that has been entered into our financial system and then

17 this is routed to the principal investigator, the unit that

18 they have assigned this project to, so each award gets assigned

19 to a unit that would then be responsible for assisting them and

20 working with our office to manage it.  And so those individuals

21 are copied as well as our contract negotiations unit in this

22 case because this is an actual contract from the federal

23 government.

24     MR. OAKLEY:  Your Honor, I offer Government's

25 Exhibit 65.

1        THE COURT:  Any objection?

2        MR. DEARINGTON:  No objection, Your Honor.

3        THE COURT:  65 admitted.

4    BY MR. OAKLEY:

5    Q.   And so is this an example of a grant application that had

6    been awarded, that had been approved by a federal agency?

7    A.   That's exactly right.  So the process here would have been

8    that Dr. Tao would have worked with our preaward.  We would

9    have prepared the proposal and submitted it.  Department of

10   Energy selected it for funding and then issued us this

11   assistance agreement.

12   Q.   And so this particular document relates to DOE, you said it

13   was a project ending in -- with a project number of

14   DE-SC0014561?

15   A.   That's correct, that's the agency award number.

16   Q.   Was this particular amount of the award $850,000?

17   A.   I think in the end it was.  The version we have here is

18   just the -- is an adjustment budget summary.  So if we scroll

19   down just a little bit on the budget summary, you can see --

20   not very well, but you can kind of see that each budget summary

21   has a summary of the budget.

22        And so these columns, previous budget -- the $450,000 would

23   have been the first year of the award.  There was a

24   supplemental amount of maybe -- honestly I can't read it, maybe

25   $220,000.  And then so the current budget column shows the

1    actual full award that's been issued currently to the Office of

2    Research.  And so oftentimes what would happen is that we might

3    get an award for $800,000, but we would get the funding in

4    increments based on reporting that we -- that the PI and our

5    office would submit to the agency.

6    Q.    So I want to talk to you -- when awards such as this are

7    submitted -- and you mentioned yesterday a partnership between

8    the university and the federal agencies.  When you submit or

9    when your office submits these applications for grants, do you

10   make certain assurances to the federal government that the

11   information you're providing is correct?

12   A.    That's exactly right, that we -- by submitting we are

13   assuring them that the information we're providing to them is

14   accurate and that we will abide by all regulations that are

15   incumbent upon us as an awardee.

16   Q.    And who was the PI on that particular grant?

17   A.    Dr. Tao is the PI.

18   Q.    When you submit -- when you submitted this application that

19   was ultimately awarded to the Department of Energy, did you

20   include as part of that the principal investigator's

21   biographical sketch?

22   A.    Yes.

23   Q.    And a current and pending support document?

24   A.    I would have to look at the application to make sure, but

25   that would be standard for us to include both the biosketch and

1    the current and pending for the agency to review.

2    Q.   And you also -- do you indicate to the federal agency that

3    is awarding the grant that KU has and complies with the

4    conflict of interest policy?

5    A.   That's right.  So by submitting, we are assuring them that

6    we're following the Federal Code of Regulations that we're

7    required to, one of which is to have controls over conflicts of

8    interest.

9    Q.   At the time that that particular application was submitted,

10   did you provide any information through your office to DOE that

11   the defendant Franklin Tao was working at a university other

12   than the University of Kansas?

13   A.   I would have to look at the proposal, but based on the

14   conflict of interest documents that I saw, we would not have

15   done so, no.

16   Q.   Did you provide any information that Dr. Tao was

17   collaborating with a university called Fuzhou University?

18   A.   I do not believe so, no.

19   Q.   That he was working at Fuzhou University?

20   A.   No.

21   Q.   That he was helping build a lab at Fuzhou University?

22   A.   No.

23   Q.   That Dr. Tao had received a Changjiang scholar award?

24   A.   I would have to look at his biosketch, but I do not believe

25   that was included.

1    Q.  Did you provide any information to DOE that the defendant

2    was recruiting students for Fuzhou University?

3    A.  No.

4    Q.  That he had submitted research proposals to the Chinese

5    National Science Foundation?

6    A.  I do not believe so.  It would have been listed on his

7    current and pending if we would have been aware of those.

8    Q.  Did you provide any information that he had been promised

9    any funding from Fuzhou University?

10   A.  No.  Again, that would have been included on the current

11   and pending should we have known that.

12   Q.  If you knew that that information was true, that Dr. Tao

13   was working for Fuzhou University or that he was collaborating

14   with Fuzhou University or that he was building a lab at Fuzhou

15   University, would you have submitted the grant application

16   as-is?

17   A.  No.

18   Q.  Why not?

19   A.  As I noted, I do not believe the information that you

20   stated was in his biosketch or his current and pending.  We

21   also -- when we looked at his conflict of interest submission,

22   that was not listed in there, and so if any of that was true,

23   he would need a management plan in place to ensure that there

24   was not a conflict of interest prior to us submitting.

25   Q.  So all that information would have been important for you

1  and the Center for Research to know prior to submitting this

2  application?

3  A.    That's exactly right.  It would have been very important

4  for us to know because we do certify everything is accurate and

5  as well as it would have been important for the Department of

6  Energy to know.  As I mentioned yesterday, research funding is

7  very limited, so they must take into account overlap and

8  commitment of time when they are selecting applicants to fund.

9  So the information that we provide on the biosketch and the

10  current and pending go into the determinations after scientific

11  merit has been determined.

12  Q.    Is that true for any grant application that the KU Center

13  for Research would have submitted to any federal entity related

14  to Dr. Tao?

15  A.    That's exactly right.  When we submit to a federal agency,

16  we are certifying that the information in that is accurate and

17  that we have controls in place to ensure that we are being good

18  stewards of that federal money.

19  Q.    The applications that are submitted through your office --

20  A.    Yes.

21  Q.    -- do they contain your signature?

22  A.    They do.  I'm the authorized representative for the

23  university and so my signature goes on all applications.  My

24  staff is highly trained and I delegate any authority to them so

25  they can assist PIs in the best manner and do not have to wait

1    for me to sign those documents.

2    Q.    We talked about the number of grants that typically go

3    through your office in a year and I apologize, I don't remember

4    that number on average.

5    A.    It's average about 1400.

6    Q.    And are you able to personally review and sign every one of

7    those grants?

8    A.    I do not sign them unless there is a question or concern or

9    that the agency specifically requires my ink signature, but my

10   staff oftentimes asks me questions or would make sure that any

11   issue was resolved and that I was on board with whatever they

12   were doing prior to that submission.

13   Q.    And you said that you have delegated the ability to sign

14   your name on certain documents related to grant applications to

15   people in your office.  Have you delegated it to all 80

16   employees in your office?

17   A.    No.  Our preaward staff have my delegated authority because

18   they go through specialized training and understand the

19   significance of submitting a proposal with my name but also my

20   representation of the university as a whole.

21   Q.    Next I want to hand you a series of exhibits.  For the

22   record these are 49, 50, 51, 52.  Are you familiar with a grant

23   that KU submitted to the National Science Foundation related to

24   Dr. Tao?

25   A.    Yes.

1    Q.   And in particular, are these documents related to what we

2    referred to earlier as the CAREER grant?

3    A.   Correct.  This is the CAREER award from National Science

4    Foundation that was originally issued to Notre Dame and then

5    transferred to the Office of Research at KU.

6    Q.   And so it's called a CAREER grant?

7    A.   Yes.

8    Q.   And does that relate to a particular principal

9    investigator's career?

10   A.   That's exactly right.  So National Science Foundation has a

11   program called CAREER and it's an acronym.  I honestly don't

12   know what it's an acronym for, but it's about an early

13   investigator, so an investigator that has started to establish

14   their research but has not fully established their research.

15   And so it is a single investigator support mechanism to really

16   help them bring their research to the next level.  It's usually

17   five years and around $500,000 for them to really establish

18   themselves as a researcher.

19   Q.   And so if someone who receives -- well, federal grants go

20   through universities, correct?

21   A.   That is correct.

22   Q.   And it doesn't go to individuals, but it goes to a

23   particular university in support of the principal investigator?

24   A.   That is exactly right.

25   Q.   And so when Dr. Tao transferred from Notre Dame to KU, that

1    award doesn't automatically go from Notre Dame to KU.  Is that

2    accurate?

3    A.    That's exactly right.  There's a process called

4    relinquishment where we work with Notre Dame for them to ensure

5    all expenses and everything that occurred at Notre Dame has

6    been concluded.  National Science Foundation is then given a

7    justification of why that award should be transferred to the

8    new institution.  In this case the justification was --

9    obviously since this was an award to support Dr. Tao's specific

10   research and he had transferred and we acknowledged that we

11   would be good stewards of the funds, it was transferred to the

12   University of Kansas.

13   Q.    And as part of that transfer process, that went through the

14   process that we had described with the jury where the PI makes

15   certain assurances including that they will abide by any

16   conflict of interest?

17   A.    That's exactly right.  When we receive a transfer in, we

18   treat it just like a new award to the university since it is

19   new to KU.  And so we would go through all the same exact

20   processing where we would require the PI checklist, to complete

21   a budget, and do all the other assurance mechanisms to make

22   sure that it was going to be handled in the same way that any

23   other award was handled.

24   Q.    And did KU tell the National Science Foundation that

25   Dr. Tao was working for Fuzhou University?

```
1              MR. DEARINGTON:  Objection.

2              THE COURT:  Just a minute.  What's the nature your

3    objection?

4              MR. DEARINGTON:  We let it go on for a while but facts

5    not in evidence.

6              THE COURT:  I think it's asking for a question one

7    way -- asking for an answer one way or the other, not assuming

8    facts.  So I'll overrule.

9              MR. DEARINGTON:  Thank you, Your Honor.

10   A.   The application that was submitted did not contain

11   information in a current and pending document or biosketch that

12   would indicate any sort of collaboration with a Chinese

13   university, no.

14   BY MR. OAKLEY:

15   Q.   Did it include any information that Dr. Tao was working on

16   building a lab at Fuzhou University?

17   A.   Not to my understanding, no.

18   Q.   And any information that Dr. Tao had received a Changjiang

19   scholar program award?

20   A.   No, no.

21   Q.   That Dr. Tao was recruiting students for Fuzhou University?

22   A.   I do not believe that information was in the application,

23   no.

24   Q.   That he was submitting research proposals to the Chinese

25   National Science Foundation?
```

1   A.   No.

2   Q.   That he had been promised funding from Fuzhou University?

3   A.   No.

4   Q.   At the time that application was submitted to NSF, if your

5   office would have known that information, would you have

6   submitted it as-is to NSF?

7   A.   No.  Just like the Department of Energy award, if we would

8   have known that information, we would have updated the forms

9   and had a conflict of interest management plan on file to make

10  sure that we could abide by the National Science Foundation

11  terms and conditions around conflicts of interest.

12  Q.   I want to hand you what's been marked as Government's

13  Exhibit 58.  Do you recognize that document?

14  A.   I do.

15  Q.   What is that document?

16  A.   This is a notice from the National Science Foundation to me

17  notifying us that they are suspending our awards.

18          MR. OAKLEY:  I offer Government's Exhibit 58.

19          THE WITNESS:  Three specific awards.

20          THE COURT:  Any objection?

21          MR. DEARINGTON:  No objection, Your Honor.

22          THE COURT:  Exhibit 58 admitted.

23  BY MR. OAKLEY:

24  Q.   What's the date of this letter?

25  A.   This is dated August 26th of 2019.

1  Q.   And could we scroll up a little bit to see who it's from.

2  A.   Yes.  So it's National Science Foundation and the Division

3  of Grants and Agreements is the unit of National Science

4  Foundation that issues all awards.

5  Q.   It is directed to you?

6  A.   Yes.

7  Q.   And you said that it's related to three different grants.

8  Were those grants that had been awarded?

9  A.   Yes.  The numbers here, CHE-1800577, CHE-1462121, and

10  OIA-1539105 are three awards on which Dr. Tao was either PI or

11  a key personnel, and so they suspended these three awards to KU

12  effective on August 26th of 2019.

13  Q.   NSF's letter to you suspending those awards, was that after

14  the allegations in this matter came to light?

15  A.   That is correct.

16  Q.   Now, you said that there were also grants provided by the

17  Department of Energy?

18  A.   Correct.

19  Q.   Did the Department of Energy take any action with regard to

20  grants associated with Dr. Tao?

21  A.   Yes.  They terminated the negotiations under which we were

22  negotiating to provide supplemental funding to an existing

23  award that had just finished as well as suspending the ongoing

24  award.  They notified us via a call.

25  Q.   Do you know if KU took any action with regard to Dr. Tao's

1   employment?

2   A.   I believe he was put on administrative leave until

3   determination of actions was finalized.

4         MR. OAKLEY:   Your Honor, I have no further questions.

5         THE COURT:   Mr. Dearington, you want to start

6   cross-examination?

7         MR. DEARINGTON:   Yes, Your Honor.

8         THE COURT:   We're going to break a little bit before

9   noon rather than take a break because there is a witness that

10  needs to be taken out of order right at 1:00, so we'll probably

11  go another 20 minutes or so and then take a little bit early

12  lunch break until 1:00.  Do you think you will finish with this

13  witness or will you need to resume cross-examination this

14  afternoon with her?

15        MR. DEARINGTON:   We'll need to resume

16  cross-examination.

17        THE COURT:   Let's go ahead and at least get started.

18                    CROSS-EXAMINATION

19  BY MR. DEARINGTON:

20  Q.   Good morning, Ms. Reed.

21  A.   Good morning.

22  Q.   So your office is entrusted with hundreds of millions of

23  dollars of research funding that supports thousands of

24  individuals, submitting more than 1,000 proposals per year,

25  correct?

1    A.   Correct.

2    Q.   You'd agree with Chancellor Girod's statement I suppose

3    that federally funded research is the foundation of KU and far

4    away the biggest funder of KU?

5    A.   I don't know that I would say federal research dollars is

6    the biggest funder of KU, but it's very important for our

7    research enterprise, correct.

8    Q.   You were promoted in August of 2017 from interim to full

9    status as vice chancellor for research and then just four

10   months later signed on to Dr. Tao's DOE proposal that Mr.

11   Oakley asked you about, correct?

12   A.   I did not sign that document; my delegation was in place.

13   But if that's the timeline for the date on the notice of award,

14   then yes.

15   Q.   So your name is not in a signature place on that proposal?

16   A.   I'd have to look if you have a copy of it.

17   Q.   Okay.  We'll get there shortly.  So that makes your office

18   -- if you were signing on as an authorized representative for

19   KU, that makes your office responsible for compliance with

20   federal requirements related to grants?

21   A.   Correct.

22   Q.   And if agencies think that your office isn't doing a good

23   job at this, KU could lose hundreds of millions of dollars; is

24   that fair?

25   A.   True.  But we are audited every year to ensure that we have

1  controls in place, so I'm not concerned about them thinking

2  we're not doing a good job.

3  Q.  You weren't concerned at all when the FBI came knocking and

4  your office was under a microscope as to whether there were

5  compliance issues and you were responsible?

6  A.  I think anybody -- sorry to interrupt.

7  Q.  It's my fault.

8  A.  I think anybody would be concerned, but we often work with

9  auditors.

10 Q.  I'm talking about the FBI.  I'm sorry to cut you off.

11 A.  Honestly to me the FBI and auditors have very similar

12 questions because they want to know if our controls are

13 adequate and in this case I believe they are.

14 Q.  Okay.  And I think you said testified earlier that KU's

15 reputation is important for funding; is that right?

16 A.  That's exactly right.

17 Q.  And fair to say that notwithstanding everything that's been

18 alleged against Dr. Tao, KU's responsibility after this

19 investigation is quite strong -- KU's reputation is quite

20 strong?

21 A.  Right.  I will note that we -- this case does come up

22 almost every research conference I go to around science and

23 security because it's an example of a time where we're trying

24 to put controls in place.

25 Q.  Just a yes-or-no question [verbatim] would do fine.  I'm

1  trying to keep things moving given our time constraints again.

2  A.   Could you please ask the question again?

3  Q.   KU's reputation remains quite strong in terms of being able

4  to get funding?

5  A.   I would agree.

6  Q.   In fact after the investigation, KU funding went up

7  dramatically several million dollars, tens of millions of

8  dollars, correct?

9  A.   I do believe that we increased five places in the HERD

10  survey, yes.

11  Q.   And months after Dr. Tao -- let me back up actually a

12  moment.

13      Do you see Special Agent Stephen Lampe in the courtroom?

14  A.   I do.

15  Q.   Is that Special Agent Lampe there sitting at the left of

16  this table?

17  A.   Yes.

18  Q.   You've met with Special Agent Lampe I suppose?

19  A.   Yes, I have.

20  Q.   How many times would you ballpark, calls and personal

21  meetings?

22  A.   I would say maybe 5 or 6.  I would have to look at my

23  calendar to know.

24  Q.   Only 5 or 6 times that you've met?  That would be in person

25  I suppose?

1    A.   Yes.  I'm trying to recall the in-person visits.  It has

2    been several years over a span of time but less than ten for

3    sure.

4    Q.   Okay.  Less than ten times.

5         And you're quite busy in your job as it is, right?

6    A.   Yes.

7    Q.   So this was probably an added stress I imagine for your

8    office?  Inquiries were made as to compliance issues, Special

9    Agent Lampe wants to meet with you roughly ten times?

10   A.   Well, my job is to ensure that we're compliant and to

11   follow up on any questions or concerns that could damage that

12   compliance, so this is part of my job.  I really don't do

13   operational activity so that I can focus on these types of

14   things.

15   Q.   And excuse me one moment.  I forgot my binders.  Sorry

16   about that.  I'd like to show you an e-mail.  I'd like to show

17   you a document that's been --

18             MR. DEARINGTON:  May I approach, Your Honor?

19             THE COURT:  Yes.

20   BY MR. DEARINGTON:

21   Q.   -- marked as Defendant's Exhibit 1454.  Do you recognize

22   that document, Ms. Reed?

23   A.   Yes.  This looks like an e-mail to me from Stephen Lampe.

24   Q.   Ms. Reed, do you recognize this document?

25   A.   Yes.

1   Q.   Is this an e-mail from Special Agent Lampe to you dated

2   November 5, 2019?

3   A.   Yes, it is.

4   Q.   That would be after Dr. Tao was charged in this case, if

5   you're aware?

6   A.   I believe so.

7           MR. DEARINGTON:  I'd like to move that into evidence,

8   Your Honor.

9           THE COURT:  Any objection?

10          MR. OAKLEY:  No objection, Your Honor.

11          THE COURT:  Exhibit 1454 admitted.

12  BY MR. DEARINGTON:

13  Q.   And so does this e-mail say, "Alicia, I spoke with Carl and

14  Kim" -- and this is from Special Agent Lampe -- why don't you

15  read from there?

16  A.   "I'd like to review Tao's applications for grants with you

17  to identify points where he potentially made false statements

18  (i.e. certifications that he had no other employment).  I

19  assume Carl let you know that I would be asking.  Please let me

20  know your availability.  I can come out there anytime.  Thanks,

21  Steve."

22  Q.   So you did your best to comply with this request, right?

23  You searched through all of Dr. Tao's old paperwork he

24  submitted to KU, and you tried to find something you could give

25  to Special Agent Lampe that would potentially be a false

1    statement, correct?

2    A.    What I did with this request was pull up every proposal in

3    which Dr. Tao was the PI.  We keep all those on record as we're

4    required to with federal documents and I provided those to him,

5    yes.

6    Q.    And he didn't ask you for proposals -- he asked you -- he

7    asked you to review the grant applications to identify points

8    where he potentially made false statements.  He didn't ask for

9    a copy of all the proposals, right?

10   A.    He says, I'd like to review Tao's applications.  To me that

11   means the proposal documents.

12   Q.    Are you forgetting about the end of the sentence though

13   where it says, "he potentially made false statements (i.e.

14   certification that he had no other proposal)"?

15   A.    I'm not forgetting about that.  I'm assuming he wanted to

16   see applications to see if he had potential areas he made false

17   statements -- that I pulled the full proposal file.

18   Q.    And are you telling me that when Special Agent Lampe,

19   having already indicted our client Dr. Tao, asked you to review

20   grant proposals to identify points where he potentially made

21   false statements, you were approaching that neutrally to see

22   whether in fact maybe he didn't make false statements and I'll

23   highlight those for Special Agent Lampe or were you looking to

24   see if you could find an arguable false statement?

25   A.    Of course not.  My job is to make sure that we're

1    protecting KU, the faculty, staff, and students.

2    Q.   Dr. Tao is a faculty member, is he not?

3    A.   That's exactly what I'm saying.  I did not pull anything

4    out of the files and hand him only pieces that I thought were

5    false.  That's not my decision to make.  Just like when we ask

6    people to submit things for conflict of interest, we're not

7    asking for a decision.  That's for the experts to do.  All I

8    was doing was pulling the proposals.

9    Q.   It's fair to say this was not your typical preaward/post-

10   award job.  You had an FBI agent asking you about potential

11   false statements of crime.  This wasn't protecting and making

12   sure everything that is going through the typical routine

13   submission process was fine.  This was a retrospective review

14   and examination --

15            MR. OAKLEY:  Objection, argumentative.

16            THE COURT:  Overruled.

17   BY MR. DEARINGTON:

18   Q.   And you were asked to find potential false statements,

19   correct?

20   A.   I was asked to provide the files so that Stephen Lampe

21   could look at them.

22   Q.   Ms. Kessler, could you please pull up Exhibit 20, the

23   native Excel file.  I want to check one thing, please.

24        Please scroll to the right column.  Actually right here is

25   just fine.

1        Ms. Reed, can you see the column notes?

2   A.   Yes.

3   Q.   So I assume those are notes that are part of the People

4   Soft system, right?

5   A.   Those are my notes.  When I was compiling this after we had

6   met, I wanted to make sure that the things that we had talked

7   about, including things like NSF's general terms and

8   conditions, a place in this award where there was a discussion

9   about terms on foreign travel, a place --

10  Q.   I'm sorry.  I just -- we're really under time constraints

11  so I'm going to ask simple yes-or-no questions where I can.

12  When I'm asking for more of an explanation, I'll try to let you

13  know.  I do apologize for cutting you off there.

14  A.   Sure.  No, these are not from the financial system.

15  Q.   When you say after we met, who is "we" in that context?

16  A.   Steve Lampe and I.

17  Q.   Special Agent Lampe?

18  A.   Yes.

19  Q.   I think you said earlier that you compiled these records

20  from the People Soft system and Streamlyne.  So that's not

21  precise, right, there were also some added notes you made here?

22  A.   Correct.

23  Q.   And you picked out T and Cs, terms and conditions, correct?

24  A.   Correct.

25  Q.   Page 70, foreign travel, correct?

1   A.   Correct.

2   Q.   Page 4, place of performance?

3   A.   Correct.

4   Q.   Did Special Agent Lampe ask you to find places in these

5   documents where there's mentions of foreign travels and terms

6   and conditions and so forth?

7   A.   I don't believe so.  I believe what I was asked to do was

8   look at our terms and conditions --

9   Q.   Sorry, yes or no for now and I'll come back to that and

10  Mr. Oakley will be able to ask you as many questions as he

11  likes about these questions as well.  So if you'd like

12  clarification, I'm sure he's able to do that.

13       So you voluntarily found spots in the proposals and then

14  you listed them and you provided that list of items that you

15  thought would be of interest to Special Agent Lampe, fair?

16  A.   These are from the award documents.

17  Q.   Correct.

18  A.   Yes.  So these are award terms and conditions that I

19  pointed out in this file.

20  Q.   You didn't get the impression that Special Agent Lampe

21  wanted help finding evidence that might suggest Dr. Tao is

22  innocent, did you?

23  A.   I don't think we talked about his innocence at all.

24  Q.   You didn't search --

25  A.   No.

1   Q.   You didn't search for documents that might contradict some

2   of the evidence that you're providing to Special Agent Lampe,

3   did you?

4   A.   I did not search for any documents other than our files.

5   Q.   And if you saw a document that could potentially hurt

6   Special Agent Lampe's case against Dr. Tao, would you have

7   pulled that and sent it to Special Agent Lampe and said, hey, I

8   think you might have misunderstood something here?

9   A.   Yes.

10  Q.   I think Dr. Tao could actually be innocent here?

11  A.   I was not interpreting the information other than finding

12  the information and showing terms and conditions.  I was not

13  interpreting guilt or innocence.

14  Q.   That's fair.  As a lawyer oftentimes we have to look at

15  things from both sides but it's very challenging, I can tell

16  you, and sometimes when you're on one side, you can look at

17  things with a certain skewed vantage point; is that fair?

18  A.   That's fair.  I'm on the side of making sure that the

19  federal dollar is protected.

20  Q.   Right.  But in this context, you are on the side of helping

21  Special Agent Lampe identify false statements, right?  You

22  don't have to answer that.  I think we've been down that road

23  enough.  But you're not a criminal investigator, right?

24  A.   I am not.

25  Q.   Did you feel comfortable in this role that Special Agent

1    Lampe put you in?

2    A.    Yes.  I often do things around audits and things like that.

3    To me it was very similar to an audit.

4    Q.    Had you been engaged with the FBI before to look for false

5    statements in grant proposals?

6    A.    No.  But since 2014 I have been working with National

7    Science OIG on several audits.  So I've been working very

8    closely with them.

9    Q.    I'm just trying to limit my questions --

10    A.    I feel like saying yes or no is not enough here.  I do

11    often look at terms and conditions, help interpret them.

12          I often look at terms and conditions and other things

13    related to research administration.  So this is a role I'm

14    comfortable in.

15    Q.    Earlier in your testimony you discussed principal

16    investigators and you referred to PIs and, quote, their grants.

17    But to be precise, what you meant is KU's grants that support

18    the PI's research, right?

19    A.    Yes.

20    Q.    And sometimes it's -- it can happen to everybody that you

21    talk about a PI and you talk about their grants, their funding,

22    their money, right?  People say those things in shorthand, but

23    it's really KU that's the awardee, right?

