```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

3   UNITED STATES OF AMERICA,

4        Plaintiff,

5        v.                          Case No. 19-20052-01-JAR

6   FENG TAO, a/k/a "Franklin
    Tao,"                            Kansas City, Kansas
7                                    Date:  March 24, 2022
         Defendant.
8                                    Day 4 (Pages 458-705)

9   .........................

10                    TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JULIE A. ROBINSON
          SENIOR UNITED STATES DISTRICT COURT JUDGE
12

13              A P P E A R A N C E S

14
    For the              Mr. D. Christopher Oakley
15  Plaintiff:           United States Attorney's Office
                         500 State Avenue
16                       Room 360
                         Kansas City, Kansas 66101
17
                         Mr. Adam Barry
18                       Department of Justice-Nsd
                         950 Pennsylvania Avenue, NW
19                       Washington, DC 20530

20  For the              Mr. Peter R. Zeidenberg
    Defendant:           Mr. Michael F. Dearington
21                       Arent Fox, LLP
                         1717 K Street NW
22                       Washington DC, 20008

23

24  _____
           Proceedings recorded by machine shorthand,
25     transcript produced by computer-aided transcription.
```

I N D E X


| Government's Witnesses: | Page |
|---|---|
| ALICIA REED | |
| Cross Examination By Mr. Dearington (Continued) | 466 |
| Redirect Examination By Mr. Oakley | 548 |
| Recross Examination By Mr. Dearington | 563 |
| KIMBERLY WITTMAN | |
| Direct Examination By Mr. Oakley | 578 |
| Cross Examination By Mr. Dearington | 606 |
| Redirect Examination By Mr. Oakley | 623 |
| Recross Examination By Mr. Dearington | 630 |
| EVELYN LOUISE HAAHEIM | |
| Direct Examination By Mr. Oakley | 631 |
| Cross Examination By Mr. Dearington | 639 |
| Redirect Examination By Mr. Oakley | 643 |
| KELLY MASON | |
| Direct Examination By Mr. Oakley | 644 |
| Cross Examination By Mr. Dearington | 655 |
| Redirect Examination By Mr. Oakley | 658 |
| MATTHEW BATTISTON | |
| Direct Examination By Mr. Oakley | 662 |
| Cross Examination By Mr. Dearington | 666 |
| JANE JOHNS | |
| Direct Examination By Mr. Oakley | 668 |
| Cross Examination By Mr. Dearington | 685 |
| Redirect Examination By Mr. Oakley | 694 |
| REBECCA LYNN SPYKE KEISER | |
| Direct Examination By Mr. Barry | 696 |


E X H I B I T S


| Government's Exhibits | Offered | Received |
|---|---|---|
| 46 | 486 | 487 |
| 148 | 583 | 583 |
| 149 | 588 | 588 |

1
                            E X H I B I T S
2
        Government's
3       Exhibits              Offered              Received

4           152                 647                  648
            153                 590                  590
5           157                 637                  637
            170                 596                  597
6           171                 601                  601
            172                 681                  681
7           193                 505                  505
            194                 508                  508
8           254                 671                  671
            257                 679                  679
9           354                 574                  575
            355                 574                  575
10          777                 627                  627

11      Defendant's
        Exhibits              Offered              Received
12
           1005                 491                  491
13         1006                 492                  492
           1225                 521                  521
14         1226                 521                  521
           1227                 522                  522
15         1228                 525                  525
           1251                 494                  494
16         1387                 477                  ---
           1389                 477                  ---
17         1390                 477                  ---
           1391                 477                  ---
18         1392                 477                  ---
           1393                 477                  ---
19         1394                 477                  ---
           1395                 477                  ---
20         1396                 477                  ---
           1397                 477                  ---
21         1398                 477                  ---
           1399                 477                  ---
22         1400                 477                  ---
           1401                 477                  ---
23         1452                 461             464,  465
           1456                 487                  487
24         1457                 504                  504
           1458                 617                  617
25

1              (Court called to order).

2              (The following proceedings were held outside the

3     presence of the jury).

4              THE COURT:  All right.  You can be seated.

5              All right.  You have something you want to take up?

6              MR. DEARINGTON:  Your Honor, we were hoping that you

7     might entertain our having another shot at explaining what the

8     purpose of our seeking to admit Exhibit 1452 is.  That's the

9     document we left off and we spoke about yesterday.

10             THE COURT:  Yes.

11             MR. DEARINGTON:  So as I understand the court's

12    guidance on that, if we lay the proper foundation that this

13    e-mail from Mr. Sunner of the research office to Doctor Tao

14    regarding how to fill out the Streamlyne approval, if we lay

15    the foundation that that's a typical type of communication that

16    Ms. Reed's office would have with Doctor Tao, we could likely

17    at least admit the attachment, which are the approval

18    instructions.  But we'd like to take the opportunity to explain

19    why we think the entire e-mail should come in.

20             This is a pretty standard-looking e-mail communication

21    between Ms. Reed's office and Doctor Tao related to one of the

22    subjects of this case, what does Doctor Tao know about what he

23    must certify with respect to the proposals.  And the government

24    I don't think is objecting on authenticity grounds.  In fact,

25    we have an agreement in principle on these types of e-mails

 1    from the KU address as far as authenticity, but as I understood

 2    it, they were objecting on hearsay grounds.

 3            But I didn't hear a single statement in this e-mail

 4    that the government identified that we're using to prove the

 5    truth of the matter asserted, and there's going to be a lot of

 6    e-mails in this case that relate to what does Doctor Tao know,

 7    what's going on in his mind because, of course, scienter is

 8    very crucial in these types of cases.

 9            So we'd like to admit the entire exhibit and not just

10    the attachment, Your Honor.  And if -- well, I'll just leave it

11    there for now, Your Honor.  Thank you.

12            THE COURT:  So this -- apparently this string has to

13    do with budgeting and allocation of expenses related to the

14    NREL submission, at least in part.  Yeah, they're trading

15    drafts of the budget.

16            MR. DEARINGTON:  Your Honor --

17            THE COURT:  Yeah, let me keep looking.  I'm sorry.

18            MR. DEARINGTON:  And, Your Honor, just to be clear,

19    we're not going to walk through any of this e-mail actually.

20    The focus of the examination with respect to this e-mail will

21    be on the attachment that's called PI Approval Instructions and

22    the date of the e-mail just to show that those are the

23    instructions from 2018.

24            I'm not going to walk through all of this e-mail or

25    really any of it.  We just don't want to -- we don't see a

1    reason to exclude on hearsay grounds something we're not at all

2    trying to introduce for the truth of the matter asserted.  And

3    if there is a concern about any statement in here that the

4    government has, surely a -- an instruction to the jury could

5    resolve that certainly.

6          THE COURT:  All right.  I pretty much read the entire

7    e-mail string now and I can't pinpoint something that looks

8    like it would be used for truth of the matter asserted

9    necessarily.  I would -- I could certainly give a limiting

10   instruction about the e-mails themselves.

11         Mr. Oakley.

12         MR. OAKLEY:  Your Honor, as I understand what the

13   defense said is they don't want the e-mail portion in, that

14   they're only -- intend to use it, I guess, related to the date.

15   I think certainly they can show Ms. Reed the e-mails to help

16   refresh her recollection, but if all they want to do is utilize

17   the attachment, it seems to me that that should be -- should be

18   the exhibit.

19         Also my concern -- we had some communication last

20   night, and defense counsel sent me two separate e-mails and

21   it's not clear to me looking at this if this is a compilation

22   of two e-mails or if this is one e-mail.

23         MR. DEARINGTON:  If I may, I'd be happy to respond to

24   those queries, Your Honor.

25         THE COURT:  Yeah, and it looks like the subject line

1    is a bunch of replies, budget estimate and PI checklist, so to

2    me it looks like one string.  But go ahead.

3            MR. DEARINGTON:  Your Honor, this is one string and

4    it's a lengthy string with two attachments.  And I would just

5    like to clarify to Mr. Oakley's point, we are trying to

6    introduce this e-mail, I'm just not going to focus with

7    Ms. Reed on all of the e-mail -- all the e-mails in this chain

8    but rather that the e-mail was sent and that there was approval

9    instructions here.  But there's no reason to exclude it on

10   hearsay grounds so we're not going to concede that.

11           THE COURT:  All right.  I'm going to admit 1452.  I'm

12   going to give the jury a limiting instruction that they're not

13   to consider what's discussed in the e-mail chain for truth of

14   the matter asserted but just to show that the attachments were

15   sent by -- because they were sent by Mr. Sunner to Doctor Tao;

16   correct?

17           MR. DEARINGTON:  Correct, Your Honor.

18           THE COURT:  Okay.  We'll leave it at that.

19           MR. DEARINGTON:  Thank you, Your Honor.

20           THE COURT:  All right.  Are we ready to bring the jury

21   in?

22           MR. OAKLEY:  Yes, Your Honor.

23           THE COURT:  Okay.  All right.  We can get Ms. Reed

24   back on the stand.  Remind me, we're in cross examination mode;

25   right?

1          MR. OAKLEY:  Yes, Your Honor.

2          THE COURT:  Okay.

3          (The following proceedings were held in the presence

4    of the jury).

5          THE COURT:  All right.  You can be seated.

6          All right.  Mr. Dearington, I think where we left off

7    was you were offering Exhibit 1452.  Do you have that or are

8    you going to publish that?

9          MR. DEARINGTON:  Yes.

10         THE COURT:  I am admitting Exhibit 1452 over

11   objection.  But I will caution the jury this exhibit, 1452, is

12   a string of e-mails and then some attachments.  With respect to

13   the e-mail conversations, don't consider what these two people

14   in the e-mail are saying as the truth, but it's just simply to

15   show you that the attachments to this e-mail came from Mr.

16   Sunner, who I believe is in an office associated with Ms. Reed,

17   to Doctor Tao.  So it's really the attachments that I think

18   you're to focus on.  But there is this string of e-mails, it's

19   sort of a transmission and conversation going back and forth,

20   but don't consider those statements because they are hearsay in

21   the e-mail string itself but focus on the attachments.

22         All right.  Go ahead, Mr. Dearington.  Exhibit 1452 is

23   admitted.

24         MR. DEARINGTON:  Thank you, Your Honor.

25                    ALICIA REED,

```
 1   called as a witness on behalf of the Government, having been
 2   previously sworn, testified as follows:
 3                        CROSS EXAMINATION
 4   BY MR. DEARINGTON:
 5   (Continued)
 6   Q.  Good morning, Ms. Reed.
 7   A.  Good morning.
 8   Q.  So before we turn back to Exhibit 1452 I'd just like to
 9   pull up Exhibit 44, which has already been admitted, just to
10   confirm that Exhibit 44 appears to be a proposal to the
11   National Renewable Energy Laboratory; is that correct?
12   A.  That is correct.
13   Q.  And that's dated January 11th, 2018, correct, or that
14   letter is?
15   A.  I believe that that letter is to our office from NREL dated
16   January 11th, 2018.
17   Q.  Right.  And that would be part of the package of materials
18   that would be submitted?
19   A.  That would be like the solicitation; correct.
20   Q.  So returning to Exhibit 1452, which has just been admitted,
21   I'm going to show you that exhibit.  Does that appear to be an
22   e-mail from Matthew John Sunner to Doctor Tao --
23   A.  Yes.
24   Q.  -- regarding the budget estimate and PI checklist?
25   A.  It does.
```

19-20052    USA v. Feng (Franklin) Tao    03.24.22    467

1    Q.   And who is Mr. Sunner?

2    A.   Mr. Sunner was a grant specialist in our pre-award office,

3    or grant coordinator, I can't remember his title, but he was a

4    trained professional that helped with pre-award activities.

5    Q.   And is this the type of e-mail that someone like Mr. Sunner

6    would send to someone like Doctor Tao to assist with approving

7    a submission before it went to some -- an agency's lab like the

8    Department of Energy's National Renewable Energy Lab?

9    A.   I've not read the e-mail so I can't state that, but I will

10   say that my staff often works with PIs in e-mail.

11   Q.   And can you see here that there's an attachment to this

12   e-mail called PI Approval Instructions?

13   A.   Yes.

14   Q.   I'd like to show you what's been marked as exhibit --

15   Government Exhibit 78.  Do you recall seeing this document that

16   Mr. Oakley asked you about?

17   A.   Yes, this is the PI approval statement in Streamlyne.

18   Q.   And was your testimony yesterday that you created this

19   document by extracting it from Streamlyne sometime after the

20   investigation of Doctor Tao began?

21   A.   That is correct.

22   Q.   But you are certain, you testified, that this certification

23   would've been seen by Doctor Tao in Streamlyne in 2018.  Was

24   that your testimony?

25   A.   Yes.

1    Q.  And this is quite a lengthy certification.  It's two

2    paragraphs long; correct?

3    A.  That is correct.

4    Q.  Returning to the Mr. Sunner e-mail, which is Exhibit 1452,

5    and the PI approval instructions, I'm going to turn for a

6    moment to those PI approval instructions and draw your

7    attention to them.

8        Now, the e-mail was dated January 2018.  Does this appear

9    to be the first page of a document called PI Approval

10   Instructions managed by your office?

11   A.  Well, I'm not familiar with that document.  I do know that

12   we had created screenshots so that investigators could become

13   familiar with how to approve proposals that were routed in

14   Streamlyne.

15   Q.  So this would be a screenshot of proposals as routed in

16   Streamlyne that the professor would see?

17   A.  Well, what I think is -- so if we look at it, I think

18   potentially -- while I can't see it clearly on the screen, I

19   think the top piece is an e-mail extract that would show sort

20   of the linkages that they would receive and where to click on

21   it.  Right.  So, for example, see, you can see this link up

22   here says "Click on this link to access your proposal."  "Click

23   on this link to access your action list."

24   Q.  And down here, that would be a picture of the screen that

25   the PI is seeing; correct?

1    A.   Correct.  Once they access that link, then they would get

2    into Streamlyne.  This would be the areas where they should

3    look at their responses that were keyed in.

4    Q.   I'd like to just show you -- because this is a four-page

5    document, and I want you to pause me where you see the two

6    paragraph certification that we just looked at, which was

7    Government's Exhibit 78.  So any -- anyplace on this first page

8    of the instructions or screenshots?

9    A.   No, this isn't the approval screen yet.

10   Q.   Okay.  Just a simple yes or no for now will suffice, I'm

11   going to try to keep this --

12   A.   But it's very difficult for me to say yes or no when there

13   is context involved.  I don't want to misstate.

14   Q.   Well, I understand that, Ms. Reed, and I appreciate your

15   concerns for not misstating or stating anything that may not be

16   true, but I'm going to ask you very binary questions.  Do you

17   see this on this page?

18   A.   Okay.

19   Q.   So if there's clarification to be had, I'm certain that Mr.

20   Oakley will come up here and ask you those types of questions.

21        Do you see those two paragraphs that you pointed us to in

22   Paragraph 78 on this page?

23   A.   On this screen I do not see it.

24   Q.   Turning to Page 2.  Do you see the two paragraph

25   certification that you testified Doctor Tao would've seen in

1    Streamlyne in 2018 on this page?

2    A.    I do not.

3    Q.    And finally Page 3.  Do you see the certification involving

4    two paragraphs that you testified you were 100 percent certain

5    Doctor Tao would've seen in 2018 in Streamlyne on this page?

6    A.    It is not in these instructions, but it would have been

7    after point 7.

8    Q.    Just a simple yes or no please for now, Ms. Reed.

9    A.    I could not answer that in a yes-or-no answer.

10   Q.    So you're saying you're not sure whether the two paragraphs

11   are on this page?

12   A.    I'm not saying I'm not sure, I am telling you where they

13   would be; they are just not on this page.

14   Q.    So the answer --

15   A.    I think the assumption is the PI who is using a system and

16   is given point by point when they had a popup screen that they

17   had to click "approve" on, they would be able to do so.

18   Q.    So you're saying there could be certifications that Doctor

19   Tao would've seen that wouldn't appear here?

20   A.    Right.  This is a document like a instruction guide.

21   Doctor Tao would've been in the system and the assurance

22   would've popped up.

23   Q.    So down here, for example, that's a certification; right?

24   A.    That's not a -- that's a note.  That's not a certification

25   until some action is taken to submit.

1   Q.  And you can see it because it's a screenshot?

2   A.  Correct.  But as you noted, the assurances are two pages

3   long, it doesn't help to add two pages of assurances.

4   Q.  Ms. Reed --

5   A.  I'm trying to give you some context so you understand my

6   answer.

7   Q.  I'll ask you if I need context or if I think the jury will,

8   and Mr. Oakley will ask you if he thinks that further context

9   is warranted.

10  A.  Okay.  I understand.

11  Q.  But we are under some time restraints here, so I just want

12  to keep things moving and I apologize for cutting you off.

13      So here, this is a certification; correct?

14  A.  This is a PHS certification; correct.

15  Q.  And this relates to conflicts of interest; correct?

16  A.  For PHS compliant sponsors.

17  Q.  And Doctor Tao is not a PHS professor, is he?

18  A.  I can't state if he has ever submitted to PHS, but

19  the proposals that I've looked at --

20  Q.  What is PHS?  I'm sorry.

21  A.  PHS is public health system.  So it's NIH, CDC, things like

22  that.

23  Q.  So you helped out with Special Lampe's investigation of

24  Doctor Tao; right?

25  A.  I provided information requested by the federal government.

1  Q.  Sure.  And you're not sure whether Doctor Tao is a -- has

2  grants with the NIH?

3  A.  At KU he does not, but I can't state -- your question was,

4  is he a PHS investigator?  I don't state that he's never been

5  funded by PHS, I don't know that.

6  Q.  So you conducted a thorough examination of Doctor Tao's

7  grant proposals, but you can't say --

8  A.  At KU.  At KU.

9  Q.  But you can't state that at KU Doctor Tao one way or

10 another --

11 A.  I can state at KU he wasn't -- (reporter interruption).

12     I'm sorry.  I can state that at KU he did not submit to a

13 PHS-compliant sponsor, but I cannot state that for the lifetime

14 of his research career, no.

15 Q.  Do you have any suspicions that Doctor Tao was submitting

16 to NIH outside of KU?

17 A.  I've not thought about that.

18 Q.  You're not aware of Doctor Tao submitting to NIH, are you?

19 A.  No, but I'm not aware of anything other than what went

20 through my office.

21 Q.  So if we look at this certification -- because I think you

22 said you may not see all certifications in this screenshot, but

23 we see this certification; correct?

24 A.  Yes.

25 Q.  And we do not see this certification; correct?

19-20052    USA v. Feng (Franklin) Tao    03.24.22          473

1    A.  I would be happy to pull up the system and show you.

2    Q.  Just a simple yes-or-no answer for now, Ms. Reed.

3    A.  I do not see it, no.

4    Q.  And this certification that we just looked at we do see,

5    and it relates to conflicts of interest but solely for PHS and

6    should that say compliant sponsors or complaint sponsors?

7    A.  It should say "compliant."

8    Q.  So for PHS-compliant sponsors, there's a certification

9    regarding conflicts of interest; correct?

10   A.  Because there's an additional step that's necessary;

11   correct.

12   Q.  Correct.  And Doctor Tao has, according to your awareness,

13   never submitted an NIH grant proposal so he is not a PHS

14   compliant -- he has not submitted a grant to a PHS sponsor

15   while at KU?

16   A.  No.

17   Q.  So this certification wouldn't apply to him, would it?

18   A.  It would not.

19   Q.  So I'd like to go back to Exhibit 44, and that was the

20   National Renewable Energy Lab, I'll call it NREL, N-R-E-L --

21   A.  Correct.

22   Q.  -- proposal.

23       I'm showing you Page 25 and this states Representations For

24   Certifications at the top; correct?

25   A.  Representations and Certifications; correct.

1    Q.  And this is your name; correct?

2    A.  That is correct.

3    Q.  You're the Director of Research Administration at this

4    time?

5    A.  Correct.

6    Q.  And Pages 25 to 36 that follow this - I'm going to quickly

7    run through them - show certain certifications that you would

8    be making here; right?  So at the top, for example?

9    A.  On behalf of the university; correct.

10   Q.  On behalf of the university.  It says congressional

11   district and county, and that would be No. 2.  And then we turn

12   the page over, I'm just going to run through these quickly, but

13   there are a number of other certifications and they're all

14   numbered; correct?

15   A.  Correct.

16   Q.  And here we have Page 27, more certifications; correct?

17   A.  Correct.

18   Q.  A lot of certifications that you had to make, isn't it?

19   A.  That's right.  It's very important that we be good stewards

20   of federal money.

21   Q.  It's very important that your office and your university be

22   good stewards of federal money?

23   A.  Right, working in partnership with our investigators.

24   Q.  And so you take these certifications extraordinarily

25   seriously?

1    A.  I do.

2    Q.  More certifications.  Here's a certification that states

3    that your certification could subject you to prosecution if

4    made falsely and knowingly; is that right?

5    A.  Right.  If I knowingly make false statements, I would be in

6    trouble; correct.

7    Q.  Okay.  And you certified this, not Doctor Tao; right?

8    A.  I certified this --

9    Q.  This document.

10   A.  Well, my staff certified this on my behalf, but they

11   certified it based on our policies and procedures that are

12   incumbent upon all faculty and staff at KU.

13   Q.  Hold on.  Just so I understand this, you personally didn't

14   certify this?

15   A.  I think we've discussed in this court that I often delegate

16   my authority because there are so many proposals that go in, it

17   would impossible for me to give my attention and expertise to

18   every single one.

19   Q.  You would be overworked if you had to personally review all

20   the proposals that your name was attached to; right?

21   A.  That's why we have controls and training for our team, to

22   make sure that they understand the significance of what they're

23   signing.

24   Q.  And can you just remind me which policy at DOE National

25   Renewable Energy Lab states that you can have other people sign

1    on your behalf?

2    A.  I don't believe it's an NRL policy.

3    Q.  You're not aware of a policy that allows you to have --

4    A.  Each agency would not have a delegation policy.  Under

5    uniform guidance 2 C.F.R. 200, we are allowed as an entity that

6    receives grants to set our own policies and controls.  We go

7    through an audit every year to ensure that our policies and

8    controls are in place.

9    Q.  I'm showing you --

10            MR. DEARINGTON:  May I approach, Your Honor?

11            THE COURT:  Yes.

12   BY MR. DEARINGTON:

13   Q.  I'm showing you what's marked as Exhibits 1388 through

14   1401.  Sorry, it's a big stack there.

15   A.  Uh-huh.

16   Q.  Do those appear to be the -- take your time reviewing, but

17   do those appear to be the uniform guidance you spoke about as

18   well as the DOE and NSF-specific guidance that govern grant

19   requirements for the years 2017 through 2019?

20   A.  This doesn't actually -- this one is Department of Energy,

21   not 2 C.F.R. 200.

22   Q.  Yes, so -- sorry if I was unclear about that.  In the stack

23   of documents you just received, there should be the uniform

24   guidance, Part 200, as well as Department of Energy's specific

25   guidance, I believe there are two or three parts.

1    A.   Uh-huh.

2    Q.   And then an NSF-specific guidance packet, that's one part.

3    A.   That's what this is, yes.

4    Q.   Okay.

5              MR. DEARINGTON:  Your Honor, I'd like to move to

6    introduce exhibits I think it was 1387 through 1401.

7              MR. OAKLEY:  May I see them, Your Honor?

8              MR. DEARINGTON:  I can give you your own stack if

9    you'd like.

10             MR. OAKLEY:  Please.

11             Your Honor, I object to relevance and also the

12   defendant is seeking to admit the law and obviously the -- Your

13   Honor will instruct the jury as to the relevant law.  I don't

14   see the point in admitting stacks of C.F.R.s.

15             MR. DEARINGTON:  Your Honor, if I --

16             THE COURT:  Wait.  First of all, I don't know that

17   she's identified any of these.

18             MR. DEARINGTON:  I can walk through them if the

19   government would like.

20             THE COURT:  1387 through 1401, by your index it looks

21   like these are all C.F.R.s.

22             MR. DEARINGTON:  Correct, Your Honor.  These would be

23   the regulations that govern the grants that are --

24             THE COURT:  Yeah, it's not proper to admit law into

25   evidence.  I'll instruct the jury on what the law is.  You can

1    certainly have her -- ask her if she's familiar with these or

2    used these in her work, however.

3         MR. DEARINGTON:  Your Honor, we'll develop this a bit

4    later, but as we'll -- I can represent to you that the grant

5    proposals and other documents expressly reference regulations,

6    including these, and they're built in essentially as terms and

7    conditions.  So they're relevant to what's required about the

8    grants, but I don't need to get into that here.

9         THE COURT:  All right.  Again, I mean, I think you can

10   ask her about it, but I'm not going to admit into evidence

11   regulations or statutes or anything like that.

12        MR. DEARINGTON:  Okay.  Thank you, Your Honor.

13   BY MR. DEARINGTON:

14   Q.  Ms. Reed, could you point me to the regulation that states

15   that you are allowed to have someone use your name to certify

16   things that you personally haven't reviewed?

17   A.  Can you point me to where it says I can't do that?

18   Q.  I'll be asking the questions today, Ms. Reed, sorry.

19   A.  Well, I was just asking you what you're asking me to do

20   because this is a large stack of documents.  My office has

21   controls that are regulated under 2 C.F.R. 200, which is one of

22   these documents.  And I monitor those controls.

23   Q.  So you're -- excuse me.  You're not aware at least off the

24   top of your head of a regulation that expressly --

25   A.  Regulations are not prescriptive as to how we perform our

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1  work.  They require us to have controls and accounting

2  procedures in place; we have that.

3  Q.  Okay.  So you're not aware as we sit here today which

4  regulation, if any, states that you can delegate to someone

5  else signature authority and review authority for documents

6  that you personally haven't reviewed?

7  A.  There's not a regulation that is prescriptive in that

8  manner.

9  Q.  Thank you, Ms. Reed, I'll take these off of your plate.

10    So returning to this list of certifications because -- I'm

11  not sure we were quite through with them yet.  11 -- or sorry,

12  this is 13, for example, is export control, just another

13  example.

14  A.  Can it be made larger so I can read the wording?

15  Q.  Happy to.

16  A.  Thank you.

17  Q.  And export control, for example, it was your testimony

18  yesterday that a PI checklist that you reviewed had a question

19  about traveling outside the United States and that was

20  important for export control reasons; right?

21  A.  Correct.

22  Q.  So you would want to see that checklist before you

23  certified under penalty of prosecution, or your delegate

24  certified on your behalf under penalty of your prosecution,

25  that there were no export control issues; right?

1    A.   Correct.  I think that we should explain that that

2    checklist is -- I need to explain --

3    Q.   Ms. Reed --

4    A.   -- so that I can tell you why it's okay for my delegate to

5    be able to sign these.

6    Q.   Ms. Reed, Mr. Oakley is here and he'll be happy to ask you

7    questions he deems important.

8    A.   But if you're asking me questions that I cannot answer,

9    I'm -- I am unable to do what my job here is, is to tell you

10   our processes and procedures.

11   Q.   You think you have a job here today?

12   A.   My job is to represent KU and represent what we do so that

13   you can understand it, yes.

14   Q.   And the certifications continue, I'm going to kind of

15   scroll through them.  Now we're up to 16 and it keeps going,

16   keeps going.  More certifications on Page 34, more

17   certifications on Page 35.  A-ha.  And then here we have your

18   signature; correct?

19   A.   No.  You can see there's a "per" there.  Somebody was

20   signing on my behalf.  It looks like Brad Bernet, the associate

21   director of pre-awards, signed this.

22   Q.   And you have no concerns about his signing this on your

23   behalf?

24   A.   He has over 20 years of experience and is an expert.  So,

25   no, I have no concerns about him signing this on my behalf.

1  Q.  And he would've gone through all the paperwork as necessary

2  to make sure all these certifications are going to be correct;

3  right?

4  A.  Correct.  Correct.

5  Q.  Okay.  And could you please read for the jury the date

6  listed there?

7  A.  I believe that says the -- January 24, 2018.

8  Q.  Okay.  I'd like to show you a document that's been marked

9  as Government's Exhibit 79, Ms. Reed.

10 A.  Thank you.

11 Q.  Do you recognize this document, Ms. Reed?

12 A.  I do.  This is the screenshot from -- does it need to be up

13 on the screen?

14 Q.  Not yet, Ms. Reed.

15 A.  Okay.  Yeah, this is the screenshot that we looked at

16 yesterday that shows the routing and approvals.

17              THE COURT:  Is this admitted?

18              MR. DEARINGTON:  Not yet, Your Honor.

19              THE COURT:  Take it off the screen.

20              MR. DEARINGTON:  It's a different document up there.

21              THE COURT:  Gotcha.

22              MR. OAKLEY:  Your Honor, I'm sorry, I think 79 is

23 admitted into evidence.

24              MR. DEARINGTON:  Is it already admitted?

25              THE WITNESS:  I think we looked at this yesterday.

1           MR. DEARINGTON:  Thank you, Mr. Oakley.  Thank you,

2    Your Honor.

3    BY MR. DEARINGTON:

4    Q.  So this is a Streamlyne document and can you -- I'll pull

5    it up on the ELMO.

6        Can you see for which grant proposal this applies?  I have

7    it up on the screen if that's helpful.

8    A.  Yes, so this is the National Renewable Energy Lab proposal.

9    Q.  So that's the one we just looked at; right?

10   A.  Correct.

11   Q.  Okay.  Which was marked as Exhibit 44.  So this would show

12   when Doctor Tao approved the submission; correct?

13   A.  On the 29th, correct.

14   Q.  So you're saying that this shows that Doctor Tao signed off

15   on and approved the NREL submission on January 29th?

16   A.  Correct.

17   Q.  So you're telling me that an experienced professional in

18   your office signed under penalty of prosecution certifications

19   five days before Doctor Tao even approved the submission?

20   A.  Doctor Tao would never see these certifications and reps,

21   they are all about the University of Kansas as a whole and

22   their ability to be a good steward of the funds.  It does not

23   have anything to do with Doctor Tao's approval of the budget or

24   the other materials in the proposal.

25   Q.  So, for example, the PI checklist talks about export

1    controls and the certification includes an export control

2    certification.  And surely Mr. Bernet would want to see --

3    A.  I think you're misunderstanding.  The certs and reps are

4    for the university as a whole.

5    Q.  Sure.

6    A.  The proposal is for the specific work that Doctor Tao

7    proposed.

8    Q.  And Doctor Tao is an employee of the university and the

9    university would be interested in knowing whether the proposal

10   had any export control issues; correct?

11   A.  Yes.  And we -- we already have that --

12   Q.  You're not aware --

13        THE COURT:  Don't talk over each other.

14        THE WITNESS:  I'm sorry.  We already had this

15   discussion where the PI checklist already said no, so we were

16   okay to go ahead and note that, but we do have an entire export

17   control office that would've already been reviewing this should

18   there have been any indication of export control.

19   BY MR. DEARINGTON:

20   Q.  So Doctor Tao approved the submission five days after your

21   office certified?

22   A.  For the University of Kansas that we could be a -- that we

23   could be a -- excuse me, a recipient of the funding.  That is a

24   common timing issue.

25   Q.  And your office certified to the complete accuracy of all

1  of these certifications before Doctor Tao had approved it,

2  approved his submission -- this submission in Streamlyne?

3  A.  Correct.  Because the submission is his scope of work and

4  budget.  The certifications are certifications about the

5  University of Kansas.

6  Q.  Sure.  And --

7  A.  His scope of work and budget would not change what is in

8  the certifications.  We had already identified that there was

9  no export control.  There were no animals or there were no

10  humans, so we would not need to indicate that on our

11  certifications.

12  Q.  So let's talk about that.  So if Doctor Tao had seen the

13  proposal and said actually there might be an export issue here,

14  there might be an ITAR issue or an OFAC issue -- and I

15  apologize for the initialisms here -- he could've reached out

16  to your office?

17  A.  Correct.

18  Q.  And that's why you want him -- one of the reasons why you

19  want him to approve, you want the PI to tell your office this

20  is all aboveboard, this all looks correct?

21  A.  Correct.

22  Q.  But your office didn't wait for that approval, they just

23  signed off?

24  A.  So I think you are conflating the signature on our certs

25  and reps and the submission of the proposal.

1    Q.  I understand that the certs and reps in the proposal are

2    different from the approval of the proposal.

3    A.  And the submission of the proposal.  You're talking about

4    this date, the 24th, as if it has relevance to the fact that

5    Doctor Tao didn't certify his scope of work and budget until

6    the 29th.  But I'm telling you it's two separate pieces of a

7    complex proposal, it's not related to each other.

8    Q.  So you're saying Doctor Tao didn't even have an opportunity

9    to review the proposal in Streamlyne?

10   A.  That's not what I'm saying at all.

11   Q.  So he had an opportunity to review the proposal prior to

12   approving?

13   A.  On the 29th.

14   Q.  And he approved after your office already signed off on the

15   proposal?

16   A.  On the certs and reps, which if you look at the certs and

17   reps - and we can go through them again - there's no mention --

18   Q.  I think we can just --

19   A.  -- of Doctor Tao's scope of work or budget in those certs

20   and reps.  We were not approving Doctor Tao's certs and rep --

21   or excuse me.  We were not approving in the certs and reps

22   Doctor Tao's budget or scope of work.  That is a separate

23   approval cycle.

24   Q.  Do you wish that Mr. Bernet had waited for Doctor Tao to

25   approve prior to his certifying on your behalf under penalty of

1    prosecution?

2    A.   No, I feel that Doctor -- excuse me, that Mr. Bernet was

3    fully able to certify without ever even seeing Doctor Tao's

4    scope of work and the approval.  His job as the director is to

5    be able to certify to facts about KU that are not specifically

6    related to the scope of work.  We fill out certs and reps for

7    almost every type of contract to the federal government.

8    Q.   Ms. Reed, I'm going to show you what's been marked as

9    Exhibit 46.

10   A.   Sure.

11   Q.   Do you recognize that document?

12   A.   This appears to be a subcontract to KU from Battelle --

13   Q.   And what would that be --

14   A.   -- with flow-through from Department of Energy.

15   Q.   So that would be Oak Ridge National Laboratory, ORNL?

16   A.   Yes.

17   Q.   And that's a Department of Energy laboratory?

18   A.   Correct.

19         MR. DEARINGTON:  Your Honor, I'd like to move

20   Exhibit 46 into evidence.

21         THE COURT:  Any objection?

22         MR. BARRY:  Just a minute, Your Honor, we're just

23   pulling up the exhibit.

24         THE COURT:  All right.

25         MR. OAKLEY:  No objection, Your Honor.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    487

```
 1            THE COURT:  Exhibit 46 admitted.
 2   BY MR. DEARINGTON:
 3   Q.  So this is the ORNL subcontract that KU had?
 4   A.  Correct.
 5   Q.  And that would be your signature there on this document?
 6   A.  No.  The "per" indicates that one of our staff - I believe
 7   this would be Kelly Mason potentially - signed that on my
 8   behalf.  I'd have to look to make sure that KM indicates Kelly.
 9   Q.  And could you please read the date of this certification by
10   someone, possibly Kelly Mason, on your behalf?
11   A.  May 23rd of 2018.
12   Q.  I'd like to show you, Ms. Reed, a document marked
13   Defendant's Exhibit 1456.  Do you recognize that document,
14   Ms. Reed?
15   A.  This appears to be a route log from Streamlyne for an --
16   this Oak Ridge National Laboratory.
17   Q.  So the one that we just identified with Exhibit 46?
18   A.  Yes.
19            MR. DEARINGTON:  Your Honor, I'd like to move into
20   evidence Exhibit 1456.
21            THE COURT:  Any objection?
22            MR. OAKLEY:  No objection, Your Honor.
23            THE COURT:  1456 admitted.
24   BY MR. DEARINGTON:
25   Q.  So here we have someone's signature for May 23rd, 2018 on
```

19-20052    USA v. Feng (Franklin) Tao    03.24.22          488

1    your behalf; correct?

