```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF KANSAS
 2

 3    UNITED STATES OF AMERICA,

 4         Plaintiff,

 5         v.                          Case No. 19-20052-01-JAR

 6    FENG TAO, a/k/a "Franklin
      Tao,"                            Kansas City, Kansas
 7                                     Date:  March 28, 2022
           Defendant.
 8                                     Day 6 (Pages 933-1155)

 9    .........................

10                       TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JULIE A. ROBINSON
            SENIOR UNITED STATES DISTRICT COURT JUDGE
12

13                    A P P E A R A N C E S

14
      For the              Mr. D. Christopher Oakley
15    Plaintiff:           United States Attorney's Office
                           500 State Avenue
16                         Room 360
                           Kansas City, Kansas 66101
17
                           Mr. Adam Barry
18                         Department of Justice-Nsd
                           950 Pennsylvania Avenue, NW
19                         Washington, DC 20530

20    For the              Mr. Peter R. Zeidenberg
      Defendant:           Mr. Michael F. Dearington
21                         Arent Fox, LLP
                           1717 K Street NW
22                         Washington DC, 20008

23

24    _____
              Proceedings recorded by machine shorthand,
25      transcript produced by computer-aided transcription.
```

I N D E X

**Government's Witnesses:**                                      **Page**

DOCTOR VIVIANE SCHWARTZ
  Direct Examination By Mr. Barry (Continued)          939
  Cross Examination By Mr. Zeidenberg                  947
  Redirect Examination By Mr. Barry                    990

DOCTOR ROBERT (SCHLÖGL) SCHLOEGL
  Direct Examination By Mr. Barry                      996
  Cross Examination By Mr. Dearington                 1011

DOCTOR BALA SUBRAMANIAM
  Direct Examination By Mr. Oakley                    1022
  Cross Examination By Mr. Dearington                 1041
  Redirect Examination By Mr. Oakley                  1069
  Recross Examination By Mr. Dearington               1073

JAMES RUPPRECHT
  Direct Examination By Mr. Oakley                    1075
  Cross Examination By Mr. Dearington                 1085
  Redirect Examination By Mr. Oakley                  1089
  Recross Examination By Mr. Dearington               1090

SPECIAL AGENT DANA KREEGER
  Direct Examination By Mr. Oakley                    1096

SPECIAL AGENT MICHAEL BUONO
  Direct Examination By Mr. Oakley                    1117
  Cross Examination By Mr. Zeidenberg                 1134

SPECIAL AGENT DANA KREEGER
  Cross Examination By Mr. Zeidenberg                 1140
  Redirect Examination By Mr. Oakley                  1146
  Recross Examination By Mr. Zeidenberg               1147
  Further Redirect Examination By Mr. Oakley          1149

E X H I B I T S

| Government's Exhibits | Offered | Received |
|---|---|---|
| 124 | 1081 | 1082 |
| 246 | 1085 | 1085 |
| 251 | 942 | 942 |
| 293 | 1004 | 1004 |
| 294 | 1006 | 1006 |
| 295 | 1008 | 1008 |
| 401 | 1102 | 1102 |
| 402 | 1102 | 1102 |
| 403 | 1120 | 1120 |
| 404 | 1121 | 1121 |
| 405 | 1106 | 1106 |
| 406 | 1122 | 1122 |
| 407 | 1123 | 1123 |
| 408 | 1123 | 1123 |
| 409 | 1116 | 1116 |
| 410 | 1123 | 1123 |
| 411 | 1123 | 1123 |
| 412 | 1123 | 1123 |
| 415 | 1124 | 1124 |
| 416 | 1124 | 1124 |
| 417 | 1124 | 1124 |
| 418 | 1124 | 1124 |
| 419 | 1124 | 1124 |
| 420 | 1124 | 1124 |
| 421 | 1126 | 1126 |
| 425 | 1126 | 1126 |
| 426 | 1126 | 1126 |
| 427 | 1126 | 1126 |
| 429 | 1126 | 1126 |
| 430 | 1126 | 1126 |
| 431 | 1128 | 1128 |
| 432 | 1128 | 1128 |
| 433 | 1128 | 1128 |
| 434 | 1128 | 1128 |
| 435 | 1128 | 1128 |
| 436 | 1128 | 1128 |
| 437 | 1128 | 1128 |
| 438 | 1128, 1131 | 1128, 1131 |
| 439 | 1131 | 1131 |
| 440 | 1131 | 1131 |
| 444 | 1131 | 1131 |

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        936

```
1

2                          E X H I B I T S

3       Government's
        Exhibits                    Offered            Received
4
            445                     1131                 1131
5           446                     1131                 1131
            447                     1131                 1131
6           448                     1132                 1132
            449                     1133                 1133
7           450                     1133                 1133
            451                     1133                 1133
8           454                     1133                 1133
            455                     1133                 1133
9           465                     1133                 1133
            466                     1133                 1133
10          467                     1133                 1133
            471                     1133                 1133
11          479                1109, 1116                1140
            481                     1116                 1140
12          779                     1038                 1038

13
        Defendant's
14      Exhibits                    Offered            Received

15         1223                      972                  973
           1224                      967                  967
16         1229                      962                  963
           1236                      982                  982
17         1379                      970                  970
           1430                      974                  975
18         1461                     1056                 1056

19

20

21

22

23

24

25
```

1          (Court called to order).

2          (The following proceedings were held outside the

3    presence of the jury).

4          THE COURT:  All right.  You can be seated.

5          All right.  You have something to take up?

6          MR. ZEIDENBERG:  Just very briefly, Your Honor.  The

7    government identified over the weekend dozens of exhibits they

8    intend to introduce through these upcoming FBI agents.  I

9    understand most, if not all, of these came off of -- or at

10   least purportedly came off our client's KU computers, devices.

11         You know, we're not objecting to any of the -- on

12   authenticity grounds.  There are a select number of those

13   documents that we have hearsay objections about, or at least

14   portions of them.  It's not a whole lot of them, just probably

15   a handful.

16         So I didn't know if the court -- we're not prepared to

17   discuss it right now.  We're not going to get to it, I don't

18   imagine, today.  But I didn't know if the court wanted to take

19   up those exhibits all at once before court one morning or just

20   do it as, you know, that one-off exhibit came up and we just

21   approach the bench and say this -- we have a problem with this

22   exhibit for this reason.  We're happy to do either.

23         THE COURT:  If the timing makes sense, I'd prefer to

24   get it sorted out, you know, when the jury is not in the

25   courtroom.  Have you told the government which ones exactly?

1    MR. ZEIDENBERG:  No, because we were just sort of

2    going through them quickly last night and sort of

3    issue-spotting on various ones, so we don't have -- you know,

4    I'm not prepared to say, you know, which ones, but clearly

5    some.

6    THE COURT:  Okay.

7    MR. ZEIDENBERG:  I don't think it's a very -- it's not

8    a long list.  I don't know, maybe ten or fewer.

9    THE COURT:  So you're talking about exhibits you think

10   will come in through FBI agents.  When can we expect FBI agents

11   taking the stand, Mr. Barry?

12   MR. BARRY:  I think that -- is this Clevenger?  I'm

13   not sure if we'll get to it today.  If it's today, it will be

14   later in the day.

15   THE COURT:  Okay.

16   MR. OAKLEY:  Your Honor, I'm sorry.  And just so that

17   we're clear, when defense says that we identified them, we

18   pointed to them in our exhibit list.  These aren't newly

19   disclosed.

20   THE COURT:  Yeah, I understand.  Well, if we can

21   figure out a way to make it work on a break, let's do that.  If

22   we can't, we'll just do it contemporaneously or take a break or

23   whatever.  We'll figure it out.

24   MR. ZEIDENBERG:  We can probably identify them this

25   evening, and if the court wants to have a discussion about it,

1    you know, 15 minutes or -- I wouldn't imagine it's going to

2    take a great deal of time.

3            THE COURT:  Okay.  Yeah, that will work.  This evening

4    or --

5            MR. ZEIDENBERG:  We can notify chambers and do it

6    tomorrow morning, 8:45 or whenever, 20 minutes before court.

7            THE COURT:  Why don't we shoot for 8:30 tomorrow.

8    Yeah, let's try that.  Okay.  Are we otherwise ready to get

9    started?

10            MR. OAKLEY:  Yes, Your Honor.

11            THE COURT:  Are these -- oh, I have some folders up

12    here I haven't seen before.  Are these demonstratives or -- 777

13    through 780.

14            MR. BARRY:  Those are new exhibits, Your Honor.

15            THE COURT:  Okay.

16            (The following proceedings were held in the presence

17    of the jury).

18            THE COURT:  All right.  You can be seated.

19            Doctor Schwartz, you're still under oath to tell the

20    truth.

21            THE WITNESS:  Sure.  Yes, I do.

22                    DOCTOR VIVIANE SCHWARTZ,

23    called as a witness on behalf of the Government, having

24    previously been duly sworn, testified as follows:

25                    DIRECT EXAMINATION

1    BY MR. BARRY:

2    (Continued)

3    Q.    Good morning, Doctor Schwartz.

4    A.    Good morning.

5    Q.    So when we left off on Friday, we were talking about the

6    various pieces of information that the Department of Energy was

7    interested in knowing about when reviewing grant applications.

8    Do you remember that?

9    A.    Yes.

10   Q.    And am I remembering right that you said that one of the

11   things that Department of Energy looks at is whether or not a

12   principal investigator has sufficient time to actually perform

13   the work that they're proposing?

14   A.    Yes, correct.

15   Q.    How does DOE make that assessment?

16   A.    We look at the current and pending and we look at the PI's

17   commitment, generally speaking.  We might not add, per se,

18   exactly each month that the PI is dedicating to a certain

19   activity, but we give a general look to see if there is no

20   overcommitment.

21   Q.    Does the DOE rely in any way on the sponsoring university

22   to also be involved in ensuring that the PI has sufficient time

23   to perform the work?

24   A.    Well, DOE is not the employer of the PI, right, so the --

25   the university should certainly make sure that the employee is

1   doing -- or dedicating the time that they are supposed to do.

2       At the DOE's side, what I'm looking is if the PI is

3   performing as it should.

4   Q.  And what about conflicts of interest or potential conflicts

5   of interest?  Does DOE evaluate information related to those or

6   does DOE rely on the employing university to manage that?

7   A.  Yeah.  As a program manager, I don't look at issues of

8   conflict of interest I think as you are defining here in terms

9   of their dedication to their job or not.  This is something

10  that the university is responsible for.

11      When I use the word "conflict of interest," I'm looking as

12  a program manager in the scientific context and especially in

13  case where I am requesting reviews.

14  Q.  So to summarize, is it fair to say that, you know, conflict

15  of interest has at least two meanings in this sense.  You look

16  at it from the perspective of determining the third-party panel

17  of reviewers who are looking at the scientific merit and then

18  there's also conflict of interest from an employing university

19  perspective and you would just rely on the university to handle

20  any issues related to that?

21  A.  Correct.

22  Q.  I want to switch a little bit to what the government has

23  marked as Government Exhibit 251.

24      Do you recognize this e-mail chain?

25  A.  Yeah.  It's a typical e-mail that I send to PIs when I'm

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    942

1    requesting review of proposals.

2         MR. BARRY:  The government moves to introduce into

3    evidence Government Exhibit 251.

4         MR. ZEIDENBERG:  No objection.

5         THE COURT:  251 admitted.

6    BY MR. BARRY:

7    Q.  And let's start at the bottom of the chain.  I think

8    this -- the last e-mail actually spills over.

9         Can you just summarize for the jury what this e-mail --

10   what the e-mail chain is about?

11   A.  So in this case I am requesting Professor Tao -- for him to

12   review a proposal from another principal investigator and I

13   request that review to be completed to a certain date.

14   Q.  So is this what we were talking about just a moment ago,

15   which is having a third-party panel of reviewers evaluate the

16   scientific merit of proposals?

17   A.  Correct.

18   Q.  And in this e-mail chain this is a situation where Doctor

19   Tao -- he's not submitting a proposal, but he's acting as one

20   of those third-party reviewers?

21   A.  Correct.

22   Q.  And you said that this last e-mail from April 9th, you're

23   e-mailing him just to remind him that his review of that

24   proposal was due a couple days ago?

25   A.  Correct.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        943

1   Q.  And then let's scroll up if we could, please.

2        And then you see he responds there and says he'll get to it

3   in about a week; is that accurate?

4   A.  Yes.

5   Q.  And then let's keep going up, please.

6        And then is this just another reminder to, you know, say,

7   "Hey, I really need you to finish that review"?

8   A.  Yes, correct.

9   Q.  And then let's go back up.  Okay.

10       And then you see Doctor Tao's response just, you know,

11  saying that he'll get to it, he's been busy.

12       Okay.  So this is just about an example -- is this an

13  example of that third-party review process that we've been

14  talking about?

15  A.  That's a very typical example.

16  Q.  All right.  I want to go back to the funding opportunity

17  announcement.  This is Exhibit 32.  And I want to go to

18  Page 62, please, and if we could focus on the Current and

19  Pending Support section.

20       Do you remember when we talked about this language on

21  Friday?

22  A.  Yes, I do.

23  Q.  So in reviewing Doctor Tao's renewal proposal, which we

24  talked about on Friday, would you have wanted to know whether

25  at that time Doctor Tao was receiving research support from a

1   foreign research institution?

2   A.   I would have liked to know all forms of research grants.

3   Q.   Why would you have wanted to know whether he was receiving

4   research support from a foreign university?

5   A.   Again, I would like to know all forms, right?  And the idea

6   is that I look at all the PI's activities and that I would

7   evaluate if those activities could somehow overlap with the

8   activity that the PI is applying to renew so that we don't use

9   the federal fundings for something that is being done

10  elsewhere.

11  Q.   So if you had known when you were reviewing the renewal

12  proposal that he was receiving foreign research support from a

13  university, would you have compared that information to what

14  you knew about the proposal to determine if there was overlap?

15  A.   I would have compared all the activities; correct.

16  Q.   Would you have done anything else with that information?

17  A.   Only if I would need further clarification.

18  Q.   So what other types of things would you have done if you

19  needed further clarification?

20  A.   I would usually reach first out to the PI and ask for more

21  details on the activity if I didn't have enough content there

22  to verify if the activity could have some overlapping with the

23  obligation.

24  Q.   And what would you have done if you -- I know this is a bit

25  of a hypothetical, but let's say you had -- foreign research

1  support was disclosed, you asked some questions to determine if
2  there was overlap and then you determined that there was
3  overlap, what would you have done?
4  A.   As in any situation where there was overlap, first we
5  evaluate the -- if it's a significant overlap, right?  If we
6  believe there is significant overlap then, for any grant, I
7  would probably not recommend funding.
8  Q.   So we talked about foreign research support.  So when you
9  were evaluating Doctor Tao's renewal proposal, would you have
10 wanted to know if he had a second job at a Chinese university
11 while having his full-time job at KU?
12 A.   Since I'm not his employer, I really don't verify, you
13 know, jobs, per se.  That is not my role as a program manager.
14 What I'm verifying is what kind of research commitment the PI
15 has, if there is enough time to perform the application and if
16 the content doesn't overlap with others.
17 Q.   So let's tweak that hypothetical a little bit.  Let's
18 say -- and we're looking again at the period when you were
19 reviewing the renewal.  Let's say Doctor Tao had a job at -- he
20 had his full-time job at KU and then he had a job at a foreign
21 institution, and one of the requirements of that job at that
22 foreign institution was to perform research at that university.
23      Would that have been information that you would've wanted
24 to know?
25 A.   I would have liked to know the research scope.

1    Q.  And is that for the same reason, because you want to be

2    able to evaluate if there's the potential for overlap as well

3    as the commitment of time and whether he had sufficient time to

4    do that, whatever research he might be doing as well as the

5    research that he's asking DOE to fund?

6    A.  Correct.

7    Q.  When you were evaluating Doctor Tao's renewal, would you

8    have wanted to know if he had any current or pending proposals

9    to the National Science Foundation of China?

10   A.  I would have liked to know any current and pending research

11   activities.

12   Q.  And that's for the same reasons that we've talked about:

13   overlap, research, commitment of time?

14   A.  Absolutely.

15   Q.  And when you were reviewing his renewal, would you have

16   wanted to know whether he had been promised or received funding

17   from a foreign research university or institution to build a

18   laboratory?

19   A.  To build a laboratory?  I don't think that would be of my

20   concern.

21   Q.  And is that because it's -- the building of the laboratory

22   is sort of a distinct concept from your perspective versus the

23   actual research that he might be doing in that laboratory?

24   A.  Correct.

25   Q.  So just in summary, when you were reviewing Doctor Tao's

1  research proposal for renewal of funding, is it fair to say

2  that you would have wanted to know about any research support,

3  whether it was in the United States or foreign, whether it was

4  from a foreign government or foreign research institution, you

5  would've wanted to know that information at the moment of

6  evaluation so you could evaluate, No. 1, the potential research

7  overlap and, No. 2, whether he would have sufficient time to

8  perform the research that he was asking DOE to fund?

9  A.   Correct.

10          MR. BARRY:   Okay.  One moment, please.  No further

11  questions.

12          MR. ZEIDENBERG:   Just one moment, Your Honor, please.

13          THE COURT:   Yes.

14                    CROSS EXAMINATION

15  BY MR. ZEIDENBERG:

16  Q.   Good morning.

17  A.   Good morning.

18  Q.   Doctor Schwartz -- do you go by Doctor Schwartz?

19  A.   Yes.  Thank you.

20  Q.   Doctor Schwartz, do you recall when it was you were first

21  interviewed by the FBI in connection with this case?

22  A.   I don't recall exactly, but probably sometime in 2020.

23  Q.   Okay.  Would May 2020 sound about right?

24  A.   It could be.

25  Q.   Okay.  So that would've been -- if Doctor Tao had been

1    arrested in August of 2019, May 2020 would've been about nine

2    months later?

3    A.    It could be, I don't know for certain the month.

4    Q.    And prior to your being interviewed -- you were interviewed

5    with a colleague of yours, Doctor Raul Miranda?

6    A.    Yes, Doctor Raul Miranda was also interviewed.

7    Q.    Do you recall being interviewed at the same time, you and

8    he, with the FBI?

9    A.    Probably we were.  I'm not exactly sure.

10   Q.    Okay.  Do you have any knowledge of anyone else, any of

11   your other colleagues at DOE being interviewed about this case

12   prior to you and Doctor Miranda being interviewed in May of

13   2020?

14   A.    I don't have any knowledge.

15   Q.    So when the FBI came to talk to you in May of 2020, I take

16   it they talked to you about disclosure obligations at DOE;

17   correct?

18   A.    Correct.

19   Q.    Okay.  And as far as you know, that was the first time the

20   government was asking anyone at DOE about DOE disclosure

21   obligations on grant applications; correct?

22   A.    I have no idea about that.

23   Q.    Okay.

24   A.    I cannot answer yes or no.

25   Q.    Okay.  Thank you.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22

1          Just a couple questions about the administration of grants
2    so that there's no question or confusion about this.  Grants
3    are applied for not by the PI personally but by the
4    institution; correct?
5    A.   Correct.
6    Q.   And in this case that would be KU, not Doctor Tao; correct?
7    A.   Correct.
8    Q.   And Doctor Tao would not receive the grant funds, KU would
9    receive the grant funds; correct?
10   A.   Correct.
11   Q.   And DOE gets the grant application from the research office
12   at KU; correct?
13   A.   Yes, correct.
14   Q.   And DOE evaluators look at the proposal to determine
15   scientific merit?
16   A.   Yes, correct.
17   Q.   And then they look at the biosketch to determine if the PI
18   is qualified?
19   A.   Yes, correct.
20   Q.   And they look at current and pending support to see if the
21   PI has the capacity to do the work; correct?
22   A.   If the PI has the capacity, if the -- if there is overlap
23   on research and the PI's commitment.
24   Q.   Right.  And the grant application, you just told Mr. Barry,
25   does not include the university conflict of interest form;

1   correct?

2   A.   I don't know the contractual part.  I only look at the

3   scientific portion, so I don't want to answer anything about

4   the contractual part.

5   Q.   You don't have any reason to think that the Department of

6   Energy reviewers looked at the KU conflict of interest form.

7   You don't know that they have certainly; right?

8   A.   I don't know.

9   Q.   And the biosketch are the section where they list the --

10  the PI lists his qualifications; correct?

11  A.   Correct.

12  Q.   And the reviewers want to see if the applicant has the

13  experience necessary to do the work?

14  A.   I would say so.

15  Q.   And that section is limited to -- well, not approximately,

16  it's limited to two pages?

17  A.   I think there's a limitation of two pages.

18  Q.   And there's no requirement that the PI update his biosketch

19  once it's been submitted; correct?

20  A.   Correct, not that I know of.

21  Q.   And the DOE grant at issue in this case was applied for on

22  December 11th, 2017; correct?

23  A.   If you say so.  I don't have the dates in front of me, but

24  I believe so.

25  Q.   Assuming that's the case and the allegations in this case

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        951

1   were that Doctor Tao took a job at a foreign university in May

2   of 2018, some months later, six months later, there would be no

3   obligation even if that allegation were true, to update his

4   biosketch; correct?

5   A.   Not the biosketch.

6   Q.   So I want to talk to you about training on -- for PIs or

7   lack of training for PIs done by the Department of Energy.  And

8   I want to go back to 2017, 2018, 2019 time frame.

9        Fair to say there was no mandatory training provided to PIs

10  prior to their applying for grants; is that correct?

11  A.   I don't know what kind of training you're referring to

12  or -- DOE wouldn't give any training to PIs.

13  Q.   It does not; correct?

14  A.   Not that I know of.  I don't know what kind of training you

15  would think they should give.

16  Q.   So what I'm talking about is the -- when one applies for a

17  DOE grant, there is a funding announcement; correct?

18  A.   Correct.

19  Q.   And the funding announcement is a fairly lengthy document

20  which includes over 70 pages of sort of the DOE rules and

21  regulations about applying for a grant; correct?

22  A.   Correct.

23  Q.   And when I'm asking you about training, what I'm saying is,

24  as far as you know, DOE doesn't have any training to explain to

25  PIs what all the various provisions are in that funding

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          952

1    announcement and how they're interpreted by DOE and what to

2    look out for, what to be careful of, what to pay special

3    attention to.  None of that is provided; correct?

4    A.  Correct.

5    Q.  There is -- during this time period, DOE did not prohibit

6    its grantees or even its employees from participating in

7    foreign talent programs; correct?

8    A.  Correct.

9    Q.  Now, current and pending support, you said that's used for

10   two purposes, to determine if the PI is overcommitted and to

11   see if there's overlap, scientific overlap; correct?

12   A.  Correct.

13   Q.  And in January 7th, 2021 the FBI -- that was six months

14   after Doctor Tao was arrested in this case.  The FBI gave you

15   translations of what it has alleged were grant applications in

16   China in which they've alleged Doctor Tao was involved and they

17   asked you to compare them with his DOE grants.  Do you recall

18   that?

19   A.  Yes.

20   Q.  And you told the FBI that you didn't see evidence of

21   overlap; correct?

22   A.  I said that I wasn't able to evaluate the document on the

23   basis of what was written to assert an overlap.

24   Q.  Okay.  So fair to say from what you could see, you couldn't

25   determine there was any overlap?

1    A.   It's fair to say I could not determine, but I can't say

2    there was no or there was.

3    Q.   And you said that the second reason DOE wanted to know

4    about current and pending support was to determine if the PI is

5    overcommitted such that he might not get all his work done?

6    A.   Correct.

7    Q.   And would you agree with me that some PIs are more

8    industrious than other PIs, harder workers, faster workers?

9    A.   Yeah.  That happens in any profession.

10   Q.   Of course.  And is it fair to say that the question of

11   overcommitment is a subjective one based on your knowledge,

12   understanding of the individual PI, the type of work that he's

13   doing for DOE, the type of work he may be doing for other

14   institutions and the amount of assistance he's getting, the

15   amount of teaching responsibility he has, a whole bunch of

16   different factors; is that right?

17   A.   I don't evaluate the PI because most of the times I

18   wouldn't know the PI.

19   Q.   I'm sorry, say that again.

20   A.   I don't evaluate the PI, if the PI is more -- has more --

21   would give more effort or not because many times there are new

22   PIs and I don't take that into consideration.

23   Q.   Okay.

24   A.   I evaluate the general size of commitment.

25   Q.   But you knew Doctor Tao in this case, you had had

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22

1   experience working with him?

2   A.   Prior to giving the grant?

3   Q.   With this grant you had worked with him for some period of

4   time; correct?

5   A.   During the renewal, I didn't have much experience with

6   Doctor Tao, was the first time I had more experience with him.

7   Q.   Well, fair to say that there wasn't -- that the DOE grant

8   at issue here, the research got done; correct?

9   A.   Yes.

10  Q.   And it appeared to have been done satisfactorily?

11  A.   Yes.

12  Q.   So to the extent that there was a potential issue with time

13  commitment, fortunately it appears that he was able to get all

14  of his DOE work done?

15  A.   Yes.

16  Q.   And you told the FBI when you were interviewed that if a PI

17  were in a foreign country, it would not violate any DOE rules

18  if he or she was overseeing a DOE grant being completed in the

19  United States; is that correct?

20  A.   Correct.

21  Q.   And that's because the PI is able, from DOE's perspective,

22  to supervise remotely the work being done in his lab and to use

23  the phone and the Internet and other communication devices to

24  supervise what's being done; correct?

25  A.   Yes.

1    Q.  Now I want to talk about the purpose of these DOE grants.

2    When they -- when DOE awards a grant, it hopes and expects that

3    the research will be done and the results published; correct?

4    A.  Correct.

5    Q.  And one of the measures of a successful grant is that a lot

6    of papers are published in high-quality journals; correct?

7    A.  Correct.

8    Q.  And the more the publications are cited, the better?

9    A.  Yes.

10   Q.  Because this work is not meant to be kept secret, it's

11   meant to be disseminated widely in the scientific community and

12   that's how -- one of the metrics DOE uses to determine a

13   successful grant?

14   A.  Yes.

15   Q.  And the hopes and the expectation is the scientific

16   community is going to read from these, they're going to learn

17   from these and science will advance to benefit all of us;

18   correct?

19   A.  Yes.

20   Q.  And you said -- you told the FBI that a PI's scientific

21   output is measured by, among other factors, the number of

22   publications, the quality of the journals, and the number of

23   citations.  Does that sound right?

24   A.  Yes.

25   Q.  So what is a satisfactory number of publications for a

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22      956

1    particular grant?

2    A.  Depends on the size of the grant.

3    Q.  Okay.  And what about the number of citations?

4    A.  We don't have, you know, an absolute number that --

5    Q.  Okay.  Well, are you aware that for the DOE grant in this

6    case ending in 14561 -- if I were to tell you that it resulted

7    in 56 publications, would you agree that that's a very

8    impressive number?

9    A.  Yes.  If that refers to those three years, yes.

10   Q.  And if it resulted in over 3,000 citations, that would be

11   an impressive number; correct?

12   A.  Correct.

13   Q.  And agree that if those metrics were correct that I gave

14   you, over 56 -- or approximately 56 publications, 3,000

15   citations, by that measure Doctor Tao's research for DOE was a

16   success; correct?

17   A.  Yes.

18   Q.  Now, Mr. Barry was asking you about the identification of

19   potential conflicts of interest or bias in selection of

20   reviewers in connection with the DOE grant.  Do you recall

21   that?

22   A.  Yes.

23   Q.  And just to be clear, I'm showing you what's Exhibit 32,

24   and this was the identification of potential conflicts of

25   interest or bias in selection of reviewers.  Do you recall when

1    Mr. Barry was asking you about that?

2    A.    Yes.

3    Q.    And it's asking for this information -- is it correct to

4    say that the DOE wants that because they want to be sure that

5    the reviewers who are looking at the grant application aren't

6    biased in favor of the PI; correct?

7    A.    I want to verify if they are not biased in favor or

8    against.

9    Q.    Or against.  Okay.

10         Is it fair to say that DOE would not have as a reviewer of

11   its grant a foreign national from a foreign university such as

12   Fuzhou University, Fuzhou University from China, sitting on a

13   grant reviewing -- well, let me ask you this way.

14         Are you aware of any grant reviewers for DOE coming from

15   Fuzhou University?

16   A.    I can't tell Fuzhou University, but I used several Chinese

17   professors for reviewing grants before.

18   Q.    Do they have to speak English?

19   A.    Yes, for sure.  Otherwise they wouldn't be able to read the

20   document.

21   Q.    Exactly.  Fair to say that DOE in general has no financial

22   conflict of interest policy?

23   A.    Again, I don't know contractual questions.

24   Q.    Back in the 2017-2019 time frame, is it fair to say that

25   DOE had no policy that would prohibit foreign academic

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          958

1    appointments?

2    A.    Yes.

3    Q.    So there was no prohibition on that; correct?

4    A.    Yes, as far as I know.

5    Q.    Going back to the grant reviewers.  You're not aware of

6    anyone from Fuzhou University reviewing any of Doctor Tao's DOE

7    grants; correct?

8    A.    I can't say yes or no because I would -- I can't remember

9    that.  I review many, many, many proposals per year.

10   Q.    And there isn't a DOE conflict of interest policy that you

11   can identify for the jury, can you?

12   A.    No.

13   Q.    And do you agree, Doctor Schwartz, with others; that

14   between 2015 and 2018 there was some confusion about the

15   question about whether foreign grants that came through a

16   separate funding institution needed to be disclosed?

17   A.    I don't think there was any confusion.

18   Q.    Are you aware of questions being raised in the field about

19   disclosure obligations involving foreign grants?

20   A.    You're asking me if there were questions from PIs on the

21   field?

22   Q.    Yes.

23   A.    No, I wasn't ever asked this question.

24   Q.    Never asked that?

25   A.    No.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22      959

1    Q.  Fair to say that between 2015 and 2020 the rules became
2    more explicit about disclosure obligations?
3    A.  There were more specific -- specificity on the rules after
4    2020.
5    Q.  And the specificity on the rules had to do with disclosure
6    obligations; correct?
7    A.  Correct.
8    Q.  And the language became broader and more explicit; correct?
9    A.  I don't know about broader, but there were specific
10   language regarding the talent, whatever it's called, the talent
11   program.
12   Q.  Would you agree that as of 2018 that DOE considered these
13   disclosure obligations more of an ethical expectation rather
14   than a legal expectation?
15   A.  I don't know how to answer because I'm not a legal expert.
16   I just say that there was required documentation and the
17   expectation was to disclose research activities.  Now, if it
18   was legal or illegal, I can't respond to that.
19   Q.  Fair to say that -- how long have you been in your position
20   as a program manager?
21   A.  Since 2015.
22   Q.  Okay.  And you supervise how many -- how many -- over that
23   period of time can you estimate for us how many grants that you
24   sort of supervised or were in charge of?
25   A.  I'm about -- I'm in charge about -- probably about almost

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    960

1    100 grants per year.

2    Q.  Okay.  Per year?

3    A.  Well, that are active, 100 active grants.

4    Q.  Okay.  And lots of different PIs?

5    A.  Correct.

6    Q.  And is it fair to say that PIs -- well, you mentioned

7    earlier that some PIs are new, some are very experienced;

8    correct?

9    A.  Correct.  Let me just re-word here.  I was -- I probably

10   supervise about 100 PIs, but about half number of the grants.

11   Q.  Okay.  And it's fair to say that there's a wide variety of

12   experience involved with the PIs?

