```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF KANSAS
 2

 3   UNITED STATES OF AMERICA,

 4       Plaintiff,
                                  Case No. 19-20052-JAR
 5       v.

 6   FENG TAO, a/k/a "Franklin      Kansas City, Kansas
     Tao,"                          Date:  31 March, 2022
 7
         Defendant.                 Day 9
 8                                  Pages 1546 - 1749
     ........................
 9
                  TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE JULIE A. ROBINSON
           SENIOR UNITED STATES DISTRICT COURT JUDGE
11

12                 A P P E A R A N C E S

13   For the Plaintiff:

14   Mr. Adam Barry              Mr. Christopher Oakley
     U.S. DEPARTMENT OF JUSTICE  U.S. ATTORNEY'S OFFICE
15   950 Pennsylvania Avenue, NW 500 State Avenue
     Washington, D.C. 20530      Suite 360
16                               Kansas City, Kansas 66101

17   For the Defendant:

18   Mr. Michael F. Dearington
     Mr. Peter R. Zeidenberg
19   ARENT FOX, LLP
     1717 K Street NW
20   Washington, D.C. 20006

21

22

23

24   _____
               Proceedings recorded by machine shorthand,
25       transcript produced by computer-aided transcription.
```

```
1                           I N D E X

2
        Government's Witnesses:                          Page
3
      DR. MEILIN LIU
4       Direct Examination by Mr. Barry              1569
        Cross-Examination by Mr. Zeidenberg          1576
5       Redirect Examination by Mr. Barry            1591
      SHIRAN ZHANG
6       Direct Examination by Mr. Barry              1595
        Cross-Examination by Mr. Zeidenberg          1611
7       Redirect Examination by Mr. Barry            1619
        Recross-Examination by Mr. Zeidenberg        1620
8     LUAN NGUYEN
        Direct Examination by Mr. Barry              1621
9       Cross-Examination by Mr. Zeidenberg          1667
        Redirect Examination by Mr. Barry            1683
10    MORGAN BECKER
        Direct Examination by Mr. Oakley             1686
11      Cross-Examination by Mr. Dearington          1704
        Redirect Examination by Mr. Oakley           1714
12    JAMES CHURCHILL
        Direct Examination by Mr. Barry              1718
13

14

15                       E X H I B I T S

16      Government's
        Exhibits            Offered           Received
17
            124A             1730              1730
18          128A             1737              1737
            131              1739              1740
19          131A             1739              1740
            132              1739              1740
20          132A             1739              1740
            133              1741              1742
21          133A             1741              1742
            134              1741              1742
22          134A             1741              1742
            136              1742              1742
23          136A             1742              1742
            137              1744              1744
24          138              1745              1745
            163              1606              1606
25          214              1636              1636
            215              1636              1636
```

| | (Continued) Government's Exhibits | Offered | Received |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | 216 | 1639 | 1639 |
| | 223 | 1648 | 1648 |
| 4 | 224 | 1653 | 1653 |
| | 229 | 1664 | 1664 |
| 5 | 230 | 1664 | 1664 |
| | 230A | 1664 | 1664 |
| 6 | 262 | 1631 | 1631 |
| | 263 | 1631 | 1631 |
| 7 | 264 | 1633 | 1633 |
| | 265 | 1633 | 1633 |
| 8 | 266 | 1633 | 1633 |
| | 267 | 1633 | 1633 |
| 9 | 268 | 1637 | 1637 |
| | 270 | 1640 | 1640 |
| 10 | 273 | 1643 | 1643 |
| | 274 | 1643 | 1643 |
| 11 | 275 | 1647 | 1647 |
| | 279 | 1650 | 1650 |
| 12 | 282 | 1655 | 1655 |
| | 283 | 1659 | 1659 |
| 13 | 284 | 1662 | 1662 |
| | 285 | 1662 | 1662 |
| 14 | 286 | 1662 | 1662 |
| | 296 | 1735 | 1735 |
| 15 | 297 | 1736 | 1736 |
| | 321 | 1743 | 1743 |
| 16 | 321A | 1743 | 1743 |
| | 358 | 1717 | 1717 |
| 17 | 700 | 1685 | 1685 |
| | 700A | 1685 | 1685 |
| 18 | 700B | 1685 | 1685 |
| | 700c | 1684 | 1684 |
| 19 | 701 | 1685 | 1685 |
| | 702 | 1684 | 1684 |
| 20 | 703 | 1685 | 1685 |
| | 704 | 1684 | 1684 |
| 21 | 705 | 1684 | 1685 |
| | 705A | 1686 | 1686 |
| 22 | 706 | 1685 | 1685 |
| | 707 | 1685 | 1685 |
| 23 | 708 | 1685 | 1685 |
| | 711 | 1689 | 1689 |
| 24 | | | |
| 25 | | | |

```
1                    P R O C E E D I N G S
2         (The following proceedings occurred outside the presence of
3    the jury.)
4         THE COURT:  Are you all ready to talk about these
5    exhibits?  I received an e-mail not too long ago this morning
6    with the basis for the defendant's objections to certain
7    exhibits.  Is this all inclusive, Mr. Dearington?
8         MR. DEARINGTON:  Yes, Your Honor.  What we tried to
9    do, because there were 215 of them, is pick out the ones we
10   thought were most appropriate for the Court to hear outside the
11   presence of the jury.  We tried to get almost all the big ones
12   in there and then reserving our right to make contemporaneous
13   objections if something comes up.
14        THE COURT:  Got it.  Okay.  So let's get through as
15   many of these as we can.  The first, Exhibit 771 and then
16   translation 771A, the objection is to authenticity, hearsay,
17   estoppel translation, constitutional violation.
18             As far as the authenticity, I don't see a URL number
19   on this.  I can't tell where this came from.  Oh, I take that
20   back.  I do see a URL number on 771, www.moe.gov.cn and slash
21   and a pathway.  Based on what's on the translation, it appears
22   to be something the government is offering for truth of the
23   matter asserted; is that correct?
24        MR. BARRY:  Yes, Your Honor.  It's offered for truth
25   of the matter asserted as well as -- yeah.  It's for truth of
```

1    the matter asserted.

2         THE COURT:  Okay.  So I was hoping we could sort of

3    put these in buckets.  This 771 comes from a website.  It has

4    to do with the regulation -- actually let's take this one up

5    separately because it's different than some of the other

6    websites.

7         Okay.  So --

8         MR. DEARINGTON:  Your Honor, I think 772 might fall

9    into the same category.

10        THE COURT:  Okay.

11        MR. BARRY:  It's a similar document just from a

12   different time period but from the same source.

13        THE COURT:  772.  Okay.  So both 771 and 772 appear to

14   be website printouts.  They're offered for the truth of the

15   matter asserted.  The defendant objects on authenticity.  These

16   documents are not self-authenticating because there's no

17   certification.  They are offered for truth of the matter

18   asserted.

19        My first question is, defendant objects in terms of I

20   guess temporally that these were pulled off the website after

21   the events depicted or after the relevant timeframe in this

22   case.

23        Does the government know whether this website existed

24   at the time?  I mean, I don't know if there's a date on

25   Exhibit 771 or 772.

1        MR. BARRY:  The documents themselves have dates on

2   them.  So, for example, if you look at 771 at the top, and I'm

3   looking at the translation, so 771A, it says date generated,

4   and it says November -- December 15, 2011, and it has an

5   information index.  And if you look at 772A, it similarly has a

6   date generated of September 21, 2018.

7        THE COURT:  Okay.  The next question I have -- I mean,

8   these clearly are out-of-court statements.  They're hearsay

9   unless an exception applies.  I can tell you, I'm not going to

10  apply the residual exception to any document, perhaps ever, but

11  not in this case.

12        But I'm looking at 803(8) public records, and so at

13  least with respect to 771 and 772, they purport to be records

14  of a public office in China, Administrative Education of the

15  People's Republic of China.  That hearsay exception is met if

16  the document sets out the office's activities, which I think

17  771 and 772 do, and the opponent, in this case the defendant,

18  does not show that the source of information or other

19  circumstances indicate a lack of trustworthiness.  So on that

20  prong the burden is on the defendant to show lack of

21  trustworthiness.

22        So I turn to you, Mr. Dearington, on that prong of the

23  analysis.

24        MR. DEARINGTON:  Sure, Your Honor.  So, Your Honor,

25  are you looking at Rule 803(8)(A)?

1      THE COURT:  Correct, 803(8)(A) and (B).  Because both

2  (A) and (B) have to be met.

3      MR. DEARINGTON:  Right.  So start with 803(8)(A), the

4  three prongs are the office's activity -- it sets out the

5  office's activities is one.  Two, a matter observed under a

6  legal duty to report but not including in a criminal case.

7  Clearly that one is not appropriate here.  Third one is about a

8  civil case.

9      So (8)(A)(i) is a record or statement of a public

10  office if it sets out the office's activities.  So I don't see

11  anything setting out any office's activities here.  This seems

12  to be, according to the government, a set of rules, and they're

13  trying to use it to prove that those rules actually do occur,

14  and we actually think that these rules don't occur.  So it's

15  not just hearsay, but we think there's extraneous evidence

16  showing there's a lack of truth to these statements.

17      So we would contend under (8)(A)(i) this is not the

18  type of document that sets out an office's activities.  It's

19  not like a department of -- a Ministry of Education website

20  that if authenticated would say the Ministry of Education does

21  X.  Instead it's a set of rules.  So it's not -- it doesn't

22  have the indicia of reliability that a set -- a website stating

23  what the Ministry of Education does would have.  No one would

24  have reason to question the scope of the Ministry of

25  Education's activities if there was such a website.  One would

1    have question over whether Article 19 of a website is actually

2    enforced and therefore true.

3            THE COURT:  Let me stop you.  I do want to ask one

4    question.  Who are these exhibits going to be offered through?

5            MR. BARRY:  Well, the translations would be introduced

6    through Mr. Churchill, and then Dr. Tiffert, who is the one who

7    has seen these live on the Internet would be the one actually

8    talking about their content.

9            THE COURT:  Let me say this on 771 and 772, both of

10   them, I'll be -- I'll entertain a contemporaneous objection

11   because I see the foundation that Dr. Tiffert is able to lay.

12   But just on their face, I do think that first prong has been

13   met.  They're activities of an office because they may set out

14   rules, but it's called an announcement from the Ministry of

15   Education concerning X.  And so -- and then, you know, rules or

16   policies or whatever.

17           So I think that on its face has shown that, you know,

18   that this entity is announcing something from its office in

19   terms of guidelines or rules or whatever.  That is an activity

20   of an office, and it's the type of activity that one would

21   expect an office to engage in if they announce it to the public

22   or the academic community.  So I think that prong is probably

23   met, but I'll wait to hear more.

24           The second prong is what I honed in on though, which

25   actually the burden is on the defendant to demonstrate a lack

1    of trustworthiness.  Let me hear from Dr. Tiffert, let me hear

2    any *voir dire* you may have with him on that point.  Then we'll

3    go from there on 771 and 772.

4            MR. DEARINGTON:  Your Honor --

5            THE COURT:  Now, the other arguments you raise, I

6    understand them, but I'm not going to sustain on the basis

7    of -- we've already addressed hearsay.  But on the estoppel

8    argument and constitutional argument, this whole -- whatever

9    the process is called, Legat, MLAT, whatever process of

10   obtaining depositions of people that are in the People's

11   Republic of China, is not analogous to obtaining evidence from

12   a website in China, which may or may not be admissible for

13   other reasons, but I don't think the government is estoped to

14   the extent this is admissible simply because you all were not

15   able to obtain the depositions from people in China despite me

16   ordering the government to start the process that frankly may

17   have -- may have resulted in fruit for the defendant had it

18   been started a year or two ago, but it wasn't.  Those aren't

19   the same thing.  That's my ruling on that.

20           Now you say there's also a translation issue.  I guess

21   that can be taken up with Mr. Churchill.  At this point I'm not

22   admitting 771 or 772 until I can hear about all of these things

23   and see if it goes through all the hurdles.

24           MR. DEARINGTON:  Your Honor, may I respond to the

25   authenticity issue because that's actually our first objection

1    on this and in our view dispositive.  If I may approach, I have

2    an example of what the Department of Justice National Security

3    Division does to authenticate foreign records in order to

4    satisfy the requirement, which is that they have someone, a

5    custodian of records or otherwise, certify this is what they

6    say it is, a public regulation in China.  And I have an example

7    of how they do that in the proper case that I can present to

8    the court.

9             THE COURT:  Okay.

10            MR. DEARINGTON:  None of that happened here.  And

11   while, Your Honor, we appreciate that -- Your Honor's position

12   about our not going through the proper channels to seek

13   depositions in China, we submit the government did the exact

14   same thing here.  There's no indication that they went through

15   the MLA process to authenticate this record.

16            The next question is why and it flatly contradicts or

17   violates the rule about self-authenticating evidence.  If they

18   don't have a custodian up here to say this is a website that

19   shows what the real regulation states, then they can't

20   authenticate it to be such a website -- such a regulation.

21            THE COURT:  All right.  Again these are legitimate

22   questions to ask when the government is laying the foundation

23   to show authenticity.  I'm not ruling these are authentic

24   obviously.  I don't want to spend the next 15 minutes reading

25   this motion *in limine* filed in another case.

1       Does the government have a response to that argument

2   that you want me to consider though?

3       MR. BARRY:  Well, I'll read this motion, you know,

4   when we have time.  I would just say that Dr. Tiffert will lay

5   the foundation in terms of how he accessed these records

6   online.  We're not offering them for the purpose of showing

7   what some sort of foreign law is; we're offering them to say

8   this is from a Ministry of Education website.  It was

9   published.  According to Dr. Tiffert's expert experience, this

10  is his understanding of how this particular program operates.

11      So if they're challenging the authenticity of saying

12  this isn't like a foreign law or regulation, this is a slightly

13  different scenario than that.

14      MR. ZEIDENBERG:  He's contradicting himself, Your

15  Honor.  He started this conversation with the Court by saying

16  we're introducing this for the truth of the matter.  Of course

17  it's for the truth of the matter.  That's the whole point.  If

18  it's not -- if it's not what it purports to be, it has no place

19  in the -- at trial that's not relevant.

20      It's not to -- Dr. Tiffert's state of mind is not

21  relevant if this information he's got isn't truthful.  And

22  they're forwarding this and trying to rely on it as if it is

23  truthful.  And as Mr. Dearington pointed -- has provided the

24  Court, this is the procedure that the National Security

25  Division of Department of Justice employed just within the past

1    year in a case in the Northern District of California to

2    introduce evidence from a website.

3           They're just plucking information, scrolling through

4    the Internet after the case, and saying look what I found.

5    They don't even know if it was in effect at the appropriate

6    time.  There are simple mechanisms that can be followed.  The

7    government has been on notice since we've *voir dire*d

8    Dr. Tiffert back in October about this issue.  Apparently they

9    figured they would just do it on the cheap and just try and

10   slide it by without going through these steps.

11          THE COURT:  All right.  So authenticity is at issue.

12   I'll hear more about that obviously when the government

13   attempts to introduce this through Dr. Tiffert.  I need to

14   listen to the foundation he lays.  That's all I can say at this

15   point.

16          What about the translation issue?

17          MR. BARRY:  So this is not a machine translation.

18   Mr. Churchill translated both of these documents.  The version

19   that we showed in October was a machine translation, so I don't

20   think there's going to be an issue with the accuracy.

21          THE COURT:  Okay.  Let's move on.  So then there are a

22   number of exhibits that the defendant characterizes as being

23   from social media websites, that would be 750, 752, 758, 759

24   through 761, 762 also -- well, 761 and 762.  There's an issue

25   with no translation or no legible translation.  And also 769

1    through 770 are -- let's stop with the ones that character --

2    the defendant characterizes as appear to be from social media.

3    That's 750, 752, 758, 759 -- 759.

4         Who is the government going to offer these through?

5         MR. BARRY:  So for -- so there's a couple things to

6    just clarify here.  The government is planning to offer -- I'm

7    going to put 750 aside because that's the only -- that's the

8    one with the photograph of the party secretary with the

9    defendant, and that is from -- I don't know if I'd classify it

10   as a social media website, but it's from a nongovernment

11   source.

12        The other documents that we're talking about here that

13   are from websites are all from either a Chinese government

14   source.  They have a .gov like the Beijing government or from a

15   Chinese university which we think falls under the public record

16   exception to hearsay based on the relationship of Chinese

17   universities to the state in China.

18        We plan to introduce -- putting aside 750, which we're

19   not planning to introduce to prove the truth of the matter, the

20   other websites we plan to introduce through a combination of

21   Mr. Churchill, who has viewed many of the sites, as well as

22   Mr. Tiffert, who has viewed some of them.

23        So 750 is the one with the photograph.  I think that's

24   kind of in a category of itself.  But the others are all from

25   either a Chinese government website, from a Beijing website, or

1   from a Chinese university website or Fuzhou, or there's one or

2   two other Chinese university websites as well and these are

3   .edus.

4            THE COURT:  I'm going to analyzing these under 803(8).

5   I can't rule on this now.  I'm going to have to see what

6   foundation is laid including authenticity.  And 803(8) requires

7   that the government show that it is a record -- a public record

8   of an office's activities, which I think has a component of

9   authenticity in it.  The government is going to have to lay

10  some foundation about this governmental office or this

11  university and this is an activity that it -- this office or

12  government or whatever engages in.

13           Assuming the government can do that, then the

14  defendant has to *voir dire*, establish one way or another that

15  there's a lack of trustworthiness.  So that's how I'm going to

16  examine these.  I've already ruled on the estoppel issue.  I

17  don't think that's a good argument.

18           MR. ZEIDENBERG:  Your Honor, the exception that Your

19  Honor pointed at is to talk about governmental activities.

20  They're not talking about governmental activities.  They're

21  talking about news.  This is the news, news of the day.  We

22  have a -- so-and-so is visiting.  This is a picture of him.

23  This is just rank hearsay, and the government is trying to put

24  in the guts of their case by scrolling Chinese websites and

25  saying, look, there's some news here.

1           We can't cross-examine that.  We can't ask why is that

2    information there, what is the reason for that?  I mean, we're

3    completely unable to cross-examine a website.  It's no

4    different than taking -- someone taking information out of the

5    *New York Times* and saying it says it right here in the

6    newspaper that you did this.

7           And now we're going to rely on this as a central

8    element of our case and argue to the jury that this is what

9    happened.  Show a picture.  There's a picture of him.  I don't

10   care if the picture comes in.  The picture is a picture.  But

11   the caption is hearsay.  The caption saying this is Dr. Tao and

12   he's meeting with so-and-so, I mean, how can we cross-examine

13   that?

14           THE COURT:  All right.  So I think what I'm hearing is

15   you're drawing a distinction -- I know you don't want 750 or

16   752 to come in either, but at the least those are -- those come

17   from presumably a website that is a governmental website that

18   is announcing something about the work of that website.  Many

19   of these others are more in the nature of news because it's

20   not -- it's not coming necessarily from a government -- well,

21   it is coming perhaps from a government or university website.

22           Well, it's going to be hard for me to rule on this

23   ahead of time.  I'm going to have to look at them, but I

24   understand your argument that it's -- the government is not

25   going to be able to establish that this is an activity of this

1  particular office.  It's more just an account of something that

2  happened.

3          I'm going to have to hear the foundation that's laid

4  for this.

5          MR. BARRY:  Yes, Your Honor.  And I just -- there have

6  been a lot of websites in this case that the parties have

7  debated about, you know, in prior hearings.  I just want to

8  make clear, there are all these other websites from social

9  media platforms, news articles, we're not seeking to introduce

10 any of those with one exception and the one exception is 750,

11 which is the web page with the photograph.  And again, we're

12 not planning to seek to admit the content of that.

13         We're simply planning to introduce the photograph, and

14 then Dr. Tiffert can independently based on his own research

15 identify the person that's sitting next to Dr. Tao.

16         THE COURT:  You're not seeking to introduce the

17 caption of the photograph?

18         MR. BARRY:  Correct, for 750.  And just to be clear,

19 the 752, 758, and 759 are all from government websites.  752 is

20 from chem.fzu.edu.cn, and it's the defendant's biography listed

21 on Fuzhou's website.

22         THE COURT:  On Fuzhou University's website.

23         MR. BARRY:  Yes, Your Honor.  758 is from the Beijing

24 municipal government website, jw.beijing.gov.cn, and that lists

25 the announcement of the upcoming Changjiang Distinguished

19-20052-JAR   USA v. Feng Tao   03.31.22   Day 9          1562

```
 1    Professor, which we heard the defendant talk about in
 2    yesterday's phone call.
 3              THE COURT:  Dr. Tiffert is going to testify to what
 4    these websites are?
 5              MR. BARRY:  Yes.
 6              THE COURT:  And what his personal knowledge is to what
 7    these websites are?
 8              MR. BARRY:  Yes.  And 759 is from the same Beijing
 9    website and it's a click through.
10              THE COURT:  I can't rule.  I got to hear your
11    testimony, I got to hear your voir dire or however you want to
12    handle it, and I'll decide if there's sufficient foundation or
13    not.
14              MR. DEARINGTON:  For the record, may I just make one
15    point, Your Honor?  I just want to be clear that we're not
16    agreeing any of these are government websites.  If the
17    University of Kansas says Dr. Tao is guilty of fraud and issues
18    a press release, it's hearsay.  It's even less reliable if
19    somewhere in China, Beijing, not even where Fujian Province is,
20    something is issued by some local government or some university
21    in China, these are not government websites that set out
22    activities.  I want to make clear that's our position on that
23    point.
24              THE COURT:  I understand.  The government says --
25    they're arguing that they're public activities of some
```

1    governmental entities.  You're arguing it's more in the nature

2    of a press release, it's hearsay, and it's not a public

3    activity of that -- whatever entity it might be.  It's more

4    news or press release.

5            MR. DEARINGTON:  Exactly, Your Honor.

6            THE COURT:  Okay.  Understand the distinction you're

7    drawing.

8            Okay.  Then there are a number -- 240 and it ends with

9    495.  I haven't looked at all those yet, but hearsay.  What's

10   the nature of these documents that are on page 4 of your

11   objection, Mr. Dearington?  I guess I could look at the exhibit

12   list here.

13           MR. DEARINGTON:  Your Honor, 240 appears to be people

14   other than Dr. Tao making hearsay statements and then Dr. Tao

15   forwards it, and we heard a lot of the government repeating

16   this incantation possession plus, as though that's some law in

17   the rules of evidence and it's not.

18           And any time someone forwards something doesn't adopt

19   it.  Just like in the example we gave, Your Honor, we sent you

20   a bunch of objections.  You may have forwarded it to your court

21   staff, doesn't mean you agree with or adopted everything we

22   sent you.  It's the nature of our virtual world.  You receive,

23   you respond.  It's not the same thing as saying I agree with

24   everything in this e-mail below.

25           THE COURT:  These are all e-mails?

1    MR. DEARINGTON:  I think the majority of this next set

2  would be e-mails, Your Honor.

3    THE COURT:  I think to be clear, I have made some

4  rulings about adoptive admissions using this possession plus

5  analysis, but I don't think I have ruled that that analysis is

6  met simply because someone forwards an e-mail.

7    What we've been talking about, as I recall, primarily

8  were things like presentation decks that were in Dr. Tao's

9  possession in the office or house, and I looked for other

10  indicia within that that would show authorship or adoption.

11    My understanding is there's some e-mails in evidence,

12  some of them of course are not statements of Dr. Tao, and I've

13  tried to give limiting instructions to say don't consider those

14  statements, but it's just to show the context of his response.

15  So they're not really hearsay in that sense, the other

16  statements.  To the extent that's what these are, that's the

17  way I'm going to analyze them.

18    My understanding from Mr. Barry yesterday was that

19  these exhibits, at least some of them, are in Chinese, have to

20  lay the groundwork with Mr. Churchill about his translation,

21  and I'm going to look at each one of them and say, okay, is

22  this hearsay and, if so, do I give a limiting instruction or do

23  I exclude it altogether?  Do I think that a limiting

24  instruction makes sense in the sense that it provides context

25  for something Dr. Tao did say?

1        I don't know that these are something that are going

2   to be analyzed under adoptive admission.  If the government

3   makes that argument, I'll do it, but I don't know.  Is that

4   your argument for any of these, that these are adoptive

5   admissions?

6        MR. BARRY:  No.  It's going to be dependent on the

7   particular exhibit.  So, for example, Exhibit 240 is an e-mail

8   chain between two other individuals where one person

9   essentially identifies Dr. Tao as a professor at Fuzhou

10  University.  We're not seeking to admit that statement.  We

11  don't -- that person's view is irrelevant.

12       What's relevant for this particular e-mail chain is

13  that Dr. Tao is introduced to that third person from his KU

14  account, and at the top of the chain Dr. Tao forwards that

15  e-mail from his KU account to his Fuzhou account.  That top

16  part is the part that we're seeking to admit for the truth of

17  the matter, which is to say these other two people were talking

18  about whatever they were talking about, it could be true or it

19  could not be true, but Dr. Tao is copied on that chain and then

20  he forwarded that from his -- and it's not a statement, yeah.

21       MR. DEARINGTON:  We're fine with redaction.  Your

22  Honor, we'd be fine with redacting the whole e-mail except the

23  top header forward in this case.

24       THE COURT:  Redacting it all doesn't establish what he

25  was forwarding to himself.

1    MR. DEARINGTON:  That's the hearsay they're claiming

2    is irrelevant.

3    THE COURT:  Well, at least with respect to 240.  So

4    these are two third parties' out-of-court statements saying

5    something that might be relevant if it were accepted as truth

6    of the matter asserted.  I'll have to look at it.

7    And I think I'm going to have to look at every one of

8    these because there's a line to be drawn, and it's hard to -- I

9    mean, so -- okay.  I understand your argument, but if I think a

10    particular exhibit -- there's no way the jury is going to look

11    at this and not look at it as truth of the matter asserted

12    irrespective of my limiting instruction, I'm probably going

13    exclude it.  But if I think that they can follow that

14    instruction, I probably won't.  It's just a call I'm going to

15    have to make.

16    Now, I thought these were more weaving in

17    conversations, e-mail strings where Dr. Tao has responded, and

18    so it brings context to his response.  But if it's just showing

19    that he took that conversation and forwarded it to another

20    e-mail, I don't know.  I'll have to read -- I'll have to read

21    the whole thing and decide exhibit by exhibit I think.

22    MR. DEARINGTON:  And, Your Honor, to that point, some

23    of the e-mails I think don't even include Dr. Tao.  So, for

24    example, Luan Nguyen is a witness for the government today, and

25    there are e-mail exchanges between Luan Nguyen and another

1    individual.  Dr. Tao is not on them.  Luan Nguyen can testify

2    to his recollections, but in that instance the e-mail would be

3    out-of-court statements.

4            THE COURT:  If the government offers that exhibit

5    through one of the parties to the e-mail, then I'll have to

6    analyze to see if the other parties' -- other parties'

7    statements can be admitted to show context to what the witness

8    said because we do have an in-court witness.  Or not.  So

9    again, different analysis because at least there's a live

10   witness with part of it.

11           But I guess I'm more concerned about those exhibits

12   where there is no live witness among the parties and there is

13   no response by Dr. Tao, and I guess the relevance to the

14   government is it's forwarded apparently from Dr. Tao from one

15   account to another.  I'm going to have to look at those with

16   some scrutiny because I'm not sure about that.

17           Okay.  Anything else?  Kind of have some ground rules

18   at least and I have a better understanding.  Okay.  Okay.  So

19   you have a new witness this morning; is that correct?  No,

20   we're still with Mr. Churchill?

21           MR. BARRY:  No, we're going to call a new witness.  We

22   finished with Weixin Huang yesterday.

23           THE COURT:  Okay.  All right.  Are we ready to bring

24   the jury in?

25           So for these exhibits, I don't know that there's

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1568

1    anything I've really ruled on other than the photograph with no

2    text.  I'm admitting that.  That's 750.  I guess signal to me

3    if we think -- you need to come to the bench to raise any

4    additional arguments, Mr. Dearington and Mr. Zeidenberg.

5          MR. DEARINGTON:  I'm sorry, Your Honor?

6          THE COURT:  I guess as we go through these, if you

7    think you need to come to the bench, I know it slows things

8    down, but we'll do it that way.  I'm not sure I'll need you to

9    come to the bench on everything.  I'll ask you to come if I

10   think you do.  But if you want to come, either one of you come

11   forward and we'll handle it that way also.

12         MR. DEARINGTON:  Okay.  Thank you, Your Honor.

13      (The jury entered the courtroom, after which the following

14   proceedings were had.)

15         THE COURT:  You can be seated.  Call your next

16   witness.

17         MR. BARRY:  Government calls as its next witness

18   Dr. Meilin Liu.

19                    DR. MEILIN LIU,

20   called as a witness on behalf of the government, having first

21   been duly sworn, testified as follows:

22         THE COURT:  Dr. Liu, if you're comfortable removing

23   your mask during your testimony.

