1            UNITED STATES DISTRICT COURT
                 DISTRICT OF KANSAS
2

3   UNITED STATES OF AMERICA,

4        Plaintiff,

5        v.                        Case No. 19-20052-01-JAR

6   FENG TAO, a/k/a "Franklin
    Tao,"                          Kansas City, Kansas
7                                  Date:  April 4, 2022
         Defendant.
8                                  Day 11 (Pages 1990-2230)

9   . . . . . . . . . . . . . . . . . . . . . . . .

10               TRANSCRIPT OF JURY TRIAL

11        BEFORE THE HONORABLE JULIE A. ROBINSON
         SENIOR UNITED STATES DISTRICT COURT JUDGE
12

13            A P P E A R A N C E S

14
    For the                Mr. D. Christopher Oakley
15  Plaintiff:             United States Attorney's Office
                           500 State Avenue
16                         Room 360
                           Kansas City, Kansas 66101
17
                           Mr. Adam Barry
18                         Department of Justice-Nsd
                           950 Pennsylvania Avenue, NW
19                         Washington, DC 20530

20  For the                Mr. Peter R. Zeidenberg
    Defendant:             Mr. Michael F. Dearington
21                         Arent Fox, LLP
                           1717 K Street NW
22                         Washington DC, 20008

23

24  _____
             Proceedings recorded by machine shorthand,
25      transcript produced by computer-aided transcription.

19-20052-01    USA v. Feng (Franklin) Tao    04.04.22    1991

1                          I N D E X

2
    Defendant's Witnesses:                                Page
3
    SPECIAL AGENT STEPHEN LAMPE
4       Direct Examination By Mr. Zeidenberg              2010
        Cross Examination By Mr. Oakley                   2145
5       Redirect Examination By Mr. Zeidenberg            2195
        Recross Examination By Mr. Oakley                 2213
6       Further Redirect Examination By Mr. Zeidenberg    2216
        Further Recross Examination By Mr. Oakley         2217
7

8                        E X H I B I T S

9    Government's
     Exhibits              Offered            Received
10
          352                2183               2183
11        352A               2184               2184
          774                2153               ----
12

13   Defendant's
     Exhibits              Offered            Received
14
          1104               2085               2085
15        1119               2131               ----
          1465               2089               2089
16        1466               2089               2089

17

18

19

20

21

22

23

24

25

```
1                  (Court called to order).

2                  (The following proceedings were held outside the

3    presence of the jury).

4                  THE COURT:  All right.  You may be seated.

5                  All right.  You all wanted to take something up

6    before -- well, we need to have you rest if you're going to

7    rest, make a record on the motion for judgment before we bring

8    the jury in, and then you can rest in their presence assuming

9    you're still going to rest at this point.

10                 MR. OAKLEY:  Yes, Your Honor.  The one thing that

11   we're going to do is just the last exhibit with the timeline

12   and then immediately following that we will rest.

13                 THE COURT:  Okay.  So why don't we make a record now

14   on the motion for judgment.

15                 MR. ZEIDENBERG:  Do that now, Your Honor?

16                 THE COURT:  Yeah, and that way we can -- they'll rest

17   in front of the jury, but they're telling me they are resting,

18   all they're going to do is display the rest of that

19   demonstrative chart, so I think we can make a record on the

20   motion for judgment now.

21                 MR. ZEIDENBERG:  Okay.

22                 THE COURT:  And then was there something else, though,

23   you all wanted to talk about?

24                 MR. OAKLEY:  I didn't know if the court wanted -- we

25   sent an e-mail yesterday to chambers after the defense provided
```

1    the exhibits I think either Friday or Saturday, and we're going

2    to have some hearsay objections.  So we just set it out in a

3    table similar to what the defense did.

4        THE COURT:  Okay.  I think I should -- there aren't

5    that many.  I think I can just look at them contemporaneously.

6        MR. ZEIDENBERG:  Yeah.  And I think that that's a --

7    an appropriate approach, Your Honor, because I'm actually very

8    unlikely to be actually admitting most of those documents.

9    They're marked because they could theoretically be exhibits,

10   but for the most part the majority of those are not going to --

11   I'm not going to be admitting them.

12       THE COURT:  Okay.  All right.  Let's just do those

13   contemporaneously then.

14       Okay.  So the government is going to rest here

15   shortly.  I'd like to make a record now of the defendant's

16   motion for judgment.  And, Mr. Zeidenberg, again, my practice

17   is I don't always, but in this case I definitely will be asking

18   for -- assuming there's -- if there's a government verdict,

19   I'll be asking for motions in writing, post-trial motions in

20   writing.

21       So go ahead and make your record for now.

22       MR. ZEIDENBERG:  Thank you, Your Honor.

23       Your Honor, I know from your comments the other day,

24   it sounds like you have a custom and practice when it comes to

25   MJOAs, and it sounded -- you know, my inference I took from

1    what your comments were is, you know, let this go to the jury

2    and then let them see if they can sort it out.  And then if

3    there's a need for you to step in, then you do it.  A lot of

4    judges will do that in a lot of cases.

5         I would like to make the argument that that's --

6    shouldn't be done in this case after the evidence that you've

7    heard.  And that's because we don't think that any rational

8    juror could convict on any of these counts beyond a reasonable

9    doubt.

10        First of all, the money -- there was a fundamental

11   misunderstanding by the government about how these grants work.

12   In their indictment they allege that the money went to Doctor

13   Tao.  The money didn't go to Doctor Tao, the money all went to

14   KU.  Doctor Tao never touched the money.  If he wanted to

15   expend the money, he would have to requisition KU and they

16   would decide which -- which quote was appropriate and they

17   would send the money to the vendor.  So he's not touching the

18   money.

19        NSF and DOE both testified that the research was done

20   and they were satisfied.  There was no intent to defraud.  The

21   whole fraud scheme theory makes no sense.  The idea is that

22   Doctor Tao engaged in a scheme to defraud NSF and DOE so that

23   they would enrich KU, they would send money to KU that KU

24   shouldn't have gotten, and then Doctor Tao would do all that

25   work for KU's benefit, which he then did do.  I mean, and then

1    he defrauded KU somehow of his salary?

2           I mean, you heard from Doctor Girod on down that he

3    was an outstanding employee.  He was on salary, so his salary

4    was not contingent on getting grants.  There's no -- you know,

5    he didn't get a bonus based on that.  So their entire theory,

6    first of all, is -- doesn't withstand scrutiny.  They have a

7    maintenance of salary theory, okay, because he didn't do this

8    to get the job, he did this at most to maintain his job.

9    That's not a viable theory, and I'll give you the cases on

10   that.

11          But just to go back to the actual evidence, if I

12   could -- if you could turn on the ELMO.

13          This is the testimony of Viviane Schwartz.  The

14   research got -- "Fair to say that there wasn't -- that the DOE

15   grant at issue here, the research got done; correct?"

16          "Yes."

17          "And appeared to have been done satisfactorily?"

18          "Yes."

19          Rebecca Keiser from NSF:  "Are you aware of any

20   allegations in this case that any of the work on the NSF grants

21   was not done in the manner prescribed?"

22          "I'm not aware."

23          Those are the only two witnesses from the NSF and the

24   DOE that testified in this case.  They both said their agencies

25   were satisfied.  So I don't think any rational juror could find

1    beyond a reasonable doubt that he had some intent to defraud

2    them when all along all we've heard about is what an

3    outstanding researcher he is, that he's a working machine and a

4    researching machine and that he worked 16 hours a day to

5    complete these research projects and then publishes

6    prodigiously, which is exactly what the agencies want him to

7    do.

8        The reasoning of Judge Varlan, who was the presiding

9    judge in the Anming Hu case in the Eastern District of

10   Tennessee a few months ago, when he granted the defendant's

11   motion for judgment acquittal in a case very similar to this

12   involving grant fraud based on undisclosed connections to

13   China, now, that was a --

14       THE COURT:  I've read that decision and that, I think,

15   was a situation where the judge thought that the theory was

16   maintenance of salary, which wasn't a violation, unless I'm

17   conflating with another case.  But I've read that decision.

18       MR. ZEIDENBERG:  No, Your Honor, actually I think that

19   what he said -- and I have the key excerpt.

20       THE COURT:  Okay.

21       MR. ZEIDENBERG:  He said, "Assuming, without deciding

22   the defendant could be deemed to have intentionally deceived

23   NASA about his affiliation with BJUT," which is a Chinese

24   entity, "such did not go to the nature of the bargain.  NASA

25   bargained for research on a particular scientific topic in

1   exchange for providing funding to the research topic, and

2   there's no evidence that NASA did not receive exactly the type

3   of research that it bargained for."

4          "In fact, Agent Gibson of the NASA's Office of

5   Inspector General testified that NASA was satisfied with the

6   defendant's work on their grants, NASA got what they had

7   bargained for and defendant did not steal any money from NASA.

8   And neither -- and neither Agent Gibson nor any other witness

9   testified that NASA received any less services; that NASA was

10  unable to use the research the defendant conducted after NASA

11  discovered his affiliations with BJUT or the defendant took any

12  money to China or had anybody in China working on the NASA

13  grants.  There's simply no evidence that NASA did not receive

14  something of value and, specifically, the benefit of its

15  bargain."

16         And the logic of that, Your Honor, fits exactly with

17  this case.  They got the benefit of their bargain.  It can't be

18  said that they were deprived of money or property when they got

19  exactly what they had hoped to get.  And, remember, they didn't

20  even bargain with Doctor Tao.  I mean, that's a whole nother

21  hurdle that the government has never really explained.  The

22  bargain they had was with KU and KU got the money.  And then,

23  as I said, only through jumping through other hurdles was it

24  ever -- it never went into our client's hands.  Never.

25         Your Honor, as for the salary issue with KU, the idea

1    that he committed wire fraud because he lied to his employer to

2    maintain his job, you know, he said, "I'm in Germany," but he

3    was really in China or something like that, Your Honor, if it

4    were the case that anyone who lies to their employer about

5    their job performance in order to maintain their job, then

6    anybody who tells their boss that they were on sick leave when

7    they really had child care issues has committed wire fraud.

8    Anybody who comes up with a bogus excuse of why they didn't get

9    their work done has committed wire fraud because they're trying

10   to keep their job.

11        And that is not the case, that is not the law.

12   Multiple circuit and district courts have held that maintenance

13   of salary is not a proper object of a wire fraud scheme.  And

14   the government cited one case in its opposition to our motion

15   to dismiss, and that involved an unpublished district court

16   opinion from this district that involved falsification of

17   timecards.  That's very different than we have here.

18        Here, we have Doctor Tao, who's one of the foremost

19   outstanding professors at KU in 2019 with remarkable -- what

20   Chancellor Girod said was remarkable accomplishments.  And the

21   only circuit courts to address the issue have rejected the

22   government's salary maintenance theory.  And there are three

23   cases, Your Honor, I can cite them to you here:  *United States*

24   *v. Yates*, 16 F.4th 256, that's a Ninth Circuit case; *U.S. v.*

25   *Goodrich*, 871 F.2d 1011; and then a recent case in DDC, which

1    is a district court opinion which collected a number of these

2    cases, *United States versus Guertin*, G-U-E-R-T-I-N.

3         So their theory as to KU is out as a matter of law we

4    believe, certainly under these facts.

5         The other issue that the government we don't think can

6    overcome and no jury could conclude differently has to do with

7    the materiality.  It did not matter -- according to the

8    government's witness, Viviane Schwartz, it did not matter to

9    her if Doctor Tao had a second job in China.  That's what she

10   testified to.

11        She said, I -- the question -- and this was a question

12   from the government to her on direct examination:  "So we

13   talked about foreign research support.  So when you were

14   evaluating Doctor Tao's renewal proposal, would you have wanted

15   to know if he had a second job at a Chinese university while

16   having his full-time job at KU?"

17        Answer:  "Since I'm not his employer, I really don't

18   verify, you know, jobs, per se.  That's not my role as a

19   program manager."

20        That's the sum of the evidence on that subject.

21        She also said she did not care if he was setting up

22   another lab in China.  Again, this was a question from the

23   government:  "And when you were reviewing his renewal, would

24   you have wanted to know whether he had been promised or

25   received funding from a foreign research university or

1    institution to build a laboratory?"

2        "To build a laboratory?  I don't think that would be

3    my concern."

4        It's impossible for a jury to conclude beyond a

5    reasonable doubt the exact contrary to that evidence.  That's

6    the only evidence on this issue.  The DOE witness said I don't

7    care, it doesn't matter, it wouldn't be material to my

8    decision.

9        As for the conflict of interest forms, Your Honor,

10   there is no evidence, none -- in fact, there's contrary

11   evidence that Doctor Tao had any knowledge and anyone ever told

12   him that that conflict of interest form would play any

13   conceivable role in the grant approval process.  Okay.  So to

14   commit a wire fraud, he has to use the wires in furtherance of

15   a scheme to defraud.

16       If he had no reason to think that this form he's

17   filling out has any role in that process, then no one, no

18   juror, no rational, reasonable juror could conclude beyond a

19   reasonable doubt that he was submitting that in order to

20   defraud NSF, DOE, and KU of grant money.

21       There was no reason for him to think that.  No one

22   told him that, and, in fact, NSF and DOE both said they never

23   looked at it.  They never saw it.  It was never explained to

24   him that this played any part of it.  So how can it be that

25   that was done knowingly with the intent to further a scheme to

1    defraud?

2         Both Rebecca Schwartz -- both Viviane Schwartz and

3    Rebecca Keiser testified that once there was an ongoing grant,

4    they did not care about pending support.  Okay?  It's very

5    important that they said they only cared about active support.

6    Both of them testified that if active -- if on the progress

7    report or on a grant if pending support wasn't listed, if it

8    had been left off, okay, but it never came to fruition, you

9    know, it fell through, then it's a no harm/no foul situation

10   because there cannot be overlap and there cannot be a

11   commitment issue if a grant falls through.  There's no need to

12   update pending support -- you know, your progress reports with

13   pending support, they don't care.  They only care about active

14   cases, active matters.  Then they can look at it and say, oh,

15   does this overlap with what you're doing.  Both of them

16   testified to that.

17        But what do we know about other support?  The NSFC,

18   the Chinese grants that the government has talked about, there

19   is no evidence they were funded, none.  They have some unsigned

20   documents filled with all kinds of anomalies and things that

21   aren't true in them.  No stamps, no signatures, and no

22   evidence -- not only no evidence they were submitted properly

23   for review by the authorities in China, there's no evidence

24   that they were funded.  So if they weren't funded, there was

25   nothing to report.

 1          The dates here are critical, Your Honor.  The NSF

 2   grant was submitted on March 4th, 2015.  The second NSF grant

 3   was submitted on October 2nd, 2017.  And the DOE grant was

 4   submitted on December 11th, 2017.  And what do we know about

 5   those dates?  They all pre-dated the allegations with Fuzhou

 6   University.  They say he accepted a job, he was negotiating a

 7   job in March of 2018, 2018, and he accepted it in May of 2018.

 8   There was nothing to disclose on these grant applications when

 9   he submitted them, nothing.

10          And you heard from both Keiser and Schwartz that there

11   was never any obligation to update a biosketch.  So you get a

12   new job, a new position, you don't have to go back to your

13   biosketch and update it.  They both said that.  The only thing

14   that is left are progress reports, but they said you don't have

15   to update progress reports with simple -- simply pending

16   support, only new active support.

17          You get a grant that's funded, then they want to know

18   so they can see if it overlaps or there's a time commitment.

19   There's no evidence that that happened.  There was nothing to

20   report.

21          And as for the specific counts, Your Honor, when you

22   go through the government's indictment, Count 1 is an e-mail

23   from Kansas to the consulate general of the PRC in terms of

24   getting a visa.  That is not in furtherance of a scheme to

25   defraud KU.

1          Your Honor instructed the government -- I think during

2    the motions *in limine* it ruled that their previous object of

3    the fraud scheme, which was to benefit the PRC, is out because

4    that's not a proper purpose of a fraud scheme.  It's not

5    illegal to benefit the PRC.  And the court properly said, you

6    know, we're excluding it, that's not part of the fraud scheme.

7    But this is their theory, is that getting the job in the PRC

8    was part of the fraud scheme.  That's not a fraud scheme.  The

9    scheme was not to get a job; the scheme apparently was to not

10    tell KU.

11          So what they're talking about is simply the underlying

12    activity that the government alleges should've been disclosed.

13    So there's no way that that count, Count 1, could be deemed in

14    furtherance of a scheme to defraud.

15          Count 2, the electronic submission of Doctor Tao's DOE

16    grant on December 11th, 2017.  As I just pointed out, there was

17    nothing to report.  He didn't have the job yet.  He can't make

18    out a fraud scheme that I'm going to submit a grant and months

19    from now I may get a position and so, therefore, what?  I

20    should tell them I'm thinking about doing something in the

21    future that may or may not happen?  I mean, no one could find

22    that beyond a reasonable doubt that's a proper -- that was done

23    in furtherance.

24          Count 3, e-mails from outside the U.S. to KU regarding

25    his proposal for collaborative research with FZU.  Your Honor,

1    the evidence was he wanted a grant from Fuzhou that would be

2    administered by the University of Kansas.  He was trying to

3    benefit KU by getting them grant funds.  It's the opposite of a

4    scheme to defraud KU.

5         Count 4 and 8 is charged as wire fraud and false

6    statements.  These are the July 16th e-mails to Viviane

7    Schwartz when she asked him to update his current and pending

8    support.  And I've touched on this already, but I want to show

9    you her testimony because, as I said, there was nothing to

10   report there.

11        I asked her this question.  I said, "Okay.  And just

12   to dive into this a little further, you're looking at a grant

13   application and you want to know about current and pending

14   support because of the overlap and time commitment issue;

15   correct?"

16        Answer:  "Yes."

17        And ultimately -- "and if ultimately something is left

18   off, but -- but it is not funded, then in a way it's a

19   situation where the problem is averted because there can be no

20   overlap and there can be no time commitment issue on an

21   unfunded grant?"

22        Answer:  Yes.

23        And then I asked:  "Okay.  And as far as the

24   scientific -- and your -- your concern about overlap, I just

25   want to emphasize, if the other grants are not funded, overlap

1    is not an issue?"

2         "Can you repeat the question?"

3         "Yes.  If there are -- other pending support is not

4    funded, then overlap and time commitment is not an issue?"

5         "Correct."

6         "You didn't care about the fact that he was

7    potentially working on helping build a second lab, that was not

8    important to you as a program manager?"

9         "Not at that time."

10        There was nothing for him to report to Ms. Schwartz in

11   his e-mail that was material because he did not have active

12   support in China.  There's no evidence that those Chinese

13   grants were funded, nothing to report.  She only cared about

14   active support.

15        Count 5 and 7 are the conflict of interest form.

16   There was no reason for Doctor Tao, as I said, for him to think

17   that these had any role in the grant approval process.  I won't

18   reiterate that argument here, but I do want to talk just about

19   the substance of that form.  You'll remember two boxes to

20   check.  One, you check it if you've received over $5,000 in the

21   preceding 12 months.  He signed this in September 2018.

22   There's no evidence in this case that he received $5,000 or

23   more between May and -- you know, in the year preceding

24   September 2018, none.

25        And then the other issue is you have to check the box

19-20052-01   USA v. Feng (Franklin) Tao   04.04.22          2006

 1  if you are engaged in activities that could adversely impact

 2  your job duties at KU.  Well, Your Honor, you've heard that he

 3  was a researching machine at KU.  He got all of his work done.

 4  He did all of his research, he worked 16-hour days, seven days

 5  a week, never took a day off.  There is absolutely no evidence

 6  that he was -- any of his work was being impacted.

 7          And it's a subjective test, there's not an objective

 8  test here.  The reviewer makes a decision, is this going to

 9  impact your ability to do your job?  He made a decision which

10  was reasonable given the work that he was able to do.  And

11  there's -- no rational, reasonable juror could conclude beyond

12  a reasonable doubt that it did, that that was done falsely at

13  the time, knowing he couldn't get his work done when he did all

14  of his work.

15          And finally, Your Honor, Count 6, which was the e-mail

16  from outside the U.S. through KU regarding his application for

17  NSFC funding.  Again, how can application to a Chinese agency,

18  which the government claims he applied for a Chinese grant, be

19  part of a scheme to defraud DOE and NSF?  I mean, that's the

20  activity they're saying he didn't disclose.  It's not part of a

21  scheme to defraud.  It has nothing to do with hiding his

22  activities.  It's just trying to get, according to them, a

23  grant.

24          On the conflict of interest form, Your Honor, there's

25  no evidence that it was -- that that form was within the

1    federal jurisdiction, that DOE had -- the evidence was that DOE

2    had no policy on conflict of interest form.

3           And, you know, for all of these reasons and there's

4    plenty of others, Your Honor -- it's not appropriate when the

5    government's only two witnesses from these agencies say there

6    was essentially nothing to report here and it wouldn't have

7    mattered to us if it did and that all of the work got done and

8    that we were completely satisfied with the research and that he

9    was on salary and he was -- which was not contingent on any of

10   this.  He was entitled to that salary legally regardless, so

11   there was no reason for him to be defrauding KU for his salary

12   which he was guaranteed.

13          You know, given all of that, there's just no reason to

14   put this to the -- to the jury and to make Doctor Tao go

15   through that additional process.  There is not evidence to

16   conclude -- that a jury could conclude that he's guilty of any

17   of these charges.  It's just -- the government's case, you

18   know, it fell apart as far as we're concerned.  The evidence --

19   the witnesses, their witnesses did not say perhaps what they

20   anticipated them to say.  But it's not a proper basis to find

21   guilt beyond a reasonable doubt.

22          But we would move for acquittal on all of those

23   counts.

24          MR. OAKLEY:  Your Honor, certainly I know that the

25   court indicated that you're inclined to order briefing on this

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE                2008

1    matter, and I think we would at this point prefer to respond in

2    writing.  I certainly am willing to answer any questions or to

3    make any comments now, but if the court is still inclined to

4    order briefing, I think we'll address that in our written

5    submission.

6            THE COURT:  I am inclined to order briefing, and there

7    are some issues that I think I would like you all to focus on.

8    And we can talk about it later, but one is materiality, two is

9    obtaining money or property.  I do understand the defendant is

10   charged with aiding and abetting.  But three is intent to

11   defraud.  I can't remember the name of the case, I think the

12   last name is Hu, you referenced it Mr. Zeidenberg in your

13   argument.  I think it was in that case the judge drew a

14   distinction between intent to deceive and intent to defraud.

15   And there is a lot of commonality between that case and this

16   one factually.

17           And then the other thing is just -- frankly, to

18   convince me that this is not a *McNally, Skilling, Bridgegate*

19   situation, this is not sort of essentially an honest services

20   case, which I guess is the same thing as telling you to focus

21   on the obtain money or property.

22           So those are the issues that I want to hone in on, but

23   at this point rather than shut the trial down and send the jury

24   home for a week or two so that I can fully analyze this and

25   write on it one way or the other, I'd rather proceed, take it

1    under advisement, and give you all the opportunity to brief it.

2         All right.  So what we'll do now is bring the jury in,

3    have the government rest -- well, after you're going to walk

4    them through the chart obviously, rest in their hearing, and

5    then proceed with Mr. Zeidenberg.

6         All right.  Anything more?  All right.  Bring the jury

7    in.

8         MR. ZEIDENBERG:  Your Honor, are you bringing in the

9    jury right now?

10        THE COURT:  Yes.

11        MR. ZEIDENBERG:  We have one evidentiary issue about

12   the Susannah Scott e-mail, but we don't have to bring it up at

13   this moment, we can bring it up during a break.

14        THE COURT:  Let's go ahead and bring them in.

15        (The following proceedings were held in the presence

16   of the jury).

17        THE COURT:  All right.  You can be seated.

18        All right.  Mr. Barry.

19        MR. BARRY:  Yes, Your Honor.  We're just going to

20   update the timeline from Friday.

21        COURTROOM DEPUTY:  If you could wait a second too, I'm

22   turning on the back monitor.

23        MR. BARRY:  Oh, absolutely.

24        COURTROOM DEPUTY:  Okay.  We're ready.

25        MR. BARRY:  All right.  So the update from last week

1    is this Exhibit 121.  And this is the second time period and

2    the update is the certificate that we all looked at.  And then

3    this is the last section.

4                   THE COURT:  All right.  Mr. Oakley, Mr. Barry.

5                   MR. BARRY:  The United States rests its case.

6                   THE COURT:  All right.  Motion is under advisement per

7    our earlier hearing.

8                   Mr. Zeidenberg.

9                   MR. ZEIDENBERG:  Your Honor, the government -- on

10   behalf of Doctor Tao, we would call Special Agent Steve Lampe.

11                   SPECIAL AGENT STEPHEN LAMPE,

12   called as a witness on behalf of the Defendant, having first

13   been duly sworn, testified as follows:

14                   DIRECT EXAMINATION

15   BY MR. ZEIDENBERG:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Could you please identify yourself for the jury?

19   A.  My name is Stephen Lampe.  I'm an agent with the FBI.

20   Q.  Can you pull that microphone a little bit closer to you so

21   everyone can hear you okay?

22   A.  Sure.  How's that?

23                   THE COURT:  It bends down, too, so you don't have to

24   scoot up if you don't want to.

25                   THE WITNESS:  Okay.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   BY MR. ZEIDENBERG:

2   Q.   Can you spell your last name?

3   A.   L-A-M-P-E.

4   Q.   How are you employed?

5   A.   I'm employed by the FBI.

6   Q.   In what capacity?

7   A.   I'm a special agent.

8   Q.   How long have you been employed by the FBI as a special

9   agent?

10  A.   Since 2014.

11  Q.   And where are you assigned?

12  A.   I'm assigned to Kansas City.

13  Q.   How long have you been in Kansas City?

14  A.   Since 2014.

15  Q.   And are you the lead case agent on the investigation into

16  Franklin Tao?

17  A.   I am.

18  Q.   Can you tell the ladies and gentlemen what a lead case

19  agent is and does?

20  A.   Well, there are normally multiple case agents on any

21  individual investigation, but there's usually one primary case

22  agent that follows the case the closest, but I do have other

23  agents within my squad who know the case well enough to support

24  me.

25  Q.   And is it fair to say as the lead case agent you are

1    intimately involved in all the investigative decisions that are

2    made?

3    A.   I am.

4    Q.   And that was the case for this investigation with Doctor

5    Tao; correct?

6    A.   That's correct.

7    Q.   The government has alleged that Doctor Tao failed to

8    disclose his alleged affiliations with Fuzhou to NSF, DOE, and

9    KU and that this failure was knowing and intentional; is that

10   correct?

11   A.   I think the lack of disclosure is to KU, which then in turn

12   is a lack of disclosure to NSF and DOE as well.

13   Q.   So no allegation that he failed to disclose anything

14   directly to NSF and DOE, he didn't have to do that?

15   A.   Well, I believe there's --

16        MR. OAKLEY:  Your Honor, I object to the question.

17   The court will instruct the jury as to the elements of the

18   offenses.

19        THE COURT:  All right.  I'll sustain.

20   BY MR. ZEIDENBERG:

21   Q.   Is it your understanding -- were you investigating Doctor

22   Tao for a failure to disclose affiliations he had in China to

23   NSF and DOE?

24   A.   Yes.

25   Q.   And as part of your investigation was it important to find

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    out what NSF and DOE expected to be disclosed in connection

2    with grant applications?

3    A.   Yes.  However, the initial -- the indictment isn't based on

4    that initially.

5    Q.   Was it important as part of your investigation to find out

6    what NSF and DOE expected to be disclosed in connection with

7    grant applications?

8    A.   Yes.

9    Q.   Was it important to find out how these expectations were

10   explained and communicated to principal investigators like

11   Doctor Tao?

12   A.   I don't understand your question.  As in how it is

13   communicated to Doctor Tao or how Doctor Tao communicates it to

14   NSF?

15   Q.   I'm asking, was it important to your investigation to find

16   out if the DOE and NSF's expectations were shared and explained

17   to Doctor Tao?  Was that part of your investigation?

18   A.   I would say my investigation focused more on whether Doctor

19   Tao disclosed properly to NSF or DOE.

20   Q.   Right.  And what I'm asking is -- you already said the

21   expectations that NSF and DOE had were important to know;

22   correct?

23   A.   Yes, that's what I just stated.

24   Q.   And I want also to know and if you could explain to the

25   jury whether it was important to your investigation to find out

1   if those expectations were ever explained to Doctor Tao?

2   A.   I believe as the -- as the PI, Doctor Tao had a

3   responsibility to understand those expectations via the

4   regulations.

5   Q.   Okay.  But you didn't -- did you learn at some point in

6   your investigation that those expectations are never explained

7   explicitly to Doctor Tao, that there's no training that's

8   required?  Did you learn that?

9   A.   I don't know of -- that is correct.  I don't know of any

10  direct training, so to speak, other than the annual meetings I

11  believe DOE had.

12  Q.   Do you agree that the obligations were not well and clearly

13  understood by the granting agencies -- strike that.

14       Do you agree that if these obligations were not well

15  understood by the granting agencies, that that would be

16  important for you to understand?

17  A.   Are you suggesting NSF and DOE don't know their own

18  requirements?

19  Q.   Yes.

20  A.   I don't know if they do or do not know their own

21  requirements.

22  Q.   Do you agree that it could be exculpatory and helpful to

23  Doctor Tao if you were to learn that the NSF and DOE believed

24  that there was confusion about whether, for example, foreign

25  grants needed to be disclosed?

1    A.   If NSF and DOE believed -- say -- I'm sorry, you'll have to

2    say the question again so I can answer it properly.

3    Q.   Do you agree that it would be helpful, exculpatory, if you

4    were to determine that NSF and DOE believed that there was

5    confusion about whether, for example, foreign grants needed to

6    be disclosed?

7    A.   If NSF and DOE felt there was confusion whether foreign

8    grants needed to be disclosed, then, yes, that would make

9    sense.

10   Q.   How did you go about learning what the expectations were of

11   NSF regarding foreign grants?

12   A.   I engaged the Office of Inspector General for NSF.

13   Q.   And DOE?

14   A.   As well, yes.

15   Q.   Fair to say that you never spoke to Rebecca Keiser of NSF

16   until after Doctor Tao was arrested?

17   A.   Yes.

18   Q.   Fair to say you never talked to Viviane Schwartz of DOE

19   until after Doctor Tao was arrested?

20   A.   Yes.

21   Q.   You never spoke with Raul Miranda of DOE until after Doctor

22   Tao was arrested?

23   A.   Yes.

24   Q.   You never spoke with Andrew Schwartz of Doctor Tao --

25   Andrew Schwartz of DOE until long after Doctor Tao was

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE        2016

1    arrested; correct?

2    A.   I've never spoken to Andrew Schwartz.

3    Q.   Members of your team did; correct?

4    A.   Perhaps the DOJ attorneys but not myself.

5    Q.   All of these people when they were interviewed - Doctor

6    Schwartz, Viviane Schwartz, Raul Miranda, Rebecca Keiser - they

7    were all asked about NSF disclosure obligations after you had

8    already arrested and indicted Doctor Tao; correct?

9    A.   That is correct.

10   Q.   Fair to say the government didn't interview a single

11   witness from the National Science Foundation prior to arresting

12   and indicting Doctor Tao?

13   A.   Whether the FBI did directly, I don't think so; however,

14   DOE was involved in the process.  And where they had

15   discussions with their own employees, I cannot speak to.

16   Q.   Doctor Tao was arrested and indicted for failing to

17   disclose being part of a foreign talent program without the FBI

18   ever having spoken to a single person from the relevant

19   agencies to see what their expectations were regarding

20   disclosure of foreign talent programs; isn't that correct?

21   A.   He wasn't arrested based on being a participant of a

22   foreign talent program.

23   Q.   He was arrested and indicted for failing to disclose being

24   part of a foreign talent program.  That's part of the

25   indictment; correct?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    A.   He was arrested for fraud.

2    Q.   And the fraud was failing to disclose being part of a

3    foreign talent program; correct?

4    A.   Indirectly because being part of the talent program also

5    includes a full-time position.

6    Q.   And you never asked anyone at the NSF or DOE about what

7    their expectations were regarding disclosing participation in a

8    foreign talent program; you never asked anyone about that

9    before arresting Doctor Tao, did you?

10   A.   I did not.

11   Q.   It was only after Doctor Tao was arrested and indicted you

12   bothered to do these interviews; correct?

13   A.   Yes.

14   Q.   And at that point the government had already issued a press

15   release about this case; correct?

16   A.   I'm unsure.

17   Q.   You don't remember the DOJ putting out a press release

18   about the arrest of Doctor Tao?

19   A.   I remember many press releases about the arrest of Doctor

20   Tao.  I don't specifically remember DOJ's comments on that.

21   Q.   Do you agree it would be better to find out critical

22   information about your investigation before an arrest and

23   indictment as opposed to after?

24   A.   I believe that arrests happen and investigations continue

25   after arrests, and further investigation may warrant more or

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1  different charges.

2  Q.  Were you aware that, before Doctor Tao was arrested, that

3  program managers at DOE considered the disclosure obligations

4  to be in a "period of transition" or "evolution" between 2017

5  and 2020?

6  A.  At the time of his arrest?

7  Q.  Yes.

8  A.  I was not aware.

9  Q.  Okay.  During the trial and during the lead-up to the

10 trial, did you become aware of that?

11 A.  I became aware of -- restate that phrase because I want to

12 make sure I state it back to you correctly.

13 Q.  Sure.  Were you aware that, before Doctor Tao was arrested,

14 that program managers at DOE considered the disclosure

15 obligations to be in a "period of transition" or "evolution"

16 between 2017 and 2020?

17 A.  I was not aware of a period of evolution or transition as

18 you say.  However, I was aware of the clarifications that were

19 being put out by NSF.

20 Q.  Well, as for the period of transition and the evolution,

21 that was what Raul Miranda said when he was interviewed;

22 correct?