24    A.    Correct.

25    Q.    And KU is the applicant?

1   A.   Correct.

2   Q.   And Dr. Tao worked for KU?

3   A.   Correct.

4   Q.   I guess technically may still work, I don't know.  But if I

5   were to represent to you that Mr. Barry stated during his

6   opening that Dr. Tao --

7        If I were to represent to you --

8             MR. OAKLEY:  Objection, Your Honor.  Opening

9   statements are not evidence.  It isn't proper to ask this

10  witness what was said in opening particularly because she was

11  not present to my knowledge.

12            THE COURT:  Overruled.

13  BY MR. DEARINGTON:

14  Q.   So if I were to represent to you that Mr. Barry in his

15  opening statements referred to Dr. Tao as having received

16  hundreds of thousands of dollars of federal money, that's not

17  precise either, is it?

18  A.   Not precise, but the expenditures were incurred by Dr. Tao

19  and his lab.

20  Q.   And if I were to represent to you that the indictment in

21  this case refers to Dr. Tao as having obtained federal funds

22  himself, that wouldn't be correct either, would it?

23  A.   The University of Kansas would not obtain funds on their

24  own behalf without representing someone who was on faculty or

25  acting as a PI.  We don't -- every award has a PI because we

1   need their expertise.  The reason that we go to the federal

2   government is because of the PI's expertise.

3   Q.   Right.  So if a charging document said that Dr. Tao was

4   obtaining funds from the federal government, that's not

5   precisely correct.  It's really KU --

6   A.   He's expending funds that KU has obtained.

7   Q.   Correct.  Okay.  So I'd like to ask you about that because

8   we talked -- you testified a bit earlier about some of the

9   expenses that Dr. Tao has made --

10  A.   Sure.

11  Q.   -- in his capacity as a principal investigator working for

12  the awardee, which is KU.

13       Ms. Kessler, do you mind please pulling up Exhibit 59A.

14       So here you can see expenses that were charged to Dr. Tao's

15  grants at KU; is that correct?

16  A.   Yes.

17  Q.   And, Ms. Kessler, could you expand upon one of the

18  equipment or supplies lines so we can see some of the more

19  granular expenditures.  And I think if you hit -- yes, perfect.

20       So you went over some of these expenses and we looked at

21  the dollar amounts.  But you don't have any reason to think any

22  of these expenses were illegitimate, do you?

23  A.   I don't know.  My understanding would be if it went -- if

24  it was charged to the project, it should have been in benefit

25  of the project.

1    Q.   Right.  And of all the expenses listed in this very lengthy

2    spreadsheet, you're not aware of any that were not legitimate,

3    not reviewed, not approved by KU.  These were all, fair to say,

4    according to your knowledge, properly expended at KU for the

5    purpose for which they're listed herein?

6    A.   If the PI says that they benefit the project, then we trust

7    them to make that assurance and we would process them, yes.

8    Q.   A PI like Dr. Tao who publishes 25 papers in 2018, he needs

9    a lab and he needs equipment, and in fact some PIs at KU have a

10   lot more funding than Dr. Tao and a lot more equipment, but

11   that's all necessary to do the research that's required by the

12   federal agencies, right?

13   A.   That's correct.

14   Q.   And that's why they're willing to approve these types of

15   expenditures?

16   A.   Correct.

17   Q.   There's nothing wrong with having a lot of expenditures to

18   support your research particularly if you do a really good job

19   at your research, right?

20   A.   Right.

21   Q.   Okay.  Ms. Kessler, could you please turn to Exhibit 16,

22   which is a native Excel file.

23        Well, I think I can maybe recall, to the extent you can

24   because I think you created the spreadsheet, the information I

25   was interested in while Ms. Kessler pulls that up.

1    So, if you recall, and please let me know if you don't, you

2  had created I think a spreadsheet in 16 which showed the

3  federal research dollars that Dr. Tao was involved with, and it

4  showed what aspect of that had been used to pay his salary from

5  May 2018 onward.  Do you recall preparing that?

6  A.   Yes.  There is a file that shows his salary paid by KU and

7  associated projects.

8  Q.   I know you don't have the benefit of the document in front

9  of you and I will of course allow Mr. Oakley to redirect -- or

10  the Court will allow Mr. Oakley to redirect you if I get

11  anything wrong here.  But it was roughly $29,000 in salary that

12  Dr. Tao had been -- had received that was paid from the

13  agencies to KU.

14    I think this might be it.  So, Ms. Kessler, could you

15  please scroll to the bottom right.  And then downward.  This is

16  not --

17  A.   This is the list of proposals and awards.

18  Q.   Oh.  Could you -- we'll have to come back to that.  Let me

19  see which number it was supposed to be.  I'm sorry.  It was

20  Exhibit 20.  Sorry about that.  The one we had already talked

21  about a little bit.

22    The bottom there you can see that Dr. Tao is involved with

23  over $2 million of awards, right, over the time period

24  reflected here?

25  A.   I believe column O is the expenditures.

1   Q.   If you scroll to the top, Ms. Kessler, I want to make sure

2   we're on the right page here.  That $4 million number, Dr. Tao

3   is not the PI on that one, right?

4   A.   That's right.

5   Q.   That's Dr. Subramaniam?

6   A.   Yes.

7   Q.   And Dr. Tao's piece of that for his lab group was $200,000.

8   Do you recall that?

9   A.   I would have to look, but that sounds approximate.

10  Q.   If you scroll down, Ms. Kessler, it looks like what you

11  have here in column O is I think you said the expenditures and

12  the column P is the amount of funds -- sorry, salary that the

13  agencies paid KU or reimbursed KU to pay Dr. Tao from May 2018

14  forward; is that correct?

15  A.   From -- I believe it was from May 18th to whenever he went

16  on leave.

17  Q.   Okay.  To when he went on leave, right, which is when he

18  would have stopped researching, right?

19  A.   That's right.

20  Q.   29,000 over 2 million.  I'm no mathematician, but it's

21  roughly one percent, is that fair, 1.4 or .5 percent?

22  A.   It is a small amount, yes.

23  Q.   And that's fairly standard, right, that the PI's salary

24  paid by the agencies is a very tiny fraction of what KU

25  receives from the agencies, right?

1  A.  Well, the salary is one piece of it.  There's also fringe.

2  There's the travel, supplies.  So there's a lot of things that

3  go into the budget.  The $2 million is what the federal

4  government awarded to support the work.

5  Q.  Right.  And the $29,000 is what Dr. Tao would have received

6  for the entire time period at issue in the spreadsheet for that

7  column, right, for his work for the agencies?

8  A.  From these sources.

9  Q.  Sure.

10  A.  This would not include the 40 percent state funding.

11  Q.  I'm talking about the agency reimbursements for now, but we

12  can come back to that.  Okay.

13      So you've talked a lot about how PIs like Dr. Tao have to

14  certify that they met and followed and read and adhered to

15  numerous policies including conflict of interest policies among

16  others, correct?

17  A.  Correct.

18  Q.  And you expect that principal investigators, they would

19  take that certification very seriously because it's relied upon

20  by KU and the federal government?  I think you may have

21  testified to that effect.

22  A.  Yes.  I would expect somebody who's certifying something to

23  take it seriously.

24  Q.  And you yourself take these certifications and this

25  paperwork process very seriously, fair?

1    A.    Yes.

2    Q.    For example, you have to certify that you've reviewed all

3    the requisite paperwork and that it's complete and accurate,

4    and you submit those types of certifications?

5    A.    I do submit certifications on behalf of the university,

6    yes.

7    Q.    You take these responsibilities yourself seriously because

8    your paperwork is similarly relied upon by the federal

9    government?

10    A.    Correct.

11    Q.    You wouldn't want to provide any false or fraudulent

12    information or you wouldn't want to provide anything that could

13    be false, you would want to do your due diligence, but you

14    attach your name to a document that could go to the federal

15    government?

16    A.    Correct.

17    Q.    Because that otherwise -- I mean not only is that your job

18    at stake here, but you could also be subject to federal charges

19    if you were to include something and send it off to the

20    government?

21    A.    Correct.  If I had intentionally done something incorrect

22    that -- I think that it would be problematic.

23    Q.    Okay.  So I want to talk a little bit about the conflict of

24    interest form.  Some of the conflict of interest forms that you

25    reviewed -- and I don't think we have to pull them up because

1  you at least have a general understanding of what they say, but

2  you looked at some of those forms and checklists too from 2015,

3  2016, 2017 --

4  A.  Yes.

5  Q.  -- and so are you aware if I represent to you that the

6  allegations in this case are that Dr. Tao took a job in

7  May 2018, he wouldn't want to report -- he wouldn't have to

8  report that job back in time three years, two years, one year

9  because he doesn't have such a job; he's not receiving any

10  funds, he doesn't have a time commitment from that job, right?

11  A.  Correct.  But if he took a job in May '18, he should have

12  within 30 days of taking that job reported it.

13  Q.  That was not my question.

14  A.  Sorry.  I was -- I thought you were asking me when he

15  should have reported.

16  Q.  No, no.  I was asking you in 2015, 2016, 2017 he would've

17  had nothing to report in there.  And you said he should have

18  reported it in 2018, correct?

19  A.  Correct.  If it occurred in 2018.

20  Q.  I'm sorry?

21  A.  If it occurred in 2018.

22  Q.  If I represent to you that the government's position is

23  that Dr. Tao took a job in 2018.  Okay.

24      And you testified previously about Dr. Tao's January 2018

25  conflict of interest form; is that right?

1  A.   I believe so.  I believe that was the one that was for the

2  2017 cycle that was submitted in January of 2018.

3  Q.   Sure.  Let's pull that up on the screen then, Ms. Kessler,

4  please.  That would be Exhibit 25.

5       Okay.  Yes.  That's the one.  Sorry, 25 I think.  Okay.

6       I'm sorry.  It might be 24 for the January 1st.  Apologies.

7  We'll get to 25 next.

8       Okay.  And so you can see here, this form is certified on

9  January 9, 2018, correct?

10  A.   Yes.

11  Q.   And I think you testified that ordinarily the certification

12  process would be the September time period, correct?

13  A.   Correct.

14  Q.   So Dr. Tao you intimated should have filled out this form

15  in September 2017.

16  A.   My assumption is based on our standard cycle of submitting

17  an annual in the fall, that because this is dated in January,

18  this was done after the standard cycle.

19  Q.   And you testified yesterday that KU doesn't submit grant

20  proposals to agencies requesting funding until the PI submits

21  his conflict of interest form, correct?

22  A.   That is correct.

23  Q.   And that's because it's important for your office, as you

24  just testified, to review conflict of interest forms before

25  submitting a grant proposal with all the required disclosures,

1    correct?

2    A.    Correct.

3    Q.    You testified KU takes this very seriously?

4    A.    Correct.

5    Q.    I'm showing you what's been marked as -- has already I

6    believe been marked as Government Exhibit 33.  Let me just

7    confirm that.

8              COURTROOM DEPUTY:  It hasn't been.

9              MR. DEARINGTON:  Has not?

10    BY MR. DEARINGTON:

11    Q.    So I'm going to show you what's been marked as Exhibit 33.

12    This one does not appear to be marked.

13              MR. OAKLEY:  Your Honor, I don't think the exhibit has

14    been admitted.

15              COURTROOM DEPUTY:  It hasn't.

16    BY MR. DEARINGTON:

17    Q.    Do you recognize that document, Ms. Reed?

18    A.    It looks like an application to the Department of Energy.

19              MR. OAKLEY:  Your Honor, I'm sorry, could we remove it

20    from the screen?

21              THE COURT:  Yes.  Don't publish it yet until it's

22    admitted.

23    BY MR. DEARINGTON:

24    Q.    And does this appear to be a proposal submitted to the

25    Department of Energy?

1    A.    It does.

2    Q.    Are you familiar with this proposal?

3    A.    I am not.  One of my staff would have prepared it, but I'm

4    familiar enough.

5    Q.    If you turn to page 2, do you see your name on it?

6    A.    Yes.  This would have been submitted through grants.gov.

7    You can tell that by the grants.gov tracking number so my staff

8    have my delegated authority to submit on my behalf.

9           MR. DEARINGTON:  Your Honor, I'd like to move into

10    evidence Exhibit -- Government Exhibit 33.

11           THE COURT:  Any objection?

12           MR. OAKLEY:  No, Your Honor.

13           THE COURT:  33 admitted.

14    BY MR. DEARINGTON:

15    Q.    You were the authorized representative for KU on this

16    proposal, correct?

17    A.    Correct.

18    Q.    Ms. Kessler, when you get a second, could you please scroll

19    to page 2 so we can see Ms. Reed's name on page 2 there.

20           Okay.  And that's your name where it says "person to be

21    contacted on matters involving this application"?

22    A.    Correct.

23    Q.    Okay.  And your office submitted this proposal to DOE?

24    A.    Correct.

25    Q.    And earlier you said that your office always checks

1    conflict of interest forms before submitting proposals because

2    it's very important?

3    A.    That is correct.

4    Q.    Could you please read for me the submission date on the

5    first page?

6    A.    It is dated 12/11 of 2017.

7    Q.    That would have fallen right between the time Dr. Tao

8    should have submitted a conflict of interest form, according to

9    your testimony, and when he actually did submit such a form?

10   A.    That is correct.

11   Q.    So Dr. Tao -- so was this a knowing and intentional policy

12   violation by you or your office?

13   A.    I would have to look at the notes around the proposal.  I'm

14   assuming that my staff would have talked with Dr. Tao about

15   this and Bob Szrot, but I don't know that.

16   Q.    Well, you testified that your office would review conflict

17   of interest forms as a matter of policy?

18   A.    Correct.

19   Q.    Before submitting a proposal?

20   A.    Correct.

21   Q.    So measuring this document against that standard, was that

22   an intentional policy violation, do you think, by your office?

23   A.    No, I do not believe so.

24   Q.    You're going to give them the benefit of the doubt?

25   A.    My office doesn't violate policies like this.  So I would

1    have to look at the surrounding facts to be able to answer

2    that.

3    Q.    I guess your testimony yesterday wasn't entirely correct

4    because you said we look at conflict of interest forms before

5    we submit proposals, and yet here is a proposal that was

6    submitted before a conflict of interest form was on file,

7    correct?

8    A.    But I don't -- I can't state that, no.

9    Q.    I'm not asking you to tell me the circumstances around

10    this.  I'm asking you to compare two dates and tell me which

11    one came earlier because you testified yesterday that your

12    office and you -- didn't say most of the time or sometimes, you

13    said your office looks at conflict of interest forms before

14    submitting proposals --

15    A.    They do.

16    Q.    -- to the agencies, but here they did not?

17    A.    I can't state that's accurate.

18    Q.    Are you aware of a conflict of interest form submitted by

19    Dr. Tao in September of 2017?

20    A.    Are you?  I don't -- I mean -- so the process that you're

21    looking at is the submitted form.  There could have been a

22    pending submission or something else.  I cannot state

23    unequivocally that there wasn't something in the system.  I

24    don't have that evidence.

25    Q.    I'm simply trying to confirm that you're not aware that

1   there was a conflict of interest form that was reviewed for

2   Dr. Tao before this proposal was submitted by your office?

3   A.   I have 100 percent confidence that my staff would have

4   followed policy.

5          THE COURT:  Mr. Dearington, I think this would

6   probably be a good time.  It's five until noon and we're going

7   to break until 1:00 -- let's make it 1:05 for lunch.  And I

8   think at that point, Ms. Reed, we'll have another witness that

9   will be taken out of order before we return to Ms. Reed's

10  testimony.  Let's take our lunch break now.  We'll reconvene at

11  1:05.

12         (Recess.)

13         (The following proceedings occurred outside the presence of

14  the jury.)

15         MR. OAKLEY:  Your Honor, could we bring up one matter

16  before the jury comes in?  We have an additional exhibit that

17  is an attachment.  We've marked it as Exhibit 221A.  I've shown

18  it to the defense and I have two copies for the Court, but it

19  wouldn't be included with what was previously submitted.

20         THE COURT:  Okay.  But it's 221 or 221A?

21         MR. OAKLEY:  221A being attached to 221.

22         THE COURT:  Okay.  So noted.

23         (The jury entered the courtroom, after which the following

24  proceedings were had.)

25         THE COURT:  You can be seated.  They're still going to

1    be working on this.  It's not working right.  Okay.  We'll

2    continue to work on that.  Maybe overnight or whatever.

3            Okay.  So we're going to take a witness out of

4    sequence now and then return to Ms. Reed later.  Correct?

5            MR. OAKLEY:  Yes, Your Honor.

6            THE COURT:  If you'll call your next witness.

7            MR. OAKLEY:  United States calls Dr. Laurence

8    Weatherley.

9                    DR. LAURENCE WEATHERLEY,

10   called as a witness on behalf of the government, having first

11   been duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. OAKLEY:

14   Q.   Good afternoon, sir.  Could you please state your name?

15   A.   Laurence Weatherley.

16   Q.   And would you mind spelling your first and last name for

17   the court reporter?

18   A.   L-A-U-R-E-N-C-E.  Weatherley, W-E-A-T-H-E-R-L-E-Y.

19   Q.   How are you employed?

20   A.   I'm a professor in chemical and petroleum engineering at

21   the University of Kansas.

22   Q.   And chemical and petroleum engineering, is that commonly

23   referred to as CP & E?

24   A.   It is indeed.

25   Q.   How long have you been a professor at KU?

1   A.   Just less than 18 years.

2   Q.   Were you a professor at any other universities prior to KU?

3   A.   Several.

4   Q.   And can you name those for us?

5   A.   I was professor at the University of Canterbury in

6   Christchurch, New Zealand, for six years.  I was a chaired

7   professor at the Queens University of Belfast in Northern

8   Ireland for five and a half years, and I was a senior lecturer

9   at Heriot-Watt University in Edinburgh, Scotland, for 13 years.

10  Q.   And I'm sorry, how long have you been at KU?

11  A.   17 and a half years.  I joined in September 2004.

12  Q.   Okay.  Before I talk to you about your role at KU and your

13  experience at KU, I want to talk a little bit about your

14  background.  As a college professor do you have any degrees?

15  A.   I have a bachelor of science in chemical engineering and I

16  have a doctor of philosophy degree in engineering.

17  Q.   You said that you've been a professor at KU for 17 and a

18  half years?

19  A.   Correct.

20  Q.   Have you always been a professor in CP & E?

21  A.   Yes.

22  Q.   Have you always -- what is your official title currently?

23  A.   It's just distinguished professor.

24  Q.   Have you -- are you familiar with a title called the

25  department chair at the University of Kansas?

1    A.    Indeed I am.

2    Q.    And how are you familiar with that position?

3    A.    Because I was -- because I was chair from September 2004

4    through to the end of June 2020.

5    Q.    From September 2004 to 2020?

6    A.    Correct.

7    Q.    Before I talk to you about the responsibilities of a chair,

8    I'd like to talk to you about the responsibilities of

9    professors at KU.  Are you familiar with the concept of a

10   40/40/20 split?

11   A.    Yes.

12   Q.    And what does that mean to you?

13   A.    That's a very good question.  It really is a -- is an

14   administrative breakdown of the employment of a professor's

15   time and effort between teaching, research, and service.  So

16   the 40 percent teaching, 40 percent research, 20 percent

17   service.

18   Q.    40 percent teaching, 40 percent research, 20 percent

19   service?

20   A.    That would be the normal allocation for any professor at

21   KU.  There are variations of that and several exceptions.

22   Q.    But the most typical split for a professor would be the

23   40/40/20 split?

24   A.    Yes, correct.

25   Q.    Let me talk to you about the roles of a department chair.

1    What does a department chair do?

2    A.    Well, the department chair has responsibility for -- really

3    for the leadership of the department, for providing strategic

4    direction, for planning the future of the department, which

5    direction we go in.  He's -- he or she is responsible for the

6    allocution of teaching duties specifically and also for annual

7    appraisal of the staff and the faculty.

8        Other than that, the chair would be responsible for

9    managing the departmental finances, also be responsible for

10    liaising with the dean's office, for making sure that student

11    issues are addressed, student questions, student complaints,

12    things like academic misconduct.  So quite wide-ranging in

13    fact.

14    Q.    So we discussed a little bit the 40/40/20 split that's

15    typical.  Would that be different for a chair?

16    A.    Yes, it would.  I think in my recollection in my case the

17    service part was 60 percent because I was chair.

18    Q.    So instead of the 20 percent service to the university, you

19    were expected to have a 60 percent service to the university?

20    A.    Yes, yes.

21    Q.    Do you know an individual by the name of Franklin Feng Tao?

22    A.    I do.

23    Q.    Do you see that person in the courtroom here today?

24    A.    I do.

25    Q.    Could you please identify that person, describe what he's

1    wearing and where he's seated?

2    A.    He's sitting over there and wearing a jacket, tie and

3    shirt.

4              MR. OAKLEY:    Your Honor, I'd ask the record to reflect

5    the witness has identified the defendant.

6              THE COURT:    The record will so reflect.

7    BY MR. OAKLEY:

8    Q.    How do you know Franklin Tao?

9    A.    Franklin was a colleague in the CP department from 2014.

10   Q.    2014?

11   A.    Yes.

12   Q.    At the time you would have been the chair of the

13   department?

14   A.    Well, it's slightly complicated because in the first

15   semester of the academic year '14-15 I was on university

16   sabbatical so I was out of the country and we had an acting

17   chair for the first semester for the fall 2014 semester.  But

18   when I got back from sabbatical in January '15, I retook my

19   position as chair.

20   Q.    So the defendant joined the university while you were on

21   sabbatical and you arrived shortly after he joined?

22   A.    Correct.

23   Q.    Arrived back?

24   A.    Correct.

25   Q.    And so other than that brief portion when you were on

1  sabbatical, had you always been -- you were the chair up until

2  2020, correct?

3  A.   Correct.

4  Q.   When the defendant -- at some point after the defendant

5  joined KU, did he have a split appointment in between CP & E

6  and another department?

7  A.   Yes.  He had a joint appointment with the Department of

8  Chemistry although chemical and petroleum was known as a lead

9  department.  It was slightly complicated because when Dr. Tao

10 was appointed in August 2014, he was with the chemical and

11 petroleum engineering exclusively until the chemical department

12 voted in the early part of the fall 2014 semester they would

13 have him as a 50 percent colleague.  But beyond that until I

14 think it was 2018 he was split appointment and in 2018 became

15 full-time in CPE.

16 Q.   Could we please pull up what's been admitted as Government

17 Exhibit 9.

18      I'm showing you what's been admitted into evidence as a

19 document with -- do you recognize that?

20 A.   Yes.

21 Q.   And is that a tenured faculty offer details for defendant

22 Franklin Tao?

23 A.   Yes.

24 Q.   And it has the start date of August 18, 2014, as associate

25 professor and FTE 1.0, correct?

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3

1    A.    Correct.

2    Q.    And you said shortly after that defendant had a split

3    appointment between chemistry and CP & E?

4    A.    Correct.

5    Q.    Was he always a full-time employee?

6    A.    Yes.

7    Q.    Could we please pull up Government's Exhibit 11.

8         Does this document show the split halftime or .5 FTE of CP

9    & E and halftime of chemistry?

10   A.    Yes.

11   Q.    And half plus half means he was a full-time employee?

12   A.    Yes.

13   Q.    You said part of the responsibilities of a chair is to

14   perform performance evaluations for the other professors in the

15   department?

16   A.    Yes.

17   Q.    I want to hand you what's been marked as Government's

18   Exhibit 26 and ask you if you recognize that document.

19   A.    Yes, I recognize it.

20   Q.    And what do you recognize it as?

21   A.    It's the summary letter of performance evaluation for

22   Dr. Tao for the year of 2015.

23        MR. OAKLEY:  Your Honor, I would offer -- may I see

24   that again -- Government's Exhibit 26 into evidence.

25        THE COURT:  All right.  Any objection?

1          MR. DEARINGTON:  Objection, Your Honor, relevance.

2          THE COURT:  You object?

3          MR. DEARINGTON:  401 please, Your Honor.

4          THE COURT:  What is the relevance?

5          MR. OAKLEY:  I'm sorry?

6          THE COURT:  Relevance.

7          MR. OAKLEY:  The defendant's service to the university

8     is relevant in this case particularly as it relates to his

9     performance and the teaching aspect.

10         THE COURT:  Does it at all speak to the research?

11         MR. OAKLEY:  I believe it discusses both, Your Honor.

12         THE COURT:  All right.  I'll overrule.

13         Exhibit 26 admitted.

14    BY MR. OAKLEY:

15    Q.  You said that this is the defendant's performance

16    evaluation for 2015?

17    A.  Yes.

18    Q.  When conducting evaluations of another -- of professors in

19    the department, we talked about the 40 percent, 40 percent,

20    20 percent split.  Are you evaluating all three components, the

21    research component, the teaching component, and the service to

22    the university component?

23    A.  Yes.

24    Q.  And so do these performance evaluations contain information

25    about all three?  The teaching, the research, and the service?

1    A.    Correct.

2    Q.    And so if I could direct your attention to the first

3    paragraph, Particular Areas of Achievement, Strength, Special

4    Awards or Items of Significance.  And in this particular

5    performance evaluation for 2015 you note that the defendant has

6    maintained an excellent record of publication, external grants,

7    and Ph.D. students and making good progress in completing the

8    transition of your research into the CEBC?

9    A.    Yes.

10   Q.    That would be related to the research part of the job; is

11   that fair?

12   A.    Yes.

13   Q.    Next paragraph, Areas Noted For Improvement.  For this

14   particular year you identify the challenges you experienced

15   with the teaching of physical chemistry in the spring of 2015

16   are noted and you are working with the chair of chemistry to

17   address the issues which were raised during that course.

18        Is that an example of the 40 percent teaching requirement?

19   A.    Yes.

20   Q.    I'm next going to hand you what's been marked as

21   Government's Exhibit 27.  Do you recognize that document?

22   A.    Yes.

23   Q.    What is that document?

24   A.    It's the performance evaluation summary of 2016.

25             MR. OAKLEY:  Your Honor, I would offer Government's

1    Exhibit 27.

2              MR. DEARINGTON:  Same objection, Your Honor, for the

3    record.