2    A.   Yes.

3    Q.   And here, Exhibit 1456, you testified is related to this

4    subcontract?

5    A.   Correct.

6    Q.   And I know it's a little hard to read, but did Doctor Tao

7    submit an approval?

8    A.   Not in the system, but during the first year of --

9    Q.   Just a yes or no with respect to this document, Ms. Reed.

10   A.   No, Doctor Tao failed to use the system to certify.

11   Q.   And you're saying that's a failure of Doctor Tao's?

12   A.   Yes.  As the PI it is his failure to not approve in the

13   system.  I'm sure he approved via e-mail or my staff would not

14   have submitted.

15   Q.   But I think it's fair to say that as of June 6th, 2018 this

16   was listed as "inaction list for approval"; right?

17   A.   Yes.  Doctor Tao still has failed to submit it separately.

18   Q.   So your office submitted a subcontract on May 23rd, 2018

19   that Doctor Tao hadn't approved as of June 6th, 2018; correct?

20   A.   He had not approved it in the Streamlyne system.

21   Q.   Just a yes or no --

22   A.   No --

23   Q.   Go ahead.  Go ahead.

24   A.   He had not approved it in the Streamlyne system.  If you

25   can pull up the e-mails related to this, I'm sure there was an

19-20052    USA v. Feng (Franklin) Tao    03.24.22    489

1    approval e-mail.

2    Q.    You're 100 percent certain, again, that there would be an

3    approval e-mail?

4    A.    My staff would never submit a proposal without the approval

5    of a PI.

6    Q.    Well, perhaps Mr. Oakley will ask you about that, but I'm

7    not going to.

8    A.    I just want you to have the facts.

9    Q.    So just going back to this Exhibit 46, which is the ORNL

10   document --

11   A.    Yes.

12   Q.    -- if I represent to you that Doctor Tao didn't approve in

13   the Streamlyne system, which is a system meant to capture those

14   approvals --

15   A.    Correct.

16   Q.    -- before your office submitted and certified this

17   contract, that would be a paperwork error; right?

18   A.    No.  As I explained, I'm sure that we have a --

19   Q.    I'm representing a hypothetical here.  Actually it's not a

20   hypothetical, we just talked about how 1456 does not show

21   Doctor Tao's approval.

22        So if your office submitted a subcontract before Doctor Tao

23   approved in the Streamlyne system, you wouldn't call that

24   paperwork error?

25   A.    No.  We had a time where we allowed PIs to certify via

1  e-mail because PIs are very busy people, they have a lot of

2  teaching, research obligations, and we would not hold up a

3  potential successful proposal to make them use a new system.

4  We do expect them to certify in the system, but if there was a

5  set deadline, we would not force them to do so prior to that,

6  but we would have an e-mail approval.  The PI must approve

7  everything before it is submitted.

8  Q.  So I'm not going to ask you for your speculation, but I

9  will ask you, are you aware of such an e-mail prior to May 23rd

10 that you came across during your assistance to Mr. Lampe here?

11 A.  I didn't pull other people's e-mails, so -- I pulled files

12 that were related to this.  So, no, I did not look at any

13 e-mails, but I can guarantee you, if you looked, there would be

14 one.  I'm 100 percent confident.

15 Q.  100 percent confident?

16 A.  Yes.  We have process, policies, and checks and balances in

17 place specifically so that we can administer the large volume

18 of awards and proposals that we put through our office.

19 Q.  Did you testify yesterday that you were confident your

20 staff would've ensured there was an approval through the

21 Streamlyne system prior to submitting a contract?

22 A.  No, I don't believe I said that.

23 Q.  Okay.

24 A.  Because I'm aware that we do have the grace period.

25 Q.  Let's turn to another grant, Ms. Reed.  Are you aware that

1    KU received a grant in 2014 from the King Abdullah University

2    of Science and Technology in Saudi Arabia where Doctor Tao was

3    the PI?

4    A.    I'm aware of its existence, it was on the list of awards;

5    correct.

6    Q.    I'm showing you what's been marked as Exhibit 1005.  Do you

7    recognize that document, Ms. Reed?

8    A.    This appears to be a subcontract to the University of

9    Kansas Center for Research from King Abdullah University of

10   Science and Technology.

11        MR. DEARINGTON:  Your Honor, I'd like to move into

12   evidence Exhibit 1005.

13        THE COURT:  Any objection?

14        MR. OAKLEY:  No objection, Your Honor.

15        THE COURT:  1005 admitted.

16   BY MR. DEARINGTON:

17   Q.    I'm showing you what's been marked, Ms. Reed, as

18   Exhibit 1006.  Does that appear to be an e-mail from

19   orscontracts@kaust.edu.sa?

20   A.    Yes.

21   Q.    And is KAUST, is that King Abdullah University we just

22   spoke about?

23   A.    I couldn't say 100 percent, but I assume so because it has

24   a .edu and it's the initials of King Abdullah University, but

25   I'm not familiar with King Abdullah University.

19-20052    USA v. Feng (Franklin) Tao    03.24.22                492

1    Q.  And this is the -- the first recipient is Rachel

2    Elizabeth --

3    A.  Saalweachter.

4    Q.  Saalweachter.

5    A.  She's in our contract negotiations unit.

6    Q.  And then the next e-mail address is KU research; correct?

7    A.  Yes, that's a central e-mail box.

8    Q.  And then the next one is Doctor Tao?

9    A.  Yes.  Doctor Tao's Gmail address and his KU address;

10   correct.

11   Q.  And a number of other people from your office; correct?

12   A.  Correct.

13        MR. DEARINGTON:  Your Honor, I'd like to move into

14   evidence Exhibit 1006.

15        MR. OAKLEY:  No objection, Your Honor.

16        THE COURT:  Exhibit 1006 admitted.

17   BY MR. DEARINGTON:

18   Q.  So just for the jury I'd like to show what we've been

19   talking about here.  This is 1005 and this is the King Abdullah

20   University of Science and Technology in Saudi Arabia subaward

21   agreement with the University of Kansas, Center for Research;

22   correct?

23   A.  Correct.

24   Q.  And we talked about 1006.  This is an e-mail from KAUST to

25   the University of Kansas, including many people from your

1    office?

2    A.    Correct.

3    Q.    And can you please read the first sentence of the e-mail?

4    A.    "I am pleased to inform you that the King Abdullah

5    University of Science and Technology's competitive research

6    grant program-Round 3 (CRG3) has approved a subaward to

7    University of Kansas, KU PI Doctor Franklin Feng Tao, for the

8    exploratory project entitled Ambient Pressure X-ray

9    Photoelectron Spectroscopy for Photocatalytic" -- excuse me,

10    guys.  This is not my -- I'm definitely not -- "Overall Water

11    Splitting Reaction."

12    Q.    Okay.  Ms. Reed, you're an expert in disclosure

13    requirements to DOE and NSF you would say?

14    A.    Yes.

15    Q.    And your office has a 100 percent compliance in your

16    estimation with grant requirements?

17    A.    We depend on the PI, but, yes, we work with the PI to make

18    sure that as much as possible we are helping them submit a

19    complete application.

20    Q.    But sometimes the PI isn't the exclusive person with

21    knowledge of what needs to be submitted in a given situation;

22    correct?

23    A.    No, the policy requires them to be that, yes.

24    Q.    Well, sometimes, for example, your office will be aware of

25    a grant like the KAUST grant?

19-20052    USA v. Feng (Franklin) Tao    03.24.22    494

```
 1    A.  I would assume since Doctor Tao was the PI on this, he was
 2    also aware of it.
 3    Q.  I'm not asking if Doctor Tao was aware, I'm asking if your
 4    office was aware.
 5    A.  Yes.
 6    Q.  Was your office aware -- strike that.
 7         I'd like to show you a document marked Defendant's
 8    Exhibit 1251.  Do you recognize that document, Ms. Reed?
 9    A.  This looks like an application to U.S. Department of
10    Energy, Office of Science, for Doctor Tao.
11         MR. DEARINGTON:  Your Honor, I'd like to move into
12    evidence Exhibit 1251.
13         THE COURT:  Any objection?
14         MR. OAKLEY:  No objection, Your Honor.
15         THE COURT:  1251 admitted.
16    BY MR. DEARINGTON:
17    Q.  Could you please read the date of this proposal, Ms. Reed?
18    A.  Yes.  Date received is marked as May 21 of 2015 at 5:49 and
19    51 seconds p.m.
20    Q.  Would your office have submitted this to DOE?
21    A.  I'm looking at the cover page.  Give me one second, please.
22    Yes, it appears my predecessor's name is on this application.
23    Q.  And is it your position that KU would have an obligation to
24    disclose grants received from foreign governments or foreign
25    universities as current and pending support in a grant proposal
```

19-20052    USA v. Feng (Franklin) Tao    03.24.22                495

1    submitted to DOE?

2    A.   If the DOE application required a current and pending

3    support, we would've provided one to Doctor Tao for him to

4    review and ensure completion prior to including in the

5    application; correct.

6    Q.   Okay.  So going back to the KAUST e-mail, that e-mail is

7    dated December 2nd, 2014; correct?

8    A.   Correct.

9    Q.   So as of December 2nd, 2014 KU had an award from KAUST;

10   correct?

11   A.   We had notification of award.  The actual award document is

12   signed and executed on January 20th, 2015.

13   Q.   January 20th, 2015?

14   A.   Correct.

15   Q.   So would that be four months prior to when your office

16   submitted this DOE proposal?

17   A.   Yes.

18   Q.   And you said it may not be required that current and

19   pending support be submitted in all proposals?

20   A.   Correct.

21   Q.   Do you know whether current and pending support had to be

22   submitted with this DOE proposal?

23   A.   I do not, I would have to look at the solicitation to

24   determine that.

25   Q.   Well, I will show you whether it was submitted with this

1    proposal.

2    A.   Thank you.

3    Q.   I believe we're on Page 66 of this document.  Does this

4    look like current and pending support for Doctor Tao?

5    A.   It does.

6         MR. OAKLEY:  Your Honor, I'm sorry.  Which exhibit are

7    we on?

8         MR. DEARINGTON:  We are on 1251.

9         MR. OAKLEY:  And, I'm sorry, what page?

10        MR. DEARINGTON:  I mean, they're not numbered because

11   it's a proposal, it's 66 pages in.

12        MR. OAKLEY:  Your Honor, has this been admitted?

13        THE COURT:  1251 was just admitted.

14        MR. OAKLEY:  And what page?

15        THE WITNESS:  It's Page 64.

16        THE COURT:  Is it like halfway through, two-thirds

17   through?  Where is it approximately?

18        THE WITNESS:  Towards the back.  It's Appendix No. 2.

19        THE COURT:  Okay.

20        MR. DEARINGTON:  Bates number would be 6009.

21   BY MR. DEARINGTON:

22   Q.   So fair to say current and pending support was submitted by

23   KU for Doctor Tao for the DOE 2015 proposal?

24   A.   Correct.  It does look like Doctor Tao provided us a

25   current and pending support to include in his proposal.

19-20052    USA v. Feng (Franklin) Tao    03.24.22          497

1   Q.   In your office several people were aware that KU at that

2   time had a grant from KAUST?

3   A.   I can't state that the person who was preparing this would

4   have known that and it would not have been their responsibility

5   after providing a document to Doctor Tao.  They would've

6   provided him something and it would've been his responsibility

7   as the PI to ensure it was accurate.

8   Q.   Your office has controls and 100 percent compliance, does

9   it not?

10  A.   On certain things, yes.

11  Q.   Does that not involve communicating to each other in your

12  office?

13  A.   Well, anytime that we are preparing a variety of proposals,

14  we are not sitting around and making sure that each PI is

15  putting the correct thing in here.  We trust that they

16  understand their responsibility to make sure that the

17  information they're providing is accurate.

18  Q.   You testified yesterday it's a shared responsibility, did

19  you not?

20  A.   It is a shared responsibility, but we cannot -- if somebody

21  is going to provide us the wrong information, we can't go

22  against them.  If they certify that it's the accurate copy, the

23  PI much better knows their activity than we do.

24  Q.   Ms. Reed, I think you're getting a little ahead of me here

25  because you see perhaps where I'm going.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    498

1    A.   No, you're casting aspersions on myself and my office and

2    I'm going to defend that we have process and policy.

3    Q.   Ms. Reed, may I remind you, you are not the defendant in

4    this matter; Doctor Tao is the defendant in this matter.  You

5    are a witness.

6    A.   Then why you are attacking my staff?

7              MR. OAKLEY:  Your Honor, I object.  I think that's

8    exactly the point.  So I would object to relevance, I would

9    object to argumentative, and I would object to asked and

10   answered.

11             THE COURT:  I agree.

12             MR. DEARINGTON:  I can move on, Your Honor, from that

13   question.

14   BY MR. DEARINGTON:

15   Q.   So, Ms. Reed, do you see in this current and pending

16   support submission on this page, and I'll show you the second

17   page, any listing of the KAUST grant KU received in 2015?

18   A.   I do not see it.

19   Q.   I'll show you the second page.  Do you see the KAUST grant

20   on this page?

21   A.   I do not.

22   Q.   So fair to say KU, your office, was aware of the KAUST

23   grant but did not disclose it to DOE in a grant proposal four

24   months after the award was received?

25   A.   That was not intentional.  Again --

1    Q.   Just --

2    A.   No, this is very important to me because this is about us

3    doing something fraudulent.  We would not do something

4    fraudulent.  If we were aware that Doctor Tao had not reviewed

5    this, we would've been more scrutinous of it, but our

6    expectation is the PI ensures accuracy in their proposal.  They

7    are the ones who are responsible under our policy and under the

8    expectations of the federal government.  So if this isn't

9    accurate, it is the responsibility of Doctor Tao to tell us

10   that before we submit.

11   Q.   I've heard a lot of testimony about how everything is

12   Doctor Tao's responsibility --

13   A.   As a PI, that is correct.

14   Q.   -- but is it a shared responsibility?

15   A.   Well, you asked me -- so we do a lot of certs and reps, we

16   have the processes and policies in place.  But if a PI does not

17   follow those processes and polices, we cannot be held

18   accountable for that.

19   Q.   So the PI is left on their own?

20   A.   No.  We have a lot of staff -- I think I testified that we

21   have over 80 staff to assist PIs and ensure compliance, but if

22   they don't give us the correct information or ensure things are

23   accurate, we don't have any way of determining that they're not

24   being accurate.

25   Q.   So you're saying you wouldn't have a way of determining

1    that there was a KAUST grant by your office?

2    A.  I think what I said previously when I talked about current

3    and pending, what we do is we take a prior version of this form

4    and provide it to the PI and they are to review it and update

5    it as necessary.  If we provided a version to the PI and they

6    failed to update it, that is their responsibility.

7    Q.  So when there's a failure, it's the PI's responsibility.

8    But when there's compliance, that's your guys' success; is that

9    fair?

10   A.  I believe that we did our part by providing a version of

11   this to the PI.  I can't assert what was done with that, but it

12   looks like it's not complete here.

13   Q.  I would just like to remind the jury and I'd like you

14   to confirm --

15          MR. OAKLEY:  Objection, Your Honor, that's

16   testimonial.  I withdraw the objection; he hasn't completed the

17   question.  I apologize.

18          THE COURT:  All right.  Reframe your question.

19   BY MR. DEARINGTON:

20   Q.  I'd like for you to confirm, Ms. Reed, that the award for

21   KAUST was January 2015 and the proposal to DOE that didn't list

22   KAUST as current and pending support was May 2015; correct?

23   A.  Correct.  I think we established that the KAUST award was

24   in-house, but Doctor Tao failed to put it on his current and

25   pending.

19-20052    USA v. Feng (Franklin) Tao    03.24.22        501

1  Q.  And your office with eight people on the KAUST award e-mail

2  didn't think to say let's help Doctor Tao out and list it as

3  current and pending support?

4  A.  An e-mail that came in months before a proposal was being

5  prepared would not be on anybody's radar.

6  Q.  Was anyone disciplined over this?

7  A.  There's not a breach in policy here.

8  Q.  You just testified that DOE would've wanted to see the

9  KAUST grant in this document and your office didn't include it

10 when they submitted the proposal.  That's not a --

11 A.  You just --

12 Q.  -- policy issue?

13 A.  You just pointed that out to me.  We will make sure that we

14 disclose it.

15 Q.  So you might discipline someone over this?

16 A.  Again, this isn't about discipline of my staff.  This is

17 that the PI failed to include when he certified that we should

18 submit this.

19 Q.  So is this more likely an oversight or was this a web of

20 lies?

21 A.  I'm not going to answer a question that says a web of lies.

22 We are a professional operation that receives millions of

23 dollars of federal funding.  The fact that you would even state

24 that shows your lack of understanding of what our operation

25 does.

1    Q.  Would you agree with me that even knowledgeable and

2    well-intentioned people can make errors and omissions like this

3    and have trouble understanding these things?

4    A.  I think my staff's instructions to PIs are pretty clear,

5    they are experts in communicating, and so I believe if we could

6    find the e-mail, there would be an e-mail that says please

7    ensure this is accurate for submission.

8    Q.  Could it be the case that your office didn't realize that

9    foreign grants had to be disclosed to DOE?

10   A.  No.  We treat all sponsors the same in our system.

11   Q.  Did you ever instruct PIs that all -- strike that.

12       So, Ms. Reed, I'll admit to you I'm not an expert in

13   disclosure requirements to agencies, but I'd like to ask you a

14   hypothetical about current and pending support while we're on

15   that topic.

16   A.  Sure.

17   Q.  What your expectations of your office would be.

18       So you just said that a foreign -- a grant proposal to a

19   foreign university should've been disclosed to DOE --

20   A.  Correct.

21   Q.  -- despite that we looked at an exhibit which was a

22   proposal to DOE where it wasn't disclosed by your office?

23   A.  Correct.

24   Q.  So let me ask you this hypothetical.  If KU were to have an

25   opportunity to receive funding from a foreign university --

1    A.    Yes.

2    Q.    -- and was in the process of seeking that funding, would

3    that be deemed pending support?

4    A.    It would depend on the state of the proposal.  But if we

5    knew something was in-house, to prepare a proposal we would

6    most likely scrutinize that to see if we were ready to put it

7    on as a pending project.  If we had an established budget and

8    commitment of time, yes, we would include it.

9    Q.    So if a foreign university were considering whether to fund

10   KU on a grant, you would include it?

11   A.    It depends.

12   Q.    So not all the time would you disclose a proposed foreign

13   funding from a university?

14   A.    If we had a budget and a scope of work, we would disclose

15   it.

16   Q.    Okay.  Fair enough.

17        I'm showing you what's been marked as Exhibit 1457.

18   A.    Thank you.

19   Q.    Is this an e-mail from Kelly Mason of your office to a

20   Doctor Jiang of Fuzhou University?

21   A.    It appears to be, yes.

22   Q.    Kelly Mason is in your office and that's her e-mail

23   address; correct?

24   A.    Kelly Mason is part of our contract negotiations team, or

25   she was, yes.

1   Q.  At this time she was part of your contract negotiations

2   team?

3   A.  Yes, in 2018, June of 2018 she was, yes.

4           MR. DEARINGTON:  I'd like to move Exhibit 1457 into

5   evidence, Your Honor.

6           MR. OAKLEY:  No objection, Your Honor.

7           THE COURT:  1457 admitted.

8   BY MR. DEARINGTON:

9   Q.  And I'll just show for the jury what this document looks

10  like.  So that's Kelly Mason there on top; correct?  And it's

11  an e-mail to Fuzhou University, copying Doctor Tao, and the

12  attachment is Tao Fuzhou U contract KUCR comments.

13      So turning to the attachment, and this appears to be a

14  draft contract with comments; correct?

15  A.  Yes.

16  Q.  And the contract appears to be between the University of

17  Kansas, Center for Research, Inc., which is your -- the entity

18  with which your office works; correct?

19  A.  Correct.

20  Q.  And Fuzhou University in China?

21  A.  Yes, this draft appears to be that.

22  Q.  And it says a subcontract amount; correct?

23  A.  Yes.

24  Q.  And I'm not going to run through the whole contract, but

25  I'll show you a few provisions to get a flavor for it.

19-20052    USA v. Feng (Franklin) Tao    03.24.22                505

```
 1   A.   I think we should note that this is not a --

 2   Q.   There's no question pending, Ms. Reed.

 3        Is Article II -- sorry, Article I is the work to be

 4   performed; correct?  Yes or no?

 5   A.   In the draft contract, yes.

 6   Q.   Okay.  And in the draft contract on Page 7 that's your name

 7   there, Alicia Reed, on the right side?

 8   A.   Correct.

 9   Q.   I'd like to show you what's been marked as Government's

10   Exhibit 193.  Does this appear to be an e-mail from Doctor Tao

11   to a Viviane Schwartz of Department of Energy with a copy to

12   Evelyn Louise Haaheim dated July 16th, 2018?

13   A.   Yes.

14   Q.   And that is Evelyn Haaheim's e-mail address; correct?

15   A.   Correct.

16        MR. DEARINGTON:  Your Honor, I'd like to move into

17   evidence Government Exhibit 193.

18        THE COURT:  Any objection?

19        MR. OAKLEY:  No objection, Your Honor.

20        THE COURT:  193 admitted.

21   BY MR. DEARINGTON:

22   Q.   So surely from the Fuzhou -- the e-mail to Fuzhou from

23   Kelly Mason of your office, your office was aware of that draft

24   contract which sought -- which includes within it funding from

25   Fuzhou University in the amount of $90,000; correct?
```

1   A.  It contains a placeholder of $90,000.  There's no budget

2   attached in this contract.

3   Q.  So $90,000 was support that, if this contract was entered

4   into, KU would've received from a foreign university, Fuzhou

5   University; correct?

6   A.  That is correct.  But we would require a full budget to

7   know Doctor Tao's commitment.  That's part of inclusion in a

8   current and pending.

9   Q.  And this e-mail from Kelly Mason to Fuzhou is dated

10  June 28th, 2018; right?

11  A.  True, but there's a subsequent e-mail in that document.

12  Q.  Just the --

13  A.  Okay.

14  Q.  Sure.  There are --

15  A.  That e-mail that you just showed me, yes, is dated that

16  date.

17  Q.  Okay.  So there's an e-mail on, just to be clear, June 25th

18  and June 25th and June 28th, and you wanted to point out that

19  there's not just one e-mail in this chain but the top one is

20  June 28th?

21  A.  Right.  I'm looking at the August 13th e-mail in the

22  document.

23  Q.  I'm sorry?

24  A.  The June -- or, excuse me, the August 13th e-mail that says

25  "following up" because there had been no response for two

1    months.

2    Q.  I'm sorry, you have two exhibits attached to each other

3    here.  That's my mistake.  So let me just unbundle those.

4    Apologies for that confusion.

5    A.  Sure.

6    Q.  So where we were is that on June 28th your office - and

7    this is 2018 - sent a markup of a contract that, if entered,

8    would've provided funding in the amount of $90,000 according to

9    the terms that we reviewed; correct?

10   A.  According to the draft terms, correct.

11   Q.  Okay.  I'm showing you Exhibit 193 which we reviewed a

12   moment ago.  That was an e-mail from Doctor Tao to the

13   Department of Energy that attached C&Ps --

14   A.  That's correct.

15   Q.  -- of a person named De-en and Doctor Tao; correct?

16   A.  Correct.

17   Q.  And do you read that to mean current and pending support?

18   A.  I do.

19   Q.  I'm going to highlight that for the jury so they can see.

20   Doctor Tao is sending an e-mail to Viviane Schwartz with

21   someone from your office copied and you can see here --

22   A.  Evelyn was copied on this, but the e-mail came from Doctor

23   Tao, correct.

24   Q.  I'm sorry, there was no question pending, but I didn't --

25   A.  Oh, I'm sorry, I thought you were asking me a question

1    because you just -- sorry.

2    Q.   That's my fault, I thought you had answered the question

3    already which had rendered the question moot.

4         I'd like to show you what's been marked as Exhibit 194,

5    Government Exhibit 194.  Does this appear to be a current and

6    pending support document for Doctor Tao?

7    A.   It does.

8    Q.   I can represent to you that this is the attachment to this

9    e-mail.  And does that look like a typical current and pending

10   support document?

11   A.   Yes.  This is a format where you -- yes, where you would

12   see the information and amounts and things like that; correct.

13           MR. DEARINGTON:  Your Honor, I'd like to move into

14   evidence Exhibit 194.

15           MR. OAKLEY:  No objection, Your Honor.

16           THE COURT:  194 admitted.

17   BY MR. DEARINGTON:

18   Q.   So weeks earlier your office, Kelly Mason, was negotiating

19   funding from a foreign university, Fuzhou University.  You'd

20   expect that to be listed as current and pending support in an

21   e-mail to DOE a couple weeks later; right?

22   A.   I think I noted that we would expect there to be a budget

23   and be able to talk about commitment.  If you put up this 194,

24   you'll see that to include it on a current and pending, we have

25   to know the person-months because part of submitting a current

1    and pending is to know how many commitment months are to each
2    project to determine overlap.
3    Q.   Sure.
4    A.   So as I mentioned before that, right, if we had a scope of
5    work and a budget that allowed us to know what kind of
6    commitment Doctor Tao had on the Fuzhou contract, we would've
7    included it, yes.
8    Q.   So we have a period of performance here from 2018 to 2020
9    and an amount --
10   A.   That is not a budget.
11   Q.   -- but you're saying that you need a formal budget --
12   A.   Correct.
13   Q.   -- in order for the agencies to care that you have a
14   pending contract with a foreign university?
15   A.   So if we can put up the form I can show you why we care,
16   because there's a specific section we have to complete called
17   "Person-Months Per Year Commitment to Project."
18   Q.   Ms. Reed, fair to say that in your estimation the agencies
19   would be interested in all work that a PI is committed to or
20   has proposed being committed to?
21   A.   Having a draft contract in hand without any sort of
22   proposal document, including formal budget, does not lead to
23   the level where we would include it.  I think that's my
24   statement from before.
25   Q.   So you're telling me that if there's no signed contract,

510

1    nothing to disclose here?

2    A.    If there's no budget.

3    Q.    So if you haven't seen a budget --

4    A.    Correct.

5    Q.    -- for a relationship with a foreign university, nothing to

6    disclose here?

7    A.    Because that means that it's been through our pre-award

8    office and we can anticipate that it will actually be funded.

9    Q.    So if I were to represent to you that there was a budget

10   for the Fuzhou draft contract you reviewed, you would concede

11   that that should've been disclosed to the Department of Energy

12   a couple weeks later?

13   A.    True.  The form that Doctor Tao e-mailed to the Department

14   of Energy should've contained that, yes.

15   Q.    Okay.  So here we have your office, Kelly Mason, June 28th,

16   negotiating a contract with a foreign university for funding.

17   And here we have, a couple weeks later, an e-mail from Doctor

18   Tao to the Department of Energy copying your office with a

19   current and pending support and here we have that current and

20   pending support.  Do you see anything about the Fuzhou contract

21   KU was negotiating?

22   A.    No.  As I indicated, because we didn't have a budget to

23   know the person months, we would --

24   Q.    It will be a lot faster if you just said --

25   A.    The answer is no.

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1   Q.   -- yes or no questions.  Thank you.

2       Let me just make sure that you don't see it.  Let me

3   know -- stop me if you see it.

4   A.   I looked through this.  In the interest of time, we don't

5   have to go through it all.

6   Q.   Great.

7   A.   It's not there.

8   Q.   I appreciate that.  That will move things along.

9       Surely your office was not trying to hide an affiliation

10  with Fuzhou University, was it?

11  A.   No.

12  Q.   Not trying to hide that from DOE?

13  A.   Why would we attempt to hide something from any federal

14  agency?

15  Q.   So I'd like for you, because you are an expert as you've

16  said in grant disclosure, to tell us where it says under DOE

17  rules that pending support does not need to be disclosed if no

18  budget has been prepared.

19  A.   I think that I mentioned before that all of the C.F.R.s,

20  including the Department of Energy C.F.R.s, are not

21  prescriptive.  They don't tell us exactly what our processes

22  have to be, they tell us that we have to have processes.

23  Q.   So you're telling me that the regulations of the agencies

24  don't prescribe the processes that you have to comply with?

25  A.   The University of Kansas does.

```
 1    Q.   The University of Kansas.
 2         So the agencies haven't decided this must be the process,
 3    they say KU --
 4    A.   Not in the C.F.R. they do not.
 5    Q.   Okay.
 6    A.   So but if you look at the National Science Foundation PAPPG
 7    or if you look at the DOE solicitation, they will tell you what
 8    needs to be included.
 9    Q.   Ms. Reed, I'm just going to ask you -- and I'm sorry if
10    this is awkward, but once you've answered the question, if you
11    could just pause to give me a chance to ask another question,
12    it will be quicker if we don't have explanations following
13    yes-or-no questions.
14    A.   Sure.
15    Q.   So are you aware that Doctor Tao stands accused of hiding
16    an affiliation with Fuzhou University?
17    A.   I do understand that, yes.
18    Q.   But your office when they were copied on an e-mail to DOE
19    in July 2018 is not accused of hiding an affiliation with
20    Fuzhou University; correct?
21    A.   At that time there was no affiliation.
22    Q.   Are you aware that Doctor Tao is charged in that very
23    e-mail with hiding an affiliation from Fuzhou University?
24    A.   I was not aware of that, but since he did send the --
25    sorry.  No.
```

19-20052    USA v. Feng (Franklin) Tao    03.24.22                   513

1    Q.  Thank you.  And no one from your office was charged, I
2    think you said, for the omission in that e-mail?
3    A.  My office didn't send that e-mail.
4    Q.  Your office was copied on the e-mail.  Fair to say that
5    Evelyn Haaheim would've read the e-mail she received?
6    A.  If the PI sends something to an agency about technical
7    information, it would not be my staff's responsibility to
8    correct the PI if the PI is certifying it's accurate.
9    Q.  So this is just technical information?
10   A.  Well, I mean, at this point -- well, do you want me to
11   explain?
12   Q.  No, I think yes or no would be -- you stand by your
13   testimony that this is technical information being sent?
14   A.  I stand by that the PI should be an expert on this, yes.
15   Q.  The PI should be an expert on current and pending support,
16   is that what you testified?
17   A.  On what they have funding for; correct.
18   Q.  How much training did your office provide Doctor Tao on
19   current and pending support in 2018?
20   A.  I don't have that information.
21   Q.  Has your office ever provided training on current and
22   pending support that Doctor Tao is expected to be an expert on?
23   A.  I don't have that information.
24   Q.  And you testified that when there's an omission, that's on
25   the PI.  But when everything is compliant, your office has done

1    a great job; correct?

2    A.   I don't think I used the words "great job."

3             MR. OAKLEY:   Objection, Your Honor, that misstates

4    the --

5             THE COURT:   I'll sustain to the -- I'll sustain the

6    objection.

7             MR. DEARINGTON:   Your Honor, I can move on from there.

8    BY MR. DEARINGTON:

9    Q.   So fair to say no one was fired over this e-mail in your

10   office?

11   A.   There was no wrongdoing on the part of KU.

12   Q.   No wrongdoing on the part of KU?

13   A.   Correct.

14   Q.   But your office was aware that there was a pending contract

15   with a foreign university, and two weeks later KU - from Doctor

16   Tao with a copy to your office - omitted that from current and

17   pending support?

18   A.   Correct.  Doctor Tao omitted it from any information.  We

19   didn't have a budget, we didn't have any information to put on

20   here, so I don't see -- I think that you misunderstand what

21   should be on here.

22   Q.   Could you please point me to a policy regarding current and

23   pending support at KU that states current and pending support

24   only needs to be disclosed if there's a budget?

25   A.   I think it is just expert understanding that if you are

1  going to complete a form, you have to have the information to

2  complete that form.

3  Q.  Expert understanding?

4  A.  Yes.

5  Q.  Are you aware Doctor Tao is an expert, one of the leaders

6  of his field in catalysis?

7  A.  I am aware of that, yes.

8  Q.  Would you say he's an expert, a leader in his field, in

9  current and pending support?

10  A.  He's an amazing scientist.

11  Q.  Scientist, but he's not in your research office; right?

12  A.  I would expect him to understand what support he has for

13  that science so that he can do it.

14  Q.  And if I represented to you that there was a budget for

15  this contract, draft contract, your office should've clarified

16  and included that in current and pending support; right?

17  A.  I can't state if there was a budget.  I have not seen any

18  evidence to that.

19  Q.  And your office reviews current and pending support before

20  it goes to the agency; right?

21  A.  Not in this case, Doctor Tao sent it directly.

22  Q.  So you're testifying that you're aware that nobody from

23  your office reviewed this current and pending support prior to

24  Doctor Tao sending it?

25  A.  Yes.  Doctor Tao sent it directly to the Department of

1   Energy as evidenced by this e-mail.

2   Q.  Of course, Ms. Reed, but it's -- you're not -- it's

3   conceivable that someone from your office reviewed the current

4   and pending support with Doctor Tao and then he submitted it to

5   DOE; right?

6   A.  I don't have evidence on that.

7   Q.  Okay.  And if no one from your office reviewed current and

8   pending support -- which would be contrary to your practice;

9   correct?

10  A.  This appears to me to be after the proposal was submitted

11  because in Evelyn's e-mail she says when you send her the

12  updated CPs.  So to me it means that we had submitted a version

13  and then something needed to be changed on it.  So I don't know

14  what was submitted because I don't have that in front of me.

15  Q.  Well, if I were to represent to you that this e-mail

16  relates to the DOE proposal that we discussed yesterday in

17  which your office was unaware of a conflict of interest form

18  being on file for Doctor Tao at the time of the proposal --

19  A.  That is not what I stated yesterday.

20  Q.  Which part was not what you stated yesterday?

21  A.  I didn't state that we were unaware of a COI form being on

22  file.

23  Q.  Allow me to --

24  A.  COI -- please.  COI and current and pending are two

25  separate things.

1    Q.  They are?

2    A.  Yes.

3    Q.  So a conflict of interest form is a different thing from

4    current and pending support and there's no overlap?

5    A.  I'm not saying there's not overlap, but I'm saying they're

6    two separate things.

7    Q.  So your office doesn't use conflict of interest forms for

8    current and pending support review?

9    A.  Not 100 percent of the time.  If somebody doesn't state

10   that they have any conflicts of interest, there's nothing to

11   review there or to compare against.

12   Q.  Okay.  And you testified that it's possible -- or you're

13   not aware of anyone reviewing the current and pending support

14   before Doctor Tao sent it, but you're also not aware that

15   nobody reviewed it before Doctor Tao sent it; right?

16   A.  Correct.  I don't know that --

17   Q.  And if nobody reviewed it before Doctor Tao sent it, surely

18   Ms. Haaheim could've reviewed it upon receiving it on the day

19   the e-mail was sent; correct?

20   A.  I would not necessarily expect her to do that, no.

21   Q.  So if she hadn't reviewed it before it was submitted to the

22   agency, you wouldn't expect her to review it after it was

23   submitted to the agency, she would just not review it at all?

24   A.  I would expect Doctor Tao to have updated his current and

25   pending with the information necessary and make it accurate

1    because that's a PI responsibility.

2    Q.    Okay.  Your office doesn't just rubber stamp things; right?

3    A.    No.

4    Q.    You actually engage in the diligence necessary to make sure

5    things are correct; right?

6    A.    My staff as experts, yes.

7    Q.    And that's because you testified yesterday, or maybe it was

8    the day before I believe, that the uniform guidance makes it

9    incumbent upon the university and your office to make sure

10   everything is compliant; correct?

11   A.    To have processes and policies in place; correct.

12   Q.    Okay.  And I think you testified yesterday or the day

13   before -- well, let me ask it this way.  You would agree that

14   the role of the research support is partly to enable PIs to

15   focus on the work so that your office can assist them with

16   meeting the agency's compliance expectations; correct?