13   A.  Correct.

14   Q.  And a degree of sophistication among the PIs?

15   A.  I don't know what you mean with "sophistication."

16   Q.  It's a bad word.  Just strike that.

17       Fair to say that a lot of questions can come up with PIs in

18   which they have -- you try to give them guidance?

19   A.  Correct.

20   Q.  And would you agree with me that mistakes can be made on

21   grant paperwork through innocent mistake and omissions that are

22   just unintentional?

23   A.  Yes.

24   Q.  And when you see mistakes, you go to the PI and raise it

25   with them and ask them about it; correct?

1  A.  Well, depends on the mistake.  There are some mistakes that

2  invalidate the application.

3  Q.  Well, let's say there is pending support that is listed

4  publicly on public articles that are published on the Internet

5  that you've read and you know about, but you don't see it on

6  the grant application.  Is that the type of thing that you

7  would ask the PI and say, "Is there some reason why this hasn't

8  been included?  I think you should include this.  We need to

9  talk about it"?

10  A.  If that would happen, that could be hypothetically the kind

11  of thing.

12  Q.  Okay.  And you wouldn't assume, fair to say, that simply

13  because something is -- like that is missing, that that must be

14  done intentionally and for a bad reason?

15  A.  I don't think I can assume anything about their intentions.

16  Q.  If you heard about an application -- an appointment that

17  was omitted -- a second grant that was omitted but that was not

18  funded, it ended up not being funded, I take it that would

19  alleviate the concern about overcommitment or overlap; correct?

20  A.  Correct.

21  Q.  Okay.  And so just to dive into that a little further,

22  you're looking at a grant application, you want to know about

23  current and pending support because of the overlap and time

24  commitment issue; correct?

25  A.  Yes.

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22      962

1   Q.  And if ultimately something is left off, but it is not

2   funded, then in a way it's a situation where the problem is

3   averted because there can be no overlap and there can be no

4   time commitment issue on an unfunded grant?

5   A.  Yes.

6   Q.  Okay.  You never had an opportunity to talk to Doctor Tao

7   about any of the alleged omissions on his DOE grant paperwork,

8   did you?

9   A.  No, I never had this.

10  Q.  I want to show you Exhibit 1229.  Page 66.

11          MR. ZEIDENBERG:  And I move to introduce Defense

12  Exhibit 1229.

13          THE COURT:  Any objection?

14          MR. BARRY:  The only objection is at least the version

15  we have isn't -- it's only a few pages, it's not the

16  complete --

17          (Counsel confer).

18          THE COURT:  This is a funding opportunity announcement

19  from Department of Energy?

20          MR. ZEIDENBERG:  Yes.

21          MR. BARRY:  The only -- right now the only objection

22  is on completeness because there's only three pages in the

23  excerpt that I have.

24          MR. ZEIDENBERG:  You don't have the full --

25          MR. BARRY:  No.  The one that was produced to us is

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22      963

1    only three pages, so I would just ask at least that the witness

2    have the full version so that if she needs to reference other

3    pages, she can.

4          MR. ZEIDENBERG:  You can have this one.

5          MR. BARRY:  Okay.

6          THE COURT:  Okay.  1229 will be admitted, but the

7    government does need a complete copy of that.  1229 admitted.

8    BY MR. ZEIDENBERG:

9    Q.  Let me just show you the front page.  You can tell us what

10   this is.  Do you recognize this, Ms. Schwartz -- Doctor

11   Schwartz?  I'm sorry.

12   A.  Yes.

13   Q.  And what is this?

14   A.  It's another funding opportunity announcement at this time

15   issued in October 1st, 2020.

16   Q.  Okay.  So this is what the current funding announcements

17   look like; correct?

18   A.  I don't know if it's the current -- this is not the

19   current.  This was from -- in October 2020.

20   Q.  Okay.  Fair enough.  So this is -- this is after the

21   clarifications that you had mentioned, the language had become

22   clearer in the funding announcements after 2020; correct?

23   A.  Correct.

24   Q.  And I want to show you the new language.  And is it fair to

25   say this section in the highlighted portion here was not in the

1    previous announcements; correct?

2    A.    Correct.

3    Q.    And I just want to read it and tell me if I'm reading this

4    correctly.  "WARNING:  These instructions have been

5    significantly revised to require disclosure of a variety of

6    potential conflicts of interest or commitment, including

7    participation in foreign government sponsored talent

8    recruitment problems -- programs."

9        "The PI and each senior/key person at the prime applicant

10   and any proposed subaward must provide a list of all sponsored

11   activities, awards, and appointments, whether paid or unpaid;

12   provided as a gift with terms or conditions or provided as a

13   gift without terms or conditions; full-time, part-time,

14   voluntary; faculty, visiting, adjunct, or honorary; cash or

15   in-kind; foreign or domestic; governmental or private sector;

16   directly supporting the individual's research or indirectly

17   supporting the individual by supporting students, research

18   staff, space, equipment, or other research expenses.  All

19   foreign government-sponsored talent programs must be identified

20   in current and pending support."

21       That's all new language; correct?

22   A.    Yes.

23   Q.    The funding announcement that Doctor Tao responded to

24   didn't have a warning written in capital letters and boldface

25   type telling him in this kind of detail what needed to be

1    disclosed; correct?

2    A.    Correct.

3    Q.    The guidance Doctor Tao would've received did not say "all

4    foreign government-sponsored talent recruitment programs must

5    be identified in current and pending support"; correct?

6    A.    Correct.

7    Q.    And to be clear, the funding announcement that Doctor Tao's

8    grant -- that he applied for did not ask for disclosure of,

9    quote, faculty, visiting, adjunct, or honorary appointments;

10   foreign or domestic; correct?

11   A.    Correct.

12   Q.    So you would agree, would you not, that the funding

13   announcements as of 2020 were much more explicit in their

14   warnings to PIs and that prior to 2020 that language was,

15   compared to this, un -- less clear; fair to say?

16           MR. BARRY:  Objection, misstates prior testimony.

17           THE WITNESS:  I don't --

18           THE COURT:  Wait, wait.  I'm sorry?

19           MR. BARRY:  Objection, misstates her prior testimony.

20           THE COURT:  I'll overrule.  If you understand the

21   question, you can answer it.

22           THE WITNESS:  I didn't -- I wouldn't affirm anything

23   about the clarity or non-clarity.  The only thing that I can

24   affirm is that the current funding opportunity, the one that we

25   are seeing here, explicitly asks to disclose some activities

1    that were not explicitly asked before.

2    BY MR. ZEIDENBERG:

3    Q.  You would agree -- or would you agree with me that this

4    language was significantly revised?

5    A.  I would agree there is an addendum on the language.

6    Q.  In 2018 if there was access to a lab but no grant and no

7    time commitment, nothing to report; correct?

8    A.  Correct.

9    Q.  And that changed in 2020?

10    A.  Correct.

11    Q.  And talking about progress reports, you would agree that

12    before 2020 DOE progress reports did not require disclosure of

13    unfunded grant applications?

14    A.  The progress reports I don't think ever changed prior or

15    after 2020.

16    Q.  Fair enough.  But they didn't require unfunded grant

17    applications to be provided in progress reports; correct?

18    A.  I don't think the progress report ever required that.

19    Q.  Okay.  And that's because, I take it, PIs are frequently

20    applying for multiple grants at any particular time, most of

21    which they don't receive; correct?

22    A.  I wouldn't know the reasons why.

23    Q.  Okay.  Now --

24        MR. ZEIDENBERG:  The court's indulgence.

25        THE WITNESS:  I didn't hear.  Was there a question?

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22            967

1          MR. ZEIDENBERG:  No, I'm sorry, that was -- that was

2     me saying can I have a minute to look at my notes.

3     BY MR. ZEIDENBERG:

4     Q.  I want to show you Defense Exhibit 1224.

5          MR. ZEIDENBERG:  I'm not sure if this has been

6     introduced.

7     BY MR. ZEIDENBERG:

8     Q.  I'm sorry.  Let me show you this way, ask you if you

9     recognize that.

10    A.  Yes, I do.

11    Q.  You do?

12    A.  (Nods head up and down).

13    Q.  Is that an e-mail that you sent to Doctor Tao?

14    A.  It's an e-mail that I sent to Doctor Tao and I send to

15    every PI that I recommend a grant.

16         MR. BARRY:  I think we need to introduce it.

17         MR. ZEIDENBERG:  I move to introduce Exhibit 1224,

18    Your Honor.

19         MR. BARRY:  No objection.

20         THE COURT:  1224 admitted.

21    BY MR. ZEIDENBERG:

22    Q.  And this was sent by you on July 10th, 2018?

23    A.  Yes.

24    Q.  And you said to Doctor Tao in that e-mail, you needed "an

25    updated current and pending support list from you and your

1    co-PI that includes a short statement for each grant describing

2    briefly their goals and indicating any existing or potential

3    overlap with this DOE grant.  For every current federal grant,

4    please include the name and phone number of the program

5    manager."  Do you see that?

6    A.    Yes.

7    Q.    And you see the reference there to current federal grant?

8    A.    Yes.

9    Q.    And did it ever occur to you, Doctor Schwartz, that -- from

10   this question that the PI in this case, Doctor Tao, would be

11   thinking in the context that you're asking about other federal

12   support?

13   A.    Can you rephrase your question?  I don't understand what

14   exactly you're asking.

15   Q.    Yes, I would be happy to.

16        So from your question or your request for current and

17   pending support and your reference to current federal grants,

18   in looking at it now and knowing the context, did it ever occur

19   to you that the way this is written might suggest to the

20   recipient that you were looking for other -- information about

21   other federal grants?

22   A.    That I was looking for other federal grants, that I was

23   looking for --

24   Q.    You wanted information from Doctor Tao about his other

25   federal grants?

1    A.   I was asking about updated current and funding support and

2    it did not occur to me, if you're asking, that I was only

3    asking about federal grant.

4    Q.   You were?

5    A.   No.  It did not occur to me that the PI would interpret

6    that way.

7    Q.   Okay.  It did not occur to you?

8    A.   Yeah.

9    Q.   Do you see how -- in looking at it now, because of the

10   language you used, it could be interpreted that way?

11   A.   I don't know about the interpretation.  I only ask about

12   the name and the phone number for the federal grants because

13   those are the ones that I can easily contact.

14   Q.   I want to show you what's been marked as Defense

15   Exhibit 1379.  Ask you if you recognize it.

16   A.   This is a funding opportunity announcement for another

17   office within DOE.

18   Q.   Okay.  And what is the -- that's a post-2020 funding

19   announcement; is that correct?

20   A.   This is post in 2022.

21   Q.   Okay.  So this has changed even further from the one we

22   looked at from 2020; correct?

23   A.   Yes, but it's not from my office.

24   Q.   But it's from DOE?

25   A.   It is from DOE, but I cannot respond to anything about this

1    funding announcement because I'm not familiar with it.

2    Q.   Okay.  But do you recognize it as being a DOE funding

3    announcement?

4    A.   Correct.

5            MR. ZEIDENBERG:  Your Honor, I'd move to introduce

6    Exhibit 1379.

7            MR. BARRY:  Objection, relevance.  She just said she

8    doesn't know anything about it because it's from a different

9    office.

10           THE COURT:  I'll overrule.  Exhibit 1379 admitted.

11   BY MR. ZEIDENBERG:

12   Q.   I'd like to show you Page 44 and what the current funding

13   announcement -- DOE funding announcement says.  This current

14   and pending support language is like -- is this similar to what

15   there was in 2020 that we just read?

16   A.   The highlighted part looks similar.

17   Q.   And then here on Page 45 is a certification.  And this

18   language is new; correct?

19   A.   I don't know if it's new or not, I'm not familiar with this

20   announcement.

21   Q.   You don't recognize this?

22   A.   No, because I don't read this announcement.

23   Q.   You don't read it?

24   A.   That's not part of my job description.  This is not the

25   announcement from my office.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22      971

1    Q.   Okay.  Well, let me read it then.  This is in -- from a
2    2022 funding announcement; correct?  We just looked at the --
3    A.   Yes.
4    Q.   And it says, "I, blank, certify to the best of my knowledge
5    and belief that the information contained in this current and
6    pending support disclosure statement is true, complete and
7    accurate.  I understand that any false, fictitious, or
8    fraudulent information, misrepresentations, half-truths, or
9    omissions of any material fact, may subject me to criminal,
10   civil or administrative penalties for fraud, false statements,
11   false claims or otherwise.  18 U.S.C. 1001 and 287, 31 U.S.C.
12   3729-3730 and 3801-3812."
13       "I further understand and agree that (1) the statements and
14   representations made herein are material to DOE's funding
15   decision, and (2) I have a responsibility to update the
16   disclosures during the period of performance of the award
17   should circumstances change which impact the responses provided
18   above."
19       Did I read that correctly?
20   A.   Yes.
21   Q.   Now, fair to say that this certification that I just read
22   does not -- or did not exist in the funding announcement that
23   Doctor Tao participated in with the DOE grant at issue in this
24   case; correct?
25   A.   I don't think it existed.

```
 1   Q.  I'd like to show just the witness Defense Exhibit 1223 and
 2   see if you recognize it.
 3          MR. BARRY:  Objection, Your Honor, it hasn't been
 4   admitted into evidence yet.
 5          THE COURT:  Wait a minute.  I'm sorry?
 6          MR. DEARINGTON:  I think it's supposed to be published
 7   just to the witness.
 8          MR. BARRY:  Got it, sorry.  I got a little too eager,
 9   I saw it on here.  Sorry, Peter.
10   BY MR. ZEIDENBERG:
11   Q.  Doctor Schwartz, could you take a look at that and see if
12   you recognize what it appears to be?
13   A.  Yes, but it's not from me.
14   Q.  Right.  Does that appear to be an e-mail from Raul Miranda
15   to Franklin Tao?
16   A.  Correct.
17   Q.  And Raul Miranda is your colleague?
18   A.  Yes; correct.
19   Q.  And do you recognize those e-mail addresses?
20   A.  Yes.
21          MR. ZEIDENBERG:  Your Honor, I'd move to introduce
22   Defense Exhibit 1223.
23          THE COURT:  Any objection?
24          MR. BARRY:  Objection, hearsay, to the extent they're
25   trying to admit anything other than Doctor Tao's statements --
```

```
1    oh, and Doctor Tao's statements.  So hearsay to the whole

2    thing.

3              THE COURT:  I'm sorry?

4              MR. BARRY:  Objection, hearsay.

5              THE COURT:  Okay.  Is this a string that includes a

6    conversation back and forth?

7              MR. ZEIDENBERG:  Between Doctor Tao and her -- Mr.

8    Miranda, yes, Doctor Miranda.

9              THE COURT:  All right.  Well, I need to look -- is it

10   offered for the truth of the matter asserted in terms of what

11   Doctor Miranda is saying?

12             MR. ZEIDENBERG:  It would go to state of mind of

13   Doctor Tao is why I would be introducing it.

14             THE COURT:  All right.  I'll admit Exhibit 1223, but

15   disregard what Doctor Miranda says as evidence of the truth.

16   In other words, this exhibit is only to be considered with

17   respect to how Doctor Tao reacts to what Mr. Miranda says.  But

18   because Mr. Miranda is not here testify about his own

19   statements, disregard those as being evidence of the truth.

20             All right.  With that limitation, Exhibit 1223 is

21   admitted.

22   BY MR. ZEIDENBERG:

23   Q.  So the top of that e-mail from Doctor Miranda to Doctor Tao

24   June 2015 -- Wednesday, 10th of June, 2015.  Let me just see if

25   I'm reading this correctly.
```

```
 1          "Dear Franklin, we're still completing paperwork required
 2     for new grants, and I can't find your annotated current and
 3     pending list, as requested.  See below [sic] block.  It is
 4     needed for my documentation as I must certify there are no
 5     overlaps with other federal funding.  (I need that info from
 6     both De-en and you)."
 7          Do you see that?
 8     A.   Yes.
 9     Q.   And is that a typical type of e-mail from a program manager
10     to a PI?
11     A.   I don't know what typically Raul Miranda sends.
12     Q.   And do you see that there's no mention in there about other
13     foreign funding; correct?
14     A.   Correct.
15     Q.   I want to show you Exhibit 1430 and ask you if you
16     recognize it.
17     A.   Yes.
18     Q.   And what do you recognize that to be?
19     A.   It's an e-mail from one of our PIs asking about activities
20     of foreign connection activities.
21     Q.   And are you on that e-mail?
22     A.   Yes, I am.  Wait a minute.  Let me see.  Yes.
23          MR. ZEIDENBERG:  And, Your Honor, I'd like to
24     introduce Defense Exhibit 1430.
25          MR. BARRY:  No objection.
```

1          THE COURT:  1430 admitted.

2    BY MR. ZEIDENBERG:

3    Q.   Now, who is Susannah Scott?

4    A.   She's a professor at University of Santa Barbara in

5    California.

6    Q.   And she is a PI on a DOE grant?

7    A.   Yes, that's correct.

8    Q.   And is it fair to say that in September of 2020 Doctor

9    Scott e-mailed you and your colleague, Chris Bradley, she says

10   on the advice of her university to let you know about various

11   foreign connections that she had?

12   A.   Correct.

13   Q.   And I'd like to go over with you the connections that she

14   revealed to you in this e-mail.  Okay?  She said, "1.  I've

15   been collaborating with researchers in China since 2005 when

16   the National Science Foundation initiated its Partnership in

17   Research and Education.  From 2005 to 2017 I was a PI on an NSF

18   PIRE project which involved collaborative research and graduate

19   student exchanges between UC Santa Barbara and several research

20   institutions in China, most notably the Dalian Institute of

21   Chemical Physics (run by the Chinese Academy of Sciences).

22   During this period, our Chinese collaborators, with the support

23   of US NSF and its Beijing office, applied for matching funds

24   from NSF-China and MOST, (the Chinese Ministry of Science and

25   Technology).  I did not list these matching funds on any

1    disclosures because I was not a PI on those grants and I had no

2    access to the funds they provided to my Chinese colleagues."

3    That's No. 1.

4    "2.  Since the NSF PIRE funding ended in 2017, I have

5    continued to collaborate informally (without research funding)

6    with colleagues in Dalian.  In 2017, the Dalian University of

7    Technology nominated me for a Changjiang International Visiting

8    Scholar Award.  This is a three-year non-salaried, non-employee

9    award sponsored by the Chinese Ministry of Education (thus

10   requiring nomination by a university, not the Chinese Academy

11   of Sciences).  I received it in 2018.  The award provided

12   travel funding and a small stipend (less than $4,500 per year)

13   to allow me to visit Dalian and continue my interactions with

14   colleagues there.  I have never had a research lab" -- the very

15   bottom of there is cut off.

16   And she continues, "... while researching *[sic]*, graduate

17   students supervisor responsibilities, or teaching

18   responsibilities there.  I gave occasional seminars based on my

19   research interests and on scientific writing, participated in

20   scholarly conferences, discussed scientific issues related to

21   fundamental catalysis informally with many faculty and

22   students.  I disclosed the award and my activities to UC Santa

23   Barbara in 2018, and they were approved.  I did not list the

24   award on any current and pending documents because it has no

25   monetary value in terms of research support.  I should note

1    that my research laboratory has hosted many visitors from

2    around the world, including China, and many of them have their

3    own scholarship funding.  I can provide you a list if you

4    wish."

5        "The total time I spent in Dalian was 20 business days in

6    2018 and '19, six days in 2019 and '20.  Due to the pandemic

7    and travel restrictions, the total amount of time I've spent

8    and expect to spend in Dalian in 2020-21 is zero."  And then it

9    skips down in.

10       "In reviewing the Changjiang International Visiting Scholar

11   agreement (written in Chinese and translated by the University

12   of California's general counsel), the university informed me

13   that it believes the agreement includes a two-month annual time

14   commitment.  I have not spent anywhere near this much time

15   there, and no one in Dalian has ever asked me to do so or

16   suggested that I should.  I have not been paid for any specific

17   time commitment nor have I been an employee of the Dalian

18   University of Technology for any period of time."

19       So apologize for reading that whole long e-mail, but do you

20   recall getting this?

21   A.   Yes, I do.

22   Q.   And do you recall how DOE responded to the question about

23   what she needed to do in terms of her disclosure obligations?

24   A.   No, because I was not privy to the response.  We send this

25   e-mail to our supervisors and let them respond to this e-mail.

1    Q.   And you were cc'd on the response; right?

2    A.   This was not the final response from the supervisors.

3    Q.   Well, do you see a response at the top of the letter?

4    A.   This was a response from my colleague.

5    Q.   Yes.  And what is the response?

6    A.   "Thanks for notification.  We appreciate the open

7    disclosure of the interactions.  We will have to pass this

8    along prior to providing any guidance on our end.  As the DOE

9    perspective on these interactions is continuing to evolve,

10   neither of us would want to say much else at this stage and

11   provide incorrect information."

12   Q.   And, in fact, DOE never required any further update on

13   this; isn't that correct?

14   A.   I don't know.

15   Q.   Well, let me show you September 28th, which is the same

16   e-mail string and you're on this as well, but this would've

17   been three days later.

18        And do you see the question there?

19   A.   Yes.

20   Q.   "While this is continuing to move up the management chain,

21   we have a clarification question.  Did the visiting scholar

22   program agreement involve anything regarding IP tech transfer

23   rights?  Specifically, I believe there is an interest to

24   determine if there's any impact from your prior association

25   with the program moving forward on BES."

1      Do you see that?

2  A.   Correct.

3  Q.   And then Ms. Scott replies on September 29th.  She says, "I

4  have not published any papers or applied for any patents

5  listing Dalian University," and she said she co-authored a

6  paper.

7      And then finally at the end of this string on October 14th,

8  which is several weeks later, Chris Bradley, with you cc'd,

9  sends a response and he replies, "Susannah, I just want to

10 provide a non-update update.  We're still waiting on feedback

11 from higher management.  This isn't an indicator in any

12 direction, just that it takes time to get guidance on these

13 types of issues.  We will continue updating you periodically."

14      Do you see that?

15 A.   Yes, I see.

16 Q.   Would you be surprised to know that that was the last

17 e-mail that Ms. Scott got from DOE on this subject?

18 A.   I wouldn't know either way.

19 Q.   And so fair to say that from this exchange that DOE

20 officials were unclear what to do with this type of

21 information?  Weeks later they still don't have a response;

22 correct?

23 A.   It's fair to say that we program managers were unclear with

24 that information specifically.

25 Q.   And that's because the rules were evolving; correct?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        980

1    A.    Yes.

2    Q.    And it wasn't 100 percent clear to even experienced program

3    managers like you what the new DOE expectations were to these

4    types of circumstances?

5    A.    To that specific circumstance, yes.

6    Q.    And is it fair -- would you agree with me, Ms. Schwartz --

7    Doctor Schwartz, I apologize.

8         Would you agree with me, Doctor Schwartz, that if program

9    managers such as yourself who deal with these issues day in and

10   day out, having difficulty grappling with the disclosure

11   obligations, that the PIs in the field who are focused on the

12   science are going to have even more difficulty?

13             MR. BARRY:  Objection, calls for speculation and lay

14   opinion testimony.

15             THE COURT:  Overruled.  You can answer it if you know.

16             THE WITNESS:  Again, it's a speculation, right?  So,

17   yes, she was confused.

18   BY MR. ZEIDENBERG:

19   Q.    And I noticed in there, that e-mail exchange, that Ms.

20   Scott referenced a contract that she said that she had in

21   Chinese with Dalian University that she had translated, and it

22   said she has a two-month commitment, but she said, but I

23   haven't really been doing a two-month commitment.  Do you

24   recall that?

25   A.    Yes.

1    Q.    And I was struck by the fact that no one from the DOE side

2    on that exchange asked her to forward a copy of that contract

3    to DOE for its review.  Did you see that?

4    A.    I don't know if anybody else had asked for a copy.

5    Q.    But you didn't see anyone on that e-mail exchange saying,

6    well, we need to review that contact to see what else it might

7    say; correct?

8    A.    On that exchange, yes.

9    Q.    You as the program manager and Mr. Bradley or Doctor

10   Bradley were willing to accept her representations about what

11   the University of California told her about their translation;

12   correct?

13   A.    We sent this to the upper management and let them decide on

14   that.

15   Q.    You aren't aware of anyone asking you -- asking her for

16   the -- a copy of the contract; correct?

17   A.    I don't know or do not recall at least.

18   Q.    Okay.  I want to talk to you a little bit about progress

19   reports and I want to direct your attention to Defense

20   Exhibit 1236.  Do you see that?

21   A.    Yes.

22   Q.    And is that a progress report for the DOE grant Doctor Tao

23   was involved in?

24   A.    Correct.

25            MR. ZEIDENBERG:  Your Honor, I'd move to introduce

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22        982

1    Defense Exhibit 1236.

2          MR. BARRY:  No objection.

3          THE COURT:  1236 admitted.

4    BY MR. ZEIDENBERG:

5    Q.   A progress report includes a space for funding support;

6    correct?

7    A.   Includes a space for participant list.

8    Q.   But that's optional; correct?

9    A.   Well, all the PIs will be allowed participants.

10   Q.   Well, fair to say that funding support does not include

11   unpaid affiliations with a foreign university; correct?

12   A.   What is the question again?

13   Q.   Funding support would not include an unpaid affiliation

14   with a foreign university; correct?

15   A.   Correct.

16   Q.   And we've already talked about that a progress report

17   doesn't require disclosure of unfunded grant proposals;

18   correct?

19   A.   Correct.

20   Q.   And one of the pieces of information the progress report

21   requires is an updated list of relevant publications; correct?

22   A.   Correct.

23   Q.   And no one requires the PI to list -- the PI selects what

24   he wants to list as his publications; correct?

25   A.   The PI should list all the publications that were derived

1    from this grant.

2    Q.  Okay.  And he selects them?

3    A.  Again, he should list all the publications that are derived

4    from this grant.

5    Q.  And do you look at them when they're --

6    A.  I look at many of them.

7    Q.  -- submitted?  Okay.

8    A.  Not all.

9    Q.  Okay.  So he listed -- do you see what page it is?  You can

10   help me out if you can remember what page it was on that report

11   that he lists his articles.  Page 4 I think.

12   A.  He starts listing on Page 18.

13   Q.  I got it.  Page 4.  Here we go.  And you see the Synergy of

14   Single-Atom?

15   A.  I should say that that's not where the publications are

16   usually listed.  Typically starts on Page 18.

17   Q.  Well, it says, "How have the results been disseminated to

18   communities of interest?"  Do you see that?

19   A.  Yeah.  That is a pretty free form in the sense that he can

20   talk about conferences, but the publications details should

21   come after Page 18.

22   Q.  And you see four articles that are listed there?

23   A.  Yes.

24   Q.  And have you looked at those articles to see the

25   affiliations that Doctor Tao listed?

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22          984

```
1    A.  It's impossible for me to say today if I looked at those

2    articles in particular.  This was in 2018.

3    Q.  I'm showing you -- do we have 1226 and 1227?  Actually

4    they're here; right?  I got them.

5         Do you see those -- I'm showing you Defense Exhibits 1226

6    and 1227.  Do you recognize those?

7    A.  Well, I can't say I recognize those papers, but those are

8    published papers in journals.

9              MR. ZEIDENBERG:  I'd move to introduce 1226 and 1227.

10             THE COURT:  They're admitted already.  They're already

11   admitted.

12             MR. ZEIDENBERG:  Thank you, Your Honor.

13   BY MR. ZEIDENBERG:

14   Q.  I'm showing you -- this is one of the articles that Doctor

15   Tao listed in his progress report; correct?

16   A.  Yeah.  It's apparently so.

17   Q.  And if you look at the affiliations, he listed his

18   affiliation -- do you see it says Franklin Tao, which is

19   highlighted there; right?

20   A.  Yes.

21   Q.  And it lists his affiliation as being with KU and Fuzhou

22   University; correct?

23   A.  Correct.

24   Q.  That's 1227.  And showing you 1226.  That's from *Chemical*

25   *Reviews.*  It mentions Franklin Tao.  It lists his affiliation
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          985

1    as being KU and Fuzhou University; correct?

2    A.   Correct.

3    Q.   And those weren't the only two articles he listed; correct?

4    A.   Correct.

5    Q.   He also listed what's been marked as Exhibit 25, Studies of

6    Surface of Metal Nanoparticles in a Flowing Liquid with XPS.

7    Here's Exhibit 25.  Do you see that?

8    A.   Yes.

9         MR. ZEIDENBERG:  Your Honor, I believe it's already

10   introduced.

11        THE COURT:  Exhibit 25?

12        MR. ZEIDENBERG:  Exhibit 1225.

13        THE COURT:  1225.  Yes, it's admitted.

14   BY MR. ZEIDENBERG:

15   Q.   So this article, which was in his -- listed in his progress

16   report -- there's Doctor Tao's name and then his affiliation at

17   the bottom of the page, it lists his affiliation as being with

18   KU and Fuzhou University; correct?

19   A.   Yes.

20   Q.   And you were -- you reviewed this progress report; correct?

21   A.   Correct.

22   Q.   And you commented on that progress report.  And do you have

23   1237 in front of you, the progress report?

24   A.   I have 1236.

25   Q.   I have it right here.

1           THE COURT:  1236 or 1237?

2           MR. ZEIDENBERG:  I'm sorry?

3           THE COURT:  Is it 1236?

4           MR. ZEIDENBERG:  That's -- I'm showing the witness

5    1237, I'm not sure if it's been introduced or not.

6           THE COURT:  Okay.  It has not.

7           MR. BARRY:  I believe a version of it has been

8    introduced from the government's exhibit.  I think it's the

9    same one, I think it's Government Exhibit 36.

10          THE WITNESS:  Yes, I saw this on Friday.

11   BY MR. ZEIDENBERG:

12   Q.  Do you recognize 1237?

13   A.  Yes.

14   Q.  What is it?

15   A.  It is a report from our web-based system showing some of

16   the actions taken on the grant and my comments on that.

17   Q.  Okay.

18          MR. ZEIDENBERG:  I'd move to introduce Defense

19   Exhibit 1237.

20          MR. BARRY:  Just a minute, Your Honor.  I just want to

21   make sure we don't double up.

22          THE WITNESS:  It was Exhibit 36 from Friday, I think.

23          MR. BARRY:  The only objection would just be that we

24   use the version that's already been -- it's the same version as

25   far as we can tell.