24         THE WITNESS:  Okay.  I can take this off.

25         THE COURT:  I'm sorry?

1    THE WITNESS:  Yeah, I can take the mask off.

2    THE COURT:  Okay.  Thank you.

3    DIRECT EXAMINATION

4    BY MR. BARRY:

5    Q.   Good morning, Dr. Liu.

6    A.   Good morning.

7    Q.   Would you please state and spell your name for the record?

8    A.   My name is Meilin Liu.  Spelled M-e-i-l-i-n, L-i-u.

9    Q.   Where do you work, Dr. Liu?

10    A.   I work at Georgia Institute of Technology.

11    Q.   What do you do there?

12    A.   Currently I'm a professor in the School of Material Science

13    and Engineering.

14    Q.   Do you have a particular specialty?

15    A.   It's in materials science engineering area and mostly

16    materials for energy storage and conversion.

17    Q.   Things like batteries?

18    A.   Yes, batteries and fuel cells.

19    Q.   How long have you worked at Georgia Tech?

20    A.   I joined the faculty at Georgia Institute of Technology in

21    1992 so I've been there for 30 years, about 30 years.

22    Q.   And when you joined the Georgia Institute of Technology,

23    what was your position?

24    A.   It was an assistant professor.

25    Q.   At some point did you get promoted to a different position?

1  A.   Yes.  Was promoted every four years from assistant to
2  associate and then to the full professor and all the way to a
3  regents professor.  So currently I hold regents professor and
4  Hightower Endowed Chair so that represent the highest academic
5  ranking in the university system.
6  Q.   And do you teach classes?
7  A.   Yes.  Over the past three decades I have taught more than
8  ten undergraduate and graduate courses in the core area of
9  material science and engineering.
10  Q.   Do you perform any research?
11  A.   Yes.  I mostly focus on fundamental research of materials
12  for energy storage and conversion such as batteries and fuel
13  cells.
14  Q.   Do you have a team to help you with research?
15  A.   Yes, I have a large research team.  Over the past 30 years
16  I have -- typically my group size varies from more than 10 to
17  over 20 including post-doctoral research associate, visiting
18  scientists, Ph.D. students, master's students, et cetera.
19  Q.   Are you the head of that group and then you have kind of a
20  team who works with you?
21  A.   Yes.
22  Q.   I want to shift a little bit.  Are you familiar with
23  Dr. Franklin Tao?
24  A.   Yes.  To the best of my recollection, I think I met him
25  first in one of the Basic Energy Science program or review

1    program under the Office of Science of Department of Energy.

2    So that's where we first met.

3    Q.   Do you remember approximately when that was?

4    A.   Let's see.  I think probably about 2012 or 2013, so during

5    that meeting I was one of the principal investigator in that

6    program, that DOE program, and he, Dr. Tao, was also a

7    principal investigator, but he was relatively young in that

8    group and so that is an indication he's really excellent in his

9    research.

10       So when I have some need for an expert in the area of

11   catalysis and then I basically approach him and ask him to work

12   with me to prepare DOE proposal.  So that proposal was

13   successful and that leaded to a research project, and so in the

14   period from 2014 to 2018 together we work on a joint research

15   program -- project.

16   Q.   And at a high level for the jury, can you just explain kind

17   of the relationship between your focus on energy storage and

18   material science and how catalysis is related to that in

19   certain circumstances?

20   A.   Okay.  So my area of expertise is develop new materials for

21   energy storage and conversion.  And for that particular

22   research project is on fuel cells.  We try to use fuel cell as

23   a device to directly convert chemical fuel into electricity.

24   For that chemical conversion processes we needed some knowledge

25   in catalysis.  That is outside my expertise.

1    So that's why I approached Dr. Tao and he's a leading

2    expert in that area.  So he has contributed to the design of

3    catalyst that will help to convert or breakdown the energy

4    barrier to chemical reactions that will make fuel cell more

5    efficient.  So I design the entire fuel cell system.  His

6    expertise most -- develop a unique catalyst that will reduce

7    the energy barrier for conversion, therefore will increase the

8    energy efficiency, make the fuel cell more efficient.

9    Q.   Just big picture, when we talk about kind of fuel cells,

10   what are some of the other aspirational or current applications

11   of this kind of fuel cell technology globally?

12   A.   Yes.  So fuel cells represent a new clean energy

13   technology.  Most electricity we're using today is from burning

14   fossil fuel.

15          MR. ZEIDENBERG:  Your Honor, I'm going to object to

16   the line of questioning.  Can we approach?

17          THE COURT:  Yes.

18      (The following proceedings were had at the bench).

19          MR. ZEIDENBERG:  Your Honor, I'm objecting on the

20   grounds of relevance, 403.  He is -- I believe the government

21   is trying to try and imply that this is some fuel cell

22   technology which has some great or significant material,

23   practical, or commercial implications and Dr. Tao was working

24   on this and somehow this is going to be benefitting the

25   government of China or we're going to be deprived of this in

1  some way.

2          That is not an allegation in this case.  This case is

3  about whether he notified Kansas or NSF or DOE of a second job

4  that he may have had or research he did, but the nature of that

5  research and whether it's got commercial implications and it

6  could be harmful or competitive, that's not an issue in this

7  case.

8          MR. BARRY:  This was the last question on this topic.

9  I'm merely laying a foundation so the jury understands who

10 Dr. Liu is, what his research is, how he first interacted with

11 Dr. Tao, and how that research overlapped.  That lays the

12 foundation for the phone call I'm about to introduce in terms

13 of why someone like Dr. Tao would call someone like Dr. Liu

14 based on the differences in their career trajectory and their

15 past experience working together.  So I'm not -- I mean, once

16 Dr. Liu finishes, I'm moving on to a different topic.

17         THE COURT:  I -- maybe the fact that they had a

18 relationship and worked on a project together lays the

19 foundation for a conversation or phone call, but I'll sustain

20 as to relevance.  When I heard this, I thought Dr. Tao only

21 engaged in fundamental science.  This is starting to sound like

22 applied science, and I'm a little worried for the reasons that

23 Mr. Zeidenberg articulated so this is going too far.  I'll

24 sustain to the objection to this line of questioning.

25         (Thereupon, the proceedings continued in open court.)

1   BY MR. BARRY:

2   Q.   So I'm going to shift topics again.  Was there a moment in

3   time when Dr. Tao called you to ask about a job he was

4   considering in China?

5   A.   Yes.   I do recall there was a phone conversation about that

6   topic.

7   Q.   What do you remember about that call?

8   A.   So it was more than four years ago.  I do not remember a

9   lot of the specific details.  To the best of my recollection, I

10  think the major point is that he told me he was offered a

11  position in China and my main response was that it sounds a

12  good opportunity.  You may start with the summer, work there

13  three months, and see how everything is going.  If things going

14  well, perhaps you can consider complete transfer to there.  But

15  if things doesn't go well, you may come back, keep your

16  original position.  So that's the major point I can remember.

17  Q.   Do you remember if in that call the defendant -- or Dr. Tao

18  said anything about the university he was going -- he was

19  thinking about working at?

20  A.   I think it was -- well, I really don't.  Maybe it's Fuzhou

21  University.

22  Q.   Do you remember him saying anything about the particular

23  position, like whether it was an associate professor position,

24  an assistant professor position, or something else?

25  A.   Seems to be a title of professor so it's like a endowed

1  chair professor.

2  Q.   Did he tell you that it was called the Changjiang

3  Distinguished Professor position?

4  A.   Yes.   Something like that.

5  Q.   And are you -- based on your decades of experience in the

6  research community, are you familiar with the title Changjiang

7  Distinguished Professor?

8  A.   To the best of my knowledge, I think it's similar to a

9  chaired professor in the U.S. so that basically means there

10  would be some sustainable research funding to support research

11  activity.

12  Q.   Okay.   I'd like to pull up what's already been introduced

13  into evidence as Government's Exhibit 512A.   And I'm going to

14  give transcripts to the jury.   And I'd first like to play the

15  first couple seconds and pause and go back to the beginning

16  because I'd like to ask Dr. Liu about something.

17      Is that you in this phone call?

18  A.   It sounds my voice.

19  Q.   Is Dr. Tao the other voice on the phone?

20  A.   Yes.

21  Q.   Is this the phone call we were talking about just a moment

22  ago?

23  A.   It sounds like, yeah.

24  Q.   At the time that you had this phone call with Dr. Tao, did

25  you know that he was recording it?

1  A.  No.  I have -- no.

2  Q.  Okay.  If we can go back to the beginning and just -- this

3  is going to be a longer call, so it's going to be about

4  20 minutes, so if we can just play the full call, please.

5       Dr. Liu, you said that you remembered the call being

6  sometime in 2018?

7  A.  Yes.

8  Q.  And you said that you didn't know at the time that the

9  defendant was recording that call?

10  A.  No.

11       MR. BARRY:  I'd just like the record to reflect that

12  the file name for that call is February 27, 2018.  No further

13  questions.

14       MR. ZEIDENBERG:  Good morning, ladies and gentlemen.

15                    CROSS-EXAMINATION

16  BY MR. ZEIDENBERG:

17  Q.  Good morning, Dr. Liu.

18  A.  Good morning.

19  Q.  Is it fair to say that you said you met Dr. Tao about ten

20  years ago?

21  A.  Yes.

22  Q.  And at the time that you met him, is it fair to say you

23  knew him by reputation?

24  A.  Yes.

25  Q.  And fair to say that he had an outstanding reputation?

1  A.  Yes.

2  Q.  What was your impression of his accomplishments given his

3  relative young age when you met him ten years ago?  He would

4  have been about 40.

5  A.  My impression is that he is an excellent scientist because

6  I met him in the DOE Basic Energy Science program.

7  Q.  If you can pull that microphone up just a little bit to

8  make sure everyone can hear you.

9  A.  You may already know, the research program managed by the

10  Basic Energy Science under Office of Science of Department of

11  Energy, that is one of the very best and most prestigious

12  research program of our nation and perhaps in the world.  Only

13  the topnotch scientists, the very well established scientists

14  has the opportunity to participate that program.

15      Now, for myself, I already work in the U.S. for over

16  30 years.  I entered that program in much larger age in

17  comparison to Dr. Tao.  So he was one of the very young

18  investigator in that group, in that club.  So the fact that he

19  can enter that program when he was very young, that itself is a

20  strong indication he's one of the best and brightest in his

21  field of study.  And that's the very reason I approached him

22  when I needed somebody with expertise in that area.  And also

23  he already published very high profile technical papers like in

24  The Journal of Science, the science is managed by the American

25  Association of Advancement of Science.  So that's the most

1  prestigious journal in the world in the scientific field.

2      So the reason I approached him, asked him to work with me

3  is because his reputation is already very well established even

4  though he's much younger than I am.

5      So yes, to answer your question, yes, my impression is that

6  he was excellent.  He's bright, very insightful, and very

7  innovative, and in my judgment I think he can contribute a

8  great deal to the U.S. competitiveness in science and the

9  technology development and that's the very reason I approached

10  him and asked him to work with me.

11  Q.  And did you in fact work with him?

12  A.  Could you please repeat the question?

13  Q.  You approached him to talk to him about working with him

14  and did you in fact work with him?

15  A.  Yes.  So I approached him, asked him to work with me to

16  prepare a DOE proposal.  So we worked together, prepared the

17  proposal, and that proposal was successful, successfully went

18  through the review process.  So in the end we were award that

19  DOE project, that was $1 million research project.  So we

20  worked together for about four years from 2014 to 2018.

21  Q.  And what were your impressions of his work when you were

22  working with him?

23  A.  He's very responsive every time when I -- since I'm the

24  principal investigator, he is the co-principal investigator, so

25  often I have to directly report to Department of Energy program

1  manager.  When they call me or send me e-mail, I have to

2  respond.

3      But often when the questions related to catalysis, I have

4  to rely on him, so I will send him e-mail or call him so he

5  always responds very fast and with -- so his response always

6  professional, very thoughtful, and very insightful and very

7  helpful to the project.

8      So we have -- the project was very successful.  We

9  published one very influential paper in the journal Nature

10  Energy.  Nature Energy is the topnotch journal in the world in

11  this area.  We also filed a patent application.  So the project

12  went very well, very successful, and he's always very

13  responsive and I have only good things to talk about, yes.

14  Q.   And what did you observe in your interactions with Dr. Tao

15  about his work ethic?

16  A.   Excellent as much as -- very professional.  When it's come

17  to the technical aspect, he's at the top of his field.  So

18  during the -- for instance, during the review process of our

19  manuscript, the editors/reviewers have a lot of questions and

20  when it comes to catalysis, I have to rely on him to respond.

21  So he responds, always very professional and excellent.

22  Q.   Now, is it fair to say for research professors like you and

23  Dr. Tao that it's common to collaborate with universities

24  overseas?

25  A.   Yes.  Since we're working in the Basic Energy Science, that

1   means everything we do will be published.  So for myself over

2   the past three decades everything come out of my research been

3   published in the open literature, including research projects

4   supported by private companies around the world.  Yes, so

5   inevitably we have a lot of collaborations with the scientists

6   around the world, for myself it's almost around the world

7   everywhere.

8   Q.   Has it at least historically been a sign of accomplishment

9   if a researcher has ties to overseas and multiple foreign

10  institutions?

11  A.   Yes.  So often there is a lot of international conferences,

12  international meetings, and so we have to participate in those

13  to get engaged with international collaboration.

14       Also, I would like to mention it is only in recent few

15  years the political atmosphere has changed.  A few years ago I

16  think everywhere from university always promote international

17  collaboration including everybody, yeah.  But I know the

18  situation has changed since a few years ago.  Right now we're

19  not promote collaboration for instance with China.  I realize

20  that.  But before a few years ago there was no -- so basically

21  everybody is promote -- is encouraged to have collaboration,

22  international collaboration.

23  Q.   So I want to ask you about your call in -- on February 27,

24  2018, when Dr. Tao called you, the call we just listened to.

25  Fair to say that Dr. Tao was calling you for advice or at least

1  as a sounding board?

2  A.   Yes, sort of.

3  Q.   What was your impression?  I mean, you look like you're

4  hesitating with my characterization for advice or sounding

5  board.  How would you characterize it?

6  A.   Can you rephrase the question?

7  Q.   What was your impression of why Dr. Tao was calling you in

8  February 2018 to talk to you about this decision he had to

9  make?

10  A.   So from that phone conversation, it seems that he was

11  struggling to make a decision if he should take position in

12  China or stay with his position in the U.S.  But my advice is

13  that for the university position all the academic contract for

14  a full time faculty, you only have nine months covered by the

15  university and the other three months you have to make special

16  arrangement in order to get covered with your salary.

17       So that is an opportunity.  That's where you can explore

18  other things.  And in fact it's very common in the university.

19  For instance, one of my colleagues in my department, I remember

20  he eventually transferred to United Kingdom, one of the

21  universities in the United Kingdom.  But the way it started is

22  he worked there in the summer, those three months, for a couple

23  times and then he feel comfortable, eventually he transferred

24  completely to a university in the United Kingdom.

25       My suggestion basically was that you have the freedom to

1  explore so you can work there three months and if things going

2  well, you can transfer, but if things does not going well, you

3  can come back.  So there's nothing to lose.  So basically that

4  was my suggestion.

5  Q.   So if I got that right, your suggestion was try it out, see

6  if it fits, see if you're comfortable?

7  A.   Right.

8  Q.   And they do what they say they're going to do, and if it

9  works out, then you can go and if it doesn't work out, then you

10 stay at KU?

11 A.   Right.  So that's what I know because a lot of professors

12 in universities doing that for typical transfers.

13 Q.   And when there was a reference in the call with Dr. Tao

14 saying he thought it would be problematic if this were looked

15 into, do you remember that?  He said if it could be looked

16 into, it could be problematic?

17 A.   Problematic in which respect?

18 Q.   Well, that's what I was going to ask you.  Was it your

19 understanding when he was talking about the issue about what to

20 reveal to KU and when, that his focus -- your understanding of

21 the conversation was that he was worried about KU rules and

22 regulations as opposed to federal wire fraud statutes?  I mean,

23 what was his concern as you understood them?

24        MR. BARRY:  Objection, speculation.

25        THE COURT:  Overruled.  You can answer if you know.

1          THE WITNESS:  I'm sorry.  Can you rephrase the

2    question?  I don't fully understand that language.

3    BY MR. ZEIDENBERG:

4    Q.   Yeah.  Was it your understanding from the conversation that

5    Dr. Tao's hesitancy and concerns pertained to what you would

6    basically call H.R. questions of KU, what the KU rules and

7    regulations were as opposed to some criminal statute?  Do you

8    understand my question?

9    A.   I really don't fully understand.  I'm sorry.  I have no

10   knowledge of law and don't fully understand your question.

11   Q.   Let me show you what I'm talking about.

12          MR. ZEIDENBERG:  If we could turn on the ELMO.

13   BY MR. ZEIDENBERG:

14   Q.   And I'm referring to page 4, ladies and gentlemen, at the

15   top of the page.  And Dr. Tao says, if I don't say anything, it

16   would definitely be problematic if this thing were looked into.

17   And you said, yeah, it would be problematic for you.  You

18   wouldn't have to deal with it if it were looked into.  I think

19   you meant you would have to deal with it if it were looked

20   into, yeah.  Do you see that?

21   A.   I see.

22   Q.   And so my question is, was this a reference to he would

23   have to deal with, you know, his KU department chair or he'd

24   have to deal with his KU dean of chemistry and sort of figure

25   out how to handle a problem like this?

1    A.    Okay.  So I sort of get your question.  Let me see.  So

2    typically for the three months it should be arranged with the

3    university.  I guess his concern maybe is that the

4    university -- his home university may not allow him to work

5    elsewhere.  For that I really cannot comment.

6        I must admit the fact that I have no knowledge of

7    University of Kansas policy about the situation.  I do not

8    believe I'm in the position or I'm not qualified to tell him

9    what to do or what he should not do or what's right or what's

10   wrong.  So I really cannot comment on that.

11       So it depends on the university.  I really can't --

12   Q.    It was in the context of what the university rules are or

13   are not.  Is that the context of your -- the way you understood

14   the questions?

15   A.    Right.  So when you negotiate with the university, it's

16   just based on -- to the best my knowledge.  I don't know.

17   Again, I have no knowledge of law, I don't know.  But I would

18   think it depends on the university.  If the university says,

19   no, we don't allow you to do that, perhaps the university has

20   the power to do so.  But I just have no idea what to advise.

21   Q.    And do you recall him in that conversation talking about

22   the research funding that he would get or that was being

23   offered but that it was significantly less than what he had at

24   KU?  Do you recall seeing that?

25   A.    Can you repeat again?

1    Q.   Yes.  Do you recall in the conversation we just looked at

2    that Dr. Tao was expressing concerns that the -- his current

3    lab was worth $5 million in terms of equipment and the one that

4    was being offered to -- when I say 5 million -- yes, 5 million

5    USD, and the one that was being offered to him in China was

6    going to be considerably less, only about 3 million.  Do you

7    remember that?

8    A.   I really don't remember that detail.

9    Q.   Let me show it to you.  This is on page 5.  This is page 5

10   starting at 7:35.  Okay.  Through 7:32.  Dr. Tao says they've

11   promised to give me 20 million -- and that would be about 3

12   million Yuan; that is correct?

13   A.   Yes.

14   Q.   You said oh.

15        And Dr. Tao said, 20 million Yuan, that's 3 million.

16        Yes, something like that.

17        Dr. Tao said, if it's $3 million, that's better than here,

18   but my current laboratory definitely -- my current laboratory

19   has assets I think of about $5 million.  So it's not quite as

20   much as here, if I were to move.  And then he said I could ask

21   for more, they would give it to me.  And then he said they

22   would give it to me, but it's hard to say whether they would --

23   they'll actually give it to me or not.  Do you see that?

24   A.   Yes.  Yes.

25   Q.   Is it fair to say, Dr. Liu, that for a researcher like

1    yourself or Dr. Tao, that it's very important to have the

2    requisite funding that you need for your research, a lab?

3    A.    Yes.    To be good, yes.

4    Q.    And why is that so important?

5    A.    Well, for -- in order to support a research activity, we do

6    need the funding.    Without funding we would not be able to hire

7    post-docs, graduate students, and then you have to rely on

8    yourself and what you can do is very limited.    So that's why we

9    have to write proposals, we have to approach private companies,

10    just about anywhere we can get funding to support our research

11    activity.

12    Q.    And during the call that we just heard, there was --

13    Dr. Tao was talking about Fuzhou University, and did you

14    understand from the context of the call that Fuzhou was not --

15    or do you know whether it was actually considered a top ranked

16    university in China?

17    A.    No, definitely not.

18    Q.    Definitely not?

19    A.    No.

20    Q.    Why do you say that?

21    A.    Well, to the best of my knowledge, Fuzhou University, if we

22    do the ranking -- let me see where it would be.    The reputation

23    of that university I think is beyond at least -- let me say how

24    many.    Just make a guess.    Most likely beyond close to 100

25    university in China, below.

1    Q.   Okay.

2    A.   Somewhere there.  I don't think first rate, even maybe not

3    second rate of university.

4    Q.   Definitely not a top tier school?

5    A.   Definitely not a top tier.

6    Q.   And for a researcher who's young and ambitious and

7    talented, why is it important to go to a top ranked university

8    if you can?

9    A.   Well, you have all the resources.  A better university, you

10   have a better reputation that attracts bright students and so

11   you have -- also have more resources.  You have -- typically

12   it's easier to attract research funding from various funding

13   sources, so you have better student, better facility, better

14   colleagues, so everything -- the entire ecosystem would be

15   better and you have a better platform to accomplish what are

16   your objectives.

17          MR. ZEIDENBERG:  Court's indulgence.

18   BY MR. ZEIDENBERG:

19   Q.   Now, at one point you said to Dr. Tao that he could work

20   both sides and see how it goes, and then if it goes well, you

21   gradually transfer over.  If it doesn't go well, you gradually

22   back out.  Do you remember saying that?

23   A.   Yes.

24   Q.   Can you explain what you were referring to with that

25   strategy.

1    A.    Yeah.    As I mentioned earlier, so that is a common strategy

2    for many university professors if they're considering a

3    transfer.    I mentioned earlier one of my colleagues, he moved

4    to a university in United Kingdom.    So he started with first

5    working there three months each year for a couple times.    Then

6    when he feel comfortable, he complete transfer over.    So that's

7    pretty common in the university, so that's why I make that

8    suggestion.

9    Q.    And when you were having this conversation with Dr. Tao, I

10    take it you're aware that he had federal grants with different,

11    you know, National Science Foundation, Department of Energy

12    grants ongoing?

13    A.    I know part, not everything.

14    Q.    I'm not asking you if you know the specific grant and what

15    it was for, but you know that generally he's funded by federal

16    grants?

17    A.    Yes, yes.

18    Q.    Like all researchers like yourself.

19    A.    Yep.

20    Q.    And when you were having this conversation with him and you

21    were, you know, suggesting, you know, you work there three

22    months, come back, see how it goes, did it ever cross your mind

23    what the implication that that decision could have on his U.S.

24    federal grants?

25    A.    At the time, no.    I wouldn't worry that because that is a

1    very common practice in the university, but as of today I would

2    say, yes, there would be implications because some of the

3    current programs.

4    Q.   So today you would be worried about it?

5    A.   Yes.

6    Q.   But back then it didn't cross your mind?

7    A.   At that point, no, because that was a very common practice

8    at university.  I would never worry.  But actually, as I

9    mentioned earlier, at that time we are all encouraged to have

10   more collaborations.  That would be considered a positive

11   aspect.  But today the situation is different I do realize.

12   Q.   And in fact, did you know that Dr. Tao published articles

13   and listed his affiliation with Fuzhou University and with KU

14   in multiple articles?

15   A.   I did not aware of that.

16   Q.   And you were talking to him during the call, at one point

17   towards the end of the call you and he started talking about

18   three different instances of Chinese-American professors being

19   prosecuted in the United States by the Department of Justice.

20   Do you remember that?

21   A.   Yes.

22   Q.   And you were talking about Professor Xi from Temple

23   University who was arrested and his case got dismissed and a

24   NOAA, N-O-A-A, scientist from down in Florida --

25             MR. BARRY:  Objection, relevance.  He's testifying

1    about the results of other criminal cases.

2            THE COURT:  I'll sustain.

3            MR. ZEIDENBERG:  I'm sorry?

4            THE COURT:  I sustained.

5    BY MR. ZEIDENBERG:

6    Q.  You were talking about these three individuals, right,

7    three different cases?

8    A.  Yeah, he mentioned three cases.

9    Q.  And were you discussing that because you thought -- well,

10   why don't you tell the ladies and gentlemen why it was this was

11   on your mind and whether it was because you thought Dr. Tao was

12   violating the law or whether it was just because you had

13   concerns about the scrutiny you were feeling under at that

14   time.

15   A.  Can you rephrase your question?  I'm not sure what concern

16   you mean there.

17   Q.  Well, when you were talking -- at one point -- let me

18   change your -- the question a little bit.

19       At one point you said you and he discussed the fact you

20   were both likely being monitored by the government.  Do you

21   remember that?

22           MR. BARRY:  Objection, misstates the testimony.

23           THE COURT:  You can clarify on redirect.

24           MR. BARRY:  Okay.

25           THE COURT:  You can answer that question, if you can.

1          THE WITNESS:  So where he says our conversation may be

2     monitored, I said, yeah, it's possible.  But I'm not sure

3     what's your question there.

4          MR. ZEIDENBERG:  One moment, Your Honor.

5          THE COURT:  Yes.

6     BY MR. ZEIDENBERG:

7     Q.  Turning to page 12, this was after you talked about the

8     third case.  Dr. Tao says, I suspect we will all be monitored

9     and you said, that's possible, we'd all be monitored.  Yeah,

10    like people with our status.  And you said, that's possible

11    especially if you go back, right.  And you said if you go back

12    you might be monitored.  Do you see that?

13    A.  Yes.

14    Q.  What do you mean by that?

15    A.  Well, just the -- as it is implying from the word there,

16    basically because there's a few professor of Chinese origin

17    already being prosecuted.  And based on from the information

18    from the news, they have a lot of monitoring of those

19    activities over years, so that's why I said it is possible

20    because the U.S.-China relationship is deteriorating and if you

21    have too much interaction with China and it is possible get

22    monitored.

23          MR. ZEIDENBERG:  I have no further questions, Your

24    Honor.

25                     REDIRECT EXAMINATION

1    BY MR. BARRY:

2    Q.   Hi, Dr. Liu.  So I first want to go back to something

3    Mr. Zeidenberg said in the beginning when he was -- do you

4    remember when he was asking you about your use of the term

5    "problematic."  Do you remember that?

6    A.   Yeah.

7    Q.   I just want to show you a section of the -- this is the

8    translation, and so this is a part of it where Dr. Tao says --

9    do you remember when he says, do you mean a lot of people

10   actually declare this to the American school?  They tell them?

11   And you say right, right.  But this, this depends on the stance

12   of your American school over here.  If the school is fairly

13   open-minded, it shouldn't be a big problem.

14        Do you remember hearing that?

15   A.   Yes.

16   Q.   And then you see how the very next question or statement

17   from the defendant is talking about those other three criminal

18   cases that Mr. Zeidenberg mentioned?  First he says because you

19   -- recently there was a Chinese person in the U.S. Oceanic

20   Administration in Florida, didn't the FBI -- and then the next

21   page later on in the conversation, he says also Michigan State,

22   you might know this Chinese person.  He's in Hong Kong.  I

23   think he got arrested when he came back.

24        So at least in that context, the conversation transitioned

25   from whether something was problematic to talking about

1   criminal prosecutions?

2   A.   What's your question?

3   Q.   I'm asking about the sequence of the call.

4   A.   Yes.  The sequence of the call is correct.

5   Q.   Okay.  You were talking about your lab and your funding for

6   post-docs.  Remember that?

7   A.   Yes.

8   Q.   You need to have funding in order to recruit post-doctoral

9   students to your team?

10  A.   Yes.

11  Q.   So if someone was recruiting post-doctoral students, would

12  you assume that they had funding to pay those students?

13  A.   Yes.

14  Q.   Mr. Zeidenberg was asking you about the conversation about

15  government monitoring and potentially surveillance.  In this

16  call Dr. Tao was the one recording you, not the FBI, right?

17  A.   I don't -- I have no knowledge of either.  I have no

18  knowledge he was recording.  I have no knowledge of that.

19  Q.   You don't know whether Dr. Tao recorded you here?

20  A.   No, no.

21  Q.   So let's just say -- I'll represent to you this was a

22  recorded call found on Dr. Tao's KU computer among hundreds of

23  other calls.  I think there was 632.  And in each call the one

24  commonality is the defendant's voice is in each call.  So based

25  on that factual predicate I've given you --

1      MR. ZEIDENBERG:  Objection.

2  BY MR. BARRY:

3  Q.  -- would you believe in this instance Dr. Tao was recording

4  you, not the government?

5      MR. ZEIDENBERG:  Objection.

6      THE COURT:  All right.  There's an objection?

7      MR. ZEIDENBERG:  He's telling him what he thinks

8  happened and then saying if that happened, would you agree that

9  that happened.

10      THE COURT:  All right.  Overruled.  You can answer it,

11  if you know.