23         MR. OAKLEY:  Objection, hearsay.

24         THE COURT:  Sustained.

25 BY MR. ZEIDENBERG:

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2019

1    Q.  You learned from Raul Miranda this information; correct?

2         MR. OAKLEY:  Objection, hearsay.

3         THE COURT:  Sustained.

4    BY MR. ZEIDENBERG:

5    Q.  Did speaking with Raul Miranda, after Doctor Tao was

6    arrested, and learning what he had to say about NSF -- I mean,

7    strike that -- DOE expectations make you wish you had spoken to

8    Doctor Miranda before you arrested Doctor Tao?

9    A.  No.

10   Q.  Didn't change your mind at all?

11   A.  No.

12   Q.  Have you heard the witnesses during this trial testify that

13   the language used in the NSF PAPP Guide and the DOE funding

14   announcements changed in 2020 such that the language was

15   broader and clearer?

16   A.  I believe Doctor Keiser stated that there were

17   clarifications, which would be different from changes.

18   Q.  And did you hear Viviane Schwartz say funding announcements

19   at DOE had changed in 2020 to make the language much clearer?

20   A.  To be -- I don't recall her saying that, but I am sure

21   you're reading from the transcript, so...

22   Q.  And were you aware prior to your arresting Doctor Tao that

23   that language was undergoing internal review because it was

24   deemed not sufficiently clear?

25   A.  Prior to arresting Doctor Tao, no.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE                2020

1   Q.  Is that information you would've liked to have had before

2   you arrested him?

3   A.  Not based on the charges that we charged him in the

4   superseding indictment.

5   Q.  You charged Doctor Tao with failing to disclose certain

6   affiliations he had in China; correct?

7   A.  With his employment in China; correct.

8   Q.  And it wasn't of interest or importance to you to learn

9   that people at these agencies thought that language that

10  controlled whether he had to disclose was undergoing revisions

11  because it was deemed insufficiently clear?

12  A.  If I'm basing your question on prior to his arrest, then,

13  no, that's not important at that point or it wasn't important

14  at that point.

15  Q.  Well, help me understand this, Agent Lampe.  The allegation

16  is that Doctor Tao knowingly and intentionally failed to

17  disclose information to these agencies; correct?

18  A.  That's correct.

19  Q.  And you subsequently learned that this language is being

20  revised because the agencies didn't think it was clear enough;

21  right?

22  A.  Correct.

23  Q.  And that's not information you would've wanted to know

24  before you arrested Doctor Tao, that the agencies themselves

25  thought that language that controlled wasn't sufficiently

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2021

1    clear?

2    A.  Again, my understanding is that NSF and DOE were making

3    clarifications to those statements rather than changes in

4    requirements.

5    Q.  Well, would you agree with me, Agent Lampe, that things

6    that are perfectly clear don't need to be clarified?

7    A.  I understand what you're saying and I -- I don't want to

8    make light of it, but clarification is sometimes necessary.  If

9    I were to say the word "all," that means pretty much everything

10   and if people don't understand what the word "all" means, then

11   a clarification might help.

12   Q.  You heard Ms. Keiser testify, did you not, that prior to

13   the changes being made in 2020, they were fielding a lot of

14   questions from people in the field about what did and did not

15   need to be disclosed?  Doesn't that suggest to you, as it did

16   to Ms. Keiser, that the language they were using was not clear

17   enough?

18   A.  Again, if the requirement is to disclose all affiliations

19   or -- and I'm using this case as an example, and people have

20   questions about that, I can't -- we can't control what other

21   people have questions about because they don't understand the

22   term "all."

23   Q.  But you can control who you arrest; right?

24   A.  Of course.

25   Q.  Okay.  And so you're learning I guess -- sitting here at

1    the trial was that news to you when you heard Doctor Keiser --

2    or Ms. Keiser say that they were hearing from people in the

3    field prior to 2020 that they did not understand that foreign

4    grants needed to be disclosed?  Was that new information to

5    you?

6    A.  I didn't hear her say that.  Did she say that foreign

7    grants did not need to be disclosed?

8    Q.  She said -- Ms. Keiser said, tell me if you remember her

9    saying this, that prior to the changes in 2020, they were

10   fielding a lot of questions from people in the field about what

11   did and did not need to be disclosed in particular regarding

12   foreign grants.  You don't remember her saying that?

13   A.  It does -- it's coming back, yes.

14   Q.  Okay.  Now, was that information you would've liked to have

15   known before arresting Doctor Tao?

16   A.  Before arresting Doctor Tao -- the charges are different in

17   the original indictment than they are in the second superseding

18   indictment.  And the second superseding indictment came as a

19   result of further investigation as you've noted.

20   Q.  And when you did the second superseding indictment, were

21   you aware that Doctor Keiser had been fielding questions from

22   people in the field prior to 2020 about misunderstanding about

23   whether foreign grants needed to be disclosed?  Did you know

24   that?

25   A.  I did not know that.

UNCERTIFIED ROUGH DRAFT -- DO NOT CITE, QUOTE OR FILE    2023

1    Q.   Is that something you wish you had known?

2    A.   Again, I think the question is whether -- I mean, people

3    have questions when they're filling out their forms and they're

4    concerned whether they're providing the correct information, I

5    think it's normal for the field to be reaching out to NSF to

6    ask questions to clarify.

7    Q.   Did you think the question of whether Doctor Tao had

8    received training on how to fill out grant forms and what

9    information granting agencies required to be filled out was

10   important to your investigation?

11   A.   I think Doctor Tao had a responsibility to know what needed

12   to be disclosed on these forms and Doctor Tao also had the help

13   of the University of Kansas Research Center to aid them in that

14   endeavor.

15   Q.   So is that a no, that you did not think that Doctor Tao had

16   received training on how to fill out grant forms?

17   A.   I did not know and I still don't know what training Doctor

18   Tao received on filling out grant forms.

19   Q.   And was that important for you to know before arresting

20   Doctor Tao, to find out whether he was informed about his

21   disclosure obligations?

22   A.   Again, before arresting Doctor Tao, there are different

23   charges.  And the second superseding indictment are -- are the

24   charges that you're talking about, I believe.

25   Q.   I'm going to ask you one more time.  Was it important

```
 1    knowing, before arresting Doctor Tao, whether he had received

 2    training on how to fill out grant forms and what information

 3    granting agencies required to be filled out?  Was that

 4    important?

 5    A.   I think it -- I mean, I think it is important whether he

 6    received training or not for sure.

 7    Q.   And did you find out before arresting Doctor Tao that he

 8    had not received any training?  Did you know that?

 9    A.   I did not know that.

10    Q.   Is that something you wish you had known?

11    A.   I think Doctor Tao had access to individuals who know best

12    how to fill out these forms and whether he engaged them or not,

13    I am not sure.  In fact, I think we heard testimony that he did

14    not engage KUCR.

15    Q.   Have you seen the NSF PAPP Guide?

16    A.   I have.

17    Q.   And it's 155 pages long; right?

18    A.   It's a big book, yes.

19    Q.   And were you familiar with that document before indicting

20    Doctor Tao?

21    A.   Before arresting him?

22    Q.   Before arresting him.

23    A.   No.

24    Q.   So you did not know that there was a 154-page guide filled

25    with regulations, on which Doctor Tao received no training,
```

1    that he was expected to be able to follow?  You didn't know

2    that?

3    A.   Say the question again.  I'm sorry.

4    Q.   So before you arrested Doctor Tao, you were unaware that

5    there was a 154-page PAPP Guide filled with regulations on

6    which Doctor Tao had received no training?  Did you know that?

7    A.   I was aware that there were guides that existed.  Whether

8    he received training on those, those guides, I did not know.

9    Q.   And it wasn't important to you to find out?

10   A.   I wouldn't say that.  I think that's a mischaracterization

11   to say it wasn't important for me to find out.  From the

12   investigation and talking with KUCR, it was apparent that he

13   had the tools necessary to properly fill out these forms.

14   Q.   So your -- from an investigative standpoint, if someone has

15   the tools to fill something out and does it wrong, that shows

16   beyond a reasonable doubt that he was knowingly and willfully

17   doing it incorrectly?

18   A.   Say that again, please.

19   Q.   Simply having the tools available to you is all you needed

20   to know.  If it was potentially -- if he was potentially able

21   to figure this out on his own, is it your assumption that he

22   must've done so?

23   A.   Again, I believe the University of Kansas gave him an ample

24   opportunity to ask for help if he was confused on any one in

25   particular thing.  And NSF is also giving him a significant

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE   2026

1    amount of money.  I would -- I would expect that Doctor Tao

2    would properly fill out the forms.

3    Q.  Well, to be clear, NSF doesn't give Doctor Tao any money,

4    do they?

5    A.  No.  The money does go to KUCR in this case, yes.

6    Q.  Okay.  So let's be clear.  Doctor Tao doesn't receive any

7    money and didn't receive any money from NSF or DOE; correct?

8    A.  I think that's a mischaracterization.

9    Q.  The money was applied for, the grants were applied for by

10   KU; correct?

11   A.  That is correct.

12   Q.  KU certifies the information on the grant application, not

13   Doctor Tao; correct?

14   A.  That is correct.

15   Q.  The money, if the grant is approved, goes to KU; correct?

16   A.  It does go to KU.

17   Q.  If Doctor Tao wants to do research, he has to submit

18   paperwork to the research office with quotations and their

19   requisition office has to approve those payments; correct?

20   A.  I don't know that that's true.  I believe the PI is

21   responsible for the management of the budget.

22   Q.  The money goes from the KU research office to whomever

23   Doctor Tao submitted the quotes from.  The money doesn't go to

24   Doctor Tao at all, does it?

25   A.  I believe some salary money goes to Doctor Tao.

1    Q.  Okay.  So that's -- a portion for the summer if he's

2    working for the summer, is that what you're talking about?

3    A.  Yes.

4    Q.  Okay.  But all this grant money you're talking about

5    doesn't go to Doctor Tao, do we agree on that?

6    A.  I don't agree on that.

7    Q.  Okay.

8    A.  You're conflating research dollars with salary dollars.

9    They're two different things.  The KUCR is not going to do

10   anything with research dollars if there's no PI to use it.

11   Q.  The summer salary goes from the agency to KU; correct?

12   A.  That's my understanding.

13   Q.  And then it goes to Doctor Tao?

14   A.  That is my understanding.

15   Q.  Nothing goes directly from the agency to Doctor Tao;

16   correct?

17   A.  I can't be sure of that, but I --

18   Q.  Agent Lampe, you've been investigating this case for

19   two-and-a-half years and you're telling these jurors you cannot

20   explain how the flow of money works from the granting agency to

21   Doctor Tao?  You don't know?

22   A.  I don't work at KU.  And I don't -- I don't know exactly

23   how the money travels through KU to Doctor Tao.  However, I do

24   know that the research dollars go to KUCR or the Shared Service

25   Center and from there the funds are disbursed to Doctor Tao.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2028

1   Q.  The government has indicted Doctor Tao for grant fraud;

2   right?

3   A.  Not grant fraud.

4   Q.  For defrauding NSF and DOE of grant money, what do you call

5   that?

6   A.  I call it fraud.

7   Q.  Okay.  And was the fraud involving grants?

8   A.  Yes.

9   Q.  And you can't explain to the jurors -- you don't understand

10  exactly how that money flows?

11          MR. OAKLEY:  Objection, asked and answered.

12          THE COURT:  I'll overrule.

13          THE WITNESS:  I understand that the money comes from

14  the agencies such as DOE and NSF, goes to KU.  Where

15  specifically in the Shared Services Centers, the SSC, it goes

16  and where every dollar goes, I'm not entirely sure.  I know his

17  research dollars pay for his -- I know his grant dollars pay

18  for his research.  They also pay for his salary and KU manages

19  that to him.

20  BY MR. ZEIDENBERG:

21  Q.  And to be clear, when you say salary, Doctor Tao was on

22  salary from KU; correct?

23  A.  He is on salary from KU, both from state funds and research

24  funds.

25  Q.  His salary is paid to him regardless of whether he gets any

1   grant money; correct?

2   A.   For his nine-month appointment, yes.

3   Q.   Okay.  So he doesn't get any grant funding, he doesn't

4   apply for anything, he just sits around his office, does his

5   office hours, goes and teaches his class, he's still getting

6   his salary, 108,000 or whatever it is per year; correct?

7   A.   If he's teaching his classes and -- I would assume.  I --

8   if he hasn't -- this is not the case because he is a

9   researcher.  So if he has no research, then I assume he's a

10  full-time professor and just teaches and provides service as

11  required.

12  Q.   You didn't see anything in his salary -- in his appointment

13  letters that said, "Your salary is contingent upon getting 'X'

14  number of grants," did you?

15  A.   I did not.

16  Q.   Before you -- the day before she testified, Rebecca Keiser

17  said she basically Googled Doctor Tao and within a few minutes

18  found four articles that listed him with dual affiliations at

19  KU and FZU.  Do you recall that?

20  A.   I recall -- I recall this e-mail.  I did not read the

21  e-mail because I knew Doctor Keiser was a witness, and I

22  provided that e-mail to the lawyers --

23  Q.   Well, if I were --

24  A.   -- who then forwarded it to you.

25  Q.   You did hear her testify, you were sitting here; right?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2030

1    A.  I did hear her testify.

2    Q.  And she said that she -- the night before she testified,

3    she basically Googled him, looked him up on a public website

4    and she found four articles that listed -- that Doctor Tao had

5    FZU listed as an affiliation.  Did you hear that?

6    A.  I think that sounds right.

7    Q.  Is there any question in your mind about that, just a few

8    days ago?

9    A.  I know.  It's been a long couple of days.  So I don't know

10   exactly what you said, but if you're representing those things

11   to me, then I'll believe it.

12   Q.  Before you arrested Doctor Tao, did you do the same thing,

13   did you Google him to find out if he had publicly listed

14   articles which listed his affiliation with Fuzhou and KU?

15   A.  I believe I did.

16   Q.  Okay.  So you were aware before you arrested Doctor Tao

17   that he publicly listed an affiliation with Fuzhou and KU; is

18   that correct?

19   A.  In a couple journal articles.  And I can't be sure of the

20   timing of when I looked up those articles, but I'm certain I

21   could find out.

22   Q.  Was it at all significant to you that in a case -- your

23   investigation, which is premised on Doctor Tao hiding his

24   affiliations with Fuzhou University, that Doctor Tao at the

25   very same time is publishing articles that listed for anyone in

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2031

1    the world to see his affiliations with Fuzhou and KU?  Was that

2    significant to you?

3    A.   It was significant to me because his draft contract from

4    Fuzhou University required him to list Fuzhou University.

5    Q.   Did you look up these articles before you arrested Doctor

6    Tao?  You knew about that?

7    A.   I believe I did, but I'm not entirely sure of the timing of

8    it.

9    Q.   Before you arrest somebody in a case like this, don't you

10   do basic Internet research on someone?

11   A.   We did.

12   Q.   Okay.  But you don't know if you came up with these

13   articles?

14   A.   I'm not exactly sure when I came up with these articles, I

15   believe it was before I arrested -- or we arrested him, but

16   amongst other open-source research.

17   Q.   And even though Doctor Tao is publishing articles that list

18   this affiliation with Fuzhou that anybody with a computer could

19   look up, it didn't give you any pause that he's engaged in a

20   scheme to hide his affiliation?  It didn't make you think maybe

21   something doesn't add up here?

22   A.   It didn't.  I think that was him simply responding to the

23   requirements of his contract at Fuzhou.

24   Q.   So he had to do what Fuzhou said even though he's engaged

25   in a scheme to defraud NSF and DOE and KU and he's trying to

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2032

1    keep it secret, since Fuzhou says you've got to publish it, got

2    to publish it.  Is that your thinking?

3    A.    That is my thinking.

4    Q.    And, by the way, the Fuzhou contract that you -- the draft

5    that we've been -- that was being passed around said he had to

6    list Fuzhou exclusively, it said he couldn't have any other

7    affiliation; correct?

8    A.    I don't think that's what it says.

9    Q.    All right.  Well, we will get to the contracts, but I'm

10   going to represent to you right now that that's exactly what it

11   said.  You don't know the details of that contract?

12   A.    I believe it says it must be the primary institution.

13   Q.    Well, we'll get to that, okay?

14   A.    Okay.

15   Q.    The KU office that administers grants is called the Office

16   of Research; correct?

17   A.    Yes.

18   Q.    And the person you interviewed there was Alicia Reed?

19   A.    That is correct.

20   Q.    And did she tell you when you were talking to her, as she

21   told this jury, that she was 100 percent certain that her

22   office did everything right and that any issues with any

23   disclosure failures were the fault of Doctor Tao?

24   A.    I heard her say that she was 100 percent confident that her

25   office didn't accidentally -- well, you'd have to read the

1  transcript back to me, but I remember her statement of

2  100 percent.

3  Q.  She was not able to provide you with a copy of the

4  Streamlyne warning that she said that Doctor Tao would've seen

5  before the approval went out, was she?

6  A.  She did provide me a screenshot of the Streamlyne warning.

7  Q.  The one that Doctor Tao would've seen, did she show you any

8  proof that he had seen it?

9  A.  I believe it's the same system that everybody else sees and

10  the screen populates.  So once the screen depopulates, it's

11  gone.  We would have to be sitting next to Doctor Tao to do so.

12  Q.  So you have no proof that you can show the jury that he had

13  seen it, just Alicia Reed's word for this is how it would've

14  happened; right?

15  A.  I believe Alicia Reed stated that the screen is the same

16  and it hasn't changed.

17  Q.  Do you recall when Mr. Dearington was cross examining Ms.

18  Reed about the fact that her office had signed and submitted a

19  grant proposal for the Oak Ridge National Lab without Doctor

20  Tao having first approved the proposal in Streamlyne?  Do you

21  remember that?

22  A.  Mr. Dearington had several lines of questioning for Alicia

23  over the course of two days.  So, again, if you refer me --

24  refer to the transcript, I'm glad to talk about it.

25  Q.  Let me go back for a second to the -- this approval in

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Streamlyne, which was the Government Exhibit 78 that you said

2    Alicia Reed provided to you.  That was done after Doctor Tao

3    was arrested, not before; correct?

4    A.   Yes.

5    Q.   You didn't need to see this before Doctor Tao was arrested;

6    is that right?

7    A.   I did not have it before Doctor Tao was arrested.

8    Q.   You didn't feel you needed to; right?

9    A.   I don't know that the investigation required it at that

10   point.

11   Q.   Do you recall Ms. Reed saying that she was 100 percent

12   certain that even though the Streamlyne system did not show

13   that Doctor Tao had approved the proposal for the Oak Ridge

14   National Lab, that there would've been an e-mail exchanged

15   between her office and Doctor Tao where he gave his approval?

16   Do you remember that?

17   A.   I don't remember the specifics of it.  I remember her

18   saying -- or suggesting that she was 100 percent certain on

19   something.  Whether it was the Oak Ridge, if you're

20   representing that, then fine, but I don't remember

21   specifically.

22   Q.   Do you remember she was saying, well, even if it's -- he

23   didn't approve the form, there had to have been an e-mail

24   exchange with my office because my office always does

25   everything right?

1    A.  Right.  Right.

2    Q.  Well, have you looked for that e-mail?

3    A.  I don't know that I have.

4    Q.  After she testified did you speak with her and say, "We

5    need to find that e-mail so we can show the jury that you're

6    right, that there really was an exchange like you just

7    testified"?

8    A.  I'm not allowed to speak to her, so...

9    Q.  You can speak to a witness after she's done testifying.

10   Who said you can't speak to her?

11   A.  Well, it was suggested that I don't.

12   Q.  Well, you heard her testimony, you could've just looked

13   yourself; right?

14   A.  Perhaps, yeah.

15   Q.  You have all of Doctor Tao's e-mails, right, from KU?

16   A.  From KU, yes.

17   Q.  And you didn't bother to look to see if Alicia Reed was

18   right, her 100 percent certainty?

19   A.  I did not.

20   Q.  So there's no evidence that supports what Ms. Reed said,

21   just her testimony, "I'm sure we did it right"; right?

22   A.  I don't know.

23   Q.  Well, we -- you haven't been able to show the jury any

24   evidence that she's right?

25   A.  I didn't search for it, like you said.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   Q.  Wasn't important?  Didn't seem important?

2   A.  Not currently.

3   Q.  It was Ms. Reed you turned to in November 2019 after Doctor

4   Tao had already been arrested, indicted, and you asked her to

5   go through his paperwork to try to find for you evidence of a

6   false statement that you could charge him with; correct?

7   A.  I asked her to go through the contracts for -- to look for

8   places where he may have made false statements, that's correct.

9   Q.  You wanted Ms. Reed to go through all of Doctor Tao's grant

10  paperwork and try to find something that you could charge him

11  with; correct?

12  A.  I wanted Ms. Reed to point me in the direction within the

13  contract information where I would find statements such as

14  false statements.

15  Q.  Did you consider that part of her job, to do your

16  investigation for you?

17  A.  I did not, but she is the most familiar with the contract

18  process and I expected that she would know best where to look.

19  Q.  I want to talk about the Department of Energy and Viviane

20  Schwartz.  You heard her testify here; correct?

21  A.  I did.

22  Q.  Do you recall Mr. Barry asking Doctor Schwartz about

23  foreign support and he asked her the following question and

24  received the following answer:

25      Question:  "So we talked about foreign research support.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    So when you were evaluating Doctor Tao's renewal proposal,

2    would you have wanted to know if he had a second job at a

3    Chinese university while having his full-time job at KU?"

4        And Doctor Schwartz said, "Since I'm not his program" --

5    strike that.

6        She said:  "Since I'm not his employer, I really don't

7    verify, you know, jobs, per se.  That is not my role as a

8    program manager."

9        Did you hear her say that?

10   A.   I did hear her say that.

11   Q.   And before you arrested Doctor Tao, did you know that his

12   DOE program manager was not interested or concerned about

13   whether or not he had a second job?

14   A.   I did not know it because I had not engaged them.

15   Q.   And that is information you could've found out if you had

16   talked to Doctor Schwartz before you arrested him; correct?

17   A.   That is information that I could've found out.

18   Q.   Is that information you would've liked to have known before

19   you arrested him?

20   A.   No.  Before I arrested him were different charges.  For a

21   second superseding indictment, yes.

22   Q.   So, I'm sorry, I just want to nail -- drill down on that.

23   A.   Okay.

24   Q.   The government has made a central part of their case for

25   the last two weeks that Doctor Tao had a second job in China at

1  Fuzhou University and didn't disclose it --

2  A.  Right.

3  Q.  -- to these granting agencies, and that that constitutes

4  grant fraud or wire fraud.  Okay?

5  A.  Okay.

6  Q.  The fact that the DOE program manager for Doctor Tao

7  testified here in court that the fact that he had a second job

8  was not of interest to her, if he did have one, that wasn't

9  important information for you to know before you arrested

10  Doctor Tao?

11  A.  I believe she said it wasn't her role to know that since

12  she wasn't his employer, since KU was the employer.

13  Q.  The only witness -- the government called one witness from

14  the Department of Energy in this case; correct?

15  A.  Correct.

16  Q.  The only witness it called was Viviane Schwartz; correct?

17  A.  Correct.

18  Q.  Viviane Schwartz said it didn't matter to her if he had a

19  second job; correct?

20  A.  She is the program manager and I believe she testified that

21  she was concerned about the science, and that she wasn't his

22  employer and that the employer would handle that.

23  Q.  But wasn't it important to know that the Department of

24  Energy -- she's the program manager, she did not care if he had

25  a second job, to her it didn't matter.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2039

1    A.  To her it didn't matter.

2    Q.  That wasn't important to your case and something you

3    would've liked to have known?

4    A.  Of course, I would like to know everything from the DOE,

5    but I didn't have that information.  But she is responsible for

6    the science; correct.

7    Q.  You say you didn't have the information.  You didn't have

8    the information because you didn't ask her for the information;

9    correct?  She was available to you.

10   A.  That is correct, yes.

11   Q.  You could've just picked up the phone and talked to her.

12   A.  I could've.

13   Q.  But you didn't?

14   A.  But I didn't.

15   Q.  When you were reviewing -- strike that.

16       This is another part of my -- the question from Mr. Barry

17   to Viviane Schwartz.

18       "And when you were reviewing his renewal, would you have

19   wanted to know whether he had been promised or received funding

20   from a foreign research university or institution to build a

21   laboratory?"

22       Answer:  "To build a laboratory?  I don't think that would

23   be my concern."

24       Do you remember that?

25   A.  I do.

1   Q.  Again, the only witness from the Department of Energy that

2   testified in this trial was Viviane Schwartz, and she said she

3   did not care if Doctor Tao had been promised or received

4   funding from a foreign research university or institution to

5   build a laboratory?

6   A.  To build a laboratory.

7   Q.  Was that information that you knew before you arrested

8   Doctor Tao?

9   A.  No.

10  Q.  Is it information you would have liked to have known before

11  you arrested Doctor Tao?

12  A.  Not necessarily.

13  Q.  Did you know that the Department of Energy was not

14  concerned if a PI had a second job or was involved in building

15  a lab?  Did you know that?

16  A.  Say that again.

17  Q.  Did you know -- let me ask you this way.  When did you

18  first learn that the Department of Energy was not concerned if

19  a PI had a second job or was involved in building a lab?

20  A.  I don't think I ever learned that.

21  Q.  Well, you heard Viviane Schwartz say that, didn't you?

22  A.  She's the program manager.

23  Q.  Did you hear her testify that no one at DOE reviews

24  conflict of interest forms?

25  A.  Again, I think that's the responsibility of the employer.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1  Q.  Did you hear her say that no one at DOE reviews conflict of

2  interest forms?

3  A.  I don't remember her saying that, but --

4  Q.  Well, if Viviane Schwartz said that no one at DOE reviews

5  conflict of interest forms, would that have been new

6  information to you?  Did you know that?

7  A.  I don't think so.  I think I -- I think I had an idea that

8  that wasn't the role of the program manager.

9  Q.  Did you hear Doctor Schwartz testify that there was no

10  requirement to update a biosketch after proposal submission?

11  Did you hear her say that?

12  A.  I don't remember her saying that.

13  Q.  Well, assuming that's what she testified to --

14  A.  Okay.

15  Q.  -- would that have been new information to you or did you

16  know that when you arrested Doctor Tao?

17  A.  Again, there are two separate times here, before arresting

18  Doctor Tao and after arresting Doctor Tao.

19  Q.  That's exactly right.

20  A.  Right.

21  Q.  And I'm asking you before you knew -- before you arrested

22  Doctor Tao, did you know that PIs had no obligation, no

23  requirement to update their biosketch?  Did you know that?

24  A.  Before arresting Doctor Tao, I did not know that because I

25  had not engaged DOE.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2042

1    Q.  Is that information you would've liked to have known?  Now

2    knowing it, is that something you think you should've known

3    before you arrested him?

4    A.  No, because the charges based on the first indictment

5    didn't involve that necessarily.

6    Q.  Did you hear Doctor Schwartz testify that the research he

7    did for Department of Energy was all completed satisfactorily,

8    such that if there was any issue with his capacity, he was

9    still able to get all of his work done?  Did you hear her say

10   that?

11   A.  I did hear her say that, yes.

12   Q.  And were you aware before you arrested Doctor Tao that DOE

13   was fully satisfied with his research?

14   A.  I didn't have any reason to believe that they weren't.

15   Q.  Did you hear Doctor Tao -- Doctor Schwartz testify that it

16   would not violate DOE rules if a PI worked and oversaw a grant

17   from a foreign country that was being completed in the U.S. and

18   all of this could be done remotely using phone and e-mail?

19   A.  You'll have to ask that again.  That was a lot.

20   Q.  Did you hear Doctor Schwartz testify that it would not

21   violate any DOE rules if a PI worked and oversaw a grant from a

22   foreign country, that the work was being completed in the U.S.

23   and all of this work could be done remotely using phone and

24   e-mail?

25   A.  I don't remember her specifically saying that, but that

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2043

1    makes sense, yes.

2    Q.  So were you aware at the time you arrested Doctor Tao that

3    there was no problem, no DOE regulation or rule that prevented

4    a PI from working on a U.S. federal grant remotely from a

5    foreign country?  Did you know that?

6    A.  I think there's more to it in terms of whether DOE is

7    notified of a change of scope, and I may be confusing that with

8    NSF with the change of scope, but --

9    Q.  There is no allegation and no evidence in this case that

10   there was any change of scope in any of his federal grants;

11   correct?

12   A.  Yeah, I don't believe there was any change of scope.

13   Q.  Okay.  So let's put that aside.

14   A.  Okay.

15   Q.  There is no problem with a PI supervising work in the

16   United States from a foreign country; correct?

17   A.  I don't know that to be true.

18   Q.  Well, the government's witness testified to it and no one

19   else testified to the contrary; correct?

20   A.  If you're representing that, then yes.

21   Q.  Is that something that you knew before you arrested Doctor

22   Tao?

23   A.  No.

24   Q.  Is it something you wish you had known before arresting

25   Doctor Tao?

1  A.  Not necessarily.

2  Q.  Did you hear Doctor Schwartz testify that if pending

3  support is omitted from a proposal but that pending support

4  isn't funded "the problem is averted because there can be no

5  time commitment -- no time commitment issue on an unfunded

6  grant?"  Did you hear that?

7  A.  I did hear her say that.

8  Q.  So before you arrested Doctor Tao, were you aware that not

9  listing pending support -- if that pending support ends up not

10  getting funded, it's not a problem for the agency?  Did you

11  know that?

12  A.  I think that's a mischaracterization because current and

13  pending involves the word "pending."  So you'd have to disclose

14  something that is pending whether it's funded or not.

15  Q.  Where do you come up with that interpretation?  Based on

16  what?

17  A.  Current and pending.

18  Q.  So the -- you read the regulation and you say, current and

19  pending.  And to you, Agent Lampe, the FBI agent, you think you

20  have a better understanding of the DOE rules than the program

21  manager?

22  A.  I do not.

23          MR. OAKLEY:  Objection.  Argumentative, leading, and

24  misstates the facts.

25          THE COURT:  All right.  I'll sustain.

1    BY MR. ZEIDENBERG:

2    Q.  The program manager said that pending only involves active

3    support.  Did you hear her say that?

4    A.  I think --

5              MR. OAKLEY:  Objection, misstates the facts and is

6    also leading.

7              THE COURT:  I'll overrule.  Answer it if you can, if

8    you know.

9              THE WITNESS:  I think it's out of context.

10   BY MR. ZEIDENBERG:

11   Q.  Just staying on that current and pending issue.

12   A.  Okay.

13   Q.  I want to try and refresh your recollection, see if -- see

14   if this refreshes your recollection about the testimony of

15   Doctor Schwartz.

16       I asked her:  "If you're looking at a grant application,

17   you want to know about current and pending support because of

18   the overlap in time commitment issue; correct?"

19       She said:  "Yes."

20       "And if ultimately something is left off but it is not

21   funded, then, in a way, it's a situation where the problem is

22   averted because there can be no overlap and there can be no

23   time commitment issue on an unfunded grant?"

24       Answer:  "Yes."

25       Do you remember that?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2046

1    A.   Yes.

2    Q.   And then I said:  "And your concern about overlap -- I just

3    want to emphasize.  If the other grant is not funded, overlap

4    is not an issue?"

5         "Can you repeat the question?"

6         "Yes.  If there are -- other pending support is not funded,

7    then overlap and time commitment is not an issue?"

8         Answer:  "Correct."

9         Question:  "You didn't care about the fact that he was

10   potentially working on helping build a second lab and that was

11   not important to you as a program manager?"

12        "Not at that time."

13        So as far as the current and pending, Doctor Schwartz said

14   they only care about current and pending because of time

15   commitment and overlap; correct?

16   A.   Yes.

17   Q.   And if something doesn't get funded, then guess what, the

18   problem goes away because there's not going to be an overlap

19   issue and there's not going to be a time commitment issue;

20   correct?

21   A.   Yes, but I think it presumes the fact that it's disclosed.

22   Q.   She didn't say that, did she?

23   A.   She did not say that.

24   Q.   Do you think you understand these rules better than the

25   program manager at DOE?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    A.   No.

2    Q.   Did you hear Doctor Schwartz testify that in the 2018 time

3    frame the disclosure rules were evolving and that it wasn't

4    always clear even to experienced program managers what DOE's

5    expectations were?  Did you hear her say that?

6    A.   I don't remember, but if you're representing it, then yes.

7    Q.   Was that news to you that the DOE disclosure rules were

8    evolving in 2018 and were not always clear to even experienced

9    program managers?

10   A.   I think the evolution and the clarification wasn't news to

11   me.

12   Q.   It was?

13   A.   Was not.

14   Q.   Okay.  So you knew that at the time when you arrested

15   Doctor Tao?

16   A.   No.

17   Q.   You learned it later?

18   A.   Yes.

19   Q.   Was that something you wish you had known before you

20   arrested him?

21   A.   No.

22   Q.   Focusing again on DOE.  The government has alleged that he

23   failed to disclose his affiliation to Fuzhou to DOE; right?

24   A.   Yes.

25   Q.   And that if DOE had known about his relationship to Fuzhou,

1    it might have decided not to fund his grants; correct?

2    A.    Correct.

3    Q.    The DOE grants that Doctor Tao had required him to make

4    periodic progress reports; correct?

5    A.    I believe so, yes.

6    Q.    And in June -- on June 15th, 2019 in his progress report,

7    Doctor Tao listed three publications under the section How Have

8    the Results Been Disseminated to Communities of Interest;

9    right?

10    A.    Right.

11    Q.    And in that section Doctor Tao listed three papers;

12    correct?

13    A.    He did.

14    Q.    And this was entirely voluntary by Doctor Tao; right?  He

15    selects what goes in that section; correct?

16    A.    He does.

17    Q.    He could've selected whichever papers he wanted to go out

18    to DOE; right?

19    A.    Yes.

20    Q.    In the acknowledgement section Doctor Tao listed his

21    affiliation in these papers with both Fuzhou and KU; correct?