4              THE COURT:  All right.  I'll admit it over the

5    objection.  Exhibit 27.

6    BY MR. OAKLEY:

7    Q.   And so just as -- excuse me -- the previous evaluation you

8    discuss particular areas of strength and things that need to be

9    worked on.  Did you conduct a similar type of evaluation for

10   2016?

11   A.   Yes.

12   Q.   And one of the things that you noted in the 2016 evaluation

13   was under Areas Noted For Improvement, you need to continue to

14   pay attention to participating in undergraduate advising and

15   other departmental service in CP & E.  This is an important

16   duty and expectation?

17   A.   Yes.

18   Q.   Would that be part of both the service and the teaching

19   component or would it be primarily one or the other?

20   A.   So technically the undergraduate advising, if I understand

21   the policy correctly, is part of teaching.  The other

22   component, departmental service, would be doing --

23   participating in the faculty meetings, the various committees,

24   helping to maybe show prospective students around, generally

25   doing what all the faculty are expected to do.  It's a

1    relatively minor task, but it basically -- it's an expectation
2    that colleagues actually work together to do the essential --
3    things like being part of the research student recruitment
4    committee, being part of the undergraduate curriculum
5    committee, just being involved in the growth of the department.
6    Q.   And that's -- that all you've described is included in the
7    20 percent service component?
8    A.   That's included in the service, yes.
9    Q.   You mentioned that the undergraduate advising would
10   typically fall under the 40 percent teaching component?
11   A.   Yes.  It's a little bit of a gray area to be honest.
12   Q.   What does undergraduate advising mean from the standpoint
13   of a university professor?
14   A.   So every professor in the department is allocated a certain
15   number of students, named students, typically can be anything
16   from a dozen through maybe 30 students.  And at a minimum the
17   faculty member is expected to meet with those students usually
18   about midway through the fall semester and midway through the
19   spring semester to discuss with each student the proposed
20   program of study for the following semester.  So typically --
21   we're actually in advising right now.
22       So typically the professor would make appointments with
23   each student.  They might spend ten minutes with them, they
24   might spend an hour with them discussing the courses which
25   they're going to take, the core courses and the electives for

1    the fall semester.  In this case it would be the fall 2022

2    semester.

3    Q.   That's something as a professor that you're responsible

4    for?

5    A.   Yes.  And they would sign off on -- once they had agreed

6    with the student, then the faculty member would actually sign

7    off that they were the courses which had been agreed with the

8    student.  And it would involve making sure the students had the

9    correct prerequisite for the courses.  Maybe provide advice in

10   taking electives but you're in line with the student's

11   interest.  It's a very valuable part of what the faculty are

12   expected to do.

13   Q.   When you say it's valuable, valuable to whom?

14   A.   Well, it's a two-way street but valuable to the students

15   particularly.

16   Q.   The students who are paying tuition to attend the

17   university?

18   A.   Yes.

19   Q.   Is that an expectation they have?

20   A.   Absolutely.

21   Q.   I'm going to hand you next what's been marked as

22   Government's Exhibit 28.  Do you recognize that document?

23   A.   Yes.

24   Q.   What is that document?

25   A.   It's a faculty evaluation for Dr. Tao for the calendar year

```
 1    2017.
 2              MR. OAKLEY:  Your Honor, I offer Government's
 3    Exhibit 28.
 4              THE COURT:  I'll note the continuing objection to
 5    these performance evaluations and admit Exhibit 28 over
 6    objection.
 7    BY MR. OAKLEY:
 8    Q.   So in 2017 -- well, let me direct your attention to the top
 9    part where it says Dr. Tao, Chemical and Petroleum Engineering,
10    January 25, 2018.  The date that's on these documents, what
11    does that signify?  Is that the date it's prepared or is it
12    another date?
13    A.   That's the date it was prepared.
14    Q.   And so could we scroll to the bottom.  There's a signature.
15    Do you recognize -- well, there's two signatures.  Do you
16    recognize the top signature?
17    A.   Yes.
18    Q.   Whose signature is that?
19    A.   The top signature is my own signature, Laurence Weatherley.
20    Q.   Do you recognize the signature that appears below your
21    signature?
22    A.   Yes.
23    Q.   Whose signature is that?
24    A.   It's Dr. Tao's.
25    Q.   And there's a date on that signature of January 26, 2018.
```

1    Do you know, what does that date correspond with?

2    A.    That's a good question.  I think it was the date that was

3    signed.

4    Q.    And below that there's a distribution of effort and it

5    says, teaching 40 percent, research 40 percent, and service

6    20 percent and it relates to what we've been discussing as far

7    as the responsibilities of a typical professor?

8    A.    Yes.

9    Q.    So Dr. Tao had that typical 40/40/20 split?

10   A.    Yes.

11   Q.    Let me direct your attention to the top part of this

12   evaluation in 2017 and the first area, Particular Areas of

13   Noted Strength, Special Awards, or Items of Significance, and

14   you state, your research productivity continues at an

15   outstanding level with 17 journal papers published in 2017 with

16   a further six under review or pending publications.  Your

17   recent selection as a Fellow of the American Association for

18   the Advancement of Science is further acknowledgement of your

19   impressive research standing in the science community.

20       In 2017 you were also appointed as editor of the Journal of

21   Applied Surface Science, which is a leading Elsevier journal.

22   I probably mispronounced that.

23   A.    Elsevier.

24   Q.    You were also invited as a visiting professor at Nagoya

25   University in Japan.  You taught the C & PE 721 graduate core

1   class in thermodynamics in fall of 2017 with good evaluations

2   and your teaching record in C & PE remains solid.

3       So in the first part you discuss Dr. Tao's research; is

4   that a fair statement?

5   A.   Correct.

6   Q.   And then in Areas Noted For Further Development, your

7   research record continues at a very high level and you're

8   encouraged to maintain your focus on funding graduate students

9   and high quality research outputs.  And so then you again

10  acknowledge the research component of Dr. Tao?

11  A.   Sorry, could you repeat the question?

12  Q.   You again acknowledge the research part of the 40/40/20?

13  A.   Indeed.

14  Q.   And directing your attention to the Particular Goals or

15  Objectives Recommended For Next Year and you discuss that

16  Dr. Tao is slatted to teach the junior level undergraduate

17  class.  You are encouraged to engage with Dr. Scurto who has

18  had extensive experience of this course.  And you might also

19  consider engaging with the KU Center for Teaching Excellence

20  who may provide further advice on teaching a large core class.

21      We also discussed your path towards future promotion to

22  full professor, and it was agreed that informal advice on the

23  best approach be sought from both your mentor and also from

24  other senior colleagues.

25      Let me talk to you a little bit about this evaluation.

1    Throughout these evaluations, did you determine that Dr. Tao

2    was stronger in one aspect than the other as it relates to the

3    40/40/20 split?

4    A.    Well, indeed I think his research record speaks for itself.

5    He was very, very strong in research.

6    Q.    Was he lacking in any of the 40/40/20 split?

7    A.    Sorry?

8    Q.    Was he lacking in any of the 40/40/20 split?

9    A.    Well, like many faculty he had some issues with teaching,

10   not at the graduate level but at the undergraduate level in

11   chemistry, and I think later on there was a need for further

12   development there in terms of getting to grips with the

13   teaching.   It was a challenge.

14   Q.    Some of the information that you provide here such as

15   engaging with Dr. Scurto or also consider engaging with the KU

16   Center for Teaching Excellence, were those ideas so Dr. Tao

17   could improve the teaching side of his 40/40/20 split?

18   A.    Really I guess that column is made in the context of the

19   teaching of the process thermodynamics which is recognized as

20   one of the more difficult and challenging courses both for the

21   students and the professor who teaches it.

22        So I think when this was written, he hadn't actually taught

23   the course.   He was what we call a new prep.   So the advice

24   stated here was to anticipate that it would need quite a lot of

25   work to be able to deliver that course to a high standard.   And

1    it was really in a mentoring supportive role that those

2    comments were written.

3    Q.    Does KU have resources available to professors that want to

4    get better in the teaching component side?

5    A.    Oh, they have a lot of resources.  Centers for Teaching

6    Excellence is actually referred to in paragraph three is

7    specifically designed for that purpose.  We also have a culture

8    in the department to -- we have a mentoring scheme so that the

9    more senior faculty, more experienced faculty can provide help

10   and advice to the faculty who are newly into the department or

11   indeed are preparing a new course which they've not taught

12   before.

13   Q.    And did any of them more -- were any of the more advanced

14   faculty ever assigned to assist Dr. Tao in the department?

15   A.    Well, Dr. Tao had Dr. Subramaniam as his mentor.

16   Dr. Subramaniam is an experienced professor.  That would be a

17   relationship between Dr. Tao and Dr. Subramaniam where I have

18   no doubt teaching would have been talked about at their

19   meetings.  He was advised to consult with Dr. Scurto to get

20   advice and help in terms of putting the course together.

21   Q.    Dr. Subramaniam, is that Dr. Bala Subramaniam?

22   A.    Yes, it is indeed.

23   Q.    And then you also mention discussion about future promotion

24   to full professor.  During your experience with Dr. Tao did you

25   discuss what he could do to advance at KU?

1  A.  Absolutely.  We had a number of discussions and I think

2  also the chair of chemistry jointly we had a number of

3  discussions about this with Dr. Tao, and we basically

4  emphasized to him that to get promoted to full professor, you

5  still needed to have a good, solid, reliable teaching record.

6  So we weren't expecting outstanding excellence, but you needed

7  a solid outstanding teaching record and that was as important

8  as the research component.

9  Q.  And you said that you provided this information to Dr. Tao

10 as the chair of C & PE?

11 A.  Yes.

12 Q.  And you also mentioned that the chair of chemistry provided

13 that information?

14 A.  Yes.

15 Q.  Do you know who the chair of the chemistry department was

16 at the time?

17 A.  That was Dr. Brian Laird.

18 Q.  Next I want to hand you what's been marked as Government's

19 Exhibit 29.  Do you recognize that document?

20 A.  Yes.

21 Q.  And what is that document?

22 A.  It's the teaching -- it's the faculty evaluation for

23 Dr. Tao for calendar year 2018.

24      MR. OAKLEY:  Your Honor, I offer Government's

25 Exhibit 29.

1          THE COURT:  I'll admit over the relevance objection.

2     BY MR. OAKLEY:

3     Q.   When you're preparing these evaluations, do you meet with

4     the faculty member who you are evaluating?

5     A.   Yes.

6     Q.   And describe how that typically occurs.

7     A.   Usually early in January I would have asked the department

8     administrator to schedule one-hour meetings with me as chair

9     over the following six to eight weeks, probably six weeks

10    because the university had -- the dean had a deadline of early

11    March for getting all these letters submitted by early March.

12    So I started the process soon after we started back in January.

13    And then those meetings would be scattered over a period of

14    four to five weeks, four to six weeks, and the faculty would

15    come in and we'd sit down basically and chat around each of the

16    areas, teaching, research, and service.

17         Prior to that the faculty member would submit a portfolio

18    or a summary of what they had done in the year listing their

19    papers, listing their teaching duties, number of students,

20    results of teaching evaluations, which I would be able to

21    review with them at the interview.

22    Q.   And you said that you usually scheduled an hour.  Did you

23    try and do in-person meetings?

24    A.   They were virtually all in-person meetings except if

25    somebody was traveling and it wasn't possible, I might -- I

1    think very, very rarely I might have done it over the

2    telephone, but I could only recall one case of that.

3    Q.   Okay.  Were you department chair during the COVID pandemic?

4    A.   I was department chair during the spring of 2020, so just

5    at the tail end of my tenure as chair the COVID came in.

6    Q.   Would that have affected the ability to do in-person

7    evaluations, if you recall?

8    A.   I think we went remote about mid March 2020 and I would

9    have had all the evaluations done by then.

10   Q.   Okay.  And so while you were chair, you did your best to do

11   in-person meetings?

12   A.   Yes.

13   Q.   Directing your attention to Government's Exhibit 29, and

14   you said that this is dated February 25th of 2019.  And that

15   corresponds with the date that you prepared it?

16   A.   Yes.

17   Q.   Would that correspond necessarily with the date that you

18   had the meeting with the professor?

19   A.   Not necessarily.

20   Q.   Then I want to direct your attention to the top part,

21   Particular Areas of Noted Strength, Special Awards, or Items of

22   Significance.  And you mention in 2018 you were welcomed as a

23   full-time faculty in C & PE.  Your research productivity

24   continues at an outstanding level with 20 journal papers

25   published in 2018 and numerous presentations.  Your recorded

1    research expenditures in 2018 amounted to 543K -- is that

2    $543,000?

3    A.    Yes, yes.

4    Q.    -- which is the second highest in the whole department.

5         And so you discuss in that first part the research

6    component?

7    A.    Yes.

8    Q.    And then the second part is the Areas Noted For Further

9    Development.  And in it you say that your research record

10   continues at a very high level and you are encouraged to

11   maintain your focus on funding graduate students and high

12   quality research outputs.  Your external visibility in the

13   science community should continue over the coming year as you

14   plan to apply for promotion in the near future.

15        Based upon the statement about plan to provide -- excuse

16   me, plan to apply for promotion, is that based on a

17   conversation that you had with Dr. Tao or something else?

18   A.    It would be based on a conversation.

19   Q.    And then you discuss other activity.  And then the next

20   section, Particular Goals or Objectives Recommended for Next

21   Year and you discuss the teaching responsibilities.  And then

22   the Summary Statement, your stellar research record has

23   continued apace in 2018 and you're strongly encouraged to

24   continue with this but with development of your teaching

25   portfolio as a high priority?

1    A.    Yes.

2    Q.    Is that further acknowledgment that Dr. Tao excelled in

3    research?

4    A.    Yes.

5    Q.    Where were his issues as far as you were concerned with the

6    40/40/20 split?

7    A.    More on the teaching and to some extent on the service,

8    internal service side.

9    Q.    When you say -- what concerns did you have with -- on the

10   teaching component?

11   A.    Well, the way in which the teaching is evaluated is really

12   twofold.  One is the student feedback forms which come in at

13   the end of every semester.  So for the -- for example, the C &

14   P 512, at the end of that course the student would be issued

15   with a questionnaire either electronic or on paper and they

16   would provide an evaluation of their experience of that

17   professor for that course.  And there's about 13 or 14

18   questions which the student would answer, have opportunity to

19   make comments.  That was one metric.

20        The other metric, we would have a mentor of another

21   department to sit in on one of the professor's lectures just to

22   see how it was going, and this was mostly a supportive

23   instrument to provide positive, supportive feedback to the

24   professor so they could actually develop their teaching and

25   improve it.

1    Q.   On the service component, you said that was an issue.  Can

2    you describe what concerns you had as it related to the service

3    component?

4    A.   So we're a very collegial department so colleagues -- we

5    work very much as a team, and the process for promotion as in

6    most universities it's basically peer review.  So for promotion

7    from associate professor to full professor, and I hope this

8    is -- hopefully the relevance of this will become clear in a

9    second.  The record is reviewed by the full professors of the

10   department.

11        So in other words, you're being reviewed by your

12   colleagues, so it is important to show -- one of the things we

13   pointed out was to show the importance of participating in

14   developmental committee activities so you're a member of the

15   team.  If you're nowhere to be seen or if you're away for long

16   periods or don't show up, then that sends out negative signals.

17   So that was one of the areas -- it was just a piece of advice.

18   You know these guys are going to vote on you, so be nice to

19   them basically and show willing -- I'm sorry.

20   Q.   Go ahead.  I interrupted you.

21   A.   It would be advice that we would give to any colleague.

22   Q.   Did you give that advice to Dr. Tao?

23   A.   Yes.

24   Q.   You said earlier that advancement was important to Dr. Tao

25   based on your conversations with him?

1  A.  Yes.

2  Q.  Did you express to him in your opinion what he needed to do

3  in order to advance?

4  A.  Yes.

5  Q.  What did you tell him?

6  A.  Both myself and his mentor basically said research, no

7  problem.  You know, you have an outstanding record,

8  internationally recognized.  Teaching, continue to develop it.

9  You need to show a bit more of a track record, satisfactory

10  track record.  And likewise with the service, internal

11  service -- external service, no problem.  He had the editorship

12  of that journal.  That's a lot of credit.  Internal service,

13  you know, keep at it basically.  Those were the things that

14  needed to be done in order to get a good, strong case for

15  promotion.

16  Q.  You mentioned that the research component as it relates to

17  Dr. Tao was strong, and you mentioned that he had a good

18  reputation internationally.  Part of the reputation that a

19  professor has as it relates in the research, is it the amount

20  of -- would the amount of federal grants that one obtains help

21  improve one's reputation in the field?

22  A.  Sure, absolutely.  So the criteria that we use are strong

23  research activity as evidenced by obtaining competitive

24  external peer-reviewed grants, by publications in the

25  international research literature, and also graduation of Ph.D.

1    students.  So they were the three main criteria that our

2    committee would look at for promotion.  We would also obtain

3    external letters from up to six external experts in the field

4    to also accredit the vitae and the reputation of the candidate.

5    Q.   So obtaining grants helps a professor enhance his or her

6    reputation in the field?

7    A.   Yes.  Because at the end of the day, you need to find

8    funding for your Ph.D. students who are your post-docs who

9    actually perform the research because the university doesn't

10   provide a lot of funding for that internally.  You have to go

11   out and get it.  That's why there's a driving force to get

12   dollars, so you can employ people to do the research.

13   Q.   Is it your understanding that those dollars are highly

14   competitive?

15   A.   Highly competitive.

16   Q.   I want to talk to you about something referred to as a

17   course buyout.  Are you familiar with what a course buyout is

18   as it relates to college professors and specifically professors

19   at KU?

20   A.   Yes, I am.

21   Q.   Can you explain for the jury, summarize what a course

22   buyout is?

23   A.   So in the department for many years we have a process

24   whereby a colleague who has external dollars, they can actually

25   buy out some of their teaching.  So typically -- if a colleague

1    came to me and said I would like to buy out a course and I want

2    to teach in the -- that I'm down to teach in the spring, I

3    could say -- it would be discussed with the faculty as part of

4    our process for allocating teaching duties and it would be

5    given approval or not.

6         And in order to make that happen, the colleague would have

7    to arrange for dollars to be transferred from their whatever

8    accounts they had to the department in order for us to cover

9    the teaching either with a temporary lecturer or to absorb it

10   within the faculty team who weren't buying out.  The formula we

11   use was 13 and a half percent of the nine-month salary of the

12   faculty which would be paid to the department.  The payment of

13   that would be arranged with the -- mostly with the Office of

14   Research and with our financial accountant in the shared

15   service center.

16   Q.  So the professor that has -- let me back up.  Typically,

17   what is the teaching load for a professor in your department

18   each semester?

19   A.  Well, it varies.  So in the chemical engineering program,

20   typically if you take the number of courses taught and divide

21   that by the number of professors, obviously depends on the

22   number of professors at any point in time, but it's typically

23   between two and three over certainly the 18 years that I was

24   chair -- 16 years I was chair, and it varied between two and

25   three.  In the petroleum engineering program we have a lot less

1    faculty.  We only had about four or five faculty total in that

2    program, the number was high, typically between three and four

3    courses per year.

4    Q.   But it would vary?

5    A.   It would vary, yes.

6    Q.   Let me talk to you about the 2019 -- fall of 2018, spring

7    of 2019.  Do you remember what a typical course load would be

8    for a professor in the CPE department?

9    A.   Not offhand.  For that semester it would probably be

10   between 1.3 and 1.5.

11   Q.   Back to the buyouts.  So a buyout is an opportunity, if

12   approved, for a professor to not have to teach a particular

13   course?

14   A.   Correct.

15   Q.   Now, does that mean that, if approved, the professor who

16   received the buyout is free to do whatever he or she wants?

17   A.   No.

18   Q.   Explain that.

19   A.   It just relieves the professor from teaching that

20   particular course.  They're still expected -- so, for example,

21   if they were allocated two courses for a semester, they bought

22   out one, they would still have to teach the other one.  And

23   also they would be expected to do their service, their advising

24   particularly and other activities connected to the department

25   in terms of service.

1    Q.   You mention a part of the teaching component is not just

2    teaching the class but also being available to meet with

3    students in an advisory capacity?

4    A.   Correct.

5    Q.   Does a course buyout relieve a professor of that obligation

6    to meet with students?

7    A.   No, it does not.

8    Q.   I want to hand you what's been marked as Government's

9    Exhibit 6.  Do you recognize that document?

10   A.   I do.

11   Q.   And what is that document?

12   A.   It's a Summary of Teaching Release and Buyout Policy for

13   the department.  This actually is an old document dated back to

14   2005.  It's based on an earlier draft of the policy that was

15   first developed in 1994.  Basically this is -- this basically

16   spells out the ground rules for allocation of effort.

17   Teaching, research, and service, which we've already discussed,

18   is on the front page and then the buyout policy.

19       The way -- this was a document that I -- this was a policy

20   that I inherited and I actually tweaked some changes to it in

21   terms of the way we ran it so when we got a request for a

22   buyout, that request would appear in the draft teaching

23   allocation which I presented to the faculty usually at about --

24   towards the end of the fall semester for the following academic

25   year.

1       So, for example, if you're talking about 2018-2019, I would

2   have started the discussion of buyouts in the fall of 2017.

3   And then we iterate the teaching duties maybe up to eight or

4   nine times before we finalize it in the May of the year --

5   towards the end of the academic year so we had the teaching

6   duties all finalized ready for the start of the fall semester.

7   Q.   I want to -- I have some questions for you on that.   But

8   before I do, I want to offer the Government's Exhibit into

9   evidence.

10           MR. OAKLEY:   Your Honor, I move to admit Government's

11  Exhibit -- excuse me -- Government's Exhibit 6.

12           THE COURT:   Any objection?

13           MR. DEARINGTON:   No objection, Your Honor.

14           THE COURT:   Exhibit 6 admitted.

15  BY MR. OAKLEY:

16  Q.   And so you mentioned that the -- that that policy, is it

17  specific to the department, to CP & E?

18  A.   Absolutely.

19  Q.   Is it your understanding that other departments may have

20  had other policies related to buyouts?

21  A.   I believe they have different policies actually to buyouts.

22  They have different -- some of them have different percentages

23  of the dollars required to buy out.

24  Q.   And you mentioned that the policy recognizes the 40/40/20

25  split?

1    A.    Yes.

2    Q.    You also mentioned that the way that you would handle it is

3    in the fall you wanted to know who might be interested in a

4    buyout?

5    A.    Yes.

6    Q.    And what was the purpose for that?

7    A.    So that we could build that into the planning process for

8    teaching of the following year.  So either we could allocate a

9    faculty member to the courses being bought out or we could hire

10    or appoint an instructor to make up for the shortfall.

11    Q.    As chair was it your responsibility to make sure that the

12    classes that needed to be taught were covered?

13    A.    Absolutely.  That was one of the primary responsibilities.

14    Q.    The -- so when a professor buys out a course, you indicated

15    it only relieves the teaching responsibility -- the classroom

16    responsibility for that course that's bought out; is that

17    correct?

18    A.    Correct, correct.

19    Q.    Now, the university still has to find someone to teach that

20    course; is that true?

21    A.    The department does, yes.

22    Q.    The department does?

23    A.    Yeah.

24    Q.    And whoever the department would find to teach that class,

25    are they earning a salary from the university for teaching that

1    class?

2    A.    Absolutely, yes.

3    Q.    And so is part of the course buyout process obtaining a

4    source of funds that the department can use for the salary of

5    whoever ends up teaching the bought out course?

6    A.    So if it was a regular faculty member who was appointed to

7    teach the extra course, they wouldn't be paid any extra.  Okay?

8    If we had an instructor from outside, if we went out and

9    advertised, then, yes, of course we would use the dollars to

10    help fund that.

11    Q.    In order to have a course buyout, does the professor that

12    wants the buyout have to have sources available to be used to

13    fund that salary?

14    A.    Indeed.  Yeah.  If you don't have any money, then they

15    can't buy out.

16    Q.    And so typically where does that funding come from?

17    A.    It would typically come from research overheads.  It may

18    come from endowment if they have an endowment account.  It

19    would not come from the department normally.

20    Q.    If someone had a federal grant, for instance, that would

21    allow salary to be used as salary, could that be a source of

22    funding for a course buyout?

23    A.    Yes.

24    Q.    I want to hand you what's been marked as Government's

25    Exhibit 145.  Do you recognize that document?

1    A.   I do.

2    Q.   What is that document?

3    A.   It's a request for a four-month no-payment leave -- leave

4    without pay.

5    Q.   Was that document -- excuse me.  Was that request sent via

6    e-mail to you?

7    A.   Yes.

8            MR. OAKLEY:  Your Honor, I offer 145.

9            MR. DEARINGTON:  No objection, Your Honor.

10           THE COURT:  145 admitted.

11   BY MR. OAKLEY:

12   Q.   You recognize this as an e-mail.  Directing your attention

13   to the from, do you know who this e-mail is from?

14   A.   Sorry.  Chris Brown did you say?  Sorry?

15   Q.   I'm sorry.  The from, on the top portion.

16   A.   Dr. Tao.

17   Q.   And who is it to?

18   A.   Me.

19   Q.   And then was Chris Brown cc'd?

20   A.   Looks like it, yes.

21   Q.   And do you know who Chris Brown is?

22   A.   Yes.

23   Q.   Who is Chris Brown?

24   A.   He was the vice provost for faculty development at KU.

25   Q.   It appears there's an attachment that refers to a letter to

1  apply a no-payment leave.  I'm going to hand you what's been

2  marked as Government's Exhibit 146.  Do you recognize that as

3  an attachment to that e-mail?

4  A.   Yes.  Yes, I do.

5          MR. OAKLEY:  Your Honor, I offer Government's

6  Exhibit 146.

7          THE COURT:  Any objection?

8          MR. DEARINGTON:  No objection.

9          THE COURT:  146 admitted.

10  BY MR. OAKLEY:

11  Q.   I want to direct your attention to the content of the

12  e-mail that the defendant sent to you.  It says, Dear Laurence,

13  good morning.  The attached is my letter to apply a four-month

14  no-payment leave.  Invitation letter of collaboration was

15  attached as well.  I would be most grateful if you could

16  process it at your earliest convenience.