17   A.    Correct.  As you've brought up several times, it's a

18   partnership.  We expect the PI to work with us and give us the

19   information to be able to complete forms and things like that,

20   yes.

21   Q.    And you don't conduct science; right?

22   A.    No.

23   Q.    Doctor Tao conducts science?

24   A.    That's right, he is a scientist.

25   Q.    But you are an expert in what needs to be disclosed;

1    correct?

2    A.   Correct.

3    Q.   And to allow Doctor Tao to focus on his research and be in

4    the lab and be on his computer and analyze things and publish

5    works, you shoulder some of that burden in your office to make

6    sure everything that goes to the agencies is correct?

7    A.   Some of that burden; correct.

8    Q.   Would you say that that was a failure of your office --

9    strike that.

10          If I were to represent to you that Doctor Weatherley stated

11   that it would be a failure of the Office of Research not to

12   disclose a draft Fuzhou contract to DOE as current and pending

13   support, would you agree?

14   A.   It would depend on the information that he had when he

15   stated that.

16   Q.   Well, I just stated to you the hypothetical, which is

17   that --

18   A.   Did you tell him that there was no detailed budget?

19   Q.   I'm not here to answer questions, Ms. Reed.  I'm not a

20   witness.

21   A.   Okay.  But I can't answer the question if I don't know the

22   full point of your hypothesis.

23   Q.   You can't answer my question?  Okay.

24          So part of your office's responsibility is to ensure that

25   principal investigators like Doctor Tao are protected as

1    they're doing their work; correct?

2    A.   Correct.  And that's why we would ask them to provide

3    complete information.

4    Q.   Did your office protect Doctor Tao in July 2018 when he

5    submitted current and pending support?

6    A.   Did he ask for assistance?  I mean, I -- this is a very

7    complex question that I can't necessarily answer without all

8    the information.  He obviously felt comfortable in submitting

9    something to the Department of Energy, I would assume since --

10   I assume he would've been working with Evelyn on this.  If he

11   had --

12   Q.   There's no need for -- sorry to cut you off, but we can't

13   talk about assumptions at this time.

14   A.   But I feel like you're making assumptions, so I just need

15   to answer them.

16   Q.   Ms. Reed, I'd like to show you what's been marked as

17   Exhibits 1225 to 1227 and they've been tabbed here for

18   organizational purposes, but feel free to leaf through them as

19   well.

20   A.   Thank you.

21   Q.   Does 1225 appear to be an article written by a number of

22   authors, including Doctor Tao, in the *Royal Society of*

23   *Chemistry* periodical?

24   A.   It does.

25           MR. DEARINGTON:  Your Honor, I'd like to move

19-20052    USA v. Feng (Franklin) Tao    03.24.22                521

```
1     Exhibit 1225 into evidence.

2            THE COURT:  Any objection?

3            MR. OAKLEY:  I'm sorry, Your Honor, I'm trying to

4     locate it.

5            THE COURT:  Okay.

6            MR. OAKLEY:  No objection, Your Honor.

7            THE COURT:  1225 admitted.

8     BY MR. DEARINGTON:

9     Q.  And what's marked as 1226, does that appear to be an

10    article where Franklin Tao is one of the authors in the

11    Chemical Reviews publication?

12    A.  It does.

13           MR. DEARINGTON:  Your Honor, I'd like to move in

14    Exhibit 1226.

15           THE COURT:  And you're also going to be offering 1227

16    after this?

17           MR. DEARINGTON:  I am, Your Honor.

18           MR. OAKLEY:  No objection, Your Honor.

19           MR. DEARINGTON:  And 1228 as well, Your Honor.

20           THE COURT:  And 1228.  Just giving Mr. Oakley a

21    heads-up.  Okay.  1226 admitted.

22    BY MR. DEARINGTON:

23    Q.  And turning to Exhibit 1227, Ms. Reed, does that appear to

24    be an article in the Journal of the American Chemical Society

25    in which Doctor Tao is one of the authors?
```

1   A.  It does.

2        MR. DEARINGTON:  Your Honor, I'd like to move into

3   evidence Exhibit 1227.

4        MR. OAKLEY:  No objection, Your Honor.

5        THE COURT:  1227 admitted.

6   BY MR. DEARINGTON:

7   Q.  Okay.  Are you aware that these are fairly elite scientific

8   journals?

9   A.  I'm not familiar with the status of these journals, but I

10  can state that they are journals.

11  Q.  Okay.  So looking first at exhibit -- well, let's pause for

12  a moment.  So one of these was in the *Royal Society of*

13  *Chemistry*'s journal, one was in *Chemical Reviews* and one was in

14  the *Journal of American Chemical Society*; correct?

15  A.  Correct.

16  Q.  So you're not aware that these have wide circulation among

17  academia, including Doctor Tao's colleagues at KU?

18  A.  You pointed out that I'm not a scientist, I'm not aware of

19  the status of any of these journals.

20  Q.  Right.  Because your domain is research and Doctor Tao's is

21  science; right?

22  A.  Research administration; correct.

23  Q.  Okay.  Excuse me, research administration.

24       So turning first to 1225.  This looks like a fairly typical

25  periodical, how this is laid out, correct, a scientific

1    article?

2    A.    Correct.

3    Q.    And you can see there Doctor Tao, I know he's last, but

4    he's listed as the first author is how you view that in

5    science; correct?

6    A.    I would know that because of the star, yes.

7    Q.    He's the lead author.

8          And publications that are funded by federal agencies are

9    required to be posted online; correct?

10   A.    That is correct, and acknowledged in most cases.

11   Q.    Acknowledged.  Okay.  So you can see next to Doctor Tao's

12   name there's an A and a B; correct?

13   A.    Correct.

14   Q.    And what does that signify?

15   A.    Those are his affiliations.

16   Q.    So his affiliations here, could you please read them for

17   the jury?

18   A.    Sure.  A, Department of Chemical and Petroleum Engineering,

19   University of Kansas, Lawrence, Kansas 66045, U.S.A., and then

20   his e-mail of franklin.feng.tao.  Would you like me to spell

21   that?

22   Q.    That's okay.  Sorry.

23   A.    And then the second one, B, Institute of In Situ/Operando

24   Studies of Catalysis and State Key Laboratory of Photocatalysis

25   on Energy and Environment and College of Chemistry, Fuzhou

1    University, Fuzhou, 350116, China.

2    Q.   So has Doctor Tao listed in a published periodical an

3    affiliation with Fuzhou University?

4    A.   That is what this appears like to me.

5    Q.   That doesn't seem like an affiliation Doctor Tao is trying

6    to hide, is it?

7    A.   I can't answer that question.

8    Q.   Okay.  And Exhibit 1226 I'd like to show to the jury,

9    *Chemical Reviews*, and Doctor Tao is listed as an author;

10   correct?

11   A.   Correct.

12   Q.   And Doctor Tao again lists KU and an affiliation at Fuzhou

13   University in this article; right?

14   A.   Correct.

15   Q.   And turning to Exhibit 1227.

16   A.   Yes.

17   Q.   This is in the *Journal of American Chemical Society* and,

18   again, Doctor Tao is listed as an author and lists two

19   affiliations, one is KU and one is Fuzhou; correct?

20   A.   That is correct.

21   Q.   So, again, with respect to the last two periodicals, fair

22   to say that someone could go on the Internet, google Doctor Tao

23   and find these articles because the agencies require that

24   articles that are funded by the agencies be posted online?

25   A.   I can't speak to anybody's ability to use Google.

19-20052    USA v. Feng (Franklin) Tao    03.24.22                525

1   Q.  Okay.  I'm showing you what's been marked as Exhibit 1228.

2   A.  Sorry, quick question.  Are these the same?  You had

3   already handed me one.  Are these the same or do I need to --

4   Q.  I'm sorry, you already have this?

5   A.  Oh, yeah.

6   Q.  Okay.  Thank you.  Does this appear to be a government

7   website printout?

8   A.  It does.

9   Q.  And does that government website list osti.gov?

10  A.  Yes.

11  Q.  And is that an Office of Science website?

12  A.  I would have to look that up to make sure that OSTI is an

13  Office of Science.

14  Q.  And this is a periodical called *Synergy of Single Atom*, and

15  then it continues; correct?

16  A.  Yes.

17  Q.  And Doctor Tao is listed as an author?

18  A.  Correct.

19          MR. DEARINGTON:  Your Honor, I'd like to move into

20  evidence Exhibit 1228.

21          THE COURT:  Any objection?

22          MR. OAKLEY:  No objection, Your Honor.

23          THE COURT:  1228 admitted.

24  BY MR. DEARINGTON:

25  Q.  So osti.gov is what it states at the top; correct?

19-20052    USA v. Feng (Franklin) Tao    03.24.22                526

1    A.  Correct.

2    Q.  And then the article title beginning with *Synergy* and the

3    authors, including Doctor Tao; correct?

4    A.  Correct.

5    Q.  And the affiliations right at the top there associated with

6    Doctor Tao.  Do you see that?

7    A.  I do see that, yes.

8    Q.  And does that state that he's affiliated with KU and Fuzhou

9    University?

10   A.  That appears to be the affiliation he submitted on this

11   publication; correct.

12   Q.  So you're telling me that a government website shows Doctor

13   Tao being affiliated with Fuzhou University?

14   A.  That's what this appears to be.

15   Q.  Does that sound like something Doctor Tao would be trying

16   to hide from the Department of Energy in plain sight?

17   A.  I didn't see it listed in any documentation that came to

18   our office.  You're asking me a question so I'm going to answer

19   it.  I did not see this on his COI and I did not see this in

20   any of his biosketches.  So while I do see it on this

21   government website, this is not something that was ever

22   submitted to my office, so I can't speak to if someone would

23   know this even existed.

24   Q.  You testified that you're not sure that all people know how

25   to use Google; right?

1   A.   Correct.

2   Q.   But you know how to use Google; right?

3   A.   Of course I do.

4   Q.   And people in your office know how to use Google; right?

5   A.   It is not their responsibility to google investigators.

6   Q.   That was not the question, Ms. Reed.  I'd like you to just

7   listen to the question and then respond to the question that

8   was asked, not something else that you think might be relevant

9   but is not part of my question.

10  A.   Sure.   Okay.

11  Q.   People in your office know how to use Google; right?

12  A.   I would assume so.

13  Q.   And Doctor Tao lists his publications in grant proposals,

14  correct, in progress reports -- excuse me, progress reports

15  submitted to the agencies?

16  A.   I cannot speak to what is included in his progress reports

17  if they didn't come to my office.

18  Q.   So your office doesn't review progress reports?

19  A.   NSF requires that PIs directly submit progress reports and

20  each department in Department of Energy handles it differently.

21  So PIs submitting technical progress reports might not submit

22  those through our office.

23  Q.   Well, let me ask you this.  Someone from your office

24  could've found this web page if they wanted to; correct?

25  A.   I can't speak to that.

1    Q.   Do you regret that no one in your office was able to spot

2    that Doctor Tao was listing Fuzhou in his publications, in a

3    handful of publications at least that we've looked at so far?

4    A.   It is not our policy to google or look at publications of

5    PIs unless they ask us to do so.  So, no, there's no regret

6    because that's not part of our process.

7    Q.   And if your office, which is a research and administration

8    office, had actually reviewed the research that Doctor Tao

9    published, you would've seen this; right?

10   A.   That is not our role.

11   Q.   That's not my question, Ms. Reed.

12   A.   I can't speak to a hypothetical that doesn't address what

13   our actual role is.

14   Q.   Well, Ms. Reed, the question is:  If your office had

15   reviewed this publication, would they have seen that Doctor Tao

16   had an affiliation with Fuzhou?  You can't answer that

17   question?

18   A.   I'm sure if given the same information that I had they

19   would be able to read that, yes.

20   Q.   And if your office had read that, might they have assisted

21   Doctor Tao with making sure that, if your office thought it

22   should be disclosed, he disclosed it?

23   A.   I can't speak to that because that did not occur, but I

24   assume that if there was something disclosed here that looked

25   like a conflict of interest, especially because you've pointed

1    out that we had a Fuzhou contract in-house, that that would

2    have been discussed.

3    Q.   And if you had done that, we probably wouldn't be here

4    today, would we?

5    A.   I guess I really can't speak to that.

6             MR. OAKLEY:  Objection, speculation, Your Honor.

7             THE COURT:  Sustained.

8    BY MR. DEARINGTON:

9    Q.   Agency program managers are supposed to review publications

10   listed in progress reports; correct?

11   A.   I believe that's part of their role.

12   Q.   So if I were to represent to you that Doctor Tao listed

13   publications in his progress report to DOE that showed a Fuzhou

14   affiliation, your expectation would be that that program

15   manager would look at the publication?

16            MR. OAKLEY:  Objection, speculation.

17            THE COURT:  Well, I don't know if there's any basis

18   for that.  I'll sustain at this time.

19            MR. DEARINGTON:  Okay, Your Honor.

20   BY MR. DEARINGTON:

21   Q.   I think I'd like to turn to the PI policy and regulations

22   we discussed yesterday.

23   A.   Sure.

24   Q.   Was it your testimony that the PI under the policy, the PI

25   policy, is responsible for ensuring compliance with federal

1    regulations?

2    A.   I believe I said that they have the final responsibility

3    for a variety of things.  I would need to look at the policy to

4    see the exact wording.

5    Q.   Okay.

6         THE COURT:  Would this be a good time to take a break

7    while you're looking for that?  You've located it.

8         MR. DEARINGTON:  I've located it, but it's up to you,

9    Your Honor.

10        THE COURT:  All right.  Go ahead.  We'll break in

11   another 5-10 minutes.

12        MR. DEARINGTON:  Okay.

13   BY MR. DEARINGTON:

14   Q.   So I'm showing you what's been --

15        MR. DEARINGTON:  Your Honor, I think this has been

16   marked as Exhibit 5.  I'm not positive it's been introduced,

17   but I think it has.

18        THE COURT:  Exhibit 5, the principal investigator

19   policy, is admitted.

20        MR. DEARINGTON:  Okay.  Thank you, Your Honor.

21   BY MR. DEARINGTON:

22   Q.   So you said you weren't sure about the policy so I'm going

23   to show it to you to refresh -- well, to ask you about it.

24        It says there in the PI -- let me zoom out to show the

25   policy.  That's the PI investigator policy; right?

1    A.   Correct.

2    Q.   And it says there that, "The PI is responsible for ensuring

3    that all sponsored research takes place in accordance with the

4    terms under which the grant was issued and that this research

5    complies with all applicable federal, state, and university

6    regulations"; correct?

7    A.   Correct.

8    Q.   So your position is under this policy Doctor Tao would be

9    required to comply with federal regulations?

10   A.   Correct.

11   Q.   Did you provide training to Doctor Tao about federal

12   regulations, your office?

13   A.   We provided copies to him and made available all of this

14   information.

15   Q.   Copies of all the federal regulations I showed you?

16   A.   We provided him copies of his agreement so that he could

17   understand what regulations were incumbent upon him.  And then,

18   yes, those either had links or have links in our office.  We

19   also have assigned specialists that he has been in contact

20   with, you've had e-mails with his contact to them.  If he had

21   questions, they would've been a point of contact for him to ask

22   questions about what was applicable if he wasn't aware.

23   Q.   So you require PIs under your policy to be responsible for

24   federal regulations, but you don't provide any training about

25   those regulations; correct?

19-20052    USA v. Feng (Franklin) Tao    03.24.22                532

1    A.   We would provide specific training requested by the PIs.

2    As you've pointed out, there's a lot of federal regulation.  It

3    would be a waste of time to train every single PI on every

4    single regulation because it might not be applicable.

5    Q.   And the regulations are fairly extensive; correct?

6    A.   True, but we do point out things that are important.

7    Q.   Ms. Reed, again, just a yes or no and I'll follow up if I

8    need clarification.

9    A.   Okay.

10   Q.   And Mr. Oakley I'm sure will as well.

11       Have you read all the regulations that govern DOE and NSF

12   grant requirements?

13   A.   I believe I've read all applicable policies.  I cannot

14   state 100 percent that every single policy in existence has

15   been read by me, no.

16   Q.   Are you aware of a requirement that states that principal

17   investigators should disclose -- excuse me, aware of a

18   requirement in the regulations, federal regulations, that

19   states that PIs should disclose honorary appointments to DOE or

20   NSF in proposals or progress reports?

21           MR. OAKLEY:  Objection, Your Honor.  The court will

22   instruct the jury to the relevant law at the end of the case.

23   He's trying to get this witness to opine on what the law

24   requires.

25           THE COURT:  I'll sustain.  I don't see the relevance

1    of that particular question anyway.

2            MR. DEARINGTON:  Your Honor, Ms. Reed just testified

3    that her expectation and policy was that Doctor Tao comply with

4    regulations.  One of the allegations in this case is that

5    Doctor Tao didn't comply with federal requirements and

6    regulations.

7            THE COURT:  I understand that.  But with respect to

8    honorary appointments, I don't see the relevance and I don't

9    think this witness should be testifying as to what the law is

10   or isn't anyway.  If it is relevant, I'll instruct the jury on

11   what the law is.

12           MR. DEARINGTON:  Fair enough, Your Honor.  Thank you.

13   BY MR. DEARINGTON:

14   Q.   You're aware that there's no restriction on travel for a

15   principal investigator as long as it's not reimbursed to an

16   agency; correct?

17   A.   That is correct.

18   Q.   And PIs regularly travel for conferences and collaborations

19   while continuing to do their research from abroad; correct?

20   A.   It would depend on the research and what is required for it

21   to be able to do it abroad.

22   Q.   So if there's no export control issues and Professor

23   Weatherley is visiting New Zealand, he can go on his computer

24   and monitor research if he's conducting research; right?

25   A.   He should not be taking KU equipment abroad without export

1    control.

2    Q.   Okay.  So you wouldn't expect -- if he had a KU-issued

3    phone, he would have to leave that behind?

4    A.   I don't believe KU issues phones.  It's a digital policy.

5    Q.   If he had a conference in Germany or Belgium, he wouldn't

6    be allowed to work on any of his grants while he's over there

7    because he would need his KU computer; is that your testimony?

8    A.   I did not say he --

9         MR. OAKLEY:  Objection, relevance as to Professor

10   Weatherley's --

11        MR. DEARINGTON:  A professor we'll say.

12        THE COURT:  Reframe the question.

13   BY MR. DEARINGTON:

14   Q.   So, Ms. Reed, you just testified that a professor is not

15   allowed to travel with their work laptop internationally; is

16   that what you testified?

17        MR. OAKLEY:  Objection, that misstates the witness'

18   testimony.

19   BY MR. DEARINGTON:

20   Q.   Ms. Reed --

21        THE COURT:  All right.  You can ask her if that's what

22   she testified.

23   BY MR. DEARINGTON:

24   Q.   Is that what you testified to?

25   A.   No.  May I answer more than yes or no?

1    Q.   Allow me to frame the question a little bit better.

2         Is a professor allowed to travel internationally with their

3    laptop issued by KU?

4    A.   They would have a special KU-issued laptop that had been

5    looked at by the export control office and ensuring that there

6    was nothing that needed a license on that computer prior to

7    them traveling.

8    Q.   And do you believe that your office has maintained

9    100 percent compliance on that policy?

10   A.   My office doesn't oversee that policy.

11   Q.   Do you think KU has had 100 percent compliance on that

12   policy?

13   A.   I can't speak to that.

14   Q.   Can you point to a policy that states that anytime a

15   professor leaves the country they have to go have someone look

16   through their laptop?

17   A.   I believe there is a policy on the export control site

18   which would be under the general counsel's website, but I

19   can't -- without seeing that, I can't speak to the wording.

20   Q.   You're not sure.

21        And during the COVID-19 outbreak KU required its

22   researchers to work remotely unless they absolutely had to be

23   in the lab for a period; correct?

24   A.   I would have to look at the timing, but KU was very

25   proactive in reopening labs and ensuring security so

1    investigators who did need to be in labs could be back in them.

2    Q.  Are you aware that much of what a professor at Doctor Tao's

3    level does is sit in front of his computer and analyze data

4    from the lab, publish articles, and send e-mails and things of

5    that nature?

6    A.  I would not presume to be an expert on what Doctor Tao's

7    science requires.

8    Q.  So you don't know what a day in the life of Doctor Tao

9    looks like if he's working on grants?

10   A.  Not particularly, no.

11            THE COURT:  All right.  Let's take a break if this is

12   a good stopping point.

13            MR. DEARINGTON:  This is a perfect spot.  Thank you,

14   Your Honor.

15            THE COURT:  Let's take a break for 15 minutes.

16            (Recess).

17            (The following proceedings were held outside the

18   presence of the jury).

19            THE COURT:  All right.  You can be seated.

20            Do you know how much longer you're going to be on

21   cross, Mr. Dearington?

22            MR. DEARINGTON:  Probably about 15 minutes.

23            THE COURT:  Okay.  Sounds like you may get to go home

24   by lunch, Ms. Reed.

25            (The following proceedings were held in the presence

1    of the jury).

2              THE COURT:  All right.  You can be seated.

3              Mr. Dearington.

4              MR. DEARINGTON:  Thank you, Your Honor.

5    BY MR. DEARINGTON:

6    Q.   So, Ms. Reed --

7    A.   Yes.

8    Q.   -- yesterday I think you testified about some checklists

9    that KU requires principal investigators to complete; correct?

10   A.   Correct.  The PI checklist.

11   Q.   And Mr. Oakley walked you through a number of checklists

12   that Doctor Tao had completed dating back to 2015; correct?

13   A.   Correct.

14   Q.   And at some point the checklist was revised; correct?

15   A.   Correct.

16   Q.   And was that in association with KU switching to the

17   Streamlyne system between 2017 and '18?

18   A.   Yes.

19   Q.   And Mr. Oakley walked you through a provision several times

20   that said something to the effect of "principal investigators,"

21   and it was cut off and there was an ellipses, "should ensure

22   compliance with conflict of interest policies," something to

23   that effect; correct?

24   A.   Correct.

25   Q.   And did you testify yesterday that while the system

1   changed, the same checklist questionnaire was maintained?

2   A.  I said similar.

3   Q.  Similar?

4   A.  And I think the point of that is that before we were using

5   Streamlyne, the COI question was on the checklist.  And then

6   once Streamlyne was put into place, the COI assurance became

7   part of the approval process.

8   Q.  Sure.  So I'd like to show you a document which is marked

9   not on this version but Government Exhibit 82.  Does that

10  appear to be a questionnaire for a PI in 2018, the version in

11  place in 2018?

12  A.  I can't state that.  There's not a date on the top.  I

13  can't state when -- when this PI checklist was completed.

14  Q.  If I were to represent to you that that's a PI checklist

15  from June 2018, does that look like what a PI checklist looks

16  like?

17  A.  Yes, I think this or something very similar.

18  Q.  You have no reason to doubt that that's a checklist from

19  2018; correct?

20  A.  No.

21          MR. DEARINGTON:  Your Honor, I'd like to move into

22  evidence Government Exhibit 82.

23          MR. OAKLEY:  Your Honor, I think this was admitted

24  through this witness yesterday.

25          THE COURT:  Yes, it's admitted.

```
1            MR. DEARINGTON:  It was?  Oh, even better.

2    BY MR. DEARINGTON:

3    Q.  If I can take that back from you, Ms. Reed.  So the 2015

4    through '17 checklist had the conflict of interest language,

5    but this checklist from 2018 - and this is a yes-or-no

6    question, Ms. Reed - does not; correct?

7    A.  It does not.

8    Q.  If you'd look at the other page.

9    A.  It does not.

10   Q.  Okay.  Do you recall giving a presentation relating to

11   conflicts of interest in September 2020?

12   A.  Not particularly.  I give presentations all the time.

13   Q.  And --

14   A.  I give presentations all the time.  You would have to

15   remind me what it looked like --

16   Q.  Sure.

17   A.  -- or what the content was.

18   Q.  Did KU's conflict of interest form, was it revised in 2020?

19   A.  It was revised in 2020 in accordance with federal

20   regulations.

21   Q.  And around that time do you recall giving a presentation

22   that was posted on the Internet for those familiar with Google

23   to be able to access?

24   A.  We did a lot of presentations around that time to make sure

25   that PIs were aware of the obligations that -- the new
```

1    interpretations from the federal government; correct.

2    Q.   I'm going to read a quote from the presentation in

3    September 2020 and see if you agree with it.  And this is

4    something you said and I want to see if you agree with it

5    today.

6    A.   Sure.

7    Q.   Federal funders -- and there's -- I'm going to read all of

8    the words, but there -- I jumped from one sentence to another

9    on occasion to cut out some -- for brevity.

10        "Federal funders have recently clarified requirements for

11   investigators.  And..." then a bit later, "we had previously

12   included information around sponsored projects, so pending and

13   current sponsored projects, federal agencies have clarified

14   these requirements.  We're now required to put controls in

15   place to ensure that we are disclosing these additional

16   requirements which are under the threshold."  Agree?

17   A.   I don't remember saying that, but that is an accurate

18   statement.  We now have to provide additional information

19   including in-kind support where we didn't before.  But, yes,

20   previously we had to put anything in that we deemed current or

21   pending.

22   Q.   And by in-kind support, do you mean, for example, if a

23   professor has access to another lab at another university,

24   doesn't commit his time, doesn't get any payments from that

25   university but has free access to the lab, that would be

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    in-kind support; right?

2    A.    It would depend on the situation, but that could be.

3    Q.    That could be in-kind support.

4         And so in 2020 KU started, according to agency changes,

5    requesting that that information be disclosed for the first

6    time; correct?

7    A.    They were agency clarifications.

8    Q.    And when the agency clarifies something, does that include

9    in your words broadening the scope of what must be required?

10   A.    It could.

11   Q.    So a clarification -- sometimes using that word you mean --

12   means requiring additional information that wasn't previously

13   required?

14   A.    That could potentially mean that, yes.

15   Q.    Because clarification to me means something like making

16   sure that an existing requirement is understood, but you're

17   saying it sounds like that a new requirement was added.

18   A.    I'm using the federal agency's language.

19   Q.    Okay.  And when NSF changed its current and pending

20   requirement in 2020, you said that it was, quote, "a much

21   broader scope than we previously captured"; correct?

22         MR. OAKLEY:  Objection, Your Honor, it misstates

23   testimony and also assumes facts that are not in evidence.

24         THE COURT:  Well, I think it's fair to ask her if she

25   recalls what she might've stated so I'll overrule.

1    BY MR. DEARINGTON:

2    Q.   Do you recall stating that?

3    A.   I don't.  If you show me the testimony -- or the transcript

4    that you're looking at, I might recall saying that.

5    Q.   We might do that, but I guess for brevity purposes, I'll

6    ask it this way first.  Would you agree that, quote, "a much

7    broader scope than we previously captured" was required as of

8    2020?

9    A.   I would agree with that, yes.

10   Q.   You would agree with that.

11       And would you agree with this statement, "The impetus for

12   this is the decisions by the National Science Foundation and

13   the National Institute of Health to clarify what is required in

14   the current and pending support and other support documents."

15   Dot, dot, dot.  "And the idea behind this is the clarification

16   is not only sponsored work, but to disclose all resources in

17   support of and are related to your research efforts.  So this

18   is a much broader scope than we previously captured."  Agreed?

19   A.   Correct.  If you look at the --

20   Q.   Ms. Reed, I apologize again, but I'm just trying to move

21   along here.

22       And do you agree with this statement:  "Another institution

23   has granted you adjunct unpaid faculty status for the purpose

24   of collaboration with their faculty member."  Dot, dot, dot.

25   "You are required in this new wider disclosure to disclose any

1    position that you hold, paid or unpaid, that's related to your

2    research.  So any adjunct or honorary positions that you hold

3    is now to be disclosed."  Dot, dot, dot.  "I know this is a

4    much broader interpretation."  Agree with that?

5    A.   I don't agree with that in the current and pending sense,

6    no.

7    Q.   And by that I presume you mean that the biosketch for the

8    first time is requiring that information to be disclosed to the

9    agencies?

10   A.   They have clarified that.  Jean Feldman of the National

11   Science Foundation has stated that it was always required.

12   Q.   Ms. Reed, I'm just going to ask you to answer the questions

13   and not provide --

14   A.   I am answering the questions.

15   Q.   -- an explanation.

16       So my question to you, and I'll repeat it and perhaps you

17   can answer this question, is:  "When you said I know this is a

18   much broader interpretation," were you referring to the new

19   requirements -- were you referring to the requirements of the

20   biosketch?

21   A.   Without seeing the document and looking at the actual

22   wording, I can't state what I was saying two years ago.

23   Q.   Well, you said I wasn't talking about current and pending,

24   so certainly you must know what you were talking about; right?

25   A.   No, not necessarily.  I don't want to misstate what I was

1    saying two years ago.  I'd be happy to clarify if you could let

2    me see that document.

3    Q.  Ms. Reed, I'm going to show you the quotation I just read

4    to you --

5    A.  Sure.

6    Q.  -- because I know I read it quickly and see if this

7    refreshes your recollection.  At the top there.  Just the

8    paragraph right at the top.

9    A.  Right.  I just don't -- this is just a --

10    Q.  This is my outline, I should've prefaced that.

11    A.  Oh, okay.  Well, I -- since this is just an excerpt, I

12    can't -- I don't know where this was said so I can't testify to

13    where it came from.

14    Q.  But --

15        MR. OAKLEY:  Your Honor, now that counsel has showed

16    it to the witness, could I see it so I know what we're

17    referring to?

18        THE COURT:  Sure.

19        MR. OAKLEY:  Thank you.

20        MR. DEARINGTON:  All the time with my outline --

21    (reporter interruption).  I'm sorry.  Strike that.

22    BY MR. DEARINGTON:

23    Q.  So, Ms. Reed, I guess I'll clarify.  You'll recall that you

24    gave -- do you recall that you gave a conflict of interest

25    presentation in September 2020?

1    A.  I don't recall the date.  I think I mentioned that we gave

2    several presentations to make sure that PIs were aware of the

3    requirements, yes.

4    Q.  And if I represent to you that you stated this in a COI,

5    conflict of interest presentation, fair to say what you were

6    talking about here was a conflict -- related to conflict of

7    interest disclosures?

8    A.  I would assume so.

9    Q.  Okay.  Thank you.  So you don't remember polling employees

10   during that presentation about a hypothetical in which a

11   professor with federal funding had a collaboration at another

12   university and had an honorary appointment there and

13   collaborated and the question was about whether that should be

14   disclosed in the eyes of the viewers?  You don't remember that?

15   A.  Not necessarily.  I will say that it's not my

16   responsibility to arrange those or do any of the -- the Zoom

17   polls or anything like that, so that could've occurred and I

18   just wasn't participating in that portion of the presentation.

19   I can't -- I can't answer that specifically.

20   Q.  And so you're not aware of the results of that poll and

21   that a third of the group --

22        MR. OAKLEY:  Objection, relevance, Your Honor, and

23   asked and answered.

24        THE COURT:  I'm not sure I understand the relevance.

25   I'll sustain.

1            MR. DEARINGTON:  I can move on, Your Honor.

2   BY MR. DEARINGTON:

3   Q.  So fair to say that researchers aren't all clear about

4   whether the types of information we needed -- we discussed

5   needed to be disclosed in 2018?

6   A.  I'm sorry, I thought you were asking about something in

7   2020.

8   Q.  Well, the presentation was in 2020.  Now I'm going back to

9   2018 so prior to the presentation.

10  A.  The presentation was because of clarifications from the

11  federal government so I don't know how that's -- I can't answer

12  that related to 2018.

13  Q.  So fair to say that if something is already crystal clear,

14  there's no need for a clarification?

15            MR. OAKLEY:  Objection, argumentative.

16            THE COURT:  I'll sustain to the form of the question.

17  BY MR. DEARINGTON:

18  Q.  If a disclosure requirement is already clear, would your

19  office feel the need to clarify it?

20  A.  It would -- it would depend on the situation.

21  Q.  Would you agree with Chancellor Girod's statement in 2020

22  that "what it means to violate a conflict of interest is really

23  I think evolving at our institutions right now"?

24            MR. OAKLEY:  Objection, hearsay and relevance.

25            MR. DEARINGTON:  Your Honor --

1          THE COURT:  Overruled.  You can answer.

2          THE WITNESS:  In 2020, yes, things were changing.

3   BY MR. DEARINGTON:

4   Q.   Would you agree with Chancellor Girod's statements that he

5   had a plea for consistency and an organized effort that we can

6   come up with one set of guidelines, rules, regs and reporting

7   and not ten because that would not be manageable?

8   A.   I would agree that's a common concern.

9   Q.   I would like to read -- do you know who Simon Atkinson is?

10  A.   I do.

11  Q.   Is he someone you report to?

12  A.   He is my boss, yes.

13  Q.   And what is his position?

14  A.   He is the vice chancellor for research at KU.

15  Q.   I'd like to read for you a statement he made in September

16  of 2020 and see if you agree with it.

17          MR. OAKLEY:  Objection, hearsay.

18          THE COURT:  All right.  The jury should disregard --

19  this is a hearsay statement so disregard this as being the

20  truth.  But if you will -- don't ask her about what he said,

21  just ask her about whether she agrees with something, all

22  right?

23          MR. DEARINGTON:  Appreciate that, Your Honor.

24          THE COURT:  Because it is a hearsay statement, so ask

25  it that way.

```
 1  BY MR. DEARINGTON:
 2  Q.  Do you agree with respect to conflict of interest
 3  disclosures that this is an area where the landscape is
 4  changing pretty quickly, the federal government is paying a lot
 5  of attention to conflicts of interest and conflicts of
 6  commitment issues and we're constantly getting new information
 7  and new requirements from the government.  So what we say today
 8  as things that need to be disclosed may change because the
 9  government is constantly, unfortunately, adding to the list of
10  things that need to be noted and disclosed and we have to deal
11  with that and Ms. Reed knows this well?
12  A.   I would agree that's a statement from 2020 and that would
13  be accurate in 2020.
14  Q.  Just one or two more questions and I appreciate your
15  patience here, Ms. Reed.
16  A.   Sure.
17  Q.  Conflict of interest forms, those are internal documents at
18  KU; correct?
19  A.   They are.
20  Q.  They do not get sent off to agencies as a matter of course?
21  A.   They do not.  They're part of our internal controls
22  process.
23          MR. DEARINGTON:  No further questions, Your Honor.
24                    REDIRECT EXAMINATION
25  BY MR. OAKLEY:
```

1   Q.  On the last question, federal law as it relates to grants,

2   KU is required to have conflict of interest policies and adhere

3   to those policies, correct?

4           MR. DEARINGTON:  Objection, leading.

5           THE COURT:  Overruled.

6           THE WITNESS:  That is correct.  As I mentioned early

7   on in the testimony, that we are required under federal

8   guidelines to have some sort of conflict of interest policy.

9   And the way that we have implemented it is to use the annual

10  certification process with the ad hoc requirement to update it

11  so that we can be compliant.  And as I mentioned, in our

12  process we do review that prior to submitting anything so that

13  if we did have a concern, it could be managed prior to that

14  submission.

15  BY MR. OAKLEY:

16  Q.  Okay.  One of the first things that Mr. Dearington showed

17  you today is Defendant's Exhibit 1452.  Do you have that in

18  front of you?

19  A.  One second, please.  I have 1456 and 1457.

20  Q.  Oh, here it is.

21  A.  Okay.

22  Q.  I think this is the document that Mr. Dearington went over

23  with you on the ELMO presentation.  I don't recall him actually

24  handing it to you so I'm going to go ahead and hand you what's

25  been admitted into evidence as Government's Exhibit 1452.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    550

1    A.   Thank you.

2    Q.   And, Ms. Reed, you take as much time as you need to review

3    that to give the jury information related to the questions.

4    A.   (Reads document).  Yes.

5    Q.   You've had a chance to review it now?

6    A.   Yes.

7    Q.   And do you recall some of the pages that Mr. Dearington

8    flipped through included screenshots from the Streamlyne

9    system?