```
1              THE COURT:  What's the exhibit -- is it a government
2    exhibit number?
3              MR. BARRY:  It's Government Exhibit No. 36.
4              THE COURT:  36.  Well, if it's one and the same, let's
5    just not duplicate.  You can certainly examine her with this
6    exhibit, though, for your own ease.
7              MR. BARRY:  I just want to make sure we don't double
8    up.
9              MR. ZEIDENBERG:  Your Honor, I move to introduce 1237.
10             THE COURT:  Is it the same as Exhibit 36?
11             MR. ZEIDENBERG:  It is not the same as 1236.
12             COURTROOM DEPUTY:  36.
13             THE COURT:  Is it the same as Government Exhibit 36?
14             MR. DEARINGTON:  It overlaps.
15             MR. ZEIDENBERG:  It overlaps.
16             THE COURT:  I just don't want to get two of the same
17   if it's exactly the same.  Let's just go with Government
18   Exhibit 36.  I mean, if they're the same, go ahead and just use
19   that to examine her, but it's already admitted as Government
20   Exhibit 36.
21   BY MR. ZEIDENBERG:
22   Q.  Okay.  So these are your comments on Doctor Tao's progress
23   report; correct?
24   A.  Correct.
25   Q.  And you say, "This is the first year after the renewal of
```

1    the PI and the PI continues reports nicely their recent

2    advances with an output of (at least), four new publications on

3    which our grant was the major contributor.  The publications

4    are (as usual with this PI) in high-impact journals (*JACS*,

5    *Nature Comm*, *Langmuir*, and others).  In addition, the PI also

6    contributed to a very comprehensive review in the field

7    published this year at *Chem Review*.  There was one instance

8    that the publication would benefit from a better delineation on

9    the acknowledgement and this was communicated to the PI as we

10    usually do.  The output is very good and supportive of

11    continued funding."

12        Is that what you commented?

13    A.  Yeah.  This is our internal comments.

14    Q.  And fair to say that when you get these publications, you

15    look at the acknowledgement because you commented on the

16    acknowledgement format; correct?

17    A.  Correct.

18    Q.  So fair to say you would've seen, would you not, that he

19    had an affiliation with Fuzhou University?

20    A.  Yeah.  I look mostly at the acknowledgements, not the

21    affiliation, because I'm, again, not their employer.

22    Q.  And you didn't have any follow-on questions for Doctor Tao

23    about that, did you?

24    A.  I had follow-on questions on the acknowledgements to make

25    sure that -- what part of the paper was covered or was

1    supported by DOE, what parts were supported by other agencies

2    or institutions.

3    Q.    But no specific questions about the affiliation, per se?

4    A.    Correct.

5    Q.    I have just a few more questions about what you covered

6    this morning with Mr. Barry, and I promise I'll be wrapping up

7    in just a minute.

8          You said you didn't care at DOE about second jobs.  That's

9    not, like, your purview; correct?

10   A.    That's not my purview.

11   Q.    Not DOE's purview?

12   A.    I don't know about DOE and contractual questions.  I'm

13   saying as a program manager, I look at the scientific nature of

14   the program.

15   Q.    Okay.  And as far as the scientific and your -- your

16   concern about overlap, I just want to emphasize, if the other

17   grants at issue are not funded, overlap is not an issue?

18   A.    Can you repeat the question again so I'm --

19   Q.    Yes, yes.  If there are -- other pending support is not

20   funded, then overlap and time commitment is not an issue?

21   A.    Correct.

22   Q.    You didn't care about the fact that he was potentially

23   working on helping build a second lab, that was not important

24   to you as a program manager?

25   A.    Not at that time.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22

1              MR. ZEIDENBERG:  I have no further questions, Your

2     Honor.

3              THE COURT:  All right.  This would probably be a good

4     time to take a break unless you'll be very brief.

5              MR. BARRY:  I think a break would make sense, Your

6     Honor.

7              THE COURT:  All right.  Let's take a break for 15

8     minutes.

9              (The following proceedings were held outside the

10    presence of the jury).

11             THE COURT:  All right.  You can recess, go ahead.  I'm

12    just going to sit here for a minute, but go ahead and take your

13    break.

14             (Recess).

15             (The following proceedings were held outside the

16    presence of the jury).

17             THE COURT:  All right.  You can be seated.  Are we

18    ready for the jury?

19             MR. BARRY:  Yes, Your Honor.

20             (The following proceedings were held in the presence

21    of the jury).

22             THE COURT:  All right.  You can be seated.

23                        REDIRECT EXAMINATION

24    BY MR. BARRY:

25    Q.  I just have a few follow-up questions, Doctor Schwartz.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22

1    First is, do you remember when Mr. Zeidenberg asked you about

2    the analysis that you did over whether or not the grants that

3    Doctor Tao was applying for with DOE overlapped at all with

4    some materials that the FBI provided to you?

5    A.    Yes, I do.

6    Q.    And was your testimony that based on the information that

7    you had been provided with, it wasn't detailed enough for you

8    to make an assessment?

9    A.    Yes, correct.

10   Q.    Did Doctor Tao provide that information to you?

11   A.    No, he did not.

12   Q.    Who provided it to you?

13   A.    The FBI.

14   Q.    All right.  I want to show you what's been previously

15   introduced into evidence as -- this is exhibit -- Defendant

16   Exhibit 1224.  And if you remember, this is an e-mail between

17   yourself and Doctor Tao where you're talking about current and

18   pending.  Do you remember this?

19   A.    Yes, I do.

20   Q.    And do you remember Mr. Zeidenberg focused in on whether or

21   not you thought it was reasonable for someone to interpret your

22   sentence here "for every current federal grant," whether you

23   thought someone like Doctor Tao could interpret that to mean

24   something -- to mean that you were only interested in federal

25   grants.  Do you remember him asking you about that?

1    A.    Yes, I do remember him asking.

2    Q.    And your testimony was that, no, you thought all meant all.

3    And as we discussed earlier in the day, that's what you

4    would've expected to see from a DOE perspective?

5    A.    Yes; correct.

6    Q.    Did Doctor Tao ever follow-up to ask you for clarification

7    about this e-mail?

8    A.    No, he did not.

9    Q.    Did Doctor Tao ever ask you whether you were only

10   interested in federal grants or other pending grant

11   applications or funding that he was receiving?

12   A.    No, he did not.

13   Q.    Mr. Zeidenberg also asked you about a hypothetical where at

14   the moment someone discloses current and pending research

15   support to you, they may have a pending application and then

16   later on they don't get funding and he asked you if that

17   mattered to you.  Do you remember that?

18   A.    Yes, I do.

19   Q.    The current and pending disclosure requirement is not just

20   asking about funding that a PI has already been -- is already

21   receiving, right, it's also asking --

22   A.    Yeah.  Includes the pending.

23   Q.    -- the pending; right?

24        And at the moment that DOE is asking, to say I want to know

25   all current and pending, they don't know which of the pending

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    993

1    applications will be successful or not?

2    A.   Yes; correct.

3    Q.   So at the moment that DOE is asking for that information,

4    they don't know whether an application will be successful,

5    unsuccessful, whether the scope will be changed?

6    A.   Correct.

7    Q.   And so at the time that they asked for that information,

8    DOE wants to know all current and pending as of that moment; is

9    that fair?

10   A.   Correct.

11   Q.   From your vantage point as a program manager, do you expect

12   that principal investigators are going to be honest with you?

13   A.   Generally speaking, yes.

14   Q.   And is -- do you expect that they're going to tell you the

15   truth -- or, rather, let me rephrase that.

16       Do you expect that principal investigators are going to

17   provide accurate information to you when you ask for it?

18   A.   Yes, I trust the information they provide me.

19   Q.   And is trusting the principal investigators important to

20   your ability to do your job in evaluating which proposals to

21   fund and which proposals not to fund?

22   A.   Yes.

23   Q.   Do you expect that PIs if they have questions -- rather,

24   let me rephrase that.

25       Do you make yourself available to principal investigators

```
1   if they have questions about anything related to the funding
2   proposal?
3   A.   Very much so.
4   Q.   And so have you had experiences where PIs have questions
5   about anything related to the proposal where they e-mail you or
6   call you and you respond to them?
7   A.   That happens very often.
8   Q.   Okay.  All right.  The last thing I want to do is I want to
9   focus on what's been previously marked as Defendant
10  Exhibit 1430.  This is the e-mail chain with Doctor Scott from
11  UC Santa Barbara.  Do you remember this?
12  A.   Yes.
13  Q.   Okay.  And I first want to focus on the beginning of this
14  chain.  It starts here.  And this is -- Doctor Scott is
15  reaching out to DOE to provide this information to them; right?
16  A.   Yes.
17  Q.   And you'll see this is the larger chain -- or the more
18  detailed discussion of what she's telling DOE about?
19  A.   Yes.
20  Q.   Okay.  And then do you remember Mr. Zeidenberg showed you a
21  couple follow-up questions that DOE had, including this one,
22  asking whether the visiting scholar program agreement involved
23  anything regarding IP tech transfer rights.  Do you remember
24  this part?
25  A.   Yes, I do.
```

1   Q.   And DOE can't ask follow-up questions about Doctor Scott's

2   commitments in China unless she tells them about those

3   commitments in the first place; right?

4   A.   Yes; correct.

5   Q.   And then I also want to just show you -- so this is another

6   part of the e-mail chain and this is the part where Doctor

7   Scott is providing the more detailed information to the

8   Department of Energy.  And you see where she says, "I disclosed

9   the award and my activities to UC Santa Barbara in 2018 and

10  they were approved"?

11  A.   Yes, I do.

12  Q.   Okay.  Do you see Doctor Scott in this courtroom?

13  A.   No, I don't.

14       MR. BARRY:  No further questions.

15       MR. ZEIDENBERG:  No further questions, Your Honor.

16       THE COURT:  May Doctor Schwartz be excused?

17       MR. ZEIDENBERG:  Yes, Your Honor.

18       MR. BARRY:  Yes, Your Honor.

19       THE COURT:  All right.  You're excused.

20       THE WITNESS:  Thank you so much, Your Honor.

21       (The testimony of Doctor Robert (Schlögl) Schloegl was

22  previously transcribed and is included here for completeness of

23  the record).

24       THE COURT:  Call your next witness.

25       MR. BARRY:  The government calls Doctor Robert

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          996

1    Schloegl.

2                   DOCTOR ROBERT (SCHLÖGL) SCHLOEGL,

3    called as a witness on behalf of the Government, having first

4    been duly sworn, testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. BARRY:

7    Q.   Hello, Doctor Schloegl.  Would you please state and spell

8    your name for the record.

9    A.   Robert Schloegl.

10   Q.   And would you please spell that?

11   A.   Oh.  Robert is okay.  S-C-H-L-O-E-G-L.

12   Q.   And where do you work, Doctor Schloegl?

13   A.   In Germany, in Berlin.

14   Q.   And can you speak a little bit more into the microphone so

15   the jury can hear you.

16   A.   Okay.

17   Q.   Thank you.

18             THE COURT:  It's very adjustable - up, down, around -

19   the microphone.  You can bend it.  Yes.

20             THE WITNESS:  Better now?

21   BY MR. BARRY:

22   Q.   You said you work in Berlin, Germany?

23   A.   Correct.

24   Q.   What do you do there?

25   A.   I'm director at -- for the Max Planck Society.  There is a

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    997

1    research institute called the Fritz-Haber Institute and I'm

2    director there.  And I'm also a director of a second Max Planck

3    Institute in Mülheim an der Ruhr called the Max Planck

4    Institute for Chemical Energy Conversion in Mülheim an der

5    Ruhr.  I'm directing both institutes.

6    Q.   Okay.  So let's break that out a little bit.  So there --

7    you're director of two institutes?

8    A.   Yeah.

9    Q.   That are part of the Max Planck Society in Germany?

10   A.   Correct.

11   Q.   And one is the Fritz-Haber Institute in Berlin?

12   A.   Yeah.

13   Q.   And what's the other one called?

14   A.   Max Planck Institute for Chemical Energy Conversion.

15   Q.   And what city in Germany is that one in?

16   A.   In Mülheim an der Ruhr.

17   Q.   Can you spell that for the court reporter, please?

18   A.   Mülheim, M-Ü-L-H-E-I-M.  Mülheim.

19   Q.   And what does the Max Plank Institute do?

20   A.   So the whole Max Planck Society is a private research

21   organization dedicated to advance the frontiers of science in

22   all branches of science.  It has 80 institutes and I'm the head

23   of two of these institutes, and they are dealing with physical

24   chemistry.

25   Q.   Okay.  So let's just focus on the Fritz-Haber Institute.

1    Is that sometimes referred to as FHI?

2    A.    FHI is fine.

3    Q.    Okay.  So what does -- what do you do as the director at

4    FHI or the Fritz-Haber Institute?

5    A.    I'm directing research.  The institute is organized in five

6    departments and I'm heading one of the departments, and in

7    addition I'm the managing director of the whole institute.  And

8    the departments deal with different aspects of processes and

9    surfaces and interfaces and one of these processes is

10   catalysis.

11   Q.    And is catalysis your specialty?

12   A.    Yes.

13   Q.    And is there a particular part of catalysis that you are

14   more focused on?

15   A.    It is energy catalysis as you would call it or it's the

16   transformation of small molecules, and we are specializing in

17   trying to understand how these reactions work.

18   Q.    And is this fundamental or basic research or applied

19   research that you're working on?

20   A.    No, it's fundamental research.

21   Q.    How large -- do you have a team of -- to help you at the

22   Fritz-Haber Institute?

23   A.    Yes, of course.  The institute is 400 people and my own

24   team is 80 people.

25   Q.    Are you familiar Doctor Tao?

1   A.   Yes.

2   Q.   And do you see him in this courtroom?

3   A.   Yes.  Over there.

4   Q.   How are you familiar with Doctor Tao?

5   A.   Oh, we met in 2014 for the first time at a conference that

6   I organized and he gave one of the lectures there.  And then we

7   met several times later here in the States - 2015, 2016, 2017 -

8   and so we got to know each other because Doctor Tao performed a

9   very important scientific experiment that is close to our

10  interest and so we got to know and to discuss about each other.

11  Q.   Before today when was the last time you saw Doctor Tao in

12  person?

13  A.   I think August 2018 in Boston.

14  Q.   And was there a point at which you and Doctor Tao talked

15  about possibly collaborating together?

16  A.   Yes.

17  Q.   Can you talk a little bit about that?

18  A.   Yeah.  There are two avenues of collaboration.  We first

19  started discussing the possibility of studying one of the

20  catalyst materials that Doctor Tao was or is interested in with

21  our methods in comparison to what he has found and we also

22  performed experiments on samples that he gave to us.

23       And the other line was later coming, then we discussed the

24  possibility of founding a journal about the methodology that

25  Doctor Tao is in particular interested.  This is this AP-XPS

1    operando methodology, and we followed these two lines of

2    potential collaboration for several years.

3    Q.    So I want to unpack that a little bit.  First is, what does

4    AP-XPS stand for?

5    A.    This is ambient pressure XPS.  This is a particular method

6    with which one can analyze the chemical state of a surface

7    using the methodology of photoelectron spectroscopy, and it

8    gives you information about the composition and the chemical

9    state of a surface.

10   Q.    So the AP stands for ambient pressure and then the XPS

11   stands for x-ray photoelectron spectroscopy?

12   A.    Correct.  But ambient pressure is of course -- this is a

13   wide designation because it's not the pressure in this room,

14   it's about only one-thousandths of the pressure in this room.

15   So it is still low pressure, but it's called ambient.

16   Q.    And is an AP-XPS a type of scientific equipment?

17   A.    Yeah, you can buy this.  It's a commercial instrument.

18   Q.    And are you familiar with how AP-XPS work?

19   A.    Yes.  I'm the co-inventor of the methodology.

20   Q.    So you were one of the inventors of the AP-XPS machine?

21   A.    Yeah.  Or at least of the part ambient pressure.  XPS is a

22   much older technique, but the ambient pressure part was a

23   collaboration between Berkeley and Advanced Light Source here

24   in the U.S. and my department.

25   Q.    So one of the discussions that you and Doctor Tao had was

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1001

1    about the AP-XPS machine?

2    A.    (Nods head up and down).

3    Q.    And then you said the second was about starting a journal

4    together potentially?

5    A.    Correct.

6    Q.    And so let's just focus on that second one first.  Can you

7    talk a little bit about what the journal was supposed to be

8    about?

9    A.    Yeah.  About using this AP-XPS instrument and related

10   methodologies that allow one to study catalytic surfaces and

11   related materials in operation conditions, so in operando, and

12   that was also the prospective name of the journal, so Chemical

13   Operando Spectroscopy.

14   Q.    Did that journal ever get off the ground?

15   A.    No, unfortunately not.

16   Q.    Why not?

17   A.    It had several reasons.  So we first thought it is too

18   narrow and we had to widen this and look for other parts of

19   science where operando methodologies play a role, and then we

20   decided this is physical chemistry but it's also life sciences,

21   and we divided our jobs and we were -- so my group was to bring

22   about people who would serve as editors for the physical

23   chemistry part, whereas Doctor Tao's job was to bring about

24   people for the life science part, and that's the situation.

25        The thing essentially stopped because it never came

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1002

1   together, that we got these two groups of editorial people

2   together.

3   Q.  So the journal was an idea, but it never materialized into

4   --

5   A.  The idea was a -- probably was a good idea, but it never

6   materialized because this combined editorial board was never

7   put together.

8   Q.  Was there a time when Doctor Tao and you discussed the

9   possibility of him visiting Germany to work together?

10  A.  Yeah, several times.

11  Q.  And can you talk about how that conversation started?

12  A.  Yeah, because we started working on Doctor Tao's samples

13  and then we -- we found some interesting results, and we

14  decided over the scientific discourse that we should continue

15  looking deeper into this and then it would be natural that he

16  would come and discuss with us first results and then we would

17  do more experiments and then he should possibly come again.

18      And so we agreed upon that he should come at least twice to

19  Berlin and come -- first give a lecture to my group, what is

20  this whole story about, and then we will do experiments and

21  then he would come again and we'd discuss the experiments.

22  Q.  And what -- what happened after you all discussed the idea

23  of him possibly coming once or twice to Germany to give a

24  lecture and visit?

25  A.  We first agreed on a possible date and the first attempt

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1003

1   was in late 2018, I think in October, and then I issued an

2   invitation to Doctor Tao for that and stated that there would

3   be a lecture, and we also agreed on the date.

4        And then shortly before this date arrived, we got an

5   information that Doctor Tao, as far as I remember, had a visa

6   problem and so we decided to postpone this to early

7   January 2019 and I reissued a letter of invitation to him, and

8   then also this date passed by and essentially the communication

9   then stopped.

10  Q.  So in 2018 or 2019 did Doctor Tao ever visit you at FHI?

11  A.  No.

12  Q.  Are you aware of whether in 2018 or 2019 Doctor Tao visited

13  anyone at FHI?

14  A.  I'm not aware of -- I haven't seen him in the institute, so

15  I can't say more than that.

16  Q.  If he had visited FHI, would you have known about it?

17  A.  Yeah, likely, because I issued the invitation.  And we have

18  a vivid collaboration at the institute, so if anyone else would

19  have visited with Doctor Tao then I would have known.

20  Q.  All right.  I'd like to show you what's been marked as

21  Government Exhibit 293.  Do you recognize this document?

22  A.  Yes.

23  Q.  What is it?

24  A.  So this was from my secretary, Andrea Moebius, and it was

25  about that we should issue him an invitation with saying a

1  particular sentence, what we-- what our collaboration is about.

2  And that is a perfectly normal process, it happens often like

3  this.  This was drafted by my office.

4          MR. BARRY:  The government moves to introduce into

5  evidence Government Exhibit 293.

6          MR. DEARINGTON:  No objection.

7          THE COURT:  293 admitted.

8  BY MR. BARRY:

9  Q.  So I want to focus on the bottom part of the e-mail first

10  from Doctor Tao to you.  And you see how he says, "I am

11  planning a visit of a couple places in spring and summer of

12  2019.  Is there any chance you could send me an invitation

13  letter?"  And then he goes on to propose some sentences to be

14  included in the invitation letter?

15  A.  (Nods head up and down).

16  Q.  Did I read that accurately?

17  A.  Yeah.

18  Q.  Okay.  And is this --

19          THE COURT:  It's visible on your screen right there in

20  front of you too.  Can you see it on that screen?

21          THE WITNESS:  I can see it on the screen.

22          THE COURT:  Okay.  All right.

23  BY MR. BARRY:

24  Q.  Is this e-mail in reference to what we talked about

25  earlier, which was that you initially talked about Doctor Tao

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1005

1    potentially visiting in October of 2018?

2    A.    Yeah.  I think it was then broadened a little bit because

3    at the time when we discussed our collaboration, I was not

4    aware that he wanted to visit other people as well so -- but

5    that is normal that one does this, so we have one practical

6    reason why he will come on.  And then on the occasion coming to

7    Germany, he would also see other people.  That's perfectly

8    normal.

9    Q.    And if we scroll up a little bit, you'll see -- you said

10    Ms. Moebius is your -- works in your group or is your

11    assistant?

12    A.    Was the assistant at the time.

13    Q.    Okay.  All right.  I'd like to show you what's been

14    previously entered into evidence as Exhibit 147, if we could

15    pull that up, please.

16        And can you see that on the screen, Doctor Schloegl?

17    A.    Yes.

18    Q.    And does this language look similar to the proposed

19    language we saw in Exhibit 293?

20    A.    Yeah, I think so.

21    Q.    So this is a letter that you -- you provided to Doctor Tao

22    formally inviting him to visit the Fritz-Haber Institute --

23    A.    Yeah.

24    Q.    -- in spring and summer of 2019?

25    A.    Yeah.

Case 2:19-cr-20052-JAR    Document 320    Filed 12/02/22    Page 74 of 223

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          1006

1    Q.   Okay.  I'd like to show you what's been marked as

2    Government Exhibit 294.  What is this document?

3    A.   All right.  What I can see is -- so Doctor Tao requested

4    another document for getting his visa sorted out.

5              MR. BARRY:  The government moves to introduce into

6    evidence Government Exhibit 294.

7              MR. DEARINGTON:  No objection.

8              THE COURT:  294 admitted.

9    BY MR. BARRY:

10   Q.   So let's just go to the bottom.  And the way that these are

11   printed out is the oldest e-mail in time is at the bottom of

12   the chain.  So you'll see -- who's Dorothea Damm?

13   A.   It's another assistant of mine.

14   Q.   Okay.  And who is Annette Trunschke?

15   A.   Doctor Annette Trunschke is a group leader in my team.

16   Q.   And is -- so let's scroll up a little bit.

17        And so is this an e-mail chain between folks in your group

18   and Doctor Tao trying to hammer out the details of this

19   October 2018 visit?

20   A.   Yes.

21   Q.   And let's keep going a little bit to the top.

22        And is that what you're talking about with Ms. Damm,

23   proposing that September 13th date, where she's proposing some

24   dates that would work for the lecture?

25   A.   Yes.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1007

1    Q.   Okay.  And then let's keep going to the top.

2        And then is this what you referenced earlier about Doctor

3    Tao asking for additional information that he said was related

4    to his visa from the German consulate?

5    A.   Yes.

6    Q.   Okay.  And I just want to point your attention -- if you

7    look on the header information, there's a bcc.  Do you see

8    that?

9    A.   Yep.

10   Q.   And you see the e-mail address is hpengtao02@gmail.com?  Do

11   you know who that is?

12   A.   No.

13   Q.   Okay.  All right.  I'd like to show you what's been

14   previously introduced into evidence as -- or actually I

15   don't -- let me see if this has been -- yeah, this is already

16   admitted.  So Government Exhibit 291A.

17       If we could zoom in on the date at the top.

18       You'll see it's October 9th, 2018.

19       And then if you scroll down a little bit to the substance

20   of it.

21       Is this the letter that you and your group sent to Doctor

22   Tao to help him with his German visa?

23   A.   Yes.  Correct.

24   Q.   And you see where it says, the second paragraph, "For our

25   further cooperation, it may be necessary for you to come back

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1008

1    several times in 2018.  We, therefore, strongly recommend

2    obtaining a multi-entry visa at least for the period

3    January 2019 to end of August 2019."

4        Did you propose that time frame or did Doctor Tao?

5    A.    Probably I proposed it, I don't really exactly remember,

6    but it is normal that we would do that because we envisioned

7    that we start the collaboration following the first visit, and

8    that takes a couple of months to do the experiments, and then

9    we would have expected that Doctor Tao comes back to discuss

10    the results.  And a typical timeline would be from the

11    beginning of the year until the end of the summer, and this is

12    where these dates come from.

13    Q.    All right.  I'd like to show you what's been marked as

14    Government Exhibit 295.  Do you recognize this document?

15    A.    Okay.

16    Q.    What is this?

17    A.    So it's an e-mail from Doctor Tao saying -- essentially

18    saying that it is okay what we wrote to him, and he said, "I

19    will keep you updated on the visa application."

20        MR. BARRY:  The government moves to introduce into

21    evidence Government Exhibit 295.

22        MR. DEARINGTON:  No objection.

23        THE COURT:  295 admitted.

24    BY MR. BARRY:

25    Q.    So this is just Doctor Tao following up after that letter

1    was sent to him?

2    A.    Yeah.

3    Q.    Is that a yes?

4    A.    Yes.

5    Q.    And after this letter was sent and this e-mail exchanged,

6    you said that things kind of -- communication ceased?

7    A.    No, it was in -- that, I don't know.  I did not know any

8    more communication after that because then we changed it, the

9    time of invitation, to the beginning of 2019.  And also this

10   was not materialized so Doctor Tao did not show up in the

11   beginning of 2019 and then we stopped sending more e-mails

12   about this.

13   Q.    So did you ever follow up with him to ask about why he

14   didn't show up in Germany based on your sort of prior plan that

15   you had?

16   A.    No, we did not.

17   Q.    Why didn't you follow up?

18   A.    That is in some cases normal because in such situations

19   there is always other people involved, and possibly there was a

20   funding problem or Doctor Tao had other things to do.  So it is

21   not uncommon that such collaborations are agreed upon and then

22   it is shifted in time, and I would have expected that Doctor

23   Tao comes back as he did in '18 and making a new suggestion

24   when he would want to come.

25   Q.    So to be clear, though, Doctor Tao never visited you in

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1010

1    Germany in 2019?

2    A.  Yes.

3    Q.  All right.  I'd like to pull up what's previously been

4    introduced into evidence as Exhibit 233.

5        And if you go to the middle paragraph.  One more down,

6    please.  Yep.  There you go.

7        So you see -- can you see the screen, Doctor Schloegl?

8    A.  Yes.

9    Q.  Okay.  Do you see this e-mail dated February 20th, 2019

10   from Doctor Tao to somebody named Doctor Laurence Weatherley?

11   A.  Yes.

12   Q.  And do you see it says, "Dear Laurence, I am visiting FHI

13   at Germany"?

14   A.  I see this.

15   Q.  Doctor Tao was never in Germany in -- February 20th, 2019;

16   correct?

17   A.  He was not in the Fritz-Haber Institute.  If he was in

18   Germany somewhere else, I wouldn't know.

19   Q.  Okay.  All right.  I'd like to show you Exhibit 231.  It's

20   also already been introduced into evidence.

21       And I'd like to go to the top e-mail, please.

22       THE COURT:  Is 233 admitted, Bonnie?

23       COURTROOM DEPUTY:  Yes.

24       THE COURT:  It is?  Okay.  Sorry.

25   BY MR. BARRY:

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1011

1    Q.  And you see this is another e-mail from Doctor Tao to

2    another -- Doctor Laurence Weatherley?

3    A.  Yep.

4    Q.  And see how it's dated January 31st, 2019?

5    A.  Yep.

6    Q.  Do you see where it says, "I am traveling in Germany"?

7    A.  I see this.

8    Q.  And on January 31st, 2019, Doctor Tao was not at the

9    Fritz-Haber Institute, was he?

10    A.  Definitely not.

11    Q.  Okay.  All right.  And then the last exhibit I'd like to

12    show you is Exhibit 225.  This has already been admitted into

13    evidence.

14        And then let's go to the top e-mail.

15        Do you see, again, this is an e-mail from Doctor Tao to

16    Doctor Laurence Weatherley, January 17th, 2019.  And do you see

17    how the first sentence says, "I apologize for missing the

18    upcoming faculty retreat due to the trips to conferences in

19    Germany"?  Do you see that?

20    A.  I can see that.

21    Q.  And Doctor Tao was not at the Fritz-Haber Institute in --

22    January 17th, 2019; correct?

23    A.  No, he was not.

24        MR. BARRY:  Okay.  No further questions.

25                  CROSS EXAMINATION

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1012

1    BY MR. DEARINGTON:

2    Q.   Good morning, Doctor Schloegl.

3    A.   Good morning.

4    Q.   So when was the first time that you met with the FBI with

5    respect to this case?

6    A.   Here in America, just --

7    Q.   In general.

8    A.   In general.  Last -- with a representative of the FBI, I

9    only had a telephone conversation last year.

10   Q.   Last year was the first time?

11   A.   Yeah.  Yeah.

12   Q.   So prior to when Doctor Tao was charged in August 2019,

13   Special Agent Lampe and anyone else from the FBI, nobody

14   reached out to you to ask you any of the questions you're being

15   asked today?

16   A.   No.

17   Q.   Okay.  And I understand that you texted someone from the

18   FBI recently that you last met with Doctor Tao in 2016 in

19   Washington, D.C., for a DOE conference.  Do you recall sending

20   that text?

21   A.   Yeah.

22   Q.   But today you testified that the last time you saw Doctor

23   Tao was in 2018; correct?

24   A.   Yeah.

25   Q.   So were you mistaken today or were you mistaken in your

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1013

1   text message to the federal officer?

2   A.   No.  After that text message I went back to my calendar and

3   re-looked whether I have met him somewhere in the U.S. in

4   between.

5   Q.   And fair to say that when the government shows you a

6   handful of documents and starts asking you questions about

7   them, you have to refresh your recollection about the events,

8   what you may have heard, what you may have said.  And they show

9   you some documents but not all of them necessarily; fair?

10  A.   Fair.

11  Q.   Okay.  Could you tell me what Rock Chalk means?

12  A.   Please repeat the question.

13  Q.   Could you tell me what Rock Chalk means?

14       MR. BARRY:  Objection, scope and relevance.  I don't

15  know what he's talking about.

16  BY MR. DEARINGTON:

17  Q.   Could tell me what Allen Fieldhouse is?

18       MR. BARRY:  Same objection.

19       THE WITNESS:  No.

20  BY MR. DEARINGTON:

21  Q.   You're not a professor at KU, are you?

22  A.   I didn't follow your questions.

23  Q.   You are not, sir, a professor at KU, are you?

24  A.   I'm not.

25  Q.   And you are not Doctor Tao's department chair at KU, are

1    you?

2    A.  Definitely not.

3    Q.  So you have no awareness that Doctor Tao after you issued

4    your invitation in early 2018 sought no-payment leave from the

5    department chair?

6            MR. BARRY:  Objection.

7            THE COURT:  Sorry?

8            MR. BARRY:  Objection, argumentative.  He already said

9    -- and relevance.  The witness already said that he's not.

10           THE COURT:  Reframe your question.  I didn't hear all

11   of it.  Go ahead.

12           MR. DEARINGTON:  Sure, Your Honor.

13   BY MR. DEARINGTON:

14   Q.  So you are not Doctor Tao's department chair at KU;

15   correct?

16   A.  Correct.

17   Q.  So you would be unaware if Doctor Tao sought no-payment

18   leave to visit Germany in April 2018, but it was denied by his

19   department chair?

20   A.  I would not know.

21   Q.  And you would be unaware if Doctor Tao later sought

22   approval for a buyout of his only course in the spring 2019

23   from his department chair and it was approved in June 2018; you

24   wouldn't be aware of that, would you?

25   A.  Yeah.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22      1015

 1   Q.  And I think you testified that it's not uncommon to issue

 2   an invitation to a professor like Doctor Tao and for it not to

 3   come to fruition; correct?

 4   A.  (Nods head up and down).

 5   Q.  You didn't take personal offense at that; right?

 6   A.  No.

 7   Q.  People are busy in your field and sometimes they take

 8   people up on invitations and sometimes they don't --

 9   A.  Correct.

10   Q.  -- correct?

11       And you traveled -- are you aware that the defense has

12   not -- does not -- strike that question.

13       You traveled roughly 4,700 miles to be here to testify; is

14   that correct?

15   A.  Yeah.  Correct.

16   Q.  And did the U.S. Government pay for your plane ticket?

17   A.  Yes, for the -- for the to-here ticket they paid for.

18   Going back home I will pay.

19   Q.  So to here from Germany they paid for --

20   A.  No, from San Diego to here.

21   Q.  So you were here not to testify alone but rather, I take

22   it, to attend the ACS conference in San Diego, California where

23   you presented last week?

24   A.  That was correct.

25   Q.  And then the U.S. Government paid for your ticket from

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1016

```
1   California to Kansas City, but then you have to pay the rest of
2   the leg home; right?
3   A.   Correct.
4         MR. DEARINGTON:  Okay.  I'll pass this witness.  Thank
5   you, Your Honor.
6         Thank you, Doctor Schloegl.
7         THE COURT:  Just a minute, Doctor.
8         MR. BARRY:  No further questions.
9         THE COURT:  Okay.  You're fine.  He's excused.
10        (Transcript excerpt of the testimony of Doctor Robert
11  (Schlögl) Schloegl concluded).
12        THE COURT:  All right.  Do you want to call your next
13  witness, get started on for a while before lunch?
14        MR. OAKLEY:  Your Honor, at this time the parties have
15  entered into a stipulation, and I would ask for the court's
16  permission to read the stipulation into the record.
17        THE COURT:  All right.
18        MR. OAKLEY:  Stipulation of facts:  The United States
19  of America, by and through its undersigned attorneys, and
20  Defendant Feng "Franklin" Tao, by and through his undersigned
21  attorneys, hereby agree and stipulate that the following is
22  true and correct:
23        No. 1.  University of Kansas students, faculty, and
24  employees are assigned e-mail addresses with the domain
25  @ku.edu.  Certain government and defense exhibits include
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1017

1    e-mails and attachments to or from e-mail addresses with the

2    domain @ku.edu, such as franklin.feng.tao@ku.edu, which was

3    assigned to Defendant Tao; Xiaoyan Zhang, that's X-I-A-O-Y-A-N,

4    Z-H-A-N-G, @ku.edu, which was assigned to Xiaoyan Zhang; and

5    luan.nguyen.nd@kd -- or excuse me, @ku.edu, which was assigned

6    to Laun Nguyen.  The parties agree that to the extent otherwise

7    admissible, the exhibits shall be admitted into evidence

8    without requiring the custodian of records to appear at trial.