12      THE WITNESS:  Well, as I mentioned, I have no

13  knowledge of who is recording.  But if from the record you tell

14  me that's Dr. Tao record that, I have no reason not to believe

15  that, but I don't know the fact.  I have no idea of who record

16  that.  I was very surprised the call was -- the phone

17  discussion was recorded.

18      MR. BARRY:  Thank you.

19      THE COURT:  Any further questions?

20      MR. ZEIDENBERG:  No further questions.

21      THE COURT:  All right.  May this witness be excused,

22  Dr. Liu?

23      MR. BARRY:  Yes, Your Honor.

24      THE WITNESS:  Thank you.

25      THE COURT:  You can call your next witness.

1    MR. BARRY:  The government calls as its next witness

2    Shiran Zhang.

3                    SHIRAN ZHANG,

4    called as a witness on behalf of the government, having first

5    been duly sworn, testified as follows:

6        THE COURT:  Dr.  Zhang, if you're comfortable, if you

7    could remove your mask while you're testifying.

8        THE WITNESS:  Yep.

9        THE COURT:  Thank you.

10                   DIRECT EXAMINATION

11   BY MR. BARRY:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   Would you please state and spell your name for the record?

15   A.   My name is Shiran, S-H-I-R-A-N.  Last name is Zhang,

16   Z-H-A-N-G.

17   Q.   Mr. Zhang, where do you work?

18   A.   I'm currently a chemical scientist and project leader

19   working in Johnson Matthey Company as a chemical scientist and

20   project leader.

21   Q.   Can you spell Johnson Matthey for the court reporter,

22   please?

23   A.   J-O-H-N-S-O-N, M-A-T-T-H-E-Y.

24   Q.   Thank you.  And what is Johnson Matthey?

25   A.   It is a specialty chemical company internationally.

1    Q.    And what do you specifically do there?

2    A.    I'm -- have several projects doing some catalyst

3    development for fluid catalytic cracking and some renewable

4    energies, biomass and, you know, those.

5    Q.    What did you do before you worked at Johnson Matthey?

6    A.    I am a post-doc at MIT for three years.

7    Q.    And when you were at MIT, did you work in a particular area

8    as a post-doc?

9    A.    Yes.  Also as catalysis area.  The specific reaction is

10   olefin metathesis.

11   Q.    Can you say that one more time?

12   A.    O-L-E-F-I-N.  Metathesis is M-E-T-A-T-H-E-S-I-S.

13   Q.    It's like a spelling bee.

14   A.    Sorry.  It's some kind of nomenclature.

15   Q.    So you work at Johnson Matthey.  You were a post-doctoral

16   researcher at MIT before that.  I'm assuming you have a Ph.D.?

17   A.    Yes, I graduate in 2016 with a Ph.D. in chemistry from

18   University of Notre Dame.

19   Q.    Okay.  And when you were doing your Ph.D. at Notre Dame,

20   who was your adviser?

21   A.    Dr. Franklin Tao.

22   Q.    You said you got your degree in 2016?

23   A.    Yes.

24   Q.    When did you start working on your doctorate at Notre Dame?

25   A.    I came to the U.S. in 2011 and in the same year I joined

1    Dr. Tao's lab.

2    Q.   You joined Dr. Tao' lab at Notre Dame in 2011?

3    A.   Yes.

4    Q.   At some point did you switch schools from Notre Dame to

5    another school?

6    A.   Actually if you say if I switched school, actually I'm --

7    from 2011 to 2016 I had been a student from Notre Dame.  I

8    never switched school.  But when Dr. Tao moved to Kansas, yeah,

9    I be there, you know, as adjunct research assistant.

10   Q.   So your degree is from Notre Dame, right?

11   A.   Yes.

12   Q.   Your Ph.D.?

13   A.   Yes.

14   Q.   But in 2014 when Dr. Tao moved from Notre Dame --

15   A.   Yeah.

16   Q.   -- to KU, did you travel with him to help work at KU?

17   A.   Yes, I went -- yeah, and I studied like two years there.

18   Q.   Okay.  And so that would be until 2016?

19   A.   Yes.  Until 2016.  And went back to Notre Dame and get my

20   Ph.D. degree there.

21   Q.   So is it fair to say that in 2014 you went with Dr. Tao

22   from Notre Dame to KU, but you -- and you worked at KU with

23   him, but your degree was still from Notre Dame?

24   A.   That's correct.

25   Q.   And when you -- I just don't want to get feedback so I'm

1   moving around.

2       When you moved from Notre Dame to KU at least physically,

3   did Dr. Tao ask you to move with him?

4   A.   Sorry.  Can you repeat that question?

5   Q.   Why did you move from Notre Dame to KU?

6   A.   Oh, I see.  So Dr. Tao told me I think before our move, he

7   told me he could transfer to University of Kansas and he asked

8   me whether I want to go with him.  And I said yes.  And my only

9   requirement there is I need to be -- I just want to receive the

10  degree still from Notre Dame, you know.  And he said no problem

11  and then I just went with him.

12  Q.   And that was in 2014?

13  A.   Yes.

14  Q.   Okay.  And then when you were there at KU from 2014 to

15  2016, generally speaking can you just talk a little bit about

16  what you did there?

17  A.   I helped to establish the wet chemistry laboratory, such as

18  setting up catalysis reactors, gas 9s, GC, and also doing some

19  scientific projects.  Sorry.  I cannot quite remember what

20  exact the project is.  I think it's related to energy catalysis

21  and some environmental remediation, you know.

22  Q.   Can you describe for the jury what a wet chemistry

23  laboratory is?

24  A.   It's, you know, usually you should have some gas hood where

25  you can make some synthesis of materials and you have some

1    calcination furnace, you have centrifuge and --

2    Q.    Did you say catalytic converters?

3    A.    I said.  I forgot.  Cat -- no.  I said centrifuge, right?

4    Q.    You said centrifuge.  Let's just say converters.  You had

5    some sort of converters?

6    A.    I see.  Oven, calcination ovens.  Yeah.  And, you know,

7    that's for the preparation of the materials and then you have

8    to test the performance.  Usually it's by GC, gas

9    chromatography.  And we have several GC and also a reactor.

10   You have to set them up.  Also the gas 9s and -- yeah.  I think

11   it's that.  And in addition to that we needed to begin -- to

12   start the project.  The project is related to energy conversion

13   and environmental remediation.

14   Q.    When you were at KU between 2014 and 2016 working in

15   Dr. Tao's lab, were there other scholars or post-doc students

16   or Ph.D. students whom you worked with?

17   A.    If you say if there are any old people, actually at that

18   time Luan Nguyen and Shibi Zeng was with us, Us three.  But

19   then after we arrived at KU, we have several other people

20   joining in the group, post-doc and visiting scholar and a

21   visiting student.

22   Q.    Did anybody else other than you and Dr. Tao move from Notre

23   Dame to KU?

24   A.    Yes.

25   Q.    Who else?

1   A.   Luan Nguyen and Shibi Zeng.

2   Q.   Can you spell the second name, please?

3   A.   S-H-I-B-I, Z-E-N-G.

4   Q.   I want to switch topics.  At some point did the defendant

5   call you to talk to you about an opportunity of working at a

6   university in China?

7   A.   Yes.  That was back to 2017.  Late 2017 in November or

8   December.  I received a phone call from Dr. Tao asking me

9   whether I want to go back to China.

10  Q.   And you said -- when did you think this call happened?

11  A.   2017, November or December.

12  Q.   Okay.  And what else do you remember about that call?

13  A.   He tell me he received the Changjiang scholarship and he

14  want me to go back with him to establish the laboratories

15  there, and I was quite surprised because I know the Changjiang

16  professorship requires the onsite full-time employment for at

17  least five years.  And so I think I asked him, does that mean

18  you will permanently move back to China?  And he said no.  And

19  I said -- I ask him how you will fulfill your responsibility of

20  the full-time employment for five years there, and he answered,

21  it's very complicated, and he did not disclose more information

22  at that time.

23  Q.   So you said your understanding is that the Changjiang

24  position that Dr. Tao told you about has a full-time

25  requirement for five years?

1    A.    Yes.

2    Q.    How do you -- what's the basis for your understanding of

3    that?

4    A.    I mean, we know that.  That's common knowledge in China.

5    Q.    And is the Changjiang Distinguished Professor position a

6    prestigious or competitive position to get?

7    A.    Yes.  It's very prestigious.

8    Q.    And it's very well known in the scientific community in

9    China?

10    A.    Yes.

11    Q.    So you said you remembered him calling you asking if you

12    would join his team or go back to China with him.  Do you

13    remember whether he told you where you would be going if you

14    went back with him?

15    A.    Yes.  Fuzhou University.

16    Q.    And did he tell you any specifics in terms of what he would

17    want you to do there?

18    A.    I cannot remember.

19    Q.    Did he tell you anything else about any of the benefits or

20    sort of the attractive aspects if you joined him?

21    A.    Yes.  He will support my application to the Thousand Young

22    Talent Plan.

23    Q.    Can you at a high level for the jury explain what the

24    Thousand Young Talent Plan is?

25    A.    It's a kind of award or something, you know, attract for

1   the Chinese studying in the U.S. and back to China, yeah.

2   Q.   And does it -- if you get that award, does it come with its

3   own set of kind of benefits and responsibilities?

4   A.   Yes.  If you get that, usually you will have a big funding

5   to start -- for startup in China basically.

6   Q.   Do you remember anything else about that phone call?

7   A.   I think most likely is that I do not recall any other.

8   Q.   And you said a minute ago I think that when you asked

9   Dr. Tao how -- whether he planned to go back to China, he said

10  no, right?  And then you asked him, well, how do you plan to

11  fulfill the full-time commitment of the Changjiang

12  Distinguished Professor position.  And your memory is that he

13  said it's very complicated?

14  A.   Yeah, that's a very clear memory.

15  Q.   Do you have very clear memory of those words?

16  A.   Yes.

17  Q.   And what happened after that?

18  A.   After that I think I want some time to think, you know, and

19  that's it.

20  Q.   So did you ever follow up with Dr. Tao about pursuing the

21  possibility of joining his team at Fuzhou?

22  A.   Yes.

23  Q.   Can you talk a little bit about that?

24  A.   I think I was also quite hesitated at that time.  I have

25  several concerns regarding whether or not going back with him.

1    First concern is I was applying for my green card at that time.

2    If I decided to go back, that means I have to give the -- give

3    it up.  That's a big expense.  Second is I want to find out at

4    least whether it is true that he got the professorship and I

5    searched online and I think it's true.

6        And then I want to understand, I mean, how he could do that

7    because in China, you know, the academics is -- has a quite

8    hierarchal system.  Normally young professors -- it is best for

9    young professors to have a big professor head, that would be

10   aid for the funding application.  And so that means if I -- if

11   he permanently moved back to China, then I think that could be

12   a good opportunity to consider.  But if he just went back to

13   China for like five years and then go back to U.S. again, then

14   that would not be beneficial for me.  So at that time I want to

15   know, will he move back to KU after fulfilling the five-year

16   employment there.

17       And third concern is the family concern.  So my wife do not

18   want to go back.  So there are three concerns of that and I was

19   being -- I have been, you know, back and forth considering

20   this, and I think I gave promise to Dr. Tao that, I mean, if I

21   really can obtain the Thousand Young Talent Plan, yeah, then I

22   might probably go back, but things just changed because I

23   considered my family and green card.  At least I did not submit

24   the application.

25   Q.   I want to go back to something you said in the beginning

1   there, which was that you first wanted to confirm or at least

2   reach a higher level of confidence that Dr. Tao had in fact

3   received the Changjiang Distinguished Professor position.  How

4   did you come to the conclusion that you thought that that fact

5   was true?

6              MR. ZEIDENBERG:  Objection.

7              THE COURT:  Overruled.

8              MR. ZEIDENBERG:  Your Honor, may we approach?

9              THE COURT:  Okay.

10      (The following proceedings were had at the bench).

11             MR. ZEIDENBERG:  He already said it once.  It's

12  hearsay.  He got online and he looked it up, and the government

13  is basically I think inviting more hearsay.  The fact that he

14  went online and looked online or he asked someone else and

15  someone else told him, it's hearsay.  The answer calls for

16  hearsay.

17             THE COURT:  I didn't hear that.  I'm not questioning

18  that he said that.  Is that the basis for his knowledge, to

19  your knowledge?

20             MR. BARRY:  I don't know.  I mean, I know he said

21  website initially, but I don't know if I -- I believe that he

22  talked to other people who Dr. Tao had said, including Weixin

23  Huang that I got the Changjiang Distinguished Professor.  He

24  was the individual we talked to yesterday.

25             THE COURT:  That would be hearsay if it came from

1    other people unless Dr. Tao told him specifically.  I think

2    what he's testified is Dr. Tao told him that he still had some

3    reservations.  So unless he has personal knowledge that comes

4    from some source other than hearsay, I think that's a good

5    objection.  Why don't we take a break and you can ask him.

6             MR. BARRY:  Okay.

7             THE COURT:  And then you'll know whether you can ask

8    that question again without eliciting hearsay.

9             MR. BARRY:  Okay.

10        (Thereupon, the proceedings continued in open court.)

11            THE COURT:  We're going to take a break anyway so

12   hopefully we can get it fixed.  Let's take a break for

13   15 minutes.

14        (Recess.)

15        (The following proceedings occurred outside the presence of

16   the jury.)

17            THE COURT:  We are still working on that screen.

18        (The jury entered the courtroom, after which the following

19   proceedings were had.)

20            THE COURT:  You can be seated.  I think we have that

21   one screen now fixed.

22            All right.  You can call your next witness, Mr. Barry.

23            MR. BARRY:  We're almost done with Mr. Zhang.

24            THE COURT:  I'm sorry.  I'm losing my place.

25   BY MR. BARRY:

1    Q.   Before we broke, we were talking about a period in which

2    you were thinking about whether to accept Dr. Tao's offer to

3    join him at Fuzhou.  Do you remember that?

4    A.   Yes.

5    Q.   I'd like you to -- I'd like to show you what's been marked

6    as Government's Exhibit 163.  Do you recognize this document?

7    A.   Yes.

8    Q.   What is it?

9    A.   This is the e-mail communication between Dr. Tao and me.  I

10   think it's before the -- my application to the Thousand Young

11   Talent Plan.

12        MR. BARRY:  Government moves to introduce into

13   evidence Government's Exhibit 163.

14        MR. ZEIDENBERG:  No objection.

15        THE COURT:  163 admitted.

16        MR. BARRY:  Can you please publish 163 for the jury

17   when we have a moment.

18   BY MR. BARRY:

19   Q.   Let me ask while we're waiting, Mr. Zhang -- so the way

20   these are published or printed out is the oldest e-mail is at

21   the back so if you flip to the second page, that will be the

22   oldest.  It's in reverse chronological order.

23        Is this e-mail chain about your kind of considerations and

24   thoughts about whether to join Dr. Tao's team at Fuzhou if you

25   were to have been awarded the Thousand Young Talents program?

1  A.    Yes.

2  Q.    And we'll look at the e-mail in a minute with the jury, but

3  did you ultimately apply for that program?

4  A.    No.

5            THE COURT:  It's -- I don't think this is working.

6  I'm wondering if it would work, what you did yesterday, to turn

7  off and turn on, rebooting.  I don't know how long that takes.

8  It looks like none of the screens are working.  Here we go.

9  Spoke too soon.

10           MR. BARRY:  Ghost of the courtroom.

11 BY MR. BARRY:

12 Q.    Okay.  So let's go to the second page, please.  Actually

13 sorry.  Let's go back to the first page.  This is a -- that

14 bottom e-mail, is that an e-mail you sent to Dr. Tao in

15 June 2018?

16 A.    Yes.

17 Q.    And the subject line is about application.  Is that about

18 the application to the other talent program that we've been

19 talking about?

20 A.    Yes.

21 Q.    And you say, and I understand you were probably very busy

22 at this transition period.

23       Do you remember what you meant by transition period?

24 A.    At that time I think he is, you know, moving back.

25 Q.    Moving back where?

1    A.    From Kansas to Fuzhou University, so it's a transition

2    period.

3    Q.    And then in the second sentence you say -- I guess it's the

4    fourth sentence you say, if you support my application, could

5    you recommend me a contact person at Fuzhou University so that

6    I can begin the preparation?

7         So if you were thinking about potentially pursuing this job

8    with another talent program, why were you asking for a contact

9    at Fuzhou University?

10   A.    I mean, normally I want to get familiar with the professors

11   there.    I mean, if I'm going to apply for that, I cannot just

12   know, you know.    And, you know, I think Dr. Tao is too busy, so

13   he might introduce me to another professor there so that I can

14   contact him, and, you know, discuss more about the application.

15   Q.    So is your understanding that for the talent program that

16   you were thinking about potentially pursuing, that if you were

17   to receive that award, you would then work at a particular or

18   specific university in China?

19   A.    Sorry.    I did not catch your last remark.

20   Q.    Sure.    So the talent program that you were thinking about

21   applying for, you never actually applied for it, right?

22   A.    Uh-huh.

23   Q.    Yes?

24   A.    No, I did not apply for that.

25   Q.    And when you were thinking about applying for it, were you

1  thinking about applying for that award for a specific

2  university and which university was that?

3  A.   That's Fuzhou University.

4  Q.   So you weren't thinking, oh, I want to apply for the --

5  A.   No, it must be Fuzhou University.

6  Q.   So it wasn't like Peking University or Xiamen University or

7  Dalian Institute?

8  A.   No, it has to be Fuzhou University.

9  Q.   When you were thinking about this, why did it have to be

10  Fuzhou University versus one of those other universities?

11  A.   Because I am in -- I have to -- if I got the plan, I go

12  back and I will work with Dr. Tao, right?  And Dr. Tao would

13  only support my application, I mean, if the -- if I'm applying

14  for the Fuzhou University.

15  Q.   Because that was the university that Dr. Tao was asking you

16  to join his team at, right?

17  A.   Yes, yes.

18  Q.   Let's scroll up a little bit, please.  Okay.  And Dr. Tao

19  says, yes, I would support definitely.  Send me information on

20  the WeChat.  What is WeChat?

21  A.   It's a app that's similar to WhatsApp, Facebook in China.

22  Q.   It's like a messaging application?

23  A.   Exactly.

24  Q.   And then he says, then I put you in contact with people at

25  Fuzhou University.  I was at Fuzhou two days ago.

1    And so is your understanding that when he's saying I put

2    you in contact with people at Fuzhou University, he's

3    essentially saying if you're interested in pursuing this job

4    there, I can connect you with the people who can help you

5    pursue that?

6    A.    Yes.   That's what I understood.

7    Q.    Okay.   And let's go to the top, please.

8          And actually we skipped a line.   You respond and you say,

9    can I have your WeChat name?   Is that just like kind of a

10   username?

11   A.    Yes.

12   Q.    And then he gives you his WeChat ID, right?

13   A.    Yes.

14   Q.    So after this -- this is June 2018.   Do you remember

15   approximately how long between this and when you decided to not

16   pursue this opportunity had passed?

17   A.    I think probably just one or two days.

18   Q.    One or two days?

19   A.    Yes.

20   Q.    And did you ever definitively tell Dr. Tao, no, I don't

21   want to pursue this or did the discussion just kind of peter

22   out and neither of you followed up?

23   A.    I think so.   I probably told him -- I don't know through

24   WeChat or phone, I told him I, you know, I won't -- I won't

25   apply.

```
 1              MR. BARRY:  No further questions.
 2                        CROSS-EXAMINATION
 3  BY MR. ZEIDENBERG:
 4  Q.   Good morning.
 5  A.   Good morning.
 6  Q.   You were first interviewed in this case just a couple
 7  months ago, right?
 8  A.   Interviewed by whom, sir?
 9  Q.   By the FBI.
10  A.   Yes.
11  Q.   That was in October 2021, just four months ago, correct?
12  A.   I think so.  It's about that time.
13  Q.   Okay.  No one ever talked to you before August 2019 when
14  Dr. Tao got arrested, correct?
15  A.   No.
16  Q.   And just so we understand the sequence, you were at Notre
17  Dame with Dr. Tao, correct, and you worked with him at Notre
18  Dame?
19  A.   Yes.
20  Q.   And then you went with him to Kansas when he moved?
21  A.   Yes.
22  Q.   And could you tell the ladies and gentlemen about what it
23  was like to work with Dr. Tao?
24  A.   Dr. Tao is -- he had a very high expectation of his crew
25  members, but he is -- you know, in his group he were very, very
```

1   pushy, but in turn you can learn a lot.  So I would say if you

2   really want to learn something, that's a good place because I

3   believe no pain, no gain.  But for other people, you know, if

4   you -- you might feel very pressurized if you want some kind of

5   life, so you could be quite pressurized.

6   Q.   So is it fair to say that he's extremely demanding of

7   himself and others?

8   A.   Yes.

9   Q.   And when -- you agree that he's demanding of himself.  Can

10  you tell the jury about what his work ethic was like?

11  A.   I say he -- he is the most hard working person I've ever

12  seen.  He worked I think probably 90 to 100 hours a week.

13  Basically start at 8 or 9 or even earlier.  He would stay in

14  his office until 11, 10, sometimes even longer and I think he's

15  really -- has a pure interest in science.  Yeah, that's it.

16  Q.   And so he's working all the time.  Is it true that he

17  expected his graduate students and his team members also to be

18  available all the time and working all the time?

19  A.   I would say most likely, you know, he had that expectation.

20  But, you know, I think for us we are not working as hard as he

21  is -- he was, you know.  Our working hours probably is shorter,

22  a little bit shorter than him.

23  Q.   So his pace was more than -- you graduate students couldn't

24  keep pace, is that fair to say, or weren't willing or able to

25  keep up in that kind of way, 100-hour weeks?

1    A.    That was really individual dependent, right.  I tried to

2    keep the pace with him, and it is very demanding, and -- but

3    again, he is definitely the most hard working person I ever

4    seen.

5    Q.    And when -- I take it when you were working with him even

6    at Notre Dame, he traveled frequently?

7    A.    At Notre Dame I don't know, you know.  He usually did not

8    tell us he traveled.

9    Q.    Right.

10   A.    So I do not know.

11   Q.    When he did travel -- I take it when you were with him at

12   Kansas, he traveled?

13   A.    I -- I do not know because he usually did not tell us his

14   schedule.

15   Q.    And when he wasn't around physically, how was he -- or did

16   he still supervise those of you that were working in his lab?

17   A.    Yes.

18   Q.    And tell us about that.

19   A.    He is -- you know, he's demanding, so if he is onsite, he,

20   you know, usually will just drop on you, check if everything is

21   good, what you're doing, and like, you know, have some random

22   brainstorming about the projects, ideas.  I think he's really

23   caring about the progress of the projects daily.

24   Q.    So how would he monitor and check in and stay on top of the

25   research that was being done if he wasn't actually physically

1  there?

2  A.  I'm not sure.  I think probably through e-mails, yeah.

3  Sometimes, you know, because we do not know his schedule, you

4  know, usually we found that out after he traveled.

5  Q.  Okay.

6  A.  Yeah.

7  Q.  And is it fair to say you would be getting e-mails from

8  Dr. Tao at all hours of the day?

9  A.  Yeah.  We were receiving quite a lot of e-mails from him.

10  Q.  And did he expect you guys to be responding promptly to

11  those?

12  A.  Yes.

13  Q.  And were there also telephone check-ins?

14  A.  That's not often.

15  Q.  It was mostly by e-mail?

16  A.  Yes.

17  Q.  And when he was away from the lab physically, did you ever

18  feel like you couldn't do your work properly because you

19  weren't getting the proper supervision or did you feel like he

20  always knew what was happening in his lab?

21  A.  No.  Actually when he was not in the lab, we feel more

22  leisured.

23  Q.  More what?

24  A.  More free.

25  Q.  Were you able to --

1  A.   Yeah, we still work and, you know, decently.  Just not feel

2  so pressured.

3  Q.   And the work continued regardless?

4  A.   Yes.

5  Q.   Now, in 2018 or 2019 Dr. Tao asked if you had an interest

6  in going back to China; is that correct?

7  A.   Actually that is -- the first time is 2017.

8  Q.   2017.  And you had some interest, but -- is that right?

9  A.   Yes.  I have interest, but I had several concerns.

10  Q.   You had concerns?

11  A.   Yes.

12  Q.   And is it fair to say that you were aware that -- of the

13  Changjiang scholarship award, but you were unclear about what

14  his future plans were?

15  A.   I mean, I know the Changjiang professorship, but I do not

16  know the details of his future plan.

17  Q.   And is it fair to say that you understood from working with

18  Dr. Tao that he was -- greatly preferred to teach in the United

19  States if he could?

20  A.   I don't know.  I mean, maybe.  Because --

21  Q.   Is it fair to say that one of your concerns about deciding

22  whether or not to go back was you had concerns about whether

23  Dr. Tao was actually going to go back and work there full-time?

24  A.   Sorry.  What do you mean by "there"?

25  Q.   China.  You were concerned that he was going to -- he was

1    going to ask you to go and you were going to agree to go, and

2    he's going to say, you know what, I decided I'm not going to

3    go, and then you would be there without your mentor and that

4    was a concern to you?

5    A.    That is one of the concerns.

6    Q.    You also mentioned your family concerns?

7    A.    Yes.

8    Q.    When he said it was complicated, you didn't interpret that

9    as that he had unequivocally decided that he was going to stay

10   in China full-time, correct?

11   A.    Can you rephrase that?

12   Q.    Yes.  You at some point asked him about his plans, and he

13   said it was complicated.  Do you remember saying that?

14   A.    Uh-huh, yes.

15   Q.    I take it that you interpreted that remark that it was

16   complicated as being different than his saying, yes, I am

17   moving back to China and I'm going to be working at Fuzhou

18   University full-time?

19   A.    Sorry.  I still do not understand that.

20   Q.    Okay.  It was -- is it fair to say that you were not

21   confident that Dr. Tao was going to move back and work at

22   Fuzhou full-time, correct?

23   A.    I was not confident that he will stay there, you know,

24   permanently.

25   Q.    And fair to say that Dr. Tao would not give you -- well,

19-20052-JAR   USA v. Feng Tao   03.31.22   Day 9   1617

1   Dr. Tao would not give you the assurance that you needed or
2   wanted about his future plans in terms of his commitment,
3   correct?
4   A.   Yes.  He did not give me that, yes.
5   Q.   In fact, when you asked him if he was moving back to China,
6   he told you no, correct?
7   A.   I asked him if he permanently move back to China.  Yes, he
8   said no.
9   Q.   And you did not know that when you were talking with him if
10  he had accepted a job at Fuzhou University, correct?
11  A.   I don't know the details.
12  Q.   When Dr. Tao switched from Notre Dame to Kansas, he still
13  had access to his lab at Notre Dame, correct?
14  A.   I think we still have access to one technique there.
15  Q.   And there was equipment there at Notre Dame that you didn't
16  have at Kansas when you moved, correct?
17  A.   Yeah.  At that time, no, yeah.
18  Q.   And isn't it true that Dr. Tao used that equipment during
19  the interim after he transferred?
20  A.   After he transferred to KU, we -- actually it's me still
21  going back to Notre Dame.  I think we still doing like two
22  months of that -- using that equipment.  I forgot the details.
23  I think it's like that.
24  Q.   And isn't it true, do you know, that Dr. Tao was considered
25  an adjunct professor at Notre Dame after he moved from Notre

1    Dame to Kansas?

2    A.    Yes.

3    Q.    And did you see Dr. Tao's grant applications that he

4    submitted after he got to Kansas to NSF or DOE?

5    A.    No.

6    Q.    So you don't know if he was ever reporting that he was a --

7    A.    I never saw those before.

8    Q.    So you don't know if he ever listed he was an adjunct

9    professor at Notre Dame?

10   A.    The reason why I think he's adjunct professor is because --

11   we had a conversation before.  He had to be a professor, you

12   know, kind of in name there because I was a Notre Dame student.

13   My salary has to be paid through Notre Dame.

14   Q.    In late 2018 he recommended you for a position at ORNL,

15   what is that the --

16   A.    Oak Ridge National Lab.

17   Q.    Oak Ridge; is that right?

18   A.    Yes.

19   Q.    So he was helping you out -- you decided you weren't going

20   to go and he recommended you for a position at Oak Ridge?

21   A.    Yes.  I think so.  I think it is that, yes.  I do not

22   remember clearly.