22    A.    I don't know, I'd have to see it, but...

23    Q.    I'm showing you 1225, 1226 and 1227, 1228.

24          MR. ZEIDENBERG:  May I approach?

25          THE COURT:  Yes.

1           THE WITNESS:  Thank you.

2           THE COURT:  These are all admitted already.

3           MR. ZEIDENBERG:  Yes.

4    BY MR. ZEIDENBERG:

5    Q.  Do you see that?

6    A.  I do.

7    Q.  These were the articles listed in that progress report to

8    DOE; correct?

9    A.  Yes.

10   Q.  And I'm showing you 1225, showing the jury 1225.  We've got

11   a journal, *ChemComm*, and it lists Franklin Tao as one of the

12   authors and then there's a little asterisk by his name.  And

13   when you go down to the bottom, it shows Department of Chemical

14   and Petroleum Engineering, University of Kansas, Lawrence, and

15   Institute of In Situ/Operando Studies of Catalysis, State Key

16   Lab, Fuzhou University.  Do you see that?

17   A.  I do see that.

18   Q.  That's 1225.

19       1226, *Chemical Reviews*, Understanding Catalyst Surfaces

20   During Catalysis.  One of the authors, Franklin Tao.  Do you

21   see what it lists for his affiliation?

22   A.  I do.

23   Q.  It lists University of Kansas and Fuzhou University;

24   correct?

25   A.  Correct.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.   1227, *Journal of American Chemical Society*, Synergy of

2    Single-Atom.  It lists Franklin Tao and lists University of

3    Kansas as his affiliation along with Fuzhou University;

4    correct?

5    A.   Correct.

6    Q.   1228, this is a Department of Energy website, which

7    re-published -- osti.gov, which re-published one of Doctor

8    Tao's articles.  And it lists -- the Department of Energy

9    listed Doctor Tao and listed his affiliation at University of

10   Kansas and Fuzhou University; correct?  The abstract of the

11   article was listed on a Department of Energy government

12   website; correct?

13   A.   Yeah, I actually only see him with the number 1 on that

14   one.

15   Q.   I'm sorry?

16   A.   I only see him with the -- the reference to number 1 there,

17   but, yes, I agree with you.

18   Q.   Now, when did you become aware, Agent Lampe, that in his

19   progress reports to the Department of Energy Doctor Tao was

20   submitting publications that listed his affiliation with Fuzhou

21   University?  When did you first learn that?

22   A.   I think during trial, right now.

23   Q.   Was that -- this was obviously something that you could

24   have found out during your investigation; right?

25   A.   I could've found out, yes.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2051

1    Q.   Because you're looking at all the grant paperwork, you're

2    looking at his progress reports; right?

3    A.   (Nods head up and down).

4    Q.   Correct?

5    A.   Amongst other things, yes.

6    Q.   And he lists articles; correct?

7    A.   Correct.

8    Q.   And you could look at the articles and see what was listed;

9    right?

10   A.   Right.

11   Q.   And if you had done that before you arrested Doctor Tao,

12   you would've known that the Department of Energy was told by

13   Doctor Tao that he had an affiliation with Fuzhou University;

14   correct?

15   A.   Not correct.

16   Q.   Well, they're getting a progress report, it lists his name

17   and it lists an affiliation at two institutions, KU and FZU,

18   Fuzhou; correct?

19   A.   Correct.

20   Q.   Are you aware -- you haven't heard certainly Department of

21   Energy raising any questions about that; right?

22   A.   I did not.

23   Q.   They didn't ask for some follow-up, did they?

24   A.   No, they didn't.

25   Q.   And this was information that you did not know when you

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE        2052

1    arrested Doctor Tao; correct?

2    A.    Correct.

3    Q.    Do you wish you had known that?

4    A.    No, not necessarily, because, again, I felt that the

5    affiliations were in response to his requirements.

6    Q.    Well, whether they were in response to his requirement or

7    not, Department of Energy knew this?

8    A.    No.

9          MR. OAKLEY:  Your Honor, I would object to leading.

10   This is direct examination.

11         MR. ZEIDENBERG:  Your Honor, he's the lead case agent

12   on the case.

13         THE COURT:  So far --

14         MR. ZEIDENBERG:  I'm sorry?

15         THE COURT:  So far I don't detect a basis to lead him,

16   but I --

17         MR. ZEIDENBERG:  I'm sorry?

18         THE COURT:  So far I do not detect a basis to lead him

19   under the rules.

20   BY MR. ZEIDENBERG:

21   Q.    Viviane Schwartz from the Department of Energy refused --

22   reviewed those affiliations, do you remember she testified to

23   that?  She commented on those articles.  Do you not recall

24   that?

25   A.    I don't.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2053

1    Q.  I'm showing you Defense Exhibit 1159.

2           MR. ZEIDENBERG:  I believe this has been admitted,

3    Your Honor.

4           THE COURT:  1159.

5           COURTROOM DEPUTY:  I don't show it as admitted.

6           THE COURT:  I don't think it has.  Do you show it

7    admitted, Bonnie?

8           COURTROOM DEPUTY:  I don't.  My apologies, I do have

9    it in JERS.

10          THE COURT:  Was it admitted?

11          COURTROOM DEPUTY:  No.  Nope, nope, it wasn't.  Sorry.

12          MR. ZEIDENBERG:  Your Honor, we admitted that as

13   Government Exhibit 36.

14          THE COURT:  Okay.

15          MR. OAKLEY:  Your Honor, I think that's a different

16   document.

17          MR. ZEIDENBERG:  We can use Government Exhibit 36.

18          THE COURT:  All right.  36 is admitted.

19   BY MR. ZEIDENBERG:

20   Q.  This was Viviane Schwartz's feedback on that progress

21   report, which is shown in Government Exhibit 36.  She said,

22   "This is the first year after the renewal and the PI," Doctor

23   Tao, "continues reports nicely their recent advances with an

24   output of at least four new publications on which our grant was

25   the major contributor.  The publications are, as usually with

1  this PI, in high-impact journals, *JACS*, *Nature Comm*, *Langmuir*,

2  among others.  In addition, the PI also contributed to a very

3  comprehensive review in the field published this year at *Chem*

4  *Review*.  There was one instance that the publication would

5  benefit from a better delineation on the acknowledgement, and

6  this was communicated to the PI as we usually do.  The output

7  is very good and supportive of continuing funding."

8      Do you see that?

9  A.  I do see that.

10  Q.  Do you think you could safely infer from this that Doctor

11  Schwartz was reviewing these acknowledgement sections

12  carefully?

13      MR. OAKLEY:  Your Honor, I would object at this point

14  to the relevance.  The jury has already heard from Doctor

15  Schwartz.  All counsel is trying to do is re-play her

16  testimony.

17      THE COURT:  I'll overrule.

18      THE WITNESS:  Ask the question again, please.

19  BY MR. ZEIDENBERG:

20  Q.  Yes.  Do you think it's safe to infer from the fact that

21  she's commenting on the acknowledgements that she read the

22  acknowledgement sections in his articles?

23  A.  So I believe the -- there is a difference between the

24  acknowledgement section and the affiliation section.  The

25  acknowledgement section has to do with the funding, I believe,

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    as opposed to the affiliation of who one works with.  Usually,

2    and from what I've seen in articles, the acknowledgements are

3    towards the end.

4    Q.  But you don't know because you never interviewed her about

5    this; right?

6    A.  No, I did not.

7    Q.  You had two-and-a-half years, actually more than that

8    because you could've spoken to her before you arrested Doctor

9    Tao; right?

10   A.  I could've.

11   Q.  So you wouldn't have to be speculating about what she did

12   or did not know or read or did not read; right?

13   A.  That's right.

14   Q.  You heard the testimony about the King Abdullah University

15   of Saudi Arabia grant, KAUST?

16   A.  I remember it, yes.

17   Q.  And do you recall you heard testimony that it was a foreign

18   grant that was funded by the King Abdullah University of Saudi

19   Arabia?

20   A.  Yes.  This was with Alicia Reed I believe.

21   Q.  I'm sorry?

22   A.  Was this with Alicia Reed, the testimony?

23   Q.  Yes.

24   A.  Okay.

25   Q.  And do you recall seeing the e-mail from KAUST to about a

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1  dozen people in the research office, at Alicia Reed's office,

2  telling her that that grant had been funded?

3  A.  You'll have to show me, please, but -- I remember you

4  talking about it, but I don't remember the e-mail specifically.

5  Q.  I'm showing you the subaward agreement.  Do you remember

6  that?

7  A.  Yes, I've seen this agreement before.

8  Q.  And then showing you 1006, an award notification from KAUST

9  to the research office.  And do you see all the names of the

10 people at the KU research office that were notified right here?

11     "I am pleased to inform you that the King Abdullah

12 University of Science and Technology competitive research grant

13 has approved a subaward to the University of Kansas PI Franklin

14 Tao."

15     Do you see that?

16 A.  I do see that.

17 Q.  So fair to say a lot of people at the KU research office

18 knew about this grant; right?

19 A.  Yes.

20 Q.  And from what you've learned, the KU research office

21 administers grants like this; right?

22 A.  Yes.

23 Q.  They get the money, they give out the money; right?

24 A.  That sounds about right.

25 Q.  And did you hear the testimony that on subsequent grants

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    that Doctor Tao submitted, the KAUST award was not included in

2    current and pending support?

3    A.    Yes, I believe Ms. Reed testified to that.

4    Q.    So in late 2014 the KU Center of Research had direct

5    knowledge, right, that Doctor Tao was the PI on a grant from

6    KAUST; correct?

7    A.    Not in 2014.  I think that e-mail is 2018.  You're right,

8    I'm sorry, 2014.

9    Q.    And in his subsequent DOE grant application and a proposal

10   ending in 9641, you saw that that KAUST grant was not

11   mentioned; correct?

12   A.    I believe that was part of it, yes -- or it was not

13   mentioned.

14   Q.    So doesn't this appear to you to be an open-and-shut case

15   of grant fraud being committed by the research office at the

16   University of Kansas?

17   A.    No.

18   Q.    They had direct knowledge, direct knowledge about this

19   grant from KAUST; they then applied for another grant on behalf

20   of Doctor Tao and did not list it.

21   A.    Right.

22   Q.    Are they being investigated for grant fraud that you know

23   of?

24   A.    Not to my knowledge.

25   Q.    Are they being charged with false statements?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2058

1   A.   Not to my knowledge.

2   Q.   Is one of the things you would want to know before deciding

3   to charge KU was whether this failure was intentional?

4   A.   To charge KU?

5   Q.   Yes.

6   A.   Yes, I would want to know.

7   Q.   You would want to find out whether this was done by a

8   mistake; right?

9   A.   If an investigation was open, surely we would determine

10  whether it was a mistake or whether it seemed purposeful.

11  Q.   You wouldn't assume simply because it was left off that it

12  was done intentionally; right?  There could be other

13  explanations, you agree?

14  A.   I agree with that, yes.

15  Q.   You can't tell from just looking at a failure to disclose

16  whether this non-disclosure was done with a corrupt intent;

17  right?

18  A.   For that single document, no.

19  Q.   When did you first become aware that -- that KU research

20  office had failed to disclose that grant?

21  A.   That KAUST grant?

22  Q.   Yeah.

23  A.   Just during trial.

24  Q.   Do you find this information, like their failure to

25  disclose, important in any way in understanding how well-known

1  and understood and followed these disclosure obligations are?

2  A.  Are you -- are you asking if I find it important?

3  Q.  Yes.

4  A.  Whether disclosure --

5  Q.  A failure, a blatant failure like this by the KU research

6  office, is it relevant in any way to your view of how

7  well-known, understood, and followed these disclosure

8  obligations were?

9  A.  I would say yes.  If it was a repeated failure inherent in

10  the system, then that would be problematic.  If it was a single

11  time...

12  Q.  Well, Mr. Dearington went through with Alicia Reed and Bala

13  Subramaniam a number of failures.  Do you recall that?

14  A.  I do.  I don't know if they all pertained to the same

15  thing, though, did they, or were they all different?

16  Q.  Well, Doctor Subramaniam failed to disclose the KAUST

17  grant.

18  A.  He did.

19  Q.  He failed to disclose other grants that he had.  Do you

20  remember that?

21  A.  I don't remember that.

22  Q.  Do you remember the research office failing to disclose the

23  Fuzhou grant that Doctor Tao was trying to get to fund his

24  buyout?

25  A.  I believe the Fuzhou grant was never completed.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2060

1   Q.  But it was pending; right?

2   A.  I don't know what stage it was in to accurately say that.

3   Q.  Well, they were negotiating, they had an agreement.  It

4   never got funded, but at the time it was pending; right?  I

5   thought you said all pending, all is all?

6   A.  I believe Doctor Tao was creating a budget for Fuzhou, that

7   subaward contract.

8   Q.  It was never disclosed.  You didn't hear that?

9   A.  I didn't hear that, no.

10  Q.  You didn't hear that testimony?

11  A.  It's not that I didn't hear it, I just don't remember it.

12  Q.  There was a final budget that was introduced, you didn't

13  see that?

14          MR. OAKLEY:  Objection, that misstates the evidence.

15          THE COURT:  All right.  I'll sustain to the form of

16  the question.

17  BY MR. ZEIDENBERG:

18  Q.  Fair to say that through the course of the trial and the

19  cross examinations that there were a number of errors about

20  disclosure obligations that were revealed; correct?

21  A.  On your crosses, yes, you guys -- you have identified some

22  errors.

23  Q.  Errors made by PIs and errors made by the grant office;

24  correct?

25  A.  The KAUST for the grant office and the PI being Bala.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2061

1    Q.  And Bala failing to disclose his own grants?

2    A.  I don't know if it was grants, multiple grants, or a single

3    grant.

4    Q.  None of that gives you any pause now thinking about how

5    well understood those obligations and how well closely followed

6    they were by the grant office and the others at KU?

7    A.  I don't know how -- how often this happens at KU without

8    investigating it further.

9    Q.  But wouldn't that be something that would be good to know

10   before arresting and indicting Doctor Tao for the same sort of

11   failures to disclose?

12   A.  I wouldn't equate them as the same.

13   Q.  How long were you an agent, an FBI agent, at the time this

14   investigation began?

15   A.  Five years.

16   Q.  And how many times had you been a lead case agent at the

17   time of this investigation?

18   A.  I'd estimate four --

19         MR. OAKLEY:  Objection, relevance.

20         THE COURT:  I'm not sure I understand the relevance.

21   I'll sustain.

22         MR. ZEIDENBERG:  Just trying to get -- understand his

23   experience, his level of experience.

24         THE COURT:  All right.  Overruled.  Proceed.

25         THE WITNESS:  Probably four or five cases.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

```
 1    BY MR. ZEIDENBERG:

 2    Q.  Four or five cases?

 3    A.  Yeah.

 4    Q.  And at the time of this case, how many times had you been a

 5    lead case agent in an espionage case?

 6            MR. OAKLEY:  Objection, relevance.

 7            THE COURT:  I don't understand the relevance.  I'll

 8    sustain.

 9    BY MR. ZEIDENBERG:

10    Q.  Fair to say that this case -- that espionage cases are

11    among the most serious cases investigated by the FBI?

12            MR. OAKLEY:  Objection, relevance and violates the

13    court's order.

14            THE COURT:  Let's talk about it.

15            (Proceedings had at the bench, outside the hearing of

16    open court).

17            THE COURT:  We're going to take a break in a minute

18    anyway, but -- well, as you know, I've ruled on this line of

19    questioning.  I did leave the door open, though, for you to

20    inquire depending on the path you take.  Is that what you're

21    doing?

22            MR. ZEIDENBERG:  Your Honor, I'm trying to explore and

23    explain to the jury why we think this case was pursued in --

24    despite the fact that it's commonplace for these types of

25    errors to occur and that it happened repeatedly throughout this
```

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2063

1   case and that the only reason they kept pursuing it is because

2   this woman, Huimin Liu, told them he was involved in espionage.

3        And that's why they pulled out all the stops and they

4   did this exhaustive review and this exhaustive investigation

5   involving all types of intrusive investigative techniques and

6   that they refused to let go even though they found nothing but

7   paperwork errors and they just couldn't let the case go.

8   And --

9        THE COURT:  Okay.  So my ruling was you couldn't --

10  you couldn't attack on the basis of selective prosecution, but

11  you could go this path if you could tie it to the reliability

12  of specific evidence.

13       MR. ZEIDENBERG:  And that's exactly what we're trying

14  to do.  And also explore the fact that the informant or Huimin

15  Liu or whatever we call her, Student 1, had access to Doctor

16  Tao's -- and demonstrated access to Doctor Tao's e-mail account

17  and that she met with Agent Lampe and that she accessed that

18  account and she still was not able to come up with a signed

19  contract.

20       THE COURT:  Okay.  So before you just went a little

21  further, I was about to say what specific evidence and

22  reliability of evidence are you tying it to?  If you're going

23  to tie it to perhaps the authenticity of certain e-mails from

24  his account showing that perhaps she authored them, if there's

25  some question that they can be reliable, then I think that's

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    enough of a nexus.  I just wasn't sure where you were going

2    with this.

3           I wasn't going to allow you to just sort of generally

4    attack this selective prosecution, that you tried to make this

5    an espionage case that didn't work out, so you tried something

6    else.

7           MR. ZEIDENBERG:  It's a -- it's a very small section

8    of this cross examination.

9           THE COURT:  All right.  Let's take -- let's take a

10    break.  Did you have something more?

11           MR. OAKLEY:  Your Honor, I still think he has to tie

12    it to specific -- reliability of specific evidence.

13           THE COURT:  Right.

14           MR. OAKLEY:  And he hasn't identified any piece of

15    evidence that he's arguing is not reliable.

16           THE COURT:  Well, what I thought I just heard was

17    that -- I mean, it sounds like this could be quite a foundation

18    to get there, but what I thought I heard was that what he's

19    trying to tie it to is the reliability perhaps of certain

20    e-mails from Doctor Tao's KU account.

21           MR. BARRY:  That's factually incorrect, though.

22    There's no evidence to suggest that Huimin Liu had access to

23    his KU account.

24           THE COURT:  I meant Gmail.  Gmail.

25           MR. BARRY:  The only account that she allegedly had or

1    that we think she had access to was the FZU account.

2            THE COURT:  Well, is that where you're headed or not?

3            MR. ZEIDENBERG:  Yes.  Yes, she had a Fuzhou account.

4            THE COURT:  I'll let you have the latitude, but I just

5    want -- understand this generic sort of selective prosecution

6    thing I'm not allowing.

7            MR. ZEIDENBERG:  It's not a question of selective

8    prosecution.

9            THE COURT:  Okay.  Let's take a break.

10            MR. ZEIDENBERG:  Thank you.

11            (Proceedings continued in open court).

12            THE COURT:  All right.  Good time for a morning break,

13    so let's take a recess until 11:00.

14            (Recess).

15            (The following proceedings were held outside the

16    presence of the jury).

17            THE COURT:  All right.  Are we ready to bring the jury

18    in?

19            Mr. Zeidenberg, we're going to need to break around

20    12:15-ish for lunch.

21            (The following proceedings were held in the presence

22    of the jury).

23            THE COURT:  All right.  You can be seated.

24            You can resume questioning.

25    BY MR. ZEIDENBERG:

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE        2066

1    Q.  Agent Lampe, before we move on, I want to just go back.  At

2    one point in your testimony you thought -- I believe you

3    testified that the fact that Doctor Tao was publishing articles

4    that listed a joint affiliation with Fuzhou and KU was not

5    particularly exculpatory to you because you believed that that

6    was required by his purported contract with Fuzhou University.

7    Is that what you -- essentially what you said?

8    A.  I think I said that, yes.

9    Q.  I want to show you Government Exhibit 335, which is one of

10   these draft contracts.  And turning to -- actually I guess it's

11   336.  Do you see that?

12   A.  I do.

13   Q.  And if you go to Page 7 out of 9, it says right here,

14   starting, "All related papers and publications as well as

15   awards, patents, and research projects and funds applied for by

16   Party B" -- that would be Doctor Tao, right, Party B?

17   A.  I believe so, yes.

18   Q.  -- "by Party B must be signed under the names of both Party

19   B and Party A; namely, they must be signed by both the author

20   and the author's employer."  The author's employer would be

21   Fuzhou; correct?

22   A.  Let's see.  So, yes, the author's employer -- if the author

23   is Doctor Tao, then, yes, the employer would be Fuzhou.

24   Q.  -- "with the author's employer signing exclusively as Party

25   A."  And Party A is Fuzhou; right?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2067

1   A.   That is correct.  However, this is one version of multiple

2   contracts that we've seen.

3   Q.   And if there's another version that says -- well, by the

4   way, this contract does say -- and we'll go through the

5   contracts in more depth in a little bit, but it says he has to

6   work exclusively for Fuzhou; right?

7   A.   Is that what it says, that one?

8   Q.   Do you not know that the contracts required and being a

9   Changjiang Scholar required that he work exclusively for

10  Fuzhou?  You didn't know that?

11  A.   I believe his application, the June 2017 application,

12  required him -- said will you -- something to the effect of

13  leave all other jobs and he answered --

14  Q.   I'm sorry?

15  A.   He answered "yes" in the application, yeah.

16  Q.   Was it your impression from reading these draft contracts,

17  including the last one that was discussed, that he could

18  work -- according to Fuzhou, you could work at Kansas while

19  you're working at Fuzhou?

20  A.   That was not my impression.

21  Q.   Okay.  He had to work just at Fuzhou?

22  A.   I think that's where the contracts -- yes.  It's coming

23  back, but yes.

24  Q.   You're confident about that?

25  A.   Not 100 percent confident about it, but I feel pretty good

1    about it.

2    Q.   Okay.  So when it says what I just showed you, you have to

3    sign exclusively with Party A and Party B, that would be

4    Franklin Tao and Fuzhou; correct?

5    A.   According to that contract, correct.

6    Q.   And so the fact that he lists publicly on the Internet for

7    all to see an affiliation with Fuzhou and KU, that wouldn't be

8    in accordance with that contract?

9    A.   No, it would not.

10   Q.   And going back again to your testimony from earlier, you

11   commented a number of times about the first indictment and

12   so -- that it was different and so you didn't care about some

13   of this information that I was referring to because that was an

14   earlier indictment.  Do you remember saying that?

15   A.   Yes, I remember saying there were multiple indictments.

16   And I wouldn't say I didn't care, but I was less concerned

17   about certain things.

18   Q.   The first indictment in this case alleged program fraud --

19        MR. OAKLEY:  Objection, relevance.

20        THE COURT:  All right.  I'm not sure I understand the

21   relevance of this line of questioning.

22        MR. ZEIDENBERG:  Well, he was saying why this

23   information that I was referring to, the evidence, was not

24   significant because the earlier indictment was different in

25   nature or suggested it was different in nature.

1           THE COURT:  All right.  Overruled.

2     BY MR. ZEIDENBERG:

3     Q.  The first indictment alleged program fraud against the

4     National Science Foundation and the Department of Energy;

5     correct?

6     A.  That's correct.

7     Q.  And that was for depriving them of information about his

8     affiliations in China; correct?

9     A.  That sounds right.

10    Q.  Okay.  So essentially the allegations -- although the

11    charges were a little different, the allegations were very

12    similar, if not identical; correct?

13    A.  Similar.

14    Q.  All right.  Where we left off, it's fair to say that

15    espionage cases are among the most serious cases investigated

16    by the FBI?

17          MR. OAKLEY:  Objection, relevance.

18          THE COURT:  All right.  I'm going to allow this line

19    of questioning, at least allow you to make your foundation and

20    then I'll entertain any contemporaneous objections later or

21    after you -- in the process of laying the foundation.  But

22    proceed at this point.

23    BY MR. ZEIDENBERG:

24    Q.  Fair to say that espionage cases are among the most serious

25    cases investigated by the FBI?

1   A.   I think that's a matter of opinion based on who you are.

2   Some people would say other investigations are more important.

3   Q.   And agree that it would be a very big deal if an actual spy

4   for China was found to be in Kansas?

5   A.   If a spy was found in Kansas, it would be a big deal.

6   Q.   And if you were a lead case agent on a case like that, that

7   would be quite a career accomplishment, wouldn't it?

8   A.   We don't get measured by case -- finding spies or anything

9   like that, that's not how we get measured.

10   Q.   You don't think that that would be a remarkable

11   accomplishment for a -- an agent only four years out into the

12   department being the lead case agent in an espionage case in

13   Kansas?  That wouldn't be a big deal for you career-wise?

14   A.   I don't feel that way.

15   Q.   And, in fact, this case started out as a result of an

16   allegation by an anonymous source that Doctor Tao was engaged

17   in espionage; correct?

18   A.   Yes, I believe the phrase was academic espionage or

19   economic espionage.

20   Q.   Economic espionage; correct?

21   A.   Yes.

22   Q.   And that's why it came to you?

23   A.   Yes.

24   Q.   And in handling this espionage investigation, the FBI

25   employed a great many resources and agents; correct?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2071

1   A.  As we often do, yes.

2   Q.  But in the end no charges were brought against Doctor Tao

3   for espionage; correct?

4           MR. OAKLEY:  Objection, relevance.

5           THE COURT:  Overruled.

6           THE WITNESS:  There were no charges for espionage.

7   BY MR. ZEIDENBERG:

8   Q.  Nothing for economic espionage?

9   A.  No.

10  Q.  Nothing for theft of trade secrets?

11  A.  No.

12  Q.  No allegation that he misused or misspent grant money from

13  NSF?

14  A.  Well, I think that's where we're at is the fraud.

15  Q.  When you testified about this case in the grand jury back

16  in August of 2019, a grand juror asked you if Doctor Tao was

17  actually doing the research and you said --

18          MR. OAKLEY:  Objection, hearsay and relevance.

19          THE COURT:  All right.  I think reframe the question

20  rather than --

21  BY MR. ZEIDENBERG:

22  Q.  Do you remember testifying in the grand jury in August of

23  2019?

24  A.  Yes.

25  Q.  And do you remember telling the grand jury that Doctor Tao

1    did the research that was required of him?

2    A.   I don't remember saying that, but again, if you represent

3    it to me, then I believe you.

4    Q.   You would accept that proposition based on your

5    investigation that he did the research that was required of

6    him; correct?

7    A.   No.  I mean, I would have to know that.  Did I say that in

8    the grand jury is what I'm asking?

9    Q.   Well, I'll show you the grand jury, but I'm just curious

10   that sitting here today, two-and-a-half years after the arrest

11   of Doctor Tao, you don't feel comfortable testifying whether or

12   not Doctor Tao did the research required of him in a case

13   involving grant fraud and the allegation is that he defrauded

14   these agencies.

15   A.   That's correct.  I wasn't sure whether he had completed the

16   work or not.  That's right.

17   Q.   Well, wasn't it important to you as the lead case agent

18   where the allegation is he deprived the agency, the NSF and

19   DOE, of grant funds, wasn't it important to you to find out

20   whether or not he had done the research required of him?

21   A.   I don't believe it was.  I think -- I don't think that was

22   my primary concern.

23   Q.   Was it a secondary concern?

24   A.   It may have been, but obviously it was not forefront in my

25   mind.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.  Well, did you not determine at some point that Doctor Tao,

2    in fact, did all the research required of him?

3    A.  I did not determine that, no.

4    Q.  So when you heard the witnesses from the DOE and the NSF,

5    Ms. Keiser and Doctor Schwartz, testify that all the research

6    was done, was that news to you?  Were you just learning this

7    for the first time during the trial?

8    A.  I was learning that, yes.

9    Q.  I mean, wasn't that kind of significant?

10   A.  I don't think so.

11   Q.  He's charged with depriving them of grant money and the

12   question of whether or not he did the work wasn't important?

13   A.  It wasn't forefront in my mind.

14   Q.  Well, in fact, maybe you've forgotten, in the grand jury in

15   August 2019 you were asked about whether or not he had done the

16   grant work, and I'll read to you what you said.

17       Was -- grand juror:  "Was he actually doing the research

18   and it's just because he had the two jobs that it's not okay?

19   Was he doing the research?"

20          MR. OAKLEY:  Objection, hearsay and relevance.

21          THE COURT:  All right.  I'm not going to find that the

22   question itself is hearsay because I'm going to direct the jury

23   to not consider that question as hearsay -- or not consider

24   that question as the truth of the matter asserted by the grand

25   juror.  What's important is what Special Agent Lampe responded

in the context of that question.

BY MR. ZEIDENBERG:

Q. And you --

MR. ZEIDENBERG: Thank you, Your Honor.

BY MR. ZEIDENBERG:

Q. And you responded: "My understanding, that he is -- was -- is that he was doing the research at the University of Kansas."

Do you remember saying that? Does that refresh your recollection?

A. It does refresh my recollection. So the question was whether he was doing the work or not?

Q. Yes.

A. And I responded with --

Q. He was.

A. -- he was doing the work.

Q. Correct. Is that -- is that -- does that sound about right?

A. If you're reading off the transcript, that sounds about right.

Q. But again, as you said, it wasn't particularly relevant to your investigation?

A. Like I said, yes, it wasn't forefront in my mind for the investigation.

Q. Well, not only was it not forefront, you said you just learned this and maybe you had known it at one time, but you

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2075

1    had forgotten it and you learned it again for the first time

2    sitting here during the trial?

3    A.    Yes.

4    Q.    And you acknowledged in the same grand jury that KU was not

5    harmed by Doctor Tao's conduct; correct?

6              MR. OAKLEY:    Objection, relevance.

7              THE COURT:    Overruled.

8              THE WITNESS:    Again, you'll have to bring me back to

9    the transcript.

10    BY MR. ZEIDENBERG:

11    Q.    Page 24, the August 19th -- I'm sorry, 21st of August 2019.

12         Grand juror:    "How was KU damaged in this, I guess is what

13    I'm not clear about."

14         The witness:    "It's not so much that KU was damaged, it's

15    the fact the U.S. government is damaged."

16    A.    Yes, I think I -- I used that as a qualifier as well.

17    Q.    So you testified that KU was not damaged?

18    A.    Not so much as it was the government.

19    Q.    Okay.  So KU -- as far as what you told the grand jury

20    under oath, KU wasn't damaged?

21    A.    That's not what you just read back to me, but yes.

22    Q.    That's what they asked you, that's exactly what they asked

23    you.  How was KU damaged?  You said they weren't.

24    A.    I said not so much as -- KU as it was the government.  I

25    think you -- is what you just read back to me.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

```
 1   Q.  And you also testified, did you not, that if Doctor Tao had
 2   fully disclosed his alleged relationship with Fuzhou, he
 3   would've been told that he had to choose between working at KU
 4   and Fuzhou University; correct?
 5          MR. OAKLEY:  Your Honor, I'm going to object at this
 6   point as improper impeachment.  If he wants to ask these
 7   questions and if he receives an answer that is inconsistent, he
 8   can then follow up with the grand jury transcript.
 9          THE COURT:  I agree.  Sustained.
10   BY MR. ZEIDENBERG:
11   Q.  In the course of your investigation, Agent Lampe, did you
12   learn what would happen to Doctor Tao if he had disclosed to KU
13   that he had a job at Fuzhou University and what he would've had
14   to have done?
15   A.  I did.
16   Q.  And didn't you, in fact, learn that if he had disclosed
17   that, they would've -- KU would've said, look, you've got to
18   pick; you've got to pick this one, Fuzhou, or you've got to
19   pick Kansas; right?
20   A.  That's accurate.  Yes.
21   Q.  They wouldn't have said you're fired, right, they just said
22   you've got to choose?
23   A.  Right.
24   Q.  Now, in the course of your investigation, and we heard a
25   little bit about this from the FBI financial analyst, you
```

1    searched bank records for Doctor Tao and his wife; correct?

2    A.   That's correct.

3    Q.   And you searched the bank records of an individual -- and

4    I'm going to spell the name so I don't mispronounce it.  It's

5    Q-I-A-N-G is the first name, last name Y-E, and Chenlan Ding,

6    C-H-E-N-L-A-N Ding; right?

7    A.   Yes, I believe the first name -- the two names are spouses,

8    I believe.

9    Q.   And you searched the bank records of Zexi, Z-E-X-I, Song

10   and Zheng, Z-H-E-N-G, Zhao, Z-H-A-O, another couple; correct?

11   A.   I believe so, yes.  Yes.

12   Q.   And are you aware that all four of these people are a

13   member of Doctor Tao's Chinese Christian Church?

14   A.   I was aware of at least one of them was part of the church.

15   Q.   And these were people -- did you determine that they were

16   people who lent Doctor Tao money for his legal defense?

17   A.   Yes.

18   Q.   And the grand jury -- you helped obtain this grand jury

19   subpoena, you were involved in that investigative step in

20   deciding who to subpoena and how far to go back?

21   A.   Yes, in conference with the AUSA, yeah.

22   Q.   And you sought their banking records going back to 2014;

23   correct?

24   A.   That's correct.

25   Q.   And did you have any evidence that Doctor Tao was

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2078

1    interacting with Fuzhou University back in 2014 or 2015?

2    A.  Not with Fuzhou, no.

3    Q.  And did you have any evidence that Doctor Tao even knew

4    these people back in 2014?

5    A.  No.

6    Q.  But you, nevertheless, obtained all of their banking

7    records going back to 2014?

8    A.  Yes.

9    Q.  There was no evidence Doctor Tao was involved in job

10   discussions with Fuzhou until 2017; correct?

11   A.  Perhaps earlier, but yes.

12   Q.  And you sought all of the information about all their

13   savings accounts, all of their deposits, withdrawals, interest,

14   debit, credit memos; right?

15   A.  Yes.

16   Q.  How would knowing how much interest these people earned

17   back in 2014 before they even met Doctor Tao advance your

18   investigation into whether he properly disclosed his

19   relationship with Fuzhou University?

20   A.  Part of investigations is getting a complete picture, and

21   to get a complete picture sometimes we need to go on a broader

22   range of dates to see if money is traveling from one person to

23   another.

24   Q.  You obtained all their checking account records, including

25   signature cards, bank statements, deposit slips, all debit and

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   credit memos and 1099s going back to 2014?

2   A.   That sounds right, yes.

3   Q.   All their loan records, financial statements, background

4   investigations, information about car loans, liens on any

5   banks, safe deposit records, credit card records, all going

6   back to 2014?