17          Do you know what a no-payment leave is?

18  A.   I do in principal.  In my experience I don't think I ever

19  experienced anybody applying for no-payment leave in my time as

20  chair.

21  Q.   So what's your understanding of no-payment leave?

22  A.   What I understand is KU has a policy on it.  I understand

23  that a person can apply for no-payment leave.  It might be for

24  some sort of domestic crisis that they may need to take time

25  out and so the university under certain circumstances may agree

1    to that, which means the person does not have to be present and

2    that they can do whatever they have applied to do.  And then at

3    the end of the period they can come back onto the payroll and

4    be reinstated in their position.

5    Q.    And that's different from a course buyout?

6    A.    Most definitely.

7    Q.    Let me direct your attention to 146, that was one of the

8    letters that was attached.  Do you recognize the letterhead at

9    the top?

10    A.    Yes.

11    Q.    Does it appear it was on KU letterhead?

12    A.    Yes.

13    Q.    And it's addressed to you?

14    A.    Yes.

15    Q.    And you recognize the signature at the bottom?

16    A.    Yes.

17    Q.    And this letter is dated April 30th of 2018?

18    A.    Yes.

19    Q.    Whose signature is at the bottom?

20    A.    Dr. Tao's.

21    Q.    Let me direct your attention to the content of that letter.

22    In the second paragraph, I am writing to you to request a

23    no-payment leave of four months, January 22nd to May 31, 2018,

24    in the academic year August 2018-2019 for development of

25    overseas collaboration.

1       And then the last sentence of that, I will only take

2   five-month basic salary as I will voluntarily take four-month

3   no-payment leave and will take zero-month of summer salary.

4   And then it discusses having these collaborations will increase

5   my exposure to international academic community and the

6   benefits to my future work in in situ/operando studies.  And

7   I'm sure I butchered that.

8       So that's the letter that was attached to the -- that was

9   one of the letters that was attached to the e-mail?

10  A.   Yeah.

11  Q.   Could we go back to 145, please.  And there's a second

12  attachment to that e-mail; is that correct?  Directing your

13  attention to the attachment line, did it appear that Dr. Tao

14  sent two attachments to you through that e-mail?

15  A.   Yes.

16  Q.   I've handed you what's been marked as Government's

17  Exhibit 147.  Do you recognize that?

18  A.   Yes.

19  Q.   What is that?

20  A.   It's an invitation to Dr. Tao from the Fritz-Haber

21  Institute to spend some time there or to conduct -- to develop

22  some collaboration.

23  Q.   And that's the second attachment to that e-mail the doctor

24  sent to you seeking a no-payment leave?

25  A.   I believe so.

1                MR. OAKLEY:  Your Honor, I offer Government's

2     Exhibit 147.

3                THE COURT:  Any objection?

4                MR. DEARINGTON:  No objection.

5                THE COURT:  Exhibit 147 admitted.

6     BY MR. OAKLEY:

7     Q.   And so in the letter that Dr. Tao prepared, he mentioned

8     international collaboration to you.  Are you familiar with the

9     Fritz-Haber Institute?

10    A.   Not personally.  I'm aware of Max Planck Institute, but I

11    don't know what they do.

12    Q.   Max Planck Institute is in Germany?

13    A.   I believe so, yes.

14    Q.   In fact, directing your attention to the -- well, let me

15    ask you, there's a signature on that and below the signature

16    there's writing that says Professor Robert Schloegl.  Do you

17    know Dr. Schloegl?

18    A.   No.

19    Q.   Directing your attention to the content of the letter where

20    it says, Dr. Franklin, I'm writing to offer you the opportunity

21    of collaboratively developing method of in situ studies of

22    catalysis.  The tentative timeline of this collaboration in my

23    group at the Fritz-Haber Institute of the Max Planck Society in

24    Berlin, Germany, on this topic is Spring and Summer 2019; is

25    that correct?

1    A.    Yes.

2    Q.    So was it your understanding that the defendant was seeking

3    no-payment leave so that he could travel to Germany?

4    A.    Yes.

5    Q.    Did you ever have a conversation with the defendant about

6    his idea to take no-payment leave?

7    A.    So in -- so I responded to the request, as I remember,

8    orally by having a meeting with Dr. Tao.  In fact, I think more

9    than one meeting.  And I also consulted his mentor because I

10   think his mentor was aware of the invitation and the proposal

11   and we discussed it and we suggested to Dr. Tao that it would

12   not be in his interest to take time during the semester because

13   he should focus also on his teaching and advising in order to

14   get promoted, that was a key part of his promotion package that

15   we were hoping he could put together.

16        And so we suggested that either he visit the institute over

17   the summer, over the summer period when there aren't many

18   teaching responsibilities or to apply for university sabbatical

19   so he could take up to a whole year or at least a semester

20   whereby he would be able to spend time, you know, according to

21   university policy, on sabbatical.  And they were options we put

22   to him rather than taking unpaid leave during the semester.

23   Q.    So let me break that down a little bit.  You said that you

24   had a discussion about the no-payment leave when you said that

25   it was not a good idea if Dr. Tao wanted to advance?

1    A.    That was our advice.

2    Q.    You mentioned he could take the trip for the

3    collaboration -- and let me just back up.  When you were

4    discussing the collaboration, who did you believe he was

5    wanting to collaborate with?

6    A.    The Max Planck Institute in Germany.

7    Q.    So when you were discussing this proposed collaboration

8    with the Max Planck Institute in Germany, you said that you

9    discussed with him the option of doing it in the summer?

10   A.    Yes.

11   Q.    And explain how that would have been possible for a

12   professor at KU to collaborate with another university in a

13   foreign country in the summer?

14   A.    Well, it's quite -- it's quite -- it's quite a regular

15   thing for faculty to do, to have international collaborations.

16   So he might have gone over there to take measurements, to use

17   instruments, to give seminars to other scientists.  That's the

18   nature of that kind of collaboration I would have thought

19   anyway.  And so to do that over the summer would have been --

20   would have been quite normal.

21   Q.    You also mentioned the concept of a sabbatical?

22   A.    Yes.

23   Q.    Discuss for the jury what a sabbatical is.

24   A.    So after seven years of service the professor is entitled

25   to apply for up to one year where they can conduct scholarly

1    work.  They have to write a proposal saying what they're going

2    to do for the semester or for the entire year.  That goes

3    before a departmental committee who would approve or disapprove

4    it and it will then go to a School of Engineering sabbatical

5    leave committee who will likewise review it and it will be

6    passed on to university sabbatical leave committee who would

7    approve it or disapprove it.

8        If it's approved, then the faculty member is entitled to

9    that time out of the department entirely to travel.  They can

10   work at home here, this is pre-COVID, perhaps work at home to

11   do their writings, to do their research without having to worry

12   about service or teaching.  Or maybe one of the proposals might

13   be to develop a new course as part of the sabbatical.  So it

14   will be -- teaching would be very important as well.

15   Q.   Let me break that down as well.  In order to even apply for

16   a sabbatical, you have to have been a professor for a certain

17   number of years?

18   A.   I think it's seven years in the policy, yes.

19   Q.   And do you have to go through certain procedures to get

20   approval for the sabbatical?

21   A.   Absolutely.  Yes.

22   Q.   As part of that procedure do you have to explain to the

23   university what you want to use your sabbatical time for?

24   A.   Correct.

25   Q.   Was the Defendant Tao eligible for a sabbatical at that

1    point in time?

2    A.    In 2018?

3    Q.    Yes, sir.

4    A.    I don't believe so.

5    Q.    And so when you brought up the idea of a sabbatical, your

6    idea was he wouldn't be eligible for a sabbatical at that point

7    in time.  So what was your suggestion to him?

8    A.    That he -- if he wanted to set up a collaboration with Max

9    Planck, that he should do it in the summer.

10   Q.    And if he -- in the summer would be limited in time,

11   correct?

12   A.    Yes.

13   Q.    And so if he wanted more time, you suggested the

14   sabbatical?

15   A.    Correct.

16   Q.    But since he wasn't eligible for a sabbatical at that

17   point, would he have had to wait in order to become eligible?

18   A.    So the advice was to wait, either go in the summer or wait.

19   It would make a very good case for a sabbatical.

20   Q.    I want to hand you next what's been marked as Government's

21   Exhibit 150.  Do you recognize that document?

22   A.    Yes.

23   Q.    Is that a continuation of a previous e-mail that I showed

24   you related to the request for no-payment leave?

25   A.    Is it not a separate e-mail?

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3

351

1    Q.   I think if you look at Government's Exhibit 145 --

2    A.   It's just several days later, is it not?

3    Q.   And so that's a continuation of Government's Exhibit 145?

4    A.   It's a continuation of the correspondence, yes.

5             MR. OAKLEY:   Your Honor, I offer Government's

6    Exhibit 145 --

7             THE COURT:   I thought you said 150?

8             MR. OAKLEY:   I did, Your Honor.   150, I'm sorry.

9             THE COURT:   Any objection?

10            MR. DEARINGTON:   No objection, Your Honor.

11            THE COURT:   150 admitted.

12   BY MR. OAKLEY:

13   Q.   And so this is Government's Exhibit 150.   And you mentioned

14   that this was part of the earlier request.   And so on May 21st

15   Dr. Tao sends you an e-mail in that chain; is that correct?

16   A.   Correct.

17   Q.   And it says, Dear Laurence, good morning.   Hope you are

18   very well in Europe or New Zealand.   I sent you my letter to

19   apply to no-payment leave.   Provost Brown quite understood it.

20       Is Provost Brown Chris Brown who we discussed earlier?

21   A.   Yes.

22   Q.   I sent you my letter -- excuse me.   I would be most

23   grateful if you could start to work with School of Engineering.

24   My overseas collaborators are planning their sides and waiting

25   for my confirmation.

1        And then there's a P.S.  I got a positive signal for my

2    renewal of DOE.  I will use it to buy out one course and renew

3    my current post-doc.  Look forward to hearing from you.  Thank

4    you very much for your support.

5        Did I read that accurately?

6    A.   Yes.

7    Q.   So that original exchange, it relates to the defendant's

8    request for a buyout.  But in this part of the e-mail he also

9    brings up the concept of a -- excuse me, the exchange relates

10   to a no-payment leave.  In this portion of the e-mail he brings

11   up the concept of a course buyout?

12   A.   Correct.

13   Q.   And those are two totally separate concepts; is that

14   correct?

15   A.   Absolutely.

16   Q.   I next want to show you what's been marked as Government's

17   Exhibit 117.  Do you recognize that as an e-mail?

18   A.   Yes.

19   Q.   And who is that e-mail from?

20   A.   From Dr. Subramaniam.

21   Q.   And is that part of an exchange?  In other words -- well,

22   let me ask you this:  Are there multiple people involved in

23   that e-mail?

24   A.   Dr. Laird, myself, Dr. Tao, from Dr. Subramaniam.

25            MR. OAKLEY:  Your Honor, I offer Government's

1    Exhibit 117.

2            THE COURT:  Any objection?

3            MR. DEARINGTON:  No objection.

4            THE COURT:  117 admitted.

5    BY MR. OAKLEY:

6    Q.  So the first part of this, the top part is an e-mail from

7    Dr. Subramaniam to Dr. Tao and you and Brian Laird.  And I want

8    to direct your attention to the portion that's marked original

9    message.

10   A.  Yeah.

11   Q.  Does it look like Dr. Subramaniam responded to a message

12   that Dr. Tao sent --

13   A.  Yes.

14   Q.  -- at the bottom?  So let's talk about that first.  That

15   message was sent from Dr. Tao.  Do you recognize that as his KU

16   e-mail account, the franklinfengtao@ku.edu?

17   A.  Yes.

18   Q.  And that was dated Thursday, July 27th and he sent it to

19   you and Brian Laird.  Do you know Brian Laird?

20   A.  Very well, yes.

21   Q.  Who is Brian Laird?

22   A.  At the time Brian Laird was the chair of the chemistry

23   department at KU.

24   Q.  Was this -- during this time did Dr. Tao have the joint

25   appointment with CP & E and chemistry?

1    A.    Yes.

2    Q.    And so was -- Dr. Laird would be your counterpart, the

3    chair for the chemistry department?

4    A.    Yes.

5    Q.    And Bala Subramaniam, you identified him earlier as another

6    professor in CP & E and as someone who acted as a mentor for

7    the defendant?

8    A.    Yes.

9    Q.    And so in this e-mail Dr. Tao says, Dear Laurence, Brian,

10   and Bala, I was recently formally invited to be an editor of

11   Applied Surface Science, an Elsevier journal starting in 1985,

12   publishing work in surface science, catalysis, materials, and

13   energy science.  Please note me if there is any potential issue

14   conflicting with KU policy.  If not, I will sign the contract

15   with them.

16        And Dr. Tao sent that e-mail to you, he sent it to

17   Dr. Laird, and he sent it to Dr. Subramaniam, correct?

18   A.    Yes.

19   Q.    And so directing your attention to the top of that e-mail,

20   does it appear that Dr. Subramaniam responded?

21   A.    Yes, he did.

22   Q.    And Dr. Subramaniam responded, Franklin, congratulations.

23   The university views it as primary your decision based on

24   competing time demands.  You may wish to fill out any

25   consulting request, form available at the provost office

1    website, and secure approval just to make sure -- just to make

2    sure you that the KU administration is informed.  Best, Bala.

3    A.    Yes.

4    Q.    Did I read that correctly?

5    A.    Yes.

6    Q.    I'm going to hand you next what's been marked as

7    Government's Exhibit 118.  Do you recognize that as an e-mail?

8    A.    Yes.

9    Q.    And is that a continuation of the exchange that we just

10   discussed?

11   A.    May I take a moment to read it?

12   Q.    Absolutely.

13   A.    Yes.  Yes, I recognize it.

14   Q.    How do you recognize that?

15   A.    The e-mail at the bottom refers to the editorship.

16   Q.    It starts off with the same e-mail we just discussed?

17   A.    Correct.

18        MR. OAKLEY:  Your Honor, I offer Government's

19   Exhibit 118.

20        THE COURT:  Any objection?

21        MR. DEARINGTON:  No objection, Your Honor.

22        THE COURT:  118 admitted.

23   BY MR. OAKLEY:

24   Q.    And so if we can scroll to the bottom.  And so this -- on

25   the second page it starts with the e-mail that we already

1  discussed from Dr. Tao related to the journal?

2  A.   Yes.

3  Q.   And then scrolling up.  Does this appear to be a version in

4  which Dr. Brian Laird responded to the defendant?

5  A.   Yes.

6  Q.   And he -- does it appear he hit reply all, it went to

7  Dr. Tao, it went to you, and it went to Dr. Subramaniam?

8  A.   Yes.

9  Q.   And Dr. Laird says, Hi, Franklin, congratulations.  As far

10  as I know there is no policy that would prevent you from doing

11  that -- or doing this as long as everything is properly

12  disclosed on the conflict of interest forms.  This is a type of

13  service to the field that is encouraged and you are to be

14  commended for this honor.

15      And then in the second paragraph he says, on another note,

16  I have responded to this request quickly.  However, when the

17  department sends you e-mails requesting meetings or

18  information, you routinely ignore them.  For example, you are

19  on the chemistry chair advisory committee and you did not

20  respond to Liz's request to set up a meeting time.  I am happy

21  to respond to your request in a timely manner, but you need to

22  take your departmental obligations seriously.

23      Did I read Dr. Laird's response?

24  A.   Yes.

25  Q.   Dr. Laird's concerns that he addressed there related to

1    the -- when the department sends you e-mails, you routinely

2    ignore them.  Is that part of the 20 percent service to the

3    university?

4    A.  Yes.

5    Q.  And then scrolling up, does it appear that Dr. Tao responds

6    to Dr. Laird's concern with, when I send e-mails to offices and

7    some colleagues to ask services on recruiting students,

8    suggestion on student admission, comments on the problems, in

9    most cases I didn't get reply.  This is my frank feedback.  I

10   did get all reply when I communicated with financial people,

11   Sara, Jane.  That is the style I felt my e-mails were dealt and

12   so I used the same style but I will do my best to reply

13   important e-mails.

14        As I have appointment at CP & E and chem, I will do half

15   service for each department.  If I do have internal service, I

16   hope this can be considered as full service at each department.

17   In addition I do have research group as everyone and I did

18   contribute substantially to research work publications.  It

19   took much time.  I'm not asking acknowledgment promotion.

20   Definitely I will do teaching and service as other faculty

21   member.  Thank you for your comments.  I will try my best to

22   reply most e-mails.  That was Dr. Tao's response to Dr. Laird?

23   A.  Yes.

24   Q.  And then scrolling to the top.  Dr. Laird responds and I

25   won't read that, but he acknowledges that Dr. Tao is in two

 1   departments and it's taken into account in terms of his

 2   assignment, correct?

 3   A.   Yes.

 4   Q.   And so since Dr. Laird was your counterpart on the

 5   chemistry department as the chair, he would have the same

 6   responsibilities as you did as far as the evaluation and

 7   helping Dr. Tao?

 8   A.   Yes.

 9   Q.   Next I want to hand you an e-mail that's been marked as

10   Government's Exhibit 164.  Do you recognize that e-mail?

11   A.   Yes.

12   Q.   And what is Exhibit 164?  It's an e-mail between who?

13   A.   Sorry.  What did you ask me?

14   Q.   That e-mail, who is included in that e-mail exchange?

15   A.   Kimberly Wittman who's in the Office of Research, myself,

16   and Dr. Tao.

17             MR. OAKLEY:  Your Honor, I would offer Government's

18   Exhibit 164.

19             THE COURT:  Any objection?

20             MR. DEARINGTON:  No objection, Your Honor.

21             THE COURT:  164 admitted.

22   BY MR. OAKLEY:

23   Q.   So could we start at the very first e-mail.

24        And does this appear to be an e-mail that has the subject

25   re:  Sub-award from Fuzhou University?

1   A.   Yes.

2   Q.   And this e-mail is just including Ms. Wittman and Dr. Tao;

3   is that accurate?

4   A.   Yes.

5   Q.   And it's dated May 29th of 2018?

6   A.   Yes.

7   Q.   And does it appear to be -- it's a discussion between

8   Ms. Wittman and Dr. Tao and you're not included on this part of

9   this chain; is that correct?

10  A.   That is correct.

11  Q.   And there's that initial e-mail from Ms. Wittman to

12  Dr. Tao, and then the next e-mail above it is an e-mail -- is a

13  response from Dr. Tao and -- or excuse me.  It's a forward from

14  Dr. Tao to you with Ms. Wittman cc'd; is that accurate?

15  A.   Yes.

16  Q.   And it's dated June 21, 2018?

17  A.   Yes.

18  Q.   And it says, Dear Laurence, Kim is setting a budget for an

19  award 90K from Fuzhou University.  Could you provide the

20  specific amount for buying out a course?  Thank you very much.

21  Look forward to hearing you.  Franklin Feng Tao.

22  A.   Yes.

23  Q.   So when Dr. Tao is requesting a specific amount for buying

24  out a course, do you know what he was referring to?

25  A.   He would want to know the actual number of dollars, and

1    that number would be provided by the administration.  In

2    addition to the salary of course, there's the fringe component

3    as well.  So the exact dollar number would come to him from the

4    administration.  I would not do that calculation.

5    Q.   The subject of that part of the -- of the e-mail is

6    sub-award from Fuzhou University.  Do you know what a sub-award

7    is as it relates to the Office of Research?

8    A.   Sub-award is usually if somebody has a funded project,

9    funded by a company or by a research foundation or a research

10   council, and part of that research may be subcontracted to

11   somebody else as part of the project.  And that's -- that's

12   what my understanding of a sub-award is.  So if University of X

13   was going to do a chunk of the work because they have expertise

14   on instrumentation, then the funding of that would be built

15   into the proposal.

16   Q.   Do you know where Kim Wittman works?

17   A.   She works in the Office of Research at KU.

18   Q.   Did you have any involvement in any discussion about a

19   sub-award between KU and Fuzhou University?

20   A.   No.

21   Q.   And so this e-mail that's sent to you, was it just to get

22   the information related a proposal for a course buyout?

23   A.   Yes.

24   Q.   Do you know anything about the Fuzhou University sub-award,

25   whether it was actually completed or what the terms of any

1    sub-award would be?

2    A.    No.

3    Q.    And so scrolling up to your response, and so you respond on

4    June 22nd, and you respond to Tao and Ms. Wittman's cc'd and

5    you say, Franklin, thanks for your message.  See below the

6    section from our C & PE policy library regarding buyout.  It is

7    important to keep in mind, as per our conversation last week,

8    that buying out of teaching of one course does not include

9    relief from other duties, including other teaching, advising,

10   and service to the department.  Also, it is expected that you

11   would be present on campus during the semester in the normal

12   way.  In order to deal with your request, I need you to address

13   the points below.  Many thanks, Lawrence.

14       And then below your signature.  It looks like you copied

15   and pasted part of the policy from the buyout; is that correct?

16   A.    Yes.

17   Q.    So in that e-mail -- now, was that an approval of a buyout,

18   this particular e-mail?

19   A.    No.

20   Q.    And were you just providing information to Dr. Tao --

21   A.    Correct.

22   Q.    -- in case he wanted to seek a buyout?

23   A.    Correct.

24   Q.    And part of the information that you provided included that

25   buying out of a teaching of one course does not include relief

1    from other duties, including other teaching, advising, and

2    service to the department; is that accurate?

3    A.   Yes.

4    Q.   And you also said, it is expected that you would be present

5    on campus during the semester in the normal way?

6    A.   Yes.

7    Q.   And then you reference in there, it is important to keep in

8    mind as per our conversation last week.  Do you -- and that's

9    when you say that buying out of a course doesn't include relief

10   from other duties, including teaching, advising, and other

11   service.  Did you have a conversation with Dr. Tao as to what's

12   related to a course buyout?

13   A.   I don't remember to be honest.

14   Q.   Looking at this e-mail -- and this was sent in June of

15   2018, so more than three years ago?

16   A.   Yes.

17   Q.   In looking at this you reference a conversation; is that

18   correct?

19   A.   Yes.

20   Q.   And then if we scroll to the top, Dr. Tao responds or

21   replies all, and says, thank you very much for the information.

22   I propose the buyout at the end of 2017 during an office

23   meeting.  The attached is my letter to ask buyout course.  I

24   would be most grateful if you could approve it.  It will

25   largely help me to run the current new grant, my NSF and DOE

1    grants.  My current and new projects do need my input.  My

2    experience in the last few years shows that a student/post-doc

3    can do but won't be able to run it in a productive way to get a

4    funded project renewed.  The success of our colleagues' buyout

5    course demonstrated the significance of buyout course.  And

6    then it has his signature block; is that correct?

7    A.   Yes.

8    Q.   And that portion, that top portion, he included an

9    attachment, attachment buyout course FT.doc.  I'm going to hand

10   you what's been marked as Government's Exhibit 165.  Does it

11   appear that was a letter that was attached to that e-mail from

12   Dr. Tao to you?

13   A.   Yes.

14            MR. OAKLEY:  Your Honor, I'd offer Government's

15   Exhibit 165.

16            THE COURT:  Any objection?

17            MR. DEARINGTON:  No objection, Your Honor.

18            THE COURT:  Exhibit 165 admitted.

19   BY MR. OAKLEY:

20   Q.   And so this is a written letter addressed to you,

21   Dr. Laurence Weatherley, and it says, Dear Chair, regarding to

22   buying out teaching, the following is the requested

23   information.  I would be most grateful if you could approve my

24   application to the buyout teaching.

25        And then in your e-mail you had asked for certain

1    information; is that correct?

2    A.   Yes.

3    Q.   And the amount of buyout proposed, including the number of

4    student credit hours involved, three credit -- it says three

5    credits.  Semester of spring 2019.  I propose the buyout of

6    teaching in December 2017 during meeting in chair office.

7         And then the second section is the source and lifetime of

8    the funding.  Fuzhou University, two-year period.

9         And then third is a justification of how the buyout will

10   further the academic goals of the department and then there's a

11   discussion about current projects and involve the use of

12   advanced public facilities/instrument to characterize catalysis

13   to gain surface structure information so that the catalytic

14   mechanism can be understood.

15        And then it goes on to further justify.

16        The last sentence of that paragraph is, buying out the

17   course of Spring 2019 is necessary to perform the research

18   projects including this project, NSF CAREER, and DOE projects.

19        And then under the next section, recommendation of

20   substitutes for the teaching to be bought out, it says to be

21   determined.

22        And then below that it says a list of teaching duties which

23   the faculty number will undertake during the proposed period of

24   buyout.  This should include contact hours and an estimate of

25   the number of students who are expected to enroll.  And it says

1    to be determined.

2        And then the next section is summary of other duties during

3    the buyout period, and it says service and research.  And then

4    on the next page, it says, other than research duty of the

5    above project, I will perform research duties of the active NSF

6    CAREER and DOE projects and the service of departments and

7    professional society; is that correct?

8    A.    Yes.

9    Q.    Next I want to hand you what's been marked as Government's

10   Exhibit 166.  And would you read that e-mail, please, to

11   yourself?  Did you have a chance to read it?

12       Earlier I showed you an e-mail exchange that began with

13   Dr. Tao and Ms. Wittman and you were included and Dr. Tao asked

14   you for the specific amount of -- for buying out a course in

15   spring of 2019.  And then you responded with the requirements

16   and the policy, correct?

17   A.    Yes.

18   Q.    Does this appear to be -- to start off with that same

19   exchange, but there was a response from Dr. Tao that doesn't

20   include your response, so it was sent separately?

21   A.    I don't remember actually to be honest.

22   Q.    Okay.

23   A.    What I would have expected to happen would be that Dr. Tao

24   would have got the approval of the buyout, he would have gone

25   to the funding source and they would have worked out the exact

1    numbers based on the 13 and a half percent of the nine-month

2    plus any fringe, which is required.

3    Q.    Okay.  And so your involvement in the sub-award was just to

4    provide that this is the amount of buyout, that 13 and a half

5    percent?