10    A.   That is correct.

11    Q.   Now, does that document contain all the screenshots in the

12    Streamlyne system?

13    A.   The document currently on the screen?

14    Q.   Anything in Government's Exhibit 1452.  And, I'm sorry,

15    it's Defense Exhibit 1452.

16    A.   So I'm looking at the attachment with the screenshots, but

17    I -- if your -- can you ask the question again, please?

18    Q.   Does that contain everything that a PI would see in the

19    Streamlyne system?

20    A.   No.  These are the points where there would be specific

21    actions that would need to be taken and that's where the red

22    arrows are.  So one of the ways that we provide some of these

23    like quick tip guides is to really highlight where specific

24    action will be taken.  If we were to put screenshots for every

25    single thing that they would see, it would defeat the purpose

1    because that would just be a re-creation of what's already on

2    their screen.

3    Q.    So this is an exchange between someone in your office and

4    the defendant where someone in your office is trying to provide

5    assistance with the Streamlyne system?

6    A.    That is correct.

7    Q.    Is that accurate?

8    A.    That is correct.

9    Q.    And so, for instance, the highlighted portions, the contact

10   this person with any questions, that sort of information is

11   an -- was provided as an aid to help the defendant?

12   A.    That is correct.  This is entitled PI Approval

13   Instructions.  It's really sort of a step-by-step of saying,

14   like, when you're in here, like, look at this little piece,

15   you're going to have to click here or do something, because the

16   PIs already have access to the full system, this document

17   really is to say, you know, if they're struggling with what to

18   review or where they need to take action, that's what this

19   document is pointing them to, sort of like the navigation of

20   the system.

21   Q.    And so this -- I think it's four pages front and back, two

22   pages -- I'm sorry, three pages.  One page front and -- one

23   page, two page, and then three page.  Do I have that accurate?

24   A.    That is correct.

25   Q.    That's not indicative of the entire Streamlyne system?

19-20052    USA v. Feng (Franklin) Tao    03.24.22          552

```
 1   A.  That is correct.  There are a lot more tabs.  And if you --
 2   if you want me -- so on this screenshot, this top here, if you
 3   see every single thing along the side, that opens up another
 4   panel that looks like this and it has all the details about all
 5   the proposals.
 6       So if we were to screenshot every single thing that the PI
 7   were to see, it would be overwhelming for anybody to actually
 8   use those instructions.
 9   Q.  I want to next talk to you about what's been admitted as
10   Defendant's Exhibit 1005.  Do you have that in front of you?
11   It's the King Abdullah subaward agreement with the University
12   of Kansas.
13   A.  I believe I do.  Yes.
14   Q.  Do you have that in front of you?
15   A.  I do.
16   Q.  First of all, I want to talk to you about a subaward
17   agreement.  What is a subaward agreement?
18   A.  A subaward agreement means that the prime institution, in
19   this case King Abdullah University, received funding from
20   another organization and then a portion of the work and a
21   portion of the funds are going to come to the subawardee to
22   provide a substantive portion of the work.  So there's some
23   technical or scientific merit to the portion of work taking
24   place at the subaward institution, in this case University of
25   Kansas Center for Research, that -- so it's an agreement for
```

1    them to flow down or pass down funding that they had received

2    from a source to us for us to perform a portion of the work.

3    Q.    Okay.  And this was a subaward agreement entered into

4    between KU and King Abdullah?

5    A.    That is correct.

6    Q.    And a subaward is different than a grant; is that correct?

7    A.    It is.  And so the -- the differences usually are the way

8    that it's awarded.  So a subaward is usually going to have some

9    additional terms and conditions passed down.  And depending on

10   how the grant is structured, it would usually be a direct

11   funding from the external organization; where a subaward is

12   that flow-down of external funds to KU or KUCR.

13   Q.    And this document, this subaward agreement, it's a

14   contract; isn't that right?

15   A.    That is correct.

16   Q.    And it's a contract between King Abdullah University and

17   the University of Kansas Center for Research; is that correct?

18   A.    That is correct.

19   Q.    Now, I imagine you don't know what happened at King

20   Abdullah, but as far as the University of Kansas side of it,

21   does that mean that somebody reviewed this to make sure that

22   the University of Kansas was protected under this agreement?

23   A.    That's exactly right.  And so the way that that works is

24   that the pre-award process would've taken place and then when

25   King Abdullah decided that they wanted to provide us funding,

1    they would've given us a draft contract and then our contract

2    negotiations office would have reviewed this and done what was

3    called a redline.  So they would've gone through and made

4    comments or edits on anything that we potentially couldn't

5    accept or that they wanted to call out to the PI.

6        So one of the steps in this is to review these terms and

7    conditions with the actual investigator that would be leading

8    as well to make sure that they're protected, because the idea

9    behind the contract negotiation team is they want to protect

10   the university and they want to protect the PI and if there's

11   any students, they want to protect them as well.  And that

12   would include things like data rights, if any sort of

13   intellectual property was developed, like if there was a new

14   scientific concept or something developed, we would want to

15   make sure that our PI, in this case Doctor Tao, had the rights

16   to use that after this agreement was done.

17       And so the way that they would go about that is that they

18   would go through, make comments, ask Doctor Tao for any

19   feedback.  And then once that was ready they would submit it

20   back to King Abdullah and say, you know, we need to negotiate

21   these terms.  We would come to an agreement and then they would

22   execute it on my behalf, meaning sign it.

23   Q.  Okay.  And this is -- and so that negotiation process, in

24   your experience that's normal as part of a contract?

25   A.  That is a normal part of a contract, yes.

1   Q.  And also based upon your understanding is it normal that
2   parties don't perform under the terms of the contract until the
3   contract is entered into; isn't that correct?
4   A.  That's exactly right.  That until there's actually a date
5   and a signature on it, it is not enforceable and so work should
6   not start.
7   Q.  And so KU would not have performed under the terms of the
8   contract unless it was actually entered into?
9   A.  We would -- KU would not have recognized it as an awarded
10  contract or agreement and so the PI should not have been
11  performing work until it was signed and put into our system;
12  correct.
13  Q.  By the way, I want you to look at Page 7 of this contract
14  that was entered into --
15  A.  Yes.
16  Q.  -- between KU and King Abdullah.
17  A.  Yes.
18  Q.  And I noticed Subsection 3.2 contains an agreement related
19  to the parties' obligations to abide by conflict of interest
20  policies; is that correct?
21  A.  That is correct.
22  Q.  Now, one of the -- may I see the exhibits that you have in
23  front of you, please?
24      One of the e-mails that the defendant showed you has been
25  admitted as Defendant's Exhibit 1457; correct?

1    A.   Yes, I saw this e-mail.

2    Q.   And that's an e-mail related to a contract or a proposed

3    contract between KU and Fuzhou University; is that accurate?

4    A.   That is accurate.

5    Q.   And, in fact, when you were talking earlier about through

6    the negotiation process that KU may do what's called a redline

7    as part of the negotiation, that contains part of what appears

8    to be a redlined version; is that right?

9    A.   That is accurate.

10   Q.   Now, as I recall, when Mr. Dearington handed that to you,

11   he handed it to you along with another e-mail and then took

12   that e-mail away.  I wasn't able to see that, but you were?

13   A.   That's correct.

14   Q.   That contained further communication related to that

15   proposed contract, didn't it?

16   A.   It did.

17        MR. OAKLEY:  Ms. Wiest, could we please have the

18   computer?

19   BY MR. OAKLEY:

20   Q.   And could we please pull up what's been admitted into

21   evidence as Government's Exhibit 211?

22        And, Ms. Reed, I'm going to hand you a printed copy of

23   Government's Exhibit 211 so you have that in front of you.

24   A.   Thank you.

25   Q.   If you could just review it and let me know when you're --

1    when you're done.

2    A.   (Reads document).  Yes, I've reviewed it.

3    Q.   Ms. Boyd, could we pull up the first section of that

4    e-mail?

5        Is this part of the exchange that Mr. Dearington showed

6    you, if you remember, and then took away?

7    A.   So I did not see this portion of it, what I saw was an

8    e-mail dated August the 13th from a staff member in my contract

9    negotiations office.  That was my staff following up.  It's

10   standard for them on a monthly basis, if they have understood

11   that a contract is coming, to reach out to ask if -- if there's

12   any progress or anything like that.

13       So what I saw was the August 13th question from Kelly Mason

14   about the progress, but then that's -- that's in this e-mail as

15   well.  That's in this string.

16   Q.   That's in Government's Exhibit 211?

17   A.   Yes, it is.

18   Q.   Ms. Boyd, can we pull down to that section, the August

19   e-mail?

20       And, Ms. Reed, let me know when we get there.

21   A.   Further down, please.  Slightly further down, please.

22       This is -- this is the e-mail -- this was the top of the

23   e-mail that I saw.

24   Q.   And so there was a back-and-forth between your office and

25   the defendant that was asking of the status of that draft

1    contract between KU and Fuzhou; correct?

2    A.   Right.  And it actually went to Doctor Jiang and I don't

3    know -- I'm assuming that the "to" there is Doctor Jiang

4    @fzu.edu.cn.

5    Q.   And directing your attention to the very first part of

6    Government's Exhibit 211 again, that contract was never entered

7    into; isn't that accurate?

8    A.   That is accurate.  On the top of this e-mail from

9    November 9th at 2018 at 10:02:12, Doctor Tao e-mailed Aaron

10   Crim, who was the associate -- who is our associate director of

11   contracts and took over for Kelly when she departed KU.  And

12   it's in response to Aaron reaching out to Doctor Tao and Doctor

13   Tao said that it was not funded.

14   Q.   I want to show you what's been admitted into evidence as

15   Government's Exhibit 81.  Is that the Streamlyne printout

16   related to that subaward, if you know?

17   A.   I would have to look.  The sponsor on this is National

18   Engineering Research Center of Chemical Fertilizer Catalysis.

19   I believe that was a center at Fuzhou and I believe that was in

20   the -- maybe the titles on those publications that I was shown,

21   but I would have to look it up to be sure.

22   Q.   Okay.  If that is the printout from the Streamlyne, do you

23   see where there's a Proposal No. 908 at the top under the

24   title?  Directing your attention to this part on the screen,

25   Proposal --

19-20052    USA v. Feng (Franklin) Tao    03.24.22                559

1    A.  Oh, yes, thank you.

2    Q.  -- 908?

3    A.  I do see that.  Yes.

4    Q.  And then next if we could bring up what's been admitted as

5    Government's Exhibit 82.

6        And does that appear to be the PI checklist related to

7    Proposal No. 98?

8    A.  That is correct.

9    Q.  Principal investigator being Franklin Feng Tao?

10   A.  That is correct.

11   Q.  And so this would've been the PI checklist that was

12   prepared as part of that contract that was never entered into?

13   A.  That is correct.

14   Q.  Could I direct your attention to the second page, the very

15   top section.  And could we zoom in on this, please.

16       "Do you anticipate that you or project personnel will do

17   any of the following:  Travel outside of the U.S.; collaborate

18   with individuals or institutions outside the U.S., irrespective

19   of the nationality of the collaborator; ship or hand-carry

20   tangible items such as equipment, software, materials, or

21   documents outside the U.S.; (iv) transfer encryption software,

22   including open-source publically-available encryption software

23   or software source code or technical information that is not

24   publicly available and will not be disseminated with the

25   research results outside the U.S. by any means?"  How was that

1    question answered?

2    A.   It is answered no.

3    Q.   And, again, this is in the contract that was never entered

4    into; is that correct?

5    A.   That is correct.

6    Q.   But if that contract had been entered into and if the

7    person that filled that out filled this out correctly, would

8    you have expected there to be travel from the United States to

9    another country as part of that contract?

10   A.   I would not.

11   Q.   You were shown a number of research articles; correct?

12   A.   Correct.

13   Q.   And I think you testified that your office doesn't go

14   through and read every single research article that a PI

15   affiliated with KU publishes?

16   A.   We do not.  We do not have the staffing to do that.

17   Q.   I think you said yesterday that your office handles

18   approximately 1,400 applications a year?

19   A.   That is correct.

20   Q.   And some of those -- some PIs submit multiple applications

21   a year; correct?

22   A.   That is correct.

23   Q.   And some PIs produce many research papers and some produce

24   not so many.  But just to keep the math safe or clear since I'm

25   not very good at math, let's assume of the 1,400 proposals that

1    are run through your office, on average there's ten research

2    articles for each one.  So that would be, what, 14,000 research

3    articles a year?

4    A.  Correct.

5    Q.  And would your office have the ability?

6    A.  We do not.  And that's not part of the services we offer

7    because we do not have the bandwidth to review everybody's

8    publications to ensure that they're accurate or that all the

9    details there reflect what we would expect.

10   Q.  So KU doesn't go out and independently investigate the

11   information that its employees provide to it?

12   A.  That is correct.  My office trusts the PI to provide us

13   accurate information.

14   Q.  And, again, we're talking about people who are employed by

15   KU, this is KU's own employees when we're talking about PIs?

16   A.  That is correct.

17        MR. OAKLEY:  Ms. Wiest, could we have the ELMO again,

18   please?

19   BY MR. OAKLEY:

20   Q.  Do you have Defendant Tao's Exhibit 1225 in front of you?

21   A.  I don't, it might be on the table.  If it's the

22   publication --

23   Q.  Let me show you mine.  Let me show you mine.  Do you

24   remember that?

25   A.  I do.

1   Q.   May I borrow it from you for just one moment?

2   A.   Yeah.   It's down there, it has tabs on the side that say

3   the numbers.

4   Q.   In this stack?

5   A.   I deal with paper a lot.   Yes.

6   Q.   Do you see that?

7   A.   I do.

8   Q.   I'm going to direct your attention to the -- you talked

9   about Franklin (Feng) Tao.

10  A.   Correct.

11  Q.   I want to direct your attention to somebody else's name

12  that's on this.   There's somebody listed as Paul Pengcheng Tao.

13  Do you know that person?

14  A.   I do not know that person.

15  Q.   And it looks to me like there is a -- an "A" listed next to

16  that person.

17  A.   That is correct.

18  Q.   And if we scroll to the bottom, "A" corresponds with KU --

19  A.   That is correct.

20  Q.   -- correct?

21  A.   Yes.

22  Q.   And, in fact, there were a number of people that had the

23  "A," but Paul Pengcheng Tao is identified as being from KU?

24  A.   That is correct.

25  Q.   You don't know who Paul Pengcheng Tao is?

1    A.   I do not know this person.

2         MR. OAKLEY:  No further questions, Your Honor.

3         THE COURT:  Any recross?

4         MR. DEARINGTON:  Yes, Your Honor.

5                   RECROSS EXAMINATION

6    BY MR. DEARINGTON:

7    Q.   So, Ms. Reed, I'd like to pick up where Mr. Oakley left

8    off.

9    A.   Sure.

10   Q.   You're not aware that Paul Tao was an intern at KU and is

11   Doctor Tao's nephew?

12   A.   I'm not aware of that, no.

13   Q.   So I'd like to turn to -- and you're not aware that he

14   interned in Doctor Tao's lab?

15        MR. OAKLEY:  Objection, asked and answered.

16        THE COURT:  Overruled.

17        THE WITNESS:  I'm not aware that we have a position

18   called intern at KU, no.

19   BY MR. DEARINGTON:

20   Q.   That was not the question, Ms. Reed, but --

21   A.   You asked me if he was an intern so I answered the

22   question.

23   Q.   Exhibit 1452 we reviewed and that was the Streamlyne web

24   shots; correct?

25   A.   Yes, it's -- it's Matthew Sunner's e-mail that included the

1   PI approval instructions; correct.

2   Q.   And we were able to show you that there were certain

3   certifications in those screenshots that related to NIH funded

4   principal investigators; correct?

5   A.   Correct.

6   Q.   But there's no certification in those screenshots like the

7   kind you showed us across multiple paragraphs in that document,

8   are there?  Yes or no, please.

9   A.   No.

10  Q.   And you were unable to find evidence of a similar document

11  or any screenshots dated to 2018 that showed those two

12  paragraphs, were you?

13  A.   I don't understand the question.

14  Q.   So you were able to find those two paragraphs that we

15  talked about by extracting them from the Streamlyne system

16  after the investigation of Doctor Tao began; correct?

17  A.   Correct.

18  Q.   So you were able to pick up a screenshot that was dated

19  sometime in 2019 or after?

20  A.   I was able to get the system coding that states those

21  words, yes.

22  Q.   And you were unable to find -- or you did not find any

23  system coding showing a screenshot with the two paragraphs from

24  2018?

25  A.   System coding from 2018 wouldn't exist any longer, the

1    "approved" showed that that was covered.

2    Q.  So the answer would be no?

3    A.  I did not look so I can't answer that question.

4    Q.  You didn't look.

5        Turning to the KAUST proposal, I was a bit confused and I

6    hope you can clarify some things for me.

7    A.  Sure.

8    Q.  Mr. Oakley asked you something about if the contract had

9    not yet been signed, did he ask you that, what the impact would

10   be on whether it needs to be disclosed?

11   A.  He asked me if -- it wasn't about disclosure, but it was

12   about this contract and its signature, which it was executed.

13   Q.  It was executed and it was executed January 2015; correct?

14   A.  Correct.

15   Q.  And although it was awarded -- excuse me, let me just grab

16   one document.

17       So, Ms. Reed, did you testify -- isn't it true that a

18   subaward agreement is a subaward of a grant?

19   A.  Not necessarily.  Sometimes subaward and subcontract are

20   used interchangeably.

21   Q.  Sure.  But it is a funding source to KU to facilitate

22   research; correct?

23   A.  This is an agreement to facilitate research, yes.

24   Q.  And the federal government in your view would deem funding

25   for research to be called an award; right?

1    A.  I don't know that they would call it that, I -- unless I

2    know the period where you're talking about.

3    Q.  You're not aware that the word "award" is defined in

4    regulations?

5    A.  So you're talking about regulations?  Yes, award is defined

6    in regulations.

7    Q.  So a subaward agreement like this, it sounded like you

8    might've testified is not a grant to KU; is that what you

9    testified?

10   A.  I said this is a contractual instrument.  This is an award.

11   In fact, if you look at Page 3 of the document you're showing,

12   it says that this is a competitive research grant.

13   Q.  Competitive research grant.  Thank you.

14       Mr. Oakley asked you whether performance of an award would

15   impact its disclosure.  Did he ask you that?

16   A.  I don't believe so.

17   Q.  You're aware that this KAUST grant -- are you aware that

18   this KAUST grant was performed beginning 2015?

19   A.  I assume it was.

20   Q.  And is it still your testimony that this -- strike that.

21       So the deal, the proposal we looked at that was submitted a

22   few months after KU received what you just called this grant,

23   was not disclosed by your office to DOE?

24   A.  I think --

25   Q.  This grant was not -- I'm sorry, let me rephrase that.  I

1    think I had a confusing question and I don't want to trip you

2    up.

3        This grant was not disclosed a few months after it was

4    signed in the proposal submitted to DOE?

5    A.  I can't speak to the proposal.  What you showed me was an

6    e-mail from Doctor Tao to DOE that contained an updated current

7    and pending.

8    Q.  I think you're talking about 2018, Ms. Reed.  I'm talking

9    about this 2015, May 21st grant proposal.

10   A.  Oh.  I would have to see the documents.

11   Q.  So we can look at the documents.  Would you expect your

12   office to disclose the KAUST grant --

13   A.  I would've expected that it be disclosed by Doctor Tao.

14           MR. OAKLEY:  Objection, Your Honor.  We're now beyond

15   the scope of redirect.

16           THE COURT:  I'm not sure this is within the scope.

17           MR. DEARINGTON:  Your Honor, Mr. Oakley asked about

18   this very document in order to be within the scope of my cross

19   from earlier about how the research office didn't disclose as

20   current and pending support the 2015 grant proposal, the KAUST

21   grant.

22           THE COURT:  I recall you asking that in your cross

23   examination.  I don't think Mr. Oakley got into that in his

24   redirect so I'll sustain.

25   BY MR. DEARINGTON:

1    Q.  Fair to say that the disclosure requirements to DOE don't

2    just ask for disclosure as -- as current and pending support of

3    grants once performance starts, they also want to know about

4    pending proposals in your view; correct?

5    A.  Correct.

6    Q.  And about awards that have been awarded before performance

7    starts; correct?

8    A.  Correct.

9    Q.  Mr. Oakley asked you about the Fuzhou University draft

10   contract and you stated that your office would go back and

11   forth to negotiate -- let me back up.  It may have been about

12   the KAUST one.

13       But the point that you made was that your office negotiates

14   and redlines with the possible funding source; correct?

15   A.  Correct.

16   Q.  And we reviewed one such redline from Kelly Mason to Fuzhou

17   University regarding a possible source of funding?

18   A.  Correct.

19   Q.  And Mr. Oakley pointed out to you an e-mail several months

20   after the current and pending support e-mail to DOE that showed

21   that the Fuzhou proposal was not funded as of late 2018;

22   correct?

23   A.  Correct.

24   Q.  And that is not uncommon because one in five grant

25   proposals are funded at KU; correct?

19-20052    USA v. Feng (Franklin) Tao    03.24.22                569

```
1    A.   That is correct.

2    Q.   And your office didn't disclose the Fuzhou relationship in

3    the DOE proposal -- in the e-mail to Viviane Schwartz in

4    July 2018 that we reviewed; correct?

5              MR. OAKLEY:  Objection, beyond the scope.

6              THE COURT:  I think it is outside the scope so I'll

7    sustain.

8              MR. DEARINGTON:  I can move on, Your Honor.

9    BY MR. DEARINGTON:

10   Q.   You testified about Exhibit 82, which was a checklist from

11   2018, and you testified about a provision that asked about

12   international travel; correct?

13   A.   I don't know if it was 82, but we did talk about the PI

14   checklist for Proposal 908.

15   Q.   And you recall the question in the checklist or

16   questionnaires about is there going to be international travel?

17   A.   Correct.

18   Q.   I'm going to show you that question from Exhibit 82.  You

19   testified earlier that this type of question was important

20   because it allows the university to understand if there are

21   export control issues; correct?

22   A.   Yes.

23   Q.   And you're not aware of any ITAR, OFAC, other export

24   control issues that governed this proposal?

25   A.   We answer -- or pardon me, we ask this kind of question for
```

1    every single proposal so that we can direct it to the

2    appropriate office, if necessary.

3    Q.   But as you stand here today, for this proposal you're not

4    aware of any export control concerns; correct?

5    A.   I've not familiarized myself with the proposal so I could

6    not answer that.

7    Q.   I want you to see if you agree with my interpretation of

8    this provision.  It states, "Do you anticipate that you or

9    project personnel will do any of the following:"  And romanette

10   (i) is travel outside of the U.S.  I read that as meaning,

11   we're talking about a proposal here, are you going to travel

12   outside of the U.S. for this proposal.  Is that a fair reading

13   of this for a layperson?

14   A.   Yes.

15   Q.   So if I'm traveling to Cancun for a week, I wouldn't have

16   to disclose that here, right, because it's not for the purpose

17   of this proposal?

18   A.   True.  If you were not performing any work on your proposal

19   while you were traveling, that would -- this would not be

20   germane.

21   Q.   And for this proposal related to Fuzhou, you pointed out

22   that Doctor Tao listed "no" for travel; correct?

23   A.   He listed "no" for all four points.

24   Q.   Correct.  And if I were to represent to you that Kim

25   Wittman approved $2,000 of international travel budget for this

1    proposal, are you aware of that?

2            MR. OAKLEY:  Objection, beyond the scope and also

3    assumes facts not in evidence.

4            MR. DEARINGTON:  I have a good-faith basis, Your

5    Honor, that --

6            THE COURT:  I'm sorry?

7            MR. DEARINGTON:  Your Honor, I have a good-faith basis

8    that this evidence will come in later, I'd just like to ask the

9    impact to the witness.

10           THE COURT:  All right.  This question, I don't think

11   it's within the scope, but I'll allow it.

12           MR. DEARINGTON:  Did you say -- sorry, Your Honor --

13   did you say you will --

14           THE COURT:  Go ahead.  I don't think -- I think it's

15   outside the scope, but I'll allow this question and then move

16   on.

17           MR. DEARINGTON:  Thank you, Your Honor.

18   BY MR. DEARINGTON:

19   Q.  If Kim Wittman approved $2,000 of international travel

20   budget for this proposal, do you think that would be consistent

21   with the "no" response here?

22   A.  It might be inconsistent, but I would oftentimes think that

23   PIs and their specialists could change based on budget, and

24   then having it in the budget would trigger the same response as

25   a "yes" here.

1   Q.  So if I were to tell you that the budget included $2,000

2   for international travel, that's effectively saying "yes" here?

3   A.  That means that Doctor Tao misfilled out this form;

4   correct.

5   Q.  And Ms. Wittman, it was incumbent upon - if she knew about

6   the $2,000 travel having approved it - to review this checklist

7   and correct it; correct?

8   A.  No, she should not be correcting a PI checklist, it's for

9   the PI to correct.

10  Q.  So she would just see the error and move on?

11  A.  She should have asked Doctor Tao to correct it.  So I can't

12  speak to what happened in this case.

13  Q.  So we reviewed a handful of articles in which Doctor Tao

14  disclosed an affiliation with Fuzhou and Mr. Oakley asked you

15  about a hypothetical involving 14,000 research articles

16  published by KU?

17  A.  Correct.

18  Q.  Are you aware of any year in recorded history in which KU

19  has published 14,000 research articles?

20  A.  I think my testimony was that we don't actually pay

21  attention to articles other than what's in proposals and how we

22  have to include them in proposals, so I can't answer that

23  question.

24  Q.  And Mr. Oakley asked you whether -- something to the effect

25  of whether you would read through an entire publication just

1    because someone like Doctor Tao published it and I think your

2    answer was no.  Does that sound consistent with your testimony?

3    A.    Yes.

4    Q.    But you don't need to read through a whole publication to

5    look at the first page and see the affiliation and the agency

6    acknowledgement, do you?

7    A.    I think I testified that my staff does not have the

8    bandwidth to look at PIs' publications.  The expectation is

9    that they provide accurate information to our office.

10   Q.    And I am sympathetic to that because your office has a lot

11   of work to do in a very complicated area; correct?

12   A.    Right.  Helping PIs make sure that they're providing

13   accurate information to the federal agencies; correct.

14   Q.    You testified earlier when Mr. Oakley asked you, and I

15   believe yesterday as well, that DOE has a conflict of interest

16   policy; correct?

17   A.    I don't know that I testified DOE has a conflict of

18   interest policy, but they do ask for conflict of interest

19   information in some cases and I know that we are required under

20   2 C.F.R. 200 to have a conflict of interest policy.

21   Q.    So you're aware that researchers applying for grants from

22   DOE is exempt from disclosing their financial interests?

23   A.    I'm not aware of that, no.

24   Q.    I'd like to show you to see if this refreshes your

25   recollection a document called GAO Report to the Chairman.

1    A.    I don't believe that I've seen this.

2    Q.    If you read that sentence, I want to see if you agree with

3    it or if that rings a bell.

4    A.    So I do not agree with that.

5    Q.    You disagree with this GAO report?

6    A.    What I'm saying is that the DOD and DOE might not have

7    policies but the university does and every single thing that

8    the PI has to certify to states that it's federal, state, and

9    university policies that they must follow.

10        MR. DEARINGTON:  No further questions, Your Honor.

11        MR. OAKLEY:  I have nothing further of this witness,

12   Your Honor.

13        THE COURT:  All right.  May Ms. Reed be excused?

14        MR. OAKLEY:  Yes, Your Honor.

15        THE COURT:  All right.  You're excused, Ms. Reed.

16        All right.  Good time to take a lunch break.  Why

17   don't we reconvene at 1:00.

18        (Recess).

19        (The following proceedings were held in the presence

20   of the jury).

21        THE COURT:  All right.  You can be seated.

22        Mr. Oakley or Mr. Barry.

23        MR. OAKLEY:  Yes, Your Honor.  At this time the

24   government would offer into evidence Government's Exhibits 355

25   and Government Exhibit 354.  355 is a U.S. Customs and Border

```
 1    Protection travel records related to the defendant, and 354 is
 2    a custodian certification related to that document.
 3              THE COURT:  All right.  Any objection?
 4              MR. DEARINGTON:  No objection, Your Honor.
 5              THE COURT:  Exhibits 354, 355 admitted.
 6              MR. OAKLEY:  Your Honor, may I publish those to the
 7    jury?
 8              THE COURT:  Yes.
 9              MR. OAKLEY:  And then, Your Honor, related to this
10    exhibit as well as some others that have been admitted, the
11    government has marked as Government's Exhibit 774 a timeline
12    that contains both travel information and then also -- it's a
13    timeline showing travel information and also dates related to
14    exhibits that have been admitted.
15              We would ask the court for permission to display that
16    as a demonstrative exhibit at this point.
17              THE COURT:  All right.  Any objection?
18              MR. DEARINGTON:  Your Honor, so long as it's not
19    entered into evidence, no objection of it being used as a
20    demonstrative at this time.
21              THE COURT:  Yes, it's -- so it's admitted for
22    demonstrative purposes only, which, ladies and gentlemen, means
23    you are not going to have this exhibit with you in the jury
24    room.  So it's just being -- it's not evidence, it's just what
25    we call demonstrative evidence, sometimes in the form of
```

```
 1    timelines or charts or whatever, to draw certain -- your
 2    attention to certain things.
 3          So you can publish that if you'd like and, you know,
 4    if you want to take notes about it, you can do that, but
 5    understand it's just a demonstrative exhibit.
 6          MR. OAKLEY:  Your Honor, for the court's information,
 7    it's a three-page exhibit and you can tell that certain
 8    information is covered up.  And we intend as items are
 9    introduced to uncover those items, so we'll update this
10    particular exhibit as we proceed.
11          THE COURT:  Okay.  So the jury will get a chance to
12    see it again during the trial is what you're saying?
13          MR. OAKLEY:  Yes, Your Honor.
14          THE COURT:  Okay.  I understand.
15          MR. OAKLEY:  And so, for instance, the travel records
16    that were admitted would relate to travel, so we'll uncover
17    that information at this point.
18          THE COURT:  Why don't you read the -- I cannot read it
19    very well.  What are the travel dates of those four blocks of
20    time?
21          MR. OAKLEY:  Yes, Your Honor.  On this particular
22    sheet it's June 9th, 2017 to July 1st of 2017.  The second
23    block is November 18th of 2017 to November 24th of 2017.  The
24    third block is December 6th, 2017 to December 13th of 2017 and
25    the next block on this page -- the last block on this page is
```

1    February 1st of 2018 to February 20th of 2018.

2        THE COURT:  Those are all based on Exhibits 354 and

3    355?

4        MR. OAKLEY:  Yes, Your Honor.

5        And then, Your Honor, the second page related to

6    travel from May of -- excuse me, the timeline extends from

7    May 2018 to December of 2018.  So the travel dates during that

8    particular time period are May 5th, 2018 to May 8th of 2018;

9    May 26th, 2018 to August 1st of 2018; August 15th of 2018 to

10   August 18th of 2018; October 25th of 2018 to October 29th of

11   2018; and then on this timeline, December 11th, 2018 to

12   December 31st, 2018.  And, Your Honor, this actually extends

13   into the next portion of the travel.

14       So, Your Honor, on this -- this is the third page, and

15   I mentioned that the travel in December extended to March 28th

16   of 2019.  And then from April 12th, 2019 to April 27th of 2019;

17   May 11th, 2019 to June 1st, 2019; June 7th, 2019 to June 23rd,

18   2019; July 7th, 2019 to July 23rd, 2019; and then August 4th,

19   2019 to August 20th, 2019.

20       Your Honor, in addition to the travel, we'd also like

21   to show the time sequence of what's been admitted into evidence

22   as Government's Exhibit 55, which is October 2nd, 2017;

23   Exhibit 33, which was December 11th, 2017; Exhibit 24, which

24   was January 9th, 2018.

25       And then on the second page, Government's Exhibit 167,

| | |
|---|---|
| 1 | which was June 25th of 2018; Government's Exhibit 170, which |
| 2 | was June 26th, 2018; Government's Exhibit 25, which was |
| 3 | September 25th of 2018; and Exhibit 221, which was |
| 4 | December 22nd, 2018. |
| 5 | And then on the third page, Your Honor, Government's |
| 6 | Exhibit 225, which was January 17th, 2019; Government's |
| 7 | Exhibit 231, which was January 31st, 2019; Government's |
| 8 | Exhibit 233, which was February 20th, 2019; Government's |
| 9 | Exhibit 247, which was May *[sic]* 26th, 2019. |
| 10 | THE COURT:  May or March? |
| 11 | MR. OAKLEY:  I'm sorry, March.  March 26th, 2019.  And |
| 12 | finally for now, Government's Exhibit 249, which was April 2nd, |
| 13 | 2019. |
| 14 | Thank you, Your Honor. |
| 15 | THE COURT:  Call your next witness. |
| 16 | MR. OAKLEY:  The next witness the United States calls |
| 17 | is Kimberly Wittman. |
| 18 | KIMBERLY WITTMAN, |
| 19 | called as a witness on behalf of the Government, having first |
| 20 | been duly sworn, testified as follows: |
| 21 | DIRECT EXAMINATION |
| 22 | BY MR. OAKLEY: |
| 23 | Q.   Ma'am, let me take those exhibits from you. |
| 24 | Could you please state and spell your name for the record. |
| 25 | A.   Kimberly Wittman.  K-I-M-B-E-R-L-Y.  W-I-T-T-M-A-N. |

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    Q.   And how are you employed?

2    A.   I'm employed as a grant officer at the University of Kansas

3    Office of Research.

4    Q.   How long have you been employed with KU?

5    A.   It will be ten years this May.

6    Q.   And you're currently -- your current employment is grant

7    officer?

8    A.   That is correct.

9    Q.   How long have you been a grant officer?

10   A.   A few months.  We went through some changes a few months

11   ago.  Prior to that I was a grant coordinator.

12   Q.   And so you said you became grant officer a few months ago

13   and your title before that was grant coordinator?

14   A.   Correct.

15   Q.   What's the difference between a grant coordinator and a

16   grant officer?

17   A.   Realistically, this change was an internal job title

18   change.  My duties did not really change between my grant

19   coordinator position and the grant officer position.

20   Q.   So what does a grant coordinator or a grant officer do with

21   the University of Kansas?

22   A.   As a grant coordinator or grant officer, I do proposal

23   submissions with our professors, I second-level review

24   proposals that other individuals have submitted with other, you

25   know, professors.  And then there's, you know, side duties that

1    we all do on committees and things like that, but it's mostly

2    surrounded, you know, by proposal submission and review of

3    others' proposals.

4    Q.    Okay.  Do you know someone by the name of Alicia Reed?

5    A.    Yes, I do.

6    Q.    And who's Alicia Reed?

7    A.    Alicia is our Director of Research Administration.

8    Q.    Okay.  So would she be above you in the pecking order of

9    the Office of Research?

10    A.    Yes, definitely.

11    Q.    Okay.  Does the Office of Research have a pre-award and

12    post-award component?

13    A.    That is correct.

14    Q.    As a grant officer are you involved in -- which of those

15    two are you involved with?

16    A.    I am in the pre-award section.

17    Q.    And does pre-award basically mean if there's a pending

18    application that has not been granted yet?

19    A.    That is correct.

20    Q.    Okay.  And you said that you've been with the office for

21    ten years?

22    A.    Correct.

23    Q.    Did you start off as a grant officer?

24    A.    My first position was a grant specialist.

25    Q.    And what did you do as a grant specialist?

19-20052    USA v. Feng (Franklin) Tao    03.24.22        581

1    A.  As a grant specialist I was responsible for submitting

2    proposals, assisting the professors with their proposal

3    submissions.  At that point I would've had somebody else

4    second-level reviewing my work.  It is only when you have been

5    able to prove accuracy that you are allowed to submit without a

6    second-level review.