9          No. 2.  The University of Kansas' e-mail servers were

10   located within the state of Kansas during the period of time

11   alleged in the second superseding indictment.

12         No. 3.  Certain government and defense exhibits are

13   e-mails to or from the e-mail account

14   franklin.tao.2017@gmail.com.  That e-mail account was a Google,

15   LLC, e-mail -- excuse me.  That e-mail account was a Google,

16   LLC, e-mail account that was subscribed to by Defendant Tao.

17   The parties agree that, to the extent otherwise admissible, the

18   exhibits shall be admitted into evidence without requiring the

19   custodian of records to appear at trial.

20         No. 4.  Certain government and defense exhibits are

21   e-mails to or from the e-mail account franklin.tao2011

22   @gmail.com.  That e-mail account was a Google, LLC, e-mail

23   account that was subscribed to by Defendant Tao.  The parties

24   agree that, to the extent otherwise admissible, the exhibits

25   shall be admitted into evidence without requiring the custodian

 1    of records to appear at trial.

 2        No. 5.  The documents and records listed below are

 3    true and accurate copies of records kept in the course of the

 4    regularly conducted activity of the respected -- respective

 5    corporations, financial institutions, and businesses listed

 6    below, were prepared at or near the time of the occurrences of

 7    the matters set forth by or from information transmitted by a

 8    person with knowledge of those matters, were made by the

 9    regularly conducted activity as a regular practice and have

10    been maintained under the care, custody, and control of the

11    custodian of records of the respective corporations, financial

12    institutions, and businesses in substantially the same

13    condition as when the records were made.  Therefore, the

14    documents and records listed below shall be admitted into

15    evidence, to the extent otherwise admissible, without requiring

16    the custodians of records to appear at trial to establish the

17    legal foundation for the admissibility of the business records.

18        The parties further stipulate and agree that duplicate

19    copies of the records may be admitted, and these relate to

20    Exhibit No. 700, which is Bank of America bank records; Exhibit

21    No. 700A, 700B, 700C, 701, 1031, 1032, 1034 through 1040, 1116,

22    1425, and 1426, which are also Bank of America records.

23        THE COURT:  Can I stop you?  It's not 1116 through

24    1425, it's just 1116 and then 1425 and then 1426; is that

25    correct?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          1019

1          MR. OAKLEY:  That is correct, Your Honor.

2          THE COURT:  Okay.  All right.

3          MR. OAKLEY:  Exhibit 702, which is JPMorgan Chase

4    records; 703, which is also JPMorgan Chase records; 704, which

5    is also JPMorgan Chase records; Exhibits 705 and 1152, which

6    are Old National Bank records; 707, which are Citibank records;

7    708, which are records from The Clearing House; 709, which are

8    records related to Kansas Secured Title; 1115, which are

9    University of Kansas pay stubs for the defendant; 1412, 1413,

10   and 1414, which are KU records related to appointment letters

11   for 2014-15, and 2017-18 for the defendant.

12          And then No. 6.  The documents listed below are

13   printed material in hard copy or electronic format purporting

14   to be newspaper or periodical materials and shall be admitted

15   into evidence, to the extent otherwise admissible, without

16   requiring the custodians of records to appear at trial to

17   establish the legal foundation for their admissibility.  And

18   1340 are ACS publications, and 1304 are various compilations of

19   publications from 2014 to present.

20          No. 8.  Government's Exhibit 358 is --

21          THE COURT:  Is there a No. 7?  I'm sorry.  I thought

22   you said No. 6 and then I just want to make sure I didn't miss

23   anything.

24          MR. OAKLEY:  Your Honor, No. 7 is omitted and the

25   numbering was not changed, I apologize.

1          THE COURT:  Okay.  Sorry.  Go ahead.

2          MR. OAKLEY:  No. 8 is Government's Exhibit 358 is an

3   authenticate copy of Defendant Tao's passport.

4          And then No. 9.  The parties reserve all their other

5   rights to object to the admission of the above-listed documents

6   and records, including but not limited to objections based on

7   relevance.

8          And then finally, this stipulation may be marked as an

9   exhibit, admitted into evidence and read to the jury, or

10  otherwise made a part of the record.

11         And it's signed by counsel for both parties, Your

12  Honor.

13         THE COURT:  All right.  So like -- because this is a

14  stipulation, we will want that both in paper and electronic

15  form.  We'll incorporate that into the instructions rather than

16  mark it as an exhibit, if that's acceptable to the parties.

17         MR. OAKLEY:  Yes, Your Honor.

18         THE COURT:  And as part of the instructions -- I'll

19  tell the jury now.  So the parties have stipulated to -- what

20  they've really stipulated to is certain foundation for the

21  admission of documents.  They're not agreeing necessarily that

22  these documents should be admitted at this time.  But because

23  they're stipulating to this, it really speeds up the trial in

24  the sense they don't have to bring in custodians of records

25  from all of these different financial institutions and other

1    institutions and companies.

2         So in a criminal trial you don't have to accept the

3    stipulations as true because the jury is always the ultimate

4    decider, the trier of fact we call you, but this is -- the

5    parties have gotten together and agreed that certain documents,

6    we don't -- they don't have to bring in custodians of records

7    to lay the foundation for their admission as business records

8    or other types of records.

9         So we will incorporate that entire stipulation into

10   the instructions that you get at the end.  And then, of course,

11   I'll keep track of them as you start to offer these particular

12   exhibit numbers into evidence.

13        All right.  So is that -- is that acceptable, we'll

14   just incorporate them in the instructions?

15             MR. OAKLEY:  Yes, Your Honor.

16             THE COURT:  Okay.  Sounds good.  All right.

17             MR. OAKLEY:  Your Honor, the United States calls

18   Doctor Bala Subramaniam.

19                  DOCTOR BALA SUBRAMANIAM,

20   called as a witness on behalf of the Government, having first

21   been duly sworn, testified as follows:

22             THE COURT:  And if you are comfortable, Doctor, will

23   you remove your mask so that she can see you testify, unless

24   you have a health issue.

25             THE WITNESS:  No, I can remove it.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22      1022

1           THE COURT:  Okay.  And then that microphone is

2   adjustable, up and down, sideways, et cetera.

3           THE WITNESS:  Thank you.

4                     DIRECT EXAMINATION

5   BY MR. OAKLEY:

6   Q.  Sir, would you please state and spell your name for the

7   record?

8   A.  Bala Subramaniam.  B-A-L-A.  S-U-B-R-A-M-A-N-I-A-M.

9   Q.  And how are you employed?

10  A.  I'm employed at the University of Kansas.  I'm a faculty

11  member in the Department of Chemical and Petroleum Engineering,

12  and I'm also the director of the Center for Environmentally

13  Beneficial Catalysis, and my appointment is split equally

14  between these two entities.

15  Q.  I want to talk to you, first of all, about your role in the

16  faculty.  What's your title?

17  A.  My title is Dan F. Servey Distinguished Professor of

18  Chemical and Petroleum Engineering.

19  Q.  And so let's talk a little bit about the different

20  professors at KU.  Can you describe the levels of professorship

21  at KU?

22  A.  Distinguished professorship is the highest level, followed

23  by full professor, followed by associate professor, and

24  followed by tenure-track assistant professor.

25  Q.  Did you start as an assistant professor?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1023

1    A.   Yes, I did.

2    Q.   When did you start at KU as an assistant professor?

3    A.   Started in January 1985.

4    Q.   And then at some point you became tenured, became an

5    associate professor?

6    A.   That's correct.

7    Q.   Do you remember when that was?

8    A.   It was I believe in June of 1990 I was promoted to

9    associate professor with tenure.

10   Q.   And then when were you promoted to full professor?

11   A.   After another five years.  That would be, again, June of

12   1995.

13   Q.   And then when did you advance to the distinguished

14   professor position that you hold now?

15   A.   After another four years, I believe in January of 1999.

16   Q.   So what type of education do you have?

17   A.   I have a bachelor's degree in chemical engineering and I

18   obtained my degree from AC College of Technology in India and

19   then I have my master's and Ph.D. degrees, both of them in

20   chemical engineering, from the University of Notre Dame.

21   Q.   So we talked a little bit about the -- your role in the

22   faculty.  You also mentioned that you have another role at the

23   university; I think you said that you're the director for the

24   Center for Environmentally Beneficial Catalysis?

25   A.   That's correct.

1   Q.   And so what do you do as director -- well, let me back up.

2        Is that commonly referred to as the CEBC?

3   A.   That's correct.  That's the acronym.

4   Q.   What do you do for the CEBC as the director, what are your

5   job responsibilities?

6   A.   As the director, I'm responsible for carrying out the

7   mission of the center, which is CEBC.  And the mission is to

8   develop technologies that take raw materials and convert them

9   to products of everyday life, be it plastics or synthetic

10  fibers, shampoos, detergents.  And we do that in a sustainable

11  matter, minimizing adverse effects on human health and the

12  environment.

13       In order to do that, my role is to bring together faculty

14  from various departments on campus, put together collaborations

15  that can address the grand challenges of sustainability in

16  order to deliver the kinds of technologies that would ensure

17  sustainability in the chemical industry space.

18       And so we work with -- predominantly with faculty members

19  from chemistry and chemical engineering departments and we also

20  partner with industries across the value chain, chemical

21  industries across the value chain.

22       I'm responsible for developing research funding from

23  federal and industry sources to keep the mission going in a

24  vibrant fashion.  I'm responsible for identifying areas of

25  expertise to recruit to the center in order to make sure that

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1025

1  we have the research expertise and bandwidth to carry out our

2  mission, and it's also my responsibility to make sure that we

3  provide opportunities for young faculty to be successful.

4      And I must mention that these faculty members are all --

5  their home departments -- just like my home department is

6  chemical engineering, they come from different departments on

7  campus.

8  Q.  And so these professors from different departments are

9  under or can be under the CEBC; is that correct?

10 A.  They have affiliations with the CEBC because they conduct

11 part of their research through their CEBC.  And conducting

12 research is a primary responsibility, one of the primary

13 responsibilities of any faculty member at the University of

14 Kansas, and the CEBC provides a forum for the faculty to

15 conduct research and typically through collaborating with other

16 faculty as well.

17 Q.  You mentioned that the CEBC is a place to do research and

18 you said that's a responsibility of professors at KU.  Are you

19 familiar with what's sometimes referred to as the 40/40/20

20 split?

21 A.  Yes, I am.

22 Q.  And that's 40 percent for research, 40 percent for

23 teaching, and 20 percent for service?

24 A.  That's correct.  That's a normal load.

25 Q.  So when we're talking about the CEBC, we're talking about

1   the research side of that 40/40/20 split; is that accurate?

2   A.   It's accurate for the faculty members.  And for me as the

3   director I'm also doing service, so part of the service is

4   counted in my role as well.  But if it's a participating

5   faculty member, without the responsibilities that I have, then

6   you're right; that will be primarily counted towards the

7   40 percent in research.

8   Q.   Now, as the director do you supervise these other

9   professors that do some research in the lab or do you have a

10  different relationship?

11  A.   I have a different relationship.  I do not supervise

12  research in the labs on a daily basis, but if I am part of the

13  collaboration in a research with a certain faculty member, I

14  have the dual role.  I have the administrative role, but I'm

15  also a faculty member, I can also engage in research and I do

16  engage in collaborative research with faculty.

17       And in that particular situation, I do work with those

18  faculty members, we do periodically meet to make sure that we

19  are delivering the obligations of the grant.  When we write a

20  research grant, we have some deliverables there.  And if I am

21  the principal investigator for that, I have the duty to

22  supervise the whole research project.  And in that capacity, I

23  do have to work with the faculty to deliver that.

24       On the other hand, if I'm not in a research with a faculty,

25  which is still being carried out through the center but then

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1027

1    collaboration with other faculty not involving me, I get

2    involved only when they want me to provide some input.  It's

3    pretty much -- the research is pretty much carried out under

4    the supervision of the principal investigator of that grant in

5    which I may not be involved.

6    Q.  Okay.  And so to kind of break that down, you're the

7    director, but you also have research projects at the CEBC?

8    A.  That's correct.

9    Q.  And some of those research projects, you may collaborate

10   with other KU professors?

11   A.  That's correct.

12   Q.  Are students ever employed at the CEBC, KU students?

13   A.  KU students are employed at the CEBC through their home

14   departments.  In other words, the CEBC as an entity does not

15   recruit students.  Because the faculty members who are part of

16   the CEBC have home departments, the home departments also

17   recruit the graduate students to work with their faculty.

18       So when a faculty member becomes affiliated with the CEBC,

19   he or she brings the students along with them to work with them

20   on the project.  That's the way it works.

21   Q.  And that would typically be from the same department that

22   the professor, that the PI is from?

23   A.  That's correct.  Yeah.  And I might add if a project

24   involves, say, multiple faculty and let's say a faculty member

25   is from chemistry and another faculty member is from chemical

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          1028

1   engineering, then the students that they bring to the

2   collaborative projects could be from chemistry and chemical

3   engineering.

4   Q.   Do you know someone by the name of Franklin Tao?

5   A.   Yes, I do.

6   Q.   And how do you know Franklin Tao?

7   A.   I know him as a professional colleague and I know him

8   because I was chair of the committee that recruited him to come

9   to KU.

10  Q.   Okay.  Do you remember when -- well, let me ask you this:

11  Do you see Franklin Tao in the courtroom here today?

12  A.   Yes, I do.

13  Q.   And could you please describe where he's seated and tell us

14  what he is wearing?

15  A.   He is seated over there, if I can just -- there, he's

16  standing and he's wearing a blue tie and a blue shirt and a

17  jacket there.

18  Q.   Do you remember when the defendant was hired by KU, what

19  year approximately?

20  A.   I believe it was in 2014.

21  Q.   And do you remember what department or departments Doctor

22  Tao was assigned to initially?

23  A.   His appointment was equally split between the Department of

24  Chemistry and the Department of Chemical and Petroleum

25  Engineering.

1   Q.   And was he a full-time employee?

2   A.   He was a full-time employee, yes.

3   Q.   But his full-time job was initially split between C&PE and

4   chemistry?

5   A.   That's correct.

6   Q.   And did Doctor Tao have space at the CEBC for his lab?

7   A.   Yes.

8   Q.   But even though you were director of the lab, were you a

9   supervisor over Doctor Tao?

10  A.   Only in the sense where if he was involved in a project

11  with me, I supervise the whole project and, as a result, his

12  role in the project.

13  Q.   So while we're talking about that, let me show you what's

14  been admitted into evidence as Government's Exhibit 53.   I

15  think it will appear on the screen in front of you.

16       Does that appear to be documents related to a grant with

17  the National Science Foundation?

18  A.   Yes.

19  Q.   And did you collaborate with Doctor Tao on an NSF grant

20  where you were the principal investigator?

21  A.   Yes.

22  Q.   Could we scroll down, please?

23       And does this appear to be that particular grant?

24  A.   Yes.  This is the cover sheet of the proposal that we

25  submitted with the University of South Carolina as a partner as

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22          1030

1   well.

2   Q.   Okay.  And so where it says PI Name, I see your name under

3   that and then there's a list of co-PIs; is that correct?

4   A.   That's correct.

5   Q.   And so if we can keep scrolling, it looks like the co-PIs

6   included Doctor Tao and others?

7   A.   Yes.

8   Q.   And so you were the PI and Doctor Tao was the co-PI on that

9   particular grant?

10  A.   That's correct.

11  Q.   And so earlier you said that by virtue of being director of

12  the lab, you don't have a supervisory capacity.  But in this

13  role as PI and co-PI, you were in charge as the PI?

14  A.   That's correct.

15  Q.   While we're talking about PIs, on grants is it the PI

16  that's ultimately responsible for that particular grant?

17  A.   The PI is responsible for the overall conduct of the

18  project consistent with what has been proposed in the -- in the

19  proposal and funded.

20       The National Science Foundation does allow some leeway for

21  the projects to veer away from what was originally proposed if

22  the PI and the co-PIs can make a strong case for that in their

23  annual reports.

24  Q.   You mentioned that you had some role when Doctor Tao was

25  brought to KU; that you served on a committee?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1031

1    A.   Yes.

2    Q.   Now, service on committees, is that part of the 20 percent?

3    We talked about a 40/40/20 split, the 20 percent being for

4    service.  Are things such as serving on committees part of that

5    service component to the university?

6    A.   Indeed.

7    Q.   Did you ever serve on any committees that were related to

8    promotion?

9    A.   I have served on several.

10   Q.   And were you in -- at any point in a mentor/mentee

11   relationship with Doctor Tao?

12   A.   Yes.

13   Q.   And describe who was the mentor and who was the mentee.

14   A.   Let me just give you some background on this mentor/mentee

15   system within the department.  It is -- it is purely voluntary

16   for a faculty member to want to have a mentor, and the role of

17   the mentor is to provide tips to the junior faculty on, say,

18   things like teaching techniques, going to the class to observe

19   teaching, providing opportunities for research funding and

20   perhaps nominating for awards, knowing the potential or the

21   accomplishments of the mentee, providing opportunities for

22   service elsewhere that could provide prominence to the person

23   and the like.

24       So in that capacity, I believe Doctor Tao agreed to have me

25   as a mentor, and I was happy to serve as his mentor as well and

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1032

1   have him as a mentee.

2   Q.   So as part of that relationship, for instance, did you ever

3   watch Doctor Tao teach any of his classes?

4   A.   I have observed him in a class.

5   Q.   And how many times have you observed Doctor Tao teach a

6   class?

7   A.   I believe I've observed him only once.

8   Q.   Through this relationship with Doctor Tao, both you as

9   director of the lab, you as the PI on a grant where he was the

10  co-PI, and then you mentioned that you served on a promotion

11  committee, would that have been -- well, did you ever have any

12  conversations with Doctor Tao about promotion and specifically

13  his promotion?

14  A.   Yes, I've had conversations.

15  Q.   And based on that did you learn whether or not being

16  promoted was important to Doctor Tao?

17  A.   It was important to him for career advancement, yes.

18  Q.   Now, is that typical of professors?  Professors are

19  interested in moving along the line?

20  A.   Certainly the ambitious ones.

21  Q.   At some point -- well, let me back up.

22       Do you know Doctor Laurence Weatherley?

23  A.   Yes, I know him very well.

24  Q.   And how do you know Doctor Weatherley?

25  A.   He was the chair of the department from approximately I

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1033

1    believe 2005 or so, and so I was a faculty and he was my

2    supervisor for that 50 percent appointment in the department.

3    So I know him as a chair and also as a faculty colleague.

4    Q.   And so he was the chair of C&PE; correct?

5    A.   That's correct.

6    Q.   And you said that part of -- in addition to being the

7    director of the CEBC, you were also a faculty member in that

8    department?

9    A.   That's correct.

10   Q.   Okay.  Did you ever have a discussion with the defendant

11   about the defendant's request to obtain a four-month no-payment

12   leave?

13   A.   Not directly with the defendant, I don't recall any direct

14   conversation.  But perhaps in an e-mail communication with

15   Doctor Weatherley because he was a chair and because I was

16   Doctor Tao's mentor, he usually keeps such requests -- keeps me

17   in the loop for such requests.  So in that capacity I do recall

18   an e-mail from him.

19   Q.   "From him" being Doctor Weatherley or Doctor Tao?

20   A.   Doctor Weatherley.  Essentially notifying me of his intent

21   to take a four-month leave.

22   Q.   And knowing that promotion was important to the defendant,

23   did you discuss with either Weatherley or the defendant whether

24   or not that would be a good idea to take a four-month

25   no-payment leave from the department?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1034

1    A.  I do not believe that I discussed it with respect to

2    promotability.

3    Q.  What did you discuss it with respect to?

4    A.  I recall mentioning to Doctor Weatherley that because of

5    the length of the leave, four months, and because Doctor Tao

6    was coming up closer to eligibility for his first sabbatical

7    leave, which typically happens after six years of full-time

8    service, that Doctor Tao might consider that four-month leave

9    as perhaps part of a sabbatical.  And that was my suggestion.

10   Whether it would be taken or not was not -- I was not worried

11   about that, but that's what I recall responding to Doctor

12   Weatherley.

13   Q.  And you said that an employee is typically eligible for a

14   sabbatical after six years?

15   A.  Correct.

16   Q.  And so if someone started in 2014, typically they wouldn't

17   be eligible until 2020 for a sabbatical?

18   A.  That's right, after completing six years.  And usually they

19   apply for the sabbatical leave at the start of that sixth year.

20   Q.  Are you familiar with a -- with what's called a course

21   buyout?

22   A.  I am.

23   Q.  Now, is that typically handled through the chair or do you

24   have any involvement in approving course buyouts?

25   A.  Because it is part of the departmental mission, I do not

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22                1035

1    have any say in the course buyout of any faculty associated

2    with the department.  So it's strictly a decision that's made

3    by the chair of the department upon request of the requesting

4    faculty.

5    Q.   Okay.  Do you remember a situation where Doctor Tao was

6    seeking approval for a course buyout?

7    A.   I do not recall that.

8    Q.   Do you ever recall a discussion with Doctor Tao or anyone

9    else about a collaboration involving Doctor Tao and a foreign

10   university?

11   A.   I believe as part of this four-month leave, I do recall

12   that was for a collaboration perhaps in Germany.  That's my

13   recollection.

14   Q.   In Germany?

15   A.   In Germany.

16   Q.   Do you remember a discussion of a collaboration between

17   Doctor Tao and any other foreign universities other than the

18   one in Germany?

19   A.   No.  I'm not aware or have not engaged in any discussion.

20   Q.   And so did Doctor Tao or anyone else -- well, strike that.

21        Did Doctor Tao ever tell you that he was working at a

22   university in China?

23   A.   No.

24   Q.   Did he ever tell you that he was helping build a lab at a

25   university in China?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22            1036

1    A.   No.

2    Q.   Did he ever tell you that he was recruiting post-doctoral

3    students to come to a university in China?

4    A.   Can you please repeat that question?

5    Q.   Did Doctor Tao ever tell you that he was recruiting

6    post-doctoral students to come to a university in China?

7    A.   Let me make sure I understand the question.  So you're

8    asking me if Doctor Tao ever told me or requested me that he

9    was recruiting a post-doc to a university in China?

10   Q.   Yes, sir.

11   A.   No.

12   Q.   Did Doctor Tao ever tell you that he was seeking funding

13   from the Chinese government?

14   A.   No.

15   Q.   And did Doctor Tao ever tell you that he was advising

16   students who were students of a university in China?

17   A.   No.

18   Q.   Does the KU university registrar publish a calendar for

19   each semester at KU?

20   A.   Yes, they do.

21   Q.   I want to hand you what's been marked as Government's

22   Exhibit 779.  Do you recognize that as a printout from the

23   university registrar related to the calendar for the spring

24   2019 semester?

25   A.   Yeah.  This looks like a typical, you know, calendar of

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1037

1    events during a semester that the university puts out.

2    Q.    And does that appear to you that it relates to the spring

3    2019 semester?

4    A.    Well, the dates on the first page are 2018 and that's why

5    I'm hesitating.    It says Spring '19 Academic Calendar but the

6    dates are all 2018, so...

7    Q.    So, for instance, directing your attention to the third

8    line where it says "Advising begins" and there's a date of

9    September 27th, 2018 --

10    A.    Correct.

11    Q.    -- based on your work as a professor at the university, are

12    you aware that advising for students typically begins the --

13    you know, for instance, for the spring semester it would begin

14    in the fall semester?

15    A.    Yes.

16    Q.    And so there were some dates on this calendar from 2018,

17    but directing your attention to the title in bold, does it

18    appear that it's captioned Spring 2019 Academic Calendar?

19    A.    Yes.

20            MR. OAKLEY:    Your Honor, I would offer -- may I see

21    that just one moment?

22            THE WITNESS:    Sure.

23            MR. OAKLEY:    I would offer Government's Exhibit 779.

24            MR. DEARINGTON:    Objection, foundation.

25            THE COURT:    Is this on KU letterhead or --

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22        1038

1           MR. OAKLEY:  It's a printout from the website, Your

2    Honor.  I think the URL is listed at the bottom of the exhibit.

3           THE COURT:  Overruled.  Exhibit 779 admitted.

4    BY MR. OAKLEY:

5    Q.  So if we can scroll to Tuesday, January 22nd, 2019 where it

6    says Academic Calendar on the left.

7         Do you see there, Doctor Subramaniam, that the first day of

8    classes for that semester was Tuesday, January 22nd, 2019?

9    A.  Yes, I do.

10   Q.  And then, for instance, if we keep scrolling.  Spring break

11   for that year began March 11th, 2019?  And so does this -- this

12   exhibit has the typical dates that you would expect for a

13   school --

14   A.  Yes.

15   Q.  -- calendar?

16   A.  Indeed.

17   Q.  And then if we can scroll to May 9th of 2019.  And so

18   May 9th of 2019 -- last day of classes was May 9th, 2019; is

19   that correct?

20   A.  That sounds about right.

21   Q.  And then Monday, May 13th was first day of finals and

22   Monday, May 17th was the last day of finals; is that correct?

23   A.  On my copy it says Friday, May 17th.

24   Q.  I'm sorry.  I don't know what I said, but it wasn't Friday,

25   May 17th.  Friday, May 17th, 2019 was the last day in that

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1039

1    semester?

2    A.  Yes; correct.

3    Q.  For finals?

4    A.  Yeah.

5         THE COURT:  When you're at a good stopping place,

6    we'll take a break.  It doesn't have to be this minute, but,

7    you know, when you finish a line of questioning.

8         MR. OAKLEY:  I will, Your Honor.  Thank you.

9    BY MR. OAKLEY:

10   Q.  You mentioned earlier that Doctor Tao was a co-PI on a

11   grant where you were the PI.

12   A.  Yes.

13   Q.  After the allegations in this case came to light, did NSF

14   seek to do anything with that grant?

15   A.  Yes.  NSF essentially put a stop, a moratorium on funding

16   for students or for any other activities associated with that

17   grant pending their own internal investigation of what was

18   going on.  And that was based on the requirement of the

19   university to let NSF know about the situation at that time.

20   Q.  Okay.  Now, after that investigation, was KU allowed to

21   continue that particular grant where the defendant was co-PI

22   and you were PI?

23   A.  Yes.  It was allowed to continue only because of the fact

24   that Doctor Tao was no longer taking any funding from that

25   particular grant in that his student who was associated with

1    that had actually graduated.  And as a matter of fact, the

2    official end date of that funding was just around that time.

3    It was ending and usually we have residual funds because we

4    just cannot exactly time the expenditures with the last day of

5    the award.

6        So the National Science Foundation provides what's called a

7    no-cost extension and that would be only to protect graduate

8    students and post-docs who are working on the projects and who

9    still need to be paid to complete their degrees and that's

10   really what that -- those funds were used for, to support the

11   completion of graduate students who are working on that grant

12   at that time.  And after they made that determination, that

13   that's where the funding was going to be used for, they

14   released the funds.

15   Q.   Okay.  And so these grants have students -- oftentimes have

16   students who are working on them?

17   A.   Correct.

18   Q.   And so the grant doesn't just affect the PI or the co-PIs,

19   students can be affected as well?

20   A.   Indeed.  Indeed.

21            MR. OAKLEY:  No further questions, Your Honor.

22            THE COURT:  You're finished with direct at this point

23   or are you just taking a break?

24            MR. OAKLEY:  I'm finished with direct.

25            THE COURT:  All right.  So let's take a recess until

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1041

1    1:30 and then, Doctor Subramaniam, you'll need to be back for

2    cross examination at 1:30.  All right?

3            (Recess).

4            (The following proceedings were held outside the

5    presence of the jury).

6            THE COURT:  We're waiting on our witness, is he out

7    there?  Here he comes.  So we're ready to go?  Okay.

8            MR. DEARINGTON:  Yes, Your Honor.

9            (The following proceedings were held in the presence

10    of the jury).

11            THE COURT:  All right.  You can be seated.

12                        CROSS EXAMINATION

13    BY MR. DEARINGTON:

14    Q.   Good afternoon, Doctor Subramaniam.

15    A.   Good afternoon.

16    Q.   So when, if you can recall, was the first time that you

17    were interviewed by the FBI in this case?  If I said it was

18    August 2021, does that sound about right?

19    A.   August 2021 sounds about right, yes.

20    Q.   Okay.  So roughly two years after Doctor Tao was indicted?

21    A.   Yes, that sounds right.

22    Q.   So all of the questions that Mr. Oakley just asked you, you

23    were not asked by Mr. Oakley, Mr. Barry, or Special Agent Lampe

24    until August 2021 at the earliest?

25    A.   That's my recollection.

1    Q.  Okay.  And I think you testified on direct that the CEBC

2    consists of professors, but they each actually have their own

3    department so they come together and have a forum where they

4    can conduct their research; is that right?

5    A.  That's correct.

6    Q.  So you were not Doctor Tao's boss or he did not report to

7    you at any time?

8    A.  That's correct.

9    Q.  Okay.  And is it fair to say that Doctor Tao was a

10   remarkably productive professor prior to his arrest?

11   A.  Yes.

12   Q.  Were you aware that he had 17 publications in 2017 and 25

13   in 2018?

14   A.  That sounds about right.  I don't know the exact numbers.

15   Q.  Okay.  And were you aware that after he was arrested, he

16   published ten more papers without being on the payroll at KU?

17   A.  I know that he had continued to publish, but I don't know

18   the exact number.

19   Q.  And are you aware that one of them, for example the last

20   one, was published in *Nature Catalysis*?