23            MR. ZEIDENBERG:  I have no further questions, Your

24   Honor.

25            THE COURT:  Any redirect?

```
1              MR. BARRY:  Briefly, Your Honor.
2                     REDIRECT EXAMINATION
3   BY MR. BARRY:
4   Q.   Mr. Zhang, you graduated and received your Ph.D. in 2016,
5   right?
6   A.   Yes.
7   Q.   So the discussion you had with Mr. Zeidenberg about what it
8   was like working in Dr. Tao's group, that experience ended in
9   2016, right?
10  A.   Yes, from 2011 to 2016.
11  Q.   Okay.  And then the other thing I wanted to ask you about
12  is Mr. Zeidenberg was asking you about your hesitancy and one
13  of them is green card, family issues, and then he focused on
14  this sort of question of whether Dr. Tao would move to China.
15  And I thought I heard you saying that -- there was a little bit
16  of nuance and what you were focused on was --
17       My question is:  Was your concern whether he would move to
18  China or whether that move would be permanent?
19  A.   Whether that move would be permanent.
20  Q.   What do you mean by that?
21  A.   Because if it's not permanent, for example, I went back
22  with him and he fulfilled his five-year employment there and go
23  back to U.S., then, I mean, I will be alone there.  There's no
24  big professor supporting there.  Or in some other cases if he
25  could not get along with the professors there and just quit
```

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1620

```
 1   like two years, I do not have a green card at that time.  That
 2   would disrupt my future plan.
 3            MR. BARRY:  No further questions.
 4                    RECROSS-EXAMINATION
 5   BY MR. ZEIDENBERG:
 6   Q.   You were interviewed by the government just two weeks ago,
 7   March 12th.  Do you remember that?
 8   A.   Uh-huh.
 9   Q.   You have to answer yes or no.
10   A.   Yes.
11   Q.   That was like a Zoom meeting?
12   A.   Yes.
13   Q.   With Mr. Barry and Agent Lampe?
14   A.   Yes.
15   Q.   And during that call you were asked -- you told the FBI and
16   Mr. Barry that you asked Dr. Tao if he was moving back to China
17   and he replied no, correct?
18   A.   I asked him if he is permanently move back to China.  He
19   said no.
20   Q.   That's not what you said to the FBI and Mr. Barry just last
21   week or two weeks ago, is it?
22   A.   This is -- I mean, the conversation is whether he's
23   permanently move back.
24   Q.   Listen to my question.  That's not what you said to
25   Mr. Barry and the FBI when you talked to them two weeks ago?
```

1   A.   I do not have a clear memory.  I might miss that word.

2   Q.   Okay.  So they asked what Dr. Tao said and you said --

3   Zhang asked Tao if he was moving back to China and Tao replied

4   no.  That's what you said two weeks ago, correct?

5   A.   I mean, I missed the permanent word.

6   Q.   You missed that word?

7   A.   Uh-huh.

8   Q.   But that is what you said, right?

9   A.   I don't know.  If you recall it, then that's it.

10          MR. ZEIDENBERG:  I have nothing further, Your Honor.

11          MR. BARRY:  No further questions.

12          THE COURT:  May Mr. Zhang be excused?

13          MR. BARRY:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you.  Call your next

15   witness.

16          MR. BARRY:  Government calls as its next witness Luan

17   Nguyen.

18                    LUAN NGUYEN,

19   called as a witness on behalf of the government, having first

20   been duly sworn, testified as follows:

21                  DIRECT EXAMINATION

22   BY MR. BARRY:

23   Q.   Hello, Mr. Nguyen.

24   A.   Hi.

25   Q.   If you like, you can take your mask off.

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1622

1   A.   Okay.  Yes.

2   Q.   Would you please state and spell your name for the record?

3   A.   Yeah.  Name Luan Nguyen.  L-U-A-N, N-G-U-Y-E-N.

4   Q.   What do you do for work, Mr. Nguyen?

5   A.   I'm a consultant for Deloitte.

6   Q.   What did you do before that?

7   A.   I was teaching assistant for online teaching program and

8   prior to that I was a researcher at University of Kansas.

9   Q.   And when you were a researcher at University of Kansas,

10  what was the time period in which you were a researcher?

11  A.   There are two periods.  About two years I was doing

12  graduate work and about two years I was a post-doc researcher.

13  Q.   Let's start with the graduate work.  What was that two-year

14  period?

15  A.   About August of 2014 to July of 2016.

16  Q.   You were doing your doctoral work then?

17  A.   Yes.

18  Q.   You have a Ph.D.?

19  A.   Yes.

20  Q.   What is it in?

21  A.   It's in chemistry.

22  Q.   Who was your Ph.D. adviser?

23  A.   My professor/adviser was Professor Franklin Tao.

24  Q.   You said in 2016 you got your Ph.D. and you became a

25  researcher?

1  A.   Yeah, a post-doc researcher.

2  Q.   How long were you a post-doc researcher at KU?

3  A.   Roughly two years, since July 2016 to September 2019.

4  Q.   And did you work in somebody's lab when you were a post-doc

5  researcher?

6  A.   Yes, I was working in Professor Tao's lab.

7  Q.   When you worked in his lab from 2016 to 2019, can you

8  describe for the jury generally what you were doing in the lab,

9  kind of what a day in the life of a post-doc researcher in that

10  lab was like?

11  A.   Yeah.  There's a few main responsibility.  One, it's

12  conducting experiments involving characterized samples,

13  chemical samples.  Other includes helping some -- training

14  graduate students with operating instrumentation.  And then

15  there's a instrumentation design where we designed experiment

16  -- set up experiment instrumentation that can characterize

17  samples.

18  Q.   So I want to focus on two words there that are I think

19  maybe not -- the meaning is not apparent from the surface.

20  When you say instrumentation, does that just mean scientific

21  equipment?

22  A.   Yes, correct.

23  Q.   And when you say the instrumentation helps you with

24  characterization or the scientific equipment helps you with

25  characterization, what does characterization mean?

1    A.   It means understanding and getting some insights and

2    informations about the substance of interest, its properties,

3    chemical properties, mostly is what we're interested in.

4    Q.   So going back to scientific equipment, were there

5    particular types of equipment that you worked on when you were

6    in Dr. Tao's lab?

7    A.   Yes.  I mainly worked on STM and AP-XPS.

8    Q.   Can you just -- each of those acronyms, can you slowly say

9    what each one is --

10   A.   Yes, of course.

11   Q.   -- for the court reporter and then explain what each one

12   is?

13   A.   Right.  Yeah.  So an STM is a scanning tunneling

14   microscopy.  It's a microscope in the sense so you can see nano

15   scales of substance.  And an AP-XPS is ambient pressure

16   photoelectron spectroscopy.  It use X-rays to provide you with

17   information about the substance of interest.

18   Q.   How much does it cost to build STM?

19   A.   An STM to build, I'm not entirely sure, but you can

20   purchase one for roughly $250,000.

21   Q.   So about $250,000 for an STM?

22   A.   Yep.

23   Q.   What about the AP-XPS?

24   A.   The AP-XPS cost more.  Can range from million, million and

25   a half to purchase.

1    Q.    And you said your -- part of your job was to help with

2    those two pieces of equipment?

3    A.    Yes.

4    Q.    When you say help, what does that mean?

5    A.    Operations, maintenance.  And for the XPS it involve

6    operations, maintenance, and also designs setups that enhance

7    and improve in terms of conditions that we would like to study.

8    Q.    I'd like to pull up what's already been admitted into

9    evidence as Government's Exhibit 467, please.  You should see

10    it pop up on your screen in a minute.

11        Do you recognize this room?

12    A.    Yes, I do.

13    Q.    What is this?

14    A.    So that is our XPS unit, and the instrument in the middle,

15    that's the AP-XPS and then gas cylinders on the side.

16    Q.    And this is a photograph of part of your lab that you

17    worked at at KU?

18    A.    Yes, correct.

19    Q.    And this is Dr. Tao's lab?

20    A.    Yes.

21    Q.    And that big shiny thing is the AP-XPS that we've been

22    talking about?

23    A.    Yes, correct.

24    Q.    And that's the piece of equipment that you said you have --

25    you had experience and responsibility with maintaining it,

1    using it in characterizations, and kind of just having

2    experience with that piece of equipment?

3    A.    Yes.

4    Q.    Was there a point at which Dr. Tao asked you about possibly

5    joining a team at Fuzhou University in China?

6    A.    Yes.  I think roughly in 2018 that was brought up,

7    suggesting me to try and apply to Fuzhou University.

8    Q.    And did you in fact ever apply to Fuzhou University to work

9    there?

10    A.    I did apply, yes.

11    Q.    And how did you apply?

12    A.    There's documentations that Professor Tao have me submit,

13    presentations that I did onsite at the university and along

14    with medical checks.

15    Q.    Sorry.  What was that the last one?

16    A.    Medical exams, yeah.

17    Q.    So you said first thing is you applied?

18    A.    Right.

19    Q.    And did you submit the materials directly to Fuzhou

20    University or did you submit them to Dr. Tao?

21    A.    Not directly, no.  I believe that Professor Tao submitted

22    that materials for me.

23    Q.    Okay.  So you gave them to Dr. Tao and he submitted them

24    for you?

25    A.    Yes.

1  Q.  And then the second thing you said is that you had an

2  onsite visit.  Does that mean you went to Fuzhou University?

3  A.  I did, yes.

4  Q.  And when did you do that?

5  A.  Beginning of 2019.

6  Q.  And have you visited Fuzhou University more than once?

7  A.  No, just once.

8  Q.  Okay.  So this is the beginning of 20 -- did you say -- 19?

9  A.  Yes, if my memory serves.

10 Q.  So based on your memory you visited Fuzhou University in

11 the beginning of 2019.  Did Dr. Tao go with you when you

12 visited?

13 A.  Yes, he did.

14 Q.  So did you fly on the same plane?

15 A.  Yes, we did.

16 Q.  And then when you got there, what did you do?

17 A.  I spent times visiting the university.  I spoke with some

18 student and professors there, and then spent most of the --

19 some time reading articles.

20 Q.  And was Dr. Tao with you for some portion of that time when

21 you were there?

22 A.  Yes.

23 Q.  Do you remember the names of any of the people you met when

24 you were there?

25 A.  I met Siwen.  I met Yu Tang, who was an old lab mate at KU.

1    And those are the two names that I could remember.

2    Q.   So let's take those in reverse order.  You said you met Yu

3    Tang, right?

4    A.   Yes.

5    Q.   Who is Yu Tang?

6    A.   Yu Tang was a graduate student at KU in Professor Tao's

7    lab.  After graduation he went to Fuzhou.

8    Q.   Is Yu Tang a professor at Fuzhou now?

9    A.   I'm not entirely sure.  He certainly have a position there.

10   He does some researchers or professor maybe.

11   Q.   When did Yu Tang get his Ph.D.?

12   A.   When?

13   Q.   When?

14   A.   I think it's somewhere in 2018.

15   Q.   So he got his Ph.D. after you got yours in 2016?

16   A.   Correct, yes.

17   Q.   And did you and Yu Tang work together when you were both at

18   Dr. Tao's lab at KU?

19   A.   Yes, correct.

20   Q.   So the second person you said you met with Dr. Tao was

21   someone named Siwen?

22   A.   Yes.

23   Q.   Do you know that person's full name?

24   A.   No.  Just, yeah.

25   Q.   I'd like to pull up what's been introduced as Government

1    351A.  If we could go -- I think it's page 36.  Can you see

2    that on the screen, Mr. Nguyen?

3    A.   Yes.

4    Q.   Is Yu Tang that person in the upper left?

5    A.   Yes.

6    Q.   Is Siwen or Su Siwen the person on the right?

7    A.   Yes.

8    Q.   Okay.  And then you see that second picture there?

9    A.   Yes.

10   Q.   Is that you?

11   A.   Yes.

12   Q.   Okay.  And if we flip back two or three pages so two more,

13   please.  That's Dr. Tao, right?

14   A.   Yes.

15   Q.   Let's go back to the page with multiple photographs.  Okay.

16   So your name is Luan Nguyen, right?

17   A.   Yes.

18   Q.   But right here it says Luan.  That's your first name,

19   right?

20   A.   That is my first name.

21   Q.   And Yu Tang's name, it says Tang Yu, but that's his family

22   name and his first name?

23   A.   Yes.

24   Q.   Do you know why yours just says Luan?

25   A.   I do not know why.

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1630

1  Q.  We can take that down.  Oh, actually, sorry, I want to go

2  back to that exhibit if we might, Ms. Boyd.

3      I want to look at the first page.  So have you ever seen

4  this document before?

5  A.  I have not.

6  Q.  You see how it says -- see how it has a little crest in the

7  upper left or seal that says Fuzhou University?

8  A.  Yes.

9  Q.  It says Explanation Report of the Joint Fund for Promoting

10 Cross Strait Science and Technology Cooperation?

11 A.  Yes.

12 Q.  It says applicant Tao Feng, Institute of Molecular

13 Catalysis and In Situ Characterization, Fuzhou University?

14 A.  Yes.

15 Q.  Did you know that Dr. Tao created a presentation and

16 included you as a member of the Fuzhou team?

17 A.  No, I don't recall, yeah.

18 Q.  Do you know whether -- actually, strike that.  Okay.

19      So we can take that down, please.

20      You said that you never ended up accepting that job at

21 Fuzhou?

22 A.  Correct.

23 Q.  Was there a point in time when you assisted Dr. Tao and Yu

24 Tang in purchasing laboratory equipment for Fuzhou?

25 A.  Yes.

1   Q.   I'd like to show you what's been marked as Government's

2   Exhibit 262 and 263.  And that second document is an

3   attachment -- the second document is an attachment to that

4   first document.

5        Do you recognize -- excuse me.  Do you recognize the first

6   document?

7   A.   Yes.

8   Q.   What is it?

9   A.   It's an e-mail, Fuzhou equipments list.

10  Q.   And you're the sender of the e-mail?

11  A.   Yes.

12  Q.   Who are you sending it to?

13  A.   I was sending it to Yu Tang.

14  Q.   And what's the attachment marked as Government Exhibit 263?

15  A.   Machine shop equipments.

16       MR. BARRY:  The government moves to introduce into

17  evidence Exhibits 262 and 263.

18       THE COURT:  Any objection?

19       Is there an objection?

20       MR. ZEIDENBERG:  No, I do not.

21       THE COURT:  Okay.  Sorry.  262 and 263 admitted.

22  BY MR. BARRY:

23  Q.   Would you please pull up 262 and zoom in on the top.

24       This is an e-mail that you sent to Yu Tang in August 2018

25  and the subject line is Fuzhou equipments list, right?

1    A.    Yes.

2    Q.    And you see there's a little attachment that says machine

3    shop equipment list?

4    A.    Yes.

5    Q.    Let's pull up 263, which is the attachment.  And let's just

6    walk through.  So this is a floor drill press.  Let's go to the

7    next page.  Metal cutting band saw.  Next page, please.  Heavy

8    duty bench grinder.  Next page, please.  Lathe.  Next page

9    please.  Starter package for a PCNC.  Next page, please.  Arc

10   welder.  Next page, please.  TIG welder.  Next page, please.

11        Okay.  So let's go back to 262.

12        You said Yu Tang got his Ph.D. in 2018?

13   A.    Yes.

14   Q.    Were you sending this list to Yu Tang to assist Fuzhou

15   University in purchasing particular equipment?

16   A.    Yes.

17   Q.    And why were you doing that?

18   A.    I was asked by Professor Tao to do so.

19   Q.    So Dr. Tao asked you to do that?

20   A.    Yes.

21   Q.    All right.  I'd like to show you what's been marked as

22   Government's Exhibit 264 and then there's three attachments to

23   264 so it's going to be 264, 265, 266, and 267.

24        Do you recognize this document?

25   A.    Yes.

1    Q.   What is it?

2    A.   It's a Fuzhou credit card purchases e-mail sending from me

3    to Yu Tang.

4    Q.   Okay.  And what are the three attachments?

5    A.   They are licensing receipts for using some references from

6    particular journals, articles.

7            MR. BARRY:  Government moves to introduce into

8    evidence Government's Exhibit 264, 265, 266, and 267.

9            MR. ZEIDENBERG:  No objection.

10           THE COURT:  264 to 267 admitted.

11   BY MR. BARRY:

12   Q.   Let's please pull up 264 and go to the top.  It says Fuzhou

13   credit card purchases and you're e-mailing Yu Tang again,

14   right?

15   A.   Yes.

16   Q.   If we can go to the first exhibit, 265, please, and go to

17   the bottom.  And actually if we can scroll up first, sorry.

18       You said these are license agreements?

19   A.   Receipts, yes.

20   Q.   Receipts.  Okay.  What do you mean by license receipt?

21   A.   To use certain referencing to a particular article,

22   sometime you got to pay a fee to use the materials as

23   reference.

24   Q.   And these are from September -- at least this license is

25   from September 2018?

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1634

1    A.    Yes.

2    Q.    And let's scroll to the bottom please of this first page.

3    See the requester location?

4    A.    Yes, yes.

5    Q.    Right here.

6    A.    Yep, yes.

7    Q.    Were you purchasing these licenses for Fuzhou University?

8    A.    Yes.

9    Q.    And why were you doing that?

10    A.    I was told by Professor Tao to do so.

11    Q.    Let's go to the first page or the next page at the very

12    top.

13        So this has some billing information.  Is this how you paid

14    for the licenses?

15    A.    Yes, correct.

16    Q.    And it says here that you used a credit card with a Visa

17    ending in 4763; is that right?

18    A.    Yes.

19    Q.    Okay.  Was that your personal credit card?

20    A.    No, it's not.

21    Q.    Whose credit card was that?

22    A.    I believe that's Siwen's credit card.

23    Q.    That's Siwen Su, the person we looked at earlier?

24    A.    Yes.

25    Q.    How did you get that credit card?

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9                    1635

```
1    A.   Professor Tao provided that to me.

2    Q.   So Professor Tao provided you a credit card of Su Siwen's?

3    A.   Yes.

4    Q.   And so Su Siwen is the person you met at Fuzhou University?

5    A.   Yes.

6    Q.   You used that credit card to purchase licenses for Fuzhou

7    University?

8              MR. ZEIDENBERG:  Objection.

9              THE WITNESS:  Yes.

10             MR. ZEIDENBERG:  He's testifying.

11             THE COURT:  I'm sorry?

12             MR. ZEIDENBERG:  Leading.

13             THE COURT:  Overruled.

14   BY MR. BARRY:

15   Q.   I'd like to show you what's been marked as Government's

16   Exhibit 214 -- actually, before I do that.  Can we go to the

17   next exhibit, please.  And this is another license that you

18   purchased for Fuzhou; is that right?

19   A.   Yes.

20   Q.   And can we scroll to the bottom again, please.

21        And you'll see it says requester:  Fuzhou.  Is that the

22   same credit card number, the 4673?

23   A.   Yes.

24   Q.   Can we go to the next exhibit, please.  This is another

25   license that you purchased for Fuzhou?
```

1  A.  Yes.

2  Q.  And if we go to the bottom, can you confirm it's the same

3  credit card, 4763?

4  A.  Yes.

5  Q.  I'd like to show you what's been marked as Government's

6  Exhibit 214 and 215.  The first cover page is an e-mail and

7  there's no content on the e-mail.  Look at the attachment and

8  tell me if you recognize the attachment.

9  A.  Yes, I do.

10 Q.  What is that?

11 A.  It's a credit card under the name of Su Siwen.

12 Q.  Is that the credit card you used to purchase those licenses

13 for Fuzhou?

14 A.  Yes.

15     MR. BARRY:  Government moves to introduce into

16 evidence Government's Exhibit 214, 215.

17     MR. ZEIDENBERG:  No objection.

18     THE COURT:  214, 215 admitted.

19 BY MR. BARRY:

20 Q.  Let's pull up 214 and I want to go to the top so folks

21 understand what this is.  Does this appear to be an e-mail sent

22 from Dr. Tao's KU account on November 29, 2018, to an e-mail

23 hpengtao02@gmail?

24 A.  Yes.

25 Q.  Do you see how it has an attachment there that's a JPG

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1637

1    file?

2    A.   Yes.

3    Q.   Let's pull up 215 which is the attachment.  This is the

4    credit card that you used to purchase those licenses?

5    A.   Yes.

6    Q.   And were you given a physical copy of the card?

7    A.   No.  Just a photo like this.

8    Q.   Who gave you the photo?

9    A.   Professor Tao.

10   Q.   Okay.  I'd like to show you what's been marked as

11   Government's Exhibit 216.

12          MR. BARRY:  The Court's indulgence.

13   BY MR. BARRY:

14   Q.   Actually I'd like to show you what's been marked as

15   Government's Exhibit 268.  Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   It's an e-mail from me to Yu Tang with the subject Fuzhou

19   AP-XPS chambers quotation.

20          MR. BARRY:  Government moves to introduce into

21   evidence Government's Exhibit 268.

22          MR. ZEIDENBERG:  No objection.

23          THE COURT:  268 admitted.

24   BY MR. BARRY:

25   Q.   This is from November 2018, and you say Yu Tang -- and Yu

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1638

1    Tang is your colleague from KU who now works at Fuzhou?

2    A.    Yes.

3    Q.    And you say can you e-mail VacGen.  What's VacGen?

4    A.    It's a vacuum equipment manufacturer.

5    Q.    Can you e-mail VacGen to get quotation for the analysis

6    chamber and load lock chamber for AP-XPS system in Fuzhou.  Did

7    I read that accurately?

8    A.    Yes.

9    Q.    And the AP-XPS system, that's that piece of equipment that

10   we looked at earlier?

11   A.    Yes.

12   Q.    And you were -- why were you ordering parts for Yu Tang --

13   or rather, why were you asking Yu Tang to get a quote for an

14   AP-XPS system at Fuzhou?

15   A.    Well, I was told by Professor Tao to get quotations for

16   this equipment, and I e-mailed Yu Tang because it's in China

17   and we are wanting to get quotation from China representative.

18   Q.    Were you helping Dr. Tao and Yu Tang build an AP-XPS system

19   at Fuzhou University?

20   A.    Yes.

21   Q.    I'd like to show you what's been marked as Government's

22   Exhibit 216.  Do you recognize this document?

23   A.    Yes.

24   Q.    What is it?

25   A.    It's an e-mail from Professor Tao to Yu Tang subject CNC

1  lathe package.

2  Q.  And is there an e-mail -- are you on that e-mail chain?

3  A.  Yes, I was cc'd to it.

4  Q.  And there's an e-mail below from you to Dr. Tao?

5  A.  Yes.

6          MR. BARRY:  The government moves to introduce into

7  evidence Government's Exhibit 216.

8          MR. ZEIDENBERG:  No objection.

9          THE COURT:  216 admitted.

10          MR. BARRY:  If we could go to the bottom, please.

11  BY MR. BARRY:

12  Q.  So this is also from November 2018, and you say to Dr. Tao,

13  Professor Tao, this is the CNC lathe package from Tormach

14  company that I showed you earlier to be purchased for Fuzhou.

15  China contract for Tormach is here.

16      Can you go up a little bit?  And then he responds, Yu,

17  please call the branch of Tormach at Nanjing there is phone

18  number you can find to ask the price of the machines.

19      Why were you e-mailing Dr. Tao an update about purchasing a

20  particular piece of equipment for Fuzhou University?

21  A.  I was asked by Professor Tao to get information about that

22  equipment.

23  Q.  I'd like to show you what's been marked as Government's

24  Exhibit 270.  Do you recognize this document?

25  A.  Yes.

1    Q.   What is it?

2    A.   It's an e-mail from me to Yu Tang, subject quotation

3    request from Fuzhou University.

4            MR. BARRY:   Government moves to introduce into

5    evidence Government's Exhibit 270.

6            MR. ZEIDENBERG:   No objection.

7            THE COURT:   270 admitted.

8    BY MR. BARRY:

9    Q.   Let's go to the bottom of the chain.  The way these are

10   printed out, Mr. Nguyen, which you've probably figured out is

11   the oldest in time to the back and it's in reverse

12   chronological order.  So I think it starts on page 2.  And this

13   is an e-mail from Yu Tang.  And this is the company that we

14   were talking about earlier, is it Tormach or Tormach?

15   A.   Yep, yeah.

16   Q.   And Yu Tang says, Dear Tormach, was glad to talk with

17   Amelia today for an international quotation.  And then he says

18   a little later on, the recipient address is as below.  And then

19   if you turn to the next page, it has Mr. Su, Siwen Su.  He's

20   the person we talked about earlier, right?

21   A.   Yes.

22   Q.   You said you met Su Siwen at Fuzhou?

23   A.   Yes, I did.

24   Q.   Do you know what his job is there?

25   A.   I did not know what his job was.  My impressions was he is

1    some form of office administrative in charge of procurement.

2    Q.  Did you say in charge of procurement?

3    A.  Yeah, purchasing, yes.

4    Q.  Is that understanding of what his job might be based on

5    your interactions with him?

6    A.  Correct.

7    Q.  Okay.  Let's go back -- let's scroll up a little bit so

8    that you have Tormach's response.  And they actually call Yu

9    Tang Su Siwen even though it's Yu Tang who sent the e-mail.

10   Then if you keep going up, it looks like they're giving -- Yu

11   Tang follows up.  He says he's contacting Tormach on behalf of

12   Mr. Su from FZU.  And let's go up a little bit more.  And I

13   want to stop right there.

14       So the representative says to Yu Tang, I've talked with our

15   logistics manager and they have informed me that the Series III

16   is only located in the U.S.  They believe that it would be more

17   cost effective for you if you order 1100M and have that shipped

18   from China.  Please let me know your thoughts.

19       And then I want to go to the very next e-mail chain.  It's

20   very narrow on the document.  And it looks like Yu Tang is

21   e-mailing you and saying, any comment, man?  Did I read that

22   accurately?

23   A.  Yes.

24   Q.  And then you respond to Yu Tang and you say, nice, the

25   1100M is even better, more horsepower.  Are you talking about a

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1642

1    piece of equipment here?

2    A.    Yes.

3    Q.    And you say, I like the 25K package.  Is that the -- is

4    you're saying $25,000 package to buy that piece of equipment?

5    A.    Yes.

6    Q.    You say, let's check with the boss first.  And Yu Tang

7    responds and says okay, I will ask for the 1100M quotation and

8    also bring this to boos.  I want to talk about the first e-mail

9    from you on November 12th.  Who is the boss you're referring to

10   there?

11   A.    Professor Tao.

12   Q.    I'd like to show you what's been marked as Government's

13   Exhibit 273.  Do you recognize this document?

14   A.    Yes.

15   Q.    And actually I want to show you -- there's an attachment,

16   which is 274.  This is attached.  So I've handed you 273 and

17   274.  Let's start with 273.

18         Do you recognize what this document is?

19   A.    Yes.

20   Q.    What is it?

21   A.    It's an e-mail from Professor Tao to me, cc to Yu Tang.

22   Q.    Does it appear from the header that there's an attachment?

23   A.    Yes.

24   Q.    If you look at 274, is that the attachment?

25   A.    Yes.

1          MR. BARRY:  Government moves to introduce into

2     evidence Government's Exhibit 273 and 274.

3          THE COURT:  Any objection?

4          MR. ZEIDENBERG:  No objection.

5          THE COURT:  273, 274 admitted.

6     BY MR. BARRY:

7     Q.  So let's zoom in on the top of the e-mail, please.  Dr. Tao

8     says -- so this is December 29, 2018.  And Dr. Tao says to you

9     and Yu Tang, Hi Luan and Yu, the attached is the schedule.  We

10    must follow the schedule to reach our goal.  We are on a

11    challenging track, but we are confident in its success by

12    making our tremendous effort.  We do it for uncovering the

13    science beneficial to improvement of human life.  Franklin.

14         Let's look at the attachment which is 274.

15         Can you just describe for the jury what is this a schedule

16    of?

17    A.  Is the schedule of building and assembling the AP-XPS.

18    Q.  And that's that piece of equipment that has sort of the

19    chrome finish on it that we looked at in the laboratory?

20    A.  Correct.

21    Q.  Okay.  So this is a schedule that Dr. Tao has sent you and

22    Yu Tang to build the equipment?

23    A.  Yes.

24    Q.  And this is building the equipment for Fuzhou University?

25    A.  Yes.

1    Q.    Okay.  And the first sort of item on the schedule is:

2    Before January 6, 2019, finalize the drawing of XPS chamber mon

3    chamber and load lock chamber and submit to get quotations.

4         Submit to get quotation, is that essentially asking various

5    vendors for quotes to procure the type of equipment that you

6    need to put together the AP-XPS?

7    A.    Yes.

8    Q.    And then the next item is:  Before January 13th finish the

9    drawing of lenses of energy analyzer and submit quotation of

10   chamber of lenses and order parts for lenses.

11        Is that talking again about doing kind of a schematic

12   drawing and going to vendors and asking for quotations?

13   A.    Yes.

14   Q.    The third says:  Before the end of February to FZ.  What

15   does FZ mean?

16   A.    Fuzhou.

17   Q.    That's Fuzhou University?

18   A.    Yes.

19   Q.    That's who you were building this for?

20   A.    Yes.

21   Q.    The next item is:  Before March 31st receive all parts and

22   start to assemble and test.

23        Did I read that accurately?

24   A.    Yes.

25   Q.    And then the next two items, May 15th and June 15th seem to

1   talk about various phases of the AP-XPS.  And I want to focus

2   on that last bullet point.  It says before July 15th start to

3   collaborate with company to make AP analyzer.

4        What does that mean?

5   A.   It means looking for vendors, companies to produce and make

6   the analyzer for the AP-XPS.

7   Q.   So let's unpack that a little.  So what is -- is the energy

8   analyzer a component part that gets put into the AP-XPS?

9   A.   Correct.

10  Q.   And you're saying here this was about potentially

11  collaborating with private companies to make that kind of

12  component part?