7   A.   That's accurate.

8   Q.   For an investigation of Doctor Tao into whether he properly

9   disclosed a job that he obtained allegedly in 2018?

10  A.   Yes.   Doctor Tao was hired by KU in 2014.

11  Q.   Whatever -- what efforts did you make before issuing that

12  subpoena to determine whether they had ever even met Doctor Tao

13  back in 2014 or 2015?

14  A.   I think -- I don't think it was a matter of whether they

15  met or not, it was a matter of if there was money being

16  transferred to Doctor Tao's account from those accounts.

17  Q.   Well, if they didn't know him and he's living in Indiana

18  and they're living in Kansas, does it really seem likely

19  they're going to be transferring money to him back in 2014?

20  A.   Doctor Tao was in Kansas in 2014.

21  Q.   But he had had no discussions with Fuzhou; right?

22  A.   Not in 2014.

23  Q.   Instead of searching through these bank records of his

24  fellow church members, did you ever contact anyone at Fuzhou

25  and ask them if Doctor Tao was an employee there or on staff

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2080

1    there?

2    A.   I'm not authorized to contact people at Fuzhou University.

3    Q.   There are mechanisms in the law that would permit you to do

4    that; correct?

5    A.   There are.

6    Q.   You didn't avail yourselves of those, did you?

7    A.   We have issued an MLAA on that.

8    Q.   In 2021 you did?

9    A.   Right.

10   Q.   Not before you arrested Doctor Tao?

11   A.   No.

12   Q.   Now, there was surveillance conducted of Doctor Tao and his

13   family prior to arresting him; correct?

14   A.   Correct.

15   Q.   And that surveillance included his wife; right?

16   A.   Probably, yes.

17   Q.   And his children?

18   A.   I doubt we surveilled the children directly.

19   Q.   The post-docs in his lab?

20   A.   That sounds right.

21   Q.   The relatives of the post-docs in his lab?

22   A.   That does not sound right.

23   Q.   In early June 2019 agents followed Doctor Tao when he went

24   to a conference in San Antonio, Texas; correct?

25   A.   That is correct.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE   2081

1   Q.  They followed him when he got off the flight; right?

2   A.  Yes.

3   Q.  They noted what color his suit was; right?

4   A.  If you say so, yeah.  I mean -- I don't remember the

5   details of that.

6   Q.  They noted what kind of shirt he was wearing, the path he

7   took out of the airport, how long he was in the men's room.

8   Does that sound about right?

9   A.  If you're reading from it, yes.

10   Q.  They noted the license plate of the cab he took to his

11   hotel at the Red Roof Inn.  Would you agree with me there are

12   nicer and more expensive hotels in San Antonio than the Red

13   Roof Inn?

14   A.  Yes.

15   Q.  6:27 a.m. the next morning they followed Doctor Tao to the

16   iHop where he had breakfast.  Do you recall that?

17   A.  I wasn't there.  The report --

18   Q.  But you got reports?

19   A.  I did get reports, yes.

20   Q.  And then he was followed to the Spaghetti Warehouse where

21   he was surveilled while he read a menu, ordered food, and left

22   with a carryout bag of food to the Red Roof Inn; correct?

23   A.  If you're reading from the report, then yes.

24   Q.  Is it fair to say that this level of surveillance of

25   everywhere Doctor Tao went and what he did was not just on

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2082

```
 1    June 1st, 2019, but it went on for many other days as well
 2    during the summer of 2019; correct?
 3    A.   Yes.  I think there were several instances where Doctor Tao
 4    was surveilled.
 5    Q.   And during that surveillance you didn't find any evidence
 6    of any illegal activity of Doctor Tao, did you?
 7    A.   Not under surveillance, no.
 8    Q.   And you surveilled Luan Nguyen in his lab?
 9    A.   Yes.
10    Q.   You said -- the agents said they wanted to help establish a
11    pattern of life for Doctor Nguyen; right?
12    A.   Yes.
13    Q.   And it wasn't just Luan Nguyen that was being surveilled,
14    he also -- the FBI also surveilled his brother, Andrew;
15    correct?
16    A.   I mean, perhaps, the -- I'm sure the request wasn't to
17    surveil his brother.
18    Q.   And another post-doc of Doctor Tao's, Yu Tang, was also
19    followed and surveilled; correct?
20    A.   He may have been incorporated into the surveillance, yes.
21    Q.   Andrew Nguyen, Luan's brother, was followed when he went to
22    a Domino's Pizza on West 23rd Street in Lawrence to pick up a
23    pizza.  Do you recall reading that report?
24           MR. OAKLEY:  Your Honor, objection, relevance at this
25    point.  The point has been made.
```

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2083

1           THE COURT:  Overruled.

2           THE WITNESS:  I don't remember the details of every

3    surveillance report, but if you are reading from the 302, then

4    I would expect it's accurate.

5    BY MR. ZEIDENBERG:

6    Q.   Do you accept the representation that Doctor Tao was

7    followed as he and his children went to get takeout at a

8    Japanese restaurant in Lawrence?

9    A.   Again, if it says so, then yes.

10   Q.   And that his wife, Hong, was followed going to the Walmart

11   and Home Depot and Menards.  Does that sound about right?

12   A.   If that is what the 302 says, then yes.

13   Q.   You had teams of eight agents in two shifts following them

14   16 hours a day; correct?

15   A.   Again, I'd have to refer to the report, but that sounds

16   right.

17   Q.   And we did not hear during the two weeks of testimony that

18   the government put on any evidence about anything that occurred

19   during any of that surveillance; correct?

20   A.   That's correct.

21   Q.   Basically a waste of time and money; right?

22   A.   No.

23   Q.   You had a drone flying above Doctor Tao's home in Lawrence

24   recording video; correct?

25   A.   There are aviation assets that are used for surveillance,

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2084

1    yes.

2    Q.  And they were employed in this case?

3    A.  Perhaps.

4    Q.  You don't know?

5    A.  Well, I know there's recordings, but it's not something

6    that I requested specifically.

7    Q.  Who's in charge?  You're the lead case agent.

8    A.  The surveillance team determines what their needs are based

9    on their manpower.

10   Q.  And the surveillance team made a decision that, look, he

11   didn't fill out his conflict of interest form correctly, he

12   should've disclosed this information even though it's in these

13   articles that he gave to DOE, we need a drone up over his house

14   to nail this case down?

15   A.  Again, it's up to them to determine.

16   Q.  I'd like to show you Exhibit 1104 if we could --

17        MR. ZEIDENBERG:  Actually I'd like to introduce

18   Exhibit 1104, Your Honor.

19        MR. OAKLEY:  May I see it, please?

20        (Counsel confer).

21        MR. OAKLEY:  Your Honor, I think we have to lay

22   foundation with this witness to see if he even -- know if he's

23   even seen what this exhibit is and I would object to it being

24   shown before it's admitted.

25        THE COURT:  Okay.  Don't show it on the screen.  Go

1    ahead.

2    BY MR. ZEIDENBERG:

3    Q.  Are you aware that video surveillance footage was provided

4    to the defense in this case?

5    A.  Yes, I provided it to you.

6    Q.  You provided it?

7    A.  I did.

8    Q.  Okay.  So you're familiar generally what it involved?

9    A.  Yes.  I mean, I didn't review every second of it, but I --

10   I know that there was aviation video at least provided to you.

11   Q.  Okay.  Including over Doctor Tao's house on the day

12   before -- or the day of the search warrant of his house?

13   A.  Again, the surveillance team makes a decision on that, so I

14   would expect that I think.

15          MR. ZEIDENBERG:  Your Honor, I introduce Defense

16   Exhibit 1104.

17          MR. OAKLEY:  Assuming that -- I assume this is a

18   digital exhibit.

19          MR. ZEIDENBERG:  Yes, video.

20          MR. OAKLEY:  I have no objection, Your Honor.

21          THE COURT:  All right.  1104 admitted.

22          (Defendant's Exhibit 1104 was played).

23   BY MR. ZEIDENBERG:

24   Q.  Do you recognize that being Doctor Tao's neighborhood?

25   A.  I don't, but I -- I would assume that it is.

1    Q.  And that vehicle that is in the center of the screen

2    driving down the road that's got an "X" very close to it that's

3    trying to stay on top of it, do you recognize that, can you

4    tell if that's the Tao's minivan, 2006 Toyota minivan?

5    A.  It appears to be a minivan from the video, yes.  I don't

6    know that it's theirs, I would assume it was.

7    Q.  And do you recognize the path that this minivan is taking

8    to the local high school, which was located nearby the Tao's

9    home, where their children were students?

10   A.  I don't recognize the path, it is a different perspective.

11   But if you are representing that, then I'll accept that as

12   true.

13   Q.  And at this time on August 20th Doctor Tao was en route

14   from -- home from China to the United States; correct?

15   A.  That's correct.

16   Q.  And it was just Hong Peng, P-E-N-G, Doctor Tao's wife who

17   was home with their children; right?

18   A.  Well, like you said, yes, she's driving them to school, I

19   believe.  It's 7:43 in the morning.

20   Q.  Right.  And Doctor Tao's children at that time were in --

21   high school age, right, young -- they were starting high

22   school?

23   A.  I believe they were 14, 15.

24   Q.  Are you aware that this was the first day of school at

25   their high school?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1  A.  I was not.

2  Q.  First day of the calendar year?

3  A.  I was not.

4  Q.  Does that appear to be stopping in front of the high school

5  to drop off the kids?

6  A.  Yes.  If that's the high school, then yes.

7  Q.  Okay.  We can stop that there.  You can take that down.

8      Fair to say that this drone footage was not just up on that

9  day, correct, or we call it aerial surveillance?

10  A.  I think there are other -- other events where the aviation

11  assets were up.

12  Q.  Does it sound right that there was aerial surveillance done

13  on July 22nd, 23rd, 24th, August 4th, August 6th, August 7th,

14  August 20th and August 21st?  Does that sound about right?

15  A.  If you're representing that to me.  I don't have my 302s in

16  front of me to confirm that.

17  Q.  And the ladies and gentlemen of the jury have not heard any

18  evidence presented during this trial about any evidence

19  obtained via this aerial surveillance; correct?

20  A.  Yes, I don't believe any evidence was provided for that.

21  Q.  And at the -- at Tao's home during their search, were you

22  present at the house?

23  A.  I was not.

24  Q.  Were you instructing people on who to -- on what to

25  photograph and what they should be doing at the house, what

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1  they should be looking for?

2  A.  I was not.

3  Q.  Who briefs the search team on what they need to be looking

4  for?

5  A.  We did a briefing the day -- day prior.

6  Q.  And was that you that led the briefing?

7  A.  Myself and another agent, yes.

8  Q.  Okay.  So you explained to them what was important, what

9  the case was about?

10  A.  In general, yes.

11  Q.  And over 600 photographs were taken of the house; is that

12  right?

13  A.  That sounds right.

14  Q.  And you took -- there were more than 59 photos taken of

15  Doctor Tao's 14-year-old daughter's bedroom?

16  A.  It's possible.  I don't know the number.

17  Q.  I'd like to show you a couple of these pictures, just a

18  few.  Out of those 600 I've got about five.  Ask you to take a

19  look, see if you recognize those.  I'm showing you 1464 to

20  1469.

21  A.  Just '64 and '65?  You handed me a bunch.

22  Q.  Thank you.  Do you recognize 1464?

23  A.  I mean, I recognize that it's a picture and likely from the

24  house.

25  Q.  And 1465 was -- fair to say it appears to be a son's

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE        2089

1    bedroom?

2    A.   It has a soccer ball in it, so yeah.

3           MR. ZEIDENBERG:  I'd like to introduce Government

4    Exhibit 14 -- I'm sorry, Defense Exhibit 1465.

5           THE COURT:  1464 and '5 or --

6           MR. ZEIDENBERG:  Just 1465, Your Honor.

7           MR. OAKLEY:  No objection, Your Honor.

8           THE COURT:  1465 admitted.

9    BY MR. ZEIDENBERG:

10   Q.   Is that the soccer ball you're talking about?

11   A.   Yes.

12   Q.   Those appear to be soccer shoes?

13   A.   They do.

14   Q.   And 1466, does that appear to be his daughter's bedroom?

15   A.   I didn't see -- I didn't see that picture.

16          MR. ZEIDENBERG:  Your Honor, I'd move to introduce

17   Defense Exhibit 1466.

18          MR. OAKLEY:  No objection.

19          THE COURT:  1466 admitted.

20   BY MR. ZEIDENBERG:

21   Q.   Those appear to be a box full of stuffed animals?

22   A.   It is a box of stuffed animals.

23   Q.   Doctor Tao's office at work was searched; right?

24   A.   That's correct.

25   Q.   His office at home?

```
 1   A.   That's correct.

 2   Q.   His computers?

 3   A.   Yes.

 4   Q.   His phone?

 5   A.   Yes.

 6   Q.   All the electronic devices?

 7   A.   Yes.

 8   Q.   And no signed contract between him and Fuzhou was found;

 9   correct?

10   A.   That is correct.

11   Q.   Now, the original complaint that came to you was sent by a

12   former visiting scholar by the name of Huimin Liu; correct?

13   A.   That's correct.

14   Q.   And you're aware that she was trying to extort Doctor Tao;

15   correct?

16   A.   I wouldn't use the term "extort."

17   Q.   Well, she said that if he didn't give her $300,000, that

18   she would accuse him of being guilty of economic espionage;

19   correct?

20   A.   She was negotiating for authorship rights, I believe, and I

21   can see your point in terms of it appearing as extortion.

22   Q.   Well, I mean, she said she was angry with him; right?

23            MR. OAKLEY:  Objection, hearsay and relevance.

24            THE COURT:  I'll sustain as to that question.

25   BY MR. ZEIDENBERG:
```

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2091

1    Q.  She was obviously angry with him.  She said that; right?

2            MR. OAKLEY:  Objection, hearsay.

3            THE COURT:  Sustained.

4            MR. ZEIDENBERG:  I'm sorry, Your Honor, I didn't hear

5    the ruling.

6            THE COURT:  I sustained.

7    BY MR. ZEIDENBERG:

8    Q.  She was saying if you don't pay me this amount of money,

9    $300,000 -- which she said that's not a lot of money for you;

10   right?

11           MR. OAKLEY:  Objection, hearsay and relevance.

12           THE COURT:  All right.  I'm going to sustain to the

13   form of the question because I don't know who she's saying this

14   to.  Is she saying it to him?

15           MR. ZEIDENBERG:  I'm sorry, Your Honor.

16           THE COURT:  Go ahead.

17   BY MR. ZEIDENBERG:

18   Q.  Do you remember reviewing e-mails that she sent to Doctor

19   Tao?

20   A.  I do remember e-mails.

21   Q.  Okay.  And she was saying, "I want $300,000 or I'm going to

22   report you to the FBI for economic espionage because that's a

23   very popular topic these days"?

24           MR. OAKLEY:  Objection, hearsay and relevance.

25           THE COURT:  Counsel approach the bench, please.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2092

1          (Proceedings had at the bench, outside the hearing of

2    open court).

3          THE COURT:  Her statements are hearsay unless there's

4    some exception or they're otherwise going to be offered into

5    evidence.  Are there e-mails --

6          MR. ZEIDENBERG:  They're going to state of mind.

7    They're going to her state of mind.  She had a motive to get

8    whatever evidence she could find on Doctor Tao, and she had

9    access to his e-mails and she had access to his Fuzhou account

10   and she was unable to provide the FBI with a copy of a signed

11   contract.

12         THE COURT:  All right.  I understand that background,

13   but I'm saying that you're asking him about statements that she

14   made to Doctor Tao, which are hearsay statements.

15         MR. ZEIDENBERG:  But I'm not introducing them for the

16   truth, I'm introducing them to show her state of mind.  I'm not

17   saying that she -- what -- whether she really wanted $300,000

18   or if she really was going to -- I'm just trying to show that

19   she had a motive to try --

20         THE COURT:  Okay.  I thing there's a way to accomplish

21   that.  I mean, this witness is privy at least -- he actually

22   interviewed her; right?

23         MR. ZEIDENBERG:  Yeah.

24         THE COURT:  But I think there's a way to ask him

25   about -- asking him to relate what she said, I mean, in terms

1   of how he reacted or what he did next.

2          MR. ZEIDENBERG:  Which she --

3          THE COURT:  To the extent she accused Doctor Tao of

4   doing certain things, it would explain perhaps what he did

5   next.  I could then give a limiting instruction to the jury.  I

6   just -- right now, I mean, there's not a statement that he has

7   said that he has seen, there's not an e-mail that's come to

8   him.

9          MR. ZEIDENBERG:  Well, he did say he saw her e-mails

10  to him.  He just said that he's reviewed these e-mails.

11         THE COURT:  Again, I think just to ask him directly

12  what she said is a proper objection and I'll sustain, but I'm

13  not saying you can't get where you're going without framing it

14  differently.

15         MR. ZEIDENBERG:  Okay.

16         THE COURT:  And then I would give a limiting

17  instruction to the extent the jury hears something along the

18  lines of what she said, you know, or what he thought she said.

19         MR. OAKLEY:  Your Honor, the other objection would be

20  if he's trying to argue -- he needs to point to evidence that

21  has come in if he's trying to argue that whatever she said

22  directly related to the investigation.  The fact of the matter

23  is they can't point to a piece of evidence that came from her

24  to support this line of questioning.

25         THE COURT:  Okay.  So my understanding was from the

1    suppression stage of this, that there was going to be an

2    argument that she was somehow -- you know, she had access to

3    that one e-mail account and that there was some question as to

4    whether he authored certain things or was somehow involved in

5    transmitting certain things, and then we do have e-mails from

6    that account in evidence.

7         So I need to let the defense lay their foundation if

8    that's the path you're on, because it does need to be tied

9    specifically to the reliability of evidence.

10        MR. OAKLEY:  Correct.  And the only e-mails from the

11   Fuzhou account that are in evidence are e-mails that the

12   defendant sent to his KU account.  So unless the defense is

13   trying to say that that evidence has been created by Ms. Liu, I

14   don't know that they can point to specific evidence to meet

15   their --

16        MR. ZEIDENBERG:  To be clear, this is the converse of

17   that exact -- of the situation.  It's not that she is producing

18   suspect e-mails, it's the fact that she had access to that

19   account and she was unable to provide the contract even though

20   she had a motive to do that.  She was -- wanted to -- she

21   wanted Doctor Tao to be prosecuted.  That was her point of

22   those e-mails to the FBI.

23        And she demonstrated to the FBI, "I can access this

24   account."  She went onto the account with the FBI at her elbow

25   in a coffee shop in Berkeley, California, and she was unable to

1    provide the signed contract.

2           THE COURT:  Okay.  So where you're going with this is

3    to question the reliability of the drafts or addendas or

4    whatever in evidence.  The reliability that those, in fact, are

5    final contracts.

6           MR. ZEIDENBERG:  Exactly.

7           THE COURT:  All right.  I'll allow you to do that.

8    Let's go until about 12:30 and then we'll take a break.

9           MR. ZEIDENBERG:  Okay.

10          (Proceedings continued in open court).

11   BY MR. ZEIDENBERG:

12   Q.  A bit earlier, Agent Lampe, you said you understood my

13   interpretation that Huimin Liu was extorting Doctor Tao,

14   although you differed with whether -- you called it a

15   negotiation; is that right?

16   A.  Yeah.  I understood your point that you felt it was

17   extortion, but I think I would have to read the e-mail that you

18   are referring to to just be clear.

19          MR. ZEIDENBERG:  Court's indulgence.

20   BY MR. ZEIDENBERG:

21   Q.  Do you not recall, Agent Lampe, Ms. Liu e-mailing Doctor

22   Tao and telling him that she was angry with him for not getting

23   credit on an article that she had worked on?  You remember

24   that; correct?

25   A.  The issue is confusing to me.  I don't know if it is she is

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   improperly given credit or if she was not properly given

2   credit.

3   Q.  Regardless of the details, she was upset?

4   A.  Yes, she was upset.

5   Q.  And she mentioned, did she not, that if she didn't get

6   money from him that she was going to report him to the FBI?  Do

7   you recall that?

8   A.  I don't know that they're all in the same e-mail, and they

9   may very well be, and that's why I was asking for the e-mail,

10   but...

11   Q.  Well, I'll dig out the e-mail.

12   A.  Okay.

13   Q.  But I'm just asking you generally do you recall that

14   exchange, even if you don't recall the precise --

15   A.  Right, generally, I -- yes, there was something about her

16   being upset and also something about her reporting -- reporting

17   Doctor Tao.

18   Q.  And do you recall her referring to the term "tech spy" in

19   quotes, saying that that was a popular topic these days with

20   the FBI?

21   A.  I think tech spy is right.

22   Q.  And at some point you were able to identify Huimin Liu.

23   And just so it's clear, H-U-I-M-I-N is the first name.  I don't

24   know if I'm pronouncing it correctly, but that's how it's

25   spelled correctly?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    A.  Huimin, yes.

2    Q.  Huimin.  And the last name was Liu, L-I-U.  And eventually

3    you were able to identify her and interview her, correct, in

4    person?

5    A.  That is correct.

6    Q.  And she admitted that she had been the source of this

7    unsigned contract that she provided to the FBI between Doctor

8    Tao and Fuzhou University?

9    A.  She did.

10    Q.  And she claimed -- she first claimed that she had obtained

11    this from Doctor Tao's secretary?

12    A.  That's my understanding.

13    Q.  And then she later admitted in an e-mail that she accessed

14    Doctor Tao's e-mail account directly?

15    A.  That is correct.

16    Q.  And she said that she had his username and password and she

17    was able to access it?

18    A.  Yes.

19    Q.  And in July 2019, July 23rd, there was a meeting at the FBI

20    you had with Ms. Liu and she showed you that she was able to

21    access Doctor Tao's e-mail account at Fuzhou; right?

22    A.  That meeting was not at the FBI, but yes, she did.

23    Q.  I'm sorry, say that again.

24    A.  The meeting was not at the FBI.

25    Q.  Right.  It was at a coffee shop.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2098

1   A.  That's correct.

2   Q.  So you're meeting with her at a coffee shop.  You've got a

3   laptop on the table.  And she says, "I can do this, I'll show

4   you"?

5   A.  Yes, she signs in.

6   Q.  And she used Doctor Tao's username and password to access

7   his account at Fuzhou University; correct?

8   A.  Presumably.  So I don't know that it was Doctor Tao's

9   account, but that was -- that was the assumption.

10  Q.  And she was not able to provide you, even though she had

11  access to that account, a copy of a signed contract between

12  Fuzhou and Doctor Tao; correct?

13  A.  She did not provide a contract that was signed by both

14  Fuzhou and Doctor Tao.

15  Q.  I want to show you -- taking a different tact now.  I want

16  to talk about the conflict of interest form.

17  A.  Okay.

18  Q.  And that's Government Exhibit 25.  Fair to say that --

19  that's the form.  Fair to say that nowhere on that form does it

20  say that filling it out incorrectly may subject you to a

21  prosecution for a felony in federal court?

22  A.  I do not believe it says that.

23  Q.  In fact, on the last page it says, "Failure to file this

24  statement as required or intentionally filing a false statement

25  may result in disciplinary action"; correct?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2099

1    A.   That's what it says.

2    Q.   And this is going to the KU H.R. department; correct?

3    A.   I believe this goes to KUCR.

4    Q.   And would you agree with me that disciplinary action

5    suggests an adverse job-related action?

6    A.   Yes, I would agree with that.

7    Q.   I mean, if someone is told at work that if they don't

8    comply with the policy, they could be disciplined, that doesn't

9    suggest they may be arrested and put on trial in federal court;

10   right?

11   A.   Yes, two different things.

12   Q.   And you were asked about these conflict of interest forms

13   in the grand jury.  Do you recall that?

14   A.   I do remember that, yes.

15   Q.   Okay.  And would you agree with me that the form does not

16   require that the submitter report any time commitment outside

17   the university, only has to do -- only has to report certain

18   types of outside time commitments; correct?

19   A.   No, I believe it says any time commitment, but I -- if I

20   could see the document, I would love to read that.  I think

21   it's the financial disclosure that's more specific.

22        (Reads document).  So I've read it.

23   Q.   Okay.  Fair to say that the form requires the submitter

24   only to disclose -- only disclose any entity with which you

25   engage in personal professional activities that takes time away

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    from your university responsibilities; correct?

2    A.   That is the first part of the sentence, yes.

3    Q.   Conflict of interest form doesn't require the submitter to

4    report an unpaid or honorary or adjunct position at a foreign

5    university, does it?

6    A.   Doesn't state that directly.

7    Q.   What investigation did you do before arresting Doctor Tao

8    to determine whether or not he was performing his duties as a

9    KU professor in September 2018?

10   A.   I don't know what you mean.  It's very specific to just

11   September 2018.

12   Q.   So the government has alleged that this Government

13   Exhibit 25, this conflict of interest form that he submitted in

14   September of 2018, was false.

15   A.   Correct.

16   Q.   And they point to in the indictment -- and I think it's

17   fair to say that they're worried about time commitment issue.

18   And according to that, what we just read and what you just read

19   to the jury, is that the form requires the submitter to only

20   disclose activities that take time away from your university

21   responsibilities; right?

22   A.   Right.

23   Q.   And I'm asking what investigation did you do to see if you

24   could determine whether or not, in fact, Doctor Tao was

25   fulfilling his university responsibilities?

1  A.  So we did follow up with Doctor Weatherley to determine

2  what courses he was teaching and as well as the dean, the

3  provost.  I mean, we interviewed several people at the

4  university.

5  Q.  And you heard Doctor Weatherley testify, did you not, that

6  Doctor Tao was a solid faculty member?

7  A.  He said -- yes, I believe he said he was a solid

8  researcher.

9  Q.  He said he was a solid faculty member.  I'll let -- the

10  jury's recollection will control on that.

11  A.  Okay.

12  Q.  And you certainly are aware -- or let me ask you this.

13  When did you become aware that in April 2019 Doctor Tao was

14  selected for the Chancellor Award for being one of the four

15  most outstanding professors at the University of Kansas?  When

16  did you become aware of that?

17  A.  I think that was fairly early on, I think.  I'm not

18  entirely sure.

19  Q.  Before or after you arrested Doctor Tao?

20  A.  Like I said, I'm not entirely sure, but it -- earlier.

21  Q.  So given that one of the allegations according to this is

22  that he was doing activities that -- that that form was

23  incorrect because he didn't check the box that says that he was

24  performing activities that would take away from his KU

25  responsibilities, doesn't the fact that he was identified and

1    awarded in April of 2019 as being one of the four most

2    outstanding professors at the University of Kansas suggest to

3    you that whatever it is he was doing, it wasn't interfering

4    with his job responsibilities?

5    A.   I can see your perspective on that.

6    Q.   Do you agree that if he is one of the four most outstanding

7    professors and he gets an award, including a prize for $10,000,

8    in April of 2019, almost one year, 11 months after he

9    purportedly takes this job at Fuzhou University, doesn't that

10   suggest to you that he was performing his job duties at Kansas?

11   A.   I don't know what goes into the selection process and how

12   they determine who the winners are, but I -- again, your point

13   is well-taken.   I understand and I would agree.

14   Q.   Did you talk to his graduate students before he was

15   arrested to determine whether he was performing his job

16   responsibilities on his research while he was off campus, off

17   Kansas campus?

18   A.   I did not.

19   Q.   And you would agree with me that he had a nine-month

20   appointment and wasn't required certainly to be on campus

21   during the summer months?

22   A.   Yes.   The summer months is kind of a confusing issue

23   because if you have research, theoretically, and you're taking

24   salary for that research, that you would be doing that during

25   the summer months.

1    Q.  But we -- we both heard Ms. Schwartz and Ms. Keiser --

2    Doctor Schwartz and Ms. Keiser testify - and I went over that

3    with you earlier - that research could be supervised from afar,

4    from overseas or wherever else, by computer and by phone;

5    right?

6    A.  Yes.  And we discussed the change of scope with that if

7    that were applicable, but yes.

8    Q.  So during the summer, summer vacation, Doctor Tao and

9    people in his position can go wherever the heck they want.  And

10   if they have research responsibilities, of course, they have to

11   do that, but they can do that from wherever they are?

12   A.  It's really up to KUCR as well as NSF and DOE.

13   Q.  And NSF and DOE said, yeah, you can do it; right?

14   A.  I mean, you're representing that right now.

15   Q.  Well, the ladies and gentlemen heard the testimony so they

16   can judge that.

17        The fall of 2018 Doctor Tao -- let me back up.

18        The government has alleged that Doctor Tao entered into

19   this contract with Fuzhou in May of 2018; correct?

20   A.  Correct.

21   Q.  And when the indictment says that he entered into a

22   contract in March of 2018, that's just wrong; right?

23   A.  The indictment may mention the contract addendum, but I

24   don't know that it mentions the five-year contract as starting

25   in March.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2104

1    Q.  And if I were to represent to you in Paragraph 29 of the

2    second superseding indictment, which is what the grand jury --

3    the jury will have, it says --

4             MR. OAKLEY:  Objection, hearsay, Your Honor, and

5    improper impeachment.  If he wants to show this witness a

6    document.  And it's not in evidence.

7             THE COURT:  You can show it to him without displaying

8    it.

9             THE WITNESS:  (Reads document).  Yes, I understand

10   your question now.

11   BY MR. ZEIDENBERG:

12   Q.  Okay.  So what does the indictment say about when Doctor

13   Tao entered into that contract?

14   A.  Is it okay if I read it?

15   Q.  Yeah, why don't you read it.

16   A.  "In or around March 2018, Tao entered into a contract with

17   FZU," that's Fuzhou University, "to serve as a Changjiang

18   Distinguished Professor for a period of five years from

19   May 1st, 2018 to April 30th, 2023."

20   Q.  Thank you.  So according to the indictment, he entered into

21   the contract in March; right?

22   A.  Yes.  We believe that that was when it started to begin,

23   but the contract itself started in May.

24   Q.  But you're saying that this is not correct when you say

25   that, because you said just a minute ago he entered into the

1    contract in May.

2    A.  I'm saying that he agreed to the contract in March to a

3    contract that starts in May.

4    Q.  But it says he entered into the contract.

5        And in any event, we'll get to the contract, but you're not

6    going to sit here and tell the ladies and gentlemen of this

7    jury, are you, that after listening to all those phone calls

8    between Doctor Tao and people at Fuzhou, that he had agreed in

9    March of 2018 to the terms of this contract?  You saw that they

10   were negotiating between March and May; right?

11   A.  I did see negotiations, that's correct, yes.

12   Q.  All right.  So there was no agreement in March, you got to

13   agree with me about that; correct?

14   A.  I mean, you're -- it depends on what you're defining

15   agreement as, it's like I will eventually come work for you.

16   Q.  I will tell you exactly what I define agreement as.

17   A.  Okay.

18   Q.  A meeting of the minds as to the terms of a contract, where

19   someone says I'm going to do "X" amount work for "Y" amount of

20   dollars and "Z" amount of research funds and they both sign it.

21   That's what I'm calling an agreement.  And you agree with me

22   there was not one of those back in March of 2018?

23   A.  There is not a document where they are both signed -- both

24   parties have signed.

25   Q.  Agent Lampe, there was ongoing discussions where Doctor Tao

1  was asking for $50 million in research funds --

2  A.   Correct.

3  Q.   -- and the President Zhang of Fuzhou University was

4  offering him 20 million; right?

5  A.   I think he goes on to say that he will eventually get the

6  30 million.

7  Q.   And so that's an agreement in your mind; is that right?

8  A.   Verbal agreement.

9  Q.   So in your mind if someone says, "I want 50 million," and

10  someone else says, "I gave you 20 and I'm going to work on the

11  rest," that's a deal?

12  A.   That's not a signed contract like you said, but it's moving

13  towards that point.

14  Q.   Would you agree with me there's a difference between moving

15  towards an agreement and actually having an agreement?

16  A.   I define you're having an agreement as the two signed --

17  both parties signing and, you know, the contract being formed

18  that way.

19  Q.   Okay.  In any event in the fall of 2018 after all these

20  negotiations were going on, Doctor Tao is back in Lawrence,

21  Kansas teaching a full load; correct?

22  A.   Yes, I believe he's teaching one course.

23  Q.   90 students, it's considered a full load, his full teaching

24  responsibility and conducting research; correct?

25  A.   Yes, he has one course and his research.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.  I just want to make sure, you make it sound like he wasn't

2    doing a lot.  Do you have any impression that Doctor Tao was

3    not working incredibly hard while he was here on campus in

4    May -- I mean, in the fall of 2018?

5    A.  No, I mean, you're -- the testimony from previous witnesses

6    has suggested that he does work very hard.

7    Q.  Okay.  And you don't question that?

8    A.  No.

9    Q.  And did you try to find out if he was doing the work he was

10   supposed to be doing on campus?  You said you did talk to some

11   people?

12   A.  We did talk to some people, yes.

13   Q.  And you talked to Laurence Weatherley?

14   A.  I did.

15   Q.  Okay.  And isn't it true that Weatherley told you that if

16   there had been complaints about Doctor Tao not showing up for

17   classes, he would've heard about it?

18   A.  He would hear about it through the students.

19   Q.  And he hadn't?

20   A.  He had not.

21   Q.  And have you become aware, if you weren't at the time of

22   his arrest, of how productive Doctor Tao was in terms of his

23   publications?

24   A.  What you guys presented in the beginning of the trial, yes.

25   Q.  Okay.  And you heard Chancellor Girod say that his

1    accomplishments were remarkable in that respect?

2    A.  Yes.

3    Q.  And was that news to you when you heard Chancellor Girod

4    talk about Doctor Tao's accomplishments as being remarkable?

5    Was that new information to you or did you know that before you

6    arrested Doctor Tao?

7    A.  I didn't -- I didn't know -- obviously I didn't know Doctor

8    Girod's testimony prior to the arrest.  I didn't interview

9    Doctor Girod for quite some time.

10   Q.  Was the fact that he was the -- by far the most productive

11   member of the chemistry department in terms of publications --

12   were you aware of that, first of all, at the time you arrested

13   Doctor Tao?

14   A.  No.

15   Q.  And is that information that you consider relevant in

16   determining whether or not Doctor Tao was, in fact, fulfilling

17   his KU responsibilities?