6    A.    That's what I was interested in to make sure the dollars

7    could be covered.  I wasn't too concerned where it came from

8    because I knew that he had a significant portfolio of funding.

9    Q.    And so directing your attention to the top part -- well,

10   let me start with the bottom parts.  That's the portion of the

11   e-mail from Dr. Tao that we discussed earlier with you and

12   Ms. Wittman where Dr. Tao asks for that -- Kim is setting a

13   budget for an award, could you please provide the specific

14   amount for buying out.  Is that correct in the middle section?

15   A.    Yes.

16   Q.    And the top section he sends another e-mail in that chain;

17   is that correct?

18   A.    Yes.

19              MR. OAKLEY:  Your Honor, I offer Government's

20   Exhibit 166.

21              THE COURT:  Any objection?

22              MR. DEARINGTON:  No objection, Your Honor.

23              THE COURT:  166 admitted.

24   BY MR. OAKLEY:

25   Q.    And so directing your attention to the middle portion of

1    page 1, and the -- this contains the e-mail that we just talked

2    about, Dear Laurence, Kim is setting a budget for an award,

3    could you provide the specific amount?  The version that we

4    showed earlier had your response, which is the conditions of

5    the buyout?

6    A.    Yeah.

7    Q.    So it looks like at some point these may have crossed each

8    other or Dr. Tao may have responded to an earlier thread, is

9    that --

10   A.    That's very possible, yes.

11   Q.    It doesn't include your response, but at the top, Dr. Tao

12   says, Dear Laurence, this is a follow-up of the e-mail I sent

13   yesterday on the amount to buy out one course, 14K or so.

14   Based on Kelly's vision, a contract of the award can be sent if

15   a budget from Kim could be prepared.  Could you provide the

16   number of dollars for buying out one course (spring 2019)?  You

17   gave me the number when I discussed with you on the buying out

18   a course.  I didn't get my notebook with me.  I'm traveling.

19   Because there is a deadline to get the paperwork done, I'm

20   trying to get it done before the deadline.  Thank you very

21   much.  All the best, then Franklin Tao.

22        Did I read that correctly?

23   A.    Correct.

24   Q.    And so your involvement was -- you said you weren't

25   concerned as far as identifying a source for a buyout.  You

1    were just providing what would need to be paid to the

2    department if a buyout was authorized?

3    A.    So really all I was interested in is making sure that, hey,

4    the faculty agreed to the buyout, to that course being taught

5    by somebody else and, B, that there was funding to fund the

6    buyout.  The actual minutia of the exact precise amount or

7    where it came from I don't involve myself specifically in those

8    details.

9    Q.    And that exchange references a sub-award from Fuzhou

10   University and you testified a little bit earlier that your

11   understanding of a sub-award is -- can be a contract between

12   two universities, but you had no involvement in that?

13   A.    No.

14   Q.    Did Dr. Tao ever tell you that he planned to travel to

15   Fuzhou University?

16   A.    I don't believe so, no.

17   Q.    Did Dr. Tao ever discuss with you attending any -- going to

18   any foreign university?

19   A.    Just the Max Planck Institute, that was the earlier one,

20   that I can remember any way.

21   Q.    So as far as you know, that was the only time you discussed

22   with Dr. Tao him traveling to another university?

23   A.    I believe so.  At least another overseas university.  I

24   think that's what you meant perhaps.

25   Q.    Another overseas university.  Just the Max Planck

1  University in Germany is the only one you're aware of?

2  A.  Correct.

3  Q.  I next want to hand you Government's Exhibit 167.  Is this

4  an e-mail exchange between you and Dr. Tao related to a buyout?

5  A.  Yes.

6  Q.  And is the subject matter -- excuse me, the subject of the

7  e-mail buying out course?

8  A.  Yes.

9       MR. OAKLEY:  Your Honor, I offer Government's

10  Exhibit 167.

11       THE COURT:  Any objection?

12       MR. DEARINGTON:  No objection, Your Honor.

13       THE COURT:  167 admitted.

14  BY MR. OAKLEY:

15  Q.  And so there's an e-mail that you sent and then Dr. Tao

16  sends a response; is that correct?

17  A.  Yes.

18  Q.  I want to focus on what you sent and that was dated

19  June 25, 2018, and it's from you to Dr. Tao, Kim Wittman, Jim

20  Hammen, Sarah Craig, and Russell Ostermann.

21       We discussed Ms. Wittman.  Do you know who Jim Hammen is?

22  A.  Yes.

23  Q.  Who's Jim Hammen?

24  A.  Jim Hammen is the Director of Finance within the shared

25  service center within the School of Engineering and they dealt

1  with all the financial transactions connected to the

2  department, the nonresearch related transactions I understand.

3  Q.  How about Sarah Craig, do you recognize that name?

4  A.  She was Jim's assistant.

5  Q.  How about Russell Ostermann?

6  A.  Russell Ostermann is one of my faculty colleagues.  At that

7  time he was -- I'm just trying to think of the title of the

8  job.  He was associate chair of the department, yes.

9  Q.  And in that e-mail to Dr. Tao and those others, you said,

10  Franklin, regarding your request for buyout of one course for

11  the spring of 2019, I am pleased to approve the request.  The

12  conditions are according to our department policy and are as

13  follows:  One, you will need to arrange the transfer of dollars

14  from your accounts to the department account amounting to

15  13.5 percent of your nine-month salary plus fringes.  These

16  dollars will be used for the funding of the instructional

17  support required to cover your release.  The SSC accountants

18  will advise on exact amounts and the account into which the

19  dollars will be transferred into.

20      Does this just relate to the discussion we had earlier?

21  When a course buyout occurs, the department still has to teach

22  so there has to be a transfer of funds?

23  A.  Yes.

24  Q.  Number two, your other duties will continue in spring 2019

25  as usual, including advising, committee work, and other service

1    to the department, school, and university.

2        Did I read that number two correctly?

3    A.    Yes.

4    Q.    And number three, you are expected to be in attendance on

5    campus during the semester in accordance with KU policy.

6    A.    Yes.

7    Q.    Please let me know if you have any questions.  Best regard,

8    Laurence.

9    A.    Yes.

10   Q.    And Dr. Tao responds at the top, thank you very much for

11   your approval of the buying out course of spring 2019.

12   A.    Yes.

13   Q.    So you said that the only university that you -- the only

14   foreign university that you were aware of that Dr. Tao intended

15   to travel to was the one in Germany, correct?

16   A.    From my recollection, yes.

17   Q.    I want to hand you what's been marked as Government's

18   Exhibit 225.  Do you recognize that e-mail?

19   A.    Yes.

20        MR. OAKLEY:  Your Honor, I offer Government's

21   Exhibit 225.

22        THE COURT:  Any objection?

23        MR. DEARINGTON:  No objection, Your Honor.

24        THE COURT:  225 admitted.

25   BY MR. OAKLEY:

1   Q.   If we could pull up the bottom portion.  Does this appear

2   to be an e-mail from a RaeShelle Largo to a whole group of

3   people?

4   A.   Yes.

5   Q.   Do you know who RaeShelle Largo is?

6   A.   RaeShelle Largo is the department administrator and my

7   personal assistant at the time.

8   Q.   When you say department administrator, is that the CP & E

9   department?

10  A.   Yes.

11  Q.   And so RaeShelle sends out this e-mail to -- I won't read

12  every one, but do you recognize the names in the two lists?

13  A.   This is a full list of faculty members in C & P at this

14  time.

15  Q.   And so are those all the faculty members of CP & E?

16  A.   I believe so.

17  Q.   And directing your attention to the middle of the bottom,

18  Tao Franklin Feng was included in that, correct?  I can show

19  you on the screen.

20  A.   Do I see his name there?  It is there, yes.

21  Q.   Ms. Largo says, hello from the other side.  Here's the good

22  news:  Only two more days until Friday.  Quick reminder about

23  the upcoming retreat.  The details of the retreat, and it says

24  C & PE faculty retreat, location Beren Conference Room Slawson

25  Hall.

 1        Where is that located?

 2    A.   That is the Earth Energy Environmental Center next to the

 3    department.

 4    Q.   It's on --

 5    A.   It's on the university campus.

 6    Q.   In Lawrence, Kansas?

 7    A.   Yes.

 8    Q.   And it says time:  Friday, January 18, 8:00 a.m.?

 9    A.   Yes.

10    Q.   See attachment for the agenda.  Can we scroll to the top.

11    Does it appear that Dr. Tao responds to that e-mail to you, to

12    Ms. Largo, and then to a Martha Kehr?

13    A.   Yes.

14    Q.   Who is Martha Kehr?

15    A.   Martha Kehr is the office manager.

16    Q.   Dr. Tao sends that response on January 17, 2019?

17    A.   Yes.

18    Q.   And he says, Dear Laurence, I apologize for missing the

19    upcoming faculty retreat due to the trips of conferences in

20    Germany.  And then (I am overseas and could not get back for

21    the meeting).  Please send my apologies to all colleagues.

22    Thank you very much.  Please note me if there's anything I

23    should catch.  Thank you very much for your understanding.

24        Did I read that correctly?

25    A.   Yes.

1    Q.    Next I want to hand you an e-mail that's marked

2    Government's Exhibit 231.  Do you recognize that e-mail?

3    A.    Yes.

4    Q.    And how do you recognize that e-mail?

5    A.    It was addressed to me.

6            MR. OAKLEY:  Your Honor --

7            THE WITNESS:  Also, I sent out an e-mail asking

8    Dr. Tao to remind him about the accreditation information that

9    was required in connection with his teaching of the four

10   thermodynamics 512 course.

11           MR. OAKLEY:  Your Honor, I offer Government's

12   Exhibit 321.

13           THE COURT:  Any objection?

14           MR. DEARINGTON:  No, Your Honor.

15           MR. OAKLEY:  321 admitted.

16   BY MR. OAKLEY:

17   Q.    It looks like this exhibit is two pages, but on the second

18   page does it appear that it's the carryover of the footer of

19   your signature?

20   A.    Yep.

21   Q.    And so directing your attention to that first page, this

22   starts with an e-mail from you to Dr. Tao on Monday,

23   January 28th of 2019.  And it's from you to Dr. Tao with Kyle

24   Vincent Camarda cc'd.  Who is Kyle Vincent Camarda?

25   A.    Kyle is an associate professor in CPE.

1   Q.   The subject is ABET outcome.  What is ABET?

2   A.   We refer to it as ABET.  It is the national accrediting

3   body for engineering and technology education programs across

4   the United States, and so they accredit both our undergraduate

5   degree courses in chemical engineering and in petroleum

6   engineering.  So it's a very important body.  And in order to

7   satisfy their requirements, it's a very important part of what

8   we do.

9   Q.   So this was an important e-mail?

10  A.   Yes.

11  Q.   And in the e-mail you say, Franklin, the ABET committee met

12  this morning and noted that your ABET Outcome Evaluations for

13  the following course in academic year 2018-19 is missing.  Then

14  you list C & PE 512.  That refers to a course?

15  A.   Yes.

16  Q.   I attached the current matrix showing the outcomes which

17  must be addressed in the course listed above.  We are expecting

18  the final statement on the 2018 accreditation evaluation from

19  ABET any day now and require the evaluations for the course

20  listed in order for our written response to be made.

21       And then you state, I would like to requests that two tasks

22  are done before Friday of this week, and then you give two

23  bullet numbers.  One, complete the evaluations and place them

24  in the following directory on the department share drive in the

25  folder --

1          THE COURT:  Slow down.

2          MR. OAKLEY:  Sorry.

3    BY MR. OAKLEY:

4    Q.   -- labeled ABET_Special_2017.  So you tell him where to

5    place that information electronically?

6    A.   Correct.

7    Q.   And then two, the ABET format syllabus for the course be

8    checked, ensuring that the ABET outcomes listed are the same as

9    those you actually assess.

10         So you give him two tasks and you say, please feel free to

11   contact me or Kyle if you have any questions.  And then you

12   state, if these are not completed and we are unable to complete

13   the responses to the weakness, the accreditation of our

14   chemical engineering program will be in serious jeopardy.

15         What did you mean by that last part?

16   A.   So the accreditation normally takes place on a six-year

17   cycle.  We did a full accreditation, submitted a full

18   accreditation application in the summer of 2018.  The ABET

19   board came back to us wanting further information before they

20   would confirm our accreditation.

21         So this e-mail was in connection with that in that we were

22   asking colleagues for the fall semester of 2018 and also for

23   the spring of '19 to submit their information so each -- for

24   each professor responsible for a core course would be required

25   to show how their course had met the required outcomes for ABET

1    to accredit our program.  And so that was in connection with

2    that.

3        So it was vitally important that we got that done.  If we

4    lose our accreditation, then our program is seriously damaged

5    in terms of attracting students and being regarded as a

6    professional program.

7    Q.   In addition to attracting students, what does it do to the

8    students that are already there in the program trying to

9    complete their degree?

10   A.   Well, it doesn't look good if you don't get accreditation.

11   Fortunately, all is well and that matter has now been resolved

12   and we are fully accredited.

13   Q.   You asked for that from Dr. Tao, that it would be done

14   before Friday --

15   A.   Yes.

16   Q.   -- of this week.  And Dr. Tao responded on Thursday,

17   January 31st, correct?

18   A.   Yes.

19   Q.   And he says, Dear Laurence and Kyle, good afternoon.  I am

20   traveling in Germany.  Unfortunately I cannot access the

21   departmental folder for some reasons, and then he discusses the

22   folder, correct?

23   A.   Yes.

24   Q.   At the time did you think Dr. Tao was in Germany?

25   A.   I took the e-mail at face value, so yes.

1  Q.   Did you assume he was giving you accurate information?

2  A.   Yes.  I have no reason not to at that time.

3  Q.   Next I want to hand you what's been marked as Government's

4  Exhibit 233.  Is that another e-mail?

5  A.   Yes.

6        MR. OAKLEY:  Your Honor, I offer Government's

7  Exhibit 233.

8        THE COURT:  Any objection?

9        MR. DEARINGTON:  No, Your Honor.

10        THE COURT:  233 admitted.

11  BY MR. OAKLEY:

12  Q.   So this appears to be another multipage e-mail, but on the

13  last page it looks like it's just your signature line; is that

14  correct?

15        Dr. Weatherley, directing your attention to the bottom of

16  the first page, does this appear to be an e-mail that you sent

17  on February 19, 2019, to Dr. Tao and cc'ing Ms. Largo?

18  A.   Yes.

19  Q.   And the subject is Annual Faculty Evaluation?

20  A.   Yes.

21  Q.   And this says, Franklin, we need to find a time for us to

22  meet and discuss your annual faculty evaluation.  If convenient

23  please can liaise with RaeShelle on a suitable time and date.

24  Many thanks, Lawrence.

25        What does this refer to, faculty evaluation?

1    A.   It's the annual performance evaluation.  Some of the

2    letters that we looked at earlier are the outcome of the

3    evaluation, so it's in connection with that annual evaluation.

4    Q.   You mentioned earlier when you're doing those evaluations

5    you typically try to meet with professors in person when

6    available?

7    A.   Yes.

8    Q.   Is that an e-mail trying to set that up?

9    A.   Yes.

10   Q.   Above that Dr. Tao responds the next day on Wednesday,

11   February 20th to you and to RaeShelle and says, Dear Laurence,

12   I'm visiting FHI at Germany and will get back to town after 15

13   March.  Could we discuss through phone call to your office or

14   Skype?

15        And then to RaeShelle, he says, Dear RaeShelle, I'm

16   available most time at 8 to 11 on this Thursday, Friday, next

17   Monday, and he gives his availability, correct?

18   A.   Yes.

19   Q.   And then so RaeShelle responds, Franklin, I have you down

20   on Monday, February 25th at 10:00 a.m.

21        And then Dr. Tao responds, thank you.  It works for me.

22        Dear Laurence, I will call your office phone on 10:00 a.m.

23   Monday, all the best.

24   A.   Yes.

25   Q.   And I think when we discussed the evaluation that was dated

1    in February, you indicated that you conducted that interview

2    via phone?

3    A.    Yes.

4    Q.    And so this phone call actually took place?

5    A.    I believe so, yes.

6    Q.    And at the time you believed the defendant was traveling.

7    Where did you think he was traveling?

8    A.    In Germany.

9    Q.    Why did you think that?

10   A.    Because in the e-mail it basically says I'm visiting FHI at

11   Germany.

12   Q.    He told you that in the e-mail?

13   A.    It's in the e-mail, yeah.  Midway down the page.

14   Q.    Next I want to hand you what's been marked as Government's

15   Exhibit 247.  This is another e-mail.  Do you recognize that as

16   an e-mail exchange between you and Defendant Tao?

17   A.    Yes.

18        MR. OAKLEY:  Your Honor, I offer Government's

19   Exhibit 247.

20        THE COURT:  Any objection?

21        MR. DEARINGTON:  No objection, Your Honor.

22        THE COURT:  247 admitted.

23   BY MR. OAKLEY:

24   Q.    And directing your attention to the bottom portion on

25   March 26th of 2019, you send an e-mail to Dr. Tao with subject

1    advising; is that correct?

2    A.  Yes.

3    Q.  You state, Franklin, it has come to my attention that you

4    have a significant number of outstanding C & PE undergraduate

5    advisees who are needing to meet with you in the current

6    advising period.  I am informed that there are at least 22

7    students who are needing to meet with you for advising this

8    week.  Despite efforts to contact you, I am informed they have

9    been unable to obtain a response from you.  The students are

10   needing to enroll for the fall classes this coming Thursday and

11   so there is urgency that you respond.  We have agreed on a

12   number of occasions in the past, including the most -- in the

13   most recent evaluation interview last month and letter that

14   undergraduate advising is a required duty of faculty unless

15   specifically excused.  I cannot underemphasize the importance

16   of your paying attention to this.  Please let me know without

17   delay your plan of action to address this important issue.

18       So when you sent this e-mail on March 26, 2019, what were

19   you concerned about, if anything?

20   A.  So in the department we have an advising officer.  She's an

21   administrator and she basically organizes the allocation of the

22   advisees, the adviser and the advisees to each faculty member.

23   We also have a director of undergraduate studies.  And the

24   concern referred to that 22 students were needing to meet came

25   from either one of those.  I think from the advising officer

1   actually because she is in contact with all the students.  So

2   the students were complaining they couldn't get ahold of their

3   adviser.  So that information came to me via that source.  And

4   so I was concerned.

5   Q.   And you indicated there were 22 of those students?

6   A.   I believe so, yes.

7   Q.   And you told the defendant there are at least -- you said

8   at least 22 students needing to meet with you for advising this

9   week.  And you sent that on Tuesday, March 26th, correct?

10   A.   Correct.

11   Q.   And the defendant responds the same day, Tuesday,

12   March 26th with, Dear Laurence, thank you very much for your

13   reminder.  I will get them done before the coming Monday.

14   A.   Yes.

15   Q.   Is that correct?

16   A.   Yes.

17   Q.   Next I'm going to hand you what's been marked as

18   Government's Exhibit 248.  Do you recognize that e-mail?

19   A.   Yes.

20   Q.   Is that an e-mail that you sent to Dr. Tao related to an

21   award that he received?

22   A.   Yes.

23         MR. OAKLEY:  Your Honor, I offer Government's

24   Exhibit 248.

25         THE COURT:  Any objection?

1          MR. DEARINGTON:  No, Your Honor.

2          THE COURT:  248 admitted.

3    BY MR. OAKLEY:

4    Q.  On the first part on March 26, 2019, you send an e-mail to

5    Dr. Tao and you cc Dr. Subramaniam and the subject is 2019

6    Scholarly Achievement Award.  And you say, Franklin, I was

7    delightful to learn that your nomination for the 2019 KU

8    Scholarly Achievement Award has been successful.  So many

9    congratulations.

10         Debra Bia in the chancellor's office would very much like

11   to hear back from you so that the date for the awards ceremony

12   can be fixed.  And you provide Debra's e-mail.

13         And Dr. Tao responds, Dear Laurence and Bala, thank you

14   very much for your support.  All the best.

15         So in the first part of this e-mail you congratulate

16   Dr. Tao for an award that he won?

17   A.  Yes.

18   Q.  And it was the 2019 KU Scholarly Achievement Award.  Is

19   that a pretty prestigious award at the university?

20   A.  Well, it's a prestigious internal award.  Normally there's

21   only about four professors across the entire university that

22   would be selected for that.  Many nominations would go in, but

23   only -- I think it's four would actually be selected.  So it

24   was a big deal, you know, within KU for him to get that.

25   Q.  In the second part of that you mention that Debra Bia in

1    the chancellor's office would very much like to hear back from

2    you so the date for the award ceremony can be fixed.  What's

3    that related to that?

4    A.    After the awards have been made known there would be a

5    ceremony, a reception hosted by the chancellor of the

6    university when the awards would be given out and each of the

7    awardees would give a short statement on their scholarly work,

8    maybe five minutes, and friends and family and colleagues would

9    be invited to be part of that.  So Debra Bia is the

10   administrator working in the chancellor's office I believe who

11   would organize that event.

12   Q.    Do you know if Dr. Tao was present when that award was

13   given to give a speech?

14   A.    He was not.

15           THE COURT:  When you're ready, let's take an afternoon

16   break.

17           MR. OAKLEY:  I'm ready, Your Honor.

18           THE COURT:  Okay.  Let's take a break for 15 minutes

19   or so.  Why don't we reconvene at 3:15.

20      (The following proceedings occurred outside the presence of

21   the jury.)

22           THE COURT:  Are you still thinking you'll finish your

23   direct fairly soon?

24           MR. OAKLEY:  Yes.

25           THE COURT:  You're still thinking Dr. Weatherley will

1    finish today?

2          MR. OAKLEY:  Yes, sir -- ma'am.

3          THE COURT:  We'll be in recess until 3:15.

4      (Recess.)

5      (The following proceedings occurred outside the presence of

6    the jury.)

7          THE COURT:  One of the jurors is complaining he's

8    having difficulty hearing Dr. Weatherley, he's having

9    difficulty hearing me.

10     (The jury entered the courtroom, after which the following

11   proceedings were had.)

12          THE COURT:  You can be seated.  Go ahead.

13   BY MR. OAKLEY:

14   Q.  Dr. Weatherley, before we broke I think you and I discussed

15   the University Scholarly Achievement Award?

16   A.  Yes.

17   Q.  And Dr. Tao won that award.  The year before he won the

18   award, did you nominate him the year prior?

19   A.  I did not nominate him.  He was nominated by another

20   colleague, but I did write a letter of -- I was chair.  I wrote

21   a letter in support of nomination.

22   Q.  A letter in support of nomination?

23   A.  Yes, yes.

24   Q.  And then also can individuals self-nominate, nominate

25   themselves for that particular award?

1  A.   I don't know the answer to that.

2  Q.   I want to hand you what's been marked as Government's

3  Exhibit 221.  Does that appear to be an e-mail exchange

4  involving you, Dr. Tao, and a Debra Ann Bia?

5  A.   So I must have nominated him, yeah, I'm sorry.  My

6  recollection was wrong.

7  Q.   And so you nominated him the year prior or the year that he

8  won it or both, if you remember?

9  A.   My memory is really a bit foggy on this to be quite honest.

10  I think he may well have been nominated the year before.  It

11  looks like he was renominated.  So, yeah, I'm sorry, I can't

12  give a good answer to that question.

13  Q.   Does this e-mail exchange, however, appear to be related to

14  that particular award?

15  A.   Yes.

16        MR. OAKLEY:  Your Honor, I offer Government's

17  Exhibit 221.

18        THE COURT:  Any objection?

19        MR. DEARINGTON:  No objection.

20        THE COURT:  221 admitted.

21  BY MR. OAKLEY:

22  Q.   I next want to show you what's been marked as Government's

23  Exhibit 221A.  And does that appear to be a letter that was

24  attached at some point to this e-mail exchange from Dr. Tao to

25  the committee that selects the -- that particular award?

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3

1    A.    Yes.

2              MR. OAKLEY:    Your Honor, I offer Government's

3    Exhibit 221A.

4              THE COURT:    Any objection?

5              MR. DEARINGTON:    No objection.

6              THE COURT:    221 admitted.

7    BY MR. OAKLEY:

8    Q.    And could we show 221A, please.

9              MR. OAKLEY:    The ELMO, thank you.

10   BY MR. OAKLEY:

11   Q.    And so this is Government's 221A, and this is the letter

12   that we were discussing from Dr. Tao to the University

13   Scholarly Achievement Award Committee dated December 19, 2018;

14   is that correct?

15   A.    Yes.

16   Q.    I want to direct your attention to the second -- excuse me,

17   the third paragraph.    Do you see that, where it begins, in the

18   last 4.5 years?

19   A.    Yes.

20   Q.    And in that letter Dr. Tao says, In the last 4.5 years I

21   was granted external funds from federal funding agencies?

22   A.    Yes.

23   Q.    Is that an acknowledgment of federal grants that were

24   received by the university where Dr. Tao was the PI?    Would

25   that be your understanding?

1    A.   Yes.

2    Q.   Is it uncommon -- now that's -- those awards go to the

3    university; is that your understanding?

4    A.   Yes.

5    Q.   Is it uncommon for PIs to refer to them as "I was granted

6    awards" such as what Dr. Tao says here?

7    A.   Nothing particularly unusual about that actually.  If he's

8    a PI, then "I was awarded."  I guess it would be more polite if

9    you were a team, "we were awarded."

10   Q.   In your experience that's not uncommon --

11   A.   It's not uncommon.

12   Q.   -- for someone to make that --

13   A.   No, no, not at all.

14   Q.   Even if it's someone who is a PI who knows that it's

15   university money?

16   A.   Correct.

17   Q.   And Dr. Tao acknowledging in this letter to the Scholarly

18   Achievement Award Committee, he references the awards, the

19   federal awards that he received, correct?

20   A.   Yes.

21   Q.   And I think you said earlier that those -- the university

22   receiving federal funding through a particular PI, that that's

23   good for the reputation of the PI; is that fair?

24   A.   It's good for the reputation of the PI and for the

25   department.