7    Q.  Okay.  Do you know a KU professor or someone who was a KU

8    professor by the name of Franklin Tao?

9    A.  I am familiar with Doctor Tao, yes.

10   Q.  Have you worked with Doctor Tao?

11   A.  I have submitted proposals for Doctor Tao.

12   Q.  Now, when you're working -- do you know the term "principal

13   investigator"?

14   A.  Yes, I do.

15   Q.  And just generally speaking, what does principal

16   investigator mean?

17   A.  Principal investigator is also known as a PI and they are

18   the individuals that are submitting the proposals.  So if

19   Doctor Tao was submitting a proposal, he would be the principal

20   investigator of that proposal.  That's how we --

21   Q.  Sure.

22   A.  I don't know how to better explain that, I'm sorry.

23   Q.  Sure, sure.

24       And a PI doesn't always have to be a professor at KU; is

25   that right?

19-20052    USA v. Feng (Franklin) Tao    03.24.22                582

1    A.   That is correct.

2    Q.   But typically speaking are professors PIs?

3    A.   Correct.

4    Q.   I want to talk to you just generally when you're dealing

5    with -- in your capacity as a grant officer when you're dealing

6    with the professors, with the PIs, are you dealing with them

7    face-to-face, on the phone, e-mail, does it depend?

8    A.   It depends.  Most of the time we are communicating via

9    e-mail, sometimes phone.  Very rarely do we sit face-to-face

10   and go over this -- you know, go over the proposal documents

11   that are needed.  We're communicating mostly by e-mail or

12   phone.

13   Q.   Okay.  If a PI, a professor, wanted to come to your office

14   and meet in person, do they have that ability?

15   A.   They would have prior to COVID.

16   Q.   The pandemic has caused some changes in that?

17   A.   Right.

18   Q.   I want to talk to you about pre-pandemic, however.

19   A.   Okay.

20   Q.   Prior to the pandemic if a professor, a PI, wanted to come

21   in and meet face-to-face with the folks in the Center for

22   Research, could they do that?

23   A.   The door was always open.

24   Q.   Do you know if you've ever met Franklin Tao in person?

25   A.   I do not recall if I've actually met Doctor Tao in person.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    583

1   Q.   Okay.  So you said that you know him.  How have you

2   communicated with Doctor Tao?

3   A.   I know I have submitted proposals with him.  I would've

4   definitely communicated with him via e-mail, which is our

5   normal base of communication.  Potentially a telephone call, I

6   can't confirm that though.

7   Q.   Sure.  I want to hand you what's been marked as Government

8   Exhibit 148 and ask you if you recognize that document.

9   A.   I recognize that document as one that would've been

10  e-mailed to me regarding being assigned a proposal and working

11  with Doctor Tao -- I mean, working on a proposal that was for

12  Doctor Tao.

13  Q.   Okay.

14       MR. OAKLEY:  Your Honor, I'd offer Government's

15  Exhibit 148.

16       THE COURT:  Any objection?

17       MR. DEARINGTON:  No objection, Your Honor.

18       THE COURT:  148 admitted.

19  BY MR. OAKLEY:

20  Q.   I think it's going to pop up on the screen in front of you.

21  You're free to use the screen or if you want to look at the

22  paper copy, you can as well.

23       MR. OAKLEY:  Bonnie, I'm sorry, can we have the --

24  BY MR. OAKLEY:

25  Q.   And so while that's pulling up, are you familiar with how

```
1   an e-mail typically prints, that the newest in time portion is
2   at the front and then at the back would be --
3   A.   Yes, uh-huh.
4   Q.   -- the oldest?
5        And so you said that this is an e-mail.  I want to direct
6   your attention first to the -- to the bottom portion.  I'm
7   sorry, at the -- on the last page of this particular -- the
8   very first e-mail in time.
9        And so it looks like this exhibit starts off with an e-mail
10  from you to Lisa Hawk with a cc to Kelly Mason and Franklin
11  Tao.  And there's a subject, ORNL, and then Doctor Tao.  Do you
12  recognize that as an e-mail that you sent?
13  A.   It appears to be an e-mail I would've sent, yes.
14  Q.   Okay.  And that was sent to Lisa Hawk.  Do you know who
15  Lisa Hawk is?
16  A.   Without some context, no, I do not right now.
17  Q.   Okay.
18  A.   I can't recall that name.
19  Q.   Okay.  And then you also cc'd a Kelly Mason.  Do you know
20  who Kelly Mason is?
21  A.   Yes, I do.
22  Q.   And then you also cc'd Doctor Tao?
23  A.   Yes.
24  Q.   And I'm not going to have you read it, but directing your
25  attention to the subject, does it appear that this relates to a
```

19-20052    USA v. Feng (Franklin) Tao    03.24.22                    585

1   project with Oak Ridge National Laboratory?

2   A.  It does.

3   Q.  Okay.  So if you could just look through the next series of

4   e-mails, does it appear to you that those are -- all appear to

5   be ORNL -- or on ORNL projects?

6   A.  Well, it shifts.

7   Q.  I want to talk to you about that shift.

8   A.  Okay.

9   Q.  Directing your attention to Thursday, May 18th [sic], 2018,

10  do you see on there an e-mail from Doctor Tao to Kelly Mason?

11  A.  I'm sorry.  You said the 18th?

12  Q.  The 17th.

13  A.  Oh, I'm sorry.

14  Q.  I could've said the 18th.  If so, it was my mistake.

15  A.  Yes, I see that e-mail.

16  Q.  Okay.  And if -- I think if we could keep scrolling to the

17  next -- right there.

18      Where it says, "Dear Kelly, it looks fine, please process

19  it", does it appear to you that that relates to a project

20  below, in other words in the previous portion of the e-mail?

21  A.  It appears as such, yes.

22  Q.  Okay.  And then there's a parenthesis that Doctor Tao

23  includes that says BTW.  Do you know that to mean by the way,

24  shorthand for by the way?

25  A.  That's what it means when I use it.

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    Q.  In context if that's what the person that drafted this

2    meant, it would make sense?

3    A.  Yes.

4    Q.  "By the way, I will send you another e-mail about a new

5    subaward.  It is nothing with the one with ORNL."

6        So does that seem to you that Doctor Tao was shifting

7    subject matter, so the e-mails above this don't relate to the

8    ORNL but is a totally separate subject that he brings up?

9    A.  I would make that conclusion, yes.

10   Q.  Okay.  And then above that it looks like Kelly says, "Okay,

11   thank you."  And then at the bottom of the first page of the

12   exhibit, it looks like there's some exchange.  And then if we

13   could get to the very first e-mail that says, "Doctor Tao,

14   hello."

15       And so this is from a Bradley -- this chain kind of goes on

16   to this part where it says -- and it's an e-mail from Bradley

17   Bernet to Doctor Tao, Kelly Mason, and you are cc'd; is that

18   accurate?

19   A.  That is accurate.

20   Q.  Who's Bradley Bernet?

21   A.  Brad is the associate director for the pre-award services.

22   Q.  And so Brad sends an e-mail to Doctor Tao, cc'ing you and

23   Ms. Mason, it says, "Hello" -- "Doctor Tao, hello.  I am

24   assigning Kim Wittman", and then provides a phone number.  Is

25   that your phone number?

1    A.   That is correct.

2    Q.   Or was your phone number at the time?

3    A.   It still is.

4    Q.   And then an e-mail, "to assist you with this project from

5    Fuzhou University in China.  She can assist you with the

6    budgeting when you send her your costing information.  We will

7    also need a budget justification for you for this project."

8    And then in parenthesis, "it appears that your scope of work is

9    described in the attached draft contract."

10        And then one -- and then Mr. Bernet adds, "One question.

11   The wording in the contract refers to this as a subcontract and

12   you call it a subaward.  Are these funds from Fuzhou University

13   coming from another funding source?  In other words, Fuzhou

14   University received funding from another entity that will come

15   to KU in a subcontract or is Fuzhou University using

16   subcontract to just mean a contract with them?"  And then "soon

17   Kim will send you an e-mail with a link to the PI proposal

18   checklist in Streamlyne.  Thank you, Brad."

19        And so does it appear that after Doctor Tao brings up the

20   proposal, that you were assigned to assist in that?

21   A.   That is correct.

22   Q.   And then there was also an attachment to this.  I'm going

23   to hand you what's been marked as Government's Exhibit 149.

24   Does that appear to be a draft of a contract that was attached

25   to that e-mail chain?

1    A.  I would say yes.

2          MR. OAKLEY:  Your Honor, I'd offer Government's

3    Exhibit 149.

4          THE COURT:  Any objection?

5          MR. DEARINGTON:  No, Your Honor.

6          THE COURT:  149 admitted.

7    BY MR. OAKLEY:

8    Q.  Could we just show 149, please.

9        And so this was the document that was attached to the

10   e-mail related to the proposal; is that correct?

11   A.  I'm assuming that that is what that attachment was, off of

12   that e-mail.

13   Q.  Okay.  So do you have any involvement in the drafting of

14   the contract or negotiating the contract or anything like that?

15   A.  I do not.

16   Q.  So what was your involvement, if any, in this proposal?

17   A.  My involvement would be actually getting the proposal and

18   the budget and the document -- the official documents for the

19   proposal to the sponsor, which would've been the university

20   that was --

21   Q.  KU or Fuzhou?

22   A.  Fuzhou.  I'm sorry.

23   Q.  And you said that it would be.  Why did you say it like

24   that?

25   A.  I mean, it appears that the subcontract possibly has come

1   in prior to the actual submission of a formal proposal through

2   the university.

3   Q.   Is that unusual in your experience?

4   A.   It is not the most common, but it does happen.

5   Q.   And so what was your involvement in this proposed

6   contract --

7   A.   My --

8   Q.   -- as far as the Center for Research is concerned?  And do

9   you know what, that was a horrible question because I said

10  contract.

11       What was your involvement from the KU Center of Research

12  related to this proposed contract?

13  A.   I would've worked with Doctor Tao to develop the budget, to

14  develop the scope of work, to get all of our internal records

15  so -- you know, to get the -- get the proposal into the -- our

16  system.

17       Since it is not the normal way -- I mean, it's not the more

18  common way that we do things.  Normally we would present the

19  proposal and then the subcontract would come, but evidently

20  there had been some previous discussion before coming through

21  our office.

22  Q.   Okay.  I want to next hand you what's been marked as

23  Government's Exhibit 153.  Do you recognize that?

24  A.   I recognize it as an e-mail that would've come from me to

25  Doctor Tao.

1    MR. OAKLEY:  Your Honor, I'd offer Government's

2    Exhibit 153.

3            THE COURT:  Any objection?

4            MR. DEARINGTON:  No objection, Your Honor.

5            THE COURT:  153 admitted.

6    BY MR. OAKLEY:

7    Q.   And so it looks like this e-mail picks up after the

8    previous one where Mr. Bernet assigned Doctor Tao -- or, excuse

9    me, assigned you to the project.

10   A.   Correct, yes.

11   Q.   And so if we look at the second page, about halfway down

12   we'll see Mr. Bernet's e-mail that says, "Hello, I am assigning

13   Kim Wittman."

14       And so the next e-mail, if we could scroll up, it looks

15   like Doctor Tao on that same day sent an e-mail to you, cc'ing

16   Kelly Mason, that had information related to financial-type

17   stuff.  Do you know what that is in reference to?

18   A.   That would be trying to get to a budget that was at the

19   90,000 total.  This is how we communicate.  Our PIs are telling

20   us what they need to do the work and he's describing in this

21   e-mail what is needed in the budget for the proposed work.

22   Q.   And in that e-mail he's -- he's giving you dollars to help

23   you in putting together a budget?

24   A.   He's giving me the estimates that he feels he needs to

25   perform the work.

1    Q.   Okay.  And he said, "I would include consumable, 26,000

2    year one and 10,000 year two; travel, 7,000 year one and 5,000

3    year two; manpower, one-fourth student" -- do you know -- is

4    that reference to a quarter of a student or do you know what

5    that's a reference to?

6    A.   He was probably -- you know, we work on FTEs, which is

7    full-time equivalent.  If I was reading that today and deciding

8    what it was, I would think he was saying a student at

9    25 percent full-time effort.

10   Q.   Okay.  And so you said earlier that this was a little bit

11   odd in the way that it normally happens.  And why was it odd?

12   A.   Normally the proposal is submitted then a subcontract or

13   the award would be acknowledged.

14   Q.   Okay.  And in this case there wasn't a contract that was

15   entered into and there wasn't an award, but the subcontract

16   came first and that -- did that cause your office to open a

17   case related to this particular subaward -- or, excuse me,

18   subcontract?

19   A.   We would've had to have had all of our normal documents to

20   substantiate the apparently $90,000 in this subcontract.  At

21   minimum when something like this happens, we have to have a

22   budget, a budget justification, and a scope of work.

23   Q.   Okay.

24   A.   And then all of our other compliance checks that we have

25   that we put through our system.

1    Q.  Okay.

2    A.  We have to create the proposal on the backside.

3    Q.  Sure.  Okay.  And so do you understand that the information

4    that Doctor Tao was providing was information for you to use in

5    putting together a budget?

6    A.  Yes.

7    Q.  And so then directing to -- your attention to the next

8    page, you respond with "what date" -- "Hello, Franklin.  What

9    date should I use for the start of the project?"  And you say,

10   "I'm fairly sure that with export control involved this won't

11   move forward too quickly, so I was thinking at the earliest we

12   should be looking at the beginning of July or August."  And

13   then, "Are you requesting" -- "are you not requesting time for

14   yourself?"

15       So you asked about the start date of the project and then

16   you said something about export control?

17   A.  Uh-huh.

18   Q.  What is export control?

19   A.  Export control can be a variety of things, but that's

20   when -- in particular traveling overseas, they have to be

21   careful on -- on what they carry with them overseas so it's

22   secured.  And I can't speak to how I knew that at the time of

23   writing this e-mail without some additional information.

24   Q.  But there was something that led you to --

25   A.  Something would've led me to believe that, yes.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    593

1    Q.   Is there a separate group at KU that deals with export

2    control issues?

3    A.   Yes.

4    Q.   And so you don't remember here today, but something led you

5    to believe that you would have to involve someone from that

6    group?

7    A.   Yes, yes.

8    Q.   Okay.  And then you said -- you said, "I'm fairly sure that

9    with export control involved this won't move forward too

10    quickly."  Does that add some time to the process?

11    A.   Anytime you add things having to be reviewed at other

12    levels, it adds time to the processing of something through the

13    office, yes.

14    Q.   And so this is an example of you and the defendant engaged

15    in starting that process?

16    A.   Uh-huh.

17    Q.   And then Doctor Tao responds above on that same date,

18    May 24th, 2018, and says, "Dear Kim, the other side hopes to

19    start ASAP.  We can temporarily put it at July 15.  We can

20    change based on the progress of the export control.  "Here I

21    still want to finish the document in format as our side; then

22    we send it to them for their checking while export control

23    office is reviewing it.  Kelly has helped me check the terms

24    and sentences used in the agreement."

25         Do you know who Kelly is?

1    A.    That would be Kelly Mason, I'm -- only because she had been

2    communicated on other e-mails --

3    Q.    Okay.

4    A.    -- I would make that connection.

5    Q.    That would make sense given the context?

6    A.    Yes.

7    Q.    "We need a breakdown list of budget.  The total budget of

8    this project is 90K.  In fact, we need to use part of the fund

9    in subaward to buy out one course in spring semester 2019.  I

10   guess you know how much budget we need to place it to buy out

11   one course.  It is about 15K.  I don't know whether it has

12   included the direct *[sic]* costs."

13          And then, "The budget may cover" -- and then there's 12,000

14   for travel, 20,000 for consumable, 8,000 for student summer

15   salary, 5,500 for publication fee and then a question mark for

16   buying out one course.  "Please change the amount to consumable

17   according to the need of cost of buying out of one course."

18          Do you know what the reference to buying out one course is?

19   A.    Typically when our PIs are proposing -- or submitting

20   proposals, they're submitting for summertime because they are

21   nine months academic.  If they are submitting a budget that

22   is -- and they're asking time for -- in the academic time, if

23   it goes over a certain percent they have to do what is called a

24   course buyout and there's -- because if they are going to be

25   spending more time on research than they're expected to during

1  the academic time, they won't be able to fulfill their teaching

2  duties so they literally are doing a course buyout.

3  Q.  Okay.  Now, does your office approve course buyouts or does

4  that come from the department chair?

5  A.  We do not approve course buyouts.  We have to have

6  confirmation from the chair or the dean telling us that it's

7  been approved and they identify how much we have to include in

8  the budget for the course buyout.

9  Q.  Scrolling up to the top portion of this exhibit, you

10  respond on May 29th with, "Hello, Franklin.  I have attempted

11  to follow your request for the budget given the two sets of

12  details that didn't match."  And then is that a frown emoji?

13  A.  That's -- yes.

14  Q.  What were you trying to express there?

15  A.  It's -- sometimes we have to go through many iterations of

16  a budget to get to where, you know -- so from the previous

17  e-mail and what was -- I mean, from the very first e-mail and

18  the breakdown of the budget that I had been given and then the

19  second set of information, numbers were changing and I was

20  trying to put a balanced budget together and the numbers

21  weren't matching.

22  Q.  And then you say, "I'm not sure I have what you really

23  want, but it is a start."

24  A.  Yeah.

25  Q.  And then you state, "We have permission to show a budget to

1    Fuzhou University as a draft, but I can't make the formal

2    institutionally-approved submission until we settle the course

3    buyout with Doctor Weatherley.  Let me know if I am even close

4    with this budget or what needs to change."

5         So that second paragraph where you mention that you can't

6    make the formal institutionally-approved submission until we

7    settle the course buyout with Doctor Weatherley, was that a

8    recognition that Doctor Weatherley has to approve buyouts for

9    professors in his department?

10   A.   That is correct.

11   Q.   And then finally you say, "Let me know if I am even close

12   with this budget or what needs to change."  And so as part of

13   this, you're dealing with Doctor Tao to put together a budget

14   based on information he provides?

15   A.   That is correct.

16   Q.   Next I want to hand you what's been marked as -- yes,

17   what's been marked as Government's Exhibit 170.  Do you

18   recognize that as another e-mail exchange?

19   A.   Yes, I do.

20   Q.   And is that exchange also related to this proposed

21   contract?

22   A.   Based on the subject line, I would say yes.

23        MR. OAKLEY:  Your Honor, I'd offer Government's

24   Exhibit 170.

25        THE COURT:  Any objection?

```
 1              MR. DEARINGTON:  No objection, Your Honor.

 2              THE COURT:  170 admitted.

 3    BY MR. OAKLEY:

 4    Q.   And so, again, this is an e-mail exchange and I want to

 5    direct your attention to the bottom portion of this page on the

 6    "from" at the very -- there we go.

 7         And so this -- this e-mail spills over into the second

 8    page, right, but let me talk to you about the "from" and the

 9    "to".  So I see the "from" is from a Streamlyne Research.  Do

10    you recognize that e-mail address?

11    A.   Yes, I do.

12    Q.   How do you recognize that e-mail address?

13    A.   That is the e-mail address for notifications sent through

14    our Streamlyne system, and our Streamlyne system is our system

15    of record.

16    Q.   And do you know who caused that e-mail to be sent?

17    A.   I would've caused that e-mail to be sent.

18    Q.   And that e-mail was sent from the Streamlyne Research

19    e-mail address to yourself, Kimberly Wittman.  Did that go to a

20    different e-mail address?  In other words, the "from" is the

21    productionresearch@ku.streamlyne.org.  What was the Kim Wittman

22    address?

23    A.   I always copy myself on them because once we instigate

24    that -- that notification out of the Streamlyne system, we

25    found that we didn't have any way to double-check that it had
```

19-20052    USA v. Feng (Franklin) Tao    03.24.22    598

1    been sent and it is something that has to be sent for every

2    proposal.  So personally I adopted e-mailing -- including

3    myself on the e-mail so I had record that it was sent.

4    Q.    Okay.  And the subject is PI checklist for Fuzhou

5    University proposal?

6    A.    Uh-huh.

7    Q.    And then if we could look at the second page.

8         And it says, "Thank you for letting us know about your

9    upcoming proposal submission.  Please click on the link

10   provided to complete the compliance checklist associated with

11   this proposal.  You will be prompted to log in using your KU

12   credentials.  Use the navigation buttons on the left to proceed

13   to the Questions tab and click on the arrow next to the PI

14   checklist bar to view the questions that need to be answered."

15        "Please read through each question carefully and answer to

16   the best of your knowledge.  Once you have completed all the

17   questions, the PI checklist bar will show the status as

18   complete.  Click on the Close button at the bottom of the page

19   and save when prompted.  You should log out of Streamlyne by

20   clicking on your name in the top right corner of your screen.

21   Please contact Kim at Kim" -- excuse me, "at kwittman@ku.edu if

22   you have questions.  Thank you, Kim."

23        Now, is this an e-mail that was drafted specifically for

24   Doctor Tao?

25   A.    No.

1    Q.    What is this?

2    A.    That is what we call a blurb.  It is the e-mail that we

3    came up with to describe the PI checklist for this notification

4    purpose only.

5    Q.    And I noticed that below that is a proposal number of 908?

6    A.    Yes.

7    Q.    Is that a number that's assigned to this particular

8    proposed contract?

9    A.    That is correct.

10   Q.    And then if we could scroll up to the middle of -- excuse

11   me.  Yes, the middle of the page following that e-mail.

12         And then there's a -- from Kim Wittman to Tao, Franklin

13   Feng, and the subject is PI checklist for Fuzhou University

14   proposal, and then you state, "Franklin, I am reviewing the PI

15   checklist.  I just want to make sure that none of the following

16   might apply regarding intellectual property development:  (1)

17   improvements on previously-disclosed inventions," and then you

18   have a series of five questions and then at the bottom you

19   state, "It is better to flag this as a yes if you are unsure,"

20   and then it says, "Just checking.  Kim."

21         And so that's an e-mail that you sent from -- was that from

22   your KU address?

23   A.    That is correct.

24   Q.    And it was to Doctor Tao?

25   A.    Yes.

1    Q.   But since you responded to the Streamlyne, that's why it's

2    included in this particular exhibit --

3    A.   Yes.

4    Q.   -- if you know?

5    A.   Yes.

6    Q.   Okay.  And so was this further engagement with the PI

7    related to the process?

8    A.   That is correct.

9    Q.   Okay.  And then if we can scroll up above that.

10        And on June 26th, 2018 the defendant responds, "Thank you.

11   I guess it is okay to choose no since it is a project to do

12   characterization.  I don't expect that new method or...  could

13   be generated from this project."

14        I next want to hand you what's been marked as Government's

15   Exhibit 171.  Do you recognize that as another e-mail?

16   A.   Yes, I do.

17   Q.   And is that an e-mail between you and Doctor Tao related to

18   this proposed contract we've been discussing?

19   A.   Based on the content of the e-mail, I would say yes.

20   It's -- I'd have to go through each one of these since there's

21   not a subject line.

22   Q.   Let me ask you this:  Do you recognize the top e-mail, the

23   e-mail dated June 26th, 2018 coming from Tao, Franklin Feng on

24   a KU e-mail address to you, Wittman, Kimberly on a KU e-mail?

25   A.   Yes, I do.

1  Q.  And do you recognize that as the defendant's e-mail address

2  and your e-mail address from KU?

3  A.  My e-mail address, I can say yes.

4        MR. OAKLEY:  Your Honor, I'd offer Government's

5  Exhibit 171.

6        THE COURT:  Any objection?

7        MR. DEARINGTON:  No objection.

8        THE COURT:  171 admitted.

9  BY MR. OAKLEY:

10  Q.  And so if we could just look at this generally and we can

11  scroll through and see that it's a series of e-mails.  And

12  we'll get back to that top part, but if we could just scroll

13  through and kind of show the exchanges and we'll start from the

14  bottom and go up.

15      And so does this e-mail exchange start with an e-mail on

16  June 25th, 2018?  Does it appear that it's from an e-mail

17  address with a domain @fzu.edu.cn?

18  A.  I would say yes.

19  Q.  Do you know who that e-mail address is affiliated with or

20  what the domain is affiliated with?

21  A.  Based on what is here, I cannot -- well, actually, I would

22  have to say it came from Fuzhou University.

23  Q.  Is that based on the signature line of this particular --

24  A.  That is correct.

25  Q.  Do you know who Jiang-Lilong is?

1    A.    No, I do not.

2    Q.    And so you're basing that on the signature line that says

3    National Engineering Research Center for Chemical Fertilizer

4    Catalyst at Fuzhou University?

5    A.    That is correct.

6    Q.    And then if we could scroll above that, does it look like

7    the defendant then forwards that e-mail to you -- or to Kelly

8    Mason and cc's you and says, "Dear Kelly and Kim, the following

9    is the e-mail from Doctor Jiang which suggest the amount of the

10   fund so please propose 90K as what we originally planned.  The

11   new total amount will be decided by the side of Fuzhou.  They

12   will give the accurate amount, the fund size, after they review

13   the contract.  All the best."  And then it's the defendant's

14   signature?

15   A.    Yes.  Excuse me, yes.

16   Q.    If we could continue scrolling.

17         And then you respond, "Franklin, what should we have for

18   the start date now?  We originally went with 7-15-18.  It will

19   get changed to the date the contract is signed by both parties

20   anyway.  Regards, Kim."

21         And then if we scroll up, the defendant responds, "Please

22   set it to September 1st, 2018.  Thank you very much."

23         And then you send an e-mail, "Franklin, please review the

24   attached budget.  Advise me if there is need for revision or if

25   you approve as-is."

1       And the defendant responds on June 26th, 2018 with "Dear

2    Kim, could you add the buyout course for the second year,

3    spring '22 *[sic]* as well.  I would just budget the buying out

4    course of 2020 spring, although it is too early to predict

5    whether I need to buy out it or not and whether chair would

6    approve or not.  In addition, please add the summer salary for

7    one student, graduate or undergraduate, to fit these changes.

8    Please remove the publication fee and even decrease the amount

9    of consumable."

10      So is this discussion about the budget that you were

11   preparing or helping to prepare?

12   A.   Yes.  Yes.

13   Q.   And if we can scroll up.  And then there's an e-mail that

14   same day from you to the defendant, "Franklin, Doctor

15   Weatherley needs to be in agreement before I add the spring

16   2020 course buyout.  Please make your request to him.  There is

17   summer salary for one" -- what's GRA?

18   A.   Graduate research assistant.

19   Q.   -- "in both years already.  Are you wanting two GRAs in the

20   summer or the one already in the budget increased to

21   100 percent?"

22      So your first comment was related to the course buyout,

23   that it has to be approved?

24   A.   Yes.

25   Q.   And would have to be approved by the chair, in this

1    instance Doctor Weatherley?

2    A.    Yes.

3    Q.    And then the second part is further discussion about the

4    budget?

5    A.    That is correct.

6    Q.    If we could scroll up.

7         And then Doctor Tao responds, "Dear Kim, please forget the

8    buying out class of the second year since it is too early to do

9    it.   Please change the consumable of the first year from 7 to

10   4,000 and then add the 3,000," and then there's other

11   discussion related to the budget; correct?

12   A.    That is correct.

13   Q.    If we could continue to scroll up.

14        And then you respond, "Revised as requested."  And then

15   "approved?"

16        What were you asking there?

17   A.    I was asking if the budget that I -- when we send the

18   budget back to the PI, we always make sure that it is approved

19   by them before we consider it final.

20   Q.    Okay.  So you were asking him is this the way you want it?

21   A.    Yeah.

22   Q.    Okay.  And then if we scroll up.

23        "Yes, I approve it.  I will finish the PI checklist."

24        What was the -- do you know what the reference is to "I

25   will finish the PI checklist"?

1    A.   It appears that maybe he had not completed it at this -- by

2    this point.  I can't confirm that without checking something in

3    the -- I mean, I would've checked something in the system to

4    see if it had been completed.

5    Q.   You were still working on the budget with the defendant

6    anyways?

7    A.   Correct.

8    Q.   Okay.  When you're working with a PI trying to get things

9    done, is that -- I mean, are you working against each other or

10   is it another type of relationship?

11   A.   We are -- when we're assigned a proposal, we are there to

12   help get the proposal to the finish line, so to speak.  I mean,

13   we're helping them get the budget put together, we're helping

14   them get all of the items needed to make a final approved -- or

15   institutionally-approved submitted proposal to the sponsor.

16   Q.   Okay.  Could we please show what's been admitted as

17   Government Exhibit 144 -- I'm sorry, 164.

18        This is an e-mail that's already been admitted into

19   evidence.  And does it appear it's an e-mail exchange between

20   the defendant and Doctor Weatherley where you were cc'd and

21   does it appear to be communications related to a course buyout?

22   A.   I would agree that that is what it's related to.

23   Q.   Okay.  I just want to -- you were included on that

24   exchange?

25   A.   Correct.

1    Q.  Could we next show Government's Exhibit 165?

2        Did this appear to be a letter that was attached to that

3    e-mail that's a more formal request for a buyout from the

4    defendant to Doctor Weatherley?

5    A.  That is what it appears to be, yes.

6    Q.  Okay.  And could we next show what's been admitted as

7    Government's Exhibit No. 166?

8        And this is just further communications that -- that have

9    been admitted.  I just want to point out that it's from Doctor

10   Tao to Doctor Weatherley related to a buyout and you were cc'd;

11   is that correct?

12   A.  That is correct.

13   Q.  And then finally can we show what's been admitted as

14   Government's Exhibit 167.

15       And is this further exchange -- this one, the defendant

16   says, "Dear Laurence, thank you very much for the approval of

17   the buying out of course of spring of 2019"?

18   A.  Yes.

19            MR. OAKLEY:  No further questions, Your Honor.

20                       CROSS EXAMINATION

21   BY MR. DEARINGTON:

22   Q.  Good afternoon, Ms. Wittman.

23   A.  Good afternoon.

24   Q.  Do you recognize Special Agent Stephen Lampe in this

25   courtroom?

1    A.    No, I do not.

2    Q.    So you've never met the case agent in the case that you're

3    testifying in?

4    A.    I don't -- we did Zoom.

5    Q.    And that Zoom presumably was in 2019 before Doctor Tao was

6    indicted?

7    A.    No, sir.

8    Q.    When was the Zoom interview?

9    A.    For prep of this trial.

10    Q.    Was it in 2020?

11    A.    It would've been in 2022.

12    Q.    Was it January 2022?

13    A.    I do not recall off the top of my head the specific date.

14    Q.    Do you know if it was this week, last week, any specifics?

15    A.    I would say within the last four weeks.

16    Q.    In the last four weeks.  Does that mean probably around

17    four weeks ago?

18    A.    I won't -- I cannot put a specified date on it.

19    Q.    So it could be one week ago, it could be four weeks ago;

20    fair?

21    A.    That is fair.

22    Q.    Okay.  And Doctor Tao *[sic]* didn't ask you questions as

23    part of his investigation, you testified he asked you questions

24    to help prepare for your testimony today; is that accurate?

25    A.    Did you just say Doctor Tao?

1  Q.  Excuse me, I meant Special Agent Lampe.  Pardon me.  I can

2  repeat the question if you like.

3  A.  That would be helpful.

4  Q.  Sorry, Ms. Wittman.

5      So I think you testified that Special Agent Lampe met with

6  you to talk about your testimony today; correct?

7  A.  I'm not --

8  Q.  Was that your testimony?

9  A.  Yes.

10  Q.  So fair to say doctor -- Special Agent Lampe didn't meet

11  with you when he was investigating this case, it was in the

12  lead-up to trial?

13  A.  I do not understand your question.

14  Q.  Was the purpose of your interview with Special Agent Lampe

15  to prepare for your testimony today?

16  A.  That is correct.

17  Q.  Okay.  I think at one point you said in your testimony that

18  the principal investigator submits proposals.  Was that

19  slightly imprecise?

20  A.  We -- the Office of Research officially submits the

21  proposal.  It is the principal investigator's proposal, though.

22  We assist the professors in getting their proposals submitted

23  to the sponsors.

24  Q.  Okay.  I just want to clarify because you again have said

25  "their proposals."

1      So someone like Doctor Tao who's the principal investigator

2  would draft the science in the proposal, but KU is actually the

3  applicant and the awardee; correct?

4  A.  That is correct.

5  Q.  And the research office would be the one that administers

6  the grant if awarded; correct?

7  A.  That is correct.

8  Q.  So, for example, if there's a spreadsheet of equipment that

9  over time a PI has requested be purchased, is it fair to say

10 the way that would work, since KU is the awardee, is the PI

11 would ask for permission to buy the equipment, get approval,

12 and then the research office would actually handle the funds,

13 buy the equipment, and then it would end up in the lab; is that

14 correct?

15 A.  I am not on the procurement side of the organization so I

16 cannot speak to how that happens.

17 Q.  So are you unsure whether the PI handles the funds when

18 they buy equipment, for example?

19 A.  I can --

20 Q.  You're unsure?

21 A.  I cannot say how that happens.

22 Q.  Okay.  So Mr. Oakley showed you what's been marked as

23 Exhibit 148.  So you're on this e-mail; correct?

24 A.  That is correct.

25 Q.  And this involves a -- an attachment which is the subaward

1    contract of Fuzhou University; correct?

2    A.   Based on the attachment line I would say that is correct.

3    Q.   Well, fair to say then that your office knew there was a

4    possible funding source from Fuzhou University?

5    A.   I would agree with that statement.

6    Q.   And I think you testified that in this instance a proposed

7    contract came to your office without the more typical

8    solicitation from the possible funder; correct?

9    A.   I don't believe I addressed that in my testimony today.

10   Q.   Well, I think you said - allow me to reframe the question -

11   that typically there would be a proposal first before a

12   contract is negotiated; is that correct?

13   A.   There would be a proposal submitted to a sponsor typically

14   before a subcontract comes to the Office of Research, that is

15   correct.

16   Q.   But you testified that that doesn't happen all the time,

17   that's more standard when dealing with federal agencies; is

18   that correct?

19   A.   That is typically the method the proposals get submitted.

20   Q.   Okay.  And do you recall being -- assisting with Doctor

21   Tao's Oak Ridge National Laboratory proposal?

22   A.   I do not recall assisting Doctor Tao with that particular

23   proposal.

24   Q.   So you can't say whether ORNL would've entered into a

25   contract with KU without a proposal?

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    A.    I'm not understanding.

2    Q.    Sorry.  I asked my first question a little bit imprecisely

3    so let me try that again.

4         Were you involved with the Oak Ridge National Laboratory

5    contract with the University of Kansas that Doctor Tao was

6    involved with?

7    A.    I have no recollection of that.

8    Q.    Okay.  And so you're not sure whether Oak Ridge National

9    Laboratory would've entered into a contract with KU without

10   using the proposal process?

11   A.    I cannot speak to that point.

12   Q.    Okay.  So fair to say from what you've just articulated,

13   that the Fuzhou draft contract came in without a proposal, that

14   Doctor Tao had a relationship with Fuzhou University around

15   this time?

16   A.    That would be an assumption to be made.

17   Q.    Because Fuzhou is probably not in the business and

18   universities aren't in the business of funding people they

19   don't know; correct?

20   A.    I would not say that as a definitive answer, no.

21   Q.    Without a proposal it is unlikely that a university or a

22   funding source would fund a principal investigator they didn't

23   know, I imagine?

24   A.    Without a proposal I would not expect funding to change

25   hands, no.

1    Q.   But you said sometimes that happens; correct?

2    A.   I do not believe that's what I said.

3    Q.   I'm sorry if I'm misunderstanding your testimony, Ms.

4    Wittman, but I think you said sometimes funding can be provided

5    without a proposal process?

6    A.   Sometimes it can -- an agreement to fund may -- through

7    conversation, but our office of -- there can be discussions

8    between PIs and possible funding sources, but the Office of

9    Research would not go to a subaward or a subcontract with an

10   organization without having at minimum a statement of work, a

11   budget, and a budget justification.