21   A.  Yes.

22   Q.  And that's an extremely highly-regarded publication;

23   correct.

24   A.  Yes.

25   Q.  And as your -- as Doctor Tao's mentor, did you ever provide

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1043

1    him with training on what it means to be current and pending

2    support?

3    A.   Can you please repeat that question?

4    Q.   Sure.  I think you testified that you were Doctor Tao's

5    mentor and in that capacity you might provide guidance to him

6    as a more junior faculty member about how to excel in his

7    position; right?

8    A.   That's correct.

9    Q.   So in that capacity, did you ever provide him with training

10   about what it means to have current and pending support?

11   A.   Nothing formal.

12   Q.   Okay.  And I think you testified that you don't recall a

13   direct conversation about Doctor Tao's request for payment --

14   for no-pay leave, but that it may have been in an e-mail that

15   you received; is that right?

16   A.   That's correct, from Doctor Weatherley.

17   Q.   Okay.  So are you aware -- and I'll represent to you this

18   is marked as Exhibit 146.  Have you seen this letter before in

19   which Doctor Tao reached out to his department chair, Laurence

20   Weatherley, about no-payment leave?

21   A.   Since I was -- I don't recall seeing this letter.

22   Q.   Okay.  And that's because you're not Doctor Tao's

23   department chair?

24   A.   Right.

25   Q.   Professor -- Doctor Weatherley is; correct?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22      1044

1   A.  That's correct.

2   Q.  Okay.  So are you aware that Doctor Tao -- that Doctor

3   Weatherley denied Doctor Tao's request for no-pay leave?

4   A.  No, I wasn't.

5   Q.  And that's because you're not Doctor Tao's department

6   chair; right?

7   A.  That's correct.

8   Q.  Do you know why the government was asking you about Doctor

9   Tao's request for no-pay leave and course buyout?

10  A.  I don't know.

11  Q.  Because you don't have the most information about that;

12  right?

13  A.  Nothing more than what I had mentioned about Doctor

14  Weatherley contacting me about that.

15  Q.  Right.  So have you seen this letter before, which is

16  Exhibit 165, in which Doctor Tao requests -- after his

17  no-payment leave request was denied, sometime thereafter he

18  requested a teaching buyout to be funded by Fuzhou University?

19  A.  No.

20  Q.  You've never seen this document before?

21  A.  I have never seen this document.

22  Q.  Because you're not Doctor Tao's department chair?

23  A.  That's correct.

24  Q.  Are you aware that -- I'm showing you what's been marked

25  Exhibit 166 -- do I have the right one?  Sorry.  Let me back

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1045

1   up.

2       167.   Are you aware that Doctor Weatherley in June 2018

3   approved Doctor Tao's buyout request to be funded by Fuzhou

4   University for a collaboration with Fuzhou University?

5   A.   Yeah, I'm not aware of this letter either.

6   Q.   Okay.  At the risk of being repetitive, that's because

7   you're not Doctor Tao's department chair; right?

8   A.   That's correct.

9   Q.   And if I wanted to know about Doctor Tao's buyout request

10  and approval, I would want to hear that from Doctor Weatherley;

11  correct?

12  A.   That's correct.

13  Q.   Okay.  You testified about an NSF grant on which you were

14  the principal investigator worth $4 million.  Do you recall

15  that?

16  A.   Yes, the one that was shown by exhibit -- as an exhibit

17  earlier.

18  Q.   Yes.  And that was Exhibit 53.  Just to clarify, when you

19  received that grant -- or, excuse me, when the University of

20  Kansas was awarded that grant on which you would work as PI,

21  you didn't get some commission or bonus because of the size of

22  the grant; right?

23  A.   No.

24  Q.   And you never get commissions and bonuses because of grant

25  awards that you're involved with?

1    A.   No.

2    Q.   Okay.  And that's because -- well, the money, the

3    $4 million doesn't go in your pocket; right?

4    A.   It is intended for what is stated in the proposal and so

5    there -- there are salary amounts that are budgeted in the

6    proposal, for example during summer months.  And those are

7    legitimate requests for funding and they go into the pockets of

8    faculty investigators upon approval by the National Science

9    Foundation.

10   Q.   So ballpark it.  If you had a $4 million grant over four

11   years, what percentage would you say of that is used for summer

12   salary?

13   A.   I would say at least one to three weeks in one summer,

14   which is less than, you know, one-ninth of the academic year

15   salary.

16   Q.   So if I said, like, 1 percent of the 4 million would go to

17   pay summer salaries, would that sound roughly reasonable, just

18   to guess?

19   A.   A few percent I would say, yeah.

20   Q.   Okay.  So this is Exhibit 53.  This is the first page that

21   I'm showing you and this is the grant that you were PI on and

22   there are a number of co-PIs, correct, from KU and the

23   University of South Carolina?

24   A.   Correct.

25   Q.   And if you zoom in, you can see that you're listed there on

1  top because you're the PI, and your year of degree, 1984.  And

2  then if you go down, listed fifth would be Doctor Tao and he's

3  the most junior faculty member on this grant; correct?

4  A.  Between -- between Marco Caricato and Franklin Tao.  I

5  don't know when -- both of them got in 2006 --

6  Q.  Fair.

7  A.  -- so I don't know who was more junior.

8  Q.  Okay.  And if we go to Page 3 - because this is a fairly

9  lengthy document - this is a certification page from 2015 --

10  from the 2015 grant, and it shows Kristi Billinger as the

11  authorized organizational representative; is that accurate?

12  A.  That is accurate.

13  Q.  So since she signed this, presumably she would have

14  awareness of this grant, have gone through it, and made sure

15  that before she signs everything looks okay; right?

16  A.  That's correct.

17  Q.  She wouldn't delegate it out to someone who says, "Yeah, it

18  looks fine, we'll just throw your name on here," that kind of

19  thing?

20  A.  I'm not sure how the KU research organization, you know,

21  approves these proposals to go forward, but then there is

22  definitely I know a due diligence process.  It's based on

23  information that the principal investigator submits upon which

24  they check and then they sign off on the proposal to be

25  submitted.

1  Q.  Okay.  So there's a diligence process and you're the

2  scientist and the PI, but the research office has some

3  responsibility here for what's being submitted; right?

4  A.  That's correct.

5  Q.  And that's a shared responsibility?

6  A.  It is.

7  Q.  And turning to page -- I think it's Bates marked 3243, just

8  an example for the jury of what the Year 4 budget would look

9  like.  So this is the last year of your grant, which was 2019;

10  is that right?

11  A.  That's correct.

12  Q.  So we see Year 4 on top there and then this would be the

13  summer salary that you referred to; right?

14  A.  Yes.

15  Q.  So for Doctor Tao, the summer salary on this grant is .25

16  of one month for roughly $3,300; right?

17  A.  That's correct.

18  Q.  So $3,300 of summer salary available to Doctor Tao if he

19  were to charge it over the summer to work on this grant; right?

20  A.  That's correct.

21  Q.  And that's out of -- one year out of four, but out of a

22  $4 million grant; right?  This is the amount of summer salary

23  Doctor Tao would get in one year?

24  A.  That's correct.

25  Q.  Okay.  Okay.  And you're aware that -- or this grant was

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22                1049

1    awarded in 2015; correct?

2    A.    Yes.    It is a four-year grant and that sounds about right.

3    Q.    Okay.    And I want to ask you about something that Mr.

4    Oakley asked you about, because I believe you said that upon

5    the government charging Doctor Tao, NSF paused the grant;

6    correct?

7    A.    That's correct.

8    Q.    But he was charged in August 2019 and this grant went

9    through 2019; is that right?

10   A.    It went through 2019.    And during the time the event

11   occurred, it was I believe in a no-cost extension.

12   Q.    So it wasn't during the ordinary term; it was just a

13   no-cost extension and they paused that no-cost extension

14   funding?

15   A.    That's correct.

16   Q.    And was that kind of like a bridge to get you to the next

17   phase of funding that you were seeking?

18   A.    No.    The no-cost extension is to spend out the remaining

19   funds in the grant, and it is primarily meant to help graduate

20   students and post-doctoral students who are working to allow

21   them to complete their degrees rather than abruptly end when

22   the funding ends.

23   Q.    Okay.    And I think you said that NSF wanted to do their own

24   investigation, having seen that Doctor Tao was charged by the

25   government, and at some point -- is that correct so far?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1050

1    A.   Yes.

2    Q.   And you weren't told the results of that investigation?

3    A.   Except that we were allowed to essentially use the funds

4    for the intended purpose that we had applied the no-cost

5    extension for.

6    Q.   Okay.  So your experience is Doctor Tao is charged by the

7    Department of Justice, NSF pauses the extension, and then they

8    say they need to investigate and suddenly the funding is

9    returned; correct?

10   A.   Yes.  They give us -- they had communicated it to the

11   Office of Research, I believe it's Alicia Reed, that, you know,

12   the frozen funding is released and it could be spent for its

13   intended use.

14   Q.   So you can't say one way or the other whether NSF found --

15   absolved Doctor Tao of any allegations or found that there

16   might be something here that we need to pause the funding; you

17   can't say anything about it?

18   A.   That's correct.

19   Q.   This grant was awarded in 2015 I think we covered; right?

20   A.   Yes.

21   Q.   And are you aware that the allegations involving Doctor Tao

22   are that he allegedly took a job in May 2018?

23   A.   Can you please repeat the question?

24   Q.   Are you aware that Doctor Tao is alleged to have taken a

25   second job at a university in China in May 2018?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1051

1   A.   I'm aware of the allegation.

2   Q.   So if Doctor Tao is accused of taking a second job in China

3   in May 2018 but you submitted this proposal in 2015, he would

4   not have disclosed that alleged second job in China in this

5   2015 proposal; correct?

6   A.   At the time of submission, yes.

7   Q.   And that's when you would've submitted the biosketches and

8   the current and pending support; right?

9   A.   That's correct.

10  Q.   And you never submitted a current and pending support for

11  this grant in 2016; right?

12  A.   That's correct.

13  Q.   Because you had already done it in 2015?

14  A.   Correct.

15  Q.   And there's not -- NSF has no requirement that in progress

16  reports, for example, you have to disclose all new current and

17  pending support every time; right?

18  A.   Not at that time.

19  Q.   Right.  At that time we mean even up until 2018?

20  A.   Correct.

21  Q.   Okay.  So do you have any idea why the government is asking

22  you about a grant that was awarded in 2015 in which the

23  proposal was submitted in 2015 and the biosketch was submitted

24  in 2015 and the current and pending support was submitted in

25  2015?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1052

1    A.   Only that the event when Doctor Tao was charged happened to

2    coincide with the no-cost extension period of the grant.

3    Q.   Okay.  Okay.  I'm going to show you the biosketch you

4    submitted in the 2015 proposal.  Is this the biosketch you

5    would've prepared for the 2015 proposal, and that's your name

6    at the top?

7    A.   That sounds about right.

8    Q.   Okay.  And you listed as your top visiting appointment,

9    just a couple months prior, that you had been a chair professor

10   at a university or research institution in India; correct?

11   A.   Correct.

12   Q.   And that was for four months.  So a four-month appointment

13   in India a couple months prior to your submission of the

14   proposal?

15   A.   That's correct.

16   Q.   Okay.  And did you disclose that appointment, if you can

17   remember, as current and pending support in any applications

18   that you can recall?

19   A.   That appointment?

20   Q.   Yes.

21   A.   That appointment did not -- it was part of a sabbatical

22   leave, so sabbatical leaves are not typically university funded

23   and we are not required to declare sabbatical leaves as current

24   and pending support in an application.

25   Q.   Did you have any grants at that time?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1053

1  A.  Yes, I did have ongoing grants.  I'm sure I had ongoing
2  grants.
3  Q.  And do you remember whether you disclosed to the agencies
4  or other grantors that you had this position in a grant
5  application as current and pending support?
6  A.  Not in the current and pending support, but this is -- this
7  is the CV where it's appropriate to mention that.
8  Q.  Okay.  I think you said it was a shared responsibility
9  between the research office and the PI to ensure that
10 everything that needs to be included in a proposal is included
11 in a proposal; right?
12 A.  That's correct.
13 Q.  And if you can take yourself back to 2015, for example, or
14 even 2016, '17, and '18, how well understood compared to today
15 do you think the rules around what needs to be disclosed and in
16 what circumstances in proposals -- how well understood do you
17 think they were compared to today by PIs?
18      MR. OAKLEY:  Objection, Your Honor.  It improperly
19 calls for a lay opinion.
20      THE COURT:  Reframe the question.
21 BY MR. DEARINGTON:
22 Q.  So if you can put yourself back in 2018, was there training
23 at KU about what information -- mandatory training about what
24 information should be included in a current and pending support
25 submission?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1054

1    A.  I don't recall any mandatory training during that period.

2    Q.  Okay.  And partly you rely on the research office to be

3    experts about what needs to be disclosed if there's an issue or

4    otherwise; right?

5    A.  We rely on guidance from the research office for certainly

6    filling out components of the grant application.

7    Q.  Okay.  And they're not infallible, right, they can make

8    mistakes?

9    A.  Like everyone else, I suppose.

10    Q.  Like everyone else.  So if they said, "We have 100 percent

11    perfection here," you'd probably start to have some doubts;

12    right?

13    A.  Yeah, we strive for -- we want whatever is going in to be

14    as accurate as possible and we strive for that.

15    Q.  Of course.  Okay.  I'd like to show you what's been marked

16    as Exhibit 1006.  So this is an e-mail from KAUST in Saudi

17    Arabia to about eight people in the research office and Doctor

18    Tao informing Doctor Tao that the King Abdullah University --

19            THE COURT:  It hasn't been admitted.

20            COURTROOM DEPUTY:  I do have it admitted.

21            THE COURT:  My apologies.  1006?

22            MR. DEARINGTON:  Yes, Your Honor.

23    BY MR. DEARINGTON:

24    Q.  So informing Doctor Tao that King Abdullah University of

25    Science and Technology has awarded a grant to KU where Doctor

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1055

1    Tao is the PI.  Do you see that?

2    A.   Yes.

3    Q.   Okay.  And you're not on this e-mail, but do you recall

4    this grant?

5    A.   I am aware of this grant.

6    Q.   Okay.  And were you aware of this grant back in 2015?

7    A.   I probably had to be because of -- generally, as a

8    director, I try to keep on top of what are some of the existing

9    grants at the center.

10   Q.   I'm showing you what's been marked as Exhibit 1461.

11        MR. DEARINGTON:  Your Honor, may I approach?

12        THE COURT:  Yes.

13   BY MR. DEARINGTON:

14   Q.   And here we have an e-mail if you look at the -- I guess

15   right here -- I'll direct your attention to here.

16        MR. OAKLEY:  Your Honor, I'm sorry, I don't think this

17   has been admitted.

18        MR. DEARINGTON:  Sorry.

19        THE COURT:  It has not.

20   BY MR. DEARINGTON:

21   Q.   Do you recognize this, Doctor Subramaniam, as an e-mail

22   that you received and then sent on November 24th, 2014?

23   A.   Yeah.  It's definitely from my e-mail address and sounds

24   like something that I usually do if people inform me of grants,

25   I congratulate them.

1       MR. DEARINGTON:  Defense moves to admit Exhibit 1461.

2       MR. OAKLEY:  No objection, Your Honor.

3       THE COURT:  1461 admitted.

4  BY MR. DEARINGTON:

5  Q.   And so here on November 24th, 2014 Doctor Tao says, "My

6  proposal sent to KAUST was chosen to be funded by KAUST."  And

7  he tells you the amount of his award that will be transferred

8  to KU.  Do you see that?

9  A.   Yes.

10  Q.   And in response, you say, "Congratulations, Feng.  I am at

11  your success and I hope that your career reaches new heights at

12  KU.  Best, Bala."

13      So does this refresh your recollection about whether you

14  would've known about the KAUST grant at November 2014?

15  A.   Yes.

16  Q.   Okay.  Okay.  I'm showing you what's been marked as

17  Exhibit 1005, previously admitted as 1005.  And does this

18  appear to be a subaward agreement between KAUST and the

19  University of Kansas Center for Research?

20  A.   Yes.

21  Q.   And turning to Page 2, does this appear to show that Doctor

22  Tao would be leading the research at KU?

23  A.   Yes.

24  Q.   And turning to Page 6, can you see there that it says, "The

25  project will begin on March 1st, 2015"?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1057

1    A.   Yes.

2    Q.   And finally on Page 24, do you see that Kristi Billinger

3    signed this in January 2015 on behalf of KU?

4    A.   Yes.

5    Q.   And is Kristi Billinger essentially the Alicia Reed of

6    2015?

7    A.   Yes.

8    Q.   Okay.  So fair to say the KU research office, between

9    having signed this subaward agreement and received the e-mail

10   to about eight people from that office around the same time,

11   would've been aware of the KAUST award?

12   A.   Yes.

13   Q.   And you were aware of the KAUST award?

14   A.   Yes.

15   Q.   Okay.  Now, I'd like to come back to Exhibit 53, which, as

16   PI, KU submitted in February of 2015.  And I think you

17   testified that the PI has a duty to ensure that current and

18   pending support is disclosed; correct?

19   A.   Right.

20   Q.   And this proposal was submitted February 2015, so just a

21   couple months after the KAUST award was -- the next month after

22   the KAUST award was signed and a couple months after you

23   learned that the KAUST award had been awarded?

24   A.   Yes.

25   Q.   But the research office, not just the PI, has a duty to

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1058

1    make sure that these submissions, like proposals and current

2    and pending support, are correct; right?

3    A.    Correct.  The current and pending works like this --

4    Q.    Sorry, there's no question pending, but I might come back

5    to that in a moment.  Sorry, Doctor Subramaniam.

6    A.    Okay.

7    Q.    So I do want to come back to current and pending, though,

8    because you mentioned it and I'm going to show you Doctor Tao's

9    current and pending support in the grant that you were PI on,

10   submitted a month after the KAUST award.

11        Do you see under pending support or current support the

12   KAUST award?  Let me know if you want me to keep going because

13   there's a second page.

14   A.    I'm just going through it just to make sure.

15   Q.    Sure.  Take your time.

16   A.    Yeah, on my screen I don't see that award.

17   Q.    Well, I can represent to you that it's -- there's nothing

18   on there that says KAUST.

19        And the second page, anything about KAUST on there?

20   A.    No, I don't see that.

21   Q.    So do you think that the KU research office knowingly

22   failed to disclose the KAUST grant?

23   A.    I wouldn't characterize it as such.

24   Q.    Okay.  It was probably a mistake, a paperwork error, to the

25   extent it should've been disclosed?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1059

1    A.    It should have been disclosed, yes.

2    Q.    And that's a shared responsibility between those who know

3    about it and those who are submitting this proposal, which

4    involves the PI -- whichever PI is involved in the grant and

5    the research office; correct?

6    A.    But more so on the co-PI, it is the diligence.  And I can

7    tell you that I hardly ever look at the current and pending and

8    the accuracy of that in proposals that go out because --

9    Q.    And you're --

10   A.    -- I, as a PI, as an investigator, I'm responsible for

11   disclosing all of my current and pending information and I

12   expect my colleagues to do the same.  And seldom do we know

13   between the principal investigators of all our current and

14   pending awards, so it is -- I consider it's my duty to be as

15   accurate as possible when I submit the current and pending to

16   our research office.

17   Q.    And nobody is blaming you, Doctor Subramaniam, for this,

18   but I think it's fair to say that the research office at the

19   very least was tasked with making sure that the PIs know what

20   needs to be disclosed and making sure that the information that

21   they have in their possession is disclosed when appropriate;

22   correct?

23   A.    We rely on that.

24   Q.    Right.

25   A.    Yeah.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1060

1   Q.  And you're a scientist and you're very busy and this isn't

2   your only grant and you probably didn't have time to review

3   every page of this grant proposal; correct?

4   A.  That's correct.

5   Q.  And you would've expected that if something were missing

6   and the research office knew about that something, they

7   would've flagged it and made sure that everything is correct;

8   right?

9   A.  That's correct.

10  Q.  Did you read the PAPP Guide, if you can recall, which is

11  the 150- or '70-page guide NSF puts out, every year a new one?

12  Do you remember reading that in 2015?

13  A.  We have to make sure we read that and then the proposal

14  that is submitted is consistent with that guide, otherwise

15  they'll be returned without review.

16  Q.  So when was the last time you read the PAPP Guide from

17  front to back?

18  A.  I do not recall reading it from front to back.

19  Q.  So you've been receiving NSF grants for how long?

20  A.  Probably I've been continuously funded from way back when.

21  Q.  1990s?

22  A.  1990s, yeah, except for --

23  Q.  '80s?

24  A.  Late '80s, I've been funded, yes.

25  Q.  And you haven't read the entire PAPP Guide once in that

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22          1061

1   time; right?

2   A.   Well, probably when I was an assistant professor or

3   associate professor, I would've read it completely.  And once I

4   have felt comfortable with draftsmanship, I may not have gone

5   through every page of it.  But certainly the research

6   description part of it I pay close attention because it's where

7   we have to write the research proposal narrative and other

8   elements of it, which is the information on appendix such as

9   current and pending support and the CV, et cetera.  That's

10  where -- while we read it, I rely on guidance from the research

11  office.

12  Q.   Which makes sense because you're a busy scientist and your

13  expertise is not the PAPP Guide, it's being in the lab; and the

14  research office, their expertise is the PAPP Guide, for

15  example, maybe?

16  A.   (Nods head up and down).  Yeah.

17  Q.   And you said associate professor might've been the last

18  time you read it through, so that would've been the late '80s.

19  Do I have that right?

20  A.   '90s, early '90s.

21  Q.   And do you know that there was a PAPP Guide issued in the

22  early '90s?

23  A.   When it was issued?

24  Q.   Do you know if there was a PAPP Guide issued by NSF in the

25  early '90s?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1062

1    A.   There was guidance, I don't know what they called it, but

2    certainly there was guidance for proposal submissions.

3    Q.   Okay.  So it may not have been the 170-page PAPP Guide that

4    you've read -- that you read back then?

5    A.   No.

6    Q.   Correct?

7    A.   Correct.  Yeah.

8    Q.   I think you said that it's partly the shared responsibility

9    between the PI and the research office.  And so in the case of

10   KAUST, while you may have known about KAUST, you probably

11   didn't have time to review Franklin's current and pending

12   support, but you reviewed your current and pending support.

13   And what happens in Franklin's current and pending support is

14   between him and the research office; is that so far correct?

15   A.   Correct.

16   Q.   Okay.  So you're responsible for your current and pending

17   support, you would've disclosed all of your current and pending

18   support; right?

19   A.   That's correct.

20   Q.   Okay.  So I want to show you your current and pending

21   support in the 2015 NSF proposal.  And I'll let you take a

22   moment just to scan it.  Let me know if I'm moving too quickly.

23            MR. OAKLEY:  What pages are we on?

24            MR. DEARINGTON:  Bates 3254.

25   BY MR. DEARINGTON:

1  Q.  So two pending supports, so those would be applications,

2  two, and the start of another current support; right?

3  A.  Uh-huh.

4  Q.  And then the end of the current support would be there.

5  Okay.  So you're 100 percent confident you disclosed all of

6  your current and pending support here?

7  A.  I'm sure I did that to the best of my ability to the KU --

8  the research office.

9  Q.  I'd like to show you a document and see if it refreshes

10  your recollection about whether you disclosed all current and

11  pending support in this submission.  There's actually just a

12  duplicate there of one page.

13      And please look up once you've been able to examine the

14  document to your satisfaction.

15              MR. OAKLEY:  Is this an exhibit?

16              MR. DEARINGTON:  No, this is just to refresh his

17  recollection.  I can show you the copy when he's done.

18              THE WITNESS:  Yes, I've seen that.

19  BY MR. DEARINGTON:

20  Q.  And you recognize the information in there?

21  A.  Yes, I do.

22  Q.  Does that refresh your recollection as to whether you

23  included all current and pending support in the page you just

24  examined?

25  A.  Yeah.  Those two are not there, in here.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1064

1    Q.  And so does that lead --
2         MR. OAKLEY:  Your Honor, I'm sorry, may I see this
3    document?  Is this the same?
4         MR. DEARINGTON:  Yeah, these are the same.
5    BY MR. DEARINGTON:
6    Q.  So fair to say you should've included those -- let me
7    rephrase.
8         So as you stand here today, does it appear that you failed
9    to disclose two current and pending support in the proposal?
10   A.  Yeah.  It does appear that they are missing from the
11   current and pending support.
12   Q.  You're not intentionally trying to defraud NSF by leaving
13   those out; right?
14   A.  Yeah, it -- but what I don't know is that those two are
15   categories which are not the traditional grant, one is a
16   matching grant for a fund and the other one is the membership
17   that is paid to the center.  So I -- usually that's an ongoing
18   annual dues that is paid.  I pretty much leave it to the
19   research office to determine if those are -- those annual dues
20   are part of the current and pending or not because those go, in
21   fact, for the entire center.  The expenditure is for the entire
22   center.
23   Q.  Okay.  I'm going to ask you to refresh your recollection
24   again, and I'm going to ask you a couple questions about any
25   grants that may have been left out of this current and pending

1    support document.

2        So did you have any grants -- anything that KU deemed as

3    grants that were left out of this proposal on which you were --

4    in which you were involved?

5    A.    Can you please repeat the question?

6    Q.    Yeah.  So what are the dates of the grants we were

7    discussing that you did not include in your current and pending

8    support in the NSF proposal in 2015?

9    A.    I'm saying that these two which are categorized as grants,

10   patents, other intellectual property in this page that I'm

11   looking at, those two items were not included in the current

12   and pending.  So what I'm saying is that these two are not your

13   traditional type of grants that you -- that you get upon

14   proposal writing, et cetera.

15       The first one is a CEBC industry partnership program.  That

16   is money that flows to the university, and this is -- that's

17   part of an annual due that comes in.  And while as the

18   director, my name is associated with those grants, I'm saying

19   that it really helps the entire center.  The use of those

20   funds --

21   Q.    Sure.

22   A.    -- is for the entire center.

23   Q.    They're grants and they're KU's grants; right?

24   A.    They are KU's grants.

25   Q.    And --

1  A.  So what I'm saying is, in my mind I've had this -- I've had

2  this question as to whether this is something as a -- as a

3  grant from a proposal.

4      And then the second one on the list, which also doesn't

5  appear in the current and pending, is an automatic matching

6  that is provided by the Kansas Board of Regents to -- and that

7  was actually provided -- I'm not sure what the date was, it

8  says September '14.  So, yes, that was a matching grant to

9  support the research and that probably should have been part of

10 that current and pending, yeah.

11 Q.  Right.  Because, for example, you did list one Kansas Board

12 of Regents grant --

13 A.  Correct.

14 Q.  -- and you didn't list another; right?

15 A.  Yep, yep.

16 Q.  And in your mind this wasn't some web of lies to defraud

17 NSF; right?

18 A.  No.

19 Q.  This was a paperwork error at best; right?

20 A.  Yep.

21 Q.  And the KU research office was aware of the grant and they

22 overlooked this as well; right?

23 A.  Yep.

24 Q.  It was a shared responsibility.  So you had two parties

25 here and neither of them identified this as something that

1  should've been disclosed even though it should've been; right?

2  A.  Correct.

3  Q.  And you're a scientist and you excel at research; nobody is

4  questioning the fact that you're one of the top researchers in

5  your field, but you'd expect the research office to do the same

6  in their field; right?

7  A.  I would.

8  Q.  Yeah.  And if the research office or if NSF had discovered

9  this inconsistency or this omission, you would've expected them

10  to reach out to you, seek clarification, and try to fix this;

11  right?

12  A.  That's correct.

13  Q.  They wouldn't have immediately terminated your grant?

14  A.  I doubt it.

15  Q.  They wouldn't have referred you out to prosecution?

16  A.  I doubt it.

17  Q.  Because it's a good-faith mistake and these things happen;

18  right?

19  A.  Yes, in this case it was.

20  Q.  So going back to the 2015 grant that Doctor Tao had a small

21  piece of, I think we said we had about $3,000 of summer salary

22  per year on that grant; right?

23  A.  Roughly.

24  Q.  And do you know how many papers Doctor Tao published under

25  this grant?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1068

1    A.  I don't have an exact count, but probably around ten or so.

2    Q.  Would it be -- would it surprise you to hear that he

3    published 12 articles with acknowledgements to this grant?

4    A.  No.

5    Q.  And is that a strong scholarly output given -- particularly

6    given Doctor Tao's relatively small share of the grant?

7    A.  It is a -- it is a strong output I would say.

8    Q.  Well, let's go back to where he started.  So Doctor Tao had

9    something like 20 papers -- 25 papers in 2018; right?

10   A.  Uh-huh.

11   Q.  And do you know what the average number of papers for

12   someone in the chemistry department is per year?

13   A.  I wouldn't know, I wouldn't know in the chemistry

14   department.  I'm part of the chemical and petroleum engineering

15   department.

16   Q.  Well, given your perspective and experience from the

17   chemical and petroleum engineering department, would it

18   surprise you to hear that between three and four papers a year

19   is the average scholarly output in chemistry?

20   A.  In the chemistry department?  I would say that, yeah, three

21   to four as an average for the entire faculty sounds like a

22   reasonable figure.

23   Q.  And if Doctor Tao published 12 articles under this grant

24   over four years, that's about three to this grant per year;

25   right?

1  A.  The average is three, yes.

2  Q.  And were you pleased with the quality of Doctor Tao's work

3  under this grant?

4  A.  Yes.

5       MR. DEARINGTON:  No further questions.  Thank you,

6  Doctor Subramaniam.

7                    REDIRECT EXAMINATION

8  BY MR. OAKLEY:

9  Q.  I want to talk to you about these two items.  The defense

10  referred to them as grants, but you described it as a CEBC

11  industrial partnership program.  What is that?

12  A.  The CEBC industry partnership program is for companies that

13  become dues-paying members off our consortium to avail

14  themselves of certain privileges.

15  Q.  When you say consortium, do you mean the CEBC?

16  A.  The CEBC is the center.  And as I mentioned earlier as its

17  mission, we work with companies to deliver technologies that

18  are of value to the companies and the companies provide input

19  to us.

20      So to be part of our research program and to gain access to

21  our faculty, our students as potential employees and

22  intellectual property on a privileged basis, they have to pay

23  some membership dues.  And that's what it is.

24  Q.  Let me back up just to make sure I understand.  Now,

25  membership dues, who does it go to?  Does it go to you or does

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1070

1   it go to KU?

2   A.   It goes to KU.

3   Q.   So KU is aware of it?

4   A.   KU should be aware of it.

5   Q.   They're not paying you a salary; that money goes to KU?

6   A.   That goes to KU, yes.

7   Q.   And so KU was aware that it was receiving money from these

8   partners that were partners of the CEBC; correct?

9   A.   Yes, it goes to the research office.  The funds go to the

10  research office and then get channeled for use by the CEBC.

11  Q.   Did you ever lie to KU about these partners?

12  A.   No.

13  Q.   Did you ever conceal any information from KU about these

14  partners?

15  A.   They're fully aware of our industry partnership program.

16  And as I said, the funds go to them and then come to our

17  center.

18  Q.   The second one you mentioned had something to do with the

19  Kansas Board of Regents.

20  A.   Yes.

21  Q.   What's -- explain to me what that one is.

22  A.   The Kansas Board of Regents -- that organization has a

23  matching funds program where they match large federal grants in

24  order to provide additional leverage for work force

25  development, et cetera, and as an incentive for investigators

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1071

1  to pursue large grants so they can make use of the matching to

2  recruit even more students or provide help to even more

3  faculty, especially at the beginning of their careers, for

4  developing human resources within Kansas.