13  A.   Correct, yes.

14  Q.   Did Dr. Tao talk to you about potentially doing that?

15  A.   Yes.

16  Q.   What was the nature of those conversations?

17  A.   It was a -- proposed ideas of how we can collaborate with

18  other company to make the analyzers and potentially be able to

19  produce and also sell the whole AP-XPS package as a form of

20  business.

21  Q.   As a what?

22  A.   As a form of business.

23  Q.   Okay.  And was the idea to collaborate with companies in

24  Kansas?

25  A.   No, not company in Kansas.

1  Q.  For the idea which companies would you have been

2  collaborating with to build these AP analyzers and AP-XPS

3  machine?

4  A.  These would be companies in China.

5  Q.  Would that be -- if you had accepted your job at Fuzhou

6  University, was your understanding that part of that job would

7  have been to pursue this business idea?

8  A.  Yes.

9  Q.  And -- okay.  All right.  I'd like to show you what's been

10  marked as Government's Exhibit 275.

11        THE COURT:  We're past noon, so you don't have to

12  break at this minute, but I don't know how much longer you'll

13  be with this witness either.

14        MR. BARRY:  I think I have a little bit more with him,

15  but I think if we could do this exhibit and then take a break,

16  I think that would be a good time.

17        THE COURT:  Okay.

18  BY MR. BARRY:

19  Q.  I've handed you what's been marked as Government's Exhibit

20  275.  Do you recognize that document?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's an e-mail from Professor Tao to me, cc to Yu Tang

24  labeled purchase parts for reaction cell.

25        MR. BARRY:  Government moves to introduce into

1    evidence Government's Exhibit 275.

2              MR. ZEIDENBERG:  No objection.

3              THE COURT:  275 admitted.

4    BY MR. BARRY:

5    Q.    And this is -- this e-mail was sent one day -- so the prior

6    exhibit we looked at, 273, was sent on Saturday, December 29th.

7    So this e-mail was sent a day later on December 30th, Sunday.

8    And it looks like Dr. Tao is saying, Dear Luan, please send the

9    list of small items of reaction cell to be purchased by Yu

10   Tang.  He needs to purchase it ASAP.  Here is a kind reminder:

11   Before January 6, 2019, finalize the drawing of XPS chamber,

12   mon chamber, and load lock chamber and submit to get

13   quotations.

14        Is he reminding you to follow that schedule we looked at?

15   A.    Yes.

16   Q.    He's reminding you the day after he proposed the schedule?

17   A.    Yes.

18   Q.    Was that typical based on your work relationship with you

19   that he wanted to make sure that everyone was staying on track

20   with kind of the schedule that he was setting for various

21   projects?

22   A.    Correct.

23              MR. BARRY:  Okay.  I'd like to -- actually that's a

24   good break.

25              THE COURT:  All right.  So let's take a break until

1    1:15 for lunch.

2        (Recess.)

3        (The jury entered the courtroom, after which the following

4    proceedings were had.)

5            THE COURT:  Continue with Dr. Nguyen.

6            MR. BARRY:  Thank you, Your Honor.

7    BY MR. BARRY:

8    Q.  Mr. Nguyen, before we broke, we were talking about, if we

9    could pull it up, Exhibit 275.

10       Do you remember us discussing -- it's just an e-mail from

11   December 30, 2018, about following that schedule to build the

12   AP-XPS at Fuzhou?

13   A.  Yes.

14   Q.  I'd like to show you what's been marked as Government's

15   Exhibit 223.  Do you recognize this document?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's an e-mail from Professor Tao to me, cc to Yu Tang,

19   title meeting with Philippe.

20           MR. BARRY:  Government moves to admit into evidence

21   Government's Exhibit 223.

22           MR. ZEIDENBERG:  No objection.

23           THE COURT:  223 admitted.

24   BY MR. BARRY:

25   Q.  Is this another e-mail between you and Dr. Tao where he's

1  asking you to follow up on something?

2  A.  Yes.

3  Q.  Was that kind of typical of your relationship?

4  A.  Yes.

5  Q.  Okay.  I'm sorry.  I misplaced one of my documents.  There

6  it is.

7      So I'd like to now have you listen to something.  This has

8  been introduced as Government's Exhibit 523 and this is another

9  item that was found on Dr. Tao's KU computer.  If we could

10  please pull that up.

11          THE COURT:  It's 523 or 573?

12          MR. BARRY:  523.  Press pause, please.  523.

13          THE COURT:  523, okay.  Sorry.

14          MR. BARRY:  Can we please play that?

15          THE COURT:  Mr. Barry, is this supposed to be

16  transcribed?

17          MR. BARRY:  No, it's in English.

18  BY MR. BARRY:

19  Q.  Was that you in that call, Mr. Nguyen?

20  A.  Yes.

21  Q.  Was Dr. Tao the other speaker?

22  A.  Yes.

23  Q.  Did you know at the time that the call was being made that

24  Dr. Tao recorded it?

25  A.  No, I did not.

1   Q.   Do you speak Chinese?

2   A.   I do not.

3   Q.   When you worked with Dr. Tao, did you work in English?

4   A.   Yes.

5   Q.   I'd like to show you what's been marked as Government's

6   Exhibit 223.  Actually, we already did that one.

7        279, do you recognize that document?

8   A.   Yes.

9   Q.   What is it?

10  A.   It's an e-mail from Professor Tao to me.  I believe it was

11  Skype discuss.

12       MR. BARRY:  Government moves to introduce into

13  evidence Government's Exhibit 279.

14       THE COURT:  Any objection?

15       MR. ZEIDENBERG:  No objection.

16       THE COURT:  279 admitted.

17  BY MR. BARRY:

18  Q.   Can we start at the bottom, please.

19       So this is Dr. Tao talking about -- what's Riguka?

20  A.   It's a manufacturer to produce a variety of X-ray

21  equipment.

22  Q.   Let's scroll up a little bit.  Dr. Tao says, Thursday is no

23  problem.  As of now, I'm beginning electrostatic field and

24  electron trajectory stimulation process.  It will take some

25  time because it's new to me and there's some learning involved.

1       What are the two of you discussing here?

2    A.    We are talking about -- this is part of us building an

3    energy analyzer which is a component of the XPS.

4    Q.    Are you building the energy analyzer for Fuzhou here?

5    A.    Yes.

6    Q.    Scroll up a little bit, please.  And then you see Dr. Tao

7    says, great, we need to accelerate it.  There are markets.

8       When you received this in January 2019, what was your

9    understanding of what that sentence "there are markets" meant?

10   A.    I understood it that there are buyers who are willing to

11   potentially purchase this AP-XPS systems.

12   Q.    Does that relate back to what we talked about before lunch,

13   that Dr. Tao and you had the idea when you went to Fuzhou

14   University you would collaborate with a company and build and

15   sell AP-XPS?

16   A.    Yes.  Although this university and the companies are two

17   separate things.

18   Q.    How are they separate?

19   A.    I'm not entirely sure.  We don't talk about them.  It's

20   like it's a part of the Fuzhou hiring package, that's what I

21   meant.

22   Q.    Let's go back to 223.  And this is the e-mail titled

23   meeting with Philippe.  And I want to go to the bottom of the

24   e-mail, please, where Dr. Tao says, Hi, Luan.  We will have

25   meeting Tuesday 5:00 p.m. Kansas time.  I will attend from

1  Skype.  Philippe asked me one question before New Year.  Did

2  you get time to work it out?  Please reply me.  If you worked

3  it out, please do send me the results/solution.

4      Is this where Dr. Tao is asking you the status of a

5  particular project he asked you to work on?

6  A.   Yes.

7  Q.   Let's go back to the e-mail above that, please.  And you

8  say, Professor Tao, Philippe asked about preferred absorption

9  site of CO and Pt(100) and suggested to look into literature

10  for that information.  I did not have a chance to look into it.

11  I'm trying to finish the Fuzhou XPS system.  I will spend some

12  time on literature tomorrow morning.

13      So I want to focus on that sentence that says, I'm trying

14  to finish the Fuzhou XPS system.  Is that the system that the

15  schedule for the analyzer was related to that we looked at

16  earlier?

17  A.   Yes, correct.

18  Q.   And so were you essentially responding by saying I can't do

19  this one thing you want me to do because I'm working on this

20  other thing you told me to do?

21  A.   At that moment, yes.

22  Q.   I'd like to show you what's been marked as Government's

23  Exhibit 224.  Do you recognize this document?

24  A.   Yes.

25  Q.   What is it?

1    A.    It's an e-mail from Professor Tao to me, cc to Yu Tang.

2    Q.    It's to you and Yu Tang?

3    A.    Yes.

4         MR. BARRY:  Government moves to introduce into

5    evidence Government's Exhibit 224.

6         THE COURT:  Any objection?

7         MR. ZEIDENBERG:  No objection.

8         THE COURT:  224 admitted.

9    BY MR. BARRY:

10   Q.    So I want to go to the very bottom of this.  I think it's

11   on the second page.  It's an e-mail -- there we go.

12        This is from Dr. Tao and it says, Hi, Luan.  Please check

13   whether the price of the crystal is reasonable.  I remember

14   it's about 26K.  Can you check your ordering system of KU?

15        What is the crystal that Dr. Tao is referring to there?

16   A.    It is a crystal that is a component of the XPS as well.

17   Q.    And then if you go up a little bit you say, Professor Tao,

18   the 35K price is right.  That's what we paid from KU.

19        So when you were at KU, did you purchase one of these

20   crystals for the XPS system?

21   A.    I don't believe I did, but I have the information about the

22   pricing.

23   Q.    So you looked into some records to figure out --

24   A.    Yes.

25   Q.    -- what price KU paid for that crystal?

1    A.   Right.

2    Q.   You were building a similar machine at Fuzhou?

3    A.   Yes.

4    Q.   Let's go up a little bit more.  So you go back and forth.

5    And then I want to focus on the January 11th e-mail.  Right

6    there.

7         You say, Professor Tao, the new chamber designs for Fuzhou

8    were sent out to American company this Wednesday.  They will

9    need some time to review and get back to me.

10        So are these the designs that were referenced in that

11   schedule that Dr. Tao sent to you and Yu Tang to build the XPS

12   system for Fuzhou?

13   A.   Yes.

14   Q.   You were reporting to him here that you were trying to stay

15   on schedule and you had sent the designs to the American

16   company?

17   A.   Yes.

18   Q.   All right.  I'd next like to show you what's been marked as

19   Government's Exhibit 282.  Do you recognize that document?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's an e-mail from Ben Bowers to me labeled chamber with

23   mu-metal liners.

24   Q.   Who is Ben Bowers?

25   A.   Ben Bowers should be a sale representative, a sale manager,

1   yeah, from Anderson Dahlen.

2   Q.  If you look through the document, it's about ten pages.  Is

3   it -- does it appear to be an e-mail chain between you and

4   Mr. Bowers?

5   A.  Yes.

6        MR. BARRY:  Government moves to introduce into

7   evidence Government's Exhibit 282.

8        THE COURT:  Any objection?

9        MR. ZEIDENBERG:  No objection, Your Honor.

10       THE COURT:  282 admitted.

11  BY MR. BARRY:

12  Q.  So I want to start at the bottom.  This is page 8 if you

13  see the little red number at the bottom.  I want to start right

14  here.  I want to kind of go through this e-mail chain.  So you

15  see this e-mail that you send to Dustin Dahlke on September 7,

16  2018?

17  A.  Yes.

18  Q.  That's your signature block there that says post-doc in Tao

19  group, University of Kansas?

20  A.  Yes.

21  Q.  You say, Hello, Dustin.  Our group is putting together

22  another XPS system and need a couple chambers made, and you ask

23  for pricing.  Let's scroll up.

24      Mr. Dahlke responds, attaches a quote.  And that's from

25  September 18th.

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1656

1      And then let's go to the next e-mail.  And it looks like,

2  like any good salesperson, Mr. Bowers follows up, wants to know

3  if a decision has been made.

4      And you say on September 24th, Hello, Ben.  My PI is okay

5  with the quotation.  We are now working internally to see which

6  source will this be charged to.

7      Who was the PI you were referring to in that e-mail?

8  A.   Professor Tao.

9  Q.   And PI means principal investigator, right?

10  A.   Correct.

11  Q.   Let's keep scrolling up.  And you have another sales

12  follow-up concerning the chambers.  Do you still intend to

13  proceed with that order separately?

14      Let's keep scrolling up.  And then there's another quote

15  attached.  Let's keep going.  And it looks like they're giving

16  you some more information about the quote, right?  Is that

17  accurate?

18  A.   Yes.

19  Q.   And then you say in the next e-mail -- and it's split

20  between the pages, so if we can go to the bottom of page 5 to

21  just see the header.  You respond, Hello, Ben.  Thank you for

22  the quotations.  I will discuss this with my PI and let you

23  know.

24      And this again is referring to Dr. Tao?

25  A.   Yes, correct.

1   Q.  Let's keep scrolling up.  You have another follow-up from

2   the salesperson.  You respond essentially saying we're seeking

3   other bids.  And let's keep going.

4       Salesperson responds.  Let's keep going to the top.  You

5   were kind of -- are you bargaining here or are you kind of

6   saying, hey, we're thinking about whether we can get a

7   competing product from somebody else?

8   A.  I'm really thinking of looking to someone else.  I'm not

9   really bargaining.

10  Q.  Let's keep going up.  And there's another follow-up here,

11  November 2018.  Let's go to the top.  Another follow-up.  It

12  looks like they're on a calendar, they're pinging you every

13  month.

14      You respond, no decision has been made yet.  We're waiting

15  on quotations.

16      Let's see the response from Anderson Dahlen.  Completely

17  understand.

18      Let's go to the next e-mail and I want to pause there.  So

19  now this is -- we started this e-mail chain in September of

20  2018, right?

21  A.  Yes.

22  Q.  And now we're five months later, so we're in February of

23  2019, and you say to the sales rep from Anderson Dahlen, Hello,

24  Ben.  I have updates on my side about this project.

25      And then would you please read the next two lines for me?

1    A.    This now is a collaborative project from us with University

2    of Fuzhou in China.    Fuzhou will be paying for this project.

3    Therefore, I want to confirm that your company is willing to do

4    business with University of Fuzhou, China.

5         In addition, some specifications had changed regarding this

6    project.    Therefore, I had to make several changes to the

7    chambers.    Attached please find CAD files for three chambers:

8    Analysis chambers, mono chambers, and load lock chamber.    The

9    analysis chambers and mono chambers has changed quite a bit

10   since last designs.    The load lock chamber is pretty much the

11   same regarding the Mu-metal liner.    Only the analysis chamber

12   requires Mu-metal liner.    Can you requote me for the three

13   chambers to the University of Fuzhou?

14   Q.    So as of February 2019, you were trying to purchase these

15   chambers for Fuzhou?

16   A.    Yes, correct.

17   Q.    Why were you doing that?

18   A.    I was told by Professor Tao to do the quotations for the

19   AP-XPS in Fuzhou.

20   Q.    Did Professor Tao tell you because there was a

21   collaborative project between -- well, let me ask this.    This

22   now is a collaborative project from us with University of

23   Fuzhou.    So by definition, collaborative means multiple

24   parties, so one of the parties is University of Fuzhou.    When

25   you wrote this e-mail, who were the other parties or party that

1    was collaborating with Fuzhou?

2    A.    No one really.  I was just implying that this is -- now

3    Fuzhou is responsible for purchasing.  There's no collaborative

4    with the University of Kansas.

5    Q.    So when you wrote here, this now is a collaborative project

6    from us with University of Fuzhou, was that accurate?

7    A.    No, the collaborative term is not accurate.

8    Q.    I want to show you what's been marked as Government's

9    Exhibit 283.  Do you recognize this document?

10    A.    Yes.

11    Q.    What is it?

12    A.    It's an e-mail from Ben Bowers to me, Mu-metal -- chambers

13    with Mu-metal liners.

14    Q.    Is this an extension of that prior conversation we just

15    looked at?

16    A.    Yes, yep.

17            MR. BARRY:  Government moves to introduce into

18    evidence Government's Exhibit 283.

19            MR. ZEIDENBERG:  No objection.

20            THE COURT:  283 admitted.

21    BY MR. BARRY:

22    Q.    Okay.  So I want to start -- you'll see this is another big

23    exhibit.  And I want to start at page 3 to sort of orient us.

24    So this is the -- right there.  Yeah, a little bit up.

25        Is this the e-mail that we just looked at in the prior

1    chain?

2    A.   Yes, correct.

3    Q.   All right.  So let's keep going up to see what happens

4    next.  So Ben Bowers, the salesperson, sends you another quote.

5    And then let's keep going.

6        And there's another follow-up from Anderson.  And then

7    let's keep going.  I want to stop there.

8        So this is an e-mail from you and you say, Hello, Dustin

9    and Ben.  Can you update two things about the quotation?

10        It looks like that first one you're updating a

11    specification; is that right?

12   A.   Yes, correct.

13   Q.   Okay.  And then the second one you're saying -- can you

14   read that second point for me, please, just the sentence and

15   then the part where it says Fuzhou University?

16   A.   Yes.  The Fuzhou office would like you to change the

17   address on the quotation to their address, which is Fuzhou

18   University and the rest.

19   Q.   Okay.  And so this is February 27, 2019.  Why were you

20   telling Anderson that you wanted them to ship the equipment

21   that you were ordering to Fuzhou University?

22   A.   I was told this is where it needs to go to.

23   Q.   Who told you that?

24   A.   Professor Tao.

25   Q.   And let's keep going up.  Okay.  If we can zoom out a

1    little bit so we can see the full e-mail, please.

2        Okay.  And can you read this paragraph for me, please?

3    A.    Yes.  I spoke with our shipping department and we have not

4    been able to find a way to ship these chambers directly to

5    China.  We have never done direct business in Asia and we do

6    not have a customs officer that can support the shipping

7    paperwork.  We can ensure the packaging meets international

8    shipping standards, but we will need to have the University of

9    Kansas handle the shipment to China.  Can we work together to

10   accomplish this?  If not, we will likely not be able to accept

11   the order.

12   Q.    And then let's go to the next e-mail from you.  What did

13   you say in response?

14   A.    Hello, Ben, it is taking some time, but I'm looking to see

15   how I can take care of the shipping from my side.  I will let

16   you know once we decide.

17   Q.    Let's go to the next e-mail, please.  Can you read that,

18   please?

19   A.    Hello, Ben.  It has been decided that we can handle

20   shipping from our end.  We will go ahead with placing the

21   order.  In addition, I will send over the Mu-metal print

22   shortly.

23   Q.    So this is an e-mail from March 2019.  And in this e-mail

24   you use the passive voice in that first sentence.  You say it

25   has been decided that we can handle shipping from our end.  Who

1  decided that your -- you and others at KU would take placement

2  of this equipment and then ship it on to China?

3  A.   Internally between me and Professor Tao, two of us.

4  Q.   Okay.  And if you go to the top.  And then it looks like

5  Mr. Bowers is following up.

6  A.   Yes.

7  Q.   Did you ever take shipment of equipment from Anderson

8  Dahlen related to this e-mail?

9  A.   No.

10  Q.   I'd like to show you Government's Exhibit 284 and its

11  attachments which are 285 and 286.

12      Do you recognize these documents?

13  A.   Yes.

14  Q.   What are they?

15  A.   An e-mail from Professor Tao to me, yeah.

16  Q.   And is it an e-mail chain?

17  A.   Yes.

18      MR. BARRY:  The government moves to introduce into

19  evidence Government's Exhibit 284, 285, and 286.

20      MR. ZEIDENBERG:  No objection.

21      THE COURT:  284 through 286 admitted.

22  BY MR. BARRY:

23  Q.   So can you describe for the jury what's going on here?

24  A.   Professor Tao wants me to talk with him to see if these are

25  the correct -- this is the correct part for the X-ray

1    generator.

2    Q.    And do you know who sent him that e-mail below?  It looks

3    like he's forwarding something to you?

4    A.    Yeah, I do not recognize that from e-mail address.

5    Q.    Okay.  You see that it appears that whoever was at that

6    qq.com address they sent it to an e-mail of taofeng@fzu.edu.cn?

7    A.    Yes.

8    Q.    And it seems that e-mail was then somehow forwarded from

9    Dr. Tao's KU account to your KU account?

10   A.    Yes.

11   Q.    And then let's look at 285 and 286.  Are these just spec

12   sheets?

13   A.    Yes.

14   Q.    Let's look at 286, please.  Okay.

15        So is it fair to say that in April of 2019 Dr. Tao was

16   asking you whether the specification for the equipment listed

17   in this exhibit were appropriate for the laboratory being built

18   at Fuzhou?

19   A.    Yes.

20   Q.    Last thing I want to show you is Government's Exhibit 229,

21   230, and 230A, which is the translation.  And I just want to

22   know if you -- if any of this is familiar to you.  So you'll

23   see 229 is an e-mail, and you're not on that e-mail, right?

24   A.    Right.

25   Q.    It looks like it's an e-mail from Dr. Tao to himself?

1   A.   Yes.

2   Q.   And then 230 is in Chinese and you don't read Chinese,

3   right?

4   A.   Correct.

5   Q.   Let's go to 230A.

6        MR. BARRY:  The government moves to introduce into

7   evidence 229, 230, 230A.

8        MR. ZEIDENBERG:  No objection.

9        THE COURT:  229, 230, 230A admitted.

10  BY MR. BARRY:

11  Q.   Let's start with 229 actually just so the jury can see what

12  we're talking about.  So this is an e-mail from Dr. Tao's KU

13  e-mail address to his KU e-mail address from January 2019 and

14  there's an attachment.  And then let's go to 230A which is the

15  English translation.  There's the original attachment.  Okay.

16       So I want you to take a minute to read this, Mr. Nguyen,

17  and I want to know whether -- and you can read this first

18  paragraph -- well, first question is have you ever seen this

19  first document before?

20  A.   No, I have not.

21  Q.   I want to see if this first paragraph where it says a high

22  precision photoelectron spectrometer is a large scale precision

23  analysis apparatus widely used in energy -- and that project

24  summary, could you read that project summary for us, please?

25       THE COURT:  And please read slowly.

1    THE WITNESS:  Yes.  A photoelectron spectrometer is a

2  high precision, large scale instrument that is essential for

3  manufacturing enterprises and research institutes.  However, at

4  present there are no domestic markets.  Every year China

5  imports 100-200 instruments from other countries (Europe,

6  Japan) at an average cost between 5 millions to 6 millions and

7  with a life cycle of approximately six to eight years.  As the

8  national economy adjusting to its new economic structure and

9  adopting a new economic direction toward technology-intensive

10  sectors, China's demands for high precision, large scale

11  analysis instruments will increase.  It is estimated that

12  between 2020 and 2030 China will purchase 200-250 such

13  instruments annually.

14  BY MR. BARRY:

15  Q.  And then I want to go to page 3.  And I want you to look at

16  these.  Can you just read the bolded for each phase?

17  A.  Phase one:  Build product prototypes (one vacuum

18  photoelectron spectrometer and one near ambient pressure

19  photoelectron spectrometer).  (The prototypes will be real

20  products and can be sold.)

21  Q.  Can you read phase two, please?

22  A.  Phase two:  Funding estimate for an annual output of ten

23  instruments.

24  Q.  Phase three?

25  A.  Phase three:  Annual production of 60 photoelectron

1    spectrometers.

2    Q.    You said you've never seen this document before, right?

3    A.    Correct.

4    Q.    When we started, you said that one of the things you talked

5    with Dr. Tao about was this idea of creating a company in China

6    to sell AP-XPS?

7    A.    Yes.

8    Q.    Does this, what you just read, relate to that idea?

9    A.    Yes.

10    Q.    And did Dr. Tao ever tell you that the idea at least had

11    been something that he had written in as a project that he was

12    applying for funding for?

13    A.    No, he did not tell me that.

14    Q.    So to recap, all those e-mails we looked at where you were

15    working on purchasing equipment to help build a laboratory at

16    Fuzhou, you were doing that because Dr. Tao asked you to do it?

17    A.    Yes.

18    Q.    And at some point Dr. Tao offered you a job to work at

19    Fuzhou University?

20    A.    He passed along the offer.

21    Q.    And you were -- you applied through him as well, right?

22    A.    Yes, correct.

23    Q.    Okay.  And you went with Dr. Tao to Fuzhou to meet with

24    folks there, including Yu Tang and Su Siwen?

25    A.    Yes.

1  Q.  Did you ultimately accept that job?

2  A.  I did not.

3          MR. BARRY:  No further questions.

4          MR. ZEIDENBERG:  Could I have just one moment, Your

5  Honor?

6          THE COURT:  Yes.

7                      CROSS-EXAMINATION

8  BY MR. ZEIDENBERG:

9  Q.  Good afternoon.

10 A.  Good afternoon.

11 Q.  Is it Dr. Nguyen?

12 A.  You can call me Mr. Nguyen, it's fine.

13 Q.  Mr. Nguyen, you -- there were a whole bunch of quotes that

14 you were forwarding on.  Do you remember Mr. Barry showing

15 those to you?

16 A.  Yes.

17 Q.  Documents like 283 which he just showed you a short while

18 ago.  Showing you 283.  Do you remember seeing a document like

19 this?

20 A.  Yes.

21 Q.  This was a quote, right?

22 A.  Yes.

23 Q.  It's not a purchase order, correct?

24 A.  No, no.

25 Q.  You're just passing along quotes?

1  A.  Yes.

2  Q.  And at one point these quotes were being passed along to

3  Fuzhou so that Fuzhou, if they wanted it, they would pay for

4  it?

5  A.  They would pay for it, yes.

6  Q.  Right.  So the money was coming from Fuzhou for equipment

7  that Fuzhou would use and keep at Fuzhou, correct?

8  A.  Yes, correct.

9  Q.  And Mr. Barry showed you three documents that were

10  purchased with a credit card that you had access to.  It was

11  265, 266, and 267.  I just want to remind the jury what that

12  looks like.

13      This was not for equipment, was it?

14  A.  No.

15  Q.  This was just for publication rights for an article?

16  A.  Yes.

17  Q.  Okay.  So that would -- so it wouldn't run afoul of

18  copyright?

19  A.  Right.

20  Q.  And there was three such purchases that Mr. Barry -- that

21  was 265.  This is 266.  They all look very, very similar,

22  right?  This is just a different journal, Journal of Catalysis?

23  A.  Right.

24  Q.  And the third one was 266.  And again, this is for a

25  different publisher for science, right?

1   A.   Yes.

2   Q.   And again, not equipment, a relatively small amount of

3   money, like $140 or something; is that right?

4   A.   About right, yeah.

5   Q.   And someone from Fuzhou paid for that on their own credit

6   card?

7   A.   Right.

8   Q.   And this is different than the quotes which were going to

9   Fuzhou University?

10   A.   Different.

11   Q.   Now, the AP -- and Mr. Barry, by the way, he showed you a

12   schedule for a AP-X machine, you know that Dr. Tao had sent a

13   very -- what he said was a very ambitious schedule?

14   A.   Yes.

15   Q.   And that actually was never met, right?

16   A.   No, we did not finish that schedule.

17   Q.   Now, you were a -- you never purchased anything related to

18   these quotes, correct?

19   A.   Me, no, I did not place any purchase for those, no.

20   Q.   Okay.  You just passed them along?

21   A.   Yes.

22   Q.   You were a graduate student at Notre Dame with Dr. Tao,

23   correct?

24   A.   Yes, correct.

25   Q.   And you selected him to be your adviser, correct?

1  A.    Correct, yes.

2  Q.    And why was it that you decided to select Dr. Tao as your

3  adviser?

4  A.    At that time I look at his publications and the field that

5  he was working in, I thought it was interesting.  And he seemed

6  to be very productive, and so I decided to join his group.

7  Q.    And you worked with him at Notre Dame and then you moved to

8  KU with him when he moved, correct?

9  A.    Yes.

10  Q.    And can you tell us a little bit about what it was like --

11  what you observed about Dr. Tao and how it was working with

12  him?

13  A.    Fast pace.  He set high expectation to the students simply

14  because -- well, he also was -- spent a lot of time working,

15  trying to be productive so he expect the same from his

16  students.  Always checking up on his students very often.  And

17  yeah.

18  Q.    What about his work hours?

19  A.    I have to estimate probably 14 hours a day, 16ish, and six

20  days a week.  Sundays probably less than that, but still part

21  of Sunday he does work, yeah.

22  Q.    So fair to say he was working seven days a week?

23  A.    Oh, yeah, yeah.

24  Q.    And no days off for vacations or holidays or things like

25  that?

1  A.  Not that I'm aware.

2  Q.  And so you came with him to Kansas in 2014, correct?

3  A.  Correct, yes.

4  Q.  And I want to direct your attention back to the fall of

5  2018.  Okay?

6  A.  Okay.

7  Q.  Fall of 2018 Dr. Tao was teaching at Kansas, correct, that

8  semester?

9  A.  Yes.

10  Q.  Teaching a chemistry class, right?

11  A.  Yeah.

12  Q.  And the next semester, which would have been the spring of

13  2019, as far as you understood Dr. Tao had a buyout, were you

14  aware of that?

15  A.  Yeah, I was aware of that he wasn't teaching class.  That's

16  what I knew.