18   A.  No.

19   Q.  Not important?

20   A.  I didn't find it relevant, no.

21   Q.  So if Doctor Tao published six papers in 2015 and 2016 and

22   12 papers in 2017 and then 25 papers in 2018, does that suggest

23   to you that whatever he was doing with Fuzhou University was

24   not interfering with his KU responsibilities?

25   A.  I don't know that I would correlate the two because he's

1   signing these as Fuzhou University as well as his affiliation,

2   right?

3   Q.   I'm asking you the question --

4   A.   Okay.  I'm sorry.

5   Q.   -- is whether the number of publications that is going up

6   dramatically after he purportedly signs this contract with

7   Fuzhou, does that suggest to you that whatever he was doing in

8   China was not adversely affecting his KU job responsibilities?

9   A.   I think it simply suggests that he was publishing more.

10   Q.   He was publishing more, which is what he was supposed to do

11   under his NSF and DOE grants; right?  That's what they wanted

12   was publications?

13   A.   I think everybody wants more publications.

14   Q.   Right.  And he's accomplishing that; correct?

15   A.   Yes.

16   Q.   You collected all of Doctor Tao's KU e-mail accounts;

17   right?

18   A.   Yeah, there was only one.

19   Q.   And his personal e-mail accounts as well?

20   A.   There was a couple of those, yes.

21   Q.   And you -- clearly you were searching through there to see

22   all of -- through all of his e-mails to see if there was any

23   connection to Fuzhou?

24   A.   Yes.

25   Q.   What search did you undertake to determine if he was still

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE      2110

1    attending to his KU job responsibilities when he was off campus

2    in China?

3    A.   What specific search did I do --

4    Q.   To see -- to determine if Doctor Tao was still attending to

5    his KU job responsibilities when he was off campus in China?

6    A.   I think that's a matter of interviews with faculty as well

7    as e-mails that I came upon during the search.  I won't say

8    there's a specific search term that I searched for.

9    Q.   Did you review his e-mails to see if he was interacting

10   regularly with the graduate students in his lab about his DOE

11   and NSF research while he was away from campus?

12   A.   I didn't specifically search for it, no.

13   Q.   Wasn't that relevant to your investigation to determine if

14   that conflict of interest form was actually false?  Because it

15   says you only got to check the box if this is going to

16   adversely impact your job responsibilities at KU, isn't it

17   relevant to see if he was doing his job responsibilities at KU?

18   A.   I think the difference is -- as you said in the beginning,

19   you know, I searched for terms that would suggest that Doctor

20   Tao worked at Fuzhou, right?  So if you have a full-time

21   position at Fuzhou and you have a full-time position at KU,

22   then that simply does not work.

23   Q.   And you don't need to do any investigation to see if he was

24   keeping up with his job responsibilities?

25   A.   Like I said, I -- we interviewed faculty as well as the

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    e-mails that I came upon.  I don't have a specific search term,

2    per se, that I looked for, but I feel like I would've seen it.

3    Q.  Well, I want to show you some exhibits.

4    A.  Okay.

5    Q.  1409 and 1410.  I'm not going to ask you to read these for

6    the jury.  You're aware that the defense provided those in

7    discovery to the government?

8    A.  Yes.  I believe we just got it a couple days ago.

9    Q.  These are the collection of exhibits that we did to -- of

10   e-mails from the summer, 1409, the summer of 2018.

11       If I were to represent to you that those are e-mails all

12   between Doctor Tao and his graduate students during the summer

13   of 2018 when he was in China, is that news to you?

14   A.  That's a lot of e-mails.  If you're representing that those

15   are all e-mails, then yeah.

16   Q.  That's double-sided.

17       Does that suggest to you that during the summer of 2018

18   while he was off campus, just as his graduate students

19   testified, he was staying in touch with them and doing work

20   with them?

21   A.  If you're representing those are e-mails with his KU

22   graduate students, that would -- and those are just -- that's

23   the summer?  Just those?

24   Q.  Let me show you 1410 and 1410-a -- I'm sorry, 1410 Volume

25   I, 1410 Volume II, and 1410-a.  Those three volumes I will

1    represent to you were the fall of 2018.  A lot of work in

2    there; right?  Those are e-mails between Doctor Tao and his

3    graduate students.

4    A.   That's a lot of e-mails.

5    Q.   And that's when he was purportedly working at Fuzhou

6    University?

7    A.   It was purportedly when he was under contract with Fuzhou

8    University, yes.

9    Q.   During the winter break of 2018 Doctor Tao was out of the

10   country, the government contends he was in China, and I want to

11   show you the e-mails just from the winter break, 1411.  These

12   are the few weeks of winter break, December to January,

13   double-sided e-mails.

14        And then, of course, we get to the spring of 2019 when

15   Doctor Tao had a buyout, a course buyout, and was in China;

16   correct?

17   A.   Spring 2019, yes.

18   Q.   And I want to show you 1341, Volume I, Volume II, Volume

19   III, and Volume IV.  And I'll just put these on the floor.

20   Again, double-sided e-mails, four volumes, several thousand

21   pages.

22        And finally the summer of 2019 when Doctor Tao had --

23   didn't have to be on campus we would say in Kansas but was in

24   China, and let's see what he did.  One volume.  Do you see

25   that?

1   A.   I do.

2   Q.   So if I were to represent that all of these e-mails --

3   these are all e-mails between Doctor Tao and his graduate

4   students while this -- the government contends that he was

5   working full-time at Fuzhou, does that suggest to you that he

6   was doing a tremendous amount of work with his graduate

7   students even while he was away?

8   A.   I think it represents a tremendous amount of e-mailing

9   between him and his graduate students.  Whether work is

10  accomplished is, you know, not something we can define right

11  here.

12  Q.   But you heard from the students, you heard from Weixin Wang

13  and Shiran Zhang and Luan Nguyen; right?

14  A.   Yes.

15  Q.   And they all said research was being done and that Doctor

16  Tao was extremely demanding?

17  A.   Yes, they say he works very hard.

18  Q.   And they said that he insisted that all of their work get

19  done; in fact, they said they got more done when he was away

20  because he was constantly, you know, on their backs

21  essentially?

22  A.   Yes, I believe Mr. Nguyen said something to that effect.

23            THE COURT:  Is this a good time to break?

24            MR. ZEIDENBERG:  Yes.

25            THE COURT:  All right.  Let's take a break until 1:30.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2114

1        (Recess).

2        (The following proceedings were held outside the

3   presence of the jury).

4        THE COURT:  All right.  You can be seated.

5        We'll hold off until Mr. Lampe gets back.

6        (The following proceedings were held outside the

7   presence of the jury).

8        THE COURT:  All right.  You can be seated.

9   BY MR. ZEIDENBERG:

10  Q.  Good afternoon.

11  A.  Good afternoon.

12  Q.  You testified at the grand jury in January 2020 that your

13  investigation revealed that Doctor Tao was working for Fuzhou

14  according to his contract.  Does that sound about right?

15  A.  Yes.

16  Q.  And I'd like to take a look at that contract to see if that

17  is really the case.  And I want to show you Government

18  Exhibit 314, which is the contract and addendum sent to Doctor

19  Tao on May 3rd and also the same one that Doctor Tao sent to

20  his wife, Hong Peng, in August 2019.

21       Now, like all the contracts that have gone back and forth

22  in this case, not signed; right?

23  A.  Not signed.

24  Q.  But it's your -- it was your testimony, I take it, that by

25  looking at extraneous factors of what you -- and in looking at

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2115

1    his e-mails and whatnot from when Doctor Tao was at Fuzhou or

2    communicating with them, you believed that that shows that he

3    was, in fact, fulfilling this contract, even though you don't

4    have a signed contract?

5    A.   I do not have a signed contract and, yes, I believe he

6    fulfilled the contract by doing the things that he was doing.

7    Q.   All right.  I want to start with the end of this Section

8    6 -- Article 6.  First supervision.  First it says, "This

9    contract is produced in triplicate, both parties each holding

10   one copy, and a third being submitted to the Ministry of

11   Education's Department of Personnel for record."  And its

12   effective date is the date that it's signed and stamped by both

13   parties.

14        Okay.  Starting with that one, we don't have a signed and

15   dated, stamped version; right?

16   A.   We do not.

17   Q.   And although it's supposedly when there is -- if there were

18   one, it would be held in triplicate with each party holding

19   one, you never found one on any of Doctor Tao's electronic

20   devices; correct?

21   A.   I did not.

22   Q.   And Huimin Liu, even though she had access to his Fuzhou

23   e-mail account or at least purported to, she was unable to

24   provide one to you; correct?

25   A.   She did not provide one to us, that's correct.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2116

1    Q.   She did provide you an unsigned version?

2    A.   She did provide us an unsigned version.

3    Q.   Now, let's look at the start date.  It says May 1st, 2018.

4    And from the calls from last week, you heard Doctor Tao was

5    still negotiating with Fuzhou on May 3rd; correct?

6    A.   You'd have to refresh me on the call, but that sounds about

7    the right time frame.

8    Q.   So clearly the start date wasn't being strictly applied,

9    which according to the contract it should've been; correct?

10   A.   According to the contract -- I mean, this is the unsigned

11   contract, like you said.

12   Q.   And let me just go back because I skipped over an important

13   part here.  In Article 6, second item, both parties shall

14   strictly abide by each article in this contract.  Do you see

15   that?

16   A.   I do.

17   Q.   So if the contract is being fulfilled, you would expect

18   that both parties to be doing -- strictly held to their

19   responsibilities; correct?

20   A.   You would.

21   Q.   Under Job Duties, "(1) Undertake the task of teaching one

22   physical chemistry class or a related course every academic

23   year, and assist in fulfilling other educational tasks arranged

24   by Party A's schools and colleges."

25        And would you agree with me that during the government's

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   presentation of evidence of e-mails, there was no e-mails

2   showing that Doctor Tao was teaching chemistry at Fuzhou

3   University; correct?

4   A.   Yes, I don't believe there are any e-mails suggesting he's

5   teaching chemistry there.

6   Q.   You didn't find a syllabus, did you?

7   A.   I don't think so.

8   Q.   And you didn't see evidence that he was grading papers or

9   exams?

10  A.   No.

11  Q.   You didn't see communications with other faculty members

12  about meetings, faculty meetings that he had to attend?

13  A.   Not specifically faculty meetings.

14  Q.   And, of course, in September 2018 -- Doctor Tao was in

15  Kansas in September starting the fall semester teaching;

16  correct?

17  A.   Correct.

18  Q.   So he was obviously not fulfilling the very first task,

19  which was to teach every academic year, teach a course in

20  chemistry; he wasn't doing that?

21  A.   If he was in Kansas in the fall, is that what you're

22  saying?

23  Q.   Right.

24  A.   Right.

25  Q.   So even though the contract says you've got to fulfill

1    every obligation in this contract, it's going to be strictly

2    enforced and he's supposed to be teaching chemistry every year,

3    the very first semester after he signs this, he's in Kansas,

4    not teaching chemistry at Fuzhou University; right?

5    A.   Well, it's every academic year, right, so that would be the

6    spring and the fall.

7    Q.   In the fall he's in Kansas -- did you -- did you see

8    evidence --

9    A.   Teaching at KU.

10   Q.   Did you see evidence in the following semester when he was

11   in China of a syllabus or that he was teaching chemistry?

12   A.   Like I said, I did not.

13   Q.   Okay.  Under Scientific Research, (2) it says, "Carry out

14   original and significant research on both theoretical and

15   applied topics, apply for and strive to achieve National

16   Natural Science awards and other significant landmark results,

17   and publish more than 60 research articles in domestic or

18   foreign publications with Party A," which would be Fuzhou, "as

19   the primary employer and Party B as the primary author."

20        Do you see that?

21   A.   I do see that.

22   Q.   And between May of 2018 and August of 2019 when you

23   arrested Doctor Tao, is it fair to say you did not find any

24   research articles published where it was just Doctor Tao and

25   Fuzhou University; correct?

1    A.   That is correct.  However, you're referring to Party A

2    being the only employer as opposed to being the primary

3    employer.  There was a previous contract that you showed me

4    that had the adjustment.

5    Q.   Okay.  We're talking to the one in May of 2018.  This is

6    the version that was in May 2018.

7    A.   Yes.

8    Q.   This is the latest version you have.  You don't have a

9    version after May 2018; correct?

10   A.   No, we have the August of 2019.

11   Q.   And that's the same one which -- I can represent to you

12   that Doctor Tao -- this is the one Doctor Tao sent to his wife,

13   Hong Peng.

14   A.   Okay.

15   Q.   So this is the latest version, and it says that he is

16   supposed to fill out -- he is supposed to publish these

17   articles; right?

18   A.   Uh-huh.  I'm sorry, yes.

19   Q.   And Party A is primary and Party B is primary author;

20   correct?

21   A.   Yes.

22   Q.   And I'm going to direct you to Page 5 of 7, Paragraph 7,

23   where there's another discussion about papers.  It says, "All

24   related papers and publications as well as awards, patents, and

25   research projects and funds applied for by Party B," which

1    would be Doctor Tao, "must be signed under the names of both

2    Party A -- Party B and Party A; namely, they must be signed by

3    both the author and the author's employer, with the author's

4    employer signing exclusively as Party A."

5        Do you see that?

6    A.    I do.

7    Q.    So according to this contract, which has to be strictly

8    enforced, it's got to be Fuzhou and Doctor Tao on the

9    publications exclusively; correct?

10   A.    According to this, yes.

11   Q.    Not KU and Fuzhou; Fuzhou and Doctor Tao.

12   A.    According to that sentence, yes.

13   Q.    And in the 18 months between May 2018 and August 2019, even

14   though Doctor Tao was supposed to be over one-fifth through

15   this contract where he's supposed to have 60 publications --

16   that would be 12 a year; right?

17   A.    Yes.

18   Q.    He's gotten zero done, right, zero publications where it's

19   just him and Fuzhou?

20   A.    Listing only Fuzhou as the affiliation.

21   Q.    So he's not fulfilling the contract as far as that goes;

22   correct?

23   A.    He's not abiding by that sentence; correct.

24   Q.    Let's look at No. 3, Party A's rights and obligations.

25   Draw your attention to No. 3.  The workplace and living

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    conditions to be provided by Party -- to Party B, Doctor Tao,

2    by Party A, Fuzhou, and then it says, "Note:  This clause

3    should be more specific."

4        Do you see that?

5    A.   I do.

6    Q.   Does that suggest to you that this contract is not a final

7    version?

8    A.   That's -- that sentence does; however, there is more to

9    that as -- in terms of living conditions and what's provided to

10   Party B.

11   Q.   This contract says that we need to clarify this provision

12   here; right?

13   A.   Right here it does on this page.

14   Q.   Now, in the spring of 2019 he was in China while he had a

15   course buyout in Kansas; correct?

16   A.   He was in China and, yes, I'll -- I'll say that he had a

17   course buyout in Kansas.

18   Q.   And the fall of 2019 he was scheduled to teach again in

19   Kansas; correct?

20   A.   That is correct.

21   Q.   So let's look at parties to Doctor Tao's obligations.  This

22   is on Page 5 of 7.  Do you see that?

23       "Party B," Doctor Tao, "shall work full-time for Party A in

24   the position of distinguished professor and shall neither

25   hold -- neither hold or draw salary from any concurrent post

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    nor change his employer."

2       Do you see that?

3    A.  I do see that.

4    Q.  So he's -- according to you, according to the government,

5    he signs this contract either in March or in May, he enters

6    into the contract.  And in September, three months later, he's

7    in Kansas teaching; right?

8    A.  Yes.

9    Q.  Even though it says right here he's supposed to be working

10   exclusively for Fuzhou?

11   A.  Right.

12   Q.  And then a year later, in August of 2019, he's headed back

13   to Kansas to teach classes?

14   A.  Correct.

15   Q.  And yet the contract says, "Each provision will be strictly

16   enforced"; right?

17   A.  That's what the contract says.

18   Q.  And he is not allowed to have a second job or a second

19   employer; correct?

20   A.  Yes.

21   Q.  So would you agree with me that part of the contract is not

22   being fulfilled?

23   A.  I agree with you.

24   Q.  It says here, "Party B's personal files should be formally

25   submitted to Party A within six months of the announcement of

1    his selection."

2        You have all of Doctor Tao's e-mails, his Gmail, KU

3    accounts?

4    A.   Can you move that up?  I don't see that on this page.

5    Q.   See that on 5, the second sentence?

6    A.   Second sentence.

7    Q.   Party B, personal files?

8    A.   There it is.  Thank you.

9    Q.   Did you see that?

10   A.   Yes.

11   Q.   Did you see any evidence of Doctor Tao transferring his

12   personal files to Party A between May of 2018 when he

13   purportedly signed this contract and November when the six

14   months would've been up?

15   A.   Are you saying did I see any evidence electronically?

16   Q.   In any -- electronically, physically, in any other way.

17   A.   Electronically I did not see any evidence of it.

18   Q.   Did you see it some other way?

19   A.   No.

20   Q.   Doctor Tao from May 2018 to the time of his arrest was

21   always publicly listed as far as you know on the KU website as

22   being employed as a KU professor; correct?

23   A.   As far as I know, he was listed as a KU professor.

24   Q.   And he was publishing paper after paper after paper in

25   which his affiliation with KU was listed publicly; correct?

1    A.  Of the papers that I saw, he was listing KU as an

2    affiliation, yes.

3    Q.  So fair to say his involvement with KU was not secret, not

4    hidden from the world; right?

5    A.  Not secret from who?

6    Q.  From anybody.  Anybody who looked up Doctor Tao would see

7    he was working as a professor at the University of Kansas.

8    A.  If they were to look at the affiliations, yes.

9    Q.  If they just looked him up on the website, it would say --

10   A.  KU, yes.

11   Q.  -- Franklin Tao, professor, KU --

12   A.  Yes, uh-huh.

13   Q.  -- chemistry department?

14   A.  Yes.

15   Q.  So Fuzhou would obviously have known that he wasn't working

16   exclusively for them as he is supposed to do under this

17   contract; correct?

18   A.  I don't know what Fuzhou knew or did not know or what

19   relationship he had with Fuzhou in terms of whether he could

20   work here in the U.S.

21   Q.  So are you suggesting that maybe they had an agreement that

22   even though this contract says certain things, that they had

23   some kind of an informal agreement that doesn't adhere to this

24   contract and it might be some kind of a side job -- side

25   agreement that's not in writing?  Is that what you're

1    suggesting?

2    A.   I don't understand what you're saying.

3    Q.   Okay.

4    A.   If you could try that again.

5    Q.   Well, the contract says he has to work exclusively for

6    Fuzhou; right?

7    A.   As to what you've pointed out, yes.

8    Q.   And we know that he wasn't working -- whatever he was doing

9    with Fuzhou, we know he wasn't working exclusive there because

10   he was still working at KU; right?

11   A.   If the times line up, then yes.

12   Q.   Well, in May 2018 until his arrest he was working at KU;

13   right?

14   A.   Well, by your argument you say he had a buyout which

15   relieved him of his teaching duties at KU.

16   Q.   That was one semester.

17   A.   That was one semester.

18   Q.   He was still doing his research; right?  He was still

19   publishing papers; right?

20   A.   I don't know that he was doing his research, and I don't

21   know what papers he was publishing.

22   Q.   Agent Lampe, you heard his students testify, his graduate

23   students.  So if you didn't know before you arrested him,

24   certainly you know now after having sat through their testimony

25   that they were doing research --

1          MR. OAKLEY:  Objection --

2    BY MR. ZEIDENBERG:

3    Q.  -- on his behalf.

4          MR. OAKLEY:  Objection, misstates the testimony.

5    Those students were from Notre Dame.

6          THE COURT:  All right.  You can cover this on

7    redirect.  I thought there was one from KU.

8    BY MR. ZEIDENBERG:

9    Q.  Luan Nguyen.

10   A.  Luan.

11   Q.  Where was he?

12   A.  KU.

13   Q.  Okay.

14   A.  Yes.

15   Q.  He said he was doing research; right?

16   A.  Luan said that he was doing research.

17   Q.  Do you think Luan was just doing it on his own without any

18   supervision?  Do you think he was fabricating or lying when he

19   said that he was supervised by Doctor Tao?

20   A.  I don't -- I don't know what the relationship was between

21   Doctor Nguyen and Doctor Tao in terms of -- other than the fact

22   that Doctor Tao was his supervisor.  And that's fair.  But what

23   kind of work was done during that time, I can't speak to that.

24   Q.  So are you saying that Chancellor Girod when he had that

25   eight-person team reviewing applications for the Chancellor

1    Award to select the one -- the four -- one of the four most

2    outstanding professors on campus for the period of 2019 didn't

3    know what he was talking about and didn't know that he was --

4    when he said he had remarkable accomplishments, he was being

5    somehow, what, just uninformed?

6    A.   Chancellor Girod -- Chancellor Girod testified that a team

7    of people came together and provided him with that information,

8    and then you represented to him that Doctor Tao had published a

9    certain number of articles and you asked him if that was

10   impressive and he replied with that, it was impressive, based

11   on what you've represented to him.

12   Q.   And do you think that that was a lie?  Do you think that

13   Girod would've got fooled by his team and gave this award out

14   to Doctor Tao and he was actually undeserving?

15   A.   I don't know because I'm not on that team.

16   Q.   So the fact that the -- Chancellor Girod testified about

17   the process that he goes through in selecting an awardee means,

18   look, I wasn't on the team so, as far as I know, it could be

19   all B.S.?  Is that what you're saying?

20   A.   Doctor Girod --

21         MR. OAKLEY:  Objection, asked and answered and

22   argumentative.

23         THE COURT:  I'll sustain to the form of the question.

24   BY MR. ZEIDENBERG:

25   Q.   So it means nothing to you that the chancellor of the

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2128

1    University of Kansas -- his team selects Doctor Tao as one of

2    the most four outstanding scientists and researchers and

3    professors at KU for the period of time that this contract is

4    purportedly in effect in China?  You don't believe it?

5    A.   You're asking me to verify something that I don't have

6    knowledge of.

7    Q.   Well, that's information you could've easily checked;

8    right?

9    A.   Yes.

10   Q.   I mean, you could've talked to the people on that committee

11   and figured out why they gave out that award; right?

12   A.   I could've.

13   Q.   You could've talked to Chancellor Girod and asked him, "Why

14   did you give him this award?"

15   A.   I could've done that too.

16   Q.   You could've looked up on the public databases and counted

17   up Doctor Tao's articles; right?

18   A.   Yeah, I could've done that.

19   Q.   You could've done it during the break, you could've done it

20   during your lunch hour.  You've never done it?

21   A.   Counted up all of his articles?

22   Q.   Yeah.

23   A.   No, I've never done that.

24   Q.   Not interested, it doesn't matter; right?

25   A.   No, I collected several articles, many articles of his.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE         2129

1   Q.   And the fact that he was publishing these articles and

2   listing his affiliation as KU during the time he was supposed

3   to be exclusively publishing articles with an affiliation with

4   he -- between himself and Fuzhou, not important in determining

5   whether this contract was ever entered into; is that right?

6   A.   No, I believe all the other actions that Doctor Tao took to

7   complete this contract overwhelm that part.

8   Q.   Remember that clause that said, "All provisions of this

9   contract will be strictly enforced"?

10  A.   Yes.

11  Q.   But it's your view, is it not, that you can just

12  cherry-pick and look at the ones that you think were being

13  followed and say, "that proves it"; is that what you're doing?

14  A.   No, I'm saying of the -- of the items that were in the

15  contract that I felt he was adhering to, this was one that may

16  have been negotiable.

17  Q.   What does that mean, it may be negotiable?

18  A.   Contracts are negotiable I think.

19  Q.   So the real contract is not the one we're looking at, it's

20  some other contract that has different terms and conditions?

21  A.   Perhaps it's the contract that's signed by both parties.

22  Q.   Okay.  So maybe that one says you don't have to work here

23  exclusively; right?

24  A.   I don't know.

25  Q.   Maybe that one says you don't have to teach chemistry?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2130

1  A.  I don't know.

2  Q.  Maybe that one says you don't have to publish 60 articles.

3  You're just speculating.  Maybe there's a contract that says --

4  that matches up perfectly with his actions because the contract

5  we have doesn't; isn't that right?

6  A.  According to what you're saying right now.

7  Q.  I'm showing you what's been marked as Defense

8  Exhibits 1126, 1127, 1129, 1134, '35, '118, '119, '120.  We'll

9  go through them one-by-one.

10      When did you become aware, Agent Lampe, that during the

11  time frame that Doctor Tao was purportedly working and had

12  accepted a full-time position at Fuzhou University that he was

13  also applying for positions at universities in the United

14  States?

15  A.  Yes, that was later in the investigation that I found at

16  least calls to Lehigh University and discussions with Lehigh

17  University, and there's a few more that I can't bring to mind

18  right now.  Lehigh just stood out.

19  Q.  And was that after the defense provided all those letters

20  to the government in discovery?

21  A.  No.

22  Q.  You found that out beforehand?

23  A.  Yeah, I believe I found that one on my own.

24  Q.  And did you find that out before or after you arrested him?

25  A.  That would be after.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2131

1    Q.  I want to show you Defense Exhibit 1018 -- I'm sorry, 1118,

2    1118.  Do you see that?

3    A.  I do.

4    Q.  And that was -- strike that.

5         I'm going to move on to 1119.  Do you see that?

6    A.  Yes.

7    Q.  Is this one of the -- an e-mail between Franklin Tao --

8    from his KU e-mail account?

9    A.  Doctor Wachs seems familiar.

10   Q.  Okay.  And if you look down just a little bit, an e-mail

11   from Doctor Tao to Israel Wachs at Lehigh University?

12   A.  Yes.

13         MR. ZEIDENBERG:  Your Honor, I move to introduce

14   Exhibit 1119.

15         MR. OAKLEY:  Objection, hearsay.

16         THE COURT:  This is -- let me find it.

17         All right.  This qualifies as an adoptive admission.

18   To the extent it's an e-mail from someone other than Doctor

19   Tao, he is an author of part of this e-mail chain, so --

20         MR. OAKLEY:  Your Honor, may we approach?

21         THE COURT:  Yes.

22         (Proceedings had at the bench, outside the hearing of

23   open court).

24         THE COURT:  Well, it's not an adoptive admission

25   obviously because this other individual is not a

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2132

```
 1    party-opponent, but this is an e-mail chain that originates
 2    with Doctor Tao to somebody named Israel Wachs at Lehigh and
 3    then Israel Wachs replies and actually it looks like there's
 4    two e-mails from Doctor Tao and then Mr. Wachs replies.
 5          MR. OAKLEY:  Your Honor, they don't get to admit
 6    Doctor Tao's statements.  He's not a party-opponent to them.
 7    The government gets to admit the defendant's statements as a
 8    party-opponent.
 9          MR. ZEIDENBERG:  Your Honor, we're not admitting it
10    for any other reason than to show that he was -- show his state
11    of mind that during the time frame that the government is
12    claiming that he was working full-time at Fuzhou, he sent out
13    job -- seeking job requests at a dozen different U.S.
14    universities at the exact same time frame.  It goes to his
15    state of mind.
16          THE COURT:  Well, I think it is being offered for the
17    truth of the matter asserted then because his state of mind is
18    he's trying to apply for jobs.  That's the truth of the matter
19    asserted.  I do think this is hearsay.
20          MR. ZEIDENBERG:  Well, Your Honor, it's the fact that
21    he was looking -- I mean, it doesn't matter whether he is
22    really happy that he received his CV, it's not really happy --
23    it's not relevant or being admitted to show that he's happy to
24    provide other information.  It's simply that he is reaching
25    out, sending e-mails to other universities, asking about job
```

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   offers.

2        THE COURT:  Yeah.

3        MR. ZEIDENBERG:  It's simply to show the fact of the

4   transaction.

5        THE COURT:  But the only way you can do that is --

6   well, that's not the only way you can do that.  These e-mails

7   on their face purport to show that he is applying, so they're

8   being offered for the truth of the matter, which is, "I am

9   applying, here's my CV."  So I do think these are hearsay.

10  That doesn't mean you can't ask this witness if he has

11  knowledge of this.

12       MR. ZEIDENBERG:  Well, I appreciate that, Your Honor.

13  But there's exceptions to the hearsay rule and that is whether

14  it's -- whether it goes to show his state of mind.  And this

15  goes to show his state of mind, which is that he is searching

16  for jobs while he purportedly has a full-time job in China.  So

17  his state of mind is relevant.  It goes to show that he was not

18  fulfilling his contract, this purported contract, in China if

19  he's -- if he's supposedly working there exclusively, he's

20  looking for other jobs, which means --

21       THE COURT:  With respect to this particular exhibit,

22  there is no difference between state of mind and truth of the

23  matter asserted because the truth of the matter asserted in

24  this e-mail is, "I'm looking for another job."  So I'll sustain

25  the objection to Exhibit 1119.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1          (Proceedings continued in open court).

2    BY MR. ZEIDENBERG:

3    Q.  You're aware, are you not, Agent Lampe, that Doctor Tao

4    reached out to Lehigh University to apply for a job?

5    A.  Yes.  He was in discussions with Doctor Wachs.

6    Q.  And that was in May of 2018; correct?

7    A.  This e-mail is dated 22 May of 2018.

8    Q.  I'm sorry?

9    A.  This e-mail is dated 22 May of 2018.

10   Q.  That was May 2019 -- 2018; correct?

11   A.  2018, yes.

12   Q.  Yeah.  The same month he purportedly entered into a

13   full-time contract in China; correct?

14   A.  Correct.

15   Q.  And are you aware that in this same time frame, well, just

16   a few months later, in October of 2018 that Doctor Tao reached

17   out to his mentor, Steven Bernasek at Princeton, to ask him to

18   be a reference for him for job applications?

19          MR. OAKLEY:  Objection, hearsay.

20          THE COURT:  I think the question asks if he's aware of

21   any such, so I will overrule this objection.

22          THE WITNESS:  I was not aware of this.

23   BY MR. ZEIDENBERG:

24   Q.  And would it be significant to you if you were to learn

25   that in October of 2018, five months after Doctor Tao

1    purportedly took a full-time job at Fuzhou University, he was

2    reaching out to his mentor at Princeton University to ask him

3    for a -- to be a reference for him for job applications?  Would

4    that be significant to you?

5    A.    No.

6    Q.    That would be consistent in your mind with having just

7    accepted this prestigious position in China, to be looking for

8    a job in the United States at the same time?

9    A.    He was holding a job at KU and holding a job at Fuzhou.  If

10   he applies to other universities in the United States, I don't

11   see how that's significant.

12   Q.    I'm going to remind you again that contract with Fuzhou

13   says it has to be exclusive.

14   A.    Yes.  You're basing it on that, yes.

15   Q.    So are you still going with, well, maybe they negotiated

16   something different?

17   A.    I am.

18   Q.    Okay.  But you don't any evidence of that?

19   A.    I don't.

20   Q.    So when you see the contract and you see conduct that's

21   inconsistent with the conduct *[sic]*, you assume, well, there

22   must be a different contract that I just don't see?

23   A.    Well, again, we don't have the signed contract, like you

24   said.

25   Q.    Again, my question is:  If you -- if you see conduct that's

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    inconsistent with this contract, this purported contract, this

2    draft, then you just assume, well, they must've negotiated

3    something different?

4    A.  Yes, I assume it's possible that they negotiated something

5    there.

6    Q.  Do you remember hearing the government expert, Glenn

7    Tiffert, testify?

8    A.  Yes.

9    Q.  Do you remember him testifying that a position of

10   Changjiang is an exclusive position?

11   A.  Yes.

12   Q.  You can't have a second job.

13   A.  I don't remember him saying that, but -- if you're

14   representing that.

15   Q.  If he said that, then would you agree that looking for

16   other jobs in the United States at the same time is

17   inconsistent with that position?

18   A.  But Doctor Tao was still holding a job here at KU; correct?

19   Q.  I mean, you would know that he's still working at KU;

20   right?

21   A.  Yes.

22   Q.  Okay.

23   A.  And --

24   Q.  And we know that that's inconsistent with this purported

25   contract that the government has alleged in their indictment

1    that he entered into in March of 2018 and you've testified it

2    was actually May of 2018, and now you're saying I think,

3    correct me if I'm wrong, well, actually maybe there's another

4    contract which we haven't seen which comports with the actual

5    conduct we've seen?

6    A.   I'm suggesting that there is some kind of negotiation

7    between Doctor Tao and Fuzhou.

8    Q.   Okay.  So now the testimony, to be clear, is that this

9    purported contract that is unsigned, you don't even think

10   that's the final contract, you think there's some other

11   contract that we've never even seen?

12   A.   I think that is a representation of the contract and it's

13   been negotiated, seeing as he also forwarded it in August of

14   2019 to himself.

15   Q.   And the provisions in that contract that weren't fulfilled

16   you think must've been written out of the one that he actually

17   did?

18   A.   The portions that he did fulfill?

19   Q.   That he did not fulfill, like working exclusively and

20   teaching chemistry and publishing 60 articles, all those

21   things.  Is that your testimony, that he -- anything that is

22   inconsistent, there must be another contract?

23   A.   Well, I believe there's some negotiation.

24   Q.   Do you recall Glenn Tiffert saying that it would be

25   inconceivable that Fuzhou would depart from the rules in

1    enforcing the contract with the Changjiang scholarship?

2             MR. OAKLEY:  Objection, misstates Doctor Tiffert's

3    testimony.

4             THE COURT:  I'll overrule.  Answer it if you can.

5             THE WITNESS:  Ask it again, please.

6    BY MR. ZEIDENBERG:

7    Q.   Yeah.  Do you recall the government expert, Glenn Tiffert,

8    testifying that it would be inconceivable that Fuzhou would

9    depart from the rules when it comes to enforcing the Changjiang

10   Distinguished chair professorship?

11   A.   I think he was describing the relationship between Fuzhou

12   and the Ministry of Education in China.

13   Q.   And he said it would be inconceivable that they would

14   depart from the rules, and the rules he said were that he had

15   to work there exclusively; correct?