1    Q.   And in this particular case Dr. Tao was identifying that,

2    in addition to other research and publications, as a reason why

3    he should receive the University Scholarly Achievement Award?

4    A.   Correct.

5    Q.   And that particular award came with a fee, a monetary

6    award; is that correct?

7    A.   I believe so, yes.

8    Q.   Do you know, did Dr. Tao give a portion of that award to

9    the department after he received it?

10   A.   I don't think so.  I don't recall if there was anything

11   coming to the department directly from that, no.

12   Q.   Based on your experience with the university, is it

13   uncommon for professors to donate their own money to the

14   department or the school or other things KU related?

15   A.   It's not common, but it's not unknown.  I mean, I can give

16   you an example.  So we have a professor who actually donated

17   some money to help with our lab teaching and made a donation to

18   KU endowment to make that happen, but it's not very common.

19   Q.   As you sit here today, do you know if Dr. Tao gave any of

20   the money that he received as part of that award to the

21   university?

22   A.   Not certainly -- certainly not to my knowledge.

23   Q.   You mentioned earlier that as part of the buyout policy

24   that you will ask the professors in your department if they

25   intend to buy out -- if they intend to seek a buyout for a

1    course and you typically do that in the fall I think you said;

2    is that --

3    A.    Yes.  Sometimes it slips a bit, but it's normally in the

4    fall, yes.

5    Q.    Sometimes you might do that in the spring?

6    A.    Very early in the spring, yes.

7    Q.    I want to hand you an e-mail that's been marked as

8    Government's Exhibit 249.  Does that appear to be an e-mail

9    exchange that starts with an e-mail, you asking if any members

10   of the department plan on seeking a buyout?

11   A.    Yes.

12        MR. OAKLEY:  Your Honor, I offer Government's

13   Exhibit 249.

14        THE COURT:  Any objection?

15        MR. DEARINGTON:  No objection, Your Honor.

16        THE COURT:  Exhibit 249 admitted.

17   BY MR. OAKLEY:

18   Q.    So directing your attention to the bottom of that first

19   page, you sent an e-mail on April 2, 2019, to a number of

20   people.  Does that appear to be the professors in the CP & E?

21   A.    Yes.

22   Q.    And directing your attention to the second page, it says,

23   All, can you please let me know as soon as possible if you're

24   proposing to apply for buyout next academic year 2019 or '20?

25   A.    Yes, it may have been a reminder.  Or we're just very late

1    in getting the information out there.

2    Q.   And Dr. Tao responds to you on April 2nd and says, Dear

3    Laurence, I plan to buy out the course of spring 2020 with DOE

4    fund.  The cost of buyout is a part of the budget of that fund.

5    Thank you very much.

6    A.   Yes.

7    Q.   I want to get back -- you said that the only university you

8    were aware of that Dr. Tao had any plans to visit, any foreign

9    institute was the institute in Germany; is that correct?

10   A.   Yes.

11   Q.   I want to hand you what's been marked as Government

12   Exhibit 291.  Do you recognize that as an e-mail from Dr. Tao

13   to you?

14   A.   Yes.

15        MR. OAKLEY:  Your Honor, I offer Government's

16   Exhibit 291.

17        THE COURT:  Any objection?

18        MR. DEARINGTON:  No objection, Your Honor.

19        THE COURT:  291 admitted.

20   BY MR. OAKLEY:

21   Q.   And so in this e-mail on October 9th of 2018 Dr. Tao sends

22   this e-mail with a couple of attachments and he says, Dear

23   Laurence, could you please use the following sentence?  I found

24   that application of a business trip visa needs more information

25   on employment letter and they request to provide reason for

1    application of a business trip visa.

2        And then the attachment is their updated request.

3        I apologize again for the confusion.  Attached is the

4    invitation letter from FHI of Germany.  Thank you very much.

5        And then there's language.  Dear visa officer of Germany

6    consulate at Chicago, and then it says here, I would confirm

7    that Feng Tao is a full-time employee of Department of Chemical

8    and Petroleum Engineering at University of Kansas.  His current

9    position is associate professorship.

10       Does it appear to you that Dr. Tao is providing you with

11   information or with language to use for some purpose?

12   A.   Yes.

13   Q.   Do you recall what this is about?

14   A.   I assume that it was for him to be able to travel to

15   Germany to the Fritz-Haber Institute and he would need a visa

16   to be able to do that.  This looks like standard language which

17   the German consulate would require.

18   Q.   And the language -- the standard language that Dr. Tao

19   suggested that you use includes he was invited by Fritz-Haber

20   Institute, FHI, of Max Planck Society of Germany to give

21   seminar at FHI in this month and will collaboratively perform

22   some experiments of his research projects at FHI at Berlin in

23   2019?

24   A.   Correct.

25   Q.   And then his trip in October will be covered by FHI and

1    expenses of other trips will be covered by his own sources, all

2    the best.  And then it says Lauren, but do you assume that was

3    meant to be Laurence?

4    A.   Yes.

5    Q.   Then I'm going to hand you what's been marked as

6    Exhibit 291A.  Do you recognize that as an attachment that was

7    provided with that e-mail?

8    A.   Yes.

9         MR. OAKLEY:  Your Honor, I offer Government's

10   Exhibit 291A.

11        THE COURT:  Any objection?

12        MR. DEARINGTON:  No, Your Honor.

13        THE COURT:  291A admitted.

14   BY MR. OAKLEY:

15   Q.   Did you believe that this was the invitation from the

16   Fritz-Haber Institute to Dr. Tao seeking him to come to

17   Germany?

18   A.   Yes.

19   Q.   You said that the Fritz-Haber Institute in Germany was the

20   only foreign institution that you were aware of that Dr. Tao

21   intended to visit, so I assume you hadn't -- you have not seen

22   any similar letters with any other foreign universities related

23   to Dr. Tao?

24   A.   Not to my recollection, no.

25        MR. OAKLEY:  I have no further questions, Your Honor.

1           CROSS-EXAMINATION

2    BY MR. DEARINGTON:

3    Q.   Good afternoon, Dr. Weatherley.

4    A.   Hello.

5    Q.   So you've testified three times by my count today that

6    you're not aware of Dr. Tao having a foreign appointment other

7    than perhaps whatever he might have been doing in Germany at

8    Fritz-Haber, correct?

9    A.   I didn't quite catch your wording.  Which appointment?

10   Q.   I believe you testified three times today that you're not

11   aware of Dr. Tao ever having a foreign appointment other than

12   possibly at the Fritz-Haber Institute, correct?

13   A.   Correct, yes.

14   Q.   And you told the FBI in January of 2020, specifically

15   Special Agent Lampe, that Dr. Tao never had an appointment at

16   Nagoya University in Japan, correct?

17   A.   Correct.

18   Q.   And they took that statement at face value, correct?  They

19   didn't challenge you on it, ask for certain documentation to

20   support that statement, push back at all?

21   A.   No.

22   Q.   They accepted.  Are you aware that eight days later

23   allegations were raised in this case about Dr. Tao stating that

24   he had concealed a position at Nagoya University eight days

25   after your interview with Special Agent Lampe in which you told

1    him --

2    A.    I was not aware of that.

3    Q.    When Special Agent Lampe asked you -- when you told Special

4    Agent Lampe that you were unaware that Dr. Tao ever had an

5    appointment of some sort of a visiting professorship or other

6    appointment at Nagoya University, had you dug through all your

7    files just to confirm that?

8    A.    To be honest, no.  It was only when I looked through his

9    CV, which is very lengthy, that I saw the visiting

10    professorship, yes.

11    Q.    Fair enough.  And you're not a criminal investigator like

12    Special Agent Lampe, are you?

13    A.    I think I may have said that to Stephen Lampe when we had

14    the interview.

15    Q.    I don't blame you.

16    A.    I'm not totally clear about that.

17    Q.    I don't blame you at all.  He was asking you information

18    and he was taking that information from you and trying to use

19    it in his investigation against Dr. Tao; is that the impression

20    you got?

21    A.    That was the impression I got, yes.

22    Q.    The government previously introduced Exhibit 28, which is a

23    faculty evaluation for 2017.

24             MR. DEARINGTON:  May I approach, Your Honor?

25             THE COURT:  Yes.

1    BY MR. DEARINGTON:

2    Q.  So Mr. Oakley was reading a great deal of information from

3    Dr. Tao's evaluations and one thing that he read jumped out at

4    me, and it said -- and this is dated January 25th, 2018,

5    correct?

6    A.  Yes.

7    Q.  And one thing that jumped out at me that Mr. Oakley

8    actually read was that you stated in 2018 to Dr. Tao, you were

9    also invited as a visiting professor at Nagoya University in

10   Japan?

11   A.  That's correct.

12   Q.  So fair to say when you told Special Agent Lampe that you

13   were unaware of a position at Nagoya University, that was

14   incorrect?

15   A.  I didn't recall it at the time to be honest.

16   Q.  You didn't recall.

17        Did you correct Special Agent Lampe immediately thereafter

18   -- sorry, did you correct your statement to Special Agent Lampe

19   thereafter?

20   A.  I said to him I may have seen something to that effect

21   listed in one of his vitaes, but I did not elaborate.

22   Q.  You may have seen a position at Nagoya University is what

23   you told him?

24   A.  Well, visiting professor means different things to

25   different people.  I assumed it was just an honorary title,

1  which is quite a regular thing that happens if people visit a

2  university maybe more than once.  It's not like an appointment

3  in the formal sense of the word.

4  Q.   And fair to say in January 2020 when you were speaking with

5  Special Agent Lampe, you didn't remember this.  You have a very

6  busy job and one of them is not investigating Dr. Tao, and so

7  you were saying what you remember?

8  A.   Correct.

9  Q.   And you just didn't remember that this position existed?

10  A.   Correct.

11  Q.   And Special Agent Lampe, I believe you testified, accepted

12  that.  He didn't push back and say, well, let's look into this

13  a little bit?

14  A.   Correct, correct.

15  Q.   And so you're not aware that that allegation subsequently

16  was not pressed against Dr. Tao?

17  A.   I was not aware of --

18  Q.   Of the first allegation?

19  A.   I was not aware of that, no.

20  Q.   And in Exhibit 20 you actually noted the Nagoya position as

21  a, quote, particular area of noted strength, correct?

22  A.   Regarded more of as an item of significance, that it's an

23  acknowledgment of research repute.

24  Q.   That's something that KU would encourage, this type of

25  recognition internationally?

1    A.    Most definitely.

2    Q.    I'd like to go back to a couple questions that Mr. Oakley

3    asked you about the chancellor's award.  But before I do that,

4    I just want to touch on these evaluations.  You saw and

5    Mr. Oakley presented to you a handful of evaluations for

6    Dr. Tao dating back to 2015, correct?

7    A.    Yes.

8    Q.    And in those evaluations there were strengths and there

9    were weaknesses identified in your view of Dr. Tao, and that's

10   common in faculty evaluations?

11   A.    Very common.

12   Q.    There would be no purpose for a faculty evaluation if

13   faculty were 100 percent perfect, right?

14   A.    Absolutely.

15   Q.    No one is perfect, fair?

16   A.    No.

17   Q.    And so it's not at all unusual that Dr. Tao had some areas

18   for development I think is how you termed it earlier?

19   A.    That's correct.

20   Q.    And I think you said it's a bit more of a track record that

21   you wanted him to develop with teaching and to keep at it,

22   correct?

23   A.    Yes.

24   Q.    And thermodynamics, one course that Dr. Tao taught, you

25   noted was particularly difficult to teach for anyone?

1    A.    So he taught two courses in thermodynamics, one was a

2    graduate course, the CP721, and that seemed to go very well.

3    There was a small number of students, maybe 12 or 15.    The

4    other course was the 512 which is the undergraduate course that

5    maybe had 90 students or so, a much more difficult course to

6    teach with that number of students.

7    Q.    And the evaluations going back to 2015, if I were to

8    represent to you that this case alleges that Dr. Tao took a

9    position at Fuzhou University in China in May 2018, fair to say

10   that the evaluations that predate all that really have nothing

11   to do with the allegation that he took a job in May 2018?

12   A.    Absolutely not.    I would never have imagined it.

13   Q.    That's fair.    And while there are strengths and weaknesses

14   in Dr. Tao's performance evaluation for where he was in his

15   career looking at him holistically, including his research

16   accomplishments, he was a fairly solid faculty member, correct?

17   A.    Yes.

18   Q.    So much so that although there may have been some teaching

19   areas for improvement, you renominated him -- so it appeared

20   you nominated him twice for the chancellor's award, correct?

21   A.    Correct, yes.    Well, I think he -- I think he did

22   self-nominate.    I think there was a self-nomination letter

23   there.    I would have supported that.

24   Q.    I will pull that e-mail up for you if it would be helpful.

25   But I think we can move on at this point.    You supported his --

1   A.   Yes.

2   Q.   -- getting the award.  And Chancellor Girod had an

3   eight-person committee that vetted Dr. Tao for the award,

4   looked at his body of work, and gave him the award.  And

5   Chancellor Girod gave him the award?

6   A.   Correct.

7   Q.   And Mr. Oakley asked you whether you were aware that there

8   was a financial element to the award; is that correct?

9   A.   Yes.

10  Q.   And you seem to recall that there was a financial element

11  to the award, correct?

12  A.   Yes.

13  Q.   And if I were to tell you that the award -- sorry.  Let me

14  strike that for a moment.

15       Are you aware -- strike that as well.

16       Mr. Oakley asked you whether you were aware that Dr. Tao

17  made a donation of a part of the award to KU in its endowment

18  for the department's use, correct?

19  A.   I was not aware there was a donation.

20  Q.   That's what you testified, you were unaware or at least you

21  don't recall?

22  A.   I don't recall it certainly.

23  Q.   Okay.  I'm going to show you what's marked as Exhibit 1455.

24  I'm going to hand this out.

25            COURTROOM DEPUTY:  Do you need that shown from the --

 1  are you going to show that from there or on the ELMO?

 2          MR. DEARINGTON:  I'm going to do it on the ELMO,

 3  please.

 4  BY MR. DEARINGTON:

 5  Q.  So, Mr. Weatherley, this is an e-mail chain that begins

 6  with an e-mail on the third page at the bottom from Dr. Tao to

 7  your e-mail address at KU, correct?

 8  A.  Yes.

 9  Q.  And I'll let you take a moment to review the chain.  It

10  moves upward in the e-mails that you're on there.  I'm going to

11  ask you in a moment if you recognize this e-mail.

12  A.  I do now, yes.

13  Q.  Okay.  And this is an e-mail chain between you and Dr. Tao

14  that then adds recipients later in the chain, correct?

15  A.  Yes.

16          MR. DEARINGTON:  Your Honor, I'd like to introduce

17  Exhibit 1455 into evidence.

18          THE COURT:  Any objection?

19          MR. OAKLEY:  May I have one moment with counsel, Your

20  Honor?

21          THE COURT:  Yes.

22          MR. OAKLEY:  No objection, Your Honor.

23          THE COURT:  1455 admitted.

24  BY MR. DEARINGTON:

25  Q.  Starting at the bottom of the chain here, which is on

1  page 4, would you please read after good morning,

2  Dr. Weatherley.

3  A.   I plan to donate $3.5K from University Scholarly

4  Achievement Award I got to the department.  I will write a

5  check in early May if department will accept it.  All the best.

6  Q.   Thank you.  Now, if you could please read from the top of

7  this e-mail.

8  A.   Franklin, very many thanks and this is very generous of

9  you.  You may want to check with Mike Arp in KU endowment to

10 register as a donor as there may be a tax advantage for you.

11 I'm not sure of the situation after the tax changes, but Mike

12 will know.

13 BY MR. DEARINGTON:

14 Q.   Thank you, Dr. Weatherley.

15      So does this exhibit refresh your recollection about

16 whether Dr. Tao made a donation to the department?

17 A.   Yeah, I don't recall having received confirmation that it

18 was actually made, but obviously the intent was there.

19 Q.   Okay.  So fair to say, Dr. Weatherley, in light of our

20 refreshing your recollection about the Nagoya position and

21 about Dr. Tao's donation, you may not remember all the ins and

22 outs of what Dr. Tao has told you during this time period?

23 A.   Correct.

24 Q.   So it's possible -- strike that.

25      So do you recall whether Dr. Tao ever mentioned to you that

1    he was in China in 2017 or 2018 or 2019?

2    A.    I don't recall him ever having told me that he was in

3    China.

4    Q.    But given that your recollection of some of the events

5    around Dr. Tao in this period are hazy, he may have told you at

6    a time that he was in China?

7    A.    It is possible.

8    Q.    And you wouldn't be expected to necessarily remember that

9    because you have a lot on your plate.  You have a lot of

10    professors working with you, and it's not your job to track all

11    the professors and take notes when they tell you where they

12    are?

13    A.    That's correct.

14    Q.    And you testified that it would be uncommon I believe, but

15    perhaps not unheard of, for a professor to donate a portion of

16    their award back to the university?

17    A.    It is uncommon.

18    Q.    What type of person do you think would donate part of their

19    award back to the university?

20    A.    Well, people give to the department for a variety of

21    reasons, but I think it's part of altruism, giving back to the

22    program.  If they feel that they've gained from the department,

23    they may want to give something back, and so it's altruistic.

24    Q.    Thank you, Dr. Weatherley.

25          So Mr. Oakley walked you through some events around a

1   proposed no-pay leave, and he walked you through some events

2   around a proposed buyout, but he didn't do them at the same

3   time, correct?

4   A.   Correct.

5   Q.   He separated some of your testimony?

6   A.   Correct.

7   Q.   Those two events.  So what I'd like to do is walk you

8   through the no-payment leave and the buyout in chronological

9   order roughly and ask you some questions about that.  Is that

10  okay?

11  A.   Sure.

12  Q.   Okay.  So generally regarding the buyout, you're aware that

13  there is a department buyout policy?

14  A.   Yes.

15  Q.   And you're aware that that policy does not state that a

16  professor who has a buyout must stay on campus?

17  A.   I think that's correct.

18  Q.   Okay.  And the buyout is a mechanism that's meant to

19  facilitate greater flexibility and also to allow a PI, a

20  principal investigator, to focus more on their research,

21  correct?

22  A.   Correct.

23  Q.   And to get a buyout, the policy states that a PI needs to

24  submit an application in writing to the department chair, which

25  would be you in this instance, correct?

1    A.   Yes.

2    Q.   And course buyouts were typically used when a faculty

3    member had to teach less in order to accomplish more research?

4    A.   Correct.

5    Q.   Would you agree if I were to represent to you that the vice

6    provost for faculty development Chris Brown stated that a

7    course buyout allowed a professor to leave campus?

8              MR. OAKLEY:  Objection, hearsay, Your Honor.

9              THE COURT:  Rephrase the question.  Rephrase the

10   question.

11             MR. DEARINGTON:  Sure, Your Honor.  Happy to.

12   BY MR. DEARINGTON:

13   Q.   Do you agree that a buyout could allow a professor to leave

14   campus?

15   A.   Of course.

16   Q.   And do you recall telling Dr. Tao that buyouts are, quote,

17   designed to provide flexibility for highly active researchers

18   such as him?

19   A.   Yes.  Agreed.

20   Q.   So Mr. Oakley asked you -- strike that.

21        Do you recall telling the FBI, specifically Special Agent

22   Lampe, in January 2020 that Dr. Tao contacted you about buying

23   out the spring 2019 semester to attend the Max Planck Institute

24   in Germany?

25   A.   I don't recall telling him that, but it sounds correct.

1  Q.  When you say it sounds correct, do you mean that the

2  statement that I just stated that you made to Special Agent

3  Lampe sounds correct or that it sounds correct that you told

4  Special Agent Lampe that information?

5  A.  Oh.  I'm confused now.  Can you repeat the question?

6  Q.  I'll restart that line of questioning.

7      Do you recall telling Special Agent Lampe when you met with

8  him in January 2020 that Dr. Tao contacted you about buying out

9  the spring semester course to attend Max Planck in Germany?

10 A.  I don't remember that.  I don't remember him having asked

11 that question.

12 Q.  I'm going to show you what I will represent to you is a

13 interview memorandum and I want to see if this refreshes your

14 recollection.

15     MR. OAKLEY:  Your Honor, may I *voir dire* the witness

16 with regards to this?  I assume he's showing him a document

17 that was not prepared by this witness.

18     THE COURT:  Well, it doesn't matter as long as it

19 refreshes his recollection.  Do you have a copy of this

20 document?

21     MR. OAKLEY:  I'm sure I do.  But I don't have it in

22 front of me.

23     THE COURT:  You can look at it if you like.

24     MR. DEARINGTON:  By all means.

25     MR. OAKLEY:  Dr. Weatherley, can I just take a look at

1    that?  Thank you.

2    BY MR. DEARINGTON:

3    Q.   Dr. Weatherley, does that refresh your recollection?

4    A.   Yes.

5    Q.   So you do recall telling Special Agent Lampe that Dr. Tao

6    requested a buyout to attend Max Planck Institute in

7    January 2020?

8    A.   Looks like I must have told him that, yes.

9    Q.   And as you stand here today, do you believe that that

10   statement was incorrect?

11   A.   What I don't remember, whether the request for the buyout

12   was specifically related to the Max Planck.

13   Q.   So it's possible that the request --

14        THE COURT:  Could you bend the microphone down?

15        THE WITNESS:  Sorry.  I beg your pardon.

16        I don't remember specifically if the buyout was

17   related directly to the Max Planck.

18   BY MR. DEARINGTON:

19   Q.   And did you not remember specifically when you met with

20   Special Agent Lampe whether the buyout was specifically

21   related --

22   A.   It looks like I did.

23   Q.   And standing here today do you have doubts about the truth

24   of that statement?

25   A.   No.

1    Q.   So you think it was correct to say that the buyout was for

2    Max Planck University?

3    A.   Well, the buyout could have covered a range of things, what

4    he did with that time.  My understanding initially was that the

5    Max Planck Institute was going to be maybe for a few days to

6    give a seminar and maybe run some tests, which was what was in

7    one of the e-mails, but he would have a host of other things to

8    do, running his research group back at KU, et cetera, doing

9    publications, writing proposals, you know, within the time that

10   he bought out.

11   Q.   Let me ask it this way.  As you stand here today, do you

12   recall Dr. Tao asking you -- seeking your permission to buy out

13   a course to attend Max Planck?

14   A.   I think the Max Planck visit was part of it.

15   Q.   Part of the buyout?

16   A.   Part of the buyout.

17   Q.   So he asked you, is your testimony, to buy out a course to

18   attend Max Planck at least in part?

19   A.   I believe that's the case.

20   Q.   I'll take that document back from you, sir.  I'd like to

21   walk you through it because these events are fairly hazy.

22   They're from a few years ago.

23        I think we've established your memory from that period at

24   least with respect to Dr. Tao is a little hazy, correct?  So

25   let's walk you through some of these documents that the

1    government walked you through.

2        The government previously introduced Exhibit 145 and 147.

3    Excuse me, 145, 146, and 147.  145 was an e-mail I will show

4    you.  And this is May 17, 2018, from Dr. Tao to Dr. Weatherley,

5    you, and Mr. Brown attaching a letter to apply for a four-month

6    no-payment leave.  And this was in connection with a possible

7    opportunity at Max Planck, correct?

8    A.    Yes.

9    Q.    I'm showing you what is marked as Defendant's Exhibit 1017.

10   Do you recognize that e-mail, Dr. Weatherley?

11   A.    I do indeed.

12   Q.    Is that an e-mail exchange between you and Professor

13   Subramaniam?

14   A.    Correct.

15           MR. DEARINGTON:  Your Honor, I'd like to move this

16   exhibit into evidence.

17           THE COURT:  Any objection?

18           MR. OAKLEY:  Mike, do you have a copy?

19           MR. DEARINGTON:  It should be in our exhibit list.

20   It's 1017.

21           MR. OAKLEY:  No objection, Your Honor.

22           THE COURT:  1017 admitted.

23   BY MR. DEARINGTON:

24   Q.   Is this at the bottom here an e-mail between you,

25   Dr. Weatherley, and Bala Subramaniam regarding Dr. Tao's

1    request for unpaid leave three days earlier?

2    A.   Yes.

3    Q.   And at the bottom of this e-mail could you please read that

4    sentence?

5    A.   You mean the highlighted?

6    Q.   Yes, sir.

7    A.   The other question on which I'm seeking clarification is

8    what happens to the funding line for the four months.  If that

9    does not come back to the department, then I would be even less

10   enthusiastic about approving the request.

11   Q.   Fair to say you were not enthusiastic about granting

12   Dr. Tao the requested no-pay leave?

13   A.   Correct.

14   Q.   Part of the reason was because of the implications on your

15   department's funding?

16   A.   That was part of the issue.  I mean, I think the main issue

17   was my concern for Dr. Tao's promotion.

18   Q.   Sure.

19   A.   And that he'd been repeatedly counselled on that particular

20   matter.

21   Q.   So four days later, the government showed you an e-mail

22   marked Exhibit 150.  And this is May 21st.  And in this e-mail

23   Dr. Tao says that he sent you a letter to apply for no-payment

24   leave, which was four days earlier, correct?

25   A.   Yes.

1    Q.    And he doesn't say no-payment leave will be implemented

2    through a buyout, correct?

3    A.    Correct.

4    Q.    And then in the next paragraph as a postscript, he says, I

5    got a positive signal from my renewal of DOE.  I will use it to

6    buy out one course and renew my current post-doc.  Correct?

7    A.    Yes.

8    Q.    Is it your interpretation and recollection of this e-mail

9    that the no-payment leave and the buyout he mentioned were

10   different?

11   A.    Quite separate.

12   Q.    Because you couldn't have a buyout in the same semester you

13   had no-payment leave?

14   A.    Correct.

15   Q.    Because there would be nothing to buy out; you're not

16   getting any pay?

17   A.    That's correct.

18   Q.    Okay.  So fair to say that the mention of a buyout through

19   DOE with one course had nothing to do with the no-payment leave

20   request?

21   A.    Correct, that's my understanding.

22   Q.    And as of May 21st the request of no-payment leave is still

23   pending, based on this e-mail.  Would you like me to show you

24   again?