12   Q.   Okay.  So Mr. Oakley showed you what has been marked as --

13   sorry, let me just confirm this.

14        Sorry about that.

15        Mr. Oakley showed you an exhibit that was marked

16   Exhibit 153; correct?

17   A.   Yes.

18   Q.   Okay.  And he asked you whether a budget could be approved

19   before Doctor Weatherley approved a course buyout; correct?

20   A.   Yes.

21   Q.   And the answer was that a course buyout would need to be

22   approved before you had a final budget; correct?

23   A.   That is correct.

24   Q.   And Mr. Oakley showed you this e-mail, but he didn't show

25   you the budget attached to it; correct?

1    A.   That is correct.

2    Q.   Okay.  And Mr. Oakley showed you Exhibit 164 and that was

3    an e-mail that you were copied on with a buyout request letter

4    attached to it; right?

5    A.   It appears so.

6    Q.   And did he show you the attachment?

7    A.   Yes.

8    Q.   And can you see here that this shows that Fuzhou University

9    would be the source of funding for the proposed buyout?

10   A.   Yes.

11   Q.   And since you would need Doctor Weatherley's approval or

12   Doctor Weatherley's approval would be required before you could

13   have a final budget, if you saw a final budget that would lead

14   you to believe that Doctor Weatherley approved a buyout;

15   correct?

16   A.   We request written approval, not through the budget but

17   through an e-mail or a letter from Doctor Weatherley.

18   Q.   Okay.

19   A.   Or from the chair, I'm sorry.  In this case that would be

20   Doctor Weatherley.

21   Q.   Okay.  And do you recall Doctor Weatherley approving the

22   buyout in June 2018, buyout request?

23   A.   If the proposal was officially submitted, I would say

24   Doctor Weatherley would have given approval for that buyout.

25   Q.   Okay.

1          MR. DEARINGTON:  So, Your Honor, we have an electronic

2    proposed exhibit that we've just pulled up and e-mailed to the

3    government, and I wonder if we would be able to publish it just

4    to Ms. Wittman to lay foundation and then seek to introduce it

5    electronically.

6          THE COURT:  What's the exhibit number?

7          MR. DEARINGTON:  The exhibit number will be 1458.

8          THE COURT:  Have you received it?

9          MR. OAKLEY:  I don't have my computer up here, Your

10   Honor, I have not.

11         MR. DEARINGTON:  Is there someone we could e-mail it

12   to among you that has access to e-mail?

13         MR. BARRY:  Is this on your exhibit list?

14         MR. DEARINGTON:  This is a new exhibit that we just --

15         THE COURT:  Do you have it in paper form?

16         MR. DEARINGTON:  We don't have a printer, Your Honor,

17   here and we've just marked this as an exhibit as we were

18   listening to Ms. Wittman's testimony.

19         THE COURT:  Okay.  Well, they're entitled to see it

20   before you proceed with even having her lay the foundation.

21         MR. DEARINGTON:  Uh-huh.  I think Mr. --

22         THE COURT:  How long of an exhibit is it?

23         MR. DEARINGTON:  It's just a short e-mail with a

24   one-page attachment.  And I think Mr. Barry, I hope, has access

25   to e-mail so we might be able to get this done quickly.

1          THE COURT:  He probably doesn't have a printer up here

2    either.

3          MR. DEARINGTON:  Well, if he could review it

4    electronically, hopefully that would allow them to object or

5    not.

6          So I think -- should I lay foundation first as we

7    typically would and then allow the government an opportunity to

8    object when I move for it to be admitted?

9          THE COURT:  Well, have you had a chance to review it?

10         MR. OAKLEY:  Your Honor, I've reviewed the e-mail, but

11    there's an attached -- Your Honor, I think for the record it

12    needs to ultimately be printed and submitted to the court.

13    Once that's done, I don't have an objection to it.

14         THE COURT:  All right.  Then it will need to be

15    uploaded to the JERS system electronically and a paper copy,

16    but -- all right.  So go ahead and proceed to lay the

17    foundation.  It's Exhibit 1458?

18         MR. DEARINGTON:  Yes, Your Honor.

19         THE COURT:  Okay.

20         COURTROOM DEPUTY:  They've already given it to me for

21    JERS.  Would you like me to print it for everybody?

22         THE COURT:  Yeah, sure.  Yeah.  Do we have a printer

23    on this floor up here, Bonnie?

24         COURTROOM DEPUTY:  No, but I can run down.

25         THE COURT:  Okay.  So she has received it from you

```
 1   all.  She will go ahead and print it.
 2          MR. DEARINGTON:  Should we do that before we publish
 3   it?
 4          THE COURT:  No.  If there's not an objection, you can
 5   go ahead and proceed.
 6          MR. DEARINGTON:  Do you mind publishing just to the
 7   witness?
 8          COURTROOM DEPUTY:  It is, I checked.
 9   BY MR. DEARINGTON:
10   Q.  Ms. Wittman, do you recognize the document before you?
11   A.  I have a blank screen.
12          COURTROOM DEPUTY:  It has to still be shown.
13          MR. DEARINGTON:  I'm sorry.
14   BY MR. DEARINGTON:
15   Q.  Sorry, Ms. Wittman.  Now do you see a document before you?
16   Yes?  No?
17   A.  No.
18          COURTROOM DEPUTY:  I just have the jury blocked.
19          THE COURT:  It's a white screen.
20          COURTROOM DEPUTY:  Let's turn on the "Right Attorney".
21   I've got too many buttons here.
22          THE COURT:  You can see it now?
23          MR. DEARINGTON:  Not to be published yet.
24          THE WITNESS:  I see it now.  Thank you.
25          THE COURT:  Not to be published, Bonnie.
```

1          COURTROOM DEPUTY:  I have the jury picked, so it's not

2    working.  Is it working?

3          MR. DEARINGTON:  Is there going to be an objection if

4    I lay foundation?

5          COURTROOM DEPUTY:  I think it's working now.

6          THE COURT:  If there's no objection, let's just admit

7    1458 and publish it to her and the jury.  Is that all right

8    with the government?  No objection?

9          MR. OAKLEY:  Yes, Your Honor.

10          THE COURT:  Okay.  1458 admitted.

11          MR. DEARINGTON:  Thank you, Your Honor.

12          Ms. Kessler, could you please publish Exhibit 1458?

13          THE COURT:  Now you can publish it to everybody.

14          Okay.  There we go.

15    BY MR. DEARINGTON:

16    Q.  Okay.  So, Ms. Wittman, is this an e-mail from you to Kelly

17    Mason and Doctor Tao on June 28th, 2018?

18    A.  Yes.

19    Q.  And in this e-mail do you attach an internal budget?

20    A.  It appears.

21    Q.  And is the subject line of this Final and Approved Budget?

22    A.  Yes.

23    Q.  And in the body of your e-mail do you say, "Please find the

24    approved budget"?

25    A.  I do.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    618

1    Q.  And you say, "Please copy me on the submission to Fuzhou

2    University"?

3    A.  Yes.

4    Q.  Ms. Kessler, could you please scroll down one page so we

5    can take a look at what the attached budget looks like?

6        Okay.  And so do you see there, Ms. Wittman, in the top

7    left corner under Salaries, it shows that Doctor Tao according

8    to the budget would have a spring 2019 course buyout?

9    A.  Correct.

10   Q.  And that shows 13.5 percent time because that's the amount

11   of time of his nine-month appointment that his one course

12   buyout would amount to; is that correct?

13   A.  That -- typically we are told the amount of dollars that

14   need to be put into the budget for a course buyout.  In this

15   case it equated to 13.5 percent of Doctor Tao's academic time.

16   Q.  Okay.  And this is going to be fairly complicated for me,

17   but in a nine-month appointment if you had 40 percent teaching

18   and you bought out one course with a typical -- strike that.

19       So can you please scroll down, Ms. Kessler?  Yeah.  Right

20   there is great.

21       So under Travel, can you see that there is a budget for

22   domestic and a budget for foreign travel in this approved

23   budget?

24   A.  That is correct.

25   Q.  So does that signify to you that the approved budget

1    included foreign travel for this?

2    A.   That's -- would be correct, yes.

3    Q.   And so if a PI checklist said there's not going to be

4    international travel, you would still know that there's

5    probably going to be international travel because there's

6    funding approved for international travel here; is that fair?

7    A.   That is correct.

8    Q.   Okay.  And just to be clear, I think you looked at a

9    Streamlyne document for this proposal, but that Streamlyne

10   document didn't have to do with the Oak Ridge National

11   Laboratory proposal, right, it was just about the Fuzhou one?

12   A.   All records are for -- all checklists are specific for the

13   proposal and one proposal only.

14   Q.   Okay.  I just wanted to clarify because there have been a

15   few proposals and a few Streamlynes that the jury has seen, and

16   I just want to make sure we're talking about the same one

17   because there were other ones that prior testimony had been

18   related to and different issues raised.

19        So for this budget we have approved federal -- or

20   international travel; correct?

21   A.   Yes.

22   Q.   So I want to ask you a question because I'm not an expert

23   by any stretch of the imagination in agency disclosure

24   requirements and the like.

25        So if you had an approved budget, is that a prerequisite to

 1    disclose current and pending support to an agency or could you

 2    be obligated to submit current and pending support -- a funding

 3    opportunity that doesn't have a formally approved budget?

 4    A.    I'm not following your question, I'm sorry.

 5    Q.    Let me try that again.

 6          Does KU policy state that a proposal only needs to be

 7    disclosed to an agency if there's an approved budget?

 8          It's sounding like you're not familiar with that -- such a

 9    policy; is that fair?

10    A.    On a current and pending -- any current funding or pending

11    funding should be listed on a current and pending.

12    Q.    So if it's pending, even without a formal approved budget,

13    you need to list it, right, that's your view?

14    A.    It would not be a pending proposal in our system if it did

15    not have an approved budget.

16    Q.    Okay.  So fair to say approved budget here, this is a

17    pending proposal for funding from Fuzhou University?

18    A.    Correct.

19    Q.    And that would need to be disclosed, according to your

20    view, as current and pending support?

21          MR. OAKLEY:  Objection, relevance and it calls for a

22    legal conclusion.

23          MR. DEARINGTON:  A legal conclusion --

24          THE COURT:  Overruled.  You can answer if you know.

25          THE WITNESS:  I'm not quite sure what you're asking.

1    BY MR. DEARINGTON:

2    Q.   Allow me to try again.

3        So if you have an approved budget for a possible proposed

4    funding from a university like Fuzhou here, you would expect

5    that to be listed as current and pending support in a, let's

6    say, DOE grant application submitted the next day?

7    A.   If I was submitting a DOE grant for a professor and it

8    required a current and pending document to be included in it, I

9    would expect that everything that is either currently funded or

10   pending, meaning it's already been submitted to the sponsor yet

11   it has not been awarded, it should be on the current and

12   pending support document.

13   Q.   And if the research office was aware of such a pending

14   proposal and failed to disclose it to an agency, would you say

15   that that's a compliance failure?

16   A.   It is the PI's responsibility to keep their current and

17   pending up-to-date.

18   Q.   So if the research office had the same knowledge as Doctor

19   Tao about pending support and the research office submits the

20   proposal to DOE, it's only Doctor Tao's fault if something is

21   missing from current and pending; is that your testimony?

22   A.   I do not agree with that statement.

23   Q.   So it would be both entities' responsibilities to ensure

24   current and pending?

25   A.   I think I misunderstood.   The office of -- we do not -- we

19-20052    USA v. Feng (Franklin) Tao    03.24.22                622

1    do not have a method to double-check all current and pendings

2    for all of the professors that we submit proposals for.  So it

3    is the PIs responsibility to keep their current and pending

4    up-to-date.

5    Q.   So you don't check conflict of interest forms before a

6    current and pending is submitted?

7    A.   Yes, we do.  Current and pending and conflict of interest

8    are two different things.

9    Q.   Two different things?

10   A.   Yes, they are.

11   Q.   Okay.  So going back to my question before, if the research

12   office was aware of current and pending support and the

13   research office submitted a proposal without listing that

14   current and pending support, you would blame the PI for that?

15   A.   It is not the Office of Research's responsibility to -- to

16   verify each and every item on a current and pending.

17   Q.   But you don't train principal investigators about current

18   and pending support, do you?

19   A.   It's the professor's funding in their proposed research.

20   They are very aware themselves of what needs to go on a current

21   and pending.

22   Q.   Because you've held formal training and Doctor Tao would've

23   attended formal training; is that what you're saying?

24   A.   Because -- no, I cannot say that we provide formal training

25   for a current and pending support.

19-20052   USA v. Feng (Franklin) Tao   03.24.22        623

1    Q.  Even today?

2    A.  There's instructions from the sponsors on what is required

3    on current and pending.

4            MR. DEARINGTON:  Thank you, Ms. Wittman.

5            No further questions, Your Honor.

6            MR. OAKLEY:  Ma'am.

7            THE WITNESS:  Oh, I'm sorry.

8            THE COURT:  Not yet.

9                         REDIRECT EXAMINATION

10   BY MR. OAKLEY:

11   Q.  Do you know as it relates to this draft contract proposal

12   between Fuzhou University and KU whether or not that contract

13   was ever entered into?

14   A.  I cannot speak to whether it was awarded or entered into or

15   not.

16   Q.  Can we please show what's been admitted as Government's

17   Exhibit 211?

18       This has been admitted into evidence and if you could

19   look --

20       If we could scroll to the very bottom.

21       An e-mail dated June 25th, 2018 from the -- in another

22   exhibit on your direct examination we referred to that and

23   that's when you said you didn't know this person but that you

24   recognized that -- you said that you believed it came from

25   Fuzhou University because it says National Engineering Research

1    Center for Chemical Fertilizer Catalyst at Fuzhou University.

2    So we had talked about that.  And then there was a series of

3    e-mails above it that were related to budget and that sort of

4    thing; correct?

5    A.    Correct.

6    Q.    Does that refresh your recollection?

7          If we could scroll to the very top.

8          And does that appear to be an e-mail from Doctor Tao to

9    Mr. Crim and it says, "There were a few competitors for that

10   fund, I was not successful in the completion of getting it."

11         Does that indicate to you that that contract was never

12   entered into?

13   A.    That would be an assumption to be made.

14   Q.    And so your e-mail that the Defense Exhibit 1458 talks

15   about, when you used the term "approved budget," you're talking

16   about a budget that could be sent to the other side to continue

17   negotiations, is that what you meant --

18   A.    That is correct.

19   Q.    -- or did you mean that there was a project, it was

20   approved, this is the final budget, this is set in stone?

21              MR. DEARINGTON:  Objection, leading.

22              THE COURT:  Overruled.  You can answer.

23              THE WITNESS:  We use the term "approved budget"

24   stating that we are done doing the -- the back-and-forth with

25   the PI.  We're saying it's approved, it's final, it's -- not

1    everything in there passes muster, so to speak, so that

2    doesn't -- it just means we're done with it in pre-award.

3    BY MR. OAKLEY:

4    Q.  And so your use of the term "approved" meant that after the

5    back-and-forth between you and Doctor Tao, that it was ready to

6    be used in contract negotiations?

7    A.  That is correct.

8    Q.  Is that accurate?

9    A.  That is correct.

10         MR. OAKLEY:  Your Honor, could we take an early break?

11   We have an -- I have another exhibit that's being printed, but

12   perhaps we could take an early break to --

13         THE COURT:  All right.  Let's reconvene at a quarter

14   'til.

15         (Recess).

16         (The following proceedings were held out of the

17   presence of the jury).

18         THE COURT:  All right.  You can be seated.

19         All right.  Ms. Wittman can get back on the stand.

20         MR. OAKLEY:  Your Honor, I have copies for the court

21   of the proposed exhibit if I may approach.

22         THE COURT:  Sure.  Is it 777?  Because you've already

23   given me that one.

24         MR. OAKLEY:  Yes, Your Honor.

25         THE COURT:  Okay.  Thank you.

 1          All right.  You can get back on the stand.

 2          (The following proceedings were held in the presence

 3  of the jury).

 4          THE COURT:  All right.  You can be seated.

 5          All right.  So can you pull that -- ma'am.  Ma'am, can

 6  you pull --

 7          COURTROOM DEPUTY:  I can get it for her.

 8          THE COURT:  Because they're very adjustable.

 9          And, counsel, please speak into the microphone as

10  well.

11          MR. OAKLEY:  Thank you, Your Honor.

12  BY MR. OAKLEY:

13  Q.  Ms. Wittman, I want to talk to you about Defense

14  Exhibit 1458, I think it's still in front of you there on the

15  witness stand.  And Mr. Dearington showed that to you on cross

16  examination; correct?

17  A.  Correct.

18  Q.  And this is 1458.  And the date of this e-mail is

19  June 28th, 2018 and it's from you to Ms. Mason; correct?

20  A.  Correct.

21  Q.  Mr. Dearington chose not to show you the response from Ms.

22  Mason to you.  I want to hand you what's been marked as

23  Government's Exhibit 777.

24          Before we talk about this, I want to go back to the

25  Defendant's Exhibit 1458 and directing your attention to the

1    second page, the top, it says Proposed Budget; correct?

2    A.    Correct.

3    Q.    Does Government's Exhibit 777 show Ms. Mason's response to

4    you that same day, June 28th of 2018?

5    A.    I'm sorry?

6    Q.    Does Government's Exhibit 777 show Ms. Mason's response to

7    the -- to the exhibit the defendant showed you?

8    A.    That is correct.

9         MR. OAKLEY:    Your Honor, I'd offer Government's

10   Exhibit 777.

11        THE COURT:    Any objection?

12        MR. DEARINGTON:    No objection, Your Honor.

13        THE COURT:    777 admitted.

14   BY MR. OAKLEY:

15   Q.    And so the same day that you sent the e-mail with the

16   proposed budget, Ms. Mason responds, "Thank you, Kim.  I really

17   appreciate it.  I'll send the contract to Fuzhou University

18   with our requests, including a request for a start date of 9-1.

19   Thanks again.  Kelly"; correct?

20   A.    Correct.

21   Q.    And so this e-mail response was the same day, June 28th of

22   2018; correct?

23   A.    Correct.

24   Q.    The same date that you sent the proposed budget?

25   A.    Correct.

1   Q.   And so when you used the word "approved", what did you

2   mean, "approved budget"?

3   A.   That I had worked with the PI, we had come to an agreement

4   that the items listed in the budget were appropriate for the

5   research that is being proposed and that in this particular

6   case, because we had a course buyout, that it had been

7   approved.

8   Q.   And so your use of the term "approved" didn't mean to

9   signify that the contract between Fuzhou and KU had been

10  finalized?

11  A.   No.

12  Q.   And so that exchange occurs June 28th of 2018.  I want to

13  show you again Government's Exhibit 211.  We talked about that

14  earlier as the e-mail that the defendant says -- sends to Aaron

15  Crim saying that the contract had not been approved.  Do you

16  remember that e-mail, 211?

17  A.   Yes.

18  Q.   Okay.  I want to direct your attention to earlier parts of

19  that e-mail, and specifically an e-mail exchange on June 28th

20  between Kelly Mason and that e-mail address we talked about

21  earlier that was fzu.edu.cn.  And Ms. Mason sends an e-mail to

22  that address copying the defendant and says, "Dear

23  Doctor Jiang, thank you for sending us the contract for Doctor

24  Franklin (Feng) Tao's work on the proposed project.  I'm

25  attaching a version of the contract with our comments and

19-20052    USA v. Feng (Franklin) Tao    03.24.22                  629

1    request for changes marked.  Please review and let me know if

2    you approve.  If you have -- if you have any questions or

3    concerns, I'm happy to explain or discuss further.  We

4    appreciate your support for Doctor Tao's work and we look

5    forward to collaborating with you."

6         And so that was sent on June 28th, the same day that you

7    sent the proposed budget to Ms. Mason; correct?

8    A.   Correct.

9    Q.   And so she then forwarded that proposed budget on to this

10   person at Fuzhou University --

11   A.   I would make that --

12   Q.   -- if you know?

13   A.   Pardon?

14   Q.   Do you know whether or not she sent that on?

15   A.   I cannot speak to whether or not that is correct.

16   Q.   Okay.  It does appear from that that she sent a version of

17   a contract that appears to be in the midst of negotiation.

18   Would you agree with that based on the context?

19   A.   I would agree with that.

20   Q.   So then that's June 28th.  July 18th -- or, excuse me,

21   July 19th, 2018, Ms. Mason sends another e-mail, "Dear

22   Doctor Jiang, I am following up on the attached agreement.  Any

23   information you can give me on the status will be appreciated."

24        In August she sends another e-mail, "Dear Doctor Jiang, I'm

25   following up on the attached agreement.  Please let me know its

19-20052     USA v. Feng (Franklin) Tao     03.24.22          630

1     status and if you need anything further from here, I would be

2     happy to provide it."

3          And then August 13th, 2018, the defendant sends an e-mail

4     to Kelly Mason, cc'ing the fuzhou.edu.cn, "Dear Kelly, Doctor

5     Jiang noted me that he would send us a signed contract at the

6     end of August or early September.  Currently their research

7     office is closed during the summertime."

8          Ms. Mason responds that same day, "Franklin, thank you for

9     the information.  I appreciate it.  I'll make a note that we

10    should expect the contract back when their offices reopen at

11    the end of the summer."

12         And then in November -- on November 9th, 2018, Aaron Crim

13    with contract negotiations sends an e-mail to the defendant,

14    "Hi, Doctor Tao.  We haven't heard anything more about this.

15    Do you know the status of the agreement and the MTA?  Thanks,

16    Aaron."

17         And that's when the defendant responds that, "There were a

18    few competitors for the funds and I was not successful."  Did I

19    read that correctly?

20    A.  Yes.  Excuse me, yes.

21              MR. OAKLEY:  No further questions, Your Honor.

22              THE COURT:  Any further questions?

23              MR. DEARINGTON:  Yes, Your Honor, just a couple.

24                         RECROSS EXAMINATION

25    BY MR. DEARINGTON:

1    Q.    So, Ms. Wittman, fair to say about one in five proposed

2    funding sources actually are awarded at KU?

3    A.    I -- that would be a roundabout guess.  I haven't heard the

4    specific percentages of funding.

5    Q.    Okay.  We've heard testimony from a KU employee that if

6    funds don't come through on a buyout and there's other

7    available funding from a grant, that can be used for a buyout.

8    Do you agree with that?

9    A.    I do not have any knowledge on that.

10    Q.    So you're not aware one way or the other?

11    A.    Not of that procedure, no.

12          MR. DEARINGTON:  No further questions.  Thank you, Ms.

13    Wittman.

14          THE COURT:  All right.  May Ms. Wittman be excused?

15          MR. OAKLEY:  Yes, Your Honor.

16          THE COURT:  All right.  You're excused.  Thank you.

17          You can call your next witness.

18          MR. OAKLEY:  Your Honor, the United States calls

19    Evelyn Haaheim.

20          THE COURT:  I'm sorry, who?

21          MR. OAKLEY:  Evelyn Haaheim, H-A-A-H-E-I-M.

22                      EVELYN LOUISE HAAHEIM,

23    called as a witness on behalf of the Government, having first

24    been duly sworn, testified as follows:

25                      DIRECT EXAMINATION

```
1    BY MR. OAKLEY:
2    Q.  Could you please state and spell your name for the record?
3    A.  Yes.  My name is Evelyn Louise Haaheim.  It's spelled
4    E-V-E-L-Y-N.  L-O-U-I-S-E.  H-A-A-H-E-I-M.
5    Q.  And what state do you currently reside in?
6    A.  I reside in Arizona.
7    Q.  And were you ever employed at the University of Kansas?
8    A.  Yes.
9    Q.  When did you work at KU?
10   A.  Between 2005 and the fall of 2018.  2018.
11   Q.  And did you ever work at the KU Center for Research?
12   A.  Yes.
13   Q.  When did you work at the KU Center for Research?
14   A.  Let's see, I think it was between 2016 and the time I left
15   KU, so...
16   Q.  So from 2016 to 2018?
17   A.  Yes.
18   Q.  What did you do for the Center for Research?
19   A.  I was a research administrator in the central sponsored
20   projects office doing pre-award.
21   Q.  And was your title research administrator or -- if you
22   recall?
23   A.  You know, the titles vary depending on what office you're
24   in, so I think I was called a research specialist at that time.
25   Q.  Okay.  What did you do in 2016 to 2018?  Just generally
```

1    describe your job duties as a grant specialist or research

2    specialist with KU Center for Research.

3    A.   I helped prepare grants for submission to various agencies.

4    Q.   Did you ever work with -- well, do you know what a PI

5    stands for?

6    A.   Sure, principal investigator.

7    Q.   Did you ever work for a -- work with a PI at the University

8    of Kansas by the name of Franklin Tao?

9    A.   Yes.

10   Q.   And do you know how many projects you worked with Doctor

11   Tao on?

12   A.   If I had -- it's -- I'm not exactly sure.  I would guess

13   two, maybe three.

14   Q.   And during the time that you -- the two years that you

15   worked, 2016-2018, doctor -- you worked with Doctor Tao on two

16   or three.  Were those all of his projects or was there a team

17   of people at the Center for Research that would work?

18   A.   They were projects where he was the single PI.  I don't

19   think I did any group projects with him.

20   Q.   Do you know if that was all of Doctor Tao's projects, the

21   two or three that you worked on, or is it possible other people

22   in the office also assisted on some different projects?

23   A.   It's possible that there were other projects being worked

24   on by others on the team, yeah.

25   Q.   Have you ever met Doctor Tao in person?

19-20052    USA v. Feng (Franklin) Tao    03.24.22        634

1    A.    No.

2    Q.    And how would you communicate with Doctor Tao during the

3    time that you worked in the Center for Research?

4    A.    Almost completely by e-mail.  I had maybe one or two short

5    phone conversations with him, but it was almost entirely

6    e-mail.

7    Q.    Did you work -- one of the two or three projects that you

8    worked with Doctor Tao, was it a Department of Energy grant, if

9    you recall?

10    A.    I can't recall.  Our volume of work is so high, I am not

11    sure what -- now it -- looking back at 2016 through '18, I

12    really can't remember what they were.

13    Q.    I want to show you an e-mail that's been admitted into

14    evidence as Government's Exhibit 193.  And if we could direct

15    your attention to the top portion of that e-mail.

16    A.    Okay.

17    Q.    And this appears to be an e-mail from the defendant to a

18    Viviane Schwartz?

19    A.    Uh-huh.

20    Q.    And do you see who was cc'd in this particular e-mail?

21    A.    Yes.  Yes, that's me.

22    Q.    And does this refresh your recollection as far as whether

23    or not one of the projects that you assisted Doctor Tao with

24    was a Department of --

25    A.    It must've been.  I don't -- I actually don't remember this

1    particular project, but I see here, yeah.

2    Q.   Okay.  And so do you see in the e-mail Doctor Tao sends an

3    e-mail to a Doctor Schwartz, "The attached are the C&Ps of

4    De-en and I, the changed budget, the budget justification, the

5    abstract in pdf and the abstract in Word format."  And then,

6    "Evelyn of our research office has submitted the revised budget

7    from their linkage as well.  I copy this e-mail" --

8              THE COURT:  Slow down.

9              MR. OAKLEY:  I'm sorry, Your Honor.

10   BY MR. OAKLEY:

11   Q.   -- "I copy this e-mail to her."

12        And so directing your attention to the top part, there were

13   attachments to this e-mail; correct?

14   A.   Yes, I see the attachments.

15   Q.   Could we please show what's been admitted as Government's

16   Exhibit 194?

17        And this shows document Current and Pending Support

18   Franklin (Feng) Tao.  And then do you see in the middle it

19   says, Investigator Franklin (Feng) Tao and co-PI De-en Jiang?

20   Does this appear to be one of the attachments to that

21   particular e-mail that was Government's Exhibit 193?

22   A.   Yes.

23   Q.   When you were at KU did you have any involvement in course

24   buyouts?  Do you know what that means?

25   A.   I do know what that means.

1    Q.   What is a course buyout?

2    A.   A course buyout is a situation in which a PI expects to

3    have enough effort in research projects, funded research

4    projects, that they will not be able to meet their teaching

5    commitments.  And so the course buyout is a way for them to --

6    it enables their department to hire someone temporary to cover

7    their teaching assignment while they're on a particular

8    research project.

9    Q.   And the PI or the professor that has the particular

10   research project that needs the buyout, are they expected to

11   actually work on the project that is the source of the buyout?

12   A.   Yes.

13   Q.   I want to hand you an e-mail that's been marked as

14   Government's Exhibit 157.  Do you recall that e-mail?

15   A.   I don't recall it, but I see it here.

16   Q.   And is that an e-mail -- and the subject is re: Budget, and

17   the top part is an e-mail from Tao, Franklin Feng to Evelyn

18   Haaheim.  Do you recognize your e-mail address in that?

19   A.   Yes.

20   Q.   And do you recognize Doctor Tao's KU e-mail address in that

21   exhibit?

22   A.   Yes.

23   Q.   And this is dated July 13th, 2018?

24   A.   Yes.

25        MR. OAKLEY:  Your Honor, I'd offer Government's

19-20052    USA v. Feng (Franklin) Tao    03.24.22        637

1    Exhibit 157.

2              THE COURT:  Any objection?

3              MR. DEARINGTON:  No, Your Honor.

4              THE COURT:  157 admitted.

5    BY MR. OAKLEY:

6    Q.  And so this is a two-page exhibit, but it looks like the

7    second page is just carryover of the defendant's signature

8    line.  So I want to focus your attention to the message at the

9    bottom of the first page.

10             And is this an e-mail from the defendant to you on

11   July 13th and it says, "Dear Evelyn, the attached is a draft of

12   Excel.  There were a few things not confirmed.  Before I get

13   them confirmed, would you add the buyout of one course of

14   spring 2020 before hearing from chair?  The account is

15   13.5 percent of my nine-month salary plus fringes.  Please send

16   me one including the buyout if you would add.  I do prefer you

17   temporarily add the cost of a buyout course.  If I don't need

18   to buy out a course or chair does not approve, we can simply

19   use it for summer payment of 2020.  Look forward to your reply.

20   Thank you very much."  And then it says, "By the way, Doctor

21   Jiang has sent you his C&P.  All the best," and then it -- from

22   Doctor Tao?

23   A.  Yes.

24   Q.  And then the next section above it looks like it's your

25   response.  It appears that you sent the response that same day.

1    "Doctor Tao, here is the budget draft back with your academic

2    time added.  I also fixed the travel line so it's pulling from

3    the travel worksheet now.  Please don't hard key into the

4    travel lines anymore.  Thanks.  I can make any changes you

5    need."

6        So is this an example of exchange back and forth related to

7    a budget for a --

8  A.    Yes.

9  Q.    -- for a project?

10  A.    Yes.

11  Q.    And then at the top is Doctor Tao's reply the same date.

12  "Dear Evelyn, I just found you placed the amount of

13  13.5 percent of my nine-month salary plus fringes through the

14  first year.  I could use it to buy out a course in 2019 if I

15  could get approval from my chair to buy out a course in 2019.

16  If I could not buy out a course, I will use it as summer salary

17  or a post-doc."

18        And then it says, "Please replace my summer of the second

19  year to the amount of 13.5 percent of my nine-month salary plus

20  fringes for the second year.  I will use it to buy a course if

21  I could buy, otherwise I will use it as my summer salary or --

22  or salary of a post-doc."

23        And then finally it says, "In addition, please increase or

24  decrease the dollar of consumable so that the total is exactly

25  $400,000.  Thank you very much."

1        Did I read that correctly?

2   A.  Yes.

3              MR. OAKLEY:  Your Honor, I have no further questions.

4                        CROSS EXAMINATION

5   BY MR. DEARINGTON:

6   Q.  Good afternoon, Ms. Haaheim.  How many times did you meet

7   with Special Agent Lampe prior to Doctor Tao's indictment in

8   August 2019?

9   A.  Never.

10  Q.  Never?

11  A.  Never.

12  Q.  When was the first time you met with Special Agent Lampe?

13  A.  We had a Zoom meeting.

14  Q.  A Zoom meeting.  And when did that occur?

15  A.  Before -- it was a prep for this testimony.

16  Q.  Do you recall the date?

17  A.  No.

18  Q.  Was it within the last week?

19  A.  It was within the last month.

20  Q.  Within the last month, okay.

21      And Special Agent Lampe, how many times would you say he

22  gave you phone calls prior to Doctor Tao's indictment in August

23  '19 to ask you some of the questions like what Mr. Oakley just

24  asked you?

25  A.  Never.

1   Q.  Never?  And how many times did he e-mail you prior to

2   Doctor Tao's indictment in August 2019 to ask you questions

3   about the propriety of some of the documents you've reviewed?

4   A.  Never.

5   Q.  So today -- as of today, how many e-mails have you

6   exchanged with Special Agent Lampe about this case?

7   A.  Maybe between three and five.

8   Q.  And were all of those about scheduling your Zoom interview

9   and your testimony?

10  A.  Yes.

11  Q.  I just want to walk you through the lead-up to what is

12  marked as Exhibit 193.  And as a reminder --

13          MR. DEARINGTON:  Bonnie, do you mind if we use that

14  for a second?

15          COURTROOM DEPUTY:  Sure.

16  BY MR. DEARINGTON:

17  Q.  As a reminder, this is the e-mail from Doctor Tao to Ms.

18  Schwartz that copies you; correct?

19  A.  Yes.

20  Q.  And provides current and pending support.

21      Nothing improper about Doctor Tao submitting current and

22  pending support directly to the Department of Energy; correct?

23  A.  No.

24  Q.  Okay.  Do you recall directing Doctor Tao to e-mail Ms.

25  Schwartz his current and pending support directly?

1    A.  No.

2    Q.  I'd like to show you an e-mail from July 16th, 2018, and

3    see if that refreshes your recollection.

4            MR. DEARINGTON:  May I approach, Your Honor?

5            THE COURT:  Yes.

6    BY MR. DEARINGTON:

7    Q.  Please don't read the e-mail out loud.  If you could review

8    it and look up when you're finished reviewing and I'll ask you

9    if it has refreshed your recollection.

10   A.  (Reads document).  I did direct him to do so.

11           THE COURT:  Yes?

12           MR. OAKLEY:  Your Honor, can I just take a look at

13   what Mr. Dearington is showing the witness?

14           THE COURT:  Sure.

15   BY MR. DEARINGTON:

16   Q.  And prior to when you directed Doctor Tao to submit his

17   current and pending support to Ms. Schwartz, do you recall

18   advising him not to submit it to Doctor Schwartz until review

19   is complete and the materials are approved to submit?

20   A.  I don't recall.

21   Q.  Okay.  I'm going to again -- just going to show you the

22   e-mail and see if this refreshes your recollection.  I've

23   highlighted some passages that might be of help.  And if I

24   could just focus on the first page.  I don't --

25   A.  Uh-huh.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    642

1    Q.  I think that might be a copy of the e-mail behind, I just

2    don't want to confuse.

3    A.  Uh-huh.  Yes, it says, "Please don't do that" --

4    Q.  Ms. Haaheim, I'm sorry.  I just would like if you could

5    review it and then look up when you're done and I will ask you

6    the question again.

7    A.  Okay.

8    Q.  Sorry to cut you off.

9    A.  (Reads document).

10   Q.  Thank you.  So now do you recall advising Doctor Tao not to

11   submit the current and pending support to Doctor Schwartz until

12   it's been reviewed by your office?

13   A.  I certainly did read that in that e-mail, but...

14   Q.  I'm sorry, I guess does it refresh your recollection as to

15   whether you advised him accordingly?

16   A.  I certainly -- it certainly does say that I advised him to

17   do that.

18   Q.  Do you have any reason to doubt that you advised Doctor Tao

19   to wait to submit current and pending support until you

20   reviewed it?

21   A.  No, I do not.

22   Q.  And do you recall then as we looked at in another -- as I

23   asked you previously, directing Doctor Tao to submit his

24   current and pending support to the Department of Energy?