5  Q.   And this is a Kansas Board of Regents grant to Kansas

6  University, which is a Board of Regents school; correct?

7  A.   Correct.

8  Q.   And the same question on those funds, did you ever -- was

9  KU aware of it?

10  A.   Again, it is channeled through the University of Kansas

11  research office, so they must be aware of it.

12  Q.   Okay.

13  A.   And, in fact, even the request for funding goes through the

14  research office.

15  Q.   Okay.  As part of -- and that's part of the funding of the

16  CEBC overall; correct?

17  A.   That's correct.

18  Q.   And it comes from the Kansas Board of Regents and you

19  mentioned that it was designed in part at least to help recruit

20  people.  I assume since it's the Kansas Board of Regents, it

21  was designed to help recruit people to KU?

22  A.   Yeah.  Students to KU and then help faculty members early

23  in their careers, that is their emphasis.  In order to develop

24  human resources within Kansas, make Kansas universities

25  competitive in research and provided as an incentive for people

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22         1072

1    to bring in large research grants to the state of Kansas.

2    Q.   I assume as part of that grant the Kansas Board of Regents

3    wouldn't want you recruiting students to the University of

4    Missouri, for instance; correct?

5    A.   That's correct.  Those funds have to be spent only in

6    Kansas.

7    Q.   When Mr. Dearington was asking about the current and

8    pending, you indicated that the principal investigator is

9    ultimately responsible; correct?

10   A.   No, I said it was a shared responsibility.

11   Q.   Okay.

12   A.   It's the responsibility of each investigator participating

13   in a proposal to provide the current and pending information as

14   accurately as possible to the research office.

15        And the research office has its own database and we do rely

16   on the research office to ensure that the information that we

17   are providing, especially when we have a number of research

18   grants, we do rely on them to check and make sure that the

19   information that goes out is as accurate as possible.

20   Q.   And in order for both the principal investigator and the

21   research office to share that responsibility, there has to be a

22   mutual exchange of information; correct?

23   A.   That's correct.

24   Q.   And so if the PI doesn't disclose information that would

25   get to the Center for Research, the Center for Research is

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1073

1    unable to disclose that information or to help the PI disclose

2    that information; correct?

3    A.    Correct.   The investigators in the form have to disclose

4    the information to the best of their knowledge to the research

5    office.   That's what is expected.

6    Q.    And the PI is in the best position to know what funding is

7    coming to projects the PI is working on; correct?

8    A.    Right.   Each investigator.

9             MR. OAKLEY:   No further questions, Your Honor.

10                     RECROSS EXAMINATION

11    BY MR. DEARINGTON:

12    Q.    I have a few more questions for you, Doctor.

13        So at the outset Mr. Oakley said I used the word "grant" to

14    describe the grants that you left off your current and pending

15    support, but actually you also used the word "grant," right, to

16    refer to those?

17    A.    That's what I find on the papers.   It was listed under

18    grants, patents, and so on.   That's what I was referring to.

19    Q.    Right.   And you acknowledged that the KBoR grant, for

20    example, should've been disclosed as current and pending

21    support when you testified a few minutes ago; right?

22    A.    Yes.

23    Q.    And you certainly were aware of that grant at the time you

24    omitted it from your current and pending support; correct?

25    A.    Correct.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1074

1    Q.  But that was an accident and these things happen; right?

2    A.  In this case it did.

3    Q.  And you weren't trying to defraud NSF; right?

4    A.  No.

5    Q.  And Doctor Tao -- Mr. Oakley kept referring to the fact

6    that you didn't conceal the grant from KU.  But this proposal

7    wasn't to KU, was it, this NSF proposal from 2015 was to NSF;

8    right?

9    A.  It was to NSF, yes.

10   Q.  So fair to say it doesn't really matter what KU knows, the

11   funder is the one that didn't have this information because you

12   omitted it from current and pending support; right?

13   A.  Yes.

14        MR. DEARINGTON:  No further questions.  Thank you.

15        THE COURT:  Anything more?

16        MR. OAKLEY:  No, Your Honor.

17        THE COURT:  May Doctor Subramaniam be excused?

18        MR. OAKLEY:  Yes, Your Honor.

19        THE COURT:  All right.  You're excused.  Thank you.

20        THE WITNESS:  Okay.  Thank you.

21        THE COURT:  You can call your next witness.

22        MR. OAKLEY:  The United States calls James Rupprecht.

23                 JAMES RUPPRECHT,

24   called as a witness on behalf of the Government, having first

25   been duly sworn, testified as follows:

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1075

```
 1                         DIRECT EXAMINATION
 2   BY MR. OAKLEY:
 3   Q.   Sir, could you please state and spell your name for the
 4   record?
 5   A.   Sure.  It's James Rupprecht.  R-U-P-P-R-E-C-H-T.
 6   Q.   And, Mr. Rupprecht, could I have you just slide that
 7   microphone a little bit closer so everyone can hear you?
 8   A.   Sure.
 9   Q.   And, sir, how are you employed?
10   A.   I work at the University of Kansas.
11   Q.   What do you do for KU?
12   A.   Today I'm an IT associate director.  I run the server and
13   caud (phonetic) infrastructure for the university.
14   Q.   And how long have you been doing that?
15   A.   That job has been almost two years now, but I've been at
16   the university for almost 31 years.
17   Q.   So let me talk to you about your current job.  What's your
18   job title?
19   A.   I'm an IT associate director.
20   Q.   And before you were an IT associate director, what was your
21   title?
22   A.   I was an IT architect.
23   Q.   How long were you an IT architect?
24   A.   Maybe ten years, eight to ten years.
25   Q.   And so for the last ten to 12 years you've been working as
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1076

1  an IT architect or an associate director in IT?

2  A.  That's correct.

3  Q.  How long have you been employed in KU's IT department?

4  A.  I started in -- so I started at KU in '91, worked in

5  Residence Life, and then I made the jump in '95 over to an

6  academic department and I did IT there until 2004.  And then

7  I've been in central IT since 2004.

8  Q.  So how long have you been in IT in some form or capacity at

9  KU?

10  A.  So from '96 to now.  So 26 years is how the math works out.

11  Q.  I want to talk to you a little bit about your educational

12  background.  Do you have any degrees?

13  A.  I have a bachelor of journalism.  I'm actually a news

14  photographer and did that for a little bit.  I have a master of

15  education degree after that.

16  Q.  And I want to talk to you specifically about KU e-mail

17  servers.

18  A.  Okay.

19  Q.  And I want to talk to you prior to 2019 specifically.

20  A.  Correct.

21  Q.  Are you familiar with how the KU e-mail servers were

22  handled at the university?

23  A.  I'm actually KU's messaging architect and I've been in that

24  role since 2004, so I've owned those servers and still do

25  today, unfortunately, or fortunately.

1  Q.  So where were the servers, the e-mail servers, located at

2  at KU?

3  A.  So today we are in the Microsoft Cloud, but prior -- we

4  made that move in the middle of 2020.  And prior to that those

5  servers were on the KU campus in Lawrence.

6  Q.  So I want to talk to you about prior to moving to the Cloud

7  in 2020.

8  A.  Okay.

9  Q.  So prior to 2020 the e-mail servers were physically located

10 on campus?

11 A.  Physically located, right.  We ran 18 of the servers, eight

12 of them were in Ellsworth Hall and ten of them were in the

13 Price Computing Center, both on the KU campus.

14 Q.  And when we say KU campus, is that the Lawrence campus?

15 A.  Yep, KU-Lawrence.

16 Q.  And so all the e-mail servers were located in the state of

17 Kansas?

18 A.  Correct.

19 Q.  And so when a person who had a KU e-mail address would send

20 an e-mail message using their KU address --

21 A.  Correct.

22 Q.  -- would those messages hit the server located in Kansas?

23 A.  For the most part, yes.  It is technically possible to send

24 an e-mail address and not use the server that your e-mail is

25 hosted on.  The delivery rate of those messages is very low,

1    but it is technically possible.  That's why you get a lot of

2    spam in your mailbox, because the bad guys have figured that

3    out.

4    Q.  So when you say it's technically possible to send an e-mail

5    address without it actually hitting the server, you said it's

6    very unlikely.  What's the unlikely scenario where that could

7    happen?

8    A.  Well, so there's a couple of them.  Today businesses, in

9    fact KU does as well, we use the ability to do this -- to hire

10   third parties to send e-mail on our behalf.  So all of the junk

11   mail you get from KU or from, you know -- it all comes from a

12   third party that's generating those messages, and they don't

13   actually originate from a KU server.  They start from a server

14   that's, you know, owned by a third party.  And there's a lot of

15   them out there.

16   Q.  But that's junk mail?

17   A.  That's right.

18   Q.  I want to focus in on, you know, individuals who have a KU

19   e-mail address who send a message.

20   A.  Correct.  Right.  So it is technically possible to point a

21   mail client to a third party not-KU mail server and send a

22   message using your KU address.  It is technically possible.

23   Now, the delivery rate on those messages will be very low

24   because most of the world realizes that the e-mail from KU is

25   only supposed to come from certain places and it's coming from

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22   1079

1   a place it's not supposed to, but it is technically possible.

2   Q.   And so someone who would do that would be in the business

3   of spam or malware?

4   A.   Well, maybe.   I mean, we used to -- back in the 1980s and

5   1990s, we used to tell people to use their ISP's mail server to

6   send outbound e-mail and that changed.   You know, when the

7   spammers really dug into e-mail, that changed, and we told

8   people then to start using the campus mail servers to send

9   outbound e-mail.

10      So the delivery rates today if you were to send an e-mail

11   message from a ku.edu address using a server that wasn't

12   authorized by KU, you could do it; the delivery rate on the

13   message would be very, very low.

14   Q.   Okay.   And so that is a very unusual situation where that

15   would happen?

16   A.   Absolutely.

17   Q.   And, again, we're talking solely about sent e-mail

18   addresses?

19   A.   That's correct.

20   Q.   What about e-mail addresses that are received by somebody

21   with a KU e-mail domain?

22   A.   So the only receiving point for e-mail messages that have a

23   ku.edu domain is on the mail servers operated by KU.

24   Q.   And so during the time period in question, prior to 2020,

25   the vast majority of sent e-mail messages would hit KU's server

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1080

1   and all the received e-mail messages would hit KU's server?

2   A.   That is correct.

3   Q.   I want to hand you what's been marked as Government's

4   Exhibit No. 124.

5   A.   Let me put my glasses on so I can actually see it.  Okay.

6   Q.   Does this appear to be an e-mail exchange involving at

7   least one KU e-mail address?

8   A.   Yes.

9   Q.   And when I say e-mail exchange, there are both sent and

10  received e-mails in this particular message?

11  A.   That's correct.

12  Q.   And so, for instance, directing your attention to the top,

13  the portion of the e-mail that's dated November 13th of 2017.

14  Do you see that that was from an e-mail address located outside

15  of KU?

16  A.   Correct.

17  Q.   To an e-mail address franklin.feng.tao@ku.edu?

18  A.   That's correct.

19  Q.   And so since this was a received e-mail, it absolutely hit

20  the KU servers in Kansas?

21  A.   Yes.   Yep.  And I might also note that the first message,

22  the sent message -- the way that KU mail servers work is that

23  the names, the display names, are formatted very specifically.

24  And it doesn't matter what your mail client is set to do, the

25  mail servers will actually fix that display name and put it in

1    the format that's on the servers.  So, you know, very few

2    people would use last name, comma, first, middle as their

3    display name.  So there's a very good chance that that first

4    original message was also sent through a KU server outbound.

5    Q.  And so that would -- you described a very unusual situation

6    where someone could theoretically send an e-mail.  But in this

7    instance, because of the way that you see the name, the Tao

8    comma Franklin Feng --

9    A.  That's correct.

10   Q.  -- that tells you that this hit KU e-mail servers?

11   A.  It appears to be, yes.

12   Q.  In addition to the fact that this includes a received -- an

13   e-mail received by that ku.edu address?

14   A.  Right.  That's correct.

15   Q.  So this hit KU's servers in Kansas?

16   A.  Yep.  And the source of this message that you handed me,

17   you actually get that from data that we provided at KU.  So

18   that's the only mailbox we would have access to is the KU

19   mailbox.

20   Q.  And so if through its investigation the FBI received

21   e-mails from KU, all of those hit KU servers?

22   A.  Absolutely.

23         MR. OAKLEY:  Okay.  Your Honor, I would offer

24   Government's Exhibit 124.

25         MR. DEARINGTON:  No objection.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1082

1        THE COURT:  124 admitted.

2    BY MR. OAKLEY:

3    Q.   Now, part of this e-mail appears to be in Chinese; is that

4    right?

5    A.   It's a language I can't read.

6    Q.   So I don't want to focus in on the content, but you had

7    mentioned the e-mail address, the Tao dot -- or excuse me, Tao

8    comma Franklin Feng is an indication to you that that's --

9    A.   That's correct.

10   Q.   -- that's KU's e-mail; correct?

11   A.   Uh-huh.

12   Q.   And then the domain.  So this particular e-mail address is

13   franklin.feng.tao@ku.edu.  Do you recognize the domain ku.edu

14   as the University of Kansas e-mail domain?

15   A.   That's correct.

16   Q.   Next I want to hand you what's been marked -- I want to

17   show you what's already been admitted as Government's

18   Exhibit 170.

19   A.   Okay.

20   Q.   And so the date of this e-mail is June 26th of 2018; is

21   that correct?

22   A.   Correct.

23   Q.   On at least the top part?

24   A.   That's correct.

25   Q.   And does this appear to be an e-mail from one University of

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1083

1    Kansas e-mail to another University of Kansas e-mail?

2    A.    That's correct.

3    Q.    And so this one absolutely hit the KU servers in Lawrence,

4    Kansas?

5    A.    Right.    So this particular message, if you look at the

6    address format after the "from", it's actually an X500 address,

7    it's not an SMTP address like we're used to seeing.    And the

8    only servers that are going to handle that address would be our

9    mail servers, and that actually is Franklin's X500 address.    So

10   this one with 100 percent certainty came from a KU server.

11   Q.    And so if this particular e-mail was sent from one of those

12   two parties while one of them was located outside the United

13   States, it would be an e-mail from wherever they were located

14   into Kansas or vice versa?

15   A.    Well, so if either of these two people on the message here

16   were outside the U.S., it wouldn't matter because the messaging

17   happens on a KU server.    So even if I traveled to London, for

18   example, today or then and I used my KU e-mail account, I'm

19   still using the account on a KU server.

20   Q.    And since you're physically located outside the United

21   States, the path is wherever you're at to KU to the other

22   person at KU?

23   A.    Right.    And most of the mail clients actually make a

24   connection back to KU in kind of a non-e-mail sort of way so

25   you're actually working against the servers at KU.    It's --

1  there's not a hop there.  It's -- you're actually working

2  against a KU server.

3  Q.  Okay.  Next I want to hand you -- or I want to show you

4  what have already been admitted as Government's Exhibits 193

5  and 194.  And so this particular e-mail is from a KU address

6  and you said because of the header information, you know that

7  that hit KU's server; correct?

8  A.  Right.  Right.  That address right there is an X500 address

9  and that is unique to KU's mail system.  That's not something

10  that you could pass from outside.

11  Q.  Okay.  And so this e-mail to a Schwartz comma Viviane with

12  the domain @science.doe.gov --

13  A.  Uh-huh.

14  Q.  -- if that person is located outside Kansas, that started

15  from Kansas -- or at least the e-mail went from Kansas to

16  wherever that person is located?

17  A.  Correct.

18  Q.  And if -- you see that there are attachments in that

19  e-mail; correct?

20  A.  Correct.

21  Q.  And so the attachments are attached to the e-mail so they

22  follow the same path?

23  A.  That's correct.

24  Q.  And so if I showed you government's -- what's been admitted

25  as Government's Exhibit 194, and that's -- if that were one of

```
 1   the attachments to this e-mail we just discussed, it would take
 2   the same path as the e-mail?
 3   A.   That's correct.
 4   Q.   Next I'm going to show you Government's Exhibit 246.  Is
 5   that another e-mail sent from a KU e-mail address?
 6   A.   That's correct.
 7   Q.   And this particular address you mentioned had the header
 8   information that tells you that that --
 9   A.   Right.
10   Q.   -- for sure went through KU's e-mail server?
11   A.   Right.  The address is an X500 address.
12   Q.   And this was sent on March 17th, 2019?
13   A.   That's what it looks like, yes.
14        MR. OAKLEY:  Your Honor, I'd offer Government's
15   Exhibit 246.
16        MR. DEARINGTON:  No objection.
17        THE COURT:  246 admitted.
18   BY MR. OAKLEY:
19   Q.   And, again, if someone sends an e-mail using a KU e-mail's
20   server, such as we know this one, and they're located outside
21   of Kansas, the e-mail would go through Kansas?
22   A.   Correct.
23        MR. OAKLEY:  Your Honor, I have no further questions.
24                    CROSS EXAMINATION
25   BY MR. DEARINGTON:
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1086

1    Q.  Hello, Mr. Rupprecht.

2    A.  Hi.

3    Q.  I just have a few questions for you because I admit this is

4    not my expertise, so I just want to make sure I understand

5    everything.

6    A.  Right, no worries.

7    Q.  So for starters, I heard you say that -- testify that if

8    someone sends from a KU e-mail address, most of the time it's

9    going to hit the Kansas server but not all the time, it's

10    possible it didn't; right?

11    A.  Yes, it is possible -- it is technically possible to send

12    an e-mail message using a mail server that doesn't belong to

13    the mail system that owns that address.

14    Q.  Right.  You need more information to be sure?

15    A.  Yeah.  If we looked at the message headers, the RFC 822

16    headers, we would be able to track that message hop by hop with

17    certainty.

18    Q.  Well, let's try that.  So this is 124.  So this one doesn't

19    have the X500 header; right?

20    A.  That's correct.  This is a message to a KU address, so that

21    would've landed in a KU mailbox.

22    Q.  So in order to understand whether this e-mail went outside

23    the state of Kansas to within the state of Kansas to the KU

24    server, you would need to know where that Gmail sender's server

25    was located; right?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1087

1    A.   I don't believe Google has a data center in Kansas that

2    handles e-mail.  But it is possible that if Google had a data

3    center in Kansas, that it would've -- could've originated in

4    Kansas.

5         I will also note that we have since 2008 or 2009 used

6    Microsoft as our e-mail hygiene provider, which means that

7    every message that comes into KU will go through a Microsoft

8    server somewhere in the United States --

9    Q.   Right.

10   A.   -- outside of Kansas because Microsoft does not have a data

11   center in the state of Kansas that processes e-mail.

12   Q.   Okay.

13   A.   Do I need to clarify that?

14   Q.   I don't think so.

15   A.   Okay.

16   Q.   I mean, are you basing that on what someone has told you

17   about where the servers are or have you personally --

18   A.   I know where Microsoft's data centers are that handle

19   e-mail.

20   Q.   So you've seen them?

21   A.   Well, I've not physically seen the data centers, but I've

22   seen the map that Microsoft publishes that tells you where all

23   the data centers are and there's not one in the state of

24   Kansas.

25         MR. DEARINGTON:  Your Honor, could we seek an

1    instruction that that hearsay not be considered by the jury?

2         THE COURT:  I don't know that it's hearsay.  He's an

3    e-mail server guy and has been for 20-something years.  I don't

4    think it's necessary.

5         MR. DEARINGTON:  The map?  Okay.

6    BY MR. DEARINGTON:

7    Q.  Okay.  So we've got 124.  And then 170 I think you said has

8    a -- pretty good confidence this one started in Kansas because

9    it has that special X500.  And since it was to someone at KU,

10   this definitely would've been -- traveled from a server in

11   Kansas to a server in Kansas.  And possibly if it came from

12   somewhere else, it would have gone through -- come from there

13   as well; right?

14   A.  Right.

15   Q.  Okay.  And for 193, the X500, so that signifies that Doctor

16   Tao's e-mail was from the servers in Kansas.  Evelyn Louise

17   Haaheim having been cc'd, that would be through the server in

18   Kansas.  And we would need to know what server Viviane

19   Schwartz's e-mail came from, yes or no, in order to know if

20   it's crossed the line?

21   A.  That's correct.

22   Q.  And for this last one, which is 246 that the government

23   asked you about, again, you can see here that it's from Doctor

24   Tao, so it would've hit the server in Kansas.  And we would

25   need to know where the Gmail server was or even if there was

```
 1   such an e-mail address to receive this e-mail in order to know
 2   what other server --
 3   A.  You are correct.
 4           MR. DEARINGTON:  No further questions, Your Honor.
 5                      REDIRECT EXAMINATION
 6   BY MR. OAKLEY:
 7   Q.  I'm sorry, when did KU start utilizing Microsoft for
 8   e-mails?
 9   A.  So our mail servers, where the e-mail lands, we moved there
10   from the end of -- the tail end of 2019 to the middle of 2020.
11   We have used -- we have used Microsoft for our hygiene
12   processing since -- I'm doing this from memory, and I know I'm
13   going to be wrong.  It's somewhere around 2010, 2009, 2011,
14   somewhere in that neighborhood.
15   Q.  So even in -- in looking prior to the move to the Cloud?
16   A.  Correct.
17   Q.  But all the e-mails I showed you absolutely came into
18   Kansas?
19   A.  Correct.
20   Q.  And then you said that because KU uses Microsoft and you
21   know that Microsoft doesn't have data servers in Kansas,
22   literally every single e-mail touches both Kansas and another
23   state?
24   A.  So unless the message is from a KU user to a KU user, we
25   did not hairpin those messages out to Microsoft and back in.
```

1    But any message that comes from the outside world will go

2    through one of Microsoft's data centers.

3          MR. OAKLEY:  No further questions, Your Honor.

4                    RECROSS EXAMINATION

5    BY MR. DEARINGTON:

6    Q.  Just have one or two more questions for you, Mr. Rupprecht.

7        This is very complicated information you've provided to us

8    that is not -- at least I didn't know all of this information,

9    so I take it Mr. -- Special Agent Lampe probably asked you all

10   these questions back prior to August 2019 when Doctor Tao was

11   indicted?

12   A.  Actually, no.

13   Q.  2020?

14   A.  We provided -- we provided I believe e-mail extracts for

15   law enforcement, but I was not questioned about that.  It's

16   possible that they questioned somebody else on our campus.  I'm

17   not -- I am actually not a security -- in the security office,

18   so...

19   Q.  Right.  So when was the first time you actually were

20   interviewed by anyone sitting at this table?

21   A.  Week-and-a-half, two weeks ago.

22         MR. DEARINGTON:  Thank you.  No further questions.

23         MR. OAKLEY:  I have no further questions.

24         THE COURT:  All right.  You're excused.  Thank you,

25   Mr. Rupprecht.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1091

```
 1                THE WITNESS:  Thank you.

 2                THE COURT:  Get started on your next witness?

 3                MR. OAKLEY:  Yes, Your Honor.

 4           Your Honor, actually before my next witness I'd like

 5      to move for the admission of some exhibits that don't require a

 6      witness.

 7                THE COURT:  Okay.

 8                MR. OAKLEY:  Your Honor, I would offer Government's

 9      Exhibit 302, which is Google's subscriber information for an

10      e-mail account associated with an e-mail address

11      franklin.tao.2017@gmail.com.

12                THE COURT:  Any objection?

13                MR. ZEIDENBERG:  Yes, Your Honor.  We're not prepared

14      to acquiesce to any of these exhibits until we've had a chance

15      to review them.

16                THE COURT:  All right.  How many exhibits are we

17      talking at this point?  Probably ought to do it over the --

18      take a break.

19                MR. OAKLEY:  I think there's -- it looks like 25 or

20      so.

21                THE COURT:  All right.  All right.  Why don't you all

22      review them.  We'll take a longer break than we normally do so

23      that you have a chance to go through all these.  Let's see, it

24      is ten 'til 3:00.  Why don't we take a break until 3:15.  Do

25      you think that's sufficient time?
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1092

1    MR. ZEIDENBERG:  Hopefully.

2    THE COURT:  All right.  I think -- well, it will go

3  smoother if you all can look at it on a break and then I'll

4  come back in at 3:15 and see where you're at.  Let's take a

5  break until 3:15.

6    (Recess).

7    (The following proceedings occurred outside the

8  presence of the jury.)

9    THE COURT:  All right.  How are we doing with the

10  exhibits?

11    MR. ZEIDENBERG:  Your Honor, we've got objections to

12  about a dozen of these documents that we think -- generally for

13  hearsay grounds because they're e-mails that don't show that

14  Doctor Tao responded in any way, they're just sent to him.

15  There's a few varieties of those.

16    And then there are a few others we couldn't tell

17  exactly what the provenance was of them, like who sent it, when

18  it was sent, what have you, because the government is only

19  providing us -- right now we just see the exhibit and we don't

20  have our materials to sort of put it in context.

21    So rather than hash this out now, we thought that this

22  evening we could communicate with the government by e-mail and

23  sort of explain what our differences are, and if we can't --

24  I'm assuming there will be some that we can't work out, maybe

25  many, I don't know.  There's not that many documents, probably

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1093

1    a dozen, and they're short, but -- and then we can come in in

2    the morning and let the court make a decision about how to

3    proceed.  I think that would be more efficient than trying to

4    do it exhibit by exhibit now.

5        THE COURT:  Okay.  So you, Mr. Oakley, were going to

6    offer these now.  Does that mean you're using them with your

7    next witness?

8        MR. OAKLEY:  No, Your Honor.  I think the plan

9    proposed by defense counsel works for us.  I think instead of

10    spending more of the jury's time arguing hearsay, that we can

11    try and work it out.

12        THE COURT:  Okay.  So you're going to work this out

13    and then there was something else you were going to work out as

14    far as exhibits that were going to be offered through an FBI

15    agent.

16        MR. OAKLEY:  I think through an RCFL examiner who I

17    think we might get to today.  I think it's probably Detective

18    Josh Clevenger, who I think will be our third witness.

19        THE COURT:  It will be your what?  Your next --

20        MR. OAKLEY:  Will be our third witness -- we'll have

21    an FBI agent now and then we'll have a photographer.  I don't

22    think -- and then we'll have Detective Clevenger.  And I think

23    he's the one, if I understand right, that we'd seek to

24    introduce the exhibits that the defendant may have issues with.

25        THE COURT:  What's the RCFL?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1094

1          MR. OAKLEY:  It's the computer forensic lab that

2    examined some of the electronic devices, computer media in this

3    case.

4          THE COURT:  Okay.  So you had started out today saying

5    if there's a way to take a break and me to rule on those

6    exhibits that would come in through the FBI agent, is that

7    something we need to do at this point?

8          MR. ZEIDENBERG:  I think so.  We're going to have

9    to -- we don't know exactly which ones are coming in.  We don't

10   have a problem with any of the photographs, I can tell you

11   that.

12         MR. OAKLEY:  Your Honor, if I may offer, it might be

13   best just to go -- I don't know how far we'll get into

14   Clevenger's testimony.  There's some background to it, so we

15   may not even get to the pertinent part, assuming we get to him

16   today.

17         THE COURT:  Let's proceed then.  And then you all work

18   on both categories tonight, if you will.  And I don't know, I

19   mean, I guess you can't tell me.  I'm wondering if we should

20   have the jury start at 9:30, which would give us an hour if we

21   needed an hour.  Do you think 30 minutes tomorrow morning would

22   be sufficient?

23         MR. OAKLEY:  Without knowing what the objections are,

24   I assume it's hearsay, but that might be wise.

25         MR. ZEIDENBERG:  I would hope we could do it.  In

1  fact, we might be able to even advise the court -- I don't

2  know, we haven't suggested this to the government.  We could

3  advise the court this evening our objections and bases and the

4  court can have it in the morning.  I don't know, that's just a

5  thought.  I don't know that we need argument on it, it will be

6  very succinct.

7        THE COURT:  Okay.  I will need time to review and I

8  don't plan to take all these volumes home with me tonight, so

9  I'm not sure that will work.  I probably won't be able to

10  really look at it, at least the exhibits themselves, until

11  tomorrow morning unless you've got a list now.

12        MR. ZEIDENBERG:  Yeah, we can draft it.  We were just

13  scribbling notes.  So we could send it to chambers --

14        THE COURT:  Okay.

15        MR. ZEIDENBERG:  -- this evening.

16        THE COURT:  Okay.  I still -- I may have the jury come

17  in at 9:30 just to give myself sufficient time to look at all

18  of that in the morning.  Okay.  That will work.

19        All right.  Let's just proceed and see how far we can

20  get.

21        All right.  You can let Bonnie know.

22        (The following proceedings were held in the presence

23  of the jury).

24        THE COURT:  All right.  You can be seated.

25        Call your next witness.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1096

```
 1          MR. OAKLEY:  Your Honor, the United States calls
 2  Special Agent Dana Kreeger.
 3                  SPECIAL AGENT DANA KREEGER,
 4  called as a witness on behalf of the Government, having first
 5  been duly sworn, testified as follows:
 6                     DIRECT EXAMINATION
 7  BY MR. OAKLEY:
 8  Q.  Sir, would you please state and spell your name for the
 9  record.
10  A.  Dana Kreeger.  D-A-N-A.  K-R-E-E-G-E-R.
11  Q.  And how are you employed?
12  A.  I'm a supervisory special agent with the Federal Bureau of
13  Investigation.
14  Q.  And how long have you been a supervisory special agent with
15  the FBI?
16  A.  I've been a supervisor since December 2019.
17  Q.  And what did you do prior to becoming a supervisory special
18  assistant?
19  A.  I was a special agent with the FBI since 2002.
20  Q.  Okay.  And you joined the FBI in 2002?
21  A.  Yes, sir.
22  Q.  I want to talk to you a little bit about the FBI and
23  specifically special agents.  Is there standard training that's
24  provided to all special agents of the FBI?
25  A.  There is.  So when we're initially offered a position of
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1097

1    employment with the FBI, we go to Quantico.  The duration of

2    your basic training at Quantico varies slightly, over the years

3    it's changed, it was 23 weeks when I went through back in 2002.

4    But essentially all agents go to Quantico for some period of

5    time.

6    Q.  Okay.  And the 23-week training at Quantico, can you just

7    generally describe the types of subject matter that's covered

8    for special agents with the FBI?

9    A.  Sure.  So the FBI looks at the approach that everybody

10   comes in at the same level.  Even though there's engineers,

11   scientists, attorneys, police officers, they want to teach

12   everybody similarly.  So they build a foundation.

13       And so we have legal blocks, we have tactical training,

14   firearms training.  We talk about the different programs that

15   the FBI is responsible for, the different statutes.  We go

16   through surveillance training, we go through crime scene

17   training.  And every agent gets the same training when you

18   first come in.

19   Q.  In addition to the training that you receive as a special

20   agent at Quantico, do you receive additional training

21   throughout the course of your career?

22   A.  You do.  And depending on kind of what area you want to

23   focus on or what area you're assigned to, then you're given

24   opportunities for additional training.

25   Q.  Okay.  As part of the training at Quantico, you mentioned a

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22      1098

1    variety of things, would it include the execution of search

2    warrants, for instance?

3    A.   Yes.  Both in the legal block, so understanding the

4    fundamentals and kind of what goes into search warrants, and

5    then also in our operational training where you walk through

6    and talk about the execution of search warrants.

7    Q.   When I think of the FBI and I think of FBI agents, I think

8    of people who carry firearms, have handcuffs and a badge.  Is

9    that typically a special agent?