17  Q.  And when he was off campus in the spring of 2019, how was

18  it that you were able to -- well, tell us how he was

19  supervising the lab, those of you graduate students such as

20  yourself in his lab at KU?

21  A.  Mostly through e-mail communications and phone calls.

22  Almost perhaps every two days or sometime daily, yeah.

23  Q.  And were you getting constant direction and feedback from

24  him?

25  A.  Yes.

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1672

1   Q.   At any point did you feel like he had abandoned you or you

2   didn't know what you were supposed to do or the lab was

3   floundering in any way?

4   A.   No.

5   Q.   Did the research that you were working on -- you were

6   working on grants that Dr. Tao had brought in?

7   A.   Right.

8   Q.   And what were his expectations for the work on those

9   grants?

10  A.   Well, results, on-time results.

11  Q.   And did he have high standards for that work?

12  A.   Yes.

13  Q.   Was the work as far as you could see on those grants all

14  done and completed satisfactorily?

15  A.   That -- to the best of our capability.  I don't know if

16  it's to satisfaction because I don't know the original

17  proposal.

18  Q.   You were working very hard.  Were you the only one working

19  on it or were there others there as well?

20  A.   There are others.

21  Q.   Now, you went with Dr. Tao -- well, Dr. Tao at some point

22  talked to you about possibly going to China and working at

23  Fuzhou; is that correct?

24  A.   Yes, correct.

25  Q.   And when you -- at some point you went with him.  When was

1    it, early 2019?

2    A.    Yes, early 2019.

3    Q.    And you did that on your own dime, so to speak?  You paid

4    for that trip?

5    A.    I paid for it, yep.

6    Q.    And from -- how long were you there?

7    A.    Roughly a week.

8    Q.    And is it fair to say that at that time you were there you

9    never saw an office with Dr. Tao's name on it?

10   A.    I did not see name plate, no.

11   Q.    Is it fair to say that while -- the observations you were

12   making there, it was your impression that Dr. Tao was

13   collaborating with people at Fuzhou?

14   A.    Yeah, it looks like he was working with people at Fuzhou

15   University, yes.

16   Q.    When you say "working with," you're making a distinction,

17   are you not, between working with and working for?

18   A.    Yes.  I do not know if he was working for Fuzhou

19   University.  From what I saw, I can say for certain he was

20   working with people at Fuzhou University.

21   Q.    And fair to say he never told you he had accepted the job

22   at Fuzhou University, correct?

23   A.    He never said, no.

24   Q.    And you mentioned -- Mr. Barry asked you at the very end

25   about this job offer, and he asked you if Dr. Tao made you a

1  job offer, and you said, well, he passed along a job offer; is

2  that right?

3  A.  Yes, I did, yep.

4  Q.  When he did that, is it fair to say that you understood

5  that he was conveying an offer from Fuzhou, he was not making

6  an offer to you?

7  A.  Yeah, he was conveying an offer.

8  Q.  He was passing it along?

9  A.  Yes.

10 Q.  And isn't it true, Mr. Nguyen, that one of your concerns

11 when you were considering whether to take that job offer is you

12 were concerned that Dr. Tao would not be there when you came if

13 you accepted it?

14 A.  No, that was not one of my concerns.  Mainly I was thinking

15 about my family.  It's an international job.

16 Q.  I'm sorry.  You mumbled there at the very end.

17 A.  I was mainly considering my family opinions because it is

18 an international job, so yeah.

19 Q.  So he never told you that he would be there or that he had

20 made a commitment to Fuzhou, had he?

21 A.  Correct.

22 Q.  Now, you were interviewed by the -- Mr. Barry and Agent

23 Lampe back in October of 2021, correct?

24 A.  Yes.

25 Q.  About four months ago?

1    A.    Yes, yep.

2    Q.    And that was in Grand Rapids?

3    A.    Grand Rapids.

4    Q.    And they told you they were recording the interview?

5    A.    Yes.

6    Q.    And do you recall at the beginning of the interview that

7    Mr. Barry told you that, you know, but the unfortunate reality

8    is, you are a witness to a crime, right?  Do you remember him

9    telling you that?

10   A.    Yeah.

11   Q.    And was that news to you?

12   A.    Well, yeah, in a sense.  I wasn't aware that I was a

13   witness to a crime, no.

14   Q.    Did you feel that you had witnessed any criminal conduct?

15   A.    Not to my knowledge, no.

16   Q.    And during that interview a little bit later, Mr. Barry

17   says to you, but the reality is, you know, Dr. Tao committed

18   fraud and we think you obviously have information about how

19   that fraud was committed.  Do you remember him telling you

20   that?

21   A.    Yes.

22   Q.    And from that questioning and the way he started that

23   interview, was it your impression that he was trying to get

24   information from you or he was trying to persuade you about a

25   certain set of facts?

1   A.   Well, certainly trying to get information from me, yeah.

2   Q.   You told about this AP-X -- let's talk about the AP-XPS

3   machine a little bit.

4   A.   Yes.

5   Q.   Now, you're aware, Mr. Nguyen, that this was a device --

6   the XPS machine was invented over 50 years ago, correct?

7   A.   A while, yes.

8   Q.   This was not a machine that was invented by Dr. Tao or your

9   group in KU or Notre Dame or anything else, correct?

10  A.   Correct.

11  Q.   In fact, the person who invented it back in the late '60s

12  or early '70s ended up getting the Nobel Prize for it, correct?

13  A.   Yes, correct.

14  Q.   And it's a very large, very sophisticated machine that only

15  a couple companies in the world build, correct?

16  A.   Yes.

17  Q.   And one is in Germany and one is in Sweden; is that right?

18  A.   Right.

19  Q.   And if you want one, you can just buy one, correct?

20  A.   Yes, correct.

21  Q.   They cost, you know, a lot of money and it takes a long

22  time to build, correct?  They build it for you?

23  A.   Yes.

24  Q.   You don't just like order it on -- and click and they send

25  it to you; they have to construct it?

1  A.  Right, yes.

2  Q.  And when there were questioning -- Mr. Barry was

3  questioning you about making one or building one, isn't it fair

4  to say that what you're really talking about is you're just

5  assembling the components?

6  A.  For the most part, yes.  There are component to assembles

7  and there are customs components that -- specifics from our

8  design.

9  Q.  And you are a -- your background is in chemistry, correct?

10 A.  Yes.

11 Q.  And Dr. Tao's background is in chemistry?

12 A.  Yes.

13 Q.  And it would take an electrical engineer to actually build

14 an AP-XPS machine, you know, to construct that?

15 A.  The component, yes.

16 Q.  You don't have the know-how to do it; Dr. Tao does not have

17 the know-how to do it, correct?

18 A.  Yes.

19 Q.  Is it fair to analogize the references to building an AP-X

20 machine to an analogy of someone saying I'm going to build a

21 stereo by buying all these different components and then

22 assembling them, knowing how -- the right cables and the right

23 setup and the right matching these components so that they

24 marry together well, is that the sense you're building an AP-X

25 machine?

1  A.   Partly.  Most of it, yes, is assembling, but like I said,

2  there are components custom made that we put in as well, yep.

3  Q.   And when you were talking about building this, and there

4  were quotes, these were quotes from one of the two companies

5  that we're talking about, SPECS?

6  A.   Yes.

7  Q.   This business about selling XPS machines, you told the

8  government that what it sounded to you was like throwing out

9  brainstorming, you know, just brainstorming ideas?

10  A.   Right.

11  Q.   And you never discussed with Dr. Tao who was going to own

12  the business or how the business would be divided, correct?

13  A.   Correct.

14  Q.   And you told Mr. Barry you had no recollection of the PRC

15  government ever being mentioned as part of this business,

16  correct?

17  A.   Correct.

18  Q.   And you said you had no idea what relationship, if any,

19  there was between this potential business idea and Fuzhou,

20  correct?

21  A.   Correct.

22  Q.   You said you were brainstorming an idea?

23  A.   Right.

24  Q.   And you never actually built any of these proposed XPS

25  machines at Fuzhou, correct?

1  A.  No, not...

2  Q.  You never sold a machine to anyone, correct?

3  A.  Correct.

4  Q.  You never built an AP-X machine for Fuzhou?

5  A.  Physically, no.  We could only get to the designing stage.

6  Q.  You simply got quotes for the parts?

7  A.  Yes.

8  Q.  You never shipped any equipment to China, correct?

9  A.  I did not.

10  Q.  So during this interview in October of 2021 do you recall

11  the government, the FBI and Mr. Barry, starting to show you a

12  whole series -- they had 300 photographs of lab that they

13  wanted you to identify.  Do you remember that?

14  A.  Yes.

15  Q.  And you were looking at the pictures and you recognized

16  them, right?

17  A.  Yes.

18  Q.  It was your Notre Dame lab?

19  A.  Some Notre Dame and some Kansas lab as well.

20  Q.  And Kansas?

21  A.  Yeah.

22  Q.  And did the government appear surprised that it wasn't the

23  lab at Fuzhou that they were showing you?

24  A.  No.  I didn't feel they were surprised.

25  Q.  Okay.  So they were showing you pictures of your lab at

1    Kansas and your lab at Notre Dame?

2    A.   Yes.

3    Q.   Now, you did tell the government when you were interviewed

4    that -- going back to this job offer that was passed along to

5    you, that it wasn't clear to you that you would necessarily be

6    working with Dr. Tao if you accepted the position.  Do you

7    recall telling them that?

8    A.   Yes.

9    Q.   You told the government in your interview that you thought

10   that if you took the job, perhaps in the future you might work

11   with Dr. Tao because you didn't know where he will be in the

12   future, if he will continue to stay at Kansas or go somewhere

13   else, and if he goes somewhere else, how likely is it to be

14   Fuzhou.  Do you recall saying that?

15   A.   Yes.

16   Q.   And you also told the government that Dr. Tao never said to

17   you that he would be going to Fuzhou in the future?

18   A.   Right.

19   Q.   You also told the government that no one ever said to you

20   that if you accepted the job at Fuzhou, you would be working

21   with Dr. Tao in any capacity?

22   A.   Right.

23   Q.   You told the government that you were considering taking

24   the job and if you had done so, the only person you would have

25   for sure known at Fuzhou was Yu Tang?

1    A.    Right.

2    Q.    And that you did not know if Dr. Tao was going to be there?

3    A.    Right.

4    Q.    In May -- in May 2019 when you were at Fuzhou, your

5    thinking was that Dr. Tao might possibly work there in the

6    future?

7    A.    Possibly.

8    Q.    Now, when you told the government this in October 2021,

9    that you did not know if Dr. Tao worked there and you had no

10   information about what his future plans were in relation to

11   Fuzhou, and you didn't know if he was going to be there if you

12   took the job, did they seem frustrated, Mr. Barry seem

13   frustrated with that answer?

14   A.    Suspicious.

15   Q.    And do you recall him trying to persuade you that Dr. Tao

16   had in fact accepted a job at Fuzhou?

17   A.    No, not persuasion but reassuring that I don't forget

18   anything.

19   Q.    That you what?

20   A.    That I don't forget anything.

21   Q.    Do recall him doing what he said was a compare and

22   contrast?  Do you remember that?

23   A.    Compare and contrast between --

24   Q.    Dr. Tao and Yu Tang?

25   A.    Yes, yes.

1  Q.   Now, to remind everybody, Yu Tang was a former colleague of

2  yours at KU, correct?

3  A.   Correct.

4  Q.   And he definitely took a job back at Fuzhou, correct?

5  A.   Correct.

6  Q.   And he went back and when you were there, you could -- you

7  saw him and he was working there?

8  A.   Yes.

9  Q.   And do you recall Mr. Barry telling you, well, let's do a

10  compare and contrast.  You see Yu Tang there.  You see Dr. Tao

11  there.  You see Yu Tang has got a Fuzhou e-mail address.

12  Dr. Tao has a Fuzhou e-mail address.  And he went through these

13  other factors and then he said, so I'm going to ask you again,

14  wasn't Dr. Tao working there, and you again said I don't know.

15  Is that about right?

16  A.   Right.

17  Q.   Dr. Tao never told you not to discuss any of the work you

18  were doing, keep it secret, right?

19  A.   The work at Kansas or --

20  Q.   Fuzhou.

21  A.   We said -- not to keep it secret but not to mention the

22  trip to other.

23  Q.   Fair to say from what you were seeing -- from what you saw,

24  it looked like Dr. Tao was collaborating with his colleagues at

25  Fuzhou?

1    A.    That's as far as I could tell, right.

2    Q.    By the way you never accepted that job, correct?

3    A.    I did not.

4    Q.    And if there was a grant application to a Chinese -- the

5    National Science Foundation of China that listed you as an

6    employee of Fuzhou, that would be completely false, correct?

7    A.    Correct, yes.

8    Q.    And you had -- would have no knowledge of that, correct?

9    A.    Right.

10    Q.    And would that make you question who wrote such a document

11    if it had what you know as false information in it?  Would it

12    cause you to question that document?

13    A.    Yes.

14            MR. ZEIDENBERG:  I have no further questions, Your

15    Honor.

16                    REDIRECT EXAMINATION

17    BY MR. BARRY:

18    Q.    Mr. Nguyen, you and I met a few times in advance of today,

19    right?

20    A.    Yes.

21    Q.    I got to enjoy Grand Rapids, Michigan, where you're from?

22    A.    Yeah.

23    Q.    We talked about a lot of different things, some of which

24    we've talked about today, right?

25    A.    Right.

1    Q.   What was the one thing that I told you?  If you don't

2    remember any of our other conversations, this is the one thing

3    I want to make sure that you remember to do.

4    A.   Tell the truth.

5              MR. BARRY:  No further questions.

6              THE COURT:  May Dr. Nguyen be excused?

7              MR. BARRY:  Yes, Your Honor.

8              THE COURT:  You're excused.  Thank you.

9              All right.  You can call your next witness.

10             MR. OAKLEY:  United States calls Morgan Becker.

11                          MORGAN BECKER,

12   called as a witness on behalf of the government, having first

13   been duly sworn, testified as follows:

14             MR. OAKLEY:  Your Honor, pursuant to the stipulation I

15   would offer Government's Exhibit 700C, which is a CD containing

16   Bank of America records.

17             THE COURT:  700C is admitted.

18             MR. OAKLEY:  702, that contains records of JPMorgan

19   Chase Bank.

20             THE COURT:  702 admitted.

21             MR. OAKLEY:  704, that contains JPMorgan Chase records

22   related to wire transfers.

23             THE COURT:  704 admitted.

24             MR. OAKLEY:  705, that's a DVD containing records from

25   Old National Bank.

1    THE COURT:  705 admitted.

2    MR. OAKLEY:  700, that contains records -- additional

3  records related to Bank of America.

4    THE COURT:  700C has been admitted.  But this is just

5  700?

6    MR. OAKLEY:  Yes, Your Honor.

7    THE COURT:  700 admitted.

8    MR. OAKLEY:  700A, that contains printed additional

9  bank records from Bank of America that are printed, 700A.

10    THE COURT:  700A admitted.

11    MR. OAKLEY:  700B, that is also a printed document

12  containing additional Bank of America records.

13    THE COURT:  700B admitted.

14    MR. OAKLEY:  701, they are additional bank records.

15    THE COURT:  701 admitted.

16    MR. OAKLEY:  703, that are printed JPMorgan Chase

17  records.

18    THE COURT:  703 admitted.

19    MR. OAKLEY:  705, that's a Bank of America signature

20  card.

21    THE COURT:  705 admitted.

22    MR. OAKLEY:  And 706, 707, and 708 that are custodian

23  certifications related to bank records.

24    THE COURT:  706, 707, 708 admitted.

25    MR. OAKLEY:  Thank you, Your Honor.

1                        DIRECT EXAMINATION

2    BY MR. OAKLEY:

3    Q.   Ma'am, could you please state and spell your name for the

4    record?

5    A.   Morgan Becker, M-o-r-g-a-n B-e-c-k-e-r.

6    Q.   How are you employed?

7    A.   I'm a forensic accountant with the FBI.

8    Q.   How long have you been a forensic accountant with the FBI?

9    A.   Two years.

10   Q.   I want to talk to you a little bit about your educational

11   background.  Do you hold any degrees?

12   A.   I do.  I have a bachelor's degree in accounting and a

13   master's degree in accounting as well.

14   Q.   I want to hand you some exhibits.

15              THE COURT:  I will say that you did not offer 705A.

16   Was that an oversight?

17              MR. OAKLEY:  It is.  I would offer 705A, Your Honor.

18              THE COURT:  705A admitted.

19   BY MR. OAKLEY:

20   Q.   Were you asked to prepare a summary of some bank records

21   that were obtained during this investigation?

22   A.   I was.

23   Q.   And did you prepare a PowerPoint that's a summary of those

24   records?

25   A.   Yes.

1   Q.   I'm going to hand you what's been marked as Government's

2   Exhibit 711 and ask you if you recognize that.

3   A.   Yes, I do.

4   Q.   What is that?

5   A.   This is a PowerPoint presentation put together that

6   contains all the international transactions that were found

7   with Mr. Tao's accounts.

8          MR. ZEIDENBERG:  Your Honor, could we approach for a

9   moment?

10          THE COURT:  Yes.

11      (The following proceedings were had at the bench).

12          MR. ZEIDENBERG:  I'm not sure what -- this is 711?

13          MR. OAKLEY:  This is 711.  This is the PowerPoint I

14   sent you that we discussed the other night.

15          MR. ZEIDENBERG:  So this is the only exhibit that's

16   coming in with this witness?

17          MR. OAKLEY:  Yes, the summary of the international.

18          MR. ZEIDENBERG:  I have it.

19          MR. DEARINGTON:  They're not going over the -- you

20   aren't going over any -- after the introduction of the exhibits

21   you just did, those are done now?

22          MR. OAKLEY:  Yes.

23          MR. DEARINGTON:  Okay.

24      (Thereupon, the proceedings continued in open court.)

25   BY MR. OAKLEY:

1    Q.    Are you familiar with Government's Exhibit 711?

2    A.    I am.

3    Q.    What is it?

4    A.    This is a PowerPoint presentation put together containing

5    Mr. Tao's international transactions.

6    Q.    And did you prepare this PowerPoint?

7    A.    I did.

8            MR. OAKLEY:    Your Honor, I offer Government's Exhibit

9    711.

10           MR. ZEIDENBERG:    No objection.

11           THE COURT:    711.

12           MR. ZEIDENBERG:    For demonstrative purposes.

13           THE COURT:    Is this a 1006 summary or is this a

14    demonstrative exhibit?

15           MR. OAKLEY:    It's a summary, Your Honor.

16           THE COURT:    1006?

17           MR. OAKLEY:    Yes, Your Honor.

18           THE COURT:    I'll admit it under that.    It's based on

19    these other exhibits that you've had admitted into evidence,

20    these voluminous bank records?

21           MR. OAKLEY:    Yes, Your Honor.    I can lay foundation

22    for that.

23           THE COURT:    Okay.    Go further.

24    BY MR. OAKLEY:

25    Q.    Government's Exhibit 711, that's the PowerPoint you

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1689

1    prepared.  What did you use to prepare that exhibit?

2    A.   I used records from JPMorgan Chase, Bank of America, and

3    Old National Bank and was able to pull all the international

4    transactions from those records to put this together.

5    Q.   Those are the CDs, perhaps DVDs, and then some paper

6    records that are sitting on the witness stand in front of you?

7    A.   That is correct.

8              MR. OAKLEY:  Your Honor, I offer Government's Exhibit

9    711.

10             MR. ZEIDENBERG:  No objection.

11             THE COURT:  711 is admitted under Rule of Evidence

12   1006.

13   BY MR. OAKLEY:

14   Q.   And so you said this PowerPoint presentation is a summary

15   of those records.  And what is contained -- what information is

16   contained in 711?

17   A.   711 has screenshots of the actual bank records containing

18   the international transactions.

19   Q.   Were you asked to identify during the years 2017 through

20   2019 any international transactions from the defendant's bank

21   records that the FBI had?

22   A.   That is correct.

23   Q.   And so this is a summary of international transactions?

24   A.   Yes.

25   Q.   Now, when we say international, is it just limited to China

1    or is it any international transactions?

2    A.   Any international transaction.

3    Q.   Can we please go to the next slide.

4         You said this contains screenshots and so it appears to me

5    that this is a Bank of America bank statement in this

6    particular slide; is that correct?

7    A.   Yes.

8    Q.   Can we scroll up to the top where it says Bank of America.

9         Does this relate to the last four, 3934?

10   A.   Yes, it does.

11   Q.   Can we please scroll back.

12        And so there's some highlighted portions on this.  What are

13   the highlighted portions?

14   A.   The highlighted portions are the international

15   transactions.

16   Q.   And so on the left under withdrawals and other subtractions

17   can we show that?

18        And so on this particular one there's an international

19   transaction -- or there's two that appear to be in the amount

20   of $146.85; is that correct?

21   A.   Yes.

22   Q.   Could we zoom back out and go to the right?

23        Now, how were you able in going through the bank records to

24   determine the international transactions?

25   A.   Under the service fees section there is an international

1  transaction fee that applies with all international

2  transactions.

3  Q.  Can we highlight that portion?

4      In this particular instance for the two withdrawals that we

5  looked at for the $146.85, there appears to be two service fees

6  related to each of those?

7  A.  Yes.

8  Q.  And this particular slide shows a Bank of America bank

9  account?

10 A.  That is correct.

11 Q.  Is that a bank account that's located in the United States?

12 A.  Yes.

13 Q.  When someone uses a debit card or a bank card on a United

14 States bank account overseas, is it your understanding that

15 there's typically an international fee that's associated with

16 that?

17 A.  Yes.

18 Q.  And so in examining these bank accounts, is that what you

19 looked for to determine whether or not there was an

20 international transaction?

21 A.  Yes.

22 Q.  And so if we could please scroll to the next slide.

23     Let me back up.  This first section of the PowerPoint, does

24 this relate to this particular account ending in 3934?

25 A.  Yes.

1    Q.    And it's a Bank of America account?

2    A.    Yes.

3    Q.    And so on the previous slide on the statement, we saw two

4    transactions of $146.85.  Then the service fee, correct?

5    A.    Yes.

6    Q.    And so if we could go to the next slide.  And so is this

7    just a summary of that month of June of 2017, there were those

8    two transactions plus the fees that totalled $302.52?

9    A.    That is correct.

10    Q.    Now, does this slide only contain information for months in

11    which there was an international transaction?

12    A.    Yes.

13    Q.    And so could we show the next slide, please.  And so could

14    we highlight the left portion.

15         So the previous slide were for transactions in June of

16    2017.  The date on this is July 9th of 2018?

17    A.    Yes.

18    Q.    And so was this the next transaction where you observed an

19    international fee and so therefore able to identify an

20    international transaction?

21    A.    Yes.

22    Q.    And this -- and then on the right is the service fee that's

23    associated?

24    A.    That is correct.

25    Q.    Okay.  Could we go to the next slide.

1    And so in -- after June of 2017, the next international

2    transaction for this particular account was in July of '18

3    related to cash withdrawals in Japan?

4    A.   Yes.

5    Q.   Could we go to the next slide, please.  Could you highlight

6    the lower left portion.

7    And so for this particular account the next international

8    transaction was October 2018 in Xiamen City in the amount of

9    287.87?

10   A.   Yes.

11   Q.   Scroll back out.  And the associated service fees with that

12   transaction?

13   A.   Correct.

14   Q.   Could we please show the next slide.

15   So that's October of '18?

16   A.   Yes.

17   Q.   Next slide, please.

18   So this was a $13.95 transaction in December of 2018?

19   A.   Yes.

20   Q.   Could we please show the next slide.

21   And that's a summary of the 2018 expenses?

22   A.   Yes.

23   Q.   And then keeping in this same account, the Bank of America

24   3934, could we show the next slide, please.

25   And so this is one in January of 2019.  What was the amount

1  of the transaction on January 18, 2019?

2  A.  $196.35.

3  Q.  And so we're now into 2019?

4  A.  That is correct.

5  Q.  Can we show the next slide.  And can we show the next

6  slide.

7      So this is the next statement for that particular account

8  in 2019?

9  A.  Yes.  That had an international transaction.

10 Q.  And so the first one was January.  The next international

11 transaction for this account was what month?

12 A.  April.

13 Q.  It appears as though there were two transactions in April?

14 A.  That is correct.

15 Q.  Can we show the next slide?  Can we show the next slide,

16 please?  And could we highlight -- show the first highlighted

17 one, please?

18     So after April for this particular account, the next

19 international transaction was in June on -- specifically on

20 June 15th and 16th?

21 A.  Yes.

22 Q.  Could we please scroll out and go to the next one?

23     And can we go to the -- to the -- are you able to see a

24 year on this slide?  Let me have you look at your paper copy.

25 On each of these you put a summary at the end of the slides.

1    Can you tell us what month and year we're in?

2    A.    Yes.   So it appears that we have -- let me see here --

3    switched bank accounts.   This is no longer a bank account

4    ending in 3934.   And we have transitioned to Bank of America

5    account ending in 3075.   And these took place in June and July

6    of 2017.

7    Q.    '17.   Can we move forward two slides to the summary that

8    relates to these?

9        And so we're now on a different account and we're back to

10   2017?

11   A.    That is correct.

12   Q.    And so in the records -- and this is another Bank of

13   America account, but this one ends in 3075?

14   A.    Yes.

15   Q.    And again we're in 2017?

16   A.    Yes.

17   Q.    Okay.   Can we go back to the slide just -- yes, to that

18   one.   And can you show the other highlighted portions, please?

19   And the next highlighted portion.   And the next slide, please.

20       So here is the summary that we just looked at and this is

21   2017, June and July, correct?

22   A.    Yes.

23   Q.    Can we go to the next slide?

24       Are we still in 2017?

25   A.    We are, yes, December of 2017.

1  Q.  Okay.  And can you show those international charges that

2  are highlighted.

3      So this is in December?

4  A.  Yes.

5  Q.  And next slide, please.

6      So we're still in the 3075 bank account, correct?

7  A.  Yes.

8  Q.  So this is December.  Can we show the next slide?

9      And so are we now in May of 2018?

10  A.  Yes.

11  Q.  Does it appear that there was a credit or can you tell?  We

12  can zoom out.

13  A.  Yes.  This is in the credit section so this is a return.

14  Q.  And, again, we're in the bank account ending in 3075 in May

15  of 2018?

16  A.  Yes.

17  Q.  Next slide, please.  And so with the credit and the

18  purchases, the total was 44.72?

19  A.  That is correct.

20  Q.  Can we go to the next slide?  And can you highlight the

21  international?

22      And some of these are -- were in Japan; is that correct?

23  A.  Yes.

24  Q.  And so again, it's all international transactions that you

25  were able to identify in these bank accounts?

1    A.    Correct.

2    Q.    For this relevant time period?

3    A.    Yes, that is correct.

4    Q.    Can we go to the next slide, the summary slide?

5          And so that was June of 2018?

6    A.    Yes.

7    Q.    Now, the -- so the number at the bottom of each slide is

8    the total for that particular month, correct?

9    A.    Correct.

10   Q.    Can we go to the next slide?

11         And are these the international transactions for the

12   account ending in 3075 in July of 2018?

13   A.    Yes.

14   Q.    If you could just highlight the whole bottom half of that

15   section.  If we could go to the next slide, please.

16         So in July of 2018 for the 3075, that's the total of the

17   transactions?

18   A.    Yes.

19   Q.    Next slide, please.

20         And the top part, does it appear that there were some

21   credits to the account?

22   A.    Correct.

23   Q.    And we're still in the 3075 Bank of America account?

24   A.    Yes.

25   Q.    And there's a couple debits, correct?

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1698

1    A.   Yes.

2    Q.   If we could go to the next slide.

3         And so in November with the debits and the credits, the

4    total is 554.75?

5    A.   Yes.

6    Q.   Next slide, please.

7         And we're in December of 2018; is that right?

8    A.   Yes.

9    Q.   And so there's the international or some of the

10   international from that.  Can we go to the next?  And then to

11   the summary slide, please.

12        And so this is December of 2018?

13   A.   Correct.

14   Q.   So the next slide is May.  Is that 2019?

15   A.   Yes, May of 2019.

16   Q.   So for the account ending in 3075 there were no

17   international transactions from January 1st to May of 2019?

18   A.   Correct.

19   Q.   Okay.  And so in May there was a $15 transaction in London?

20   A.   Yes.

21   Q.   And then a $0.45 fee?

22   A.   Correct.

23   Q.   If we could go to the next slide, please.  And so that's

24   the summary.  Could we go to the next one?

25        So in June of 2019 on that account, there was one

1    international transaction and a service fee, correct?

2    A.    Yes.

3    Q.    And so the international transactions that you identified

4    were in two Bank of America accounts; is that --

5    A.    That is correct.

6    Q.    -- correct?

7         Could we please bring up what's already been admitted as

8    Government's Exhibit 15.  So this has been admitted as payroll

9    records from the University of Kansas.  And if you see the pay

10   period ends in column C, could we please scroll to August 24th

11   of 2019, please?

12        And there appears to be three entries for August -- or

13   three rows for August 24th of 2019.  Do you see that?