16   A.   No.  The contract between Fuzhou University and Doctor Tao

17   says, according to this, that he has to work there exclusively.

18   Q.   Don't you remember Mr. Tiffert, Doctor Tiffert, said, well,

19   maybe he had a six-month wind-down period, but after that he's

20   supposed to be working exclusively under this agreement,

21   because he's the expert on Changjiang scholarships and you only

22   get a six-month wind-down and then you've got to be exclusively

23   working in China?  Do you remember that?

24            MR. OAKLEY:  Objection, leading and asked and answered

25   and argumentative.

1          THE COURT:  Overruled.

2          THE WITNESS:  I don't remember Doctor Tiffert saying

3    that he had to work exclusively for Fuzhou University.  I do

4    remember Doctor Tiffert testifying that they was a potential

5    for this six-month transition period.

6    BY MR. ZEIDENBERG:

7    Q.  Six month -- and then what would appear after six months?

8    A.  I don't --

9    Q.  You just continue as you're doing or six months go by and

10   now you're working full-time?  That's what he said; right?

11   A.  I assume that that -- that the transition period leads to a

12   full-time -- yeah, the full-time.

13   Q.  Full-time.  And remember when Mr. Dearington asked him,

14   "Did you know he was still working at KU?"  He said, "No, I did

15   not know that."  He was surprised.

16   A.  Okay.  I didn't -- I don't remember that.

17   Q.  When did you learn, Agent Lampe, that in November of 2018

18   Doctor Tao applied for a faculty position at Brown University?

19   A.  I've never known that.

20   Q.  You never knew that?

21   A.  I never knew that.

22   Q.  Did you review the discovery the defense provided to the

23   government and said we were going to be using as exhibits for

24   your testimony?

25   A.  I did.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.   Okay.  Did you look at Exhibit 1121?

2    A.   Probably, yes.

3    Q.   It's right in front of you, take a look.

4    A.   Okay.

5    Q.   When was the first time you became aware that Doctor Tao

6    applied for a position at Brown University in November 2018?

7    A.   1121 is for C&EN jobs.

8    Q.   I'm sorry?

9    A.   Are you -- are you referencing Exhibit 1121?

10   Q.   Yeah.

11   A.   Oh, I see it.  So --

12   Q.   When did you become aware that he was applying for a job at

13   Brown University in November of 2018?

14   A.   Right now.

15   Q.   I'm showing you 1122.  Skip 1122.  Let's go to 1123.

16       When did you become aware that Doctor Tao was applying for

17   a position at Stanford University in November of 2018?

18   A.   Yes, I saw this in the discovery materials.

19   Q.   Significant to you that he was applying for a position at

20   Stanford in November of 2018 when he purportedly signed a

21   contract with Fuzhou University in May of 2018 that said he has

22   to work there exclusively?  Is that significant to you?

23   A.   It's not.

24   Q.   Directing your attention to 1125.  When did you become

25   aware that Doctor Tao applied for a position at the University

1    of Illinois in December of 2018?  When did you learn that?

2    A.  That was also in the discovery material.

3    Q.  So you learned it very recently?

4    A.  Very recently.

5    Q.  You certainly didn't know this during the course of your

6    investigation?

7    A.  I did not.

8    Q.  Something that you think you should've known?

9    A.  Should've known?  Perhaps.

10   Q.  Important?

11   A.  As I said before, I don't find the importance there.

12   Q.  Showing you 1126.  When did you become aware that in

13   December of 2018 Doctor Tao was applying for a position at the

14   University of Florida?

15   A.  Yes, I remember this from the discovery material as well.

16   Q.  Something you didn't know during the course of your

17   investigation; right?

18   A.  That's correct.

19   Q.  And something that isn't significant in terms of Doctor

20   Tao's guilt or innocence?

21   A.  It appears through what you've provided that he was

22   applying to several places.

23   Q.  When did you become aware - I'm showing you 1127, if you

24   could take a look at that - that Doctor Tao was applying for a

25   position at Georgia Tech?

1    A.   Again, the discovery material.

2    Q.   That would've been in January 2019.

3         So you didn't know that while you were investigating Doctor

4    Tao; correct?

5    A.   I did not.

6    Q.   When did you become aware that in February of 2019, seven

7    months after he applied for this position -- after he

8    purportedly accepted a full-time job at Fuzhou University, that

9    Doctor Tao was applying for a faculty position at the

10   University of Wisconsin in Madison?

11   A.   This, again, would be the discovery material.

12   Q.   Something you didn't know during the course of your

13   investigation?

14   A.   I did not.

15   Q.   When did you become aware, Agent Lampe, that Doctor Tao

16   contacted Laurence Weatherley in August of 2018 to inquire

17   about a promotion?

18          MR. OAKLEY:  Objection, hearsay.

19          THE COURT:  Sustained.

20   BY MR. ZEIDENBERG:

21   Q.   Did you know that Franklin Tao was trying to get a

22   promotion in August of 2018 to full professorship at KU?

23   A.   I do know that Doctor Tao was attempting to get a full

24   professorship.  The time frame I'm not certain of.

25   Q.   Is it significant to you that five months -- or strike

1   that -- three months after Doctor Tao purportedly took a

2   full-time position in China that requires him to work there

3   full-time, he was trying to get a promotion in Kansas?

4   A.   Do I find that significant?

5   Q.   Yes.

6   A.   No.

7   Q.   Were you aware that he was still pushing for that promotion

8   in November, the end of November, 2018 with Paul Willhite at

9   KU, trying to get a meeting to discuss his promotion?

10  A.   I was not aware.

11  Q.   Are you aware that in December of 2018 Doctor Tao was

12  contacting Stevin Gehrke at KU trying to persuade him to give

13  him a full professorship?

14  A.   I was not aware.

15  Q.   But not significant to you?

16  A.   No.

17  Q.   So if I've got this correct, and you tell me if I have this

18  incorrect, that anything that Doctor Tao did in China that

19  appears consistent with that unsigned contract is evidence that

20  the contract was in effect, that's what you testified to in the

21  grand jury; right?

22  A.   Yes.  The evidence that he was -- that was consistent with

23  the contract, yes.

24  Q.   And anything that he did that was inconsistent with the

25  contract means that they must've had some other contract or

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2144

1    some other side agreement or negotiation that he didn't have to

2    follow; is that right?  Do I have that straight?

3    A.   I would say that there was probably a negotiation, yes.

4    Q.   Well, would you agree that it kind of puts a situation

5    that's -- he can't disprove your theory when anything that he

6    does that looks similar proves the contract and anything

7    inconsistent means there must be another contract; is that

8    right?

9    A.   I see your point.

10   Q.   And any evidence that we present to you about his interest

11   in other jobs or his performing on his DOE or NSF grants or

12   his -- doing his KU responsibilities is not relevant to whether

13   or not -- to these charges are true?

14   A.   It's not that it's not relevant.

15   Q.   But you didn't investigate those things.

16   A.   All these things -- most of these things are new, like you

17   said.

18             MR. ZEIDENBERG:  I have no further questions, Your

19   Honor.

20             Your Honor, I would move to introduce the binders.

21             MR. OAKLEY:  Objection.

22             THE COURT:  I think we talked about it, those could be

23   a demonstrative exhibit but not something that would be

24   admitted for the jury to review in the jury room.  You're

25   talking about this pile of binders here?

1        MR. ZEIDENBERG:  Yes.

2        THE COURT:  Yeah, I'll sustain the objection, but they

3    are appropriate as a demonstrative exhibit.  Actually, I guess

4    you've identified for the record all of the numbers of them, so

5    they'll be admitted but only for demonstrative purposes, not

6    for the jury to review in the jury room.

7                         CROSS EXAMINATION

8    BY MR. OAKLEY:

9    Q.   You're the case agent in this investigation; correct?

10   A.   I am.

11   Q.   And your role was to gather evidence, submit it to the

12   prosecution.  The jury has the role of deciding whether or not

13   the facts support the law; correct?

14   A.   Correct.

15   Q.   And the jury will decide whether or not the evidence is

16   sufficient -- is sufficient to prove the allegations beyond a

17   reasonable doubt; correct?

18   A.   Correct.

19   Q.   And throughout the course of this trial the defense has

20   talked about things that you learned after the defendant's

21   arrest?

22   A.   Correct.

23   Q.   And the fact of the matter is, the evidence of the

24   defendant's guilt got stronger after his arrest; correct?

25   A.   That is correct.

1        MR. ZEIDENBERG:  Objection.

2        THE COURT:  I'm sorry?

3        MR. ZEIDENBERG:  Objection to his --

4        THE COURT:  All right.  All right.  I'll sustain to

5    the form of the question.

6    BY MR. OAKLEY:

7    Q.   The jury decides whether or not there's sufficient evidence

8    based upon the law as the judge will instruct?

9    A.   Yes.

10   Q.   Could we please bring up Government's Exhibit 78?

11        This is the Streamlyne approval; correct?

12   A.   It is.

13   Q.   And Ms. Reed testified that this is what a PI sees in

14   navigating the system; correct?

15   A.   Correct.

16   Q.   And at some point you sat down with Ms. Reed and you asked

17   her to show you the system; correct?

18   A.   I asked her to show me this screen -- well, this

19   information, yes.

20   Q.   Okay.  And this is the information that the PI sees before

21   submitting grant applications in the Streamlyne system?

22   A.   This is, as she described it, the information seen by a PI

23   prior to submitting.

24   Q.   And the Streamlyne system, as you understand it, was a

25   click-through system; that as you hit certain buttons, other

1    information pops up?

2    A.   Yes, it populates as it goes.

3    Q.   Okay.  Your understanding of grant funding and particularly

4    as it relates to federal grants, the money goes to the

5    university; correct?

6    A.   Correct.

7    Q.   But the principal investigator, the PI, is ultimately

8    responsible for providing truthful information to the

9    university; correct?

10   A.   Correct.

11   Q.   And the -- although the university gets the money, the PI

12   often gets prestige based upon the fact that he or she received

13   certain grants?

14   A.   Yes, I believe people testified to that earlier.

15   Q.   And, in fact, you heard testimony from Doctor Girod, and

16   you were asked about this on cross examination, about that

17   award that the defendant received from KU.  Do you remember

18   that?

19   A.   I do remember that.

20   Q.   And that award was based on the defendant's research;

21   correct?

22   A.   I believe so.

23   Q.   And his research grants.

24   A.   I believe so.

25   Q.   That award wasn't -- didn't take into consideration his

1    teaching or his service to the university, it was based solely

2    on the 40 percent research component; correct?

3    A.   I'm not entirely sure, but I believe that is correct.

4    Q.   And you know that research is only part -- or was only part

5    of the defendant's obligation to the University of Kansas;

6    correct?

7    A.   That's correct, it's only 40 percent.

8    Q.   And another 40 percent was the teaching; correct?

9    A.   That is correct.

10    Q.   And the fact that 40 percent research, 40 percent teaching,

11    that tells you that that's just as important.  The teaching

12    part is just as important to the university; correct?

13    A.   Correct, correct.

14    Q.   Then you have the 20 percent that's a service to the

15    university; correct?

16    A.   That is correct.

17    Q.   And that would be things such as attending meetings?

18    A.   Attending meetings, advising students.

19    Q.   Could we please bring up Government's Exhibit 225 and can

20    we highlight the top part, please?

21    You were asked on direct examination about a mistake that

22    the KU Center for Research may or may not -- made as it relates

23    to the KAUST grant.  Do you remember that?

24    A.   I do remember that.

25    Q.   And I think you testified that there's a difference between

UNCERTIFIED ROUGH DRAFT -- DO NOT CITE, QUOTE OR FILE      2149

1   a mistake and criminal intent?

2   A.   Yes, whether it was purposeful.

3   Q.   Did you find any evidence that KU lied about anything

4   related to that KAUST grant?

5   A.   Purposely lied, no.

6   Q.   Now, there was evidence that the defendant lied about where

7   he was at in 2019; correct?

8   A.   This e-mail would be an example.

9   Q.   And Doctor Schloegl coming in and saying that the defendant

10  never visited me in Germany would be another example; right?

11  A.   It would be.

12  Q.   There's no such evidence as it relates to Alicia Reed or

13  anyone else at the Center for Research; is that true?

14  A.   That's true.

15  Q.   Is there any evidence that anyone at the -- either Alicia

16  Reed or anyone else at the Center for Research told anyone,

17  hey, don't mention our affiliation together?

18  A.   With -- with who?

19  Q.   Between KU and KAUST.

20  A.   I don't know.

21  Q.   Is there any evidence that anyone at the Center for

22  Research was told, "Hey, just go talk to DOE, go talk to NSF,

23  tell them about this relationship with KAUST," and then

24  somebody from the university didn't follow that advice?  Any

25  evidence that that happened?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    A.  Not that I know of.

2    Q.  But there's evidence that the defendant in a conversation

3    was told by Professor Liu, "Talk to KU, let them know, maybe

4    you can work something out"; correct?

5    A.  There is evidence of that.

6    Q.  And he didn't do that?

7    A.  He did not do that.

8    Q.  There's also evidence of another conversation, this one

9    with a professor from KU.  Do you remember that phone call?

10   A.  Yes.

11   Q.  And in that phone call the defendant said that he had a

12   collaboration with Germany, which we know is not true; correct?

13   A.  This is with Professor Huang.

14   Q.  From KU?

15   A.  Yes.

16   Q.  And that professor from KU said, "Talk to your chair, talk

17   to Weatherley"; correct?

18   A.  Correct.

19   Q.  There's no evidence that KU was intentionally concealing

20   anything from the Department of Energy or the National Science

21   Foundation, is there?

22   A.  There is no evidence of that.

23   Q.  Are there any e-mails to or from anybody at the Center for

24   Research where they said, you know, don't disclose this

25   relationship?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   A.  Not that I saw.

2   Q.  Do you know of any phone calls involving Alicia Reed in

3   which Alicia Reed said anything to the effect of, "Don't put

4   this in writing because that would be evidence," and Alicia

5   Reed says, "Understood, understood, understood"?

6   A.  No.

7   Q.  Any evidence where someone -- where KU told KAUST, "Don't

8   put this on your web page"?

9   A.  No.

10  Q.  I want to talk to you about the conflict of interest policy

11  at KU.

12      Could we please bring up Government's Exhibit 3?

13      This is KU's conflict of interest policy; correct?

14  A.  Correct.

15  Q.  And could we please go to the second page and could we

16  please bring up the conflicts of time commitment?

17      Now, I want to talk to you as it relates to the grant

18  submissions to the federal government.  I think you testified

19  on direct examination that DOE and NSF don't require the

20  submission of the institutional responsibilities form; correct?

21  A.  For them, yes.

22  Q.  But they do require KU to have a conflict of interest

23  policy; correct?

24  A.  That is correct.

25  Q.  And they require KU to enforce their conflict of interest

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    policy?

2    A.  That is correct.

3    Q.  And under KU's conflict of interest policy, your obligation

4    to report potential conflicts exceeds just a signed employment

5    contract; isn't that correct?

6    A.  Restate it, please.

7    Q.  Under KU's conflict of interest or conflict of time

8    commitment, it is -- it's not just --

9    A.  It's very broad.

10   Q.  It's very broad.  It's not just you have to report a signed

11   employment contract with another university?

12   A.  That's correct.

13   Q.  And if the United States government grant entities, in this

14   case NSF or DOE, believed that KU is not enforcing and doesn't

15   have a sufficient conflict of interest policy, KU is at risk of

16   losing federal grant funds; isn't that true?

17   A.  That is true.

18   Q.  And did you hear evidence both from Doctor Girod and from

19   Alicia Reed as far as how important federal grants are to the

20   university?

21   A.  Yes, it's very important to the university.

22   Q.  I mean, we're talking about millions of dollars each and

23   every year; isn't that true?

24   A.  That is true.

25   Q.  I want to show you the demonstrative exhibit that's been

1   shown as Government's Exhibit 774.  Do you recognize that?

2   A.  I do recognize it.

3   Q.  Now, you've been in the courtroom throughout the

4   presentation of evidence; correct?

5   A.  I have.

6   Q.  And so you've seen and heard evidence as it's been

7   admitted?

8   A.  I have.

9   Q.  Was one of the things that you were tasked with is

10  identifying exhibits, keeping a list of things as they come in?

11  A.  I was.

12  Q.  Is Government's Exhibit 774 a true and accurate summary of

13  the exhibits that have been admitted in this case?

14  A.  It is.

15       MR. OAKLEY:  Your Honor, I offer Government's

16  Exhibit 774 under Rule 1006.

17       MR. ZEIDENBERG:  We object, Your Honor.

18       THE COURT:  Parties approach the bench, please.

19       (Proceedings had at the bench, outside the hearing of

20  open court).

21       MR. DEARINGTON:  Your Honor, there are a number of

22  reasons that 1006 does not permit the introduction of this as

23  evidence.  First of all, they're trying to use it to summarize

24  stuff that's already in evidence.  It's not instead of

25  voluminous contents.

1          Second of all, there's numerous misleading and

2     prejudicial statements on there.  One of which, for example, is

3     that there's a self-nomination of this chancellor's award that

4     we already heard Doctor Weatherley twice nominated Doctor Tao

5     for and then eight people had to, as a peer review, go through

6     it and approve.

7          And then there's other things like -- there's things

8     called agreements on there that just aren't agreements.  I

9     think this was drafted as advocacy, and now that they're trying

10    to introduce it in the 11th hour, having already introduced it

11    only as a demonstrative, they're stuck with something that's

12    just not accurate.  There's all sorts of labels that are

13    misleading on there.  We could go one-by-one if you want.

14          MR. OAKLEY:  This is the first time that we've heard

15    the defense allege that it's inaccurate, Your Honor.  As to the

16    first objection, the whole purpose of a summary is that the

17    underlying information is admitted into evidence.  So the fact

18    that these exhibits are already admitted is not a reason to

19    keep this out.

20          MR. DEARINGTON:  I'm not sure that --

21          THE COURT:  All right.  So 1006 allows for the summary

22    chart calculation of the content of voluminous writings,

23    recordings, or photographs.  This is actually more -- it's a

24    summary of -- not only of documents but of testimony, and I

25    don't think that's a proper use of 1006.  So it is properly

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE        2155

 1    admitted for demonstrative purposes, but it does not fall

 2    within the confines of Rule 1006.  So I'll sustain the

 3    objection.

 4              MR. DEARINGTON:  Thank you, Your Honor.

 5              (Proceedings continued in open court).

 6    BY MR. OAKLEY:

 7    Q.  Under the conflict of interest policy that we talked about,

 8    it's broader -- you said that it's broader than just a signed

 9    employment contract; correct?

10    A.  Yes.  It's very broad, yes.

11    Q.  And so I want to first direct your attention to May 2018.

12    Prior to -- so the second page begins in May of 2018, so I want

13    to focus on the first page.  And so working backwards, on

14    April 29th, 2018 we have a call between the defendant related

15    to signing of the contract; correct?

16    A.  Correct.

17    Q.  Let's -- and then also on April 29th, 2018 there's a

18    version of the contract; correct?

19    A.  Correct.

20    Q.  Could we -- and then March 31st, Exhibits 332 -- excuse me,

21    322 and 323 are the Fuzhou faculty mentor forms; correct?

22    A.  Yeah, the mentor selection forms.

23    Q.  Okay.  And those are in evidence; correct?

24    A.  They are.

25    Q.  On March 24th, 2018 there's an e-mail log-in by the

1    defendant at the Fuzhou University, the e-mail account;

2    correct?

3    A.    That is correct.

4    Q.    And so by that time he had a Fuzhou University e-mail

5    account?

6    A.    Yes.

7    Q.    And then on March 9, 2018 there's a contract addendum,

8    correct, Exhibits 321 and 487?

9    A.    There is.

10   Q.    March 4th, 2018, there was a Fuzhou University and NNSF

11   grant proposal that was prepared; correct?

12   A.    Yeah.  NSFC.

13   Q.    NSFC.

14       February 5th, 2018 there was another version of a draft

15   contract, and that's Exhibits 131 and 132; correct?

16   A.    That's correct.  Correct.

17   Q.    And then Exhibit 121.  And in an attachment to an e-mail,

18   that was the Changjiang Scholar defense that the defendant

19   possessed; correct?

20   A.    Yes.

21   Q.    November 11th, 2017, that's when the defendant e-mails the

22   Chinese consulate saying he has to go back to defend the

23   Changjiang Scholar?

24   A.    That is correct.

25   Q.    And on July 6th of 2017, Exhibits 484 and 485 from his KU

1   computer, that was the Changjiang Scholar application; correct?

2   A.   The application, correct.

3   Q.   And none of the things that we've talked about here

4   beginning July continuing through May did the defendant ever

5   report to KU, did he?

6   A.   He did not.

7   Q.   On direct examination Mr. Zeidenberg asked you about the

8   testimony of Viviane Schwartz from the Department of Energy;

9   correct?

10  A.   Correct.

11  Q.   And Ms. Schwartz said that if he took another job, that's

12  between the defendant and the university; correct?

13  A.   Correct.

14  Q.   And she didn't say the DOE didn't care about it; correct?

15  A.   She did not say that.

16  Q.   She said that that's part of the conflict of interest

17  between the defendant and the university; correct?

18  A.   That is correct.

19  Q.   And as part of the conflict of interest, the federal

20  government, the granting-giving agencies, require KU to have

21  that conflict of interest policy; correct?

22  A.   That is correct.

23  Q.   And enforce it?

24  A.   That is correct.

25  Q.   And you were asked about Doctor Schwartz's testimony on

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    direct examination.  Do you remember that?

2    A.    I was.

3    Q.    And defense counsel asked you some things that Doctor

4    Schwartz testified to; correct?

5    A.    Correct.

6    Q.    Do you remember when Doctor Schwartz was asked:  "Am I

7    remembering right that you said that one of the things the

8    Department of Energy looks at is whether or not a principal

9    investigator has sufficient time to actively perform the work

10   that they're proposing?"

11        And Doctor Schwartz said "yes"; correct?

12   A.    Correct.

13   Q.    And then she was asked:  "How does DOE make that

14   assessment?"

15        Do you remember that she said:  "We look at the current and

16   pending and we look at the PI's commitment generally speaking.

17   We might not add, per se, exactly each month that the PI is

18   dedicating to a certain activity, but we give a more general

19   look to see if there's overcommitment."

20        And then:  "Does the DOE rely in any way on the sponsored

21   university to also be involved in ensuring that the PI has

22   sufficient time to perform the work?"

23        And then --

24   A.    That's correct.

25   Q.    -- Doctor Schwartz said:  "Well, DOE is not the employer of

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2159

1    the PI, right?  So the university should certainly make sure

2    that the employee is doing or dedicating the time that they're

3    supposed to do.  At the DOE's side of what I'm looking at is if

4    the PI is performing as it should."

5        So she didn't say that that's not important, she said that

6    that information should go through the university; correct?

7    A.   It was the university's job.

8    Q.   And then what about the conflicts -- she was asked:  "What

9    about the conflicts of interest or potential conflicts of

10   interest?  Does DOE evaluate information related to those or

11   does DOE rely on the employing university to manage that?"

12       Do you remember what her response was?

13   A.   She relies on the university.

14   Q.   Do you remember her saying:  "Yeah, as a program manager, I

15   don't look at the issues of conflict of interest, I think as

16   you're defining here, in terms of their dedication to their job

17   or not" --

18           MR. ZEIDENBERG:  Objection.

19           THE COURT:  I'm sorry?

20           MR. ZEIDENBERG:  Objection.  Could we approach?

21           THE COURT:  Okay.

22       (Proceedings had at the bench, outside the hearing of open

23   court).

24           MR. ZEIDENBERG:  Your Honor, the purpose of my cross

25   examination of this witness about the testimony was to go into

1    and to explore the nature of his investigation, who he spoke

2    to, what he knew and what he didn't know at the time that

3    Doctor Tao was arrested, what information he was learning that

4    was new to him, and the fact that -- what the disclosure rules

5    were.

6            Now, the fact that Mr. Oakley is just going to read

7    back testimony from direct examination doesn't rebut that.  The

8    point was he didn't know this information, it was new to him,

9    and that goes to undermine the nature of his investigation.  I

10   don't think it's proper to just re-read direct testimony and

11   ask him is that what she said.

12           MR. OAKLEY:  He asked about it on direct examination.

13   This is cross examination.  I'm entitled to ask leading

14   questions.  I don't see how this is objectionable.

15           THE COURT:  I think this particular question is

16   relevant to something that was asked on direct, so I'll

17   overrule the objection.

18           (Proceedings continued in open court).

19   BY MR. OAKLEY:

20   Q.   Do you remember the question I asked?

21   A.   No.

22   Q.   Neither do I.

23        Do you remember Doctor Schwartz testifying when asked about

24   the relationship with the conflict of interest forms and she

25   said:  "Yeah, as a program manager, I don't look at issues of

1    conflict of interest, I think as you are defining here, in

2    terms of their dedication to their job or not.  This is

3    something that the university is responsible for."

4        "When I use the word 'conflict of interest,' I am looking

5    as a program manager in the scientific context and especially

6    in cases where I am requesting reviews."

7        And then the question -- the next question to her was:  "So

8    to summarize, is it fair to say that, you know, conflict of

9    interest has at least two meanings in the sense you look at it

10   from the perspective of determining the third-party panel of

11   reviewers who are looking at the scientific merit and there's

12   also the conflict of interest from an employing university

13   perspective, and you would just rely on the university to

14   handle any issues related to that?"

15       Do you remember what her answer was?

16   A.   I believe she affirmed that, yes.

17   Q.   And you remember both Doctor Keiser and Doctor Schwartz

18   testifying about the importance of the -- of the current and

19   pending forms?

20   A.   I do.

21   Q.   And do you remember them -- both of them testifying that

22   part of the current and pending is because the federal

23   government doesn't want to be funding research that's being

24   funded by someone or someplace else?

25   A.   Yes, they used the term "duplicative research", yes.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2162

1   Q.  Do you know whether or not there's an unlimited amount of

2   federal funding that's available to universities?

3   A.  There's a limited number, amount of funding available to

4   universities.

5   Q.  And there's more people than -- there's more universities

6   that would like that money than there is money available; is

7   that correct?

8   A.  That's the highly competitive nature, yes.

9   Q.  Do you remember when Doctor Keiser testified that the

10  discussion of the -- the current and pending forms and what

11  they're used for came up?  Do you remember that?

12  A.  You'll have to refresh me on that.

13  Q.  Well, do you remember how she talked about how when

14  taxpayers fund research, taxpayers are entitled to

15  conflict-free research?

16  A.  Right, proper use of funds.

17  Q.  And do you remember that she gave the example, you know, if

18  you have an investigator that's researching something related

19  to cancer, that you'd want to know if that PI also had other

20  funding that was provided by the tobacco industry?

21  A.  Yeah, I do remember that.

22  Q.  And so the fact that the university doesn't have to send

23  the institutional responsibilities form to DOE or NSF, that

24  doesn't mean those forms aren't important; correct?

25  A.  Correct.

1    Q.  I next want to talk to you about these clarifications or

2    the period of transition.  Those clarifications related to the

3    situation where someone has an honorary title that had no time

4    commitment associated with that; is that your understanding?

5    A.  That is my understanding.

6    Q.  In other words, it was just a title only essentially?

7    A.  That's how I remember it.

8    Q.  And there was some -- some people were confused as to

9    whether or not in that particular situation that honorary title

10   would need to be reported.  Do you remember that?

11   A.  Yes.

12   Q.  That's not the situation involving this defendant, is it?

13   A.  No.

14   Q.  The allegation is not that he had an honorary award in name

15   only; correct?

16   A.  Correct.

17   Q.  And, in fact, the allegation is not that this award, this

18   Changjiang Distinguished Scholar Award, had no time

19   commitment --

20   A.  No, it did.

21   Q.  -- is that correct?

22   A.  It does have a time commitment.

23   Q.  Let's talk about that.  We talked about what the defendant

24   was doing prior to May of 2018.  I want to talk to you about

25   what the defendant was doing from May 2018 going forward.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1      And let me back up, I'm sorry.  So beginning May 1st of

2   2018 moving forward.  May 4th is the modified contract that you

3   were asked about, correct, Exhibits 335 and 336?

4   A.   I believe so.

5   Q.   Okay.  And so let's talk about what occurred May 5th going

6   forward.

7   A.   Okay.

8   Q.   The day after that the defendant travels to China; correct?

9   A.   Yes, he does.

10  Q.   And do you remember a phone call that the defendant had

11  with President Zhang and -- do you remember that call?

12  A.   I remember the call.

13  Q.   And do you remember conversations about, "When you get

14  here, we'll sign"?

15  A.   Yes.

16  Q.   And we know that the defendant travels to China May 5th.

17  He's there from May 5th to May 8th; correct?

18  A.   Correct.

19  Q.   And then he travels again May 26th to August 1st?

20  A.   Correct.

21  Q.   Both to China and to Japan.  And then in 2018 he's back,

22  August 15 to August 18th; correct?

23  A.   Correct.

24  Q.   August 25th to August 29th?

25  A.   Correct.

1  Q.  And December -- actually we'll talk about December because

2  that carries on into the next year; is that true?

3  A.  To March, yes.

4  Q.  So let's talk about what was going on as it relates to the

5  University of Fuzhou and the NSFC.

6      So Exhibit 155 happens after that trip to China; correct?

7  A.  That's correct.

8  Q.  That's a recruitment ad?

9  A.  Yes.

10  Q.  July 4th there's e-mails related to the purchase of

11  equipment at Fuzhou University; is that correct?

12  A.  That's correct.

13  Q.  July 16th there's e-mails related to recruitment at Fuzhou

14  University?

15  A.  That's correct.

16  Q.  July 25th the defendant sends an e-mail from his KU account

17  to his Fuzhou University account; correct?

18  A.  That's correct.

19  Q.  Now, we talked about the fact that the defendant had an

20  e-mail account at Fuzhou University prior to May.

21  A.  Correct.

22  Q.  We also know that he had one in July.

23  A.  Yes.

24  Q.  And so if something happened in May where there was no

25  longer an agreement, he still had the use of his Fuzhou

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2166

1    University account in July?

2    A.   Yes, in July.

3    Q.   August 23rd from the defendant's KU -- KU computer there

4    was a grant proposal related to an NSFC grant; correct?

5    A.   Correct.

6    Q.   August 27th there's an e-mail related to NSF fraud;

7    correct?

8    A.   Correct.

9    Q.   And then based on the search warrant -- do you remember

10   Detective Clevenger talking about log-ins?

11   A.   Yes.

12   Q.   Then it shows the defendant logged in to his FZU account on

13   September 6th, 2018; correct?

14   A.   Correct.

15   Q.   September 20th is the Fujian proposal?

16   A.   Correct.

17   Q.   September 27th is another e-mail related to recruitment at

18   Fuzhou University?

19   A.   That's correct.

20   Q.   October 15th, Exhibit 208 relates to Fuzhou University

21   appointment?

22   A.   That's correct.

23   Q.   November 8th, 2018 is the FZU lab PowerPoint; correct?

24   A.   Correct.

25   Q.   And then on November 27th, November 30th -- November 30th

1    there are exhibits that relate to Fuzhou lab equipment and

2    recruitment by the defendant to Fuzhou University; correct?

3    A.    That is correct.

4    Q.    And so that gets us into December of 2018.

5         Now, December 11th of 2018 the defendant travels to China;

6    correct?

7    A.    That is correct.

8    Q.    Now, if you look at the last page, the defendant leaves

9    December 11th and he's there until March 28th of 2019; correct?

10   A.    Yes.  It transitions there from December to January 1st and

11   then on to March.

12   Q.    So December -- going back.  December 11th -- now, it says

13   December 31st, but he doesn't come back, that just signifies

14   the end of 2018.

15   A.    Yeah, it's just the way we wrote up the key.

16   Q.    And so it's actually December 11th to March 28th, 2019 that

17   the defendant is in China; correct?

18   A.    That's accurate.

19   Q.    And then March 28th, 2019 he comes back to the -- to the

20   United States but only until April 12th; correct?

21   A.    That's correct.

22   Q.    And then April 12th to April 27th he's back in China?

23   A.    Correct.

24   Q.    He's back in the United States around April 27th but only

25   until May 11th; correct?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2168

1   A.   Correct.

2   Q.   And then May 11th to June 1st he's in China; correct?

3   A.   Correct.

4   Q.   He comes back to the United States around June 1st but only

5   until June 7th; correct?

6   A.   Correct.

7   Q.   And then he's in the United States from -- he's in China

8   from June 7th to June 23rd and he's in the United States from

9   June 23rd to July 7th; correct?

10  A.   Correct.

11  Q.   Do you remember the testimony of Special Agent Clevenger

12  based on the information that he found on the defendant's KU

13  computer?

14  A.   Be more specific.

15  Q.   Related to log-ins, Chrome log-ins.

16  A.   Oh, yes.  Yes.

17  Q.   And so the July 4th-July 5th log-ins occurred during that

18  brief period of time in which the defendant is back in the

19  United States; correct?

20  A.   That's correct.

21  Q.   And so the evidence shows that during that brief time he

22  goes to KU, but he logs in to his Fuzhou University account;

23  correct?

24  A.   Correct.

25  Q.   And then goes back July 7th to July 23rd, 2019.  He comes

1    back from July 23rd to August 4th; correct?

2    A.   Correct.

3    Q.   But then August 4th to August 20th he's back in China?

4    A.   Correct.

5    Q.   And during that time we have Exhibit 224 that's

6    January 11th, 2019.  I believe that's an e-mail related to

7    Fuzhou University equipment; correct?

8    A.   Correct.

9    Q.   We have the February 10th, 2019 e-mail related to Fuzhou

10   recruitment; correct?

11   A.   Correct.

12   Q.   We have another e-mail from the defendant's -- to the

13   defendant's Fuzhou University account in March of 2019;

14   correct?

15   A.   Correct.

16           MR. ZEIDENBERG:  Your Honor, I mean, I didn't mean to

17   interrupt Mr. Oakley, but, I mean, we're just reading every

18   entry on this demonstrative, going through every single one.