25   A.    Yes, it was pending, but I think -- what happened was

1   the -- I had counselled Franklin based on my correspondence

2   with Dr. Subramaniam and we left it at that.  And he said, you

3   know -- I wasn't going to -- I wasn't going to send a letter of

4   approval because we didn't think it was a good idea and we

5   didn't hear any more back from Dr. Tao so we assumed the matter

6   was closed.

7   Q.   So no-payment leave is Max Planck, correct?

8   A.   Correct.

9   Q.   And you denied the no-payment leave request, correct?

10  A.   Correct.

11  Q.   And after you denied the no-payment leave request, Dr. Tao

12  sometime later, around the time but later, requested a course

13  buyout, correct?

14  A.   Yes.

15  Q.   The government presented to you an e-mail marked

16  Exhibit 164 dated June 22nd and this e-mail has a subject line

17  buying out course, correct?

18  A.   Yep.

19  Q.   And Dr. Tao in this e-mail is requesting that you approve a

20  course buyout, correct?

21  A.   Yes.

22  Q.   So not no-payment leave and nothing about Max Planck you

23  see in here, correct?

24  A.   Correct.

25  Q.   Attached to this e-mail you can see buy out course and

1    there's a document, correct?

2    A.    Yes.

3    Q.    The government showed you that document and I'm going to

4    show you it again, Dr. Weatherley.    It's Exhibit 165.    And

5    Mr. Oakley kindly walked you through this document, correct?

6    A.    Yes, he did.

7    Q.    Do you recall him mentioning that the source and lifetime

8    of the funding for this buy out was Fuzhou University?

9    A.    I don't recall --

10   Q.    I thought he skipped that.

11   A.    I don't recall him reading that.

12   Q.    He read a lot of content in this letter?

13   A.    Yeah.

14   Q.    He didn't mention Fuzhou University to you?

15   A.    I don't remember.

16   Q.    But you agree that Fuzhou University is listed in this

17   letter as the source of the buyout?

18   A.    Yes.

19   Q.    Fair to say that Fuzhou University wouldn't fund Dr. Tao's

20   buyout for nothing, right?

21   A.    Well, I didn't know --

22   Q.    Sure.

23   A.    -- what portion, if any, in the end came from that funding.

24   Q.    Right.    But you knew that Dr. Tao was requesting a buyout

25   that would be funded by Fuzhou University, correct?

1    A.    It may have been partly funded or completely funded, but I
2    didn't --
3    Q.    I'll let you take a moment to review this letter and let me
4    know if that refreshes your recollection as to whether it would
5    be completely funded or partly funded by Fuzhou University.
6    A.    So I would have taken that at face value and I would have
7    assumed the funding would have been covered.
8    Q.    And you're a busy person, but you don't get into the weeds
9    on what would be involved with Dr. Tao's buyout from Fuzhou
10   University?
11   A.    Correct.
12   Q.    You care more that it's funded?
13   A.    Correct.
14   Q.    But Dr. Tao wanted to show you, consistent with the policy,
15   that he was going to have Fuzhou University, according to his
16   plan, fund his buyout?
17   A.    Correct.
18   Q.    And fair to say that that would be in exchange for some
19   sort of service or collaboration?
20   A.    Right.
21   Q.    Fuzhou University isn't in the -- no university is in the
22   business of paying researchers for nothing?
23   A.    Absolutely.
24   Q.    So it would involve a collaboration with Fuzhou University?
25   A.    Correct.

1  Q.  And Dr. Tao is not hiding the fact that Fuzhou was going to

2  be the source of the funds for his proposed buyout?

3  A.  No, it was upfront.

4  Q.  And here where I'm pointing, it says he'd like his buyout

5  so he can spend some days to travel, to access public

6  facilities and instruments located at certain centers in other

7  states or country for these projects, right?

8  A.  Correct.

9  Q.  So fair to say Dr. Tao is proposing that Fuzhou University

10 provide funds to KU to support a collaboration of some sort and

11 that Dr. Tao would also be freed up consistent with the buyout

12 policy to work on his grants and further his research?

13 A.  That's the general idea.

14 Q.  Okay.

15 A.  Yes.

16 Q.  I'd like to pause to ask you whether you yourself have

17 experience conducting federally-funded research?

18 A.  Very little in this country, very little.

19 Q.  Are you familiar -- sorry?

20 A.  I have been involved as a -- really as a co-PI.

21 Q.  Okay.  So you're familiar --

22 A.  Ten years ago plus but not -- nothing recent.

23 Q.  And you're familiar with the concept of current and pending

24 support, correct?

25 A.  Yes.

1    Q.   And so if KU -- I'd like you to consider a hypothetical.

2    If KU had a proposal that Fuzhou was going to provide funding

3    to KU for a buyout, that would be considered in your view

4    pending support, correct?

5    A.   Yes.

6    Q.   And if KU research office knew about that pending support,

7    they would have an obligation in your view to disclose it to an

8    agency as current and pending support in a proposal?

9    A.   I would expect so, yes.

10   Q.   Would you say the KU research office, if it knew those

11   hypothetical facts and failed to disclose it, had failed in its

12   job?

13   A.   Well, my understanding is it's incumbent on the PI

14   applicant in the application to disclose.  Normally they would

15   obtain that information from the Office of Research.  But in

16   terms of disclosing other things, I think it was incumbent on

17   the PI to --

18   Q.   It's a shared responsibility?

19   A.   It's a shared responsibility.

20   Q.   So if both parties know about it?

21   A.   Correct.

22   Q.   Surely the research office would be better trained in these

23   matters?

24   A.   Correct.

25   Q.   And they would have an obligation in your view to disclose

1    it?

2    A.   Yes.

3    Q.   If they didn't disclose it, it could be a failure of both

4    the PI and the KU research office, correct?

5    A.   Yes.

6    Q.   And you would expect the KU research office, if it realized

7    this error, to acknowledge it?

8    A.   Yes.

9    Q.   Okay.  So the government showed you Exhibit 167.  And here

10   on June 25, 2018, you can be seen saying, I am pleased to

11   approve the request, correct?

12   A.   Yes.

13   Q.   So you approve the request for Dr. Tao to have a one-course

14   buyout to be funded by Fuzhou University?

15   A.   I -- not clear.  I thought that the funding was -- maybe he

16   had DOE funding, maybe that was the proposal for spring '20,

17   but I didn't connect -- I didn't connect this directly to

18   Fuzhou University when I wrote this.

19   Q.   But three days earlier we just saw Dr. Tao sent you a

20   formal letter at your invitation --

21   A.   Yes.

22   Q.   -- stating that Fuzhou University would support and fund

23   the buyout?

24   A.   Yes.

25   Q.   And three days later you approved that request?

1    A.    Yes.

2    Q.    So fair to say your interpretation at the time was that you

3    were approving Fuzhou University funding a buyout to KU for one

4    course of Dr. Tao's teaching obligations?

5    A.    I never saw any numbers apart from the --

6    Q.    Sure.

7    A.    -- apart from the 90,000 figure that was referred to.  But

8    in terms of the breakdown, whether that was to be used for

9    funding the research or whatever, it was not specifically

10    earmarked for buyout I don't think.

11    Q.    You're not an SSC accountant, correct?

12    A.    Correct.

13    Q.    Could you tell the jury what SSC stands for?

14    A.    SSC stands for shared service center and it's an

15    administrative center which provides financial and H.R. support

16    to the units in the School of Engineering.  It's called the

17    shared service center for engineering and they process all our

18    invoices, our accounts, make sure bills are paid.  They'll deal

19    with contracts, deal with H.R. issues as well.  It's a group of

20    administrators which is devolved to the School of Engineering.

21    Q.    And here you stated the SSC accountants will advise on

22    exact amounts and the account to which the dollars will be

23    transferred into?

24    A.    Correct.

25    Q.    Are you aware of whether the SSC accountants followed up

1    with Dr. Tao in the months to come about that topic?

2    A.   I don't know.

3    Q.   And they were copied on this e-mail?

4    A.   Yes.

5    Q.   And that's Jim Hammen and he and Sarah Craig and Russell D.

6    Ostermann.  Are any of those individuals from SSC?

7    A.   Jim Hammen and Sarah Craig.

8    Q.   Okay.  And here you also stated, as Mr. Oakley asked you,

9    I'm going to highlight it for you, you are expected to be in

10   attendance on campus during the semester in accordance with KU

11   policy?

12   A.   Yes.

13   Q.   So you're not saying here you're expected to stay on campus

14   full stop, you said in accordance with KU policy?

15   A.   Yes.

16   Q.   And Mr. Oakley didn't ask you to identify a policy that

17   stated when you have no teaching classes that you have to

18   remain on campus at all times, did you?

19   A.   No.

20   Q.   You're not aware of such policy, are you?

21   A.   I wouldn't like to give a definitive answer to that.  I

22   would need to go back to the unit, to the KU policy library on

23   attendance.  But in terms of the department, there's an

24   expectation to be in attendance to deal with things like

25   advising, to attend faculty meetings, and to, you know, to

1    fulfill their service obligations and also to, you know, be

2    there for their students and post-docs working either within

3    the CEBC or on the campus.

4    Q.   I'm asking you whether there's a policy because, see,

5    there's the normative expectations that would be nice, but

6    there's also a world where policies exist and tell exactly the

7    employee what needs to be done and what is required of the

8    person.  I guess I'm asking you, is there a policy that you're

9    familiar with that states when you have no teaching

10   obligations, you have to be on campus?

11   A.   For faculty members there is no kind of 8-to-5 policy if

12   that's what you mean.

13   Q.   Yeah.  And faculty members at KU, especially those as

14   accomplished as Dr. Tao, they travel a lot, right?

15   A.   Correct.

16   Q.   And they're not small children.  They don't need to be

17   micromanaged about where they are at any given time, correct?

18   A.   Correct.

19   Q.   Conferences around the world, correct?

20   A.   Correct, yes.

21   Q.   And if a professor had no courses, there's no policy that

22   says they need to hold office hours for people who -- they

23   don't have students in those courses for those people to

24   attend, right?

25   A.   That's correct.

1  Q.  Are you aware that Dr. Tao, having had a successful buyout

2  in spring 2019, had no courses to teach at KU that semester?

3  A.  That's correct.

4  Q.  So Mr. Oakley presented you with a handful of e-mails and

5  one of them involved the faculty retreat in which Dr. Tao sent

6  his regrets that he was unable to attend the retreat?

7  A.  Correct.

8  Q.  And in that e-mail he stated that he was in Germany?

9  A.  Yes.

10  Q.  Okay.  And faculty members don't with 100 percent

11  attendance go to faculty retreats, correct?

12  A.  That's correct.  There's nothing unusual about that e-mail.

13  Q.  Okay.

14  A.  Didn't raise any flags to me.

15  Q.  The only thing Mr. Oakley was focused on in -- strike that

16  question.

17      Mr. Oakley asked you if your belief was that Dr. Tao was in

18  Germany when you received that e-mail?

19  A.  Correct, yes.

20  Q.  Would it matter to you whether Dr. Tao was in Germany

21  versus Belgium?

22  A.  Not specifically.

23  Q.  Belgium versus the U.K.?

24  A.  Wouldn't strike me as unusual.

25  Q.  So where Dr. Tao was was not significant.  The point was

1    that he was extending you a courtesy to let you know he was not

2    going to be at the retreat, correct?

3    A.    Correct.

4    Q.    Are you aware that shortly -- a few months after Dr. Tao

5    joined KU, his father fell ill in China?

6    A.    I did become aware of that, yes.

7    Q.    And did you become aware because Dr. Tao had to go to China

8    for three to four weeks to tend to his father and attend a

9    funeral of his father?

10   A.    I was aware of that, yes.

11   Q.    Were you aware that upon his return, there was blow-back

12   over the fact that he had spent time with his family in China

13   for so long despite having classes?

14   A.    No.

15   Q.    And that was in April 2015 we're talking about, correct?

16   A.    Correct.

17   Q.    Can you imagine someone who's been criticized in those

18   circumstances being reluctant to tell a department chair that

19   they're in China with family if in fact they were with family

20   in China after having experienced that?

21   A.    I think that may have been -- at the time he was due to

22   teach in the chemistry department and I think that's where the

23   problem --

24   Q.    Right, in 2015.

25   A.    -- blow-back as you call it, actually came about.  I was

1    very sympathetic to what happened, but I have no role in any

2    criticism of what he had done.

3    Q.    Understood, Dr. Weatherley.  And you in fairness seem like

4    a very sympathetic person.  Are you aware that Dr. Laird said

5    something to Dr. Tao in 2015 after returning to the effect of

6    everybody has fathers, you still have to get your courses done?

7               MR. OAKLEY:  Objection, hearsay.

8               THE COURT:  I'll sustain.

9               THE WITNESS:  Do I answer that?

10              THE COURT:  No.

11              THE WITNESS:  Okay, thank you.

12    BY MR. DEARINGTON:

13    Q.    So I think going back to my question prior, can you imagine

14    someone who has been criticized for spending too much time with

15    family in those circumstances being reluctant to admit if those

16    types of things happen again that they were in China?

17    A.    That's quite possible.

18    Q.    And it might be better just to say I'm at a conference in

19    Germany, Belgium, U.K., correct?

20    A.    Possibly.

21    Q.    And one of the e-mails the government asked you about,

22    Exhibit 231, was about ABET, correct?

23    A.    Yes.

24    Q.    And you're aware that Dr. Tao got back to you after you

25    e-mailed him before your given deadline with the information

1    you needed?

2    A.   Yes.

3    Q.   One of your e-mails was about Dr. Tao advisees reaching out

4    to him?

5    A.   Yes.

6    Q.   Are you aware that Dr. Tao spoke to all 20 of his advisees

7    during that time period after receiving your e-mail?

8    A.   Not 100 percent sure he met with all 22 or whatever number

9    it was because the advising officer -- if the students who

10   still haven't been advised by a deadline, she would probably do

11   that herself.  So I honestly don't.

12   Q.   You can't --

13   A.   I assume since I didn't hear anymore about it that the

14   problem had been solved.

15            THE COURT:  Don't talk over him.

16            MR. DEARINGTON:  Sorry, Your Honor.  I thought he was

17   done.

18   BY MR. DEARINGTON:

19   Q.   Sorry, Dr. Weatherley.

20        So you don't know one way or another?

21   A.   Correct.

22   Q.   Okay.  And when Dr. Tao sent you those e-mails that the

23   government presented to you, in not one of those e-mails did he

24   say I'm spending the semester in Germany collaborating and

25   researching, right?

1   A.   I don't believe he said he was spending the semester in

2   Germany.

3   Q.   Okay.  He said I'm in Germany and one of them said I'm at a

4   conference, correct?

5   A.   So the first one when he said he couldn't come to the

6   retreat, I assumed he was there either at a conference or to

7   give, you know, a seminar, away for a couple of days.  The

8   later e-mail, which I think was dated mid-February, it was

9   obvious that he was away for several weeks because he said he

10   was going to be back on the -- I think the 15th of March and

11   the e-mail was dated something like February the 20th, so I

12   assume then he was away for a longer period.

13   Q.   Sure.  And so I want to --

14   A.   I'm sorry.

15   Q.   No, I'm sorry.  No, I thought you had stopped.

16        I want to go back to a question I asked you about before we

17   ran through all the no-pay and buyout e-mails and we talked

18   about how you had recalled, after I refreshed your

19   recollection, that you had told Special Agent Lampe Dr. Tao

20   sought a buyout to be at Max Planck, correct?

21   A.   Correct.

22   Q.   But now that we've walked through those e-mails, fair to

23   say that that was inaccurate?

24   A.   I thought the question for buyout was for him to spend some

25   time at Max Planck.

1    Q.    Allow me to refresh your recollection about that.  I'm

2    showing you Exhibit 165 again.  Do you see anything about Max

3    Planck in this letter?

4    A.    No.

5    Q.    And do you see here where it says the buyout will be funded

6    by Fuzhou University?

7    A.    But that -- so it depends on the nature of the funding.  So

8    funding for a research project would usually comprise dollars

9    for the actual researcher employing a research assistant or for

10   using an instrument or for supplies plus an overhead, which the

11   Office of Research charge.

12        Now, some of those overhead dollars come back to the

13   principal investigator from which they can -- they can use

14   those dollars for buyouts.  So the -- there may not have been

15   and I have not seen the proposal to Fuzhou University, I have

16   not seen the contract.  So the buyout may not have -- in legal

17   terms may not have been specifically linked to Fuzhou

18   University.  The dollars may have come from a proportion of the

19   overhead money that would come back to Dr. Tao from that

20   project pieced together with maybe other dollars from other

21   projects.

22        So what I don't know is whether or not within the contract

23   with Fuzhou University whether there was a specific link to the

24   buyout.  And I don't know the answer because I haven't seen the

25   papers.

1    Q.   So you don't know -- and that's fair.  But when you told
2    Special Agent Lampe, you told him you knew and that Dr. Tao
3    sought a buyout to work at Max Planck, correct?
4    A.   Yes.
5    Q.   So back then you knew.  Now you don't know, correct?
6    A.   Well, I thought we were talking about Fuzhou University.
7    Q.   We were.
8    A.   Yeah.
9    Q.   And when you told Special Agent Lampe that Dr. Tao had a
10   buyout request for Max Planck, now you see that the buyout
11   request was actually for Fuzhou University, correct?
12   A.   No, I don't believe -- the answer is I don't know.
13   Q.   You don't know?
14   A.   So the way PIs work is they collect a proportion of the
15   overhead's dollars, which the university charges.  Some comes
16   back to the department; some goes to the dean; some comes to
17   the PI.  And we can put together those dollars to provide a
18   funding package, for example, to buy out.  So there's no direct
19   link necessarily between a contract with Fuzhou University and
20   the buyout.
21   Q.   There's not necessarily a direct link, but I'm showing you
22   a letter that creates a link.  It says the amount of proposed
23   buyout involved and it says the source and lifetime of the
24   funding is Fuzhou University.
25   A.   To put it another way, I don't know if the buyout is

19-20052-JAR    USA v. Feng Tao    03.23.22    Day 3          428

1    specifically in the contract with Fuzhou University.

2    Q.   It sounds like you have a lot of questions around this.

3    A.   Yeah.

4    Q.   And it's still been unanswered, correct?

5    A.   Correct.

6    Q.   But when you met with Special Agent Lampe, you did not

7    state that Fuzhou University was to fund the buyout request,

8    did you?

9    A.   I don't believe so, no.

10            MR. DEARINGTON:  No further questions.  Thank you,

11   Dr. Weatherley.

12            THE COURT:  Do you have redirect?

13            MR. OAKLEY:  I do, Your Honor.

14            THE COURT:  Can we finish before 5:00?

15            MR. OAKLEY:  Yes, Your Honor.

16            THE COURT:  Good.

17                     REDIRECT EXAMINATION

18   BY MR. OAKLEY:

19   Q.   In order for a buyout to occur, does the underlying source

20   of the buyout have to be funded?  In other words,

21   Mr. Dearington asked you about this reference in Government's

22   Exhibit 165 to a Fuzhou University agreement.

23   A.   Correct.

24   Q.   And when he was on cross-examination, he asked you a

25   question that assumed that that was the funding source for the

1    buyout --

2    A.    Yes.

3    Q.    -- correct?

4    A.    Yes.

5    Q.    Do you know whether or not that proposed contract between

6    the University of Kansas and Fuzhou University was ever entered

7    into?

8    A.    I don't know.

9    Q.    And if it wasn't entered into, there would be no source of

10   funding for a buyout, would there?

11   A.    Well, yes, he may have been able to piece it together

12   through other grants.  He had a significant portfolio, so he

13   would have had access to overhead for those grants or he could

14   have paid maybe some of his own salary in that way to buy out.

15   Q.    So the funding -- if the agreement between University of

16   Kansas and Fuzhou doesn't go through, the funding is not going

17   to be from Fuzhou?

18   A.    From that particular source, correct.

19   Q.    Do you know whether or not this proposed agreement with KU

20   and Fuzhou University ever came to fruition?

21   A.    I do not know.

22   Q.    I'm going to show you what's been marked as Government's

23   Exhibit 211 and direct your attention to the top portion of

24   that e-mail.  Is that an e-mail from Dr. Tao to other people at

25   the University of Kansas?

1    A.    It looks like it's between Dr. Tao and an Aaron Crim.

2    Q.    And in that e-mail does Dr. Tao indicate whether or not the

3    university received funding under that subcontract or whether

4    or not that subcontract --

5              MR. DEARINGTON:  Objection, Your Honor.  Foundation.

6    He has not -- Dr. Weatherley hasn't acknowledged he's familiar

7    with the e-mail.

8              THE COURT:  All right.  Just a minute.  Lay the

9    foundation.  You're going to offer this?

10   BY MR. OAKLEY:

11   Q.    Do you recognize the e-mail address on that as coming from

12   Dr. Tao's KU e-mail account?

13   A.    Yes.

14             MR. OAKLEY:  Your Honor, I'd offer Government's

15   Exhibit 211.

16             THE COURT:  Any objection?

17             MR. DEARINGTON:  Yes, Your Honor, objection.

18             MR. OAKLEY:  Statement of party-opponent, Your Honor.

19             THE COURT:  What's your objection?

20             MR. DEARINGTON:  Sorry.  Your Honor, if I could take a

21   moment to review the e-mail.

22             Your Honor, I'm at a loss here for the foundation.

23   Dr. Weatherley is not even on this e-mail.  He's using him to

24   read an e-mail aloud as far as I can tell.  And in fact, there

25   are people on this e-mail on the government's witness list, so

```
 1    I'm a little confused.
 2             THE COURT:  He's identified it as being an e-mail from
 3    Dr. Tao.  Proceed with laying the foundation for a business
 4    record, Mr. Oakley.
 5    BY MR. OAKLEY:
 6    Q.   Do you have an KU e-mail account?
 7    A.   Yes, I do.
 8    Q.   Earlier I showed you and we admitted into evidence copies
 9    of an e-mail that were sent from Dr. Tao to you?
10    A.   Correct.
11    Q.   And so are you familiar with Dr. Tao's e-mail account?
12    A.   Yes.
13    Q.   And you recognize that particular e-mail as an e-mail
14    coming from Dr. Tao's KU account to other people at the
15    University of Kansas?
16    A.   I believe so, yes.
17             MR. OAKLEY:  Your Honor, I offer Government's
18    Exhibit 211.
19             THE COURT:  Any objection?
20             MR. DEARINGTON:  Yes, Your Honor.
21             THE COURT:  So this is an e-mail from Dr. Tao's KU
22    e-mail account to somebody named Aaron Crim at also a KU e-mail
23    account?
24             MR. OAKLEY:  Yes, Your Honor.
25             THE COURT:  All right.  I'll overrule.  I think it is
```

1   outside the hearsay rules as a statement of a party-opponent

2   and foundation has been laid that it's from Dr. Tao to another

3   KU person.

4        MR. OAKLEY:  Bonnie, could we have the computer,

5   please.

6        THE COURT:  Exhibit 211 admitted.

7   BY MR. OAKLEY:

8   Q.  If we could go to the very top part of that.

9        Dr. Tao in this e-mail says, there were a few competitors

10  for that fund.  I was not successful in the competition of

11  getting it.  I thought I had the best chance to get that fund.

12  There are other calls for application.  I will contact you if

13  it fits my expertise.  Thank you very much for your time and

14  efforts.

15       Did I read that correctly?

16  A.  Yes.

17  Q.  If someone asks you a question that the funding for the

18  buyout was based on a Fuzhou sub-award, knowing that the

19  sub-award didn't happen, that would be misleading, would you

20  agree?

21  A.  It may have been construed as misleading, yeah.

22  Q.  Let me ask you, I think you testified before that -- is it

23  the Center for Research that gets involved in the grant

24  application process and the funding process related to

25  receiving grants?

1    A.    So the KU -- so exactly.  So the KU Center for Research

2    will take responsibility for all the negotiations, working with

3    the PI and with the vendor, you know, to reach in this case

4    some kind of contract if that's what it was.  And I may --

5    that's what they do.  That's one of the things they exist for

6    is a major role of that.

7    Q.    Do you know anything about that -- about a proposed

8    subcontract related to Fuzhou University?

9    A.    Only the -- only the couple of words that were in a couple

10   of the earlier e-mails to say that there was a contract pending

11   perhaps and that it was about $90,000 was actually one of the

12   numbers.  But in terms of the minutia, the detail, what kind of

13   work was to be done, how the funding was going to be broken

14   down, I never saw any of that.

15   Q.    And based on this e-mail, it appears that that funding --

16   that contract was never entered into?

17   A.    Correct.

18   Q.    While we're talking about the KU Center for Research, you

19   indicated that your experience with awards is outside the

20   United States.  I think you said in the last ten years you've

21   served as a co-PI?

22   A.    Most of my research funding has been outside the United

23   States before I came to the country.

24   Q.    So as it relates to dealing with the KU Center for

25   Research, you don't have a lot of experience, am I correct, did

1    you testify to that on cross-examination?

2    A.   Well, since I demitted as chair, I've been writing

3    proposals, so I've had quite a bit to do with those and they've

4    gone to proposal to the National Science Foundation and to --

5    also to the Department of Energy.  So I'm getting back into

6    that.  But because I was chair for 16 years, I wasn't into

7    doing proposals.

8    Q.   Sure.  You had some involvement as a co-PI?

9    A.   Yes.

10   Q.   But you testified on cross-examination that even with your

11   lack of experience dealing with the process, you know that it's

12   incumbent upon the PI to make sure that the information that's

13   submitted is accurate?

14   A.   Yes.

15        MR. OAKLEY:  No further questions, Your Honor.

16        MR. DEARINGTON:  Your Honor, I have two or three more

17   questions on recross here.

18                    RECROSS EXAMINATION

19   BY MR. DEARINGTON:

20   Q.   Hello, Dr. Weatherley.

21   A.   Hello.

22   Q.   You mentioned that you now are back into submitting grant

23   proposals as a co-PI, right?

24   A.   Yes.

25   Q.   So presumably you have mandatory conflict of interest

1    training?