25   A.  Yes.

19-20052    USA v. Feng (Franklin) Tao    03.24.22                    643

1    Q.  And then Doctor Tao at your direction submitted his current

2    and pending support to the Department of Energy; correct?

3    A.  I see the subsequent e-mail in which he did so.

4    Q.  I just have one more question I think for you, Ms. Haaheim.

5         So if your office was aware of a pending proposal at the

6    time of this e-mail, your office would've probably wanted to

7    include the pending proposal as current and pending support;

8    correct?

9    A.  Can you rephrase the question?

10   Q.  Sure.  So let's say in a hypothetical the University of

11   Kansas was in negotiations to receive funding from another

12   university at the time Doctor Tao submitted this e-mail to DOE

13   and your office was aware of it, would your office have likely

14   ensured that that was listed as current and pending support?

15   A.  Yes.

16   Q.  And if it didn't do so, would that be a paperwork error of

17   your office?

18   A.  We would -- it is very unlikely that we would've submitted

19   something that was incorrect.  We would've checked it.

20        MR. DEARINGTON:  Thank you, Ms. Haaheim.  No further

21   questions.

22                      REDIRECT EXAMINATION

23   BY MR. OAKLEY:

24   Q.  Whose responsibility is it to make sure that the current

25   and pending is as accurate as it can be?

```
1    A.   It is a joint responsibility between the sponsored
2    project's office and the preparer and the PI.
3              MR. OAKLEY:   Thank you.
4              THE COURT:   Any further questions?  Any further
5    questions?
6              MR. DEARINGTON:   No, Your Honor.
7              THE COURT:   All right.  May this witness be excused?
8              MR. OAKLEY:   Yes, Your Honor.
9              THE COURT:   All right.  You're excused.  Thank you.
10             THE WITNESS:   Thank you.
11             THE COURT:   Call your next witness.
12             MR. OAKLEY:   The United States calls Kelly Mason.
13                          KELLY MASON,
14   called as a witness on behalf of the Government, having first
15   been duly sworn, testified as follows:
16                       DIRECT EXAMINATION
17   BY MR. OAKLEY:
18   Q.   Ma'am, could you please state and spell your name for the
19   record?
20   A.   Sure.  Kelly Mason.  Kelly, K-E-L-L-Y.  Mason, M-A-S-O-N.
21   Q.   Could I talk you into pulling that microphone up to you
22   close?
23   A.   Yeah.
24             THE COURT:   It will bend down as well, it bends up and
25   down.  There you go.
```

```
1          THE WITNESS:  Thanks.
2   BY MR. OAKLEY:
3   Q.  And, Ms. Mason, where are you currently employed?
4   A.  The Kansas University Medical Center.
5   Q.  How long have you been employed with KU Med?
6   A.  Since January 18th of this year.
7   Q.  And have you ever been employed with the University of
8   Kansas as a research contract officer?
9   A.  Yes.
10  Q.  And when were you employed as a research contract officer?
11  A.  June of 2017 to September of 2018.
12  Q.  And your employment as a research contract officer, were
13  you part of the Center for Research at KU?
14  A.  Yes.
15  Q.  And what were the responsibilities that you had as a
16  research contract officer?
17  A.  My job was to review, negotiate, finalize, and obtain
18  signature for contracts related to research projects,
19  particularly funded research projects at the university.
20  Q.  So typically when you got involved, the project was funded?
21  A.  Usually, yes.
22  Q.  Did you ever work with a professor or a PI by the name of
23  Franklin Tao?
24  A.  Yes.
25  Q.  And did you -- how did you communicate with Franklin Tao?
```

1    Was it in person or was it through some other means?

2    A.    By e-mail to the best of my recollection, just by e-mail.

3    Q.    I'm going to show you what's been admitted into evidence as

4    Government's Exhibit 148.

5        Directing your attention to the top of that e-mail, does it

6    appear that you were cc'd by Bradley Bernet on an e-mail to

7    Franklin Tao along with Kelly Mason?

8    A.    Do you mean along with Kim Wittman?

9    Q.    Along with Kim Wittman.

10    A.    Yes.

11    Q.    You're Kelly Mason.

12    A.    I'm Kelly Mason, yes.  Yes, I was cc'd.

13    Q.    And along with that e-mail was an attachment, Subaward

14    contract (FZU).  Could we please see Government's Exhibit 149,

15    please?

16        So what was your involvement, if any, in the draft and the

17    negotiation of this contract between KU and Fuzhou University?

18    A.    So, again, this is four years ago so I'm going off the best

19    of my recollection, but it looks like -- and if I remember

20    correctly, the University of Fuzhou drafted it, sent us a

21    draft, and my role would've been to review it to make sure that

22    we could actually agree with the terms and conditions in the

23    contract, to make sure that the appropriate offices at KU and

24    in the Center for Research were cognizant of the relationship

25    and arrangement and to negotiate the contract with the other

1    university and finalize it.

2    Q.  And so in your employment on behalf of the University of

3    Kansas, whose interests are you looking out for, if any?

4    A.  Mostly the university's interests to make sure that we

5    understand our obligations and can actually carry out those

6    obligations, but also secondarily our own researchers and their

7    interests to make sure that they too understand what they're

8    obligated to do and can actually do it and can -- and

9    understand what they're doing.

10   Q.  Do you know whether or not -- well, let me back up.

11       I want to show you what's been marked as Government's

12   Exhibit 152 and ask you if you recognize that e-mail.

13   A.  Yes.

14   Q.  And is Government's Exhibit 152 an e-mail related to that

15   proposed subcontract?

16   A.  Without seeing what was actually attached, I can assume

17   that it was the same contract because I don't know of any

18   other.  So I'm assuming that is the case because it's the same

19   university and they're talking about basically the same work,

20   but without the attachment I can't be absolutely certain.

21   Q.  Okay.

22       MR. OAKLEY:  Your Honor, I would offer Government's

23   Exhibit 152.

24       THE COURT:  Any objection?

25       MR. DEARINGTON:  No, Your Honor.

1    THE COURT:  152 is admitted.

2    BY MR. OAKLEY:

3    Q.   And so this is an e-mail exchange and there's a series of

4    back and forth in this; is that correct?

5    A.   Uh-huh, right.

6    Q.   So let me direct your attention to the last page, which

7    would be the first e-mail in this exchange.

8    A.   Uh-huh.

9    Q.   And this is an e-mail -- do you recognize who it's from?

10   A.   That's from me.

11   Q.   And who's it to?

12   A.   To KU export control.

13   Q.   And in an e-mail to KU export control on May 21st, 2018,

14   you state, "Hello, I am forwarding the attached contract for

15   your review which was sent to us from Fuzhou University in

16   connection with a project award whose PI is Doctor Feng

17   (Franklin) Tao.  We have a few details of the project itself

18   since the statement of work and budget must still be submitted

19   to and approved by KUCR's pre-award team."

20       Now, was this an unusual situation based on your experience

21   at the university?

22            MR. DEARINGTON:  Objection, leading.

23            THE COURT:  Overruled.

24            THE WITNESS:  It's unusual but not unheard of.

25   Normally the reason we call the pre-award team the pre-award

19-20052    USA v. Feng (Franklin) Tao    03.24.22                    649

1   team because they're the first people to work on a project

2   because normally what happens is that a budget is prepared, a

3   statement of work is reviewed, various compliance issues are

4   checked into and verified, and only after the project is funded

5   do we get a contract.  That is the typical way that it happens,

6   but it's not unheard of that it happens the other way around.

7   BY MR. OAKLEY:

8   Q.  Okay.  And in this particular case were the things that you

9   talked about as far as checking any issues, working on the

10  award, going along at the same time as you were reviewing the

11  proposed contract --

12  A.  Right.

13  Q.  -- and doing what it is that you needed to do?

14  A.  Right.  That's correct.

15  Q.  Okay.  And so you send this e-mail to KU export control

16  office?

17  A.  Yes.

18  Q.  And why?

19  A.  Because it had to do with an international organization

20  that is not an American organization, and that's our normal

21  process in those cases.

22  Q.  Okay.  And so the next e-mail in the change -- excuse me,

23  in the chain is, "Hello.  To follow up on the message below, I

24  am attaching an additional version of the agreement which has

25  now been reviewed and edited by both the PI and contract

19-20052    USA v. Feng (Franklin) Tao    03.24.22    650

1    negotiations."

2        When you say PI, are you referring to Franklin Tao?

3    A.   Yes.

4    Q.   And you say contract negotiations, is that you or someone

5    else?

6    A.   That would be me and my team, my group that I was in at the

7    time.

8    Q.   Okay.  "And the new version has all of these changes

9    incorporated and Doctor Tao has requested me to send it to you.

10   As soon as Doctor Tao has consulted with you and we are free to

11   proceed with the contract, I'll send Fuzhou University a

12   version that shows our changes tracked.  They can then review

13   and respond."

14       Is that part -- so the -- when you send this to export

15   control, they're -- negotiations are continuing?

16   A.   Well --

17   Q.   Well, KU's review has started at this point; correct?

18   A.   KU's review has started, but we have not sent anything to

19   the other university yet because we're waiting for export

20   control to review it first.

21   Q.   Okay.  But it looks like as part of that internal review,

22   some changes were made and so you're just sending export

23   control a change with --

24   A.   Yes.

25   Q.   -- a version with the updates?

1   A.  Yes.

2   Q.  And so the next exchange -- the next part of this e-mail

3   exchange is from the defendant on May 23rd to you, to KU export

4   control office, and it says, "Dear colleague at export control

5   office, please review the contract of a subaward from one

6   university of China.  Please note us if there is something not

7   in line with your vision or policy.  Thank you very much."

8       And then above that we see a response from KU export

9   control office on May 25th?

10  A.  Uh-huh.

11  Q.  And if we could scroll to the bottom of that e-mail, does

12  this appear to come from a Matthew Battiston?

13  A.  Yes.

14  Q.  And in that portion of the e-mail, does it look like there

15  are a number of questions and then there is a part that is --

16  is in bold?

17  A.  Yes.

18  Q.  And it says before the bold portion, "Franklin reply."

19      So if we scroll up to the very top of the -- of the part

20  just above that, and it says -- so Doctor Tao says, "Dear

21  Matthew, thank you very much for reviewing it.  Please see my

22  imbedded answers for your questions."

23      Does it appear that what Doctor Tao did was respond to

24  Battiston's questions by the bold portion and so his response

25  to the questions are included -- he included -- he scrolled

1    down to the -- to Battiston's questions and then he included

2    them and we can tell it's what he included because he also put

3    "Franklin reply"?

4    A.   Yes.

5    Q.   And so Battiston says, "Franklin, I hope you are well.  We

6    have begun our export control review of your contract with

7    Fuzhou University, FU.  There are a few initial questions.

8    Will the catalysis be shipped from FU to KU?"

9        And then it's "Franklin reply.  Some of the catalysts need

10   to be shipped from FU to KU.  Some of them will be prepared by

11   my group with their methods."

12       And then, "If yes, how will the items be shipped to KU?"

13       And the defendant's reply was, "UPS or DHL is the typical

14   method to ship.  Each sample is only a couple of grams."

15       "Have you coordinated with EH&S for shipping?"

16       And the reply, "Each sample is only a couple grams.  FU

17   will permit of shipping through UPS or DHL.  I received a

18   couple samples from one collaborator from Germany.  They sent

19   it through UPS.  UPS call me when the samples were delivered to

20   U.S.A. and they asked me to fill out a form so they could

21   release the package."

22       And then, "For the catalysts of the subaward, would you

23   provide the contact information of KUCTC?  I can find it

24   probably through online."

25       And then the next question was, "Do you have a detailed

1    description of the catalysts so we may determine if they are

2    export controlled?"

3         And the defendant's reply, "They are catalysts designed

4    with a potential to use for synthesis of ammonia."  And then a

5    parenthesis, and then, "The catalysts will be Ru metal

6    particles supported on silica or alumina."

7         And then there's a question about the value of the items

8    which the defendant answers.  And then the last -- under e --

9              MR. DEARINGTON:  Objection, relevance.  We're talking

10   about export control.  This isn't an export control case, Your

11   Honor.

12             THE COURT:  What's the relevance?

13             MR. OAKLEY:  Your Honor, in this e-mail the defendant

14   describes what was going to occur under the terms of that

15   proposed subcontract that was never entered into.  So this is

16   offered to show the jury a description in the defendant's own

17   words of what was proposed.

18             THE COURT:  All right.  So the exhibit is admitted;

19   correct?

20             MR. OAKLEY:  Yes, Your Honor.

21             THE COURT:  All right.  Well, I think it speaks for

22   itself.  If you want to target -- you know, point to something

23   specific about the steps in the contract outside of the export

24   control process, because I don't think that's really at issue,

25   you can do that.

1        MR. OAKLEY:  Thank you.  I will, Your Honor.  Thank

2    you.

3    BY MR. OAKLEY:

4    Q.   So according to the defendant's e-mail to Mr. Battiston at

5    export control, the plan, if the contract would've actually

6    come to fruition, catalysts from Fuzhou University would've

7    been shipped to KU so that the defendant could look at those

8    catalysts at KU; correct?

9    A.   Yes.

10   Q.   And that's assuming that the contract was ever entered

11   into?

12   A.   Yes.

13   Q.   Do you know if the contract was ever entered into?

14   A.   No, I don't know that.

15        MR. OAKLEY:  Can we please show what's been admitted

16   as Government's Exhibit 211?

17   BY MR. OAKLEY:

18   Q.   At what point did you leave the KU Center for Research and

19   go to work for KU Med Center?

20   A.   I left mid-September 2018.

21   Q.   Do you know somebody by the name of Aaron Crim?

22   A.   Yes.

23   Q.   Who is Aaron Crim?

24   A.   He was another research contract officer in the same group.

25   Q.   Do you know if after you left the Center for Research to go

1    to KU Med, did Mr. Crim take over this draft of this proposal?

2    A.  I don't know for sure.  I would -- whatever I had left and

3    done would've been portioned out amongst the other people

4    there, so...

5    Q.  Directing your attention to this portion of Government's

6    Exhibit 211, on November 9th, 2018, Mr. Crim sends an e-mail to

7    the defendant, "Hi, Doctor Tao.  We haven't heard anything more

8    about this.  Do you know the status of the agreement and the

9    MTA?"

10        And the defendant responds that, "There were a few

11   competitors for that fund.  I was not successful."

12        Does this indicate that that subcontract was never entered

13   into?

14   A.  Yes.

15        MR. OAKLEY:  I have no further questions, Your Honor.

16        THE COURT:  Any cross examination?

17                    CROSS EXAMINATION

18   BY MR. DEARINGTON:

19   Q.  Good afternoon, Ms. Mason.

20   A.  Good afternoon.

21   Q.  So I'm going to cut to the chase here.  I gather that the

22   first time you heard of Special Agent Lampe was about a month

23   ago when he sent you a few e-mails to set up a Zoom

24   conversation.  You had a Zoom conversation with him to talk

25   about your testimony here today, and you had never heard of

1   Special Agent Lampe for the two years prior; fair?

2   A.   He had actually sent me an e-mail when the trial was

3   scheduled for an earlier date, so back before that, but the

4   same -- the rest of that is accurate.

5   Q.   I stand corrected.  Thank you, Ms. Mason.

6        Sound right that about one in five funding sources actually

7   come through and result in an award at KU?

8   A.   To the best of my recollection and in my experience, that's

9   accurate.

10  Q.   Okay.  And we heard testimony that if the funds don't come

11  through on a proposal for a buyout, you can potentially use

12  other grant funds that are available to fund the buyout; is

13  that your understanding?

14  A.   I can't really speak to that because that wasn't under my

15  purview.

16  Q.   Do you agree that there's a shared responsibility between

17  the KU research office and the PI to make sure that everything

18  is correct that's going to the agencies?

19  A.   Yes.

20  Q.   And if someone from your office saw an inconsistency

21  between what is being submitted and the information within the

22  possession of the office, they would've wanted to flag that and

23  correct it; correct?

24  A.   Yes.

25  Q.   And part of the reason is because your office is -- deals

1    with -- your former office deals with research administration,

2    and Doctor Tao and other researchers are experts in science and

3    their course of work; is that correct?

4    A.   Yes.

5    Q.   And your former office would want to protect someone like

6    Doctor Tao to make sure he's not running afoul of requirements

7    if it could do so; correct?

8    A.   Yes.

9    Q.   Mr. Oakley showed you an Exhibit 211 a moment ago with an

10   Aaron Crim on it.  You weren't on that e-mail, were you?

11   A.   I don't remember, but probably not because I wasn't at KU

12   anymore.

13   Q.   And, sorry, I should say on the top level e-mail that he

14   asked you about.  Do you recall being on that e-mail?

15   A.   I don't know.

16   Q.   I can show you.

17        MR. DEARINGTON:  Sorry, Bonnie.  Do you mind if I use

18   the ELMO just very quickly?

19   BY MR. DEARINGTON:

20   Q.   Was this the e-mail Mr. Oakley asked you about?

21   A.   Yes.

22   Q.   And had you ever even seen this e-mail before?

23   A.   Not before we discussed it during trial prep.

24   Q.   Oh, you discussed this e-mail in trial prep?

25   A.   Yes.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    658

1    Q.   Did you discuss other e-mails in trial prep?

2    A.   Yes.

3    Q.   And did you discuss your testimony in trial prep and what

4    it would look like?

5    A.   We discussed what questions he would ask me and he showed

6    me the exhibits that I would have to look at.

7    Q.   And did you go over your answers during trial prep?

8    A.   I'm not sure what you mean "go over."

9    Q.   Did you discuss what your answers might be during trial

10   prep?

11   A.   Well, I answered the questions for him.  And if he didn't

12   understand the answer, he would tell me and then I would try to

13   explain.

14   Q.   Okay.

15            MR. DEARINGTON:  No further questions.  Thank you.

16            THE COURT:  Any further redirect?

17            MR. OAKLEY:  Just briefly, Your Honor.

18                       REDIRECT EXAMINATION

19   BY MR. OAKLEY:

20   Q.   So you and I got together on a Zoom meeting that Special

21   Agent Lampe was also --

22   A.   Right.

23   Q.   -- observing; correct?

24   A.   Yes.

25   Q.   And during this Zoom meeting you had received a subpoena to

1    appear to testify in court?

2    A.  Yes.

3    Q.  And you and I started off and I told you that the goal was

4    to make you comfortable when you testify so that you knew the

5    types of questions that I was going to ask you, is that --

6              MR. DEARINGTON:  Objection, leading.

7              THE COURT:  Overruled.

8    BY MR. OAKLEY:

9    Q.  Is that accurate?

10   A.  That's accurate.

11   Q.  Did I ever tell you what to say as you sit here in the

12   courtroom -- on the witness stand in this courtroom?

13   A.  No.

14   Q.  Did I ever tell you -- did I ever give you information to

15   say to this jury?

16   A.  No.

17   Q.  I showed you the exhibits that I wanted to talk to you

18   about; correct?

19   A.  Yes.

20             MR. OAKLEY:  No further questions.

21             THE COURT:  All right.  May this witness be excused?

22             MR. OAKLEY:  Yes, Your Honor.

23             MR. DEARINGTON:  Yes, Your Honor.

24             THE COURT:  All right.  You're excused.  Thank you.

25             Call your next witness.

1        MR. OAKLEY:  Your Honor, the United States calls

2   Matthew Battiston.

3        MR. DEARINGTON:  Your Honor, may we approach the

4   bench?

5        THE COURT:  Yes.

6        (Proceedings had at the bench, outside the hearing of

7   open court).

8        MR. DEARINGTON:  Your Honor, our understanding is that

9   Mr. Battiston is an export control person who's testifying

10  about the very same export control e-mail we just looked at.

11  That's not relevant.  We'd ask that if we're just going to go

12  through this testimony, we ask that he not be called to save

13  time.

14       MR. OAKLEY:  I was simply going to ask Mr. Battiston

15  if in the e-mail that he based his opinion on what the

16  defendant said and that the defendant summarized the terms of

17  the proposed contract, instead of having the jury read through

18  the contract.

19       THE COURT:  You can call him.  I mean, the defendant's

20  knowledge of how this works is clearly an issue in this case.

21  So overruled.

22       MR. DEARINGTON:  Even the -- I mean, I'm going to

23  object in any event, but -- to the export control aspects.

24       THE COURT:  Well, what I heard Mr. Oakley say is he

25  was going to ask him about the steps of the contract, not

1    necessarily specific to export control, although clearly that

2    was part of the review for this proposed contract.

3          Are you going to go beyond asking him questions about

4    the export control process?

5          MR. OAKLEY:  I will ask him what he does.  He works

6    with export control and he reviews things to see if there's any

7    issues; that he was assigned to this project; that he looked at

8    the answers to the e-mail that are imbedded.  And based upon

9    the description of the subaward as provided by the defendant,

10   he determined there was no issues.

11         THE COURT:  All right.  I think that's -- I think

12   that's proper.  I think that's proper because this e-mail does

13   include a number of statements by Doctor Tao designed to, I

14   guess, give KU information about the contract, proposed

15   contract.  Export control is part of that.

16         I do think it -- if you spend too much time on it, I'm

17   probably going to start sustaining contemporaneous objections

18   because I don't think the particulars of the export report

19   control process are important.  What is relevant is the

20   defendant's state of mind as to how the contract process of

21   approval proceeded, including this component of it.

22         MR. DEARINGTON:  Your Honor, just one more point.  I'd

23   like to make a continuing objection not only on 401 grounds but

24   on 403 grounds in light of the fact that this is a case

25   involving a defendant who is accused of doing work in China and

1    we're talking about export controls.  It gets very close to the

2    line of making some sort of national security implication

3    that's really not at issue here.

4         THE COURT:  I understand the continuing objection, and

5    it's so noted and I'm overruling it.  I do not think under a

6    403 analysis that prejudicial value -- or the prejudicial

7    effect outweighs the probative value and here's why:  It's

8    pretty obvious through the testimony and evidence presented

9    thus far that this university, like probably a lot of research

10   universities, considers itself a global scientific community.

11        I have heard nothing from any of these witnesses to

12   suggest the fact that Doctor Tao was negotiating with Fuzhou

13   University or any other foreign university, King Abdullah

14   University, was at all an issue.  This is normal stuff to them.

15   So I don't think, you know, they're leaving any impression that

16   there's any prejudice or anything wrong or illegal about the

17   fact that they're collaborating with -- anybody is

18   collaborating with other universities.

19        MR. DEARINGTON:  Thank you, Your Honor.

20      (The following proceedings continued in open court.)

21                    MATTHEW BATTISTON,

22   called as a witness on behalf of the Government, having first

23   been duly sworn, testified as follows:

24                    DIRECT EXAMINATION

25   BY MR. OAKLEY:

1   Q.   Sir, could you please state and spell your name for the

2   record?

3   A.   Sure.  Matthew Mario Battiston.  M-A-T-T-H-E-W.  M-A-R-I-O.

4   B-A-T-T-I-S-T-O-N.

5   Q.   And how are you employed?

6   A.   I'm the export control officer at the University of Kansas.

7   Q.   And as the export control officer at the University of

8   Kansas, is part of your responsibility to make sure that the

9   university complies with any export control rules, regulations,

10  and laws?

11  A.   That's correct.  I review all international transactions

12  for the economic sanctions as well as export control

13  regulations to ensure that there are no prohibitions or if we

14  have to seek some type of government authorization, we do that.

15  Q.   I want to show you what's been admitted into evidence as

16  Government's Exhibit 152.  It should appear on the screen in

17  front of you.

18       And so this is the latest in the -- in the e-mail exchange.

19  If we could scroll down, it looks -- well, I'm sorry, let's

20  stop there.

21       Do you recognize your signature line and your -- in this

22  particular e-mail?

23  A.   Yes, I do.

24  Q.   And then it's from an e-mail address e -- excuse me,

25  ueco@ku.edu.  Do you recognize that e-mail address?

1    A.  Yes, I do.

2    Q.  And how do you recognize that e-mail address?

3    A.  That's a shared e-mail box that our office uses that all --

4    all the members of our office at this time -- back in 2018 I

5    was the only one that had access to that e-mail address.

6    Q.  So you sent this e-mail?

7    A.  Yes.

8    Q.  If we could scroll down.  I want to direct your attention

9    to -- so on -- right there.  If we can scroll just a little bit

10   up.

11       It looks like on May 23rd Franklin Tao sends an e-mail to

12   Kelly Mason and to the KU export control office, which you said

13   would've been you at the time, and it says, "Please review the

14   contract of subaward from one university of China.  Please note

15   us if there's something not in line with your vision or policy.

16   Thank you very much."

17       And so you received that particular e-mail that was sent to

18   the export control office e-mail address?

19   A.  Yes, I did.

20   Q.  Could we continue to scroll up?

21       And then the next portion is an e-mail that says,

22   "Franklin, I hope you are well.  We have begun our export

23   control review of your contract with Fuzhou University.  There

24   are a few initial questions."

25       And then do you see where there's a series of questions and

1    then there's a bold part that says "Franklin reply"?

2    A.    Yes.

3    Q.    Now, did you draft the questions?

4    A.    Yes, I did.

5    Q.    And then let's scroll up a little bit to the next e-mail.

6    And Doctor Tao to you says, "Dear Matthew, thank you very much

7    for reviewing it.  Please see my imbedded answers for your

8    questions."

9        So if we scroll back down where it says "Franklin reply,"

10    that would've been -- the defendant imbedded his answers to the

11    questions that you had originally submitted to him?

12    A.    Yes.

13    Q.    And those answers to the questions, is it a summary of

14    information that he provided to you based on what was set to

15    occur under the proposed contract --

16    A.    Yes.

17    Q.    -- between KU and Fuzhou University?

18    A.    Yes.

19    Q.    And then if we scroll to the top, the last e-mail is the

20    one that we talked about that came from that e-mail address

21    that you had control over on May 29th, 2018.

22        "Franklin, I hope you are well.  Thank you for providing

23    the timely and detailed information.  There are no export

24    control issues for this collaboration with Fuzhou based on the

25    information provided."

1    And so you used the information provided by the defendant

2    as far as the description of what was going on --

3    A.   Yes.

4    Q.   -- correct?

5    A.   Yes.

6    Q.   Now, you're simply looking at it from that perspective.

7    Did you have any involvement in negotiating the contract or do

8    you know whether or not a contract was ever entered into?

9    A.   Well, the initial e-mail also had the contract or the

10   subaward, the contract, and then some of the changes that were

11   made.  That way we would review some of the export compliance

12   language that may be in there, if any, as well as some of the

13   deliverables that may be expected on that contract.

14   Q.   Okay.  So you saw some of the negotiation that -- in other

15   words, some of the changes?

16   A.   Well, just the final product.  Their initial, I guess,

17   award between Fuzhou and the University of Kansas and then the

18   one with the recommended changes, that helps us with our

19   review.

20   Q.   Okay.  So you're involved with that part, but you don't

21   know what happened after May 29th, 2018 with regards to that

22   proposed contract, do you?

23   A.   No.

24        MR. OAKLEY:  No further questions, Your Honor.

25                   CROSS EXAMINATION

1  BY MR. DEARINGTON:

2  Q.  Good afternoon, Mr. Battiston.

3  A.  Good afternoon.

4  Q.  When was your first interview with Special Agent Lampe?

5  A.  I believe the first one would've just been the preparation

6  for this, so like last fall, November.

7  Q.  Okay.  So if I represent to you that Doctor Tao was

8  indicted August 2019, you didn't meet with Special Agent Lampe

9  before that; correct?

10  A.  No.

11  Q.  Okay.  And in your e-mail that Mr. Oakley asked you

12  about -- well, I'll just read it to you and see if you still

13  agree with it.  Let me read from the third sentence.  "Due

14  diligence checks were completed without issue.  The items,

15  proposed research, and value do not trigger any export control

16  issues."

17      Does that mean that you conducted due diligence checks and

18  they were completed without issues and the items and the

19  proposed research and the value did not trigger any export

20  control issues?

21  A.  That's correct.

22      MR. DEARINGTON:  No further questions, Your Honor.

23      THE COURT:  All right.  May this witness be excused?

24      MR. OAKLEY:  Yes, Your Honor.

25      THE COURT:  Thank you.

 1                THE WITNESS:  Thank you.

 2                THE COURT:  Call your next witness.

 3                MR. OAKLEY:  The United States calls Jane Johns.

 4                          JANE JOHNS,

 5     called as a witness on behalf of the Government, having first

 6     been duly sworn, testified as follows:

 7                          DIRECT EXAMINATION

 8     BY MR. OAKLEY:

 9     Q.   Ma'am, would you please state and spell your name for the

10     record?

11     A.   My name is Jane Johns.  J-A-N-E.  J-O-H-N-S.

12     Q.   And how are you presently employed?

13     A.   I'm currently employed at the CEBC at KU.

14                THE COURT:  Why don't we move the microphone over a

15     little bit more right in front of her.  There we go.

16     BY MR. OAKLEY:

17     Q.   And you said the CEBC at KU?

18     A.   Right.

19     Q.   What is the CEBC?

20     A.   The CEBC is the Center for Environmentally Beneficial

21     Catalysis.  It's a -- it's one of the research centers of

22     excellence that was set up at KU under the Office of Research.

23     And it's a small administrative unit that applies for and

24     receives grant funding for sponsored research projects.

25     Q.   And you said that you're the business manager for the CEBC.

19-20052    USA v. Feng (Franklin) Tao    03.24.22    669

1    What are your job duties as the business manager?

2    A.  Most of it has to do with overseeing the individual budgets

3    for the sponsored research projects that CEBC administers.  We

4    also have some direct funding from the KU Center for Research

5    for our administrative responsibilities.  And then I also

6    perform kind of some general office duties in terms of ordering

7    supplies, making sure that invoices get paid, making sure that

8    the bill for the water cooler gets paid, you know, some routine

9    kinds of things like that.

10   Q.  Sure.  Do you know a KU professor by the name of Bala

11   Subramaniam?

12   A.  Subramaniam?  Yes, he's my boss.

13   Q.  He's your boss?

14   A.  Uh-huh.  He's the director of the CEBC.

15   Q.  Okay.  How long have you been at the CEBC?

16   A.  Six-and-a-half years.

17   Q.  What did you do prior to joining the CEBC?

18   A.  I worked at KU Medical Center for ten years at the center

19   of -- Center on Aging.  And there I worked with training grants

20   for projects for them.

21   Q.  So how long have you been employed with KU?

22   A.  So 16-and-a-half years.

23   Q.  Do you know someone by the name of Doctor Franklin Tao?

24   A.  Yes.

25   Q.  And how do you know Doctor Franklin Tao?

1    A.   He is one of the faculty who had research funding that was

2    being administered by the CEBC.

3    Q.   And do you see Doctor Tao in the courtroom here today?

4    A.   Yes.

5    Q.   And could you just point at him and describe what he's

6    wearing?

7    A.   He's over there.  I can't see him very well.  It looks like

8    he's got on a light blue shirt.  Oh, there he is.  Light blue

9    shirt with his suit.

10   Q.   Okay.  At some point -- well, let me back up.

11       Do you know -- are you familiar with something called a

12   course buyout?

13   A.   A little bit.  I had a case where I was notified that

14   Doctor Tao had requested a buyout from some teaching

15   responsibilities with chemical and petroleum engineering and I

16   wasn't made aware of it at the time that request was made or

17   while it was ongoing, but after the session for which he had

18   requested the buyout was over, I got a note from I think it was

19   chemical and petroleum engineering asking me what funding was

20   to be used to cover the buyout.  And that was the first I had

21   heard of it.

22   Q.   I want to hand you what's been marked as Government's

23   Exhibit 254.  Is that an e-mail?

24   A.   Uh-huh.

25   Q.   And are you familiar with that e-mail?

1    A.  Yes.

2          MR. OAKLEY:  Your Honor, I'd offer --

3    BY MR. OAKLEY:

4    Q.  Well, is that an e-mail related to the course buyout?

5    A.  Yes.

6          MR. OAKLEY:  Your Honor, I'd offer Government's

7    Exhibit 254.

8          THE COURT:  Any objection?

9          MR. DEARINGTON:  No objection, Your Honor.

10          THE COURT:  254 admitted.

11    BY MR. OAKLEY:

12    Q.  So directing your attention to that bottom part of that

13    e-mail, so this is an e-mail -- do you recognize the "from"

14    where it says Johns, Jane?

15    A.  Yep.

16    Q.  Was this an e-mail you sent?

17    A.  That's me.

18    Q.  And you sent this to Doctor Tao?

19    A.  Yes.

20    Q.  And you cc'd Tim Spencer?

21    A.  Yes.  Tim Spencer at the time was my grant coordinator in

22    our Shared Service Center.

23    Q.  And what was the subject of this e-mail?

24    A.  This was -- as I say here, that CPE had contacted me about

25    what funding was to be used to cover the course buyout.  And so

1    I sent a note to Franklin saying this is how much you need to

2    cover and I've reviewed your research projects and these are

3    the places where I see that you might have available funding to

4    cover this.

5    Q.   And you -- this was sent May 23rd of 2019?

6    A.   Yes.

7    Q.   You state that it was related to a -- a buyout for a course

8    for the spring semester.  Which spring semester?

9    A.   Spring of 2019.  So the semester that had just ended.

10   Q.   And did this cause you any concern?

11   A.   Some, because I hadn't been made aware of it at the time

12   that the course buyout was requested.  So I felt a little

13   caught off-guard to have to be cleaning this up after the fact.

14   Q.   Okay.  And so you said that in that e-mail you identify

15   three sources of funds --

16   A.   Uh-huh.

17   Q.   -- related for the course buyout?

18   A.   Right.

19   Q.   And why did you do that?  What's the significance of

20   identifying funds that were available?

21   A.   The buyout had to be paid with salary dollars.  And so I

22   looked at his available sources of funding and these three --

23   the career award listed here is an NSF award as well as the one

24   at the bottom, and the one in the middle is Department of

25   Energy.

1    And those are sponsored research projects where he still

2    had key salary, which is PI salary, available.  And so

3    basically I'm saying you need to use some of your key salary to

4    cover this, from what project or projects do you want to take

5    those salary dollars from?

6    Q.   And you said that a buyout is where a professor doesn't

7    have to teach a class for a particular semester to focus on

8    research?

9    A.   That's my understanding.

10   Q.   Okay.  And is it your understanding that the -- that the

11   money should come from the research project that the PI is

12   actually doing during the time of the course buyout?

13   A.   Not specifically or not necessarily.  The way the research

14   projects work or salary overall, faculty are generally paid

15   directly by the department that employs them.  In the case of

16   Franklin, it had originally been chemistry and chemical and

17   petroleum engineering.  At the time this occurred, he was only

18   employed by chemical and petroleum engineering.

19       And his academic department pays his full salary during the

20   fall and spring semesters.  And then to be paid anything at all

21   in the summer, he needs to provide self-funding in the way of

22   key salary off of sponsored projects or if they have other

23   sources of funds available to them.

24       And so it's known that research is not done just in the

25   summer, it's done over the course of the academic year and

19-20052    USA v. Feng (Franklin) Tao    03.24.22                      674

1    expenditures are made on those projects, you know, on an

2    ongoing basis.  You know, a faculty member would meet with the

3    researchers working with him, post-docs or grad students

4    typically, over the course of the year.  So that research

5    activity isn't exclusively, you know, contained in just the

6    summer months.

7    Q.  And so the -- let's talk about a buyout.  And that's for

8    courses that occur during the typical school year; is that

9    accurate?

10   A.  Right.  Right.

11   Q.  Let's talk a little bit about the summer salary.

12   A.  Okay.

13   Q.  Can a professor -- you said that a professor is on a

14   nine-month contract?

15   A.  Yes.

16   Q.  And so during the typical school year is the -- more or

17   less the nine months.  Do I have that correct?

18   A.  Yeah, in our case.  There are some research centers that

19   hire people directly into the center.  CEBC does not do that.

20   All of the faculty who do research on CEB-administered projects

21   are employed by their academic departments.