10   A.   It is.  We're, yeah, sworn law enforcement agents.

11   Q.   Now, are there other employees of the FBI, however, that

12   aren't law enforcement officers?

13   A.   There are.  And so just like any organization, you have

14   employees that kind of do the administrative functions of the

15   agency.  After 9/11 we became more of an intelligence-driven

16   organization and so we have intelligence analysts and those

17   sorts of things, and those individuals are not sworn --

18   typically not sworn law enforcement.

19   Q.   I want to talk to you about something called the evidence

20   response team.  Are you familiar with that phrase?

21   A.   I am.

22   Q.   What is that?

23   A.   So every field office, every office of the FBI has this --

24   an evidence response team.  And these are teams of both agents

25   and professional employees that I was just talking about that

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22      1099

1   receive additional training on how to identify and collect

2   evidence at a crime scene or during the execution of a search

3   warrant.

4   Q.   And you said that every field office has an evidence

5   response team.  What's a field office?

6   A.   So with the FBI there's 56 field offices spread throughout

7   the country.  And, for example, Kansas City, our field office

8   is in Kansas City, Missouri.  We have satellite offices off of

9   that.  And the whole concept is to be able to respond to the

10  community as quickly as possible, and so field offices are

11  primarily in large metropolitan areas but spread throughout the

12  country.

13  Q.   And you said that the evidence response teams that are

14  located at every field office -- is every field office able to

15  include non-agent employees as part of the evidence response

16  team?

17  A.   I believe every field office has professional support,

18  non-agents on their evidence response team.  It's not a

19  requirement to have one or the other, but I think they all do.

20  Q.   Are you a member or were you a member of the evidence

21  response team for the Kansas City field office?

22  A.   I was a member of the evidence response team, yes.

23  Q.   We talked a little bit about the training that you receive

24  as a special agent at Quantico.  Is there any particular

25  training you receive as being part of the evidence response

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22                1100

1    team?

2    A.    Yes.    So every member of the evidence response team is

3    required to go back to our training facility and they receive

4    at least two weeks of more advanced training on forensic

5    techniques, on search techniques, on packaging and chain of

6    custody and that sort of stuff for the identification and

7    collection of evidence.

8    Q.    The FBI is responsible for investigating federal crimes;

9    correct?

10   A.    Correct.

11   Q.    And there's a large variety of federal crimes; is that a

12   fair statement?

13   A.    Yes.

14   Q.    Some are financial, some are violent.    And so let me just

15   ask you this question:    Is the execution of a search warrant in

16   a particular case, is it different in each case?

17   A.    It can be.    If you're looking at kind of how to carry out

18   the execution of a search warrant, there's a lot of factors

19   that go into it.    But the fundamentals of how the individuals

20   on the evidence response team operate, we are all taught the

21   same at the two-week course and then get additional training

22   beyond that to specialize in certain areas.    But, yeah, they --

23   I mean, we assess every crime scene or every location where

24   we're executing a search warrant a little bit different because

25   of the nuances associated with whether it's a house or a public

1    venue or whatnot.

2    Q.    And is a search warrant a court-authorized order allowing

3    the FBI to go to a -- or other law enforcement officers to go

4    to a particular location to seize evidence related to a

5    particular investigation?

6    A.    Yes.

7    Q.    Were you involved in the execution of a search warrant on

8    August 19th, 2019 at the University of Kansas?

9    A.    August 20th of 2019.

10    Q.    Excuse me, August 20th of 2019.

11    A.    Yes.

12    Q.    What was your involvement in the execution of a search

13    warrant on August 20th of 2019 at KU?

14    A.    I was the team leader for the evidence response team that

15    was responsible for searching, executing a search warrant at

16    1501 Wakarusa Drive in Lawrence, Kansas.

17    Q.    Okay.  I'm going to show you what's been marked as

18    Government's Exhibits 401 and 402.  What are those two

19    documents?

20    A.    So this is the exterior of the building located at 1501

21    Wakarusa, also known as the Life Sciences Research Lab

22    building.  And I think there's a sign, Center for

23    Environmentally Beneficial Catalysis, CEBC.

24    Q.    Okay.  And both of those exhibits, Government's Exhibit 401

25    and 402, are photographs of that particular location?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1102

1   A.   Yes.

2   Q.   And that's the location of the search warrant on

3   August 20th that you were involved in?

4   A.   Correct.

5   Q.   And do both of those photographs fairly and accurately

6   depict the way the building appeared when that warrant was

7   executed?

8   A.   Yes.

9         MR. OAKLEY:   Your Honor, I'd offer Government's

10  Exhibits 401 and 402.

11        MR. ZEIDENBERG:   No objection.

12        THE COURT:   401, 402 admitted.

13  BY MR. OAKLEY:

14  Q.   So you mentioned earlier that you observed a sign that said

15  Center for Environmentally Beneficial Catalysis, and we can see

16  that on the right side of this particular photograph; is that

17  accurate?

18  A.   Yes.

19  Q.   In parenthesis, CEBC is also on the sign?

20  A.   Yes.

21  Q.   If we can show 402, please.

22        This is just a -- is this just a photograph of that same

23  building taken from a different view?

24  A.   Yes.

25  Q.   You mentioned that you were the team leader from the ERT,

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1103

1    from the evidence response team.  What's the duties of a team

2    leader during the execution of a search warrant?

3    A.   As I mentioned, our training as an ERT, one of the

4    things -- as an evidence response team, one of the things the

5    team leader then is responsible for is assigning specific roles

6    and duties for each team member.  And so typically as team

7    leader I'll designate somebody to take photographs of the

8    scene, I'll designate individuals that are responsible for

9    searching, I'll designate individuals that are responsible for

10   the -- making sure that all the evidence is inside the right

11   container and sealed correctly.  And so as team leader, I'm

12   responsible for assigning roles of individuals at that scene.

13   Q.   Let me talk to you a little bit about the steps that are

14   involved in the execution of a warrant and let's just speak

15   generally.

16        MR. ZEIDENBERG:  Your Honor, if I may, just to speed

17   it up, I haven't spoken to counsel about this, but we don't

18   object to the authenticity of anything that's been taken from

19   the building.  So, I mean, if we want to just cut to the chase,

20   I'm happy to, or we can go through the -- how he collected it,

21   but...

22        MR. OAKLEY:  I appreciate that, Your Honor.  And when

23   we get to the collection part, we'll certainly bear that in

24   mind.

25        THE COURT:  Okay.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1104

1    BY MR. OAKLEY:

2    Q.    So let me just speak to you generally about the execution

3    of search warrants by the FBI as far as the steps.  Before you

4    can search a physical location, you have to gain entry; is that

5    accurate?

6    A.    That's right.

7    Q.    And, generally speaking, is that -- how that is

8    accomplished depends on the type of location?

9    A.    Yes.

10    Q.    And so, for instance, this was a university campus.

11    Sometimes is FBI involved in executing search warrants that are

12    at people's homes?

13    A.    (Nods head up and down).

14    Q.    Is that --

15    A.    That's correct, yes.

16    Q.    Sometimes businesses or cars or other locations; correct?

17    A.    Correct.

18    Q.    And so how the FBI gains entry into a particular location I

19    assume is dependent on what type of location it is?

20    A.    That's correct.

21    Q.    In this particular search warrant how did FBI gain entry to

22    the KU lab at the CEBC?

23    A.    We were actually escorted in by university officials.  And

24    so officers with University of Kansas went in first just -- and

25    some of that has to do with officer safety, of course.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1105

1    Q.   When you say officer safety, you mean in executing the

2    search warrant?

3    A.   That's right.

4    Q.   And I assume the different -- the concerns with officer

5    safety is always present; is that true?

6    A.   Yes.

7    Q.   But the risk factors vary based on where you're executing

8    the search warrant?

9    A.   That's correct.

10   Q.   I assume executing a search warrant at a university has

11   different concerns than an unknown house?

12   A.   That's correct.

13   Q.   So back to the execution of this search warrant.  Was part

14   of the space that was searched office space?

15   A.   Yes.

16   Q.   I'm going to hand you what's been marked as Government's

17   Exhibit 405.  Do you recognize that photograph?

18   A.   I do.

19   Q.   And what is that a photograph of?

20   A.   This is a photograph of the room identified by the FBI as

21   letter D and it's within -- located within Suite 112 of the

22   building that we've been talking about.  And on the outside was

23   a name plate.

24   Q.   And what name plate was on the outside?

25   A.   Franklin Tao.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          1106

1        MR. OAKLEY:  Your Honor, I'd offer Government's

2   Exhibit 405.

3        THE COURT:  Any objection?

4        MR. ZEIDENBERG:  No, Your Honor.

5        THE COURT:  405 admitted.

6   BY MR. OAKLEY:

7   Q.  You had mentioned that the FBI designated this space as

8   Room D, and I notice on the wall on this photograph is a letter

9   D.  So is that something that the FBI provided?

10  A.  Yes.

11  Q.  Explain that to the jury.

12  A.  So that we know after the fact and as we're collecting

13  evidence, we go in -- once we make sure that it's safe for our

14  officers and searchers to be there, we'll go and designate each

15  of those rooms.  We'll take photographs before we put this

16  letter designation up.  But then we can say, okay, this

17  particular space in Suite 112 is designated by the letter D,

18  and so the items that we removed from there are associated with

19  Room D in this case.

20  Q.  As part of the execution of a search warrant, does FBI or

21  members of the team maintain logs about specific rooms that are

22  searched?

23  A.  Yes.

24  Q.  And then likewise does a member of the team maintain a list

25  of things that were taken?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1107

1    A.   Yes.

2    Q.   When a physical item is taken during a search, explain for

3    the jury how it's handled.

4    A.   So as a searcher from our evidence response team identifies

5    a potential piece of evidence or something that we want to

6    collect or seize, they'll identify that piece with a marker.

7    And so I don't think you can see it in this particular

8    photograph, but we'll put down a number marker next to that

9    piece of evidence.  We'll try to photograph that item with that

10   number and then that item is -- once it's photographed, we'll

11   collect it.

12        And there's certain procedures and protocols that we use at

13   every crime scene, gloves and making sure that we don't

14   contaminant that evidence, remove that evidence, put it into

15   the appropriate packaging, seal it up and then check it into

16   our evidence at our office.

17   Q.   Let me direct your attention back to the exhibit that's

18   displayed on the screen.  You said this is a photograph of the

19   office space belonging to Doctor Tao?

20   A.   There's a name plate for that, yes, sir.

21   Q.   Okay.  And is this a desk that's in that office?

22   A.   Yes.  Yes.

23   Q.   And then does it appear that there was a computer --

24   computer monitors and computers that were -- and a computer

25   that was in that office?

1   A.   That's correct.

2   Q.   I want to direct your attention to what I've circled on

3   that photo.  Does it appear that there were some documents that

4   were on the floor of that office?

5   A.   That's correct.

6   Q.   I want to hand you what's been marked as Government's

7   Exhibit 479.  Do you recognize what's been marked as

8   Government's Exhibit 479?

9   A.   I do.

10  Q.   And what is that?

11  A.   This is identified as a piece of paper marked with specs,

12  and the -- it is -- in the upper left from Fuzhou University is

13  imprinted on there.

14  Q.   And do you know where that item came from?

15  A.   This particular item was on the floor behind the desk, so

16  in the approximate area that you have circled there.

17  Q.   How do you know that that's the same item that came from

18  that location?

19  A.   So like I mentioned earlier, each of these items is given a

20  specific number and then it's photographed in place or close

21  proximity to actually where it was found.  And that number

22  stays with this particular piece of item -- or this particular

23  piece of evidence.  So in this case, it's documented as Item

24  No. 9, it would have a marker next to it that says Item No. 9.

25  And as it's collected, then we have our evidence collection

1   log, evidence recovery log, and it's identified with that same

2   number.

3   Q.  Is that particular exhibit still sealed?

4   A.  Yes.

5   Q.  I gave you some scissors along with that, could you please

6   open it?

7   A.  (Witness complied).

8          MR. OAKLEY:  And, Your Honor, I would offer

9   Government's Exhibit 479.

10         THE COURT:  Any objection?

11         MR. ZEIDENBERG:  May I see it?

12         Could I have just one moment, Your Honor?

13         Your Honor, we'd object at this time.  We don't have a

14   copy of this, so maybe we can get a copy and we can look at it

15   overnight, but we haven't seen this before.

16         MR. OAKLEY:  Your Honor, we offered the defense the

17   opportunity to inspect any of the physical items that were

18   seized.

19         THE COURT:  So we have a whole string of items that

20   were seized now that you haven't seen?

21         MR. ZEIDENBERG:  I have not seen this, Your Honor.

22   I -- it hasn't been provided.

23         THE COURT:  You provided access to it?

24         MR. OAKLEY:  We offered multiple times to the defense

25   the opportunity to come to FBI and view any physical item that

1    was seized.

2        THE COURT:  Well, I don't want to stop the trial for

3    this.

4        MR. ZEIDENBERG:  Your Honor, can we just approach for

5    a moment?

6        THE COURT:  Yes.

7        (Proceedings had at the bench, outside the hearing of

8    open court).

9        MR. ZEIDENBERG:  Your Honor, I was certainly under the

10    impression that anything that wasn't going to be -- anything of

11    a paper nature like this would be turned over -- photocopied

12    and turned over electronically like everything else.

13    Government, of course, did say you can come and inspect

14    physical evidence.  I don't consider this document, which looks

15    like some sort of receipt, to be physical evidence.  It's a --

16    it's a receipt, paper, maybe ten pages.

17        All we'd like to do is just get a copy of it so we can

18    inspect it and not try and do this on the fly.  I don't know

19    why we weren't given a copy electronically with all the other

20    exhibits that were seized, paper exhibits that were seized from

21    his office.

22        THE COURT:  So what else falls in this category of

23    documents that were seized that they have not seen?

24        MR. OAKLEY:  Your Honor, first of all, I'm not sure

25    that they have not had an opportunity.  The next thing is going

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1111

1    to be a red planner and my recollection is that was

2    photographed and there is actually a translation that applies

3    to that.

4           The other thing that I would say is, in addition to

5    providing them the opportunity multiple times to come view it,

6    our exhibit list I think identifies these things as physical

7    exhibits, and I believe that was the way it was placed on the

8    exhibit list.

9           But for Mr. Kreeger, for Special Agent Kreeger, it's

10   this document and a red planner.

11          THE COURT:  Have you seen the red planner, the pages

12   from the planner?

13          MR. DEARINGTON:  No, not off the top of our head.  I

14   mean, I did e-mail Mr. Oakley last night to ask for the things,

15   and I don't think he's gotten back to us.  Did you?

16          MR. OAKLEY:  I explained that they were physical

17   exhibits.

18          MR. DEARINGTON:  So we didn't know what that meant, I

19   guess.

20          THE COURT:  But they're on the exhibit list.  How are

21   they described on the exhibit index?

22          MR. ZEIDENBERG:  It just says physical exhibit.

23          MR. OAKLEY:  But with a physical description of specs,

24   as I recall.

25          MR. ZEIDENBERG:  There was no --

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1112

1    THE COURT:  Well, I'm going to give you a chance to
2    look at these.  We'll take about a ten-minute break.  Where is
3    the other -- is it just these two?
4    MR. OAKLEY:  Through this witness, yes, Your Honor.
5    MR. ZEIDENBERG:  I mean, can I suggest that -- I mean,
6    he's already identified it.  We may not have an objection to
7    it.  It's very possible we won't.  And then it can be
8    published, you know -- I don't know that he has to be present
9    when it's published.  The government is -- it can be moved and
10   be admitted provisionally, it won't be published to the jury,
11   we'll make our objection.  I'm just trying to make a
12   suggestion so we don't have to --
13   THE COURT:  Unless you want to ask him questions about
14   it.
15   MR. ZEIDENBERG:  I don't want to do it on the fly.
16   THE COURT:  Do you have other subject matter to cover
17   with him, other items that were seized other than these two
18   things?
19   MR. OAKLEY:  Just those two things, that'll be it with
20   this witness.  The next witness is the photographer, so his
21   will be all photographs.
22   THE COURT:  Have you seen the photographs?
23   MR. ZEIDENBERG:  Yes.  We don't have any objection to
24   any of the photographs.
25   THE COURT:  I mean, he's not going to take very long.

1          MR. ZEIDENBERG:  There's a lot of photographs.

2          THE COURT:  Well, I mean, are you going to want to

3    call this witness back is what I'm saying?  Because if he lays

4    a foundation but I don't admit these now, you're going to have

5    to call him back to go over them?

6          MR. OAKLEY:  To make sure the jury understands, yes,

7    what it is.  I planned on just showing him that it was a

8    document addressed to Fuzhou University, and it appears to be,

9    you know, an invoice of some sort, but I was going to focus on

10   the top left portion that says Fuzhou University.

11         THE COURT:  Okay.  Go ahead and lay the foundation

12   with him on these two exhibits, and then we'll have to recall

13   him I think -- let's next put the photographic evidence on.

14   Then if we need to take a break, we'll take a break so that he

15   doesn't have to come back tomorrow hopefully.  Let's try to

16   proceed that way.

17         (Proceedings continued in open court).

18   BY MR. OAKLEY:

19   Q.  So directing your attention back to Government's

20   Exhibit 479, that was a document that was found on the floor

21   behind the desk in the defendant's office; is that correct?

22   A.  That's correct.

23   Q.  And directing your attention to the top right portion of

24   that document, do you see a name and an address?  I'm sorry, I

25   say right.  The top left portion, do you see -- do you see the

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1114

1  name of a university on that document?

2  A.  I do.

3  Q.  And what's the name of the university that's on that

4  document?

5  A.  Fuzhou University.

6  Q.  Can you spell the --

7  A.  F-U-Z-H-O-U.

8  Q.  And, again, that's Exhibit 479?

9  A.  That's the Government Exhibit 479, yes.

10  Q.  Okay.  I next want to hand you an evidence sack containing

11  a planner that's been marked as Government's Exhibit 481.

12  A.  Yes.

13  Q.  Do you recognize that as an item that was seized during the

14  execution of the search warrant at the defendant's office?

15  A.  I do.

16  Q.  And how do you know that?

17  A.  Because I was the seizing official for the items that were

18  seized from that office and it has the markings in the same

19  format as the other item of evidence, and this is marked as

20  Item No. 17.

21  Q.  And I noticed that when I handed you the item, it was in a

22  brown paper sack.  Do you recognize that paper sack?

23  A.  Yes.

24  Q.  And how do you recognize that paper sack?

25  A.  This is typical for some of the items of evidence that we

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1115

1    collect, we'll put it in a paper sack or plastic or the

2    right -- the appropriate container depending on what the

3    evidence is.

4    Q.  And I also noticed that when I handed you the other

5    exhibit, there was some red tape and this paper sack has red

6    tape on it.  Can you explain for the jury the significance of

7    the red tape?

8    A.  Before we leave -- or before it's checked into evidence at

9    our office where it's put on the shelf and stored, we seal

10   every package with evidence -- with red tape marked as evidence

11   that way we know that it hasn't been tampered with.

12   Q.  And where was that item found in the -- in the office?

13   A.  This was on the third shelf of a bookcase that you can see

14   on the left of that photograph.

15   Q.  Let me hand you another photograph.  This one has been

16   marked as Government's Exhibit 409.

17   A.  And when I say third shelf, that's from the top going down.

18   Q.  Okay.  Do you recognize Government's Exhibit 409?

19   A.  Yes.

20   Q.  What is that a photograph of?

21   A.  That is Room D or the office that we've been discussing and

22   a bookshelf in that office.

23   Q.  And you referenced that bookshelf as far as where the red

24   planner was found.  In looking at the photograph that's on the

25   screen that's been admitted, as we look at that photograph,

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1116

1   where are those bookcases?

2   A.   To the left of the desk and those chairs.

3   Q.   And so this photograph just shows if you were in the office

4   and turned to the left, what you would see?

5   A.   Yeah.  And this photograph is essentially taken from the

6   doorway into the office.

7           MR. OAKLEY:  Your Honor, I'd offer Government's

8   Exhibit 409.

9           THE COURT:  Any objection?

10          MR. ZEIDENBERG:  No objection.

11          THE COURT:  409 admitted.

12  BY MR. OAKLEY:

13  Q.   And so you see what appears to be three different pieces of

14  furniture in this office.  Where was that planner located?

15  A.   In the bookshelf in the center of the picture there and it

16  would be down on the third shelf from the top or the second

17  from the bottom.

18          MR. OAKLEY:  Your Honor, other than offering

19  Government's Exhibits 478 and 481, I have no further questions

20  of this witness at this time.

21          THE COURT:  Okay.  So it's 479 and 481 I think.

22          MR. OAKLEY:  Yes, Your Honor.

23          THE COURT:  All right.  So subject to defense being

24  able to review those, I won't admit those at this time.  Does

25  this complete your questions of this witness at this point?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1117

```
 1           MR. OAKLEY:  Yes, Your Honor.
 2           THE COURT:  Okay.  I think what we're going to do,
 3    Special Agent Kreeger, is have you step down and we'll have you
 4    return back to the stand hopefully sometime later this
 5    afternoon for any further questions about these two exhibits so
 6    that the defense has a chance to look at them.
 7           So if you'll go back out to the witness room, we'll
 8    call your next witness, but in the meantime -- so are there
 9    paper copies of 479 or 481?  Do you have a photocopy of those?
10           MR. OAKLEY:  Not up here, Your Honor, no.
11           THE COURT:  All right.  So I would say give those two
12    exhibits to Mr. Zeidenberg and Mr. Dearington at this point and
13    we'll proceed with the next FBI witness I think it is.
14           We'll recall you, Special Agent Kreeger, if we can
15    later on this evening.
16           THE WITNESS:  Thank you.
17           THE COURT:  All right.  And your next witness.
18           MR. OAKLEY:  Your Honor, the United States calls
19    Special Agent Michael Buono.
20                   SPECIAL AGENT MICHAEL BUONO,
21    called as a witness on behalf of the Government, having first
22    been duly sworn, testified as follows:
23                   DIRECT EXAMINATION
24    BY MR. OAKLEY:
25    Q.   Sir, would you please state and spell your name for the
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1118

1    record.

2    A.   Yes.  My name is Michael Buono, and it's spelled B, as in

3    bravo, U-O, N as in November, O.

4    Q.   Could I have you pull that microphone closer to you?

5    A.   Sure.

6    Q.   How are you employed?

7    A.   I'm sorry?

8    Q.   How are you employed?

9    A.   I'm a special agent with the FBI.

10   Q.   How long have you been employed with the FBI?

11   A.   I've been employed with the FBI for over 15 years, since

12   September 5th, 2006.

13   Q.   I want to talk to you about -- well, let me ask you this.

14   Are you a member of the evidence response team at the FBI?

15   A.   Yes.

16   Q.   And what field office do you work at?

17   A.   I work out of the Kansas City field office.

18   Q.   And were you involved in the execution of a search warrant

19   at the campus at the University of Kansas?

20   A.   Yes.

21   Q.   Was that August 20th of 2019?

22   A.   Yes.

23   Q.   And what was your role in the execution of that search

24   warrant?

25   A.   Sure.  I was a member or -- I was a member of the evidence

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1119

1   response team, and my role that day was photographer and also

2   the photo logger.

3   Q.  Okay.  And as a photographer, it may be self-apparent, but

4   can you explain for the jury what a photographer does during

5   the execution of a search warrant?

6   A.  Sure.  We try to tell a picture or a story with the

7   photographs.  So we'll take entry photographs, when evidence is

8   being searched and collected and before collected.  We'll take

9   a photo of it in place, we'll take medium-range, close-up,

10  close-up with scale.  And then upon leaving we'll take exit

11  photos to show the condition of how we left the premises.

12  Q.  And so the photographs give an overview of the location

13  being searched, the way that that location appeared both before

14  and after the execution of the search?

15  A.  That's correct.

16  Q.  Today I want to show you some photographs that you took on

17  that date.  First I want to show you a photograph that's been

18  admitted as Government's Exhibit 401.

19  A.  Okay.

20  Q.  And it should appear on the screen in front of you.  And

21  that's the location of the search; is that correct?

22  A.  That's correct.

23  Q.  And this is taken outside the building?

24  A.  Yes.

25  Q.  Okay.  I'm going to hand you Government's Exhibits 403,

1    404, 406, and 407.  Let's start with Government's Exhibit 403.

2    Do you recognize that photograph?

3    A.   Yes.

4    Q.   What is that a photograph of?

5    A.   I would consider it an entry photograph approaching the

6    building.

7    Q.   And does that photograph fairly and accurately depict the

8    way the building appeared when FBI executed the search warrant?

9    A.   Yes.  Yes.

10            MR. OAKLEY:  Your Honor, I'd offer Government's

11   Exhibit 403.

12            THE COURT:  Any objection?

13            MR. ZEIDENBERG:  No, Your Honor.

14            THE COURT:  403 admitted.

15   BY MR. OAKLEY:

16   Q.   And, again, this is just a photograph of the exterior of

17   the building showing the stairs leading to the door to get in?

18   A.   Yes.

19   Q.   Could you look next at Exhibit 404?  Government's

20   Exhibit 404 should be in front of you.

21   A.   Yes.

22   Q.   Okay.  You have it, sorry.

23   A.   Yes.

24   Q.   You're ahead of me.  What's Exhibit 404?

25   A.   Again, I would consider this an entry photograph and it's

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1121

1    entry inside the building.

2    Q.  And does it fairly and accurately depict the way the

3    building appeared?

4    A.  Yes, that's correct.

5        MR. OAKLEY:  Your Honor, I'd offer Government's

6    Exhibit 404.

7        THE COURT:  Any objection?

8        MR. ZEIDENBERG:  No objection.

9        THE COURT:  404 admitted.

10   BY MR. OAKLEY:

11   Q.  And so does this show after you entered the building what

12   you would see?

13   A.  Yes.  And I'd like to add that is a photograph of

14   Suite 112.

15   Q.  I want to next show you what's already been admitted as

16   Government's Exhibit 405.  So you don't have it in front of

17   you, but it's going to appear on the screen.  And is that a

18   photograph of one of -- the office space that was identified by

19   the FBI as office space D?

20   A.  Yes, that's correct.

21   Q.  Okay.

22   A.  Or Room D.

23   Q.  Room D.  Okay.

24       And do you have 406 in front of you?

25   A.  I do.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1122

1    Q.   What's Government's Exhibit 406?

2    A.   That's a very similar photograph to the photograph you

3    have --

4    Q.   And again --

5    A.   -- on the screen.

6    Q.   I'm sorry?

7    A.   Of Room D.

8         MR. OAKLEY:  Your Honor, I would offer Government's

9    Exhibit 406.

10        MR. ZEIDENBERG:  No objection.

11        THE COURT:  406 admitted.

12   BY MR. OAKLEY:

13   Q.   And so in the photograph we just saw there was a letter D

14   that was affixed on the wall?

15   A.   That's correct.

16   Q.   Can you -- was that letter D that was affixed to the wall

17   there when the FBI showed up or --

18   A.   No, it wasn't there prior to our arrival.  We take entry

19   photographs of the room and then the last photograph that we

20   take would be of us putting up a letter identifying the room.

21   Q.   And so in this particular photograph that letter D does not

22   appear, so what does that tell you related to this photograph?

23   A.   It was taken prior to putting the letter D on the wall.

24   Q.   Okay.  And do you have 407 in front of you?

25   A.   That's correct.

1   Q.  What is Government's Exhibit 407?

2   A.  It's also an entry photograph of Room D.

3   Q.  And does it fairly and accurately depict the way Room D

4   appeared?

5   A.  Yes.

6           MR. OAKLEY:  Your Honor, I'd offer Government's

7   Exhibit 407.

8           MR. ZEIDENBERG:  No objection.

9           THE COURT:  407 admitted.

10  BY MR. OAKLEY:

11  Q.  And that's just another view of that room; correct?

12  A.  That's correct.

13  Q.  Next I want to hand you Government's Exhibits 408, 410,

14  411, and 412.

15          MR. ZEIDENBERG:  No objection.

16          THE COURT:  You said no objection?

17          MR. ZEIDENBERG:  No objection.

18          THE COURT:  Okay.  408, 410, 411, 412, these are all

19  photographs as well?

20          MR. OAKLEY:  Yes, Your Honor.

21          THE COURT:  I'll admit them.  You can have the witness

22  tell us what they are.

23  BY MR. OAKLEY:

24  Q.  What is Government's Exhibit 408?

25  A.  408 is also an entry photograph of Room D.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1124

1    Q.  And let's show 410.  What is that a photograph of?

2    A.  That's also a photograph of -- an entry photograph of Room

3    D just from a different angle or a different corner.

4    Q.  Is this taken from the back corner?

5    A.  Yes.  I'm considering what a back corner is -- for our

6    entry photographs, what we try to do is take a photograph or

7    multiple photographs from each corner of the room to kind of

8    get an angle of every view of the room.  So this is would just

9    be taken from a different corner.

10    Q.  And can we please see 411?

11        Is this a photograph from that corner looking out?

12    A.  Yes, sir.

13    Q.  And 412, please.

14        What is this a photograph of?

15    A.  That would be a photograph of the computer inside Room D.

16    Q.  Next I want to hand you 415, 416, 417, 418, 419, and 420.

17    Do you recognize those as photographs that you took?

18    A.  Yes.

19        MR. OAKLEY:  Your Honor, I'd offer Government's

20    Exhibits 415, '16, '17, '18, '19 and '20.

21        MR. ZEIDENBERG:  No objection.

22        THE COURT:  Exhibits 415 through 420 admitted.

23    BY MR. OAKLEY:

24    Q.  Can we show 415, please?

25        What is this a photograph of?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1125

1    A.    Sure.  When the searchers find an item of evidence that

2    they're interested in collecting, what we do is we put evidence

3    tents with numbers near the evidence and we'll take a

4    photograph long-range, medium-range, close-up, close-up with

5    scale, to kind of tell a story where it's located in the room.

6    So this would be a medium-range photograph of Item No. 4 and

7    Item No. 5.

8    Q.    Can we please show 416?

9          Can you explain this photograph?

10   A.    Sure.  That would be a close-up photo with scale of Item

11   No. 4.

12   Q.    So you say scale, is that the black L-shaped item that we

13   see?

14   A.    That's correct.

15   Q.    And then the flag with the No. 4 -- both the scale and the

16   flag with the No. 4 are FBI items?

17   A.    Yes, that's correct.

18   Q.    Can we please show 417, please?

19         And so this is just another example of how FBI photographs

20   evidence that's being collected?

21   A.    Yes.

22   Q.    418, please.

23         You had mentioned you take a long-range photo and then

24   medium and then close-up.  Is this kind of an example of the

25   overview photo?

1    A.    That's correct.  It would be like a long or medium-range

2    photograph of Item No. 6.

3    Q.    And this shows No. 6 in this particular photograph?

4    A.    Yeah.

5    Q.    Could we please show Exhibit 419?

6        And 420, please?

7        Is this a photograph on top of the desk showing the monitor

8    and other items?

9    A.    Yes.  But there's a item of evidence near the evidence tent

10   that you can't really see, but it's in that area.

11   Q.    Okay.  And it was assigned Item No. 7?

12   A.    That's correct.

13   Q.    Okay.  Next I want to hand you Government's Exhibits 421,

14   425, 426, 427, 429, and 430.  Do you recognize those as

15   photographs that you took?

16   A.    Yes.  Item No. 7 is close-up with scale.  421 is Item No. 7

17   and it's close-up with scale.

18        MR. OAKLEY:  Okay.  Your Honor, I'd offer Government's

19   Exhibits 421, 425, 426, 427, 429, and 430.

20        MR. ZEIDENBERG:  No objection.

21        THE COURT:  421, 425, 426, 427, 429, 430 admitted.

22   BY MR. OAKLEY:

23   Q.    Let's look at 421.  This is another thumb drive, this is to

24   scale?

25   A.    Yes, that's correct.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1127

1    Q.  And 425, please.

2        And this photograph shows what?

3    A.  It would be a medium or long-range view of Items No. 8 and

4    No. 9.

5    Q.  426, please.

6        And 427, please.

7        And what was this item -- what number was this assigned?

8    A.  No. 9.

9    Q.  And if we can zoom in on the top left part of this exhibit.

10       Can we please show 429, please?

11       Are these travel-related documents that were found in that

12   office?

13   A.  Yes.

14   Q.  Can we please show Government's Exhibit 430?

15       Do you recognize what this is a photograph of?

16   A.  Appears to be a passport.

17   Q.  And there's writing on this that appears to be both in

18   Chinese and English; is that correct?

19   A.  That's correct.

20   Q.  Do you read Chinese?

21   A.  I do not read Chinese.

22   Q.  Can you read the English portion of this?

23   A.  Sure.  It says People's Republic of China.  And it's a

24   travel document.

25   Q.  And so this travel document was found in the office during

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1128

1    the execution of the search warrant?

2    A.  Yes.

3    Q.  Okay.  It was photographed?

4    A.  Yes.

5    Q.  I'll next hand you what's been marked as Government's

6    Exhibits 431 through 438 and have you look through those.  What

7    are those all photographs of?

8    A.  Inside the passport.

9    Q.  The last document that we saw said travel -- the last

10   photograph we saw, the blue travel document?

11   A.  That's correct.

12   Q.  These are photographs --

13   A.  From within that travel document.

14   Q.  From the inside?

15   A.  That's correct.

16        MR. OAKLEY:  Your Honor, I'd offer Government's

17   Exhibits 431 through 438.

18        MR. ZEIDENBERG:  No objection.

19        THE COURT:  431 through 438 admitted.

20   BY MR. OAKLEY:

21   Q.  Can we please show 431?

22        And so in this photograph I see -- at the top I see some

23   black items.  What are those?  Let me show you on the screen.

24   A.  Yes, those are nitrile gloves.

25   Q.  So is someone holding -- this is a -- the travel document,

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1129

1    is it a book?

2    A.    Yes, it is.

3    Q.    Similar to like a passport?

4    A.    Yes.

5    Q.    And so in order for these photographs to be taken, was an

6    agent or someone else holding them open?

7    A.    That's correct.

8    Q.    Okay.  Can we please show --

9         Well, and so in this document there are a series of stamps;

10    is that correct?

11    A.    That's correct.

12    Q.    And do you know, are those stamps related to travel to

13    different locations?

14    A.    Based on my training, knowledge, and experience, that's

15    what those stamps would indicate, yes.

16    Q.    Can we please show 432?

17         What's this a photograph of?

18    A.    Also within the book, it appears to be a visa for Japan.

19    Q.    Okay.

20    A.    And additional stamps along the -- Page 18 above it.

21    Q.    The part related to a Japan visa is the bottom part in this

22    photograph?

23    A.    That's correct.

24    Q.    And then above you said are additional stamps?

25    A.    Yes.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22          1130

1    Q.  Could we please zoom in on the bottom part?

2        Is there a name on this particular page of this document?

3    A.  Yes.

4    Q.  And what name do you see?

5    A.  I see Tao Feng.

6    Q.  Could we please show 433?

7        Does this show additional pages of that same document?

8    A.  That's correct.

9    Q.  434, please.  Here do we have additional pages with

10   additional stamps?

11   A.  Yes.

12   Q.  435, please.  Same thing?

13   A.  Yes.

14   Q.  436.  Same thing?  Does this appear to have one stamp?

15   A.  Yes.

16   Q.  437.  Same thing with -- showing two pages with multiple

17   stamps?

18   A.  Yes.

19   Q.  438, please.  Does this show the inside of the last page?

20   A.  Yes.

21   Q.  Could we please zoom in on the bottom part?

22       Next I want to hand you Government's Exhibits 439, 440,

23   444, 445, 446, and 447.  Do you recognize those as photographs

24   that you took?

25   A.  Yes.

1    MR. OAKLEY:  Your Honor, I'd offer Government's

2  Exhibits 439, 440, 444, 445, 446, 447, and 438.

3    THE COURT:  Any objection?

4    MR. ZEIDENBERG:  No, Your Honor.

5    THE COURT:  439, 440 and 445 through 447 all admitted.

6  BY MR. OAKLEY:

7  Q.  Can we please show 439?

8    Does this photograph show the desk as the drawers were

9  opened?

10 A.  Yes.

11 Q.  And is this the same desk that had the computer that we saw

12 earlier?

13 A.  Yes.

14 Q.  Please show 440, please.  Is this a close-up of a thumb

15 drive?

16 A.  Yes.

17 Q.  444, please.  Is this the right-side drawer of that desk?

18 A.  Yes.

19 Q.  And, again, the 13, 14, 15, 16 exhibit flags were placed

20 there by the FBI?

21 A.  Yes.

22 Q.  Prior to the photograph being taken?

23 A.  That's correct.

24 Q.  445, please.  This is a photograph of another thumb drive?

25 A.  Yes.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22        1132

1    Q.  446.   This is a photograph of another thumb drive?

2    A.  Yes.

3    Q.  447.   Another thumb drive?

4    A.  Yes.

5    Q.  I want to hand you what's been marked as Government's

6    Exhibit 448.  Do you recognize 448?

7    A.  Yes.

8    Q.  What's that a photograph of?

9    A.  Multiple business cards.

10   Q.  And those were found in that same room?

11   A.  Yes.

12        MR. OAKLEY:  Your Honor, I'd offer Government's

13   Exhibit 448.

14        MR. ZEIDENBERG:  No objection.

15        THE COURT:  448 admitted.

16   BY MR. OAKLEY:

17   Q.  Can we please zoom in on each business card starting with

18   the top left?  Can we move to the top middle.  Top right,

19   please.  The middle right.  The middle middle.  The middle

20   left.  And then the bottom left.  And then the last one.  Thank

21   you.

22        I'd next hand you what's been marked as Government's

23   Exhibits 449, 450, 451, 454, 455, 465, 466, 467, and 471.  Do

24   you recognize those as photographs that you took during the

25   execution of the search warrant?

1  A.  Yes.  Yes.

2          MR. OAKLEY:  Your Honor, I'd offer Government's

3  Exhibits 449, 450, 451, 454, 455, 465, 466, 467, and 471.

4          MR. ZEIDENBERG:  No objection.

5          THE COURT:  Admitted, Exhibits 449 through 450, 451,

6  454 through 455, 465 through 467 and 471.

7  BY MR. OAKLEY:

8  Q.  Can we please show 449, please?

9      Is this a photograph of the middle bookcase that's in that

10  same office space?

11  A.  Yes.

12  Q.  Does this show evidence Item No. 17?

13  A.  Yes.

14  Q.  450, please.  Is this a close-up photograph of that item?

15  A.  Yes.

16  Q.  Could we please show 454?

17      Now, is this a photograph of a different space at the KU

18  CEBC?

19  A.  Yes.

20  Q.  Is this more laboratory space?

21  A.  That's correct.

22  Q.  So there was office space and also lab space located in

23  that building?

24  A.  Yes.

25  Q.  We're still in that same building that I showed you when we

1    started?

2    A.    Yes, just down the hallway though.

3    Q.    Show 455, please.  Is this just another photograph of more

4    lab space?

5    A.    Yes.

6    Q.    465, please.  Is this a photograph of a different room but

7    showing more of the lab-type space?

8    A.    Yes.

9    Q.    466.  And, again, we're in lab space?

10    A.    Yes.

11    Q.    And does this appear to be a piece of laboratory equipment

12    there in the middle, the shiny silver thing?

13    A.    That's what it appears to me.

14    Q.    You don't know what that is?

15    A.    No, I do not.

16    Q.    467, please.  Is this that same room with that same piece

17    of equipment just taken from a different point of view?

18    A.    Yes.

19    Q.    And 471, please.  Again, more lab equipment?

20    A.    Yes.

21            MR. OAKLEY:  I have no further questions, Your Honor.

22                        CROSS EXAMINATION

23    BY MR. ZEIDENBERG:

24    Q.    Good afternoon.

25    A.    Good afternoon.

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1135