14   A.    I do.

15   Q.    Does this appear that the person whose bank account --

16   whose payroll records this relates to had their paycheck

17   deposited into three different bank accounts?

18   A.    Yes.

19   Q.    You see the column I where it says account number?

20   A.    Yes.

21   Q.    Do you recognize those account numbers?

22   A.    I do.

23   Q.    How do you recognize them?

24   A.    I recognize them through going through the financial

25   statements.  One of them belongs to Bank of America, one of

1    them belongs to JPMorgan Chase, and one of them belongs to an

2    Old National Bank account.

3    Q.   When we were going through the bank records, we were

4    talking about a Bank of America account ending in 3934.  Do you

5    see that one on here?

6    A.   I do.

7    Q.   And then a Bank of America account ending in 3075?

8    A.   That one is not listed here.

9    Q.   That one is not listed?

10   A.   Correct.

11   Q.   So the -- the portion of the payroll records from KU didn't

12   go into that account, correct?

13   A.   Correct.

14   Q.   But there's two other accounts here.  You said that you

15   recognized one as the Old National account?

16   A.   Yes.

17   Q.   Were the Old National account records included in what you

18   examined in putting together this PowerPoint?

19   A.   Yes.

20   Q.   And then the other one you said was a JPMorgan Chase?

21   A.   That is correct.

22   Q.   And so was that part of the account records that you

23   reviewed in putting together this?

24   A.   Yes.

25          MR. OAKLEY:   Could I please have the presenter,

1    Ms. Wiest?

2    BY MR. OAKLEY:

3    Q.   Ms. Morgan, I want to show you what's been admitted as --

4    excuse me, a demonstrative exhibit that's marked for

5    identification purposes as Government's Exhibit 774.  And

6    specifically I want to show you the third page.  And does this

7    appear to you to be a timeline that begins in January 2019 and

8    extends through August of 2019?

9    A.   Yes.

10   Q.   And then you see a portion down here in the middle.  Does

11   it appear to have information related to dates where someone

12   was in China?

13   A.   Yes.

14   Q.   And so I want to -- you focused on 2017, 2018, 2019 on the

15   PowerPoint, and I want to go back and I want to specifically

16   focus on 2019.

17   A.   Okay.

18   Q.   So for the 2019 account -- excuse me, the account ending in

19   3934 for the year 2019, you have a transaction of $202.24?

20   A.   Yes.

21   Q.   And that's in January?

22   A.   Correct.

23   Q.   And then staying with that account, in April of 2019

24   there's a $56 transaction?

25   A.   Yes.

1    Q.    Do you have your printed PowerPoint in front of you?

2    A.    I do.

3    Q.    For the 3934 do you see any other transactions in 2019

4    other than those two?

5    A.    No, I do not.

6    Q.    Let's focus on the 3075 account for 2019.  Excuse me.  In

7    May of 2019, there was a $15.45 transaction related to

8    something from London; is that correct?

9    A.    Yes.

10   Q.    And then staying with that 3075, there was a $24.21

11   transaction?

12   A.    Yes.

13   Q.    Do you see any other transactions in 2019 for the Bank of

14   America ending in 3075?

15   A.    I do not.

16   Q.    When I showed you the spreadsheet that was the payroll

17   records, did it appear that the largest portion of the

18   defendant's KU paycheck went into the Old National account?

19   A.    That is correct.

20   Q.    Did you find any 2019 international transactions from the

21   Old National account?

22   A.    I did not.

23   Q.    There was another one that was JPMorgan Chase where some of

24   the defendant's money went into from the payroll records from

25   KU?

1    A.    That is correct.

2    Q.    Did you find any international transactions in the JPMorgan

3    Chase account?

4    A.    Not during the time period we were looking at.

5    Q.    And so for 2019, the four pages that I just showed you were

6    all the international transactions that you could find?

7    A.    Yes.

8    Q.    I'm going to try and do something on the fly here, and I'm

9    not very good at math so excuse me.  Since I'm not good at

10   math, let's round up.  Let's say -- round up to $203 for

11   January.  We have April 56.11, so let's round that up to $57.

12   In May the one in London for 15.45, let's round that up to $16.

13   And then finally in June of 2019, the 24.21, let's round that

14   up to 25.  So 11, 18, 21, move the 2, 7, 8, 9, 10.  Carry the

15   one.  Does my math look correct?

16   A.    It does.

17   Q.    Now, as part of your examination, did you just look at bank

18   accounts from the United States?

19   A.    That is correct.

20   Q.    Based upon your knowledge as a forensic accountant with the

21   FBI, do you know, is the FBI able to obtain bank accounts that

22   are from foreign institutions that don't have a United States

23   presence?

24   A.    We are not able to.

25         MR. OAKLEY:  No further questions, Your Honor.

1    THE COURT:  We can take a break now unless you'd like

2    to proceed.

3        MR. ZEIDENBERG:  That was what I was going to ask.

4        THE COURT:  Okay.  Let's take a break for 20 minutes.

5    (Recess.)

6    (The jury entered the courtroom, after which the following

7    proceedings were had.)

8        THE COURT:  You can be seated.

9                    CROSS-EXAMINATION

10   BY MR. DEARINGTON:

11   Q.  Good afternoon, Ms. Becker.

12   A.  Good afternoon.

13   Q.  So are you aware that Dr. Tao was indicted in August of

14   2019?

15   A.  I am.

16   Q.  And were you on the case at that time?

17   A.  I was not.

18   Q.  What were you doing at that time?

19   A.  I was not on the case.  There was another forensic

20   accountant who was overseeing the case.  I was working other

21   cases.

22   Q.  Were you at the FBI at that time?

23   A.  I was.  Or excuse me.  You said August of '19?

24   Q.  Yes.

25   A.  I was not.

1  Q.  Where were you at that time?

2  A.  I was working for a manufacturing firm in Overland Park.

3  Q.  Okay.  So at this time Dr. Tao was accused of secretly

4  working at a second university and receiving pay, you weren't

5  on the case, you weren't at the FBI yet, but you came to the

6  FBI sometime late and you received your assignment; is that

7  correct?

8  A.  That is correct.

9  Q.  Your assignment, was it not, was to find a payment from

10  Fuzhou University that could be tied from Fuzhou University to

11  Dr. Tao or his family or his friends, correct?

12  A.  No.  I was tasked to find all international transactions.

13  Q.  That was your only task?

14  A.  That is correct.

15  Q.  And when did you join the team over here --

16  A.  I joined --

17  Q.  -- in preparation?

18  A.  -- the team approximately August of 2020.

19  Q.  Are you aware that there was a different forensic

20  accountant part of the case prior to that?

21  A.  Yes.

22  Q.  And that accountant you're aware was tasked with finding a

23  transaction involving Fuzhou University that could be linked to

24  Dr. Tao?

25  A.  I am not sure what she was tasked with.

1  Q.  You weren't told what the work of the prior examiner was?

2  A.  I was handed her work product, but I'm not sure what her

3  specific tasks that were assigned to her were.

4  Q.  Are you surprised in a case whose central allegation is

5  Dr. Tao was receiving money from Fuzhou University you weren't

6  asked to find any money from Fuzhou University?

7          MR. OAKLEY:  Objection, Your Honor.  That misstates

8  the charges in the indictment.

9          MR. DEARINGTON:  I can rephrase it you like, Your

10  Honor.

11          THE COURT:  All right.  Rephrase.

12  BY MR. DEARINGTON:

13  Q.  Ms. Becker, are you aware that there's an allegation that

14  Dr. Tao worked for Fuzhou University and received pay from

15  Fuzhou University?

16  A.  Yes.

17  Q.  And did it surprise you when you received an assignment,

18  that your assignment was not to try to find a payment from

19  Fuzhou University that could be tied to Dr. Tao?

20  A.  I was not alarmed that that was not the specific task that

21  I was looking for because there could have been -- it could

22  have went to multiple different financial institutions.

23  Q.  I'm sorry?

24  A.  Could you rephrase the question?  I'm sorry.  I might be

25  confused.

1  Q.  Are you surprised that when you were going to testify in a

2  case, one of the issues of which is that there's an allegation

3  Dr. Tao received money from Fuzhou University, that your task

4  as forensic examiner wasn't to try to find evidence of that?

5  A.  My tasks were not only to find -- my task in general were

6  to find all international transactions.

7  Q.  Just international transactions, didn't matter what they

8  were?

9  A.  That is correct.

10 Q.  And you searched -- when I say you, I want to say the FBI's

11 forensics examiner, you and your predecessor searched as many

12 records related to Dr. Tao's finances as you could get your

13 hands on; is that right?

14 A.  We searched three financial institutions:  Bank of America,

15 JPMorgan Chase, and Old National.

16 Q.  Those are the only financial institutions you're aware the

17 Department of Justice subpoenaed?

18 A.  I don't know if those are the only three.  I believe there

19 probably were more.  I would have to look at the report to

20 verify that for you.

21 Q.  Let's start with those three.  Fair to say there were

22 hundreds of hundreds if not thousands of pages of financial

23 records from those institutions?

24 A.  That is correct.

25 Q.  And you scoured all of those financial records in search of

1  your foreign transactions?

2  A.  I was able to place all of the financial records into Excel

3  documents and look through them that way.

4  Q.  And some of those would include, for example, if there was

5  a wire from, I don't know, a journal in the United Kingdom, you

6  could see there was a wire coming from a journal in the United

7  Kingdom?

8  A.  That is correct, if the wire details were given.

9  Q.  You found no evidence in searching through those hundreds

10  or thousands of pages of financial records of any payments from

11  Fuzhou University to Dr. Tao, correct?

12  A.  There were no payments directly from Fuzhou.  There were

13  payments from financial institutions in China.

14  Q.  You said directly.  There were no -- there was no payments

15  indirectly from Fuzhou University that you're aware of,

16  correct?

17  A.  Correct, none that I'm aware of.

18  Q.  Certainly that would have been part of your presentation if

19  you did find such records; fair to say?

20  A.  Yes.

21  Q.  And you didn't just look at Dr. Tao's financial records,

22  you and your predecessor, right?

23  A.  Correct.

24  Q.  You searched through Dr. Tao's wife's accounts, you

25  searched through Dr. Tao's children's accounts, you searched

1    through Dr. Tao's church member accounts, and you even searched

2    through Dr. Tao's church member friend's young daughter's

3    account, correct?

4    A.    I'm not sure of that last statement, but there were -- I

5    did -- there were accounts from his wife and his children.

6    Q.    Her name is Ms. Tang Dang [ph] is the church member's

7    daughter.  You're not aware of searching an account of that

8    name?

9    A.    I do not recall that name.

10   Q.    Would you know of the identity of the accounts you searched

11   or did you have a bunch of names and you searched the accounts

12   of names that you were given?

13   A.    I would have to look at the signature cards of the accounts

14   I looked through.

15   Q.    You did find some transactions that occurred in China and

16   presented them a moment ago with Mr. Oakley, and they seemed to

17   be based in far flung places from Japan, to China, to the UK.

18   For example, Chongqing, China.  Are you familiar with that

19   name?

20   A.    Not off the top of my head.  But if --

21   Q.    I can represent to you that the transactions worth I think

22   about $300 in withdrawals were in Chongqing, China.  Were you

23   informed that's where Dr. Tao and his wife Hong Peng grew up?

24   A.    I was not.

25   Q.    Were you informed he had family there, family with homes,

1  and family whom he would meet with and have dinner with and

2  that sort of thing?

3  A.   I was aware that he had family members still in China, yes.

4  Q.   Do you know the number of family members that the two of

5  them still have in China?

6  A.   I do not.

7  Q.   And Xiamen.  Are you aware there's a university in Xiamen?

8  A.   Yes.

9  Q.   Were you informed or did you investigate how honoraria are

10  paid from universities when a professor goes and speaks there?

11  A.   I'm sorry.  Could you --

12  Q.   Do you know what an honorarium is?

13  A.   I do not.

14  Q.   So if I were to represent to you that the way this works in

15  academia is often the case that if a professor attends a

16  conference, let's say down at K-State, K-State will pay a small

17  stipend to cover expenses, pay a small stipend to cover a

18  hotel, that sort of thing, and there will be a small honorarium

19  to compensate the person for their time.

20      So were you aware of those facts and did you take them into

21  consideration when you were examining the financial records

22  here?

23  A.   I was not aware of that.

24  Q.   And were you aware that in China it's customary to use

25  WeChat to pay for items?

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1711

 1  A.  I was not.

 2  Q.  Were you aware if a professor were to receive an honorarium

 3  from Xiamen University for example, the university would make a

 4  transfer directly to the WeChat and the person could use their

 5  WeChat to buy groceries, that sort of thing?

 6  A.  I was not.

 7  Q.  Were you aware that phone devices were seized in this case?

 8  A.  No.

 9  Q.  Were you aware that there were WeChat files seized in this

10  case?

11  A.  No.

12  Q.  Are you aware of whether a financial analysis was done of

13  the WeChat files that were seized in this case?

14  A.  I am not sure.

15  Q.  Did you inquire about that?

16  A.  I did not.

17  Q.  So your predecessor searched for I imagine also foreign

18  transactions and probably searched for Fuzhou payments and

19  found none, correct?

20  A.  Again, I'm not sure what her specific tasks were.  I was

21  just given her report.

22  Q.  And when were you assigned your task?

23  A.  Again, approximately August of 2020 I believe --

24  Q.  August of 2020?

25  A.  -- is when I came on board to this case, yes.

1    Q.  And would you have known by that point in a case involving

2    the allegations here whether a single financial transaction

3    among all of those financial records we talked about was

4    identified that involved Fuzhou University?

5    A.  Could you repeat the question?

6    Q.  Sure.  Sorry.  Let me rephrase it because I know that was a

7    little unclear.

8        Fair to say when you took on the role of financial examiner

9    and took over for your predecessor, that person would have

10   informed you, given your role in the case, if they had found a

11   transaction involving a payment from Fuzhou to Dr. Tao?

12   A.  I believe that would be a correct --

13   Q.  And no one alerted you to any such payment, right?

14   A.  Correct.

15   Q.  And so your case team had already indicted Dr. Tao at that

16   point, didn't they?

17   A.  Yes.

18   Q.  And no financial forensic examination was conducted prior

19   to his indictment, was there?

20   A.  Again, I'm not sure the timeframe of which the previous

21   forensic accountant had examined documents.  We'd have to look

22   at her report date to see when it specifically went in the

23   file.

24   Q.  So fair to say that if the forensic examiner had identified

25   a payment involving Fuzhou University and Dr. Tao, the forensic

1    examiner would have alerted you to that fact when handing over
2    the file?
3    A.    I would say that's true.
4    Q.    Long after Dr. Tao is indicted, when you took over the case
5    in 2020, the forensic examiner prior to you did not alert you
6    to that fact?
7    A.    Correct.
8    Q.    So is your inference that there was no evidence identified
9    as of 2020 of a transaction involving Fuzhou University and
10   Dr. Tao?
11   A.    Correct.
12   Q.    And so fair to say your case team had already indicted
13   Dr. Tao and you had to scramble to find a theory that could
14   explain why there was no payment?
15            MR. OAKLEY:    Objection, argumentative.
16            THE COURT:    Overruled.
17   BY MR. DEARINGTON:
18   Q.    You had to scramble because there was a trial coming to
19   find a theory to explain why Dr. Tao had no payments coming
20   from a university that supposedly employed him, right?
21   A.    I wasn't scrambling.    I went through the financial
22   statements.
23   Q.    And you had discussions with Special Agent Lampe about how
24   you could make sense of these facts versus these allegations?
25   A.    Case Agent Lampe and I have had discussions but not

1    specifically regarding that.

2    Q.   So you never had a discussion with Special Agent Lampe

3    about how you can make sense of the allegation that Dr. Tao is

4    receiving funds in China and the lack of any evidence of such

5    funds from China?  You never had that discussion?

6    A.   Special Agent Lampe and I discussed looking for

7    international transactions to see if we could find anything.

8    Q.   And was that related to a strategy, you two were trying to

9    brainstorm to try to fill the gap in this case since there's no

10   evidence that Dr. Tao received payments from Fuzhou University?

11   A.   Yes.

12          MR. DEARINGTON:  No further questions, Your Honor.

13                    REDIRECT EXAMINATION

14   BY MR. OAKLEY:

15   Q.   So let's talk about facts and let's talk about your review

16   of the bank records.

17   A.   Okay.

18   Q.   The $300 that we found was the only expenditures in 2019,

19   correct?

20   A.   Yes.

21   Q.   And so from a period of time that actually begins

22   December 11th through March -- of 2018 through March 28, 2019,

23   that includes April 12th to April 27, 2019; to May 11, 2019; to

24   June 1, 2019; from June 7, 2019; to June 3, 2019; July 7, 2019,

25   to July 23, 2019; and finally August 4, 2019; to August 22nd --

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9                1715

1    excuse me, August 20, 2019.  $300 in total is all that you were

2    able to identify?

3    A.    That is correct.

4    Q.    Did you see any charges related to the purchase of a water

5    or a snack at the Fuzhou University bookstore?

6    A.    No, I did not.

7    Q.    Any meals at any place in China?

8    A.    No.

9    Q.    Any lodging?

10   A.    I believe --

11   Q.    Let me ask it this way.  Other than the $300 that we've

12   already talked on the screen, any money related to lodging?

13   A.    I believe, yes, there was one hotel stay.

14   Q.    That's included in the $300?

15   A.    No, it is not included in the 300, I don't believe.  Let

16   me -- let me verify really quick.

17   Q.    Okay.

18   A.    No, there is no hotel during -- that is included in the

19   $300.

20   Q.    What about any time someone used a debit card to buy gas?

21   A.    No.

22   Q.    Do you see any evidence of that?

23   A.    No.

24   Q.    Public transportation?

25   A.    No.

1    Q.   Clothing, dry cleaning, anything related to clothes?

2    A.   No.

3    Q.   So during that course in time, the $300 we talked about is

4    all you were able to find?

5    A.   That is correct.

6    Q.   Could we please -- Ms. Wiest, could we have the computer?

7         Could we please bring up 526?

8         Now, you mentioned --

9              MR. DEARINGTON:  Objection, Your Honor, scope.  This

10   wasn't part of the direct.

11             MR. OAKLEY:  Bank records certainly were.  Bank

12   accounts certainly were.

13             THE COURT:  All right.  Overruled.

14   BY MR. OAKLEY:

15   Q.   So you mentioned that you weren't able to examine any

16   accounts from Chinese banks, correct, they don't have a

17   presence in the United States?

18   A.   Correct.

19   Q.   And you said that you determined the international

20   transactions from an international transaction fee, correct?

21   A.   Yes.

22   Q.   Do you know, does that work the other way?  So in other

23   words, if someone is in a foreign country and they use a U.S.

24   Bank, is it likely that U.S. Bank is going to hit them with a

25   foreign transaction fee?

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1717

1    A.   Most likely, yes.  It's up to the bank's discretion.

2    Q.   So again, 2019 and your examination of the bank records,

3    $300?

4    A.   That is correct.

5              MR. OAKLEY:  No further questions, Your Honor.

6              THE COURT:  All right.  May Ms. Becker be excused?

7              MR. DEARINGTON:  Yes, Your Honor.

8              MR. OAKLEY:  Yes, Your Honor.

9              THE COURT:  You're excused.  Call your next witness.

10             MR. BARRY:  Actually before we call our next witness,

11   can I please update the timeline?  And then also I'd like to

12   display the defendant's passport to the jury.

13             THE COURT:  And that's been admitted, correct?

14             MR. BARRY:  I don't believe it's -- let me

15   double-check.  It has not been admitted, so I would move to

16   introduce Exhibit 358, which is the passport that the Court

17   released to the government.

18             THE COURT:  Any objection?

19             MR. ZEIDENBERG:  No objection, Your Honor.

20             THE COURT:  358 admitted.

21             MR. BARRY:  Can we switch to the ELMO, please?  Thank

22   you.

23             I'm going to just flip through this slowly for the

24   jury.

25             And just to update the timeline, this is the middle

1    portion.  This is Exhibit 216, which was introduced through

2    Mr. Nguyen earlier.

3              THE COURT:  Speak more into the microphone.

4              MR. BARRY:  Sorry.  This is Exhibit 216 that was

5    introduced through Mr. Nguyen earlier today.

6              And this is the last part of the timeframe for 2019.

7              And this is Exhibit 224, which was another one of the

8    e-mails Mr. Nguyen introduced.

9              The government calls as its next witness Mr. James

10   Churchill.

11                        JAMES CHURCHILL,

12   called as a witness on behalf of the government, having first

13   been duly sworn, testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. BARRY:

16   Q.   Hello again, Mr. Churchill.

17   A.   Hello.

18   Q.   We spoke yesterday about how in the course of this

19   investigation you translated -- actually, I don't remember.

20   Approximately how many documents related to the investigation

21   of Dr. Tao have you read in Chinese and translated?

22   A.   I've read more than I've translated.  I've read well over

23   100.  But translated, maybe 50, 60, 70, I don't recall.

24   Q.   So you've read about -- did you say 100, at least 100

25   documents?

1    A.    At least a hundred.

2    Q.    Translated over half of those?

3    A.    Yeah.

4    Q.    And you said yesterday that you listened as well to at

5    least somewhere between 100 and 200 calls?

6    A.    That's correct.

7    Q.    So what I'd like to do now is I want to walk through a

8    number of documents, many of which you've read before because

9    they were originally in Chinese and you either translated or

10   reviewed.  There will be a few other documents that the parties

11   have stipulated to authenticity that are in English, but there

12   may be some objections based on other bases.

13        And I just want to walk through in chronological order.

14   And the way we're going to do this is we are first going to

15   walk through the time period of July 2017 through the end of

16   April 2018.  Okay?

17   A.    Okay.

18   Q.    I'm going to show you documents, many of which you've seen

19   and translated.  Some of them have been admitted into evidence

20   and so I'll try to be clear.  I will likely make a few

21   mistakes, but I'm going to note if it's been admitted into

22   evidence and then either I'll show you -- I'll show you the

23   document itself on the ELMO, and I may ask you some questions

24   about it, Ms. Boyd will pull it up on the screen so we can all

25   see it.  Okay?

1   A.   Understood.

2   Q.   So the first thing I'd like to do --

3          MR. BARRY:  Can we please switch over to the computer?

4   BY MR. BARRY:

5   Q.   I'd like to pull up what's already been admitted into

6   evidence as 485, Government's Exhibit 485.  And what I'd like

7   to do first is I'd like you to just read -- so this is the

8   original source document in Chinese.  And I'd like you to just

9   read this first page in Chinese, please.

10  A.   All the text in Chinese?

11  Q.   Yes.

12  A.   Okay.

13  Q.   If you could while you're reading kind of maybe put a

14  little dot on the screen to sort of show us where you're

15  reading.

16  A.   Sure.  (Reads in Chinese.)

17  Q.   Would you please circle the Chinese characters there that

18  are Dr. Tao's name?  Okay.

19      Can please pull up 485A which has already been admitted.

20      Can you please read just the sort of sections down there at

21  the bottom that Ms. Boyd is going to highlight?

22  A.   I'm sorry?

23  Q.   Can you read this in English, please?

24  A.   Sure.  *Name of recommending school:  Fuzhou University.*

25      *Position name:  Physical chemistry.  Applicant name:  Tao*

1    *Feng.  Current employer of candidate:  University of Kansas.*

2    *Academic discipline subgroup:  Chemistry science group.  Date:*

3    *July 6, 2017.  Ministry of Education, People's Republic of*

4    *China.*

5    Q.  Can we scroll up a little bit so we can see the title of

6    this document?  Okay.

7        Let's go to the next page.  I want you to read that

8    first -- see where it says instructions?

9    A.  I do.

10    Q.  I want you to read the first instruction.

11    A.  *Before filling out this form, please carefully read the*

12    *measures for the implementation of the Changjiang scholars*

13    *award program.*

14    Q.  And then, Ms. Boyd, can we please zoom out and I want to

15    just sort of slowly for the jury scroll through some of the

16    pages, and I want to scroll through until we get to page 7.

17        All right.  Let's stop there.  And then I'd like to zoom in

18    at the top here.

19        And I'd like you to read, Mr. Churchill -- so this says

20    scientific research, the candidate's main academic

21    contributions, important innovations, and their scientific

22    value or socioeconomic significance.

23        I'd like you to read from where it says Franklin Tao and it

24    has his name in Chinese to where it says in situ

25    characterization.

1  A.  All right.  *Franklin Tao, Tao Feng, is a tenured professor*

2  *in the departments of chemistry and chemical engineering at the*

3  *University of Kansas in the United States because he must take*

4  *two core courses for five consecutive years before being*

5  *promoted as a full professor.  He is now a tenured associate*

6  *professor of the Miller Chair.  The Franklin Tao Research Group*

7  *focused on the major scientific issues of heterogenous*

8  *catalysis and the development needs of the new energy and*

9  *advanced environmental protection emerging strategic industries*

10 *in the United States, and carried out the scientific basis of*

11 *heterogenous catalysis, the basis of energy catalysis and its*

12 *application, and the key technologies of catalysis in situ*

13 *characterization.*

14 Q.  And then you see how -- let's scroll down a little bit.  It

15 seems to talk about some of his achievements.  Research focus.

16 All right.

17     Let's actually go back to the first page of this.  Based on

18 your interpretation of the content, is this an application to

19 the Changjiang Distinguished Professors program?

20 A.  It is.

21 Q.  Okay.  Let's go to page 12, please.  If we can zoom in at

22 the top.  It says Changjiang Distinguished Scholar Program

23 candidate's recommendation.  Major scientific research projects

24 in the past five years.  If we could scroll down, does this

25 look like it lists a number of research grants from primarily

1    the National Science Foundation and the Department of Energy?

2    A.    Yes, it appears that way.

3    Q.    Okay.  And then let's go to page 26, please.  This is the

4    tentative work plan.  Can you summarize -- and if you need, we

5    can scroll down, but can you summarize what this tentative work

6    plan appears to be proposing?

7             MR. DEARINGTON:  Objection, Your Honor.  He's a

8    linguist and now he's summarizing documents.

9             MR. BARRY:  He's summarizing a translation.

10            THE COURT:  I think it's fair to ask him what does

11   this represent.  He doesn't have to read it verbatim in order

12   to answer the question.  If he's able to describe what he

13   thinks this is talking about, I think that's appropriate, so

14   I'll overrule.

15   BY MR. BARRY:

16   Q.    Just at a really general level.

17   A.    This appears to be summarizing the applicant's plan to

18   conduct research on -- using in situ catalysis in conjunction

19   with Fuzhou University's national key discipline of physical

20   chemistry and their state key laboratory in order to fulfill

21   China's strategic scientific requirements.

22   Q.    And the first bullet point for kind of the proposed goal

23   says carry out basic and applied research and the second point

24   says team building.  And can we scroll down to the third one

25   says discipline construction, establish an internationally-

1  leading discipline combining in situ catalysis characterization

2  in environmental energy catalysis.

3        And let's keep scrolling.  Research direction, research

4  plan.

5        Keep scrolling, please.  Okay.  And I want to stop here.

6  It says the primary content of the research is as follows.  And

7  I'd like you to read this first bolded sentence and we're going

8  to keep going, there's a few more bolded sentences I'd like you

9  to read.

10  A.   *Development, design, and installation of an*

11  *ambient-pressure photoelectron spectroscopy.*

12  Q.   Scroll down to the second bolded.  Can you read that,

13  please?

14  A.   *Development, design, and installation of photoelectron*

15  *spectroscopy with high surface sensitivity.*

16  Q.   Let's go to the third one, please.  Can you read that for

17  the jury, please?

18  A.   *Development of ambient pressure scanning tunnelling*

19  *microscopy technology suitable for studying the surface*

20  *structure of catalyst particles.*

21  Q.   I think there's one more, so let's go to number four.  Can

22  you read that, please?

23  A.   *Develop highly efficient catalytic processes through the*

24  *most advanced in situ characterization technology.*

25  Q.   I'd like to go to the next page.  There's a section that

1   says expected goals.  It's on page 29.  If you could do the

2   same thing, please read the bolded expected goals in this

3   application.

4   A.   *One, basic and applied research.  Two, occupy domestic and*

5   *international markets and be market-oriented.  Three, establish*

6   *an in situ research technology innovation team.*

7   Q.   And can we go to the next page, and can you read numbers 4

8   and 5, please?

9   A.   *Number four, research on the nature of major catalytic*

10  *reactions in energy and the environment.  Five, international*

11  *exchanges and cooperation.*

12  Q.   Let's go to page 31, which is titled candidate commitment.

13  Can you please read that first box and what the answer is?

14  A.   *Do you commit yourself to the full-time position as the*

15  *specially-appointed professor and promise to work full-time*

16  *every year in this position?  Yes.*

17  Q.   And then let's scroll down to that document.  Tell me if

18  you see a signature.

19  A.   I do.

20  Q.   Can you read what that says?

21  A.   *Franklin Tao.*

22  Q.   Okay.  I'd like to next show you what's already been

23  admitted as Government's Exhibit 486.  And let's go to 486A

24  which is the translation.  It's already been admitted.  What

25  does this appear to be?