19           THE COURT:  I agree.  It needs to be tied to some

20   specific thing he testified to on direct, so I'll sustain.

21           Let's take a break for 15 minutes.

22           (Recess).

23           (The following proceedings were held outside the

24   presence of the jury).

25           THE COURT:  All right.  You can be seated.  Are we

1    ready for the jury?

2            MR. OAKLEY:  I'll get Special Agent Lampe, Your Honor.

3            (The following proceedings were held in the presence

4    of the jury).

5            THE COURT:  All right.  You can be seated.

6    BY MR. OAKLEY:

7    Q.  So at some point prior to the break we had discussed the

8    clarification, and we had discussed how that related to these

9    honorary in-name-only type titles; correct?

10   A.  Correct.

11   Q.  Would you agree that the issue in this case is not what

12   others knew but what the defendant knew as far as what needed

13   to be reported on a current and pending, for instance?

14   A.  You're going to have to rephrase that.

15   Q.  The issue here is the defendant's intent; correct?

16   A.  Correct.

17   Q.  And so what other people may or may not have been

18   confused -- confused about is not really the issue, the issue

19   relates to the defendant; correct?

20   A.  Yeah, you're talking about the other people who are asking

21   for clarifications?

22   Q.  Correct.

23   A.  Yes.

24   Q.  And so I want to talk to you about the current and pending,

25   for instance.

1   A.   Yes.

2   Q.   The grants in question, were these the first time that the

3   defendant had applied for federal grants?

4   A.   No.

5   Q.   Do you know how many other federal grants the defendant had

6   applied to?

7   A.   Not off the top of my head.

8   Q.   It was many; correct?

9   A.   It was several.

10  Q.   And so these were not -- this was not the first time that

11  the defendant prepared a current and pending related to a

12  federal grant submission; correct?

13  A.   It was not the first time.

14  Q.   And in this particular case what, if anything, did the

15  defendant report in his current and pending related to his

16  relationship with Fuzhou University?

17  A.   Nothing.

18  Q.   What, if anything, did the defendant report in his current

19  and pending as it related to submission of grants to the NSFC,

20  the Chinese National Science Foundation?

21  A.   The National Natural Science Foundation of China, nothing.

22  Q.   What, if anything, did the defendant report in his current

23  and pending related to his obligation to recruit students for

24  Fuzhou University?

25  A.   He didn't report any of that.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   Q.  What, if anything, did the defendant report as far as

2   promises that he had received or contracts that he was

3   negotiating in which he expected to receive money for research

4   from Fuzhou University?

5   A.  That was not disclosed.

6   Q.  Similar to the current and pending, the issue on the

7   conflict of interest is whether or not the defendant knew he

8   needed to make reports to KU -- to KU related to potential

9   conflicts; correct?

10  A.  Correct.

11          MR. OAKLEY:  Ms. Wiest, could we have the computer,

12  please?

13  BY MR. OAKLEY:

14  Q.  Was there any evidence in this case that the defendant was

15  aware of his obligation to report potential conflicts to the

16  University of Kansas?

17  A.  Yes.

18  Q.  And what evidence would that be?

19  A.  I believe there are e-mails regarding his wife's business.

20  Q.  Who -- go ahead, I'm sorry.

21  A.  That he -- he communicated with somebody at KU regarding

22  whether it would be a conflict or not.

23  Q.  Could we please bring up Government's Exhibit 292?

24          And, in fact, looking at the e-mail at the bottom, on

25  March 3rd, 2017, so back in March of 2017, the defendant sends

1    an e-mail.  And who did he send that e-mail to?

2    A.   It's KU conflict of interest.

3    Q.   Do you remember, was this the account that Ms. Reed

4    testified was set up for this purpose, to help employees?

5    A.   Yeah.  She said it was their generic mailbox for this.

6    Q.   And the defendant said, "Dear Colleague, here I am writing

7    to ask what paperwork I need to do for clearance of conflict of

8    interest if my wife would launch a consultant limited company.

9    Look forward to your reply."

10        Did I read that correctly?

11   A.   You did.

12   Q.   And, again, what's the date of this e-mail?

13   A.   It's March of 2017.

14   Q.   Was that the only e-mail related to the defendant asking

15   someone at KU about a potential conflict of interest?

16   A.   It's not, but I don't remember what the other one was.

17   Q.   Can we please bring up Government's Exhibit 117?  And if we

18   could focus on the -- oop.  Go ahead.

19        And so let's focus on the bottom part of that e-mail.  What

20   date was that e-mail sent?

21   A.   That's July 27th, 2017.

22   Q.   So, again, we're in 2017; correct?

23   A.   Correct.

24   Q.   And this e-mail is from whom?

25   A.   From Doctor Tao.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2174

1    Q.   The defendant?

2    A.   Yes.

3    Q.   To whom?

4    A.   To his department chair, Laurence Weatherley; the other

5    department chair, Brian Laird; and the director of the CEBC,

6    Bala Subramaniam.

7    Q.   And did you hear the testimony that Doctor Subramaniam was

8    also the defendant's mentor?

9    A.   Yes.

10   Q.   And in this e-mail to both the department chairs and to his

11   mentor, what does the defendant say?

12   A.   "I was recently formally invited to be an editor of *Applied*

13   *Surface Science*, an Elsevier journal started in 1985,

14   publishing work in surface science, catalysis, materials and

15   energy science.  Please note me if there is any potential issue

16   conflicting with the KU policy.  If not, I will sign the

17   contract with them."

18   Q.   Could we please bring up Exhibit 335 and 336, please, and

19   336A?

20        And so this is the draft of the contract that the -- that

21   Mr. Zeidenberg read from to you on your direct examination;

22   correct?

23   A.   I believe so.

24   Q.   And can we please turn to Page 3, Article II?

25        And part of it that the defense read to you related to the

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1  publishing and I think the part he read said that, you know,

2  Fuzhou University had to be the only affiliation.  But this

3  portion that the defendant -- or, excuse me, that Mr.

4  Zeidenberg chose not to read to you discusses Party A is the

5  primary employer and Party B is the primary author; correct?

6  A.  Correct.

7  Q.  And on direct there were many questions to you about the

8  contract as it related -- as it stated that under the terms of

9  the contract the defendant was supposed to be a full-time

10  employee of Fuzhou University; correct?

11  A.  Correct.

12  Q.  And based on phone calls -- there's a phone call the jury

13  heard where the defendant discusses full-time as being nine

14  months out of the year; correct?

15  A.  Correct.

16  Q.  And that's also consistent with his employment agreement

17  with the University of Kansas, isn't it?

18  A.  It is.

19  Q.  He agreed with the University of Kansas that he would be a

20  full-time employee of KU; correct?

21  A.  Correct.

22  Q.  And we know that he didn't abide by the terms of that

23  agreement, don't we?

24  A.  Correct -- well, you'll have to restate that.  You'll have

25  to restate that.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE      2176

1    Q.  We know that his employment agreement with the University

2    of Kansas required him to be a full-time employee of the

3    University of Kansas.

4    A.  That is correct.

5    Q.  And full-time at the University of Kansas means nine

6    months, the normal school year; correct?

7    A.  Correct.

8    Q.  And we know that he didn't -- the defendant did not abide

9    by that agreement with KU because he was off in China for most

10   of 2019; correct?

11   A.  He did not follow the directions of his department chair,

12   that's correct.

13   Q.  Well, let me talk to you about that.  The directions of his

14   department chair related to the course buyout?

15   A.  Correct.

16   Q.  The course buyout -- the e-mail from Doctor Weatherley

17   said, "I'll approve the buyout"; correct?

18   A.  Correct.

19   Q.  Now, that buyout was initially submitted by the defendant

20   as somehow being part of this subcontract with Fuzhou

21   University; correct?

22   A.  Initially, yes.

23   Q.  And you know, because of the e-mail that's Government's

24   Exhibit 211, that that contract was never signed between Fuzhou

25   and KU; correct?

1    A.    That's correct.

2    Q.    And so there was no reason for that buyout to occur?

3    A.    Because the funding wasn't there.

4    Q.    But regardless --

5    A.    Right.

6    Q.    -- in that e-mail approving the proposed buyout, Doctor

7    Weatherley gave the defendant instructions, didn't he?

8    A.    He did.

9    Q.    And one of those instructions was, "You need to be on

10   campus"?

11   A.    Correct.

12   Q.    And another instruction is, "Your other obligations to the

13   university continue"?

14   A.    Correct.

15   Q.    On direct examination Mr. Zeidenberg talked to you about

16   when you became aware of the fact that the defendant was

17   sending out e-mails related to trying to find another

18   university, and I think you testified that that was around the

19   winter of 2018; is that correct?

20   A.    There's -- I mean, it's a broad range of dates, but, yes,

21   it's in 2018, late 2018.

22   Q.    Okay.  And so when we look at the timeline and based on

23   what you know about the travel, you know that the defendant is

24   going to be gone to China beginning mid-December for most of

25   2019; correct?

1    A.   Correct.

2    Q.   And that included almost the entire spring semester -- in

3    fact, did include the entire spring semester at KU; correct?

4    A.   It did.

5    Q.   And you know that he was instructed by Doctor Weatherley

6    that he had to be on campus; correct?

7    A.   That's what Doctor Weatherley said, yes.

8    Q.   And then I think you also testified just a minute ago that

9    his full-time obligation to -- his obligation to KU was

10   full-time; correct?

11   A.   Correct.

12   Q.   You don't know why the defendant was applying to other

13   universities, do you?

14   A.   I don't.

15   Q.   Based on what you know from the evidence, was it -- would

16   it become clear to somebody in the defendant's situation that

17   he couldn't keep this gig up if he was going to be -- planned

18   to be at Fuzhou University for the bulk of 2019; that KU would

19   likely find out about it?

20   A.   I believe so.

21   Q.   And the defendant hadn't said anything to KU about what he

22   was doing at Fuzhou; right?

23   A.   Correct.

24   Q.   I mean, he didn't characterize it as a collaboration, he

25   told them nothing.

1    A.  Correct.

2    Q.  And so presumably when KU finds out about that, somebody at

3    KU is going to be upset; correct?

4    A.  Yes.

5    Q.  You don't know these jobs that he was applying for, whether

6    or not he was applying for full-time jobs, do you?

7    A.  I don't.

8    Q.  You don't know whether or not he was going to try and find

9    a summer job at one of these universities?

10   A.  I don't.

11   Q.  Now, you know what he told and didn't tell KU about Fuzhou?

12   A.  I do.

13   Q.  But since none of those jobs ever happened, I assume

14   there's no way for you to know what the defendant intended to

15   tell those universities?

16   A.  Correct.

17   Q.  And so therefore, again, the jury is left to consider the

18   evidence that does exist; correct?

19   A.  Correct.

20   Q.  Mr. Zeidenberg asked you at various times about grand jury

21   testimony that you gave.  Do you remember that?

22   A.  I do.

23   Q.  And there were different indictments in this case; correct?

24   A.  Yes.

25   Q.  And the jury will decide whether the facts support beyond a

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   reasonable doubt the allegations that we're here about;

2   correct?

3   A.   Correct.

4   Q.   Okay.  And there was a discussion about whether or not KU

5   was harmed.  Once this case and the evidence in this case came

6   to light, KU sought to terminate the defendant's employment

7   with KU; is that correct?

8           MR. ZEIDENBERG:  Objection.

9           THE COURT:  I'll sustain as to the form of the

10   question.

11   BY MR. OAKLEY:

12   Q.   Do you know whether or not KU sought to terminate the

13   defendant's employment?

14           MR. ZEIDENBERG:  Objection.

15           THE COURT:  Come forward.

16           (Proceedings had at the bench, outside the hearing of

17   open court).

18           THE COURT:  I mean, I think the questions about harm

19   were in the context of lost money.  I'm concerned about going

20   down this path about termination.  I don't know what the answer

21   is, but I'm worried that it's more prejudicial than probative

22   at this point.

23           MR. OAKLEY:  I think there's been testimony that KU

24   has started the proceedings, I think it was through --

25           THE COURT:  KU has what?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE      2181

1          MR. OAKLEY:  Has started termination proceedings, but

2    I can withdraw the question.

3          THE COURT:  All right.  I think you should.  I'll

4    sustain.

5          (Proceedings continued in open court).

6    BY MR. OAKLEY:

7    Q.  And so back to the course buyout.  A course buyout is

8    different than summer salary; correct?

9    A.  Yes.

10   Q.  Could we please bring up Government's Exhibit 15?

11         And do you remember -- I think it was Ms. Loving that

12   testified that these are the payments that the defendant

13   received, a salary from KU?

14   A.  I do.

15   Q.  Could we please scroll to January of 2019?

16         And so beginning, it looks like, around Row 302 you have

17   the defendant's paychecks that occurred in December of '18 and

18   then in January of 2019; correct?

19   A.  Yes.

20   Q.  And could we please scroll through the entry that would

21   cover August 20th?  Can you stop at -- right here, please.

22         And so if you look up there at 334, that includes a pay

23   period in May; correct?

24   A.  Yes.

25   Q.  And then so the defendant -- the defendant received payment

1  from KU January, February, March, April, May; correct?

2  A.  Correct.

3  Q.  And then he continued to receive payments May, June, July,

4  August of 2019; correct?

5  A.  That's what it shows.

6  Q.  Thank you.

7      On direct examination you were asked about Huimin Liu.  Do

8  you remember that?

9  A.  Yes.

10  Q.  And Mr. Zeidenberg asked you something about an allegation

11  that she made related to espionage.  Do you remember that?

12  A.  I do.

13  Q.  Now, Mr. Zeidenberg said espionage, but other than that,

14  that's not been raised in this case; correct?

15  A.  It's not been raised in this case.

16  Q.  And Mr. Zeidenberg asked you about certain documents that

17  Ms. Liu provided to the FBI; correct?

18  A.  Correct.

19  Q.  And I think you mentioned the unsigned contract was one of

20  the documents that Ms. Liu provided to the FBI; correct?

21  A.  Correct.

22  Q.  Now, the version that's been admitted into evidence didn't

23  come from Ms. Liu, correct, it came from the defendant's e-mail

24  account?

25  A.  Either his e-mail account or his computer.

UNCERTIFIED ROUGH DRAFT -- DO NOT CITE, QUOTE OR FILE                2183

1    Q.  Or his KU computer.  He stored it on his KU computer;

2    correct?

3    A.  It's one or the other I believe.

4    Q.  In fact, they were both locations, wasn't it?  He had it

5    both on his KU computer and then he forwarded copies both to

6    himself and to his wife; correct?

7    A.  Correct.

8    Q.  Ms. Liu provided other documents to the FBI; correct?

9    A.  She did.

10   Q.  I want to hand you what's been marked as Government's

11   Exhibit 352.  Is that one of the documents that Ms. Liu

12   provided to the FBI?

13   A.  It is.

14   Q.  Now, a version of this has been admitted into evidence, a

15   version that's a draft; is that correct?

16   A.  Yes, there's -- it's different.

17   Q.  But this version appears to be one that was filed with the

18   NNSF; correct?

19   A.  Yes.

20        MR. OAKLEY:  Your Honor, I'd offer Government's

21   Exhibit 352.

22        THE COURT:  Any objection?

23        MR. ZEIDENBERG:  No objection.

24        THE COURT:  352 admitted.

25   BY MR. OAKLEY:

 1   Q.  And so directing your attention to the top right portion --

 2           THE COURT:  I think admit 352A as well if that's the

 3   translated version of it.

 4           MR. OAKLEY:  Yes, Your Honor.

 5           THE COURT:  All right.  352 and 352A admitted.

 6   BY MR. OAKLEY:

 7   Q.  And so this is the version that's in Chinese and so this is

 8   the version that was provided by Ms. Liu; correct?

 9   A.  Correct.

10   Q.  And I think you testified that another version of this was

11   found on the defendant's KU computer?

12   A.  Correct.

13   Q.  But this is a different version; correct?

14   A.  Correct.

15   Q.  And if we could focus in on the top right part.

16       There's actually a bar code with this; correct?

17   A.  Correct.

18   Q.  Could we please bring up Government's Exhibit 352A and

19   could we please highlight that right portion?

20       And then directing your attention to the bottom, it says

21   "receipt number" -- I'm sorry, to the -- that portion above the

22   bar code it says "receipt number"?

23   A.  Yes.

24   Q.  And so it appears that this version was actually submitted

25   to the Chinese National Natural Science Foundation; correct?

1    A.   Correct.

2    Q.   You were asked on direct examination about obtaining bank

3    accounts; correct?

4    A.   Correct.

5    Q.   Now, federal law enforcement officers are able to ask the

6    grand jury to issue subpoenas to banks; correct?

7    A.   That's correct.

8    Q.   Banks located in the United States?

9    A.   That's correct.

10   Q.   Are you able to obtain foreign bank records, without going

11   through a process, with the foreign country that holds those

12   records?

13   A.   Only by going through that process am I able to do that.

14   Q.   And is that a mutual -- as it relates to China, is it a

15   Mutual Legal Assistance Agreement process?

16   A.   It is an MLAA, yes.

17   Q.   And did you -- well, does that also relate to other

18   evidence that may be held in a foreign country?

19   A.   Yes.

20   Q.   And Mr. Zeidenberg asked you about interviewing people in

21   China.  Would that also relate to your ability to interview

22   people in a foreign country?

23   A.   Absolutely.

24   Q.   Did you or others attempt to obtain evidence from China?

25   A.   Through the MLAA process, yes.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2186

1  Q.  And was that process -- did China provide evidence to you

2  related to that process?

3  A.  China did not provide that evidence.

4  Q.  Back to the bank records.  And some of those bank records

5  were -- the question was asked if they were friends of the

6  defendant; is that correct?

7  A.  Yes.

8  Q.  At some point during your investigation did you or other

9  employees of the FBI see transactions related to the purchase

10  of a house in Lawrence?

11  A.  We did.

12  Q.  And when did the defendant and his wife purchase their

13  residence in Lawrence?  I think -- well, let me back up.

14      There was testimony that at the time of the execution of

15  the search warrant it looked as though the family was just

16  moving in; is that your recollection?

17  A.  That is.

18  Q.  So do you know when the defendant and his wife purchased

19  that residence?

20  A.  I'm -- I would guess somewhere in the summer, I think July

21  of 2019, perhaps later.

22  Q.  Related to that purchase of that -- well, let me ask you

23  this:  Did the defendant and his wife take out a mortgage for

24  that residence?

25  A.  No, they did not.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.   How did they pay for that residence?

2    A.   In bulk, cash payment.

3    Q.   And was that funded by some transfers that came from bank

4    accounts from China?

5    A.   Yes.

6    Q.   And, again, because of information that's in China, you

7    weren't able to obtain anything related to that; is that a fair

8    statement?

9    A.   That's correct.

10   Q.   I want to talk to you a little bit about the surveillance

11   video that we saw.

12   A.   Okay.

13   Q.   You're an employee of the Federal Bureau of Investigation?

14   A.   Am I?

15   Q.   Yes.

16   A.   Yes.

17   Q.   You're a special agent with the FBI?

18   A.   I am.

19   Q.   Does the FBI have surveillance teams whose job it is to

20   conduct surveillance?

21   A.   We do.

22   Q.   And that includes things such as aircraft with the ability

23   to video such as we saw?

24   A.   That is correct.

25   Q.   And these surveillance squads, are they available to

1   special agents that are conducting any type of investigation?

2   A.  Yes, they serve the entire division.

3   Q.  And so as a special agent, can you ask, hey, could we get

4   surveillance for this particular case for a particular period

5   of time?

6   A.  Yes, I can.

7   Q.  And is that unusual in your experience?

8   A.  It's fairly routine.

9   Q.  That's part of the job; right?

10  A.  Yes.

11  Q.  I mean, the video that we saw, I think it was represented

12  to you that that was taken the day of the execution of the

13  search; correct?

14  A.  I believe that's correct.

15  Q.  And I think Mr. Zeidenberg represented to you that that was

16  video of the defendant's wife dropping the kids off at school.

17  Do you remember that part?

18  A.  I do.

19  Q.  And so was that video taken before or after the search

20  warrant at the defendant's house?

21  A.  Before.

22  Q.  As part of the execution of that search warrant, did the

23  FBI want to make sure that the children weren't there?

24  A.  That is correct.

25  Q.  Why?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    A.  Kids don't need to see that.

2    Q.  Is there any danger associated with -- well, let me back

3    up.

4        That search warrant, was it a court-authorized search

5    warrant?

6    A.  It was.

7    Q.  Is there any danger associated for law enforcement officers

8    with the execution of search warrants at residences?

9    A.  There's lots of dangers, yes.

10   Q.  And what are the types of things that are done to address

11   some of those dangers that are associated?

12           MR. ZEIDENBERG:  Objection.

13           THE COURT:  Overruled.

14           THE WITNESS:  Surveillance.

15   BY MR. OAKLEY:

16   Q.  Now, after the kids were dropped off at school, that's when

17   the search warrant was executed; correct?

18   A.  Yeah, I believe the search warrant was executed at 9:00

19   a.m.

20   Q.  And do you remember hearing testimony about how agents

21   approached that residence?

22   A.  I do.

23   Q.  And do you remember, there were two agents that walked up

24   to the door and knocked on the door; right?

25   A.  Correct.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2190

1    Q.  Do you remember who they -- who they were?

2    A.  I believe Agent Hall and Agent Rohrbaugh maybe is the other

3    one.  I could be wrong on the second name.

4    Q.  Now, there's a variety of ways to gain entry into a

5    residence to execute a search warrant; correct?

6    A.  There are.

7    Q.  And walking up and knocking on the door is one of the least

8    intrusive ways to accomplish that; is that a fair statement?

9    A.  Yes.  That's fair.

10   Q.  You saw a couple photos that Mr. Zeidenberg showed you that

11   related to the kids' room; is that correct?

12   A.  That's correct.

13   Q.  And I think -- were you present when the photographer from

14   that search warrant testified?

15   A.  I was in the courtroom, yes.

16   Q.  Do you remember her name?

17   A.  Erica Guyer.

18   Q.  Do you remember Ms. Guyer stating that as part of the

19   execution of searches she takes both before-and-after

20   photographs?

21   A.  That's correct.

22   Q.  What's the purpose of taking both before-and-after

23   photographs?

24   A.  The FBI takes pictures on entry to see the house as it was

25   before the search warrant and then on exit to show how we leave

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    it after the search warrant.

2    Q.  Part of that is for civil liability; right?  Someone may

3    come to the FBI and say, "Hey, I had this item and it's

4    missing"?

5    A.  Yes.

6    Q.  And so taking photographs of the way that things are left

7    is one way to address that; right?

8    A.  Yes.

9    Q.  And so the person taking photographs tries to take

10   photographs of everything he or she can for that reason;

11   correct?

12   A.  Correct.

13   Q.  Now, the photos that you were shown of the children's room,

14   there was no evidence that was obtained from the children's

15   room in this case; right?

16   A.  Not that I know of.

17   Q.  So do you know of any reason the defense counsel would want

18   to show you photographs of the children's room or the

19   children's stuffed animals that would be relevant to the

20   evidence that the jury will consider?

21   A.  I don't.

22   Q.  Did it seem to you that that was just an attempt to gain

23   sympathy from the jury?

24          MR. ZEIDENBERG:  Objection.

25          THE COURT:  Overruled.

1              THE WITNESS:  Yes.

2     BY MR. OAKLEY:

3     Q.   Mr. Zeidenberg talked to you a little bit about Doctor

4     Tiffert's testimony; correct?

5     A.   Correct.

6     Q.   And you heard Doctor Tiffert testify concerning

7     Government's Exhibit 619 --

8     A.   I did.

9     Q.   -- correct?  And you've seen this before; right?

10    A.   I have.

11    Q.   And do you know that this was found in the defendant's

12    house?

13    A.   Yes.

14    Q.   And you heard Doctor Tiffert testify about -- under the

15    terms of the Changjiang Scholar that there's the Ministry of

16    Education that has certain requirements; correct?

17    A.   Correct.

18    Q.   And then there's also the component between the school and

19    the award winner; correct?

20    A.   Correct.

21    Q.   You heard Doctor Tiffert testify that there's a period of

22    time where the Ministry of Education and the school realize

23    that they're bringing in -- well, let me back up.

24         You heard the testimony that the Changjiang Scholar program

25    is designed to bring in knowledgeable people in particular

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   fields; correct?

2   A.  Correct.

3   Q.  And so as part of that process, it's known that these

4   people may already have full-time jobs?

5   A.  Yes.

6   Q.  And so that there's a wrapping-up period; correct?

7   A.  I believe that's what he testified.

8   Q.  And so part of that is taken into account; correct?

9   A.  Correct.

10  Q.  You've heard testimony about what a good researcher the

11  defendant is; correct?

12  A.  Correct.

13  Q.  I want to talk to you a little bit about that.  Do you

14  remember the testimony from Doctor Keiser of, well, part of the

15  research and part of the quality of the research is also

16  dependent on how open the research is.  Do you remember that?

17  A.  Yes.

18  Q.  And so if there's a situation where even if the research is

19  good, if the PI doesn't disclose potential conflicts of

20  interest, it could affect that research?

21  A.  Yes, the integrity of it.

22  Q.  So based on the evidence, it's clear -- let me back up.

23      The Changjiang Distinguished Scholar is a big deal;

24  correct?

25  A.  Yes.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2194

1    Q.   And I think you heard testimony that it's a big deal not

2    only for the person that receives it but for the university

3    that brings someone in --

4    A.   Yes.

5    Q.   -- is that your understanding?

6    A.   That is my understanding.

7    Q.   Did you hear testimony about whether or not Fuzhou

8    University is a top-tier school?

9    A.   I believe it was mentioned, yes.

10   Q.   And it's not a top-tier school in China?

11   A.   It's not.

12   Q.   And so this was a big deal to the university to bring in

13   the defendant as its Changjiang Distinguished Professor?

14   A.   It was.

15   Q.   And the fact that this is such a big deal, would that be

16   some indication as to what concessions Fuzhou University would

17   be willing to make?

18   A.   In negotiations, sure.

19   Q.   And whether or not it would allow the defendant to get by

20   on some of the technical requirements of the written contract?

21   A.   Perhaps.

22   Q.   But the fact of the matter is, you know that the defendant

23   received Government's Exhibit 619; is that true?

24   A.   That is true.

25            MR. OAKLEY:  No further questions, Your Honor.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

                    REDIRECT EXAMINATION

1

2   BY MR. ZEIDENBERG:

3   Q.  All right.  Let me start -- let's start with this MLAA

4   process which you talked about with Mr. Oakley.  And this was a

5   legal process that can be used to obtain evidence overseas,

6   including in China; right?

7   A.  That's correct.

8   Q.  And Mr. Oakley asked you if you attempted to do that in

9   this case and you said yes?

10  A.  Yes, through the Department of Justice.

11  Q.  Okay.  And did you do that before you arrested Doctor Tao?

12  A.  Did not.

13  Q.  Okay.  So you didn't do it anytime in 2019; correct?

14  A.  Correct.

15  Q.  And did you do it anytime in 2020?

16  A.  No, I believe it was later than that.

17  Q.  And, in fact, isn't it true that it was only after the

18  defense said it wanted to depose someone from the H.R.

19  department at Fuzhou University that your team then said, okay,

20  we'll try and talk to someone in Fuzhou?  In 2021, the summer.

21  A.  I don't know the timing about that.  I don't know if it was

22  when you -- the defense mentioned the deposition of Fuzhou

23  employees or if it was prior, so I don't know the exact timing.

24  Q.  Okay.  So when I was asking you about searching the bank

25  accounts of the fellow church members of Doctor Tao going back

1    to 2014, I then said did you -- instead of searching their bank

2    accounts, did you try reaching out to anyone at Fuzhou?  The

3    answer was no; right?

4    A.   That is correct.

5    Q.   You waited two years later to try and do that?

6    A.   That's correct.

7    Q.   After the defense said it was trying to talk to someone at

8    Fuzhou?

9    A.   I don't know that -- again, I don't know that -- the timing

10   of that, whether it was after the defense said they wanted to

11   depose Fuzhou employees or not.

12   Q.   You said surveillance is fairly routine in investigations;

13   is that right?

14   A.   Yes.

15   Q.   Are you really telling these ladies and gentlemen that it's

16   fairly routine for the FBI to conduct aerial surveillance in

17   cases involving a conflict of interest?

18   A.   In any investigation surveillance is fairly common.

19   Q.   Really?  In a white-collar case involving a failure to

20   disclose on an H.R. form to one's own university, it's routine

21   to conduct aerial surveillance of the family?

22   A.   I stated that surveillance is routine in FBI investigations

23   and I --

24   Q.   I'm asking you about investigations like this that involve

25   a conflict of interest form.  Is that routine?

1    A.    Specific to this investigation, surveillance was requested,

2    yes.

3    Q.    I know that.  I'm saying -- you're claiming that this is

4    routine to do it in cases like this, and I am asking you, are

5    you really trying to tell us that in a white-collar case

6    involving a conflict of interest form it is routine for the FBI

7    to conduct aerial surveillance?

8    A.    I don't know about other cases.  I know that investigations

9    in general throughout the FBI utilize surveillance.

10   Q.    And you said something about the drone footage or the

11   aerial surveillance had to do about agent safety; is that

12   right?

13   A.    It can be used for agent safety, yes.

14   Q.    I'm talking about this case.  It wasn't because of agent

15   safety in this case?

16   A.    I'm not sure why aerial surveillance was utilized by the

17   surveillance team.

18   Q.    Well, if -- fair to say that if aerial surveillance was

19   being conducted on July 23rd and July 24th and August 4th and

20   August 6th and August 7th and July 22nd and August 21st and

21   August 20th, it's not because of officer safety; right?

22   A.    I believe it was for pattern of life.

23   Q.    Pattern of life?

24   A.    Pattern of life.

25   Q.    And is it your testimony, Agent Lampe, that the FBI

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    routinely tries to determine pattern of life conduct in cases

2    involving conflict of interest?

3    A.   Again, you're zeroing in on the conflict of interest.

4    That's specific to this case.  I would say investigations in

5    general, the FBI utilizes surveillance of all forms.

6    Q.   Mr. Oakley asked you about Huimin Liu -- or Liu, the woman

7    who came forward and initially made the complaints about Doctor

8    Tao and gave you this unsigned contract.  Do you remember he

9    was asking you about that?

10   A.   Yes.

11   Q.   And I believe he was asking you that you found other

12   evidence that corroborated her; is that right?

13   A.   Yes.

14   Q.   And isn't it true that Ms. Liu told you in writing, the

15   FBI -- strike that.

16       She wrote to the FBI in an e-mail that she had lied to the

17   FBI repeatedly during an interview; correct?

18   A.   Yes.  She was correcting lies from the interview, yes.

19   Q.   And she admitted that she was, in fact, the source of the

20   multiple complaints against Doctor Tao; correct?

21   A.   She admitted that she was the source of multiple

22   complaints.

23   Q.   And that she had done so using fictitious names or at least

24   the names of real people, but she was claiming to be them?

25   A.   She was portraying to be other people.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE        2199

1   Q.  And you still found her to be credible?

2   A.  I did.

3   Q.  And obviously you would agree that she was highly

4   incentivized to implicate Doctor Tao?

5   A.  Based on?

6   Q.  Based on the fact that you acknowledged that she wanted

7   $300,000 and, if he didn't pay her, that she was going to

8   report him as a tech spy and that she then made up false

9   identities and sent in complaints to the FBI.  Would you say

10  that someone who did that is -- appears to be highly

11  incentivized to implicate Doctor Tao?

12  A.  I believe she was angry with Doctor Tao and this was her

13  reaction.

14  Q.  And she told you that she had his e-mail and password at

15  Fuzhou?

16  A.  Yes.

17  Q.  And she showed you an unsigned contract that she said she

18  obtained from his e-mail account at Fuzhou?

19  A.  That's correct.

20  Q.  And, in fact, you later wrote in an affidavit that you

21  believed she hacked that contract out of his e-mail even though

22  she had first claimed she got it from his secretary?

23  A.  Correct.

24  Q.  So she had lied to you about that you think?

25  A.  No, I -- we discussed this before.  I believe she had

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   implied access to that e-mail account.

2   Q.  And despite her being highly incentivized to implicate

3   Doctor Tao in criminal activity and her ability to obtain -- to

4   access his Fuzhou e-mail account, she wasn't able to provide

5   you a signed contract; right?

6   A.  She did not provide a signed contract, that's correct.

7   Q.  Do you have any doubt that she would've given it to you if

8   she could have?

9   A.  I really don't know.

10  Q.  Really?  As a trained investigator, an agent, a lead case

11  agent, you know and met this woman, you know she made up lies

12  about who she was, you know she wanted Doctor Tao to get in

13  trouble with the FBI, you know she hacked into his e-mail

14  account and obtained an unsigned contract and gave it to the

15  FBI and said he was a tech spy, you have doubts about whether

16  she would give you a signed contract if she could get one?

17  A.  You piled a lot into that sentence.  So I met her once in

18  person and I talked with her for approximately three hours or

19  less.  I believe she had implied access to the account.  And

20  whether she was willing to give us the signed contract or not,

21  I'm still unsure.

22  Q.  Because you think maybe she was, like, holding back and she

23  didn't want to get him in that much trouble, just a little bit

24  of trouble?

25  A.  I don't know that the signed contract that you speak of was

1    on the purported e-mail account.

2    Q.   And she provided you no signed proposals either; correct?

3    A.   That's correct, no signed proposals.

4    Q.   Those NSFC, Natural Science Foundation of China, proposals,

5    including the one Mr. Oakley just showed you, 352, was

6    unsigned; right?

7    A.   Unsigned, yes.

8    Q.   And it wasn't stamped?

9    A.   I don't believe so.

10   Q.   And you heard the government expert, Doctor Tiffert, say

11   that in China everything to be official needs a stamp; right?

12   A.   Yes.

13   Q.   And this document was not stamped?

14   A.   It was not stamped.

15   Q.   And I want to just go over a couple of parts of this

16   contract, this proposal, 352A, which is --

17           MR. ZEIDENBERG:  Could you turn on the ELMO?

18   BY MR. ZEIDENBERG:

19   Q.   Do you see there where it says Luan Nguyen is an associate

20   professor at Fuzhou University?