2    A.   I have mandatory --

3    Q.   When was the last time you had mandatory conflict of

4    interest training?

5    A.   I don't believe I've ever had any mandated conflict of

6    interest training.  It's been offered certainly, but I have

7    never taken up on it.

8    Q.   Because it's not required and you're a busy guy, right?

9    A.   When I was chair -- well, I'm still busy.  I'm officially

10   on sick leave at the moment.

11   Q.   Fair enough.

12       You testified earlier on redirect that if Dr. Tao had a

13   buyout approved for Fuzhou but the funding didn't go through,

14   he could use other grants potentially to fund the buyout,

15   correct?

16   A.   Correct.

17   Q.   And he could work on that grant for that semester?

18   A.   Correct.

19   Q.   You wouldn't fire him because his funding had to come

20   through and he had to charge another grant and do the work?

21   A.   No.  Maybe, if I can add, the accountant to the SSC would

22   have come right back to me --

23   Q.   Sure.

24   A.   -- if the funding had not been available.  So I -- I would

25   have assumed that the funding for the buyout would have come

1    from other grants.  If it hadn't, they would have been on to me

2    saying, hey, where is the funding for this coming from.

3    Q.   That sounds like a properly functioning system, and they

4    never came back to you?

5    A.   They never came back to me so I assumed all was fine.

6              MR. DEARINGTON:  No further questions, Your Honor.

7              THE COURT:  Anything more from Dr. Weatherley?

8              MR. OAKLEY:  No, Your Honor.

9              THE COURT:  May he be excused?

10             MR. OAKLEY:  Yes, Your Honor.

11             THE COURT:  Thank you.  You're excused.

12             THE WITNESS:  Thank you.

13             THE COURT:  I do want to break about ten till or so,

14   but can we at least get a little bit of Ms. Reed's testimony?

15   Is she still here?

16             Okay.  Ms. Reed, you can come forward.  You're still

17   under oath to tell the truth.  Do you understand?

18             THE WITNESS:  Yes.

19                       ALICIA REED,

20   called as a witness on behalf of the government, having been

21   previously sworn, testified as follows:

22             THE COURT:  We were on cross-examination.

23             MR. OAKLEY:  Yes, Your Honor.

24             THE COURT:  Okay.  I didn't remember that.  Had you

25   just finished your direct exam?

1      MR. DEARINGTON:  Your Honor, I had just been a little

2 bit into the cross.

3      THE COURT:  Okay.  I just didn't remember.

4                  CONTINUED CROSS-EXAMINATION

5 BY MR. DEARINGTON:

6 Q.  Good afternoon again, Ms. Reed.

7 A.  Good afternoon.

8 Q.  So I think when we left off, I had asked you whether you

9 were aware when your office submitted Dr. Tao's DOE grant in

10 late 2017 that he had not -- whether you were aware of a

11 conflict of interest form being submitted by Dr. Tao in

12 September as required, and you were unaware of such a form,

13 correct?

14 A.  It would not be usual for me to know of a particular PI's

15 COI form.  I think my last response was that I'm sure my office

16 followed policy.

17 Q.  Okay.  I'd like to show you what's been marked as

18 Government Exhibit 1055 [sic].

19      MR. DEARINGTON:  May I approach, Your Honor?

20      THE COURT:  Yes.

21 BY MR. DEARINGTON:

22 Q.  Do you recognize this document, Ms. Reed?

23 A.  I do.  This is like a proposal to the National Science

24 Foundation.

25      MR. DEARINGTON:  Your Honor, I'd like to introduce

1   Government Exhibit 55 into evidence.

2            THE COURT:  55?  Okay.

3            MR. DEARINGTON:  Sorry, Your Honor.

4            THE COURT:  Any objection?

5            MR. BARRY:  No objection.

6            THE COURT:  Exhibit 55 admitted.

7   BY MR. DEARINGTON:

8   Q.  If you turn to page 4, Ms. Reed.

9   A.  Yes.

10  Q.  This shows that your office was involved with this NSF

11  grant proposal, correct?

12  A.  Correct.  This was a submission for Dr. Tao from our

13  office, correct.

14  Q.  And University of Kansas Center for Research, Inc., that is

15  also your office or the entity with which you work?

16  A.  Correct.

17  Q.  Ms. Reed, can you read to me the date at the top of this

18  NSF proposal?

19  A.  Sure.  October 2, 2017.

20  Q.  So that means, according to your testimony earlier, that

21  someone from your office would have looked at Dr. Tao's

22  September 2017 conflict of interest form before submitting this

23  grant proposal, correct?

24  A.  Well, I think -- do you need me to answer yes or no because

25  I think we've already --

1    Q.   Yes.

2    A.   No, because he did not submit one.

3    Q.   Now you're acknowledging that Dr. Tao did not submit one?

4    A.   Well, I think that you've already shown me evidence that

5    said he didn't submit it until January.  But may I explain the

6    context behind this?

7    Q.   I think we'll allow Mr. Oakley to redirect you afterwards.

8    I'd like to keep moving in consideration of time.

9         So this is the second grant proposal involving Dr. Tao that

10   your office submitted without looking at his conflict of

11   interest form?

12            MR. OAKLEY:  Objection.  Compound question and assumes

13   facts not in evidence.

14            THE COURT:  Reframe the question, please.

15   BY MR. DEARINGTON:

16   Q.   Ms. Reed, you just acknowledged that Dr. Tao didn't have a

17   conflict of interest form in September of 2017, correct?

18   A.   I acknowledge that I have not seen evidence of that in this

19   courtroom.

20   Q.   Fair to say you're not aware for these two grants I just

21   showed you, DOE and NSF, that someone from your office reviewed

22   Dr. Tao's conflict of interest form before submitting the

23   proposal?

24   A.   Them reviewing the conflict of interest disclosures and him

25   having a completed form is two separate things.

1   Q.   I'm sorry.  Could you repeat that?

2   A.   Having a form that has been completed with the date stamp

3   on it is different than him starting a process so I can't say

4   for factual -- I would highly doubt knowing my staff and the

5   training that they receive that they did not look for a COI

6   form or have some communications about a COI prior to

7   submitting these proposals.

8   Q.   I'm sorry for saying this, Ms. Reed, but it sounds to me

9   like you're unwilling to entertain the possibility that your

10  office couldn't be responsible if there's a compliance issue.

11  Is that correct?

12  A.   I am unwilling to entertain the idea that there were two

13  separate occasions within a month or two of each other where

14  the process was not followed.

15  Q.   But the process you identified earlier was that your office

16  would look at a conflict of interest form before submitting a

17  grant proposal?

18  A.   Yes.  They look at the conflict of interest system to see

19  what has been filed, correct.

20  Q.   And that process wasn't followed by your office in this

21  scenario, correct?

22  A.   I think I explained earlier that I would need to see the

23  evidence, the Streamlyne system where we record exactly what

24  occurred prior to being able to answer that question.

25  Q.   Okay.  I'm showing you what's been marked as Government

1   Exhibit 44.  Do you recognize this document, Ms. Reed?

2   A.   It looks like a submission for the National Renewal Energy

3   Laboratory for Dr. Tao on January -- the statement of work is

4   dated January 1st.

5   Q.   January 11th is that --

6   A.   Sorry.  The letter is dated January 11th.  The statement of

7   work is dated January 1st.

8   Q.   Okay.  You'll have to excuse me, Ms. Reed, because I'm not

9   an expert like you are.  But I'd like to show you page 19 and

10  ask for your help interpreting.

11           MR. OAKLEY:  Your Honor, is this an admitted exhibit?

12           MR. DEARINGTON:  I'm sorry.

13           THE COURT:  Exhibit 19.  No, don't publish yet, not

14  until it's admitted.

15           MR. DEARINGTON:  Your Honor, I'd like to move to

16  introduce this exhibit into evidence.

17           THE COURT:  Exhibit 19, has she identified it?

18           MR. DEARINGTON:  Yes, Your Honor.  No, this is --

19  sorry -- didn't we already move in -- hold on one second.

20           THE COURT:  Exhibit 19 has not been admitted.

21           MR. DEARINGTON:  19 I'm not sure I asked about.  I

22  think this is 44.

23           THE COURT:  44.  Okay.  I'm sorry.  I misheard.  So

24  Exhibit 44, she needs to identify it.

25  BY MR. DEARINGTON:

1  Q.   So, Ms. Reed, could you please identify this document for

2  the record?

3  A.   Yes.  This is a proposal to the National Renewable Energy

4  Laboratory for Dr. Tao.  The letter of invitation is dated

5  January 11, 2018.

6            THE COURT:  Now are you moving it into evidence?

7            MR. DEARINGTON:  Okay.  I just need to find that

8  sheet.  Thank you, Your Honor.

9            THE COURT:  Are you moving it into evidence?

10           MR. DEARINGTON:  Yes, Your Honor.

11           THE COURT:  Any objection?

12           MR. OAKLEY:  No, Your Honor.

13           THE COURT:  Exhibit 44 admitted.  Now you can publish.

14  BY MR. DEARINGTON:

15  Q.   So, Ms. Reed, what does that number that I just circled,

16  the 610 tell you about this proposal?

17  A.   It tells me that the proposed budget would have Dr. Tao

18  being paid for his effort and $610.

19  Q.   So for this entire proposal what's budgeted for Dr. Tao's

20  effort is $610?

21           MR. OAKLEY:  Your Honor, I'm sorry, may I have a

22  moment with counsel?

23           THE COURT:  Yes.

24           THE WITNESS:  It does look like --

25           THE COURT:  Wait, wait, wait.

1          Okay.  Go ahead.

2    A.   It appears to me that this is -- that is correct for the

3    period of performance of February 2018 through June of 2018 so

4    it's only four months.

5    BY MR. DEARINGTON:

6    Q.   Okay.  And bear with me one moment, Ms. Reed.  The

7    government previously introduced a fairly lengthy certification

8    marked as Exhibit 78.

9          Ms. Kessler, do you mind pulling that up electronically for

10   us, please.

11   A.   Yes, this is the wording from our Streamlyne award system.

12   Q.   And did you create this document and provide it to the

13   government, this one that appears to have the certification on

14   it?

15   A.   This is the extract from our system, correct.

16   Q.   And when did you extract this from your system?

17   A.   I would have to look at my files.  I don't have any idea.

18   Q.   Presumably, and correct me if I'm wrong, it was after the

19   government reached out to you when it was investigating

20   Dr. Tao, correct?

21   A.   Most likely, yes.

22   Q.   It wasn't the day that Dr. Tao has been alleged to have

23   submitted a certification of this kind, right?

24   A.   No.

25   Q.   So it's possible Dr. Tao didn't see this certification that

1    you pulled later?

2    A.    No.   That's not accurate.   This is the certification from

3    the system.

4    Q.    Well, you testified earlier that he should have seen it.

5    And Mr. Oakley had asked you if he saw it I believe.

6    A.    Well, if you remember in one situation he did not approve

7    one of them, so I cannot certify that he actually even opened

8    the e-mail that he needed to approve it on.   So I can't say he

9    saw it.   In the version where we have the documentation of his

10   approval, he would have seen this screen.   I don't know if he

11   read it.

12   Q.    You're basing that on your memory?

13   A.    I'm basing it on the piece of evidence that I saw earlier

14   where we showed the Streamlyne record that showed that there

15   was approval by his name.   This is part of the approval.

16   Q.    Right.   But that Streamlyne record didn't show this

17   certification.   You made an inference that he saw this

18   certification based on the Streamlyne records, correct?

19   A.    Part of my job was to design and implement the Streamlyne

20   system.   I'm familiar with how it works.   Anybody who is doing

21   an approval at the PI level would see this approval prior to it

22   being marked as approved in the system.

23   Q.    You seem confident about that.

24   A.    I am.

25   Q.    As confident as you are about the fact that your office

1    wouldn't have a compliance lapse when I asked you about the

2    conflict of interest form before?

3    A.    I have 100 percent confidence in my staff and in myself.

4    Q.    About both statements?

5    A.    Yes.

6    Q.    I envy you.

7          Let me ask you this then, were you able to find a

8    certification that looks like that that Dr. Tao certified?

9    A.    I don't understand your question.

10   Q.    Well, you've shown a lot of certifications through your

11   testimony today with people's signatures on them.  You've shown

12   checklists with stamps on them and it shows what has been

13   approved, but you weren't able to find anything, any document

14   that shows this certification with Dr. Tao's name on it having

15   certified?

16   A.    That's not how the system works.

17   Q.    So fair to say you were unable to find it, such a document?

18   A.    Well, unless Dr. Tao shared his log-on with someone else

19   and they went in and approved for him, he would have had to

20   have seen this to mark approved in Streamlyne.  And we did see

21   earlier the system record that showed he approved it at least

22   once.

23   Q.    Well, again, to be fair, you saw a Streamlyne that showed

24   approved which didn't show this certification in that document,

25   correct?  You made an inference?

1    A.   I made an inference based on how the system works, correct.

2    Q.   I'd like to show you what's been marked as Exhibit 1452.

3    Ms. Reed, is this an e-mail from Matthew John Sunner to

4    Dr. Tao?

5    A.   Yes, it appears to be.

6    Q.   Do you know who Mr. Sunner?

7    A.   Yes.  He was one of our preaward staff members.

8    Q.   The date of that e-mail is?

9    A.   The top e-mail in this string is dated January 29th of

10   2018.

11           MR. DEARINGTON:  Your Honor, I'd like to move

12   Exhibit 1452 into evidence.

13           MR. OAKLEY:  Objection, Your Honor; it's hearsay.

14           THE COURT:  Lay further foundation.

15           MR. DEARINGTON:  Your Honor, may I approach?

16           THE COURT:  I'm sorry?

17           MR. DEARINGTON:  May I approach?

18           THE COURT:  Me?  Up here?  Okay.

19      (The following proceedings were had at the bench).

20           MR. DEARINGTON:  I'm not actually trying to -- I know

21   we had a certification that we agreed we're not going to have

22   hearsay objections on the basis of just a business record, but

23   I'm actually not using this for the truth of the matter

24   asserted herein.  I'm really just going to the fact that

25   Dr. Tao received PI approval instructions and what those

1   instructions show.

2          MR. OAKLEY:  Your Honor, this e-mail is a large

3   compilation of documents.

4          MR. DEARINGTON:  Those are attachments.

5          MR. OAKLEY:  And certainly while the hearsay rules

6   allow the government to admit statements of the defendant as a

7   party-opponent, the defense doesn't get to admit statements of

8   Dr. Tao.  So the objection is hearsay.  I don't know that I

9   understand the argument as it relates to the -- to the

10  attachments.  I think some foundation would need to be laid.

11         THE COURT:  Let's do this.  I'm going to let the jury

12  go home for the evening.  It sounds to me like we might need to

13  parse through this.  I'm not sure all of it is admissible.

14         MR. DEARINGTON:  I'm really just going, Your Honor,

15  I'll tell you, to the fact that there's no certification in

16  here.  It's a short point.  That's the only reason.

17         THE COURT:  We'll talk about it further.  Let me go

18  ahead and -- we have a juror that has child care issues and has

19  to leave no later than 5:00, so I'll go ahead and let them go.

20     (Thereupon, the proceedings continued in open court.)

21         THE COURT:  All right.  We will sort this out while

22  you all are on recess.  So we will recess for the evening.  We

23  will reconvene at 9:00 tomorrow morning.  From here on out it

24  will be 9:00 every day unless you hear otherwise.

25         So have a pleasant evening, remember not to do any

1   independent research or reading or looking things up, and avoid

2   any exposure to media coverage of any of these issues.  If you

3   do come across something, let us know in the morning.  And

4   hopefully we have the snafu from this morning worked out.

5           So anyway, have a pleasant evening.  We'll see you

6   back at 9:00 in the morning.

7       (The following proceedings occurred outside the presence of

8   the jury.)

9           THE COURT:  All right.  You can be excused, Ms. Reed.

10  We'll see you back at 9:00 in the morning.

11          So this appears to be a number of communications

12  between --

13          MR. DEARINGTON:  Your Honor --

14          THE COURT:  -- Mr. Sunner -- yes.

15          MR. DEARINGTON:  Would it be possible to provide an

16  instruction to the witness not to speak to anybody, including

17  the government, about her testimony while she's on cross?

18          THE COURT:  I'll have the government do that.  Have

19  you been policing?  Ms. Reed, we do have a sequestration --

20  witness sequestration rule in this case so none of the

21  witnesses are to discuss their testimony with any other

22  witness, whether already testified or potential witness.

23          THE WITNESS:  Yes.

24          MR. DEARINGTON:  Or speak with the government during

25  cross now that my cross is pending.

1        THE COURT:  Well, I mean, they can prepare her for

2    questions they're going to ask.

3        MR. ZIEDENBERG:  Our point -- I'm sorry.  Our point

4    would be that during cross-examination while it has begun that

5    at that point they shouldn't be conferring or strategizing

6    about cross-examination.

7        THE COURT:  I think that's fair.

8        MR. ZIEDENBERG:  Thank you.

9        MR. DEARINGTON:  Thank you, Your Honor.

10        THE COURT:  All right.  So let's talk about

11    Exhibit 1452.  I haven't studied it much except it looks like a

12    string of e-mails between this Mr. Sunner and Dr. Tao talking

13    about the submission of the proposal and the instructions in

14    Streamlyne.  What is it that you're wanting to really get to

15    with this?

16        MR. DEARINGTON:  So, Your Honor, we just have I

17    believe two exhibits like this and I think it's one of the

18    government's exhibits, the Streamlyne this pertains to.  And

19    what we'd like to show is that Dr. Tao was receiving

20    information at the time that he was about to certify in

21    Streamlyne about approving a particular proposal and the

22    information didn't tell him anything about the certification

23    that the government has introduced.

24        So we're not using it to prove the truth of anything

25    in here.  We're using it to show that Dr. Tao, his state of

1    mind was not such that he had awareness of the type of

2    certification the government is trying to show and impute to

3    him.

4            THE COURT:  Okay.  So there's a lot in this exhibit.

5    There's e-mails and then there's an attachment of a letter to

6    Mr. Sunner and then there's an appendix statement of work and

7    then are these screenshots from the Streamlyne?  I'm not sure

8    what this is.  There's a lot going on here.  You're going to

9    have to parse through so I can figure out whether any of it

10   comes in, part of it or all of it.

11           MR. DEARINGTON:  I should have explained.  The way we

12   set this exhibit up for ease was to make it one exhibit that

13   includes the e-mail chain, which is quite lengthy, and the two

14   attachments behind the e-mail chain.  And one of them is a

15   draft proposal that's at issue and one of them is the PI

16   approval instructions screenshot.  So it's e-mail, parent

17   e-mail, plus two attachments.

18           And the foundation I would be happy to lay is that I

19   imagine that Ms. Reed has seen the PI approval instructions and

20   will acknowledge that there's no certification similar to the

21   one that the government asked her about.

22           THE COURT:  All right.  Mr. Oakley.

23           MR. OAKLEY:  Your Honor, I think the -- I'm not

24   exactly sure what the defense is attempting to do.  I think if

25   they want to show printouts of the Streamlyne to Ms. Reed and

1   she's familiar with it and she can identify it, that's one

2   thing.

3          My concern -- and, Your Honor, I think having reviewed

4   many of the defense exhibits, my concern is that they're

5   compilations.  They include a series of e-mails, and any

6   statement of the defendant that's in an e-mail that they're

7   wanting to offer for the truth of the matter is going to be

8   hearsay.  And my concern is that they provide these -- what

9   they refer to as a compilation, some of which may be

10  admissible, some of which may not be, and it needs to be broken

11  down, Your Honor.

12         MR. DEARINGTON:  May I, Your Honor?

13         THE COURT:  Yes.

14         MR. DEARINGTON:  I'm a little bit taken -- or confused

15  by Mr. Oakley's reference to compilations.  Those are other

16  exhibits.  This is just a parent e-mail with two attachments.

17  And I haven't heard a single statement that Mr. Oakley has

18  identified that we're trying to use to prove the truth of the

19  matter asserted in this exhibit.

20         THE COURT:  So what you want to ask this witness about

21  is the attachments more so than the e-mails, because it's the

22  attachment that sets forth --

23         MR. DEARINGTON:  Your Honor --

24         THE COURT:  -- statement of work and then a draft

25  proposal itself?

1          MR. DEARINGTON:  Well, Your Honor, if I could put a

2    little context in this.  I believe the government has alleged

3    in paragraph 39 of the indictment that this is -- this date --

4    day, January 29th, and the certification to which this e-mail

5    chain relates is part of the scheme to defraud.  It's, I

6    believe and they can correct me if I'm wrong, expressly stated

7    in paragraph 39(e) that Dr. Tao submitted some false

8    certification through Streamlyne on January 29, 2018, and this

9    relates to it.

10         So it really is important to know what is Dr. Tao

11   thinking when he submits that certification.  What information

12   was flowing to him from the KU research office before he

13   submitted that certification.

14         THE COURT:  I think you're going to have to lay the

15   foundation through this witness because Mr. Sunner is not here

16   and I think you're going to have to go the business record

17   route, that this is essentially a submission by Dr. Tao of

18   information related to a proposal.

19         You're going to have to try to lay the foundation

20   through her that is -- this is a business record and that this

21   is something they routinely keep, which is, you know, a

22   submission and also it's something they routinely give those

23   PIs that are applying for funds.  I'm a little concerned though

24   about the e-mails because, again, I don't think they're outside

25   the hearsay rule.

1         So I mean, if what you're trying to show is that he

2    had this conversation with Mr. Sunner and as a result he

3    submitted certain things or he was required to submit certain

4    things and there's no signed certification in the packet that

5    was sent to him -- is that where you're going with this?

6              MR. DEARINGTON:  Not quite, Your Honor.  Rather this

7    includes instructions for using Streamlyne, and Ms. Reed has

8    testified that she believes Dr. Tao saw a certification that's

9    quite lengthy and it was introduced by the government and these

10   instructions don't show that certification.

11             THE COURT:  Let's do this.  I don't know if it's

12   admissible, but go ahead and see if you can lay a foundation

13   with her.  She was speaking about an electronic submission.

14   This is something that was attached to an e-mail.  So you can

15   try to lay the foundation with her that this is the kind of

16   information that is provided to people such as Dr. Tao that are

17   applying for proposals.  It's provided -- it can be provided --

18   it appears to be something different than the actual

19   screenshots of the Streamlyne, I don't know, but if you can lay

20   the foundation that this is also information that may be shared

21   and discussed as part of the process and it's just one of their

22   sort of regularly conducted things as part of that process, I

23   may allow it.  I'm just not sure that the cover e-mails and all

24   the statements between the two of them are admissible.

25             But you could -- if she can lay the foundation that

1    this is something they do and something generated by them, et

2    cetera, I think you can get it in as a business record and then

3    point out that there's no signed certification page in this

4    business record.

5        So I'm just not sure the e-mail should come in because

6    there's a lot of statements going back and forth and I haven't

7    studied them and they are on their face hearsay.  And maybe

8    they're not offered for the truth of the matter asserted, but

9    there's a lot going on here.  So I'm not comfortable in finding

10   they're not for truth of the matter asserted unless I studied

11   each one of them.

12       MR. OAKLEY:  Your Honor, then I think to address Mr.

13   Dearington's -- as I understood Mr. Dearington's reference to

14   the indictment, I think he's talking about paragraph 39.  And

15   this would relate to Counts 3 and 8 which were dismissed, and

16   if he's referring to 39B in communications with the defense,

17   we've already told him we think this needs to be struck from

18   the indictment as the Court will read to the jury.  I note that

19   the Court has instructed us to get together to try and come to

20   an agreement, but unless I misunderstood that's the reference,

21   it's also irrelevant at this point.

22       MR. DEARINGTON:  Your Honor, I may have misspoke off

23   the cuff about which subparagraph it was, but I believe there's

24   an allegation with regards to January -- yes, 39B.

25       THE COURT:  National Renewable Energy Laboratory.

1          MR. OAKLEY:  That's part of the indictment in

2     communication with the defense that we've agreed need to be

3     struck because it relates to Counts 3 or 8 that we dismissed.

4          MR. DEARINGTON:  It's still an exhibit though, is it

5     not, the Streamlyne submission that you pointed to there of the

6     government's --

7          MR. OAKLEY:  I'm just responding to counsel's argument

8     about the indictment.

9          THE COURT:  So it there -- is there in evidence a

10    Streamlyne submission for this particular proposal?  Or not?

11    The proposal for the National Renewal Energy Laboratory

12    project?

13         MR. OAKLEY:  It's on the exhibit -- my understanding

14    it's on the exhibit list, but it hasn't been admitted.

15         THE COURT:  All right.  I think just in terms of --

16    you've asked her about the fact that there's no certification

17    page within the electronic submission.  She's explained why.  I

18    think it's -- I think it's fine if you can lay the foundation

19    and she says, yes, this is part of the process, sometimes we do

20    this by attachments to e-mail, blah, blah, blah, and then ask

21    her whether or not, you know, there was a certification --

22    signed certification page in this communication, I think that

23    suffices.  I don't think this whole thing needs to come in.  At

24    most just the attachments rather than the e-mail itself.

25         MR. DEARINGTON:  Thank you, Your Honor.

1          THE COURT:  I know you're going to work jointly on

2    this indictment, but, you know, I think I've given you my view

3    of speaking indictments.  My practice is to pare them down

4    quite a bit.  I mean, there may be some, you know, really

5    material, germane things in here that need to be read by way of

6    background, but may be not either because of course the jury is

7    going to hear it in terms of the evidence, not, you know -- so

8    speaking indictments are a great tool, but they're not so much

9    of a tool by the time we get to trial usually.

10          All right.  Anything else we need to talk about

11    tonight?

12          MR. OAKLEY:  No, Your Honor.

13          MR. DEARINGTON:  No, Your Honor.

14          THE COURT:  All right.  9:00 tomorrow.  I'll be

15    available at 8:30 if you need something.

16          (Evening recess.)

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2        I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        SIGNED 16th of November, 2022

9

                            /s/Danielle R. Murray
10                          DANIELLE R. MURRAY, RMR, CRR
                            United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25