22   Q.  And so a professor can earn additional money -- and I say

23   additional, additional to the --

24   A.  Academic.

25   Q.  -- KU salary --

1    A.    Right.

2    Q.    -- by doing work in the summer?

3    A.    The way they essentially get additional money is by

4    applying for and being awarded sponsored research projects.

5    And there is a line item budget on every sponsored research

6    project that's awarded.  One of the lines on that budget is key

7    salary, which is the salary line for payroll for the principal

8    investigator on that project.

9         And so because they are paid, you know, their full academic

10   salary in the fall and spring semesters, we apply the funds

11   that they receive on their sponsored research projects to cover

12   the summer's -- the summer's salary.  And in many cases, you

13   know, faculty may or may not have enough additional resources

14   to cover what they would normally earn on their biweekly pay

15   during the academic semester.

16        And so, you know, every -- in the spring just before the

17   summer, I would always put together a spreadsheet with all --

18   listing all the PIs on CEBC-administered projects and then go

19   through the individual project budgets and identify, you know,

20   which of those PIs had summer salary available for that

21   particular summer.  I would put that spreadsheet together, I

22   would follow up with questions, you know, if I had any with the

23   individual faculty members.

24        Then when I had the spreadsheet together, I would submit

25   that to my grant coordinator in the Shared Service Center

1    because they are the ones who had access to what's known as the

2    summer pay calculator where they would actually load the time

3    for summer pay.

4    Q.   And so a professor, a principal investigator, who has been

5    awarded a research grant that allows for salary --

6    A.   Uh-huh.

7    Q.   -- can earn summer salary through that particular award?

8    A.   Right.

9    Q.   If it's part of that --

10   A.   That's during the summer because they're being paid

11   full-time in the spring and fall.

12   Q.   Directing your attention back to the exhibit on the screen,

13   so you identify three grants, you don't identify any other

14   source of funding for the buyout, though; correct?

15   A.   That's right.

16   Q.   Okay.  Let me direct your attention to this -- that same

17   exhibit, but let's -- Doctor Tao responds to you in two --

18        254, please.

19        And so after you send that e-mail, Doctor Tao responds and

20   he says, "Hi, Jane.  Please use NSF career to cover it.  It is

21   fine to reduce my summer -- summary payment to cover the

22   buyout."

23        Do you know what -- when he says "summary," do you think

24   that's a typo?

25   A.   Yes, I think he meant to say summer payment.

1    Q.  And so you then respond to that -- or, I'm sorry, he

2    responds to you, looking above that.  Thank you -- "Hi, Jane.

3    Thank you very much.  You may update the summer salary.  I am

4    totally fine for any amount summer salary, even down to no

5    summertime payment."

6    A.  Right.

7    Q.  Had you had involvement with the defendant prior to 2019 as

8    it relates to summer salary?

9    A.  Yes.  I started with the CEBC in the fall of 2015, and so

10   the first summer that I had to set up salary for was 2016.

11   Q.  Prior to this was the defendant concerned with receiving

12   summer salary?

13   A.  Yes.  In 2016 I sent -- you know, I put together a

14   spreadsheet and I had sent him an e-mail saying, you know, this

15   is how much you have, it isn't enough to cover the full summer,

16   you know, how do you want this paid out?  And he responded,

17   frankly in a bit of panic, you know, what do you mean I don't

18   get paid for the whole summer?

19        And he then made arrangements with the program officer on

20   one of his awards that was -- it was a DOE project that had

21   been awarded to Georgia Tech and then Georgia Tech had provided

22   a subaward to Doctor Tao and there was summer pay on that.  And

23   he contacted them and got their approval to move forward some

24   of the key salary funds from subsequent years up to that year

25   so that he could be paid fully for that summer.

1  Q.  And so prior to this -- you said that was in 2016?

2  A.  Right.

3  Q.  And so was this response out of the norm to you as it

4  relates to the defendant?

5  A.  Yes.  You know, largely, number one, I never had to deal

6  with a buyout before, so this was the first time that had come

7  up.  You know, also what happened at the time of this award, by

8  the time he, you know, he got back to me saying use my career

9  award to pay back CPE, the summer salary for the summer of 2019

10  had already been loaded.  And because I wasn't aware that he

11  had essentially used his summer salary in the spring semester,

12  I looked at what was available on summer salary on his awards

13  and it had already been loaded and was being paid.

14      So in this particular case, it didn't overspend his key

15  salary on the career award where he asked me to go ahead and

16  cover the buyout since that was applied after the summer salary

17  had already been set up.

18      And, you know, one way or another -- and, again, this is

19  part of the process of -- in the spring when I look at whether

20  or not they have funds available for summer salary, you know,

21  if this had been identified or paid out sooner, it would've

22  reduced the amount on his key salary line on that budget and I

23  would've taken that into account at the time I submitted the

24  summer salary request for that summer.

25  Q.  And so directing your attention to the defendant's two

1    responses, the first one was May 23rd, 2019 at 10:10 a.m. and

2    then the second response was about an hour -- just over an

3    hour-and-a-half later --

4    A.    Uh-huh.

5    Q.    -- at 11:48 a.m.; is that correct?

6    A.    Uh-huh.

7    Q.    Next I want to show you what's been marked as Government's

8    Exhibit No. 257.  Does that appear to be an e-mail exchange

9    between you and the defendant?

10   A.    Yes.

11         MR. OAKLEY:  Your Honor, I'd offer Government's

12   Exhibit 257.

13         THE COURT:  Any objection?

14         MR. DEARINGTON:  No objection, Your Honor.

15         THE COURT:  257 admitted.

16   BY MR. OAKLEY:

17   Q.    And so directing your attention to the bottom.  On

18   June 3rd, 2019, you send an e-mail to the defendant that says,

19   "Franklin, your latest Matheson cylinder rental invoice is

20   attached.  Please confirm which funding should be used to pay

21   this."

22         What were you asking the defendant in that e-mail?

23   A.    As part of their research, the faculty will purchase

24   cylinders of gas to attach to their equipment for different

25   reasons from Matheson, who is the state provider contract for

1    the State of Kansas.  Every month I get an invoice for all the

2    cylinders that we have still within the labs for the rental of

3    the actual cylinders.  And so when a bill comes, in this case

4    it would've been on the Matheson account set up for Franklin, I

5    contact them and say what funding, you know, should be used to

6    cover this cylinder rental.  And that's what this is.

7    Q.  And his response was, "Dear Jane, please pay it with NSF

8    career fund."

9    A.  Right.

10   Q.  And then you replied, "Franklin, your career funds were

11   spent down on the course buyout for the academic year and the

12   balance has already been loaded for summer pay.  There aren't

13   sufficient career funds to cover the Matheson bill.  Please let

14   me know which alternate source of funding you're going to use

15   for this Matheson bill."

16       And the defendant responds, "Please use the DOE fund" --

17   A.  Yes.

18   Q.  -- correct?

19           MR. OAKLEY:  May I have just one moment, Your Honor?

20           THE COURT:  Yes.

21           (Government counsel confer).

22   BY MR. OAKLEY:

23   Q.  Next I want to show you what's been marked as Government's

24   Exhibit 172.

25   A.  Okay.

19-20052    USA v. Feng (Franklin) Tao    03.24.22          681

1    Q.  Do you recognize that as an e-mail exchange between you,

2    the defendant, and then some others?

3    A.  Yes.

4          MR. OAKLEY:  Your Honor, I'd offer Government's

5    Exhibit 172.

6          THE COURT:  Any objection?

7          MR. DEARINGTON:  No objection, Your Honor.

8          THE COURT:  172 admitted.

9    BY MR. OAKLEY:

10   Q.  So if we can scroll to the bottom.

11        So on June 26th, 2018 you send an e-mail to the defendant

12   and then -- and you cc Tim Spencer, and you say, "Hi, Franklin.

13   KUCR policy dictates that tuition and salary for GRAs" --

14   what's a GRA?

15   A.  Graduate research assistant.

16   Q.  -- "needed to be funded together from the same source.

17   Since you don't have sufficient funds to pay Yuting's tuition

18   and salary for the summer on the NREL project, you must submit

19   an appeal to KUCR to request permission to pay just the

20   tuition."

21        What does that mean?

22   A.  I think a little background on this.  Yuting Li was one of

23   Doctor Tao's grad students and a GRA, and he did not have

24   sufficient funding for her during the academic year to pay her

25   directly from any of his projects.  So she worked as a graduate

1  teaching assistant for the physics and astronomy department in

2  the fall and spring semesters, but GTAs aren't generally

3  employed in the summer because there aren't as many classes

4  done and they don't need the GTAs.

5      So I had sent an e-mail to Franklin at the time that I was

6  going through the process of identifying which grad students

7  would be on what funding for the summer.  A similar thing, I

8  put spreadsheets together and then I'd -- and send them out.

9      And at the time I contacted Doctor Tao prior to this in

10  this -- earlier in the spring.  I had, you know, sent him an

11  e-mail saying I don't see that you have available funding for

12  Emily -- or Yuting Li.  And if that is the case, if you don't

13  have another source of funds, then you must let her know that

14  you don't have funding.

15      And apparently that didn't happen and she enrolled for the

16  summer session.  And in I think it was mid-June she realized

17  she wasn't getting a paycheck and she contacted Doctor Tao to

18  ask him why she wasn't getting paid.  My understanding is he

19  told her he didn't know, that she would need to ask me.

20          MR. DEARINGTON:  Objection, hearsay.

21          THE COURT:  Overruled.

22          THE WITNESS:  I was on vacation at that time.  One of

23  my other colleagues heard about this so they called me and --

24          MR. DEARINGTON:  Objection, hearsay.

25          THE COURT:  All right.  Reframe the question rather

1    than a narrative response at this point.

2    BY MR. OAKLEY:

3    Q.   And so there was an issue related to paying the graduate

4    assistant's salary for the summer?

5    A.   Right.   And, again, prior to this e-mail Franklin had said

6    to me I don't have enough money to cover her payroll, but I

7    could cover her tuition.   So in this e-mail I'm suggesting that

8    he contact Anita Abel, who was one of the managers over

9    post-award at KUCR, to see if he could get permission to

10   essentially unlock tuition from payroll, which is typically

11   required, so that he could pay the tuition at least to help her

12   out for the summer.

13   Q.   Okay.

14   A.   So that's the nature of this particular e-mail.

15   Q.   Okay.   And so then the response to your e-mail from Doctor

16   Tao was, "Dear Anita, please allow me to introduce the fund

17   status of my group.   My current funds have been used to pay

18   another student's summer salary and post-doc salary.   There is

19   no fund to pay one of my students," and then, "Yuting Li's both

20   tuition and summer salary.   I was assuming the paperwork of one

21   award from overseas institution (Fuzhou) could be finished and

22   then could be used to pay Yuting's summer salary.

23   Unfortunately, the paperwork is still being processed."

24        And then it goes on to the next page.

25        And then Anita Abel, do you know who Anita Abel is?

1    A.  Anita Abel is -- I'm not sure what her title is.  She's a

2    manager in the post-award component of the KUCR.  And so a lot

3    of the functions, especially, you know, related to policies for

4    payments and that sort of thing, she would oversee.  And so I

5    knew that -- again, because I was out of town and wasn't able

6    to really deal with any of this directly myself, I knew that

7    Anita Abel would be the person who possibly might be able to

8    work with him on finding a workaround to allow us to pay the

9    tuition.

10   Q.  So then Ms. Abel responds, "Hi, Doctor Tao.  Is this

11   student being paid for doing any work from any source?  Tuition

12   is tied to the GRA appointment and is required due to the

13   appointment.  Do you expect the Fuzhou contract to be available

14   soon?"

15       And so that's a reference to Doctor Tao's statement

16   earlier, "I was assuming that the paperwork of one award from

17   overseas institution could be finished."  So she brings up

18   that.

19       And then so the top part is Doctor Tao's response back to

20   Anita.  "For the award from Fuzhou, I am not sure when the

21   paperwork at Fuzhou side could be done in short time and since

22   that involves two sides."

23   A.  Yes.

24   Q.  Is that correct?

25   A.  Uh-huh.

```
 1              MR. OAKLEY:  Your Honor, I have no further questions.
 2                         CROSS EXAMINATION
 3   BY MR. DEARINGTON:
 4   Q.  Hello, Ms. Johns.
 5   A.  Hi.
 6   Q.  So if Doctor Tao -- if I represent to you Doctor Tao was
 7   indicted in August 2019, is it fair to say you didn't meet with
 8   Special Agent Lampe until a couple years after that?
 9   A.  I'm sorry, I can't hear you very well.
10   Q.  Sorry.  Is it fair to say the first time you met with
11   Special Agent Lampe was about a couple years after that?
12   A.  Yeah, I first met him in November of 2021.
13   Q.  Okay.  So more than two years after August 2019 when Doctor
14   Tao was indicted?
15   A.  Right, uh-huh.
16   Q.  So Special Agent Lampe and Mr. Oakley, they didn't ask you
17   any of the questions that you were just asked until
18   November 2021; is that fair?
19   A.  Yes.
20   Q.  I'd like to ask you about your role because I think you
21   said that you're a business manager at CEBC; correct?
22   A.  Uh-huh.
23   Q.  And so you oversee certain financial aspects, getting
24   invoices paid and so forth?
25   A.  (Nods head up and down).
```

1    Q.  I must say I'm a little confused by the ins and outs of how

2    invoices are paid.  And it's very complicated; right?

3    A.  Yes.

4    Q.  So try to see if I can get this right and then you can

5    correct me if I have it wrong.

6        If a grant is funded and the PI would like to buy equipment

7    in order to use on the grant or multiple grants that could use

8    the equipment, they would need to seek approval from someone in

9    SSC or in the department.  They couldn't just buy equipment on

10   their own; right?

11   A.  Not directly.  You know, there are policies and procedures

12   for doing everything at KU.

13   Q.  Right.

14   A.  And so the way that would work is if the project had been

15   awarded and if it had a line on the budget for equipment

16   sufficient to cover the equipment that was being requested,

17   then he could request that a requisite -- you know, he could

18   get quotes for the equipment, submit, you know, the -- several

19   quotes for comparison and which, you know, quote he preferred

20   to go with.  And based on that, a requisition could be prepared

21   identifying the equipment to be purchased and the funding

22   stream for that project or, again, if it were going to be

23   shared by more than one project, for split funding, to make

24   that purchase.

25   Q.  Okay.  And then who would need to approve the purchase

1    before it's made?

2    A.   The way the system is set up, they -- you know, somebody

3    generates the requisition and they either would assign it to me

4    or to the financial specialist working with me in our Shared

5    Service Center.  And they would go ahead and finish entering

6    the funding stream information and any other additional

7    information needed to explain the requisition and then it would

8    be submitted.

9         And then it's a system process where it is routed through a

10   series of people for approval.  You know, there's a fund check,

11   you know, it goes through IT, a number of other places.  And

12   once it's gotten final approval, then the purchase order is

13   sent out.

14   Q.   Wow.  Okay.  So, for example, this is Exhibit 257 that Mr.

15   Oakley asked you about with a Matheson cylinder invoice.  And

16   that's about a $100 piece of equipment; is that right?

17   A.   Actually cylinders are, you know, the big containers that

18   the gases go in.  And so a PI could have multiple -- and

19   typically the way these things are set up is a cylinder of gas

20   is attached to some piece of equipment because it's needed to

21   perform whatever research experiments or process to make that

22   equipment work.

23        And so on a monthly basis I get -- I would get an invoice.

24   Doctor Tao had a dedicated account with Matheson so I would get

25   the invoice for all of his cylinder rentals for the month and

1    this was processed as what we call a non-PO invoice, meaning it

2    didn't go through the purchasing system.

3        And so the way these invoices would be handled is I'd have

4    a physical copy of the invoice, I'd clarify what funding was to

5    be used to pay the expenses on that invoice.  I would then mark

6    that invoice up with that funding stream information and sign

7    off on it.  Then I would route it forward to the service center

8    that would go into the online system to enter that invoice to

9    be submitted for payment.

10   Q.   Okay.  So fair to say for a large piece of equipment, for

11   example, Doctor Tao isn't being cut a check from the university

12   and then he takes it to the vendor; right?

13   A.   No.

14   Q.   Doctor Tao doesn't even touch the funds; right?

15   A.   Right.

16   Q.   It goes from university to vendor.  So it might go from an

17   agency to KU and then right to the vendor; right?

18   A.   Uh-huh.

19   Q.   Okay.  And, by the way, in that e-mail I showed you where

20   Doctor Tao says, "Please use DOE funds," there's nothing wrong

21   with that; right?  Even if you have an NSF grant and a DOE

22   grant and you use the cylinder for research for both, you could

23   use a DOE grant to fund that; right?

24   A.   Yes.

25   Q.   So I think you testified you were not made aware of Doctor

1    Tao's approved buyout when it first happened; is that correct?

2    A.   That's true.

3    Q.   And you would've expected the department to tell you,

4    wouldn't you?

5    A.   Or Doctor Tao.

6    Q.   One or the other?

7    A.   Yeah.

8    Q.   Either the department or Doctor Tao should've told you?

9    A.   Right.

10   Q.   And the department didn't tell you; correct?

11   A.   Right.

12   Q.   And you had some concern because the department had not

13   made you aware that Doctor Tao had -- that the department had

14   approved a buyout; correct?

15   A.   Yes.   Because I was -- you know, it could've been possible

16   that he had negotiated the buyout but didn't have the funds to

17   actually cover it.

18   Q.   Okay.   And when the Fuzhou funding source didn't pan out, I

19   think Mr. Oakley showed you Exhibit 254 in which you discussed

20   with Doctor Tao how to cover the buyout; right?

21   A.   Actually the discussion about the Fuzhou project was about

22   paying the grad student, Emily Li.   And that was I believe

23   in 20 -- what year?   2018 I think.

24   Q.   Well, let me ask you about that first then.

25   A.   And so that's separate from the buy -- those are two

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    separate things, the buyout and payment for this grad student.

2    Q.   Right.  So I was asking about the buyout, but I think since

3    you mentioned that, the grad student, I'll start there.

4        So here Mr. Oakley read, "I was assuming that paperwork of

5    one award from overseas institution (Fuzhou) could be finished

6    and then be paid to -- used to pay Yuting's summer salary."

7    And that's June 2018.

8        So are you aware that it was still a pending contract in

9    June 2018 with Fuzhou and had not been funded yet?

10   A.   Actually at the time that I saw this -- the process for

11   applying for grants, a PI will work on a proposal.  If they

12   intend to have it administered by CEBC if it's awarded, then

13   Chris Lyon, who's our director of administration, will work

14   with PIs on helping them put their proposal together and kind

15   of serves as an intermediary then with the pre-award staff at

16   the Center for Research.

17       And when I heard this reference to Fuzhou, I asked Doctor

18   Lyon if he was aware of a proposal being prepared, and he said

19   he knew nothing about it.  I also checked with KUCR to see if

20   they had a proposal in the works and they indicated that they

21   did not.

22       So at the time this e-mail came in, no one at KU other than

23   possibly Doctor Tao was aware that he was, you know, trying to

24   align some funding from Fuzhou.

25   Q.   So your understanding from KUCR is that no one in KUCR was

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    aware of the draft contract with Fuzhou?

2    A.   There was no draft contract because the contract would've

3    been prepared by KUCR.

4    Q.   Right.  And you weren't informed of that by KUCR so your

5    inference was there was none?

6    A.   Well, we -- Chris checked.  Like I said, I asked Chris

7    Lyon, who works with me in my office, if he knew anything about

8    it because, like I said, typically the PIs work with Chris, but

9    I thought, well, maybe he jumped over Chris and went directly

10   to KUCR and is working with somebody in pre-award.  So we asked

11   pre-award if they had a proposal pending and they did not.

12   Q.   It sounds like there's a lot of moving pieces at KU with

13   respect to research and --

14   A.   Yeah.

15   Q.   -- coursework and buyouts and grants coming from agencies.

16   A very complicated landscape; right?

17   A.   It is.

18   Q.   And things can sometimes get probably lost in the mix, fair

19   to say?

20   A.   I don't know if lost in the mix, but sometimes there can be

21   miscommunication between all the various parties that, you

22   know, have to have a hand in completing any process for

23   something.

24   Q.   So if I were to represent to you that the KU research

25   office in May 2 -- excuse me, in May -- in June 2018 had been

1    in the process of negotiating a contract with Fuzhou

2    University, would you be surprised?

3    A.    Yes, because they told -- we heard that they had not been

4    doing any proposal work on -- with that university.

5    Q.    Okay.  So going back to this exhibit that Mr. Oakley showed

6    you where you e-mailed Doctor Tao about covering the buyout in

7    May 2019.  There was nothing improper about you e-mailing

8    Doctor Tao in May and asking which grant he wanted to use for

9    the buyout; right?

10   A.    No.  I mean, it was his call which funding he was going to

11   use for that.

12   Q.    It was Doctor Tao's call --

13   A.    Uh-huh.

14   Q.    -- whether he wanted to use the NSF career fund to buy out

15   spring 2019?

16   A.    Right, because he did have available funds on that project.

17   Q.    He didn't overcharge NSF.  He charged NSF for the buyout

18   for all the research he was doing for NSF; correct?

19   A.    Uh-huh.

20   Q.    So no problem with Doctor Tao choosing an NSF grant to

21   cover the buyout in May 2019?

22   A.    That's my understanding.  Again, all of this stuff gets

23   approved by other people down the line.  But at the point that

24   I was involved in this, it was my understanding that he had to

25   identify salary dollars that he did have available to cover the

1    buyout.

2    Q.  Okay.  And I just want to direct your attention to some of

3    the language that Mr. Oakley may have even read.  And this is

4    from Doctor Tao after you've -- after he's selected the NSF

5    career to cover it, which as you've testified is totally fine,

6    and Doctor Tao says, "I'm totally fine for any amount of summer

7    salary, even down to no summer payment."

8        So Doctor Tao was willing to forego summer salary even

9    though he was eligible to get paid summer salary; correct?

10   A.  In this case we were actually spending the summer salary.

11   Doctor Tao would not have had the authority to in any one

12   summer say don't apply my summer salary.  On federal awards,

13   key salary must be taken.  And again, it's taken generally in

14   the summer because they're paid by their departments in the

15   fall and spring semesters.

16       To re-route those funds to another line on the budget or do

17   anything else with key salary funds other than pay key salary

18   would require approval from the sponsoring agency, in this case

19   NSF.

20   Q.  So Doctor Tao suggested he could also just forego summer

21   salary, but he was required to take summer salary from NSF that

22   was used for the buyout?

23   A.  Yeah.  He was required that the key salary awarded on that

24   project be taken.

25   Q.  Okay.  Does someone who tries -- who is willing to forego

1    summer salary, even though they're researching under a grant

2    anyway, sound like someone who would be stealing salary to you?

3                MR. OAKLEY:  Objection.  He's asking for an opinion.

4                THE COURT:  Overruled.  You can answer if you can.

5                THE WITNESS:  Would you repeat that?

6    BY MR. DEARINGTON:

7    Q.   Is someone who's willing to forego summer salary even

8    though they're researching under a grant sound like someone

9    who's stealing salary to you?

10   A.   I have no idea.

11   Q.   But fair to say that a person who is willing to give up

12   summer salary may not also be the same person who during that

13   same time period is trying to take summer salary that's not

14   authorized?

15   A.   Authorization for the summer salary is built into the

16   project budget and it's awarded and spent accordingly.

17   Q.   And, excuse me, because I think you did already testify to

18   that, so I'm sorry if I'm covering similar ground, but I want

19   to be clear on this.

20       Doctor Tao had no choice but to take that salary from KU as

21   charged to NSF under the conditions of the award?

22   A.   That is my understanding of how that has to be taken, yes.

23               MR. DEARINGTON:  No further questions.  Thank you.

24                         REDIRECT EXAMINATION

25   BY MR. OAKLEY:

1    Q.  Do you know when you had the conversation with Chris Lyon?

2    A.  This all took place again while I was on vacation.  So I

3    think when I saw the e-mail that mentioned the -- you know, the

4    potential funding from Fuzhou, at that -- when I saw that, at

5    that point is when I would've asked Chris if -- you know, what

6    he knew about it.

7    Q.  Okay.  When you say that Doctor Tao was allowed to use NSF

8    funds for a buyout, would you assume that the PI was following

9    the budget and the terms of the grant?

10   A.  Yes.  Again, it's because he had key funds available on

11   those three projects that I identified as possible sources of

12   the buyout funding.

13   Q.  And do PIs need to get approval from the funders if they

14   want to change the scope of a project?

15   A.  Yes.

16           MR. OAKLEY:  No further questions, Your Honor.

17           THE COURT:  May this witness be excused?

18           MR. DEARINGTON:  Yes, Your Honor.

19           MR. OAKLEY:  Yes, Your Honor.

20           THE COURT:  Thank you.

21           Do you have another witness we can at least maybe

22   spend ten minutes with before we break for the evening?

23           MR. BARRY:  Yes, Your Honor.  The United States calls

24   Doctor Rebecca Keiser.

25           THE COURT:  We'll break in about ten minutes or so.

1                    REBECCA LYNN SPYKE KEISER,

2    called as a witness on behalf of the Government, having first

3    been duly sworn, testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. BARRY:

6    Q.   Hello, Doctor Keiser.

7    A.   Hello.

8    Q.   Would you please state and spell your name for the record?

9    A.   Sure.  It's Rebecca Lynn Spyke Keiser.  K-E-I-S-E-R is my

10   last name.

11   Q.   And would you please spell the first three names?

12   A.   Sure.  Rebecca is R-E-B-E-C-C-A.  Lynn, L-Y-N-N.  Spyke is

13   S-P-Y-K-E.  And then Keiser, K-E-I-S-E-R.

14   Q.   Where do you work, Doctor Keiser?

15   A.   I work at the U.S. National Science Foundation.

16   Q.   And what do you do there?

17   A.   I am the chief of research security, strategy, and policy.

18   Q.   And can you elaborate a little bit on what that means?

19   A.   Sure.  It's a position that I've held since 2020.  And in

20   this position I focus on research security, which means making

21   sure that we protect the integrity of the research that we

22   fund.

23       The National Science Foundation funds about $8 billion in

24   research every year and we want to make sure when we provide

25   this money to researchers that we provide clear rules for how

1   this money should be used so that it's in the business interest

2   of the taxpayer and that our researchers are clear about the

3   rules about how they can use the funding so that they produce

4   the best science.

5        So I focus on making sure that these rules are clear for

6   what the responsibilities of the researcher are, what they need

7   to disclose to us so that we can make good funding decisions to

8   them.  I also focus on making sure that our policies are as

9   clear as possible, both for them and for the U.S. institutions

10  that we fund.  And I work very closely with other U.S.

11  government federal agencies to make sure that we're as

12  consistent as possible.  So the National Science Foundation

13  gives out money, Department of Energy gives out money, National

14  Institutes of Health gives out money, we all give out money for

15  research.

16       And so I work very closely with these other agencies to

17  make sure that when we have our requirements for the

18  researchers, what they need to tell us, what they need to

19  report back to us, what they need to do in response to

20  receiving the funding, to make sure that we're consistent

21  across the board.

22       And the reason why it's called research security is because

23  we want to make sure that we protect the research itself, that

24  it's secure.  And in the area of basic research that I work on,

25  that means making sure that the research is transparent, the

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    researchers are transparent, that they're objective, and that

2    any potential conflicts, whether it's a domestic conflict or a

3    foreign conflict, is disclosed to us so that it can be resolved

4    and that we could all trust in the research.  So that's what I

5    focus on.

6    Q.  So that was a lot.

7    A.  It was a lot.

8    Q.  So I want to unpack that a little.  So first I want to just

9    take a -- sort of zoom out.  So what does the National Science

10   Foundation do?

11   A.  The National Science Foundation was established in 1950 and

12   it was in direct response to World War II where leaders in the

13   U.S. government realized that the path to both innovation and

14   to peace was science and research.  And so we were established

15   as a science agency to -- basically to give out grants, to give

16   out research funding to researchers mostly in the academic

17   community so that they can do research, produce results, and

18   help the United States innovate.

19       So we are -- we are made up of seven different departments,

20   each one focuses on a different area of science.  And

21   researchers and research institutions submit to us what they

22   call research proposals saying this is the kind of research

23   they want to do.  And we go through a very thorough review

24   process to determine which are the best from an intellectual

25   merit standpoint and which are going to provide the best

1    impacts and we select those research projects.

2        So we're what you call a funding agency where we provide

3    funds to researchers to perform research projects.  And that's

4    really basically what our job is.

5    Q.   Where does NSF's money come from?

6    A.   It comes from the federal government, it comes from the

7    taxpayers.  We're what you call an independent agency so we do

8    not report up to another cabinet department.  And that was on

9    purpose so that we could be as independent as possible in our

10   selection of science.

11       So every year this amount of money gets appropriated to us

12   through the Senate and the House, through Congress.  And so our

13   current budget is about $8.4 billion a year.  93 percent of

14   that budget goes out the door back to the research community to

15   perform research.

16   Q.   You said earlier that the type of research that the

17   National Science Foundation funds is called fundamental

18   research; right?

19   A.   That's correct.

20   Q.   Can you explain for the jury what fundamental research is?

21   A.   Fundamental research is the funding of knowledge and ideas

22   that is relatively far away from what we call application.  So

23   as an example, in the 1990s we funded Yuri Gagarin (sp) and he

24   was doing research at that time into what he called the digital

25   library.  So he had this idea where maybe you could take all

1    this information that's floating around there electronically

2    and somehow categorize it, but he didn't quite know exactly how

3    that would work.  He wanted to look into the basic ideas of how

4    would you even look at categorizing stuff.  So he wasn't

5    thinking commercially at that point, he was just thinking about

6    what the meaning of that might be.

7         And so when you're looking at something that's not in the

8    area yet of getting commercialized, of making it into a

9    business, but you're looking at ideas, you're looking at

10   knowledge, that's fundamental research.

11        Eventually, as you know, Yuri Gagarin eventually took that

12   idea that we funded him to do and it got to the point where he

13   realized this could be a really good business and he formed

14   Google.  That was much further down the line.  We didn't fund

15   Google, we funded his original ideas.

16   Q.   And are there certain areas or scientific disciplines that

17   the National Science Foundation funds?

18   A.   We fund across the span of fundamental research.  And so we

19   fund everything from mathematical and physical sciences to

20   basic engineering to basic biology and biological sciences.

21   So, for instance, we funded the basics of gene editing and the

22   gene editing -- the discoverers of that just won the Nobel

23   Prize.  It can now be used for health, but we funded it at the

24   beginning.

25        We fund education, so STEM education:  science, technology,

1    engineering and math.  So really across the board of the areas

2    of science.

3    Q.   Other than the federal government, are there any other

4    players or funders in the United States who fund this type of

5    fundamental research?

6    A.   Fundamental research is really all funded mostly I should

7    say by the government.  Very few private companies fund this

8    because it's not yet at the area where they can think about

9    making a profit.

10        There are some philanthropic organizations like the Simons

11   Foundation, the Gates Foundation, that also fund some

12   fundamental research and we try to partner with them in doing

13   that, but the majority really does come from the government.

14   Q.   So I want to talk a little bit more about you.  You said

15   your title is chief research officer?

16   A.   Chief of research security, strategy, and policy.

17   Q.   Okay.  And you said you started that job in 2020?

18   A.   That's right.

19   Q.   What did you do before that?

20   A.   Before that I came to the National Science Foundation, NSF,

21   in 2015 to head the Office of International Science and

22   Engineering.  So I came to head the international office and

23   transitioned into this new role in 2020.

24        Before that I worked at NASA.  I worked at NASA for 16

25   years and I started at NASA in their international office where

1    I worked on the Japan portfolio and on the International Space

2    Station.

3         From NASA I went on loan to the White House Office of

4    Science and Technology Policy for a few years to do their

5    international activities for the White House Office of Science

6    and Technology Policy.

7         I came back to NASA and I had various science policy roles

8    that led to me being the head of NASA's strategy office that

9    did its long-term strategy.  And from there I went to NSF to

10   head the international office.

11        THE COURT:  I think we're going to have to leave it

12   there for now.

13        MR. BARRY:  Okay.

14        THE COURT:  I know we're just getting started, but --

15   best to get started.

16        All right.  So we will reconvene at 9:00 tomorrow

17   morning.  Remind the jury not to allow yourselves to be exposed

18   to any media coverage about this, don't do any independent

19   research or reading or looking things up.  We'll see you

20   tomorrow at 9:00.

21        And, counsel, stick around for just a minute.

22        Doctor Keiser, we'll see you back at 9:00.

23        THE WITNESS:  Thank you, Your Honor.

24        (The following proceedings were held outside the

25   presence of the jury).

1    THE COURT:  One of our jurors has to pick up a child

2    and has to be out of here before 5:00, so I know how stressful

3    that can be.  30 years ago I had those experiences so I just

4    want to make sure we break a little bit before 5:00 every day.

5    So we'll reconvene at 9:00.

6    How do you think you're doing, Mr. Oakley, as far as

7    your estimate of time and where we're at in the schedule?

8    MR. OAKLEY:  I think we're on track for the government

9    to finish its case within two weeks.

10    THE COURT:  Okay.  Oh, so by the end of next week?

11    MR. OAKLEY:  Yes.

12    THE COURT:  Not necessarily in the middle of next

13    week?

14    MR. OAKLEY:  I don't want to -- I want to underpromise

15    and overdeliver.  It's possible we could be done Wednesday,

16    but...

17    THE COURT:  Okay.  I understand.

18    MR. OAKLEY:  We had gone slower than expected, but we

19    picked back up today.  So we're still hopeful that our two-week

20    estimate is on track and we may be able to keep continuing to

21    gain steam.

22    THE COURT:  Okay.  All right.  Anything else we need

23    to talk about before we close out for the night?

24    MR. ZEIDENBERG:  Nothing from us, Your Honor.

25    MR. OAKLEY:  Your Honor, just one thing on exhibits.

1          THE COURT:  Yes.

2          MR. OAKLEY:  And I know that things come up and we did

3     that today with Government's Exhibit 777.  The defense has

4     identified exhibits, and I think we have most of them, but some

5     of them we don't.  I would simply ask the court if the defense

6     has additional exhibits that have not been provided to the

7     government that it knows it's going to seek admit, that we be

8     provided those as soon as possible.

9          THE COURT:  That's fair.  And I suggest you all get

10    together every night to just sort of talk to each other about

11    what you think is coming up the next day.  And particularly if

12    there's any new exhibits that next day, that you exchange those

13    in the evening before so the parties have them.

14         MR. ZEIDENBERG:  The government has been providing us

15    with upcoming witnesses and exhibits for the following day, so

16    that's -- that's been helpful.  I mean, occasionally when a

17    witness is up there, like today, an exhibit comes to mind that

18    we weren't planning on using, we didn't even have a sticker on.

19         THE COURT:  I understand.

20         MR. ZEIDENBERG:  So, you know, it's not the plan.

21         THE COURT:  Okay.  I would say to the best of your

22    ability, but I do know from time to time things come up and you

23    remember something in an exhibit that had not occurred to you

24    before.  So that's understood.

25         But to the extent you can, try to make sure the

19-20052    USA v. Feng (Franklin) Tao    03.24.22

1    government has what you think you're going to use that's not

2    already on the exhibit list and then confer over the evening

3    break if something else comes up that you're aware that you

4    will use the next day.  All right?  And that pertains to the

5    government as well obviously.

6                MR. OAKLEY:  Thank you, Your Honor.

7                THE COURT:  Okay.  I'll be available at 8:30 if you

8    need me.

9                (Proceedings concluded).

10

11                                    *  *  *

12

13                C E R T I F I C A T E

14        I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16

17    December 2, 2022.

18

19

20                     /s/ Kelli Stewart _____
                       KELLI STEWART, CSR, RPR, CRR, RMR
21                     United States Court Reporter

22

23

24

25