```
 1   Q.  I just got a few questions for you.  I'm showing you
 2   again --
 3           MR. ZEIDENBERG:  Can you turn on the ELMO, please?
 4   BY MR. ZEIDENBERG:
 5   Q.  It's Exhibit 466.  You don't have any idea what that
 6   machine is, do you?
 7   A.  No, sir.
 8   Q.  Do you have any idea what the significance is -- it is to
 9   the allegations in this case?
10   A.  Other than the case agent providing guidance on rooms and
11   labs that Mr. Tao Feng had access to.  As far as how the
12   equipment operates or what its purpose is, I do not understand
13   it.
14   Q.  And when you're talking about the case agent, you're
15   talking about Special Agent Lampe?
16   A.  Yes.
17   Q.  Do you have reason to think he would know what this
18   equipment is?
19   A.  I believe he would know more than I would, yes.
20   Q.  And do you have any idea -- this is 467 -- what this
21   equipment has to do with the allegations in the indictment in
22   this case?
23   A.  I do not.
24           MR. ZEIDENBERG:  I have no further questions.
25           THE COURT:  May Special Agent Buono be excused?
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1136

```
 1          MR. OAKLEY:  Yes, Your Honor.

 2          THE COURT:  All right.  Counsel approach the bench,

 3  please.

 4      (The following proceedings were had at the bench by Court

 5  and counsel.)

 6          THE COURT:  My -- I'll wait on Mr. Zeidenberg.

 7          My first question is, how are you doing timing-wise

 8  with your evidence?  What's your estimate at this point as far

 9  as getting -- finishing your case?

10          MR. OAKLEY:  I think we'll finish --

11          MR. BARRY:  I think this week.

12          MR. OAKLEY:  -- this week, maybe even Thursday.

13          THE COURT:  Okay.  So how -- I'm sorry?

14          MR. ZEIDENBERG:  If we're talking about the last

15  witness, we don't have a problem with 479, which is the paper

16  document.  481, which is the planner, we do have an objection

17  to because we haven't gotten a translation, all we got was a --

18  I think all we got was a summary of a translation.  So we would

19  object to that.

20          THE COURT:  Do you have that?

21          MR. ZEIDENBERG:  Yes.

22          MR. DEARINGTON:  I think --

23          THE COURT:  Okay.  She can't hear.  So 481 is the

24  actual planner and 481 is the --

25          MR. ZEIDENBERG:  479 was the receipt.
```

1           THE COURT:  Okay.  You don't have any objection to

2     479, so I can admit that and I will admit that.  But 481 is the

3     planner and you're telling me that 481A was a summary of some

4     of the contents of the planner?

5           MR. ZEIDENBERG:  Yes.

6           MR. BARRY:  If I may.

7           THE COURT:  Yes.

8           MR. BARRY:  So what that is, that was turned over in

9     discovery probably a year ago.  If you look in the planner,

10    it's in handwriting, so the linguist who translated wasn't able

11    to translate everything because some of it you can't read the

12    handwriting.  So what that is is a translation of everything he

13    was able to translate from the handwriting in the planner.

14          So it's not like a typed document where you can

15    translate everything, he did his best to translate what he

16    could read, but there are probably some sections of it that

17    because the handwriting is so illegible, he wasn't able to

18    discern what it said.  So, therefore, he didn't translate it.

19          THE COURT:  Is this Doctor Tao's handwriting?

20          MR. BARRY:  We believe it is.

21          THE COURT:  481, so it pinpoints by page number what's

22    translated.  Does it --

23          MR. BARRY:  Yes, Your Honor.

24          THE COURT:  -- pin cite it any more than that?  It

25    just says Page 1 contains a list of names; Page 2, a list of

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1138

1    names?

2         MR. BARRY:  In the translation it just identifies it

3    by page number.  The translation -- or the calendar, if you

4    look at it, each page has a variety of handwriting.  Some pages

5    have six characters, some pages have 20 characters.  So what

6    we're planning to do with the linguist is have him look at the

7    calendar and then he's going to discern and show through the

8    ELMO what he can translate and what it means.

9         THE COURT:  And the defense can cross examine the

10   linguist, but in the meantime I think the defense needs time to

11   go through the planner.  So how voluminous -- can I see what it

12   looks like?  I'm just thinking maybe overnight is the way to go

13   with this, give you the chance to review it and --

14        Oh, okay.  So I'm just wondering, do you need to bring

15   Special Agent Kreeger back in the morning?  Because you've

16   registered your objection.

17        MR. ZEIDENBERG:  Yes, of course.

18        THE COURT:  And I'm basically -- well, I'm -- your

19   objection is that it's not completely translated.  And with the

20   linguist you can ask about this, so...

21        MR. ZEIDENBERG:  Our objection would be that that is

22   not admissible because it's a summary.  So if the linguist is

23   up there on the stand and wants to testify as to what is there,

24   then that's one thing.  But this is a - the way I read that -

25   sort of their impression of different topics that they see.  I

1    mean, this is not verbatim.

2          THE COURT:  Okay.  So but this -- so 481 is not being

3    offered at this point?

4          MR. OAKLEY:  No.

5          THE COURT:  So we can deal with that later.  I think

6    that the defense should have 481 overnight to review.  In

7    conjunction with 481, I don't need to rule on the admissibility

8    of 481 *[sic]* yet, but I will rule on the admissibility of 481

9    but with the proviso that the defense has overnight to review

10   it first.  So I don't think you need to bring Special Agent

11   Kreeger back.

12         MR. ZEIDENBERG:  Well, we have questions for him.

13         THE COURT:  Okay.  Well, then I guess you do need to

14   bring him back.

15         MR. ZEIDENBERG:  Yes.  Yes.  Yes.

16         THE COURT:  Bring him back in the morning.

17         Okay.  It's 4:30.  Do you have another witness or

18   should we break?  Because I know we have some other work to

19   take up.

20         MR. OAKLEY:  I think breaking now would be --

21         THE COURT:  Okay.  Let's do that.  You all stick

22   around because I want to talk to you about a couple other

23   things.

24         MR. OAKLEY:  Do you want to do Kreeger's cross now?

25         THE COURT:  Are you prepared to do Kreeger's cross

1    now?

2            MR. ZEIDENBERG:  Yeah.

3            THE COURT:  Okay.  Let's do that.

4            (Proceedings continued in open court).

5            THE COURT:  All right.  We'll bring Special Agent

6    Kreeger back for cross examination.

7            And, again, I've admitted Exhibits 479 and 481.

8            You can go ahead and be seated.

9                    SPECIAL AGENT DANA KREEGER,

10   recalled as a witness on behalf of the government, having

11   previously been duly sworn, testified as follows:

12                    CROSS EXAMINATION

13   BY MR. ZEIDENBERG:

14   Q.  Good afternoon.

15   A.  Good afternoon.

16   Q.  Agent Kreeger, you were not the lead case agent on this

17   case; correct?

18   A.  That's correct.

19   Q.  That is Agent Lampe, who's here?

20   A.  That's correct.

21   Q.  And the role of the lead case agent in an investigation, is

22   that individual responsible for the investigative strategy in

23   the case?

24   A.  That is part of it, yes.

25   Q.  And the lead case agent would play a -- an important role

1  in determining who needed to be interviewed in a case?

2  A.  They are part of the decision-making on who to interview,

3  yes.

4  Q.  And would they also be involved in the decision and play a

5  role in deciding when to interview individuals?

6  A.  I'm sorry, did you say what or when?

7  Q.  When.  So I asked whom first, who to interview, and you

8  said that they would play a role in deciding who to interview;

9  correct?

10  A.  Sometimes.  Sometimes witnesses come unexpected or people

11  to be interviewed.

12  Q.  Right.  But in the course of an investigation which is

13  still covert, which means you're -- no arrest has been made and

14  you're investigating a potential crime, potential violation of

15  the law, decisions are made about who needs to be interviewed;

16  correct?

17  A.  Correct.

18  Q.  And that's a decision that the lead case agent plays an

19  important role in; correct?

20  A.  Correct.

21  Q.  And they would also play an important role in deciding when

22  to interview an individual, correct, because the timing matters

23  sometimes in these cases; correct?

24  A.  It could, yes.

25  Q.  And would the lead case agent also play an important role

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1142

1    in deciding whether or not surveillance is necessary in a case?

2    A.    They could, yes.

3    Q.    And what type of surveillance to use?

4    A.    Yes.

5    Q.    And so those types of decisions in connection with this

6    investigation, those decisions would've been made not by you

7    but by Agent Lampe?

8    A.    They would not be made by me and likely it would be made by

9    Agent Lampe, but I can't say for sure.

10    Q.    And you were not present at the search of the home of

11    Doctor Tao; correct?

12    A.    That's correct.

13    Q.    And who was in charge of the search at the home?

14    A.    I don't know that.

15    Q.    You don't know if that was Agent Lampe who was present

16    there that day?

17    A.    I was at the building that we talked about earlier.

18    Q.    Going back to 479, you testified this was taken from Doctor

19    Tao's office?

20    A.    Yes.

21    Q.    And do you have any idea what this has to do with any of

22    the allegations in this case?

23    A.    The reason this was collected is because it says Fuzhou

24    University and that was in the search warrant specifically.

25    Q.    Have you looked at this document?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1143

1   A.   I looked at the reference to Fuzhou University.

2   Q.   And fair to say that Doctor Tao's name doesn't appear

3   anywhere on it?

4   A.   I don't know that.

5   Q.   Fair to say you haven't seen Doctor Tao's name on it?

6   A.   I'm not aware that it was -- that his name is on there.

7   Q.   And fair to say it appears to be a quote for equipment for

8   a company -- from a company in Germany in November 2018?

9   A.   I can't say that for sure.

10  Q.   Any idea what this equipment is for?

11  A.   No.

12  Q.   Any idea who Siwen Su is at Fuzhou University?

13  A.   No.

14  Q.   Was that something you think that Agent Lampe would know?

15  A.   I don't know if he would know that individual.

16  Q.   Do you think he would know that name?

17  A.   I don't know.  I don't have enough knowledge of the case

18  itself.

19  Q.   This wasn't hidden in Doctor Tao's office in any way, was

20  it?

21  A.   No.

22  Q.   Any idea what this type of equipment that's being ordered

23  here or being -- I should say being quoted, what it's for --

24  A.   No.

25  Q.   -- or what it has to do with the case?

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22        1144

1    A.   No, sir.

2    Q.   Let's go back to 426 we just saw.  We just saw the

3    photograph of this.  Do you have any idea what the significance

4    is of this document?

5    A.   No.

6    Q.   Do you know why a photograph was taken of it?

7    A.   Well, essentially we photographed everything that's present

8    in a particular area, whether it's up close or not.  This

9    particular one identifies -- does have a language or writing on

10   there that one would maybe consider as Chinese, but I don't

11   speak it or write it, so...

12   Q.   And --

13   A.   You would have to ask the case agent on the meaning behind

14   this or the relevance.

15   Q.   Okay.  It looks like from your description and the

16   photographs that they were going through -- Mr. Oakley was

17   going through, that there were a lot of computers seized from

18   Doctor Tao's office; correct?

19   A.   There were a lot of images of computers from the office --

20   from the building.

21   Q.   And a lot of -- were you told to seize anything that had

22   Chinese writing on it?

23   A.   No.

24   Q.   Or at least photograph anything with Chinese writing on it?

25   A.   We were not told that, not directed to do that.

19-20052-01   USA v. Feng (Franklin) Tao   03.28.22      1145

1    Q.  Okay.  You -- it appeared that a lot of thumb drives were

2    taken; is that correct?

3    A.  A number of thumb drives were seized, yes.

4    Q.  And I take it those items were processed; correct?

5    A.  I can't speak to that.

6    Q.  Well, wouldn't that be the normal course, if thumb drives

7    are taken from a -- in the course of a search warrant, to

8    process them?

9    A.  That's commonly done, but that's not my role to do that.

10   Q.  Okay.  Do you know offhand how many thumb drives were

11   taken?

12   A.  I'd have to look at my evidence collection log to see the

13   exact number.

14   Q.  Could you give us an approximation?

15   A.  Fewer than ten.

16   Q.  Fewer than ten.  Fair to say based on your understanding of

17   the investigation, did you -- as the supervisory special agent,

18   you kept apprised generally of the steps in this case?

19   A.  No.

20   Q.  Not at all?

21   A.  No.

22   Q.  Fair to say -- are you unaware that after all the search of

23   all those computers and all those thumb drives that there was

24   no signed employment contract between Doctor Tao and Fuzhou

25   University?  You didn't know that?

1    A.    No, sir.

2    Q.    That would be something that the lead case agent would

3    know; correct?

4    A.    Yes.  Well, could know.  I don't -- you'd have to ask him.

5    Q.    Well, if he didn't know, who would know?

6    A.    I don't know.

7    Q.    Okay.

8              MR. ZEIDENBERG:  I have no further questions, Your

9    Honor.

10                   REDIRECT EXAMINATION

11   BY MR. OAKLEY:

12   Q.    Mr. Zeidenberg talked to you about interviewing people and

13   that sort of thing.  And to be clear, your role in this case

14   was the execution of the search warrant; right?

15   A.    That's correct.

16   Q.    But you're familiar with typically how FBI works?

17   A.    Yes.

18   Q.    And if FBI agents want to or need to talk to somebody

19   located in the United States, it's simply a matter of finding

20   that person, knocking on the door, giving them a phone call,

21   something like that; correct?

22   A.    Sometimes a little more challenging, but, yes, essentially.

23   Q.    But when we're talking about people that are located

24   outside the United States in another country, it's not as

25   simple as flying over to that country and talking to someone;

1    right?

2    A.  That's correct.

3    Q.  Okay.  It's like there are certain rules that are governed

4    by treaties and other things that dictate what an agent is able

5    to do as it relates to obtaining evidence in a foreign

6    location; correct?

7    A.  That's right.  We're sworn law enforcement in the United

8    States and to the interests of the United States.

9    Q.  Mr. Zeidenberg asked you a few questions about surveillance

10   and the case agent's role in surveillance.  Does FBI have a

11   separate group of people who conduct surveillance?

12   A.  We do.

13   Q.  And being the FBI, do those people have resources that are

14   available to them in conducting surveillance?

15   A.  Yes.

16          MR. OAKLEY:  One moment, Your Honor.

17          No further questions, Your Honor.

18          THE COURT:  All right.  Any further questions of

19   Special Agent Kreeger?

20                     RECROSS EXAMINATION

21   BY MR. ZEIDENBERG:

22   Q.  Mr. Oakley was asking you about the process involved in

23   getting information from foreign countries.  How long have you

24   been with the bureau?

25   A.  Almost 20 years.

1   Q.   Okay.  So you're familiar that in cases where the FBI is in

2   need of information from a foreign country, there are steps

3   that have to be gone through, but they can be done; correct?

4   A.   Yes.  It depends on the country sometimes, but yes.

5   Q.   There's something called mutual legal assistance treaties

6   that can be filed and to obtain evidence from a foreign

7   country?

8   A.   Yes, those exist, yep.

9   Q.   I'm sorry?

10  A.   Yes, those exist.

11  Q.   And so those are steps that are done through the Department

12  of Justice when you need documents or even testimonial evidence

13  from a foreign country; correct?

14  A.   Correct.

15  Q.   And are you aware of any prohibition or impediment in

16  reaching out to other federal -- U.S. federal agencies like the

17  Department of Energy or the national -- or the NSF, National

18  Science Foundation?

19  A.   Any prohibitions by the Department of Justice?

20  Q.   Yeah.  I mean, is there any reason why an agent can't just

21  pick up the phone and contact someone at another U.S.

22  government agency like NSF or DOE?

23  A.   I think they're often -- if there's a need to know, right,

24  and there's clearances and there are things that need -- may

25  need to be addressed before you do that, but it is -- those are

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22                1149

```
1   opportunities -- or available if you need it.
2   Q.  Right.
3           MR. ZEIDENBERG:  Okay.  Nothing further, Your Honor.
4           THE COURT:  Anything more?
5           MR. OAKLEY:  Just briefly, Your Honor.
6                   FURTHER REDIRECT EXAMINATION
7   BY MR. OAKLEY:
8   Q.  The MLAT process, the Mutual Legal Assistance Treaty
9   process, requires that there be a treaty between the United
10  States and a particular country; correct?
11  A.  I believe so, but...
12          MR. OAKLEY:  No further questions, Your Honor.
13          THE COURT:  All right.  Special Agent Kreeger, you're
14  excused.  Thank you.
15          THE WITNESS:  Thank you.
16          THE COURT:  All right.  So we have some legal matters
17  to take up and it would be a good time I think to break for the
18  day as far as the jury is concerned.
19          So are we safe in having them reconvene at 9:00 or
20  should we do 9:30 based on what we discussed earlier?  There's
21  a number of legal matters I may need to take up, so why don't
22  we say 9:30 rather than have you wait in the jury room in case
23  I'm a little delayed in being able to make all the rulings.
24          So we'll recess for the night.  We'll have you all
25  back at 9:30 tomorrow morning and remember the overnight
```

1    admonition I give you ad nauseam, right, to not read or

2    research or look up or talk to anyone and not to -- certainly

3    not to read any press accounts of any of this.

4            All right.  Have a good evening.  We'll see you at

5    9:30.

6            (The following proceedings were held outside the

7    presence of the jury).

8            THE COURT:  Okay.  So tonight you all have the red

9    planner you are going to review.

10           And then I don't have the list in front of me, but

11   there were about 25 exhibits, Mr. Oakley, that you planned to

12   introduce through another FBI agent who is coming up shortly?

13           MR. OAKLEY:  No, Your Honor.  The exhibits that I was

14   prepared to admit were from this -- based on the stipulation, I

15   understand they don't agree to hearsay and the sort, but they

16   were e-mails from different Google accounts.

17           THE COURT:  Okay.  So you all are going to work on

18   that overnight and then identify for me the subset of those 25

19   that you have objections to?

20           MR. ZEIDENBERG:  Correct.

21           THE COURT:  Okay.  And we'll take that up in the

22   morning.  And then there was another category I thought of

23   documents that there might be a hearsay objection to that are

24   going to come in through a particular FBI agent.

25           MR. OAKLEY:  Yes, Your Honor.  My -- the government

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1151

```
1   anticipates the next witness will be Josh Clevenger and he is

2   with the computer lab and so he imaged the defendant's computer

3   from KU.  And so there will be items taken from that.

4            THE COURT:  Okay.

5            MR. OAKLEY:  Including recorded phone calls and other

6   documents.  And my understanding is that would be the universe

7   of the portion that the defense might have specific objections

8   to.

9            THE COURT:  Okay.  So that there were recordings, but

10  there were also documents that were taken as part of imaging

11  the hard drive of the computer?

12           MR. OAKLEY:  Yes, Your Honor.

13           THE COURT:  And some of those you may object to?

14           MR. ZEIDENBERG:  Yes.  I mean, I don't know, but we

15  might.  If we get the list tonight of the exhibits, we'll sit

16  down and go through them and figure out what we have issues

17  with.

18           THE COURT:  Okay.  So if you get the list tonight, you

19  can do that.  Meanwhile the other 25 or so that you identified,

20  you do know what those are so you can work on those tonight.

21           So let's plan on getting together at 8:30.  And at

22  some point tonight or first thing in the morning, whatever, if

23  you just want to give me the -- by exhibit number what is at

24  issue, I'll try to look at those at 8:30 or even before if I

25  can.
```

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22    1152

1          And I think the government should be prepared with

2    respect to those that would contain hearsay statements to point

3    me to whether they might be admissible on the basis of not

4    being truth of the matter asserted.  My guess is if they're

5    going to be admissible at all, it might be on that basis, I

6    don't know.  But anyway, we'll take it all up at 8:30 tomorrow.

7          MR. OAKLEY:  Your Honor, without knowing what the

8    particular objection is, it's either going to be statements of

9    a party-opponent, or not offered for the truth of the matter

10   because it's needed to explain the defendant's statements, or

11   an adoptive admission.

12          I think this kind of ties into the *limine* arguments

13   that we had related to e-mails and everything.  But again, I

14   may be assuming that I understand where the defense is going

15   with these objections.

16          THE COURT:  Yeah.  So as far as the *limine* -- let me

17   just kind of do a recap to help me remember, and maybe you as

18   well.  So there was a motion *in limine*, e-mails sent from

19   Doctor Tao's Fuzhou University e-mail account.  I denied that

20   *limine* motion without prejudice saying subject to

21   contemporaneous objection.

22          There was a motion *in limine* about -- asking, I think,

23   for an adverse inference instruction regarding the contents of

24   Doctor Tao's Fuzhou University e-mail account based -- of

25   wiping of log-in credentials from the FBI laptop.  I did deny

1    that so I've already made a record on that.

2            There was a motion -- no, that's something different.

3    Let's see.  There was a motion *in limine* regarding unsigned

4    contracts and addendum that were signed.  I denied that without

5    prejudice to raising contemporaneous objections.

6            There was one -- a *limine* motion regarding printouts

7    and screenshots of Chinese web pages.  I denied that without

8    prejudice subject to contemporaneous objection.  The same with

9    respect to a *limine* motion regarding e-mails from third

10   parties, including post-doc students, asserting that Doctor Tao

11   worked or will work at Fuzhou University.  I think that's it.

12   So hopefully that helps as far as prior *limine* rulings.

13           And you've got the instructions overnight -- or not

14   overnight, actually Friday.  And I don't think we're ready yet,

15   but we were just trying to do some planning on when we might

16   have an informal instruction conference.

17           So you're thinking you could finish on Thursday, it

18   will be Thursday or Friday, you won't finish on Wednesday; is

19   that fair?

20           MR. OAKLEY:  I think that's fair.

21           THE COURT:  Okay.  So I think we probably ought to

22   plan on an informal conference Wednesday at the end of

23   business, so be ready for that.  And then we'll do the formal

24   probably on Thursday, whenever makes sense.

25           Okay.  Can you think of anything else?

19-20052-01    USA v. Feng (Franklin) Tao    03.28.22                1154

1       MR. OAKLEY:  Yes, Your Honor.  Just related to the --

2  to the item that the court is going to allow defense to have

3  overnight.  Since that was a physical item seized, I think

4  Agent Lampe, to abide by FBI requirements, will need the

5  defense to sign a chain of custody-type document.

6       THE COURT:  Okay.

7       MR. ZEIDENBERG:  No problem.

8       THE COURT:  Okay.  I've looked at it.  It didn't look

9  like a lot of pages, I didn't count, but I would say under ten

10 pages at issue in this, so -- but, yeah, I think that makes

11 sense to do a chain of custody, and then tomorrow it will come

12 back to Special Agent Lampe's custody.

13      MR. OAKLEY:  Thank you, Your Honor.

14      THE COURT:  Okay.  All right.  Have a good evening.

15 We'll be in recess until 8:30.  I'll plan to be here with you

16 at 8:30 tomorrow.

17      MR. BARRY:  Thank you.

18      (Proceedings concluded).

19

20

21

22

23

24

25

1                          * * *

2

3                  C E R T I F I C A T E

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    December 2, 2022.

8

9                          /s/ Kelli Stewart _____

10                         KELLI STEWART, CSR, RPR, CRR, RMR
                           United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25