1    A.    This appears to be an addendum to the Changjiang

2    application attaching the applicant's materials.

3    Q.    Okay.  And, Ms. Boyd, can we please start scrolling through

4    this.  Might want to zoom out a little bit.

5        Ms. Boyd, could we please go to -- I'm sorry.  I don't have

6    the page numbers on here, but maybe around page 50.  Okay.  Can

7    we please scroll from there.  Okay.  We can put that away,

8    please.

9        I'd like to show you what's been marked as Government's

10   Exhibit 119, 119A, 120, 120A, 121, and 121A.  And this is an

11   e-mail with some attachments.

12       Do you recognize these documents?

13   A.    Yes.

14   Q.    What do they appear to be?

15   A.    One is an e-mail that is an e-mail sent to the defendant.

16   One is a CD titled -- it indicates that it's a spreadsheet.

17           MR. DEARINGTON:  Your Honor, may we approach before we

18   go any further with these three, please?

19           THE COURT:  All right.  Let him identify the third

20   one, and I'll hear them all at once.  I think the third one is

21   121.

22           MR. BARRY:  Yes, Your Honor.

23           THE COURT:  He can identify that and I'll talk to you

24   all at the bench.

25           THE WITNESS:  The third document is an announcement

1    from the Ministry of Education about --

2            MR. BARRY:  Okay.  Let's stop there.

3            THE COURT:  Okay.  Come forward.

4        (The following proceedings were had at the bench).

5            THE COURT:  Okay.  So 119 I know was in the list and I

6    think --

7            MR. DEARINGTON:  I think all of them were, I hope.

8            THE COURT:  It doesn't matter, but 119 and 122 you're

9    objecting to.  So starting with 119, okay, e-mail dated 2017

10   from Suc Kingdom to Professor Tao.  The translation is 119A and

11   it has attachments congratulating him in advancing to the

12   Changjiang -- congratulating him on advancing to the Changjiang

13   defenses.  So the objection is hearsay.

14           Mr. Barry.

15           MR. BARRY:  We're not offering this for the truth of

16   the matter.  We're simply offering it to show that somebody

17   sent him these attachments.

18           THE COURT:  What attachments other than the

19   congratulatory ones?

20           MR. BARRY:  Attachments are 120 and 121.

21           THE COURT:  120 is -- let me look at it.  So there's

22   an -- there's an e-mail that congratulates him and there's an

23   attachment, 120A, which says this document is titled panel of

24   peer expert reviewers for the Changjiang scholar award program

25   and lists candidates.  But there is no list of candidates in

1    120A.  And then in 121A which is the other attachment --

2            MR. BARRY:  Yes, Your Honor.

3            THE COURT:  -- an announcement about matters

4    concerning the panel of peer expert reviewers.  Well, I don't

5    understand what the relevance is of this unless you're offering

6    it for the truth of the matter asserted that he advances far in

7    the process.

8            MR. BARRY:  It's to show that somebody sent him

9    documents saying this is the process for the oral defense for

10   the Changjiang program.

11           THE COURT:  I think it's irrelevant unless they come

12   in for the truth of what that process is.  So I'm going to

13   sustain to 119, 120 -- wait a minute.  Don't leave yet.

14           MR. BARRY:  Judge, 119 --

15           THE COURT:  119A I'm going to sustain.  And then

16   120 --

17           MR. BARRY:  And 121.

18           THE COURT:  Is 121 the other attachment?

19           MR. BARRY:  Yes, Your Honor.

20           MR. DEARINGTON:  They all have As so it's three

21   exhibits and three As, Your Honor.

22           THE COURT:  You also had him identify 122, which is an

23   e-mail from some person at qq.com to Franklin Tao and it also

24   has attachments, correct?

25           MR. BARRY:  I don't know if I -- if I said 122, I

 1   misspoke.

 2           THE COURT:  I'm sorry.

 3           MR. DEARINGTON:  Thank you, Your Honor.

 4       (Thereupon, the proceedings continued in open court.)

 5   BY MR. BARRY:

 6   Q.  I'd next like to show you what's already been admitted as

 7   Government's Exhibit 124 and 124A.  And if we could go to

 8   124 -- actually, wait a minute.

 9           MR. BARRY:  Your Honor, may I have a moment at the

10   bench?

11           THE COURT:  Yes.

12       (The following proceedings were had at the bench).

13           THE COURT:  I show that 124 is admitted, but I don't

14   think you had offered the English translation.  I'm sorry, I

15   show that 124 is admitted, but the English translation has not

16   been offered yet; is that correct?  It's 124A.  Maybe it was

17   and I just missed it.

18           MR. OAKLEY:  I show the translation has not been

19   admitted.

20           MR. BARRY:  I'm going to move to introduce the

21   Exhibit 124A.  I want to note, because I'm not sure how the

22   Court wants to do this, is the bottom part of that chain is

23   from that prior e-mail.

24           MR. DEARINGTON:  We would only object to the bottom

25   e-mail.

1        MR. BARRY:  So I don't know if we want to redact that

2   bottom part.

3        THE COURT:  From Suc Kingdom?

4        MR. BARRY:  Yes.  Basically this is the prior e-mail

5   where the objection was sustained, a portion of that was then

6   forwarded on by the defendant.

7        THE COURT:  All right.  I think just redact that

8   bottom portion.

9        MR. BARRY:  Okay.

10       THE COURT:  And the rest of 124A will come in.

11       MR. BARRY:  How would you like me -- for displaying to

12  the jury.

13       THE COURT:  Can you use the paper on the ELMO and lay

14  a piece of paper over that?

15       MR. BARRY:  Sure.  Okay.

16     (Thereupon, the proceedings continued in open court.)

17       MR. BARRY:  Can I have the ELMO please, Bonnie?

18  BY MR. BARRY:

19  Q.  This is 124.  It's in Chinese.

20       MR. BARRY:  The government moves to introduce 124A

21  which is the translation.

22       THE COURT:  124A is admitted with the one redaction I

23  spoke to you all about.

24  BY MR. BARRY:

25  Q.  So I'd like you -- I want to show you the bottom part of

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9    1731

1    124A, and I'd like you to just read this bottom e-mail from

2    November 11, 2017, please.

3    A.    *Dear passport and visa office of colleagues at consulate*

4    *general of the People's Republic of China in Chicago. Please*

5    *allow me to introduce myself. This is Feng Tao, Tao is the*

6    *last name, working at Lawrence, Kansas. I applied the renewal*

7    *of my passport at Kansas City to you or your colleagues three*

8    *weeks ago.*

9    *As you can find from the attached files from Fuzhou*

10    *University, I must attend the preparation of materials for the*

11    *defense of a talent plan of Department of Education of China.*

12    *The Department of Education of China requests to submit*

13    *materials of defense before November 24th. The preparation of*

14    *this materials for Department of Education needs one week.*

15    *Thus, I was asked to return to Fuzhou University to prepare the*

16    *materials on next Friday or Saturday, November 18th.*

17    *Could I request an expedition service to get my password on*

18    *or before November 18th? I would be happy to pay the fee of*

19    *expedition service. Thank you very much for your tremendous*

20    *help. In case you need more information, I am available all*

21    *time at my cell* ▮▮▮▮▮▮. *All the best, Franklin Feng Tao.*

22    Q.    And this is the -- one of the response e-mails. Can you

23    please read this e-mail address right here?

24    A.    Chinavisachicago@gmail.com.

25    Q.    Who is that e-mail sent to?

1    A.    Franklin.feng.tao@ku.edu.

2              MR. DEARINGTON:  Your Honor, may we approach?

3              THE COURT:  Okay.

4         (The following proceedings were had at the bench).

5              MR. DEARINGTON:  So, Your Honor, this is our fault.

6    We didn't realize that there was this top e-mail when we just

7    talked a minute ago, which is also hearsay.  So to the extent

8    the Court is amenable to redacting the top part, we would

9    request that as well.  We were focused on the bottom one which

10   is the one Mr. Barry referenced.

11             MR. OAKLEY:  This has already been admitted, 124.

12             MR. DEARINGTON:  Just now?

13             THE COURT:  124 was admitted earlier.  It's only the

14   translation that was not admitted.

15             MR. DEARINGTON:  Right.

16             THE COURT:  Your response?

17             MR. OAKLEY:  I mean, I don't know that this would be

18   offered for the truth of the matter.  It's an accurate

19   translation of a document that's already in evidence, and I

20   think it is admissible.

21             THE COURT:  Is there some follow-up or evidence

22   following this about next steps that this would provide context

23   for?

24             MR. BARRY:  Yes.  This whole sequence is going to be a

25   chronological introduction of additional evidence that provides

1    context.  So the next thing -- there will be a couple of other

2    things, but it will be essentially application, oral defense,

3    travel to prepare for oral defense, oral defense itself --

4         THE COURT:  Is there something specific after this

5    communication from the passport office giving him steps on what

6    to do to renew?  Is there more communication between him and

7    the passport office or is there another e-mail where he

8    responds?  Because if there is, then I think, you know, this is

9    contextual and I can tell the jury don't consider this for

10   truth of the matter asserted, but it gives context to something

11   that he did or said next.  So did he apply for a renewal?  Did

12   he apply -- did he act upon this?

13        MR. BARRY:  Yes.

14        THE COURT:  Are you presenting evidence that he acted

15   upon this?

16        MR. BARRY:  Yes.

17        MR. OAKLEY:  We're not presenting an e-mail response,

18   just that he followed through with these steps and traveled.

19        MR. BARRY:  If you like -- so there's the passport,

20   which I just went through.  There's a document we went through

21   a couple days ago called a travel document that had a blue

22   cover, that's the document that was -- that the defendant

23   obtained as a result of this reachout.

24        THE COURT:  I'm going to admit 124A, this top portion.

25   I'm going to tell the jury to disregard this top e-mail, don't

1    consider it for truth of the matter asserted.

2         (Thereupon, the proceedings continued in open court.)

3              THE COURT:  124A is admitted.  However, the top e-mail

4    which comes from sort of a passport or visa office in Chicago

5    to Dr. Tao, don't consider what was said in that particular

6    e-mail as the truth of whatever that office is saying.  No one

7    from that office is here to testify.  It's hearsay.  But it

8    just provides context for what Dr. Tao might have said or done

9    next.  So with that limitation, Exhibit 124A is admitted.

10   BY MR. BARRY:

11   Q.  Mr. Churchill, I'd just like you to read the first

12   sentence.

13              MR. DEARINGTON:  Your Honor, objection.

14              MR. BARRY:  Okay.  I can withdraw it.

15   BY MR. BARRY:

16   Q.  All right.  The next exhibit I'd like to show you -- and

17   actually, I'd just like to remind us where we are.  I'm going

18   to display the Demonstrative Exhibit 774.  So this is the

19   e-mail we just looked at.

20       I'm going to show you, Mr. Churchill, what's been marked

21   as -- it's already been admitted as Government's Exhibit 484.

22   This is the original in Chinese.  This is the translation.  Can

23   you read the date down there for me, please?

24   A.  I'm sorry?

25   Q.  Can you read the date for me, please?

1  A.   The date, December 2017.

2  Q.   That's the first page.  And then I'll just display for the

3  jury, resume, pages about different types of research,

4  different types of instruments.

5       I'd next like to show you what's been marked as

6  Government's Exhibit 296.  This is an e-mail chain from the

7  defendant's KU account.  There's no dispute over authenticity

8  with the account origin.  I want to focus on, do you see how

9  there's a middle e-mail there from the defendant to someone

10 named Aaron Scurto?

11 A.   Yes.

12 Q.   I'm going to ask you about before that.

13       MR. BARRY:  But before I do that, government moves to

14 introduce into evidence Government's Exhibit 296.

15       THE COURT:  Any objection?

16       MR. ZEIDENBERG:  No objection.

17       THE COURT:  296 admitted.

18 BY MR. BARRY:

19 Q.   So I just want to focus on this middle part.  This is from

20 December 3, 2017.  Can you please read this part of the e-mail?

21 A.   *Dear Aaron, is there a chance you could help to cover one*

22 *lecture of CPE721 thermodynamics at 1:00 p.m. to 2:15 p.m. on*

23 *the coming Tuesday, December 5th, Learned Hall 3152?  I have to*

24 *leave for an urgent family issue on early Tuesday morning*

25 *3:00 a.m. on December 5th.  The attached is the PowerPoint*

1  *slides I planned to teach on the coming Tuesday.  Thank you*

2  *very much in any cases.*

3  Q.   So that's sent on December 3rd, right?  Is that right?

4  That e-mail is sent on December 3rd?

5  A.   Correct.

6  Q.   I'd like to show you again the timeline.  Travel is

7  indicated on December 6th.

8      I next want to introduce Government's Exhibit 297.

9          MR. BARRY:  I move to introduce 297 into evidence.

10         MR. DEARINGTON:  Continuing objection, Your Honor.

11         MR. BARRY:  This is a possession plus.

12         MR. DEARINGTON:  Your Honor, we'd object along the

13  lines of now the linguist is reading e-mails in English, and

14  we're not sure that that's appropriate because he has no

15  personal knowledge of the e-mails, he's not translating.  I'm

16  not sure what the connection to this witness is to the e-mail.

17         THE COURT:  Once is an exhibit is in, anyone can read

18  it.  I will police it so as to not be here for the next six

19  months, I'm not going to let everybody read everything.  But if

20  you want to ask a witness to point to a particular language and

21  have them read it, I'm fine with that unless I think it's being

22  abusive.

23         Okay.  So 297 -- okay.  Objection overruled for the

24  reasons I've stated before under the adoptive admission

25  analysis.  297 admitted.

1    BY MR. BARRY:

2    Q.   Okay.  What's the departure city from December 13th?

3    A.   Fuzhou.

4         MR. BARRY:  Government next would seek to introduce

5    Government's Exhibit 128, which has an accompanied translation

6    at 128A.

7         THE COURT:  Any objection?

8         MR. DEARINGTON:  Yes, Your Honor.

9         THE COURT:  128A is admitted under adoptive admissions

10   analysis.

11   BY MR. BARRY:

12   Q.   So I want to start with the bottom e-mail.  This is

13   Government's Exhibit 128A.  The date of this is November 26,

14   2017.  Can you please read this paragraph?

15   A.   *Hello.  I'm Jiang Lilong of Fuzhou University.  I sat next*

16   *to you the last time you came to Fuzhou University when we went*

17   *to dinner together.  I apologize for not contacting you more*

18   *promptly.  I learned from Professor Wang Xinchen that you're*

19   *already back in the U.S. and that you plan to arrive in China*

20   *around December 4th.  When the time comes, I really hope you*

21   *can find some time to come take a look around our National*

22   *Engineering Research Center for Chemical Fertilizer Catalysts*

23   *and provide some advice on our research.  I wish you success in*

24   *your Changjiang scholar oral defenses.*

25   Q.   Can you please read the defendant's response?

1  A.  *Dear Lilong, I will definitely visit your center in the*

2  *coming trip.  My cell phone in USA is* ███████.  *I will*

3  *contact you when I get to Fuzhou University.  Thank you very*

4  *much.  All the best, Franklin Feng Tao.*

5  Q.  Can you read this one, please?

6  A.  *Dr. Jiang, hello.  Congratulations on getting the national*

7  *award in chemical industry.  Last time I forgot to leave you my*

8  *WeChat and cell phone number.  My WeChat is Franklin-Tao.*

9  *Please add me.*

10  *Soon we'll be going in turn to two synchrotron radiation*

11  *centers to do catalyst in situ indicators.  I saw a description*

12  *of the National Engineering Research Center for Chemical*

13  *Fertilizer Catalysts.  You have all made incredible world class*

14  *achievements in A202-type iron cobalt sympathetic ammonia*

15  *catalysts, A202-type low temperature synthetic ammonia*

16  *catalysts, B116-type low chrome high temperature variable*

17  *catalysts, B121-type non-chrome high temperature variable*

18  *catalysts.*

19  *I would like to cooperate on research with you all by doing*

20  *in situ research of your catalysts to understand at a deeper*

21  *level why these catalysts are so good.  Let's collaborate in*

22  *doing basic research to publish some papers jointly.  Ideally*

23  *high level papers.  I'll contact you soon.*

24  BY MR. BARRY:

25  Q.  And then I would like you to just read the first sentence

1    -- the salutation and then the first two sentences of this one.

2    A.    *Professor Tao, happy New Year.  Congratulations on being*

3    *chosen as a Changjiang scholar and thank you for your*

4    *confidence in us.*

5    Q.    I'd like to show you what has been admitted as Government's

6    Exhibit 325.

7          THE COURT:  This one was already admitted.  I think

8    there was a continuing objection, but it has been admitted.

9          MR. BARRY:  Government next seeks to introduce

10   Government's Exhibit 131 and 131A.

11         THE COURT:  Any objection?  Has the witness identified

12   it?

13         MR. BARRY:  I can hand it to him.

14   BY MR. BARRY:

15   Q.    Do you recognize those documents?

16   A.    I do.

17   Q.    What are they?

18   A.    An original and a translation of an e-mail from Su Siwen to

19   Dr. Tao.

20         MR. BARRY:  Government seeks to introduce into

21   evidence Government's Exhibit 131 and 131A.

22         THE COURT:  Any objection?

23         MR. BARRY:  Actually, let me modify that.  The

24   attachments are 132 and 132A.  So the government seeks to

25   introduce Government's Exhibits 131, 131A, 132, 132A.

 1          THE COURT:  Any objection?

 2          MR. ZEIDENBERG:  No objection.

 3          THE COURT:  131, 131A, 132, 132A admitted.

 4   BY MR. BARRY:

 5   Q.   So I'm going to start with 131A.  Does this appear to be an

 6   e-mail from someone with the name Su Siwen from a QQ account to

 7   Dr. Tao's KU account?

 8   A.   Yes.

 9   Q.   Dated February 5, 2018?

10   A.   Yes.

11   Q.   Subject is hiring contract for Changjiang Scholar

12   Distinguished Professor Tao Feng?

13   A.   Correct.

14   Q.   Then I'd like you to take a look at this.  Do you recognize

15   this?

16   A.   Yes.

17   Q.   Did you translate this?

18   A.   I did.

19   Q.   And this is an eight-page document, and there's a few

20   places I'm going to point to, but generally speaking, based on

21   your translation of this, what does it appear to be?

22   A.   A contract between Tao Feng and Fuzhou University for his

23   employment as a Changjiang Scholar.

24   Q.   This contract is unsigned, right?

25   A.   That's correct.

1  Q.  You see here the term says February 1, 2018, to January 31,

2  2023?

3  A.  Correct.

4  Q.  Okay.  Then it has objectives for the position.  Teach core

5  courses in the field of physical chemistry.  Good grasp on

6  trends and chemical and cater to the nation's major strategic

7  needs, et cetera.

8       And then job duties.

9       Then it looks like the other bullets are scientific

10  research, team building, disciplinary building, other duties.

11       Rights and obligations.

12       Do you see here how it says funds for scientific research,

13  Party A shall provide Party B blank thousand Yuan in research

14  funds?

15  A.  Yes.

16  Q.  Is party -- Party A is Fuzhou, correct?

17  A.  Correct, Fuzhou University.

18  Q.  And there's just some more language about rights.  Okay.

19       And this was 131 and 132.

20       MR. BARRY:  Government next seeks to introduce

21  Government's Exhibit 133, 133A, 134, 134A.

22       THE COURT:  These aren't in evidence yet.

23       MR. BARRY:  Correct.  Similar to the prior exhibits we

24  just introduced.

25       THE COURT:  Is there objection to 133 and A or 134 and

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9         1742

1    A or both?

2              MR. ZEIDENBERG:  No objection.

3              THE COURT:  Any objection?

4              MR. ZEIDENBERG:  No objection.

5              THE COURT:  All right.  133, 133A, 134, 134A admitted.

6              MR. BARRY:  This is 133.

7    BY MR. BARRY:

8    Q.   Does this appear to be another e-mail from that same e-mail

9    account we looked at?

10   A.   Yes, from Su Siwen.

11   Q.   And here's the translation.  Does this appear to be a draft

12   contract addendum?

13   A.   Yes.  Yes.

14             MR. BARRY:  Government next seeks to introduce

15   Government's Exhibit 136 and 136A.

16             THE COURT:  Any objection?  Any objection to 136A?

17             MR. DEARINGTON:  No objection, Your Honor.

18             THE COURT:  136A admitted and 136.

19   BY MR. BARRY:

20   Q.   This is an e-mail from February 22, 2018.  *Hello, Professor*

21   *Tao.  I couldn't reach you.  Have you changed your mobile phone*

22   *number?  I've arrived in Fuzhou.*  The subject is Su Siwen.

23   Dr. Tao responds, *Hi, Siwen.  I missed your text [sic].  I will*

24   *contact you in the next couple days.*

25        I'd next like to show you what's already been admitted into

1    evidence as Government's Exhibit 491.  What does this document

2    appear to be?

3    A.    An application by Tao Feng to the National Natural Science

4    Foundation in 2018.

5    Q.    What's the date on the bottom?

6    A.    March 4, 2018.

7    Q.    And the supporting unit is listed as Fuzhou?

8    A.    Fuzhou University, correct.

9             MR. BARRY:  The government next seeks to introduce

10   what's been marked as Government's Exhibits 321 and 321A.

11            THE COURT:  Any objection?

12            MR. DEARINGTON:  No objection, Your Honor.

13            THE COURT:  321, 321A admitted.

14   BY MR. BARRY:

15   Q.    March 9th e-mail.  The attachment.  Translation of the

16   attachment.

17       Does the original -- this is 321, does that have a

18   signature on it?

19   A.    Yes.

20   Q.    Okay.  Whose signature is that?

21   A.    Tao Feng's.

22   Q.    I'd next like to pull up what's already been admitted into

23   evidence as Exhibit 488 --

24            MR. BARRY:  And actually, can we switch over to

25   Ms. Boyd, please?

1          Can we pull up 488A.

2    BY MR. BARRY:

3    Q.   This is a slightly different version that's already been

4    admitted.  Does this look similar to the prior document we

5    looked at?

6    A.   It does.

7          MR. BARRY:  Can we go back to the ELMO, please?  The

8    government next seeks to introduce into evidence Government's

9    Exhibit 137 -- actually let me show Mr. Churchill a copy.

10          THE COURT:  Any objection?

11          MR. DEARINGTON:  Yes, Your Honor.

12          THE COURT:  Adoptive admission.  Objection overruled.

13    Exhibit 137 admitted.

14    BY MR. BARRY:

15    Q.   This is from March 2018.  We have the defendant e-mailing

16    someone by the name of Huimin Liu.  *Would you propose two*

17    *projects in thermal catalysis you would like to work on?*

18        Ms. Liu responds, *Dear Professor Tao, I will consider the*

19    *projects I would like to work on.  Are they projects I will*

20    *work on in Fuzhou University?*

21        Dr. Tao responds, *yes, you can name them as projects in*

22    *Fuzhou.*

23        Ms. Liu says, *Dear Professor Tao, I will think about it and*

24    *give you a proposal.  Best regards, Huimin.*  That's March 5th,

25    2018.

1      MR. BARRY:  Government next seeks to introduce what's

2   been marked as Government's Exhibit 138.  Admission of the same

3   e-mail chain.

4      MR. DEARINGTON:  Same objection, Your Honor.

5      THE COURT:  All right.  Again, I admit Exhibit 138,

6   adoptive admissions in Dr. Tao's responses to the out-of-court

7   statements of Dr. Liu by context to explain Dr. Tao's responses

8   so 138 admitted.

9   BY MR. BARRY:

10  Q.  And is this -- this same e-mail we looked at previously,

11  that sort of origin e-mail?

12  A.  Yes.

13  Q.  And then Dr. Tao's -- Huimin's response is -- or Ms. Liu's

14  response, *I listed the projects I will do in FZU.*

15      Based on your review of dozens of documents in this case,

16  do you know what FZU refers to?

17  A.  FZU stands for Fuzhou University.

18  Q.  *I will not do pure photocatalysis in Fuzhou.*

19      MR. BARRY:  Your Honor, would this be a good time to

20  break?  I see we're a quarter till already.

21      THE COURT:  How much longer do you think you're going

22  to have on direct of this witness?

23      MR. BARRY:  A significant amount of time.  I would say

24  at least 90 more minutes.

25      THE COURT:  All right.  Will you all come forward?  I

1    want to ask you about scheduling beyond that.

2        (The following proceedings were had at the bench).

3        THE COURT:  All right.  Now, you know, I think

4    defendant has been very efficient with their cross-examination

5    on most of these witnesses.  I understand some witnesses

6    require a lot more cross-examination.  But so if you're going

7    to spend another let's say 90 minutes on him and cross itself

8    and then what's next?  Is Dr. Tiffert going to be on tomorrow?

9        MR. BARRY:  Yes, and then the government will rest its

10   case.

11       THE COURT:  Okay.  And is it fair to say that there's

12   still a lot of exhibits in dispute?  And if so, are they going

13   to be offered through Dr. Tiffert or this witness or both?

14       MR. BARRY:  The vast majority will be offered through

15   Mr. Churchill.  It's mostly communications.  Most of the stuff

16   that was found on the electronic devices has already been

17   admitted, so Mr. Churchill may put it in context since he did

18   the translations.  But I would say 90 to 95 percent of the

19   additional exhibits are going to be through him, and there are

20   a handful that Dr. Tiffert -- we'll seek to introduce through

21   him.

22       THE COURT:  My guess is you'll probably close sometime

23   tomorrow afternoon, could be late afternoon but sometime

24   tomorrow afternoon.

25       MR. BARRY:  I think that's realistic.

1       THE COURT:  And then you're going to call Special

2   Agent Lampe, which we could start with right away, but I'm

3   going to try to build in some time to talk about instructions

4   tomorrow too.

5       MR. ZEIDENBERG:  Would it be possible to do the

6   instructions after government rests?

7       THE COURT:  Yeah.  If it's late in the day, let's just

8   do it that way, and you can start fresh on Monday morning.  Are

9   you still thinking at least a day?  Okay.

10      MR. ZEIDENBERG:  I think our case will take a day and

11  a half.

12      THE COURT:  So we may or may not get it to the jury on

13  Tuesday afternoon.

14      MR. ZEIDENBERG:  A day to two days.  I mean, I don't

15  know how long the cross-examinations will be and -- yeah.

16      THE COURT:  Okay.  All right.  Thank you.

17      (Thereupon, the proceedings continued in open court.)

18      THE COURT:  We will reconvene at 9:00 tomorrow

19  morning.  I'm trying to get a reestimate on where we're at.  It

20  looks like perhaps the evidence will be finished on Tuesday.

21  Perhaps we'll even get to closing arguments on Tuesday.  But

22  it's possible we may not get to closing arguments until

23  Wednesday morning, but that's the best estimate.  It is

24  possible the case will be submitted to you by Tuesday evening

25  though, so we'll see how we move along tomorrow and Monday.

1        Remind the jury to not discuss, research, listen,

2   expose yourself to media coverage, et cetera, and we'll see you

3   back at 9:00 tomorrow morning.

4      (The following proceedings occurred outside the presence of

5   the jury.)

6        THE COURT:  All right.  Thank you, Mr. Churchill.

7        THE WITNESS:  Thank you.

8        THE COURT:  We'll see you back at 9:00.

9        And, again, so we'll shoot for having at least an

10  informal instruction conference Friday after the government

11  rests, unless it's early enough in the day that I don't want to

12  lose hours.  But it sounds like it probably won't be.

13       So the informal instruction conference is just --

14  you're not to argue your objections to Ms. Merklen.  She's not

15  the decision-maker, but she's basically trying to figure out

16  with you what's really at issue, what can be agreed to.  She'll

17  point out to you -- because we're working off the Court's set

18  of instructions you received over the weekend so we're working

19  off that.

20       So if you have questions about where did this language

21  come from, et cetera, et cetera, she can kind of explain that

22  to you.  And then she will brief me on what the objections are,

23  and then we'll make a record and do a final -- or do a formal,

24  I guess, instruction conference sometime on Monday or Tuesday.

25       There's always, you know, some instructions that we

19-20052-JAR    USA v. Feng Tao    03.31.22    Day 9          1749

1    remove at the last minute.  We usually give you both

2    alternatives as far as the defendant testified or the defendant

3    didn't testify.  I don't know if we put an instruction in about

4    character evidence, but maybe that will come out.

5          There will be some last-minute changes based on the

6    way the case proceeds through the defense case, but anyway we

7    should be able to get them in pretty good form by Monday is my

8    hope.  Okay?  All right.  We'll see you tomorrow at 9:00 --

9    I'll be here at 8:30 if you need me.

10       (Evening recess.)

11

12                    C E R T I F I C A T E

13    I, Danielle R. Murray, a Certified Court Reporter and the

14    regularly appointed, qualified, and acting official reporter of

15    the United States District Court for the District of Kansas, do

16    hereby certify that the foregoing is a true and correct

17    transcript from the stenographically reported proceedings in

18    the above-entitled matter.

19       SIGNED 17th of November, 2022

20

21                    /s/Danielle R. Murray
                      DANIELLE R. MURRAY, RMR, CRR
22                    United States Court Reporter

23

24

25