21   A.   I do.

22   Q.   That's not true; right?

23   A.   Not to my knowledge.

24   Q.   Well, you've interviewed him; right?

25   A.   I have.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.  You've looked into his background?

2    A.  Yes, I've looked into Doctor Nguyen.

3    Q.  He was being surveilled by the FBI, you were checking him

4    out for pattern of life; right?

5    A.  If you represent that, yeah, I believe that's correct.

6    Q.  Okay.  Do you have any information that he was an employee

7    of Fuzhou University, a professor?

8    A.  I mean, this document would suggest that he was.

9    Q.  Right.  Oh, so now you think that maybe this document is

10   true, but Luan Nguyen is lying to you when he says, I'm really

11   working at Grand Rapids?

12   A.  No, I'm just answering your question.

13   Q.  Yeah.  My point is, this document is wrong; right?  Will

14   you concede that?

15   A.  Yes, I can concede that.

16   Q.  It sounds like you were ready to believe this document that

17   was provided to you by Huimin Liu, who was trying to extort

18   Doctor Tao.  You were willing to believe that Luan Nguyen was

19   an associate professor at Fuzhou University because it says so

20   in here?

21   A.  I expected Doctor Nguyen to eventually be an associate

22   professor at Fuzhou University.

23   Q.  So if something is going to happen you think in the future

24   and it says it already happened, that makes the document true?

25   A.  Doctor Nguyen has testified that he was thinking about

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    taking a job at Fuzhou University and he relayed that to me in

2    an interview as well.

3    Q.  I just want to see if there's an asterisk by his name here

4    that says "considering taking a position in the future" or if

5    it actually just says he's an associate professor.  Which one?

6    A.  It just says he's an associate professor.

7    Q.  This is Page 28.  They're talking about Doctor Tao.  In

8    2009 he independently established a group at the University of

9    Notre Dame.  He wasn't at Notre Dame in 2009, was he?

10   A.  No.  It wasn't until, your note, 2010 is my understanding.

11   Q.  Or do you think maybe your investigation is wrong and

12   because this says 2009, he was, in fact, at Notre Dame in 2009?

13   A.  It's a typo, I don't know.

14   Q.  Okay.  You think it's just a mistake, a typo?

15       Let's see what else.  It says here on Page 33, "Upon

16   returning to the country full-time in 2017, the project

17   applicant, Tao Feng, began forming the Institute of Molecular

18   Catalysis and Characterization at Fuzhou University."

19       Okay.  Where was Doctor Tao in 2017?  Was he in China or

20   was he in Kansas?

21   A.  He was in Kansas.

22   Q.  Okay.  Do you think this is a typo or do you think this is

23   just wrong?

24   A.  Yes, I think this is wrong based on the evidence that I

25   have.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    Q.  All right.  Let me ask you if this is right or wrong.  "The

2    project applicant, Professor Tao Feng, is not currently

3    undertaking or currently participating in any projects of the

4    National Science Foundation or other national scientific and

5    technological plans."

6         Do you think that's true?

7    A.  I'm unsure.

8    Q.  Okay.  So when something is in here that would help Doctor

9    Tao and show that he has no pending grants in China, you're

10   kind of doubting it; is that right?

11   A.  No, because there are other NSFC documents that are from

12   2018.

13   Q.  Yeah.  And he -- this is saying he has no current

14   participation in them.  Doesn't that tell you that they weren't

15   funded?

16   A.  Is this Doctor Tao writing this document?

17   Q.  I'm asking you, you're the one -- the government is the one

18   who showed you this document; right?

19   A.  Right.

20   Q.  And I'm asking you about it.

21   A.  Okay.

22   Q.  And I'm asking if it's accurate or not.  Do you think

23   that's accurate or you just don't know?

24   A.  I don't know.

25   Q.  Because you have no evidence that Doctor Tao had any active

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   grants in China; correct?

2   A.   I do believe I -- I do believe we do have evidence of that,

3   yes.

4   Q.   And are you going to benefit us by showing it to us?

5   A.   Isn't it one of the counts?

6   Q.   An allegation isn't evidence, Agent Lampe.

7   A.   You're right.  I'm sorry, I misstated that.

8   Q.   I'm asking about proof, evidence.

9   A.   Yes, there is an e-mail between himself and Doctor Yu-Wen

10  Chen of Taiwan where the e-mail states that Doctor Tao has

11  added you to his NSFC grant.

12  Q.   Okay.  That doesn't mean it's been funded, does it?

13  A.   I mean, it may suggest that it has.  No, it doesn't.

14  That's a fair statement.

15  Q.   March 2018 to the present, Fuzhou University, chemistry

16  professor.

17  A.   Yes.

18  Q.   Where was Doctor Tao in March of 2018?

19  A.   In March of 2018, I'd have to look at the travel records,

20  but...

21  Q.   He was in Kansas, wasn't he?

22  A.   If you are representing it, yes.

23  Q.   Do you have some doubts about where he was in the spring of

24  2018 when he first got word or -- they started this negotiation

25  process?  He was in Kansas; right?

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   A.   In March of 2018 he was in Kansas.

2   Q.   So if this says March 2018 to the present, Fuzhou

3   University, chemistry professor, that isn't true; right?

4   A.   I can't say that it's not true.

5   Q.   Agent Lampe, we've gone through these contracts and you

6   agreed with me a couple hours ago that there was no contract

7   agreed to in March and that it -- negotiation went on until

8   May; right?

9   A.   Yes.  We agree that there was a contract addendum signed in

10  March, and that the contract that was -- the draft contract

11  that was provided to us starts on May 1st, 2018.

12  Q.   And you heard the conversations with Doctor Tao and people

13  at Fuzhou University through April and May where he's still

14  negotiating with them; right?

15  A.   I did.

16  Q.   And they're between 20 million and 50 million apart; right?

17  A.   For research funds, yes.

18  Q.   And I thought you agreed with me, maybe you didn't or maybe

19  you don't anymore, that there was no agreement in March 2018;

20  correct?

21  A.   Again, I think you're taking my words out of context.  He

22  had -- does he have a role there?  I don't suspect he would

23  sign an addendum to a contract if there wasn't some kind of

24  role.

25  Q.   I want to just -- you referenced an e-mail that he had with

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    someone in Taiwan.  And showing you 494.

2            MR. ZEIDENBERG:  Has this been admitted?

3            MR. DEARINGTON:  (Nods head up and down).

4    BY MR. ZEIDENBERG:

5    Q.   Is this the e-mail you're talking about?

6    A.   That is it.

7    Q.   Is that the one you're talking about?

8    A.   Yes.

9    Q.   Okay.  He says, Doctor Tao -- "Professor Tao will add you

10   as a project participant when filling in an application";

11   right?

12   A.   Yes.

13   Q.   Doesn't say anything about a funded grant, does it?

14   A.   It does not.

15   Q.   Okay.  Let's cut to the chase on this 352.  Do you see

16   where it says "signature"?

17   A.   Yes.

18   Q.   Not signed, is it?

19   A.   It is not.

20   Q.   And do you see all those names that were listed there, one

21   through nine?

22   A.   I do.

23   Q.   None of them signed either; right?

24   A.   That's correct.

25   Q.   And do you see at the bottom where it asks for a

1  collaborating institution seal and date?  Nothing; right?

2  A.  Nothing.

3  Q.  Let's talk a little buyout.  Isn't it true that what we

4  heard and what we saw in the e-mails from Weatherley was that

5  he -- he said to Doctor Tao that he was to stay on campus in

6  accordance with policy; right?

7  A.  Yes, that's in the e-mail.

8  Q.  And do you remember him testifying that there was no policy

9  that required teachers on buyouts with no other teaching

10  obligations to remain on campus?  Do you remember that?

11  A.  I do remember him testifying to that.

12  Q.  And in the spring of 2019 Doctor Tao did not have any other

13  teaching responsibilities; correct?

14  A.  That's correct.

15  Q.  So there was no policy that required him to remain on

16  campus.  He had to comport himself with the policy, and no

17  policy required him to be present; correct?

18  A.  There was no policy, correct.

19  Q.  And although the Fuzhou grant -- proposed grant fell

20  through, Doctor Weatherley said any grant could be used to pay

21  for a buyout; correct?

22  A.  I think that's true for all teachers.  They could use

23  whatever grant is necessary.

24  Q.  Mr. Oakley asked you about these other universities and

25  their significance, but the fact is, you never even knew about

1    most of these universities until the last couple days; right?

2    A.   That's correct.

3    Q.   So you couldn't investigate what type of position -- you

4    don't know what type of position he was looking for; right?

5    A.   That's correct.

6    Q.   I mean, it could be that he was looking for a full-time job

7    that would require him to be there full-time, you just don't

8    know?

9    A.   I don't know.  I think the --

10   Q.   Not what you think.  You didn't investigate.

11   A.   There is evidence from the Lehigh University, there's phone

12   calls with that professor, so...

13   Q.   There were about a dozen job applications I went through

14   with you.

15   A.   Yes, that is correct.

16   Q.   And you haven't spoken to those individuals that he was

17   talking to about a job to find out what was going on there?

18   A.   Right.

19   Q.   Because you did not consider it relevant?

20   A.   Right.

21   Q.   Okay.  Almost done.

22       Would you agree with me if I represented to you that the

23   three grants at issue in the case were submitted on these

24   dates:  The NSF grant on March 4th, 2015; the NSF grant on

25   October 2nd, 2017; and DOE December 11th of 2017?  Does that

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2210

1    sound about right?

2    A.   If you're representing it, then yes.

3    Q.   And did you hear that the -- well, let me ask you this:

4    Are you aware of any requirement based on what you've heard

5    here in the courtroom or anywhere else that there was any

6    requirement that a PI update his biosketch after his grant is

7    submitted?

8    A.   I think it's only done at the request of the program

9    manager or the program officer.

10   Q.   Okay.  So if the grants were submitted in March of 2015,

11   October of 2017, and December of 2017, you would agree with me

12   there was no position at Fuzhou University by any of those

13   dates, correct, even under the government's theory?

14   A.   What was the last date?

15   Q.   December 11th, 2017.

16   A.   Well, there was the application to Fuzhou in July of 2017.

17   Q.   Did you hear anyone say at any point during this trial or

18   are you aware of any regulations that applications for a job or

19   a position need to report -- be reported on your biosketch?

20   A.   No.

21   Q.   Okay.  So you agree with me that there was nothing to

22   report on these grant applications as it pertains to any of

23   these activities in China because they pre-dated that activity;

24   correct?

25   A.   Yes.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   Q.  And are you aware of any DOE or NSF regulation or policy

2   that requires a PI to report pending support on a progress

3   report?

4   A.  I don't know the regulations that well to answer that.

5   Q.  Well, I mean, you know, here we are --

6           MR. OAKLEY:  Objection, beyond the scope of cross,

7   Your Honor.

8           THE COURT:  All right.  I'll sustain.

9   BY MR. ZEIDENBERG:

10  Q.  You don't know what the rules are regarding progress

11  reports?

12          MR. OAKLEY:  Objection, beyond the scope of cross.

13          MR. ZEIDENBERG:  Your Honor, he asked extensively

14  about progress reports, repeatedly about progress reports.

15          MR. OAKLEY:  I didn't ask a single question about

16  progress reports.

17          THE COURT:  All right.  I'll sustain.

18  BY MR. ZEIDENBERG:

19  Q.  Isn't it true, Agent Lampe, there was nothing for Doctor

20  Tao to report once he submitted --

21          MR. OAKLEY:  Objection, it's beyond the scope.

22          THE COURT:  Finish your question and then I'll rule.

23          MR. ZEIDENBERG:  I'm sorry?

24          THE COURT:  Go ahead and finish your question and then

25  I'll rule.

1  BY MR. ZEIDENBERG:

2  Q.   There was nothing for Doctor Tao to report on any of his

3  grant paperwork that was submitted to DOE or NSF because it all

4  pre-dated these -- the job at -- the purported job at Fuzhou,

5  and there was nothing to report on his progress reports?

6        THE COURT:  All right.  I'll overrule.  You can answer

7  the question.

8        THE WITNESS:  I mean, at the dates of submission,

9  provided they are prior to employment at Fuzhou, then I would

10  agree with you.

11        As far as progress reports, again, I'm not so familiar

12  with progress reports that I can answer accurately.

13  BY MR. ZEIDENBERG:

14  Q.   So Mr. Oakley asked you about whether there were, in your

15  view, further -- that he asked you whether or not there

16  could've been other negotiations undisclosed so far in trial

17  about what was going on at Fuzhou between Doctor Tao and the

18  administration there, that he may not have had to follow the

19  contract, and you said perhaps; right?

20  A.   Yes, I said perhaps.

21  Q.   Like maybe, you don't know.

22  A.   I don't know.

23  Q.   And when you say perhaps there were further negotiations

24  that allowed him, would you agree that perhaps there could've

25  been further negotiations such that Doctor Tao agreed to work

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    for no pay and no time commitment and to work there on a trial

2    basis and see if he could build up a team and see how things

3    went?  Do you agree that that's perhaps what happened?

4    A.   Yeah, I don't know the nature of the negotiations.

5    Q.   But perhaps that happened?

6    A.   Perhaps.

7              MR. ZEIDENBERG:  I have no further questions.

8                          RECROSS EXAMINATION

9    BY MR. OAKLEY:

10   Q.   You heard -- now, there's a difference between the

11   biosketch and the current and pending; correct?

12   A.   Yes.

13   Q.   And you heard both Schwartz and Keiser testify that between

14   the submission and the grant, that the program officer or

15   manager can ask for updated information, including current and

16   pending; correct?

17   A.   That is correct.

18   Q.   And, in fact, in this case we've seen agencies do that,

19   haven't we?

20   A.   We have.

21   Q.   Whether or not FBI used surveillance in this case or air

22   surveillance in this case is not relevant to whether or not the

23   defendant defrauded KU or NSF or DOE --

24             MR. ZEIDENBERG:  Objection.

25   BY MR. OAKLEY:

1    Q.  -- isn't that true?

2           THE COURT:  All right.  Overruled.

3           THE WITNESS:  I don't believe it's relevant.

4    BY MR. OAKLEY:

5    Q.  It has about as much relevancy as a photo of stuffed

6    animals, doesn't it?

7    A.  It does.

8    Q.  May I see the NSFC --

9           Mr. Zeidenberg had asked you about the defendant's

10   obligation to be on campus in the spring of 2019.

11   A.  Yes.

12   Q.  In fact, Exhibit 247 is an e-mail from Weatherley to the

13   defendant saying -- discussing all the undergraduate advisees

14   who needed to meet with the defendant; correct?

15   A.  That's correct.

16   Q.  Now, you were asked about Ms. Liu and you testified on

17   redirect that you interviewed her.  That interview -- where did

18   that take place, what state?

19   A.  California.

20   Q.  And prior to the government's admission of Exhibit 352,

21   which was during the defendant's case, no piece of evidence

22   obtained from Ms. Liu has been offered into evidence in this

23   case; is that correct?

24   A.  That is correct.  I mean, separate from the draft contract.

25   Q.  Which was found on the defendant's --

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE    2215

1    A.   Yes.

2    Q.   -- KU computer; correct?

3    A.   Yes.   That's the better way of saying it, yes.

4    Q.   And when you talked about Ms. Liu having access to an

5    account, it was the defendant's FZU e-mail account; correct?

6    A.   That was what we suspected it was, yes.

7    Q.   And she wasn't at KU, she didn't have the ability to go

8    into the defendant's office at KU?

9    A.   No, she did not.

10   Q.   You were asked about some of the false statements that were

11   in that particular document.  Do you remember that?

12   A.   I do.

13        MR. OAKLEY:  Could we please have the computer,

14   Bonnie?

15   BY MR. OAKLEY:

16   Q.   Do you remember Government's Exhibit 350, which is the

17   thumb drive that was found in the defendant's pocket at the

18   time of his arrest?

19   A.   I do.

20   Q.   In fact, that had a PowerPoint presentation, didn't it?

21   A.   It did.

22   Q.   Can we please bring up Government's Exhibit 351A?

23        MR. ZEIDENBERG:  Objection, beyond the scope.

24        THE COURT:  How's this within the scope?

25        MR. OAKLEY:  It relates to the -- to the false

1    statements, the same false statements.

2            THE COURT:  All right.  In the NNSFC application?

3            MR. OAKLEY:  Yes.

4            THE COURT:  All right.  Overruled.

5    BY MR. OAKLEY:

6    Q.  And so this item was found -- this is a PowerPoint taken

7    from the thumb drive that was found in the defendant's pocket;

8    correct?

9    A.  That is correct.

10   Q.  Could we please go to Page 33?  And do you see -- can we

11   highlight the top part?

12       The defendant in his PowerPoint identifies himself in 2017

13   as a Changjiang Distinguished Scholar; correct?

14   A.  He does.

15   Q.  Do you know why the defendant lied in this PowerPoint

16   presentation?

17   A.  I do not.

18            MR. OAKLEY:  No further questions.

19                    FURTHER REDIRECT EXAMINATION

20   BY MR. ZEIDENBERG:

21   Q.  Do you know if he wrote that PowerPoint presentation?

22   A.  I do know that it was authored by him last.

23   Q.  If he just accessed it, it would show up that it -- he

24   accessed it; right?  That would show that.  It doesn't mean he

25   authored it, does it?

1    A.  The metadata suggested that it was authored by him.

2    Q.  If he opened it, it would appear to be the same; correct?

3    A.  I don't know.

4         MR. ZEIDENBERG:  Nothing further, Your Honor.

5                   FURTHER RECROSS EXAMINATION

6    BY MR. OAKLEY:

7    Q.  Is that the only time that the defendant had a document

8    with that false information in it?

9    A.  Say it again.

10        MR. ZEIDENBERG:  Beyond the scope, Your Honor.

11        THE COURT:  All right.  I'll sustain.

12        MR. OAKLEY:  I'm sorry?

13        THE COURT:  I'll sustain.

14        All right.  May Mr. Lampe step down?

15        MR. ZEIDENBERG:  Yes, Your Honor.

16        THE COURT:  All right.  You can step down.

17        Counsel, come forward.  Let's talk about planning for

18   tomorrow.

19        (Proceedings had at the bench, outside the hearing of

20   open court).

21        THE COURT:  All right.  Where are we at?

22        MR. ZEIDENBERG:  We've got two witnesses.  One will be

23   very short and one will be relatively short.

24        THE COURT:  Okay.  So you'll finish tomorrow morning?

25        MR. ZEIDENBERG:  Yes, yes.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1          THE COURT:  Like 10:30, 11:00 maybe?

2          MR. ZEIDENBERG:  Yeah.

3          THE COURT:  Okay.

4          MR. ZEIDENBERG:  I mean, if we start at 9:00, I would

5    think that we would be done by 11:30 at the latest.

6          THE COURT:  So we need to have a formal instruction

7    conference.  I think what I'll do is bring the jury in a little

8    bit later so we can have the instruction conference at 8:30.

9    Okay.  How about 9:00?  We're negotiating now.

10         MR. ZEIDENBERG:  When you said "later," I was like --

11         THE COURT:  I meant not tonight.  I meant later

12   bringing in --

13         MR. ZEIDENBERG:  I know you did.  I was just

14   associating the two things.

15         THE COURT:  Well, I'm just trying to figure out in

16   terms of timing of your witnesses.  I mean, I don't know where

17   they're coming from.  But let's just say we brought the jury in

18   say at 9:30, and then would that be fine to get your witnesses

19   on and off in the morning?  We could even bring the jury in at

20   10:00.

21         MR. ZEIDENBERG:  Oh, yeah.  Yeah.  My witnesses are --

22   you know, are here, they'll be in the witness room.

23         THE COURT:  Because I'd like to get the jury

24   instruction conference done so that when you finish your

25   witnesses -- do you contemplate there could possibly be

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2219

 1    rebuttal evidence?

 2              MR. OAKLEY:  No.

 3              MR. BARRY:  I think it's unlikely.  I mean, it sort of

 4    depends on tomorrow, but I think it's unlikely.

 5              THE COURT:  Okay.  So why don't we bring the jury in

 6    at 10:00, I think we can knock out the instruction conference

 7    between 9:00 and 10:00, and then hopefully around lunchtime

 8    you're done.  We'll take up a long lunch break maybe, maybe an

 9    hour and 15, hour and 30, and we just have closings tomorrow.

10              So I'll tell them to be back at 10:00, but we'll meet

11    at 9:00.

12              MR. ZEIDENBERG:  Thank you, Your Honor.

13              (Proceedings continued in open court).

14              THE COURT:  All right.  We're going to recess for the

15    night.  We're going to have you all come back at 10:00

16    tomorrow.  We're going to be busy from 9:00 to 10:00 taking up

17    some legal matters.  Come back at 10:00.  It sounds like it's

18    pretty definite that this case will be submitted to you

19    sometime tomorrow, probably tomorrow afternoon.  We'll have

20    closing arguments and deliberations in the afternoon.

21              So we may take a slightly longer lunch break than

22    usual just so that we can get the jury instructions in final

23    form for you, but it sounds like your deliberations will start

24    sometime tomorrow afternoon.

25              So you haven't heard all of the evidence obviously and

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    you haven't heard the parties' closing arguments and so, again,

2    it's not time to start deliberating or talking to anybody, even

3    among yourselves, about any of these matters.

4             Again, refrain from any media coverage, independent

5    research, reading, looking things up and communicating.

6             All right.  We'll see you at 10:00 tomorrow morning.

7             (The following proceedings were held outside the

8    presence of the jury).

9             THE COURT:  All right.  So we will be back together at

10   9:00 tomorrow morning.  Anything else we need to talk about?

11            MR. ZEIDENBERG:  Yes.  Your Honor, I was going to --

12   we have one evidentiary question we were going to raise about

13   an exhibit that we'd like to introduce.  There's a -- I mean,

14   we don't have to do it now or we can do it now.

15            And then the other question I had for the court was

16   what the court was thinking about closing arguments in terms of

17   length.

18            THE COURT:  Okay.  Well, if we can talk about the

19   exhibit now, let's do that.  And what would -- what were you

20   thinking?

21            Mr. Oakley, Mr. Barry, how long would you like for

22   closing?

23            MR. OAKLEY:  I think an hour, Your Honor.

24            THE COURT:  All right.  Does that work for you?

25            MR. ZEIDENBERG:  And I'm not -- it's been a while.  Is

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE                2221

1    that a combined hour?

2            THE COURT:  (Nods head up and down).

3            MR. ZEIDENBERG:  30 and 30?

4            THE COURT:  Right.  And I don't allow a 50/50, but I

5    would allow like a 75/25.  In other words, they spend

6    75 percent of the hour on the front end and 25 percent of the

7    hour on the back end.

8            MR. ZEIDENBERG:  Okay.

9            THE COURT:  That's a combined.  Does that work for

10   you, because you'd have a whole 60 minutes?

11           MR. ZEIDENBERG:  I would think hopefully less, but

12   that -- an hour I appreciate at least so we have that peace of

13   mind, but I hopefully will be less.

14           THE COURT:  Okay.  And I don't know what you plan to

15   do in terms of demonstratives, audio, video, but if you need

16   any help with that, I assume you're going to be using your own

17   computers if you're going to do any of that during the

18   closings.  And you can let Ms. Wiest know.

19           Is there a countdown clock in here?

20           COURTROOM DEPUTY:  Yes, there is.

21           THE COURT:  Because this is an appeals courtroom.  But

22   anyway, you can let her know what kind of warning you want on

23   yours and yours.  Okay?  And I'll be -- like I said, I'll be

24   reading almost all of the instructions before closing so you

25   can publish those or use them as you like.

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1      Okay.  So what -- what exhibit were you wanting to

2  talk about?

3      MR. ZEIDENBERG:  Your Honor, this is in regard to

4  1429.

5      THE COURT:  1429.

6      MR. ZEIDENBERG:  Here, I've got an extra copy.

7      THE COURT:  Okay.  Thank you.

8      MR. ZEIDENBERG:  Your Honor, this is -- just to

9  refresh, Your Honor, when we -- Susannah Scott was the

10  University of California-Berkeley professor who sent an --

11  basically identical e-mails to the DOE and to the NSF.  There

12  was an objection on hearsay grounds, but then Viviane Schwartz

13  testified and so we were able to show it to Viviane Schwartz

14  and she said, yes, I was on that e-mail.  And as far as the NSF

15  goes, you didn't want me to sort of quote the e-mail but to do

16  it as a hypothetical, which I did.

17      But this was an e-mail we're trying to introduce.  We,

18  frankly, didn't want to bother Robert McCabe to fly out here

19  from the NSF to say I received the e-mail and I sent the e-mail

20  or whatever.

21      What we are trying to introduce is the advice that she

22  asked for, and when I say the response, it's really the lack of

23  response.  There was no "We need to see the contract, we need

24  to investigate, we need to ask more questions"; it was just,

25  you know, "Well, thanks, we'll look into it.  We'll let you

1    know if we need anything else."

2          At the end on September 25th there was a response that

3    they -- they had checked and there was -- "No specific NSF

4    guidance has been released regarding response to the

5    disclosures of the type you sent."

6          Now, the government has objected on hearsay grounds,

7    and I'll let them make that argument.  But our point is not

8    that this is necessarily true, that there are -- no specific

9    NSF guidance has been released, it's that there was a lack of

10   response.  It goes to materiality; that these types of issues

11   simply were not on the radar screen of the NSF.

12         So we think it's -- it's relevant to materiality

13   regardless of whether the response was actually truthful or

14   not.

15         THE COURT:  Are you -- is Ms. Scott coming to testify?

16         MR. ZEIDENBERG:  No, she is not.

17         THE COURT:  Who are you offering this through?

18         MR. ZEIDENBERG:  Well, we were offering it because it

19   was a NSF document that I believe -- you know, from the

20   e-mails, they are what they are.  I don't think the government

21   is questioning what it is.  It's a question of -- I think -- I

22   don't want to speak for the government on the basis of their

23   objection, I believe it's on hearsay grounds.

24         THE COURT:  So you're wanting me to revisit my prior

25   ruling where I said I wasn't going to admit this?

1    MR. ZEIDENBERG:  I don't believe we were -- we sought

2    to admit it.  Well, I'll have to ask Mr. Dearington.

3    MR. DEARINGTON:  Your Honor, I think where we left it

4    was you advised the defense that you'd want to hear from Mr.

5    McCabe himself.  And our understanding is the government was

6    not going to object on authenticity grounds and have him fly

7    out here for that purpose but was objecting on hearsay grounds.

8    And given the cost and having talked to the NSF,

9    Doctor Tao was willing to release Doctor McCabe from his

10   subpoena if the only reason he was going to fly out here was

11   hearsay, because we felt pretty confident about the basis of

12   getting this in since it's not hearsay in our view, something

13   like saying we're not -- "It doesn't give us pause."

14   So while we understand the court's guidance on that,

15   we decided we would, for multiple reasons, allow Doctor McCabe

16   not to have to come today, given his schedule, to testify and

17   given our confidence in the argument that this isn't actually

18   being introduced for the truth of the matter asserted but

19   rather for the materiality point that Mr. Zeidenberg pointed

20   to.

21   THE COURT:  So I assume that what -- so it's an e-mail

22   string that starts with Ms. Emig from NSF to Susannah Scott and

23   others, including Mr. McCabe.  No, actually it starts with

24   Susannah Scott sending this e-mail to a number of people at

25   NSF, and then Anne Emig from NSF responds, "I'll let you know

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1    if we need any additional information."  And then ends with Mr.

2    McCabe responding that, "We've checked with Tim Patten, our

3    deputy division director and ethics officer, and he noted that

4    no specific NSF guidance has been released regarding response

5    to disclosures of the type you sent.  There is nothing in the

6    disclosure that would give us pause with respect to the awards

7    that you have through our programs."

8         So you're saying that you're not offering that for the

9    truth of the matter asserted by Mr. McCabe?

10        MR. DEARINGTON:  Correct, Your Honor.  And if Your

11   Honor has concerns about it, we'd be amenable to redacting the

12   first sentence.  It's really the fact that "there's nothing in

13   the disclosure that would give us pause" is what's most germane

14   to the lack of materiality.

15        THE COURT:  But that's offered for the truth of that

16   statement though; right?  What you've told us doesn't give us

17   pause.  I mean, you're going to want to argue that, look, this

18   is what the NSF -- this is their answer to what that --

19        MR. DEARINGTON:  Well, Your Honor, I guess it's

20   really -- it's kind of a complicated concept, but it's the

21   notion that there wasn't a different response.  And the

22   different response could've been "We need to see that

23   contract," or, "Hold on, we're pausing the grant funding."

24        The lack of any response of concern is really why

25   we're introducing it, not because it actually didn't give them

1    pause.  It's clear it didn't give them pause, whether he says

2    this or not, just from reviewing the response.

3            THE COURT:  All right.  Government?

4            MR. OAKLEY:  Your Honor, we did discuss this Friday

5    and the court ruled that if the defense wanted to bring in Mr.

6    McCabe so that he could testify so that he could be subject to

7    cross examination so that the government could point out the

8    difference between this award that Ms. Scott allegedly obtained

9    versus the defendant's, we could do that.

10           After the court ruled that, yes, Mr. McCabe would need

11   to appear and testify if the defense wanted to seek to admit

12   this, my understanding is NSF was made aware, they were

13   prepared for him to fly out yesterday.  The defense then sent

14   an e-mail saying we've changed our mind or whatever it is, and

15   he's not here.

16           If the court allows this without a witness, the

17   government has no way -- assuming that the court even ruled

18   that the Susannah Scott e-mail was admissible, which we've

19   argued is hearsay, we would have no one to cross examine

20   related to this.  It's hearsay, it's not relevant, it violates

21   Rule 403.

22           THE COURT:  All right.  I'm not going to admit it

23   because although I think -- with Mr. McCabe here, I'd have a

24   different outcome because it's not so much important whether

25   Ms. Scott's hypothetical or -- she's not -- she's saying this

1    is my situation.  Whether or not that's true or not in every

2    respect is not important.  What is important is what -- based

3    on these facts what the NSF's response was.

4          And I -- as I sit here, I can't imagine how this would

5    come in with me telling the jury to disregard NSF's response

6    because it's not offered for the truth of the matter asserted

7    because that's exactly the import of this.  That based on the

8    facts from Ms. -- as articulated by Ms. Scott, the NSF says no

9    pause, nothing we need to do with this.

10         So that is being offered for the truth of the matter

11   asserted, so I don't think this is admissible.

12         Now, I did allow you to pose the hypothetical, and I

13   think -- and I don't remember if it was to Ms. Schwartz or

14   someone -- I guess it would have to be Ms. Schwartz.  And so at

15   least you have an NSF response in that regard, I guess.

16         But I don't -- I don't see how this could not be

17   offered for the truth of the matter asserted.  I mean, it has

18   no relevance otherwise.

19         MR. DEARINGTON:  Your Honor, if I may.  So we've

20   addressed and appreciate the court's ruling on the McCabe

21   response, but Raymond Adomaitis says, as with everyone else,

22   "I'll let you know if we need anything."  That itself we think

23   is certainly not hearsay and also goes to the materiality.

24         So does Thomas Kim, "Thanks for your note.  Let you

25   know if we have any further information needs."

1          So we'd respectfully ask that at least those come in

2    since there's not even a statement being made.  We don't care

3    whether it's true or not they're going to get back to her.  The

4    point is they didn't say, "Stop everything.  You have a

5    Changjiang?"  And that's the point is there's a lack of

6    materiality in that response.

7          THE COURT:  Well, with respect to those two responses,

8    they are sort of non-responses, "We'll get back with you."

9          Now, I can tell the jury don't consider that for the

10   truth of the matter asserted.  I don't think there's anything

11   true really to assert there other than we'll let you know if we

12   need anything else.  We don't know whether they needed anything

13   else.  So it's at least -- there's sort of a -- it leaves

14   everybody hanging.  I mean, I suppose either side could argue

15   it any way they want at that point, but...

16         MR. OAKLEY:  Your Honor, there would be no way for us

17   to cross examine -- if the court just admits this as is,

18   there's no way for us to cross examine anyone based on the fact

19   that Ms. Scott's situation is completely different.  It's

20   hearsay, it's not a statement of a party-opponent.  There is no

21   way to admit this.  If the defense wanted to bring in Mr.

22   McCabe, the court told them that they could do that and they

23   chose not to.

24         MR. DEARINGTON:  Your Honor, now we're talking about a

25   different e-mail.  And there's nothing to cross examine,

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE

1   there's nothing that's being introduced as true that you can

2   now impeach as false.  That's the point; that it's not hearsay,

3   there's nothing that needs to be cross examined here.

4           THE COURT:  Well, I mean, to the extent there are

5   differences in this, the government is -- would be foreclosed

6   from cross examining anybody from NSF.  You know, changing the

7   facts and saying, "Is this the response you would get -- you

8   would give if the response were different" -- I don't know, I

9   think it's problematic because just coming in as it is, nobody

10  can cross examine Ms. Scott, nobody can cross examine anyone

11  from the NSF as to whether they did do any follow-up and if

12  they didn't, why not.  I mean, that is relevant.

13          So I'm not going to allow 1429 in without Mr. McCabe

14  or somebody else who can testify to the response given by NSF.

15          All right.  So I will see you all back at 9:00 and we

16  will finalize the jury instructions, we'll finalize the

17  indictment and how it will read.  And I assume there were no

18  objections to the verdict form, we'll finalize that as well.

19          All right.  9:00.  No matter the outcome of the game

20  tonight, we have to be here at 9:00.

21          All right.  Have a good evening.

22          (Proceedings concluded).

23

24

25

UNCERTIFIED ROUGH DRAFT  -- DO NOT CITE, QUOTE OR FILE          2230

1                              * * *

2

3                    C E R T I F I C A T E

4        I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    December 2, 2022.

8

9                         /s/ Kelli Stewart_____
10                        KELLI STEWART, CSR, RPR, CRR, RMR
                